# DAVIS GRAHAM & STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

March 12, 2018

Bureau of Land Management
Attn: Mike Robinson
Casper Field Office
2987 Prospector Drive
Casper, Wyoming 82604
WY_CasperMail@blm.gov

Dear Mr. Robinson:

Anadarko Petroleum Corporation, Chesapeake Energy Corporation, Devon Energy Corporation, EOG Resources, Inc., and SM Energy (collectively, "the Operator Group") appreciate the opportunity to submit comments on the Draft Environmental Impact Statement (DEIS) for the Converse County Oil and Gas Project ("Project"), 83 Fed. Reg. 3,767 (Jan. 26, 2018). These comments supplement any individual comments submitted separately by members of the Operator Group (individually "Operator"). The Operators are the Project applicants. The Operators' ability to exercise their valid existing rights within the acreage encompassing the Project (the "Project Area") depends on BLM's issuance of a Final Environmental Impact Statement (FEIS) and Record of Decision (ROD).

## I. Executive Summary

➢ The Project will generate significant economic benefit to the citizens and State of Wyoming.

➢ BLM should adopt the Preferred Alternative and issue a FEIS and ROD before the end of 2018.

➢ Although the Operator Group's Proposed Action includes year-round development in the Project Area, the DEIS does not outline a clear process or mechanism to allow year-round development. The DEIS does not outline how or when BLM may grant exceptions to raptor and greater sage-grouse timing stipulations. BLM should amend the Casper Resource Management Plan (RMP) to waive or modify timing stipulations around raptor nests consistent with the Operator Group's Proposed Action.

➢ The FEIS must highlight the environmental and economic benefits of year-round development.

➢ BLM must correct the DEIS to reflect current national and Departmental policies, particularly Department policies related to compensatory mitigation.

➢ The FEIS must recognize BLM is reviewing its RMP amendments for the greater sage-grouse and allow for management of greater sage-grouse that is consistent with the

March 12, 2018
Page 2

Wyoming Core Area Strategy. Additionally, BLM must update the DEIS to incorporate the State of Wyoming Core Area Version 4 maps.

➢ The DEIS must recognize the limits of BLM's authority on nonfederal lands.

➢ BLM must manage historic trails in accordance with the National Historic Preservation Act (NHPA).

➢ BLM may not label or manage the Pine Ridge area as a "special management area" when the Casper RMP does not designate the Pine Ridge area as such.

➢ BLM must recognize lessees' valid existing rights.

➢ BLM must revise mitigation measures in Chapter 4 and 6 to be technically and economically feasible and consistent with BLM's management authority.

➢ Alternative C must be revised because it contains management measures beyond BLM's authority.

## II.    The Project Will Generate Significant Economic Benefit to the Citizens and State of Wyoming.

BLM should approve the Operator Group's Proposed Action because it will generate significant economic benefit to the citizens and State of Wyoming. These economic benefits cannot be discounted. First, the Project will generate between $5.1 billion and $7.9 billion in severance tax revenues to the State of Wyoming. DEIS, pg. 4.11-36. Of these, between $2.1 billion and $3.3 billion will go to the permanent Wyoming Mineral Trust Fund and between $1.0 billion and $1.5 billion will go to the state's general fund. *Id.* Second, the Project will yield between $8.3 billion and $12.8 billion in federal mineral royalties over its lifetime. DEIS, pg. 4.11-37. Forty nine percent of these royalties will be allocated to the State of Wyoming. *Id.* Between $1.36 billion and $2.09 billion will be distributed to the Wyoming School Foundation. *Id.* Third, between $4.59 billion and $7.07 billion in ad valorem tax revenues will be allocated to Converse County, Converse County school districts, and the Wyoming School Foundation. *Id.* pg. 4.11-38. Fourth, between $760 million and $1.37 billion in sales and use tax revenues will be generated for state, county, and municipal governments. *Id.* pg. 4.11-39. Finally, between $19.9 billion and $30.8 billion in total taxes and royalty revenues will be generated from the Project for public-sector and private royalty owners. *Id.* pg. 4.11-40.

BLM should not deprive the State of Wyoming, the State's public school system, Converse County and adjacent counties, municipal governments, the federal Treasury, and citizens of Wyoming these substantial economic benefits, especially given the relatively low commodity prices over the last several years. Therefore, BLM should approve the Project.

March 12, 2018
Page 3

## III.    BLM Should Adopt the Preferred Alternative.

The Operator Group supports BLM's decision to identify the Operator Group's Proposed Action as the preferred alternative. *See* 40 C.F.R. § 1502.14(e). The Operator Group encourages BLM to select the Proposed Action in its Record of Decision (ROD), after adjusting the environmental analysis in the FEIS as requested herein and appropriately responding to public comment.

## IV.    BLM Must Promptly Issue a FEIS.

The Operator Group encourages BLM to issue a FEIS and ROD that appropriately respond to comments and incorporate any necessary adjustments to the environmental analysis before the end of 2018. To implement Executive Order No. 13,807, "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects," Secretary Zinke has directed BLM to complete each FEIS within one year from the issuance of a Notice of Intent. Secretarial Order No. 3355 § 4(a)(2) (Aug. 31, 2017). The DEIS, however, has already taken 45 months to prepare since release of the Notice of Intent. During this time, the State of Wyoming, Converse County, mineral owners, and the United States have been unable to realize the economic benefits of development of the Project. To be consistent with Secretarial Order No. 3355 and to promote the economic benefits of development, the Operator Group encourages BLM to commit to completing the FEIS and ROD before the end of 2018.

## V.    Key Issues

### A.    The DEIS Does Not Outline a Clear Process or Mechanism to Allow for Year-Round Development.

An essential component to the Operator Group's Proposed Action is the ability to develop year-round by obtaining relief from raptor and greater sage-grouse timing stipulations outside of core areas,[1] but the DEIS does not clearly explain how BLM will programmatically allow for year-round development. The analysis of Alternative B in Chapter 4 of the DEIS clearly contemplates that year-round development will occur and appropriately analyzes the impacts from such development. *See* DEIS at pg. 4.7-6, line 31; pg. 4.9-4, lines 18, 22, 25; pg. 4.9-6, line 28; pg. 4.11-15, line 30; pg. 4.11-17, line 32; pg. 4.11-19, line 28; pg. 4.11-46, line 43; pg. 4.11-47, lines 4, 44; pg. 4.11-48, line 14; pg. 4.14-12, line 22; pg. 4.18-10, lines 42, 48; pg. 4.18-15, line 11; pg. 4.18-27, line 15; pg. 4.18-35, line 18; pg. 4.18-72, line 3; pg. 4.5-4, line 13; pg. 4.7-5; pg. 4.9-4, lines 18–29; pg. 4.11-15, line 30; pg. 4.11-19, lines 27–28; pg. 4.11-46, lines 42–44; pg. 4.11-47, lines 43–45; pg. 4.11-48, lines 1–7, 13–14; pg. 4.14-12, lines 19–22; pg. 4.18-10, lines 42–48; pg. 4.18-11, lines 1–3; pg. 4.18-15, lines 11–13; pg. 4.18-27, lines 13–15; pg. 4.18-35, lines 17–23. The discussion of Alternative B, however, fails to clearly outline the mechanism by which programmatic year-round development can be achieved.

---

[1] The Operator Group does not seek programmatic exceptions to timing stipulations for bald and golden eagles.

March 12, 2018
Page 4

A clear mechanism to facilitate year-round development is critical to efficient development in the Project Area and to reduce impacts to air quality, soils, vegetation, truck traffic, and other resources resulting from adherence to timing stipulations. As reflected by the map below, at least 1,400 nest buffers exist in the project area. Multiple buffers frequently overlap with one another, and siting development outside of buffers often is not feasible, particularly in the northern eastern portions of the Project Area. A modeling exercise conducted by the Operator Group suggests approximately 45 percent of all pads in the Project Area would fall within greater sage-grouse or raptor nest buffers.[2]



Year-round development produces numerous environmental benefits. Year-round development reduces the overall time to drill multiple wells from a single pad which, in turn, reduces the amount of time that well pads remain unreclaimed. Year-round development also eliminates the needs for rigs to move on and off a location when timing stipulations take effect, thus reducing truck traffic and associated air quality impacts. Year-round development also promotes continuous employment and economic returns because timing stipulations cause seasonal swings in activity.

---

[2] To demonstrate the number of well pads potentially impacted by nest buffers across the Project Area, the Operator Group applied a conceptual development scenario of one pad per two sections (i.e., one pad per one 1280-acre drilling and spacing unit) to the overall project area.

March 12, 2018
Page 5

The DEIS, however, does not outline a clear process for year-round development within the Project Area or identify when the circumstances under which BLM will allow year-round development. These omissions create uncertainty for the Operator Group. Further, BLM attempts to impose unnecessary and burdensome limitations on exceptions, such as the requirement for an environmental assessment and the limits on the length of lapses in development.

1.    The DEIS Does Not Define How or When BLM May Grant Exceptions to Timing Stipulations.

The DEIS states that year-round development may be achieved by utilizing BLM's process for exceptions to stipulations that limit activities near raptor nests and greater sage-grouse leks outside of Priority Habitat Management Areas (PHMA). DEIS, pg. 2-25. The DEIS, however, provides no guidance as to: (1) the circumstances in which BLM will grant (or deny) exceptions to seasonal timing stipulations; (2) any measures that BLM expects Operators to adopt in lieu of adhering to timing stipulations; and (3) whether Operators may request and receive exceptions when they submit Applications for Permit to Drill (APDs) or well in advance of the proposed work to be excepted if an APD has already been approved, rather than waiting to request exceptions only two weeks before initiating proposed work as suggested by the Casper RMP, *see* Casper RMP ROD, pg. F-1. The description of the process to obtain exceptions in the DEIS does not give operators the certainty they need to rely on the ability to develop year-round within the Project Area. Furthermore, the requirement that an environmental assessment accompany each exception request will slow the process for obtaining exceptions.

The DEIS's unclear procedures for exceptions are highlighted by breaking down the DEIS's references for exceptions and noting the flaws with each:

➢ **Exceptions may be granted or denied in undefined circumstances, based on undefined criteria.** The DEIS recognizes that exceptions will be granted on a case-by-case basis and also recognizes that exception requests may be denied. *See* DEIS, pgs. 4.18-27, line 16 (stating "[e]xceptions generally would be granted on a case-by-case basis"), 4.18-27, line 20–22; pg. 4.18-60, lines 21–23 (stating "[w]here seasonal wildlife stipulations are required, and exceptions are not available, drilling and completion of wells would be scheduled outside of the stipulation windows"). The DEIS, however, does not specify the circumstances in which exceptions would be granted or denied. *See id.*

➢ **The DEIS does not identify when Operators may submit requests for exceptions.** Onshore Order No. 1 and the Casper RMP contain conflicting direction on the timing of exception requests. Onshore Order No. 1 allows exception requests to be submitted with a Notice of Staking or APD. *See* 72 Fed. Reg. 10,307, 10,337 (Mar. 7, 2007). The Casper RMP, however, directs that "[a]s a general rule," an exception request "should be made within 2 weeks of conducting the proposed work." Casper RMP, F-1. In order to promote certainty, allow for sufficient processing time, and avoid delays in operations, BLM should consider exceptions and approve requests that are submitted with Notices of Staking or APDs or, for previously approved APDs, well in advance of the proposed work to be excepted.

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 6

> **An environmental assessment is unnecessary to obtain an exception.** Each exception request "would require an environmental assessment to be completed that would allow the BLM to analyze the effects of development on wildlife within the site-specific project area." DEIS, pg. 2-25, lines 15–18. This requirement presents an unnecessary regulatory impediment and will cause significant delay in Operators' ability to timely obtain exceptions. The Casper RMP does not contain any requirement that an environmental assessment accompany an exception; in fact, the Casper RMP's suggestion that exception requests be made within two weeks of conducting proposed work would not allow time for the preparation of an environmental assessment. *See* Casper RMP, pgs. F-1 – F-2. Furthermore, given the extensive analysis of the impacts of year-round development in the Project DEIS, additional environmental analysis is unnecessary. *See* 40 C.F.R. § 1502.20 (encouraging agencies to tier to existing environmental analysis). Developing an environmental assessment for one or more exception requests will deter operators from pursuing exception requests, undermine the year-round development proposed as part of the Operator Group's Proposed Action, and unnecessarily duplicate analyses under the National Environmental Policy Act (NEPA).

> **An exception request and environmental assessment must be accompanied by a wildlife monitoring plan.** An "intensive wildlife monitoring plan" would "be developed by the [Operator Group] for BLM review." DEIS, pg. 2-25, lines 20–21. The plan would require monitoring during and possibly after the allowed development and "would include items such as notifications to BLM of when activities begin and end, reports on wildlife monitoring, and any other site-specific information developed under the environmental assessment." *Id.* pg. 2-25, lines 21–24. The DEIS fails to explain how the requirement for a wildlife monitoring plan would interact with the migratory bird conservation plan referenced elsewhere in the DEIS.

> **Operators must implement unspecified avoidance, minimization, and compensatory mitigation measures.** The DEIS states that BLM "would work with the operator" to implement "avoidance, minimization, and compensatory mitigation." DEIS, pg. 2-25, lines 13–15. The DEIS does not identify such measures. It also does not specify whether an operator must implement all three forms of mitigation (avoidance, minimization, and compensation) or whether an operator may implement one form of mitigation, such as minimization, in lieu of another form of mitigation, such as compensatory mitigation. Furthermore, the suggestion that compensatory mitigation may be necessary conflicts with a statement elsewhere in the DEIS that "[d]ue to the temporary nature of disturbance to migratory birds and the application of avoidance and minimization mitigation, OG-committed design features and the additional mitigation measures (Section 4.18.2.3), compensatory mitigation would not be warranted to offset the impacts resulting from development under Alternative B." *Id.* pg. 4.18-35, lines 24–27. Finally, the reference to a requirement of compensatory mitigation is inappropriate in light of changed Departmental policies. *See, e.g.*, Secretarial Order No. 3360 (Dec. 22, 2017).

March 12, 2018
Page 7

> **An Operator must adhere to operational limitations to obtain an exception, regardless of whether the limitations are feasible.** The DEIS explains that "the operator would be required to begin activities at the well pad no less than 30 days before the date of the timing limitation outlined in the [Conditions of Approval], with no break in activities on the well pad longer than 72 hours during the stipulations season." DEIS, pg. 2-25, lines 18–20. First, BLM offers no justification for these limitations, and none exists. BLM offers no explanation for the maximum 72-hour break in activities; 72 hours appears to be entirely arbitrary. Second, this limitation is ambiguous because BLM does not define which "activities" may not cease for more than 72 hours, thus burdening operators to determine the conduct necessary to allow year-round development. These limitations unnecessarily constrain Operators' ability to conduct year-round development and defeat the year-round development proposal in the Operator Group's Proposed Action. Finally, BLM must consider the unintended consequences of unnecessarily constraining breaks in activity; for example, BLM risks personnel safety by creating an incentive to resume activities to avoid losing the ability to continue operations.

> **Operators may develop site-specific migratory bird conservation plans, but the DEIS does not specify (1) when plans will be used or (2) whether the plans may be used to obtain an exception to a raptor stipulation.** The DEIS states that site-specific migratory bird conservation plans "would provide a strategy for assessing impacts, avoiding and minimizing impacts, guiding actions, and planning future impact assessments and actions to conserve raptors and their habitats." DEIS, pg. 4.18-30, lines 11–13. The DEIS, however, ignores one use of the Umbrella Migratory Bird Conservation Plan, if finalized, upon which site-specific plans could be based: to streamline the process of obtaining exceptions from raptor stipulations. The DEIS does not explain when plans will be used or whether they may be used to obtain an exception to a raptor timing stipulation. Further, the DEIS does not explain how the site-specific migratory bird conservation plans will integrate with the wildlife monitoring plans and conservation measures that BLM will require to obtain exceptions to raptor stipulations.

Given the density of raptor nests within the Project Area, *see* DEIS, pg. 3.18-25, fig. 3.18-9, the Operator Group is concerned that the exception process will not provide it with certainty as to how year-round development can proceed efficiently in the Project Area. Because the exception process may not provide the Operator with the relief they need to accommodate year-round development consistent with the Proposed Action, the Operator Group encourages BLM adopt a more durable solution: amendment of the Casper RMP to eliminate raptor timing stipulations within the Project Area and to permanently waive or modify raptor timing stipulations attached to existing leases.

        2.      BLM Should Amend the Casper RMP to Allow Year-Round Development within the Project Area.

An RMP amendment is advantageous to the exception process for several reasons. First, it would not require BLM to consider exception requests on a case-by-case basis, thus reducing the burden of the permitting process on BLM. Second, because BLM would not consider

March 12, 2018
Page 8

exception requests on a case-by-case basis, it would streamline the permitting process and avoid delays to Operators' APDs.  Third, this process eliminates the uncertainties surrounding when and how Operators could obtain relief from raptor stipulations.

The Operator Group maintains that BLM can efficiently amend the Casper RMP because waiving or modifying raptor stipulations only within the Project Area is a narrow amendment. BLM has already issued a Notice of Intent for and conducted public scoping on a proposed RMP amendment.  BLM's Notice of Intent released for the Project specifically notified the public that BLM "may also prepare land-use plan amendments to the Casper Resource Management Plan" and "announc[ed] the beginning of the scoping process to solicit public comments and identify issues."  79 Fed. Reg. 28,538 (May 16, 2014).

Because BLM has properly noticed and scoped an amendment to the Casper RMP, *see* 43 C.F.R. § 1610.2(c), a targeted amendment can be accomplished without additional process before the FEIS is released if BLM analyzes the amendment in an environmental assessment (EA) or in the FEIS itself.  *See* 43 C.F.R. § 1610.5-5; BLM's Land Use Planning Handbook, H-1601 § III(B) (Rel. 1-1693 Mar. 11, 2005).  The Operator Group is willing to discuss with BLM measures that can avoid or minimize any impacts to raptors if necessary to allow BLM to determine the RMP amendment will not have significant impacts.  Furthermore, because Chapter 4 of the DEIS analyzes the impacts of year-round development under Alternative B on a variety of resources, little if any additional analysis is necessary.

The Operator Group also requests that the United States Forest Service (USFS) consider amending the Thunder Basin National Grassland Land and Resource Management Plan (TBNG LRMP) to similarly waive raptor timing stipulations.  In the Notice of Intent for the Project, BLM advised the public that authorization of the Project "may require amendments of the 2007 Casper resource management plan or the 2001 Thunder [Basin] land and resources management plan because resource impacts will likely exceed those analyzed in the existing plans."  79 Fed. Reg. at 28,538.  The Operator Group seeks a discussion with the USFS to assess the feasibility of an amendment and whether it would delay issuance of the ROD.

      B.    <u>The FEIS Must Highlight the Environmental and Economic Benefits of Year-Round Development</u>.

Although the DEIS analyzes the environmental impacts associated with year-round development, it does not adequately disclose and compare the environmental impacts of adhering to raptor stipulations under Alternative C.  Year-round development carries multiple environmental benefits, primarily for two reasons:  the drilling rig does not need to move off the surface location during the stipulation period, and the amount of time to drill all wells from a single location is reduced.  The DEIS, however, incorrectly assumes that application of timing stipulations under Alternative C generally will <u>reduce</u> environmental impacts.  *See* DEIS, pgs. 4.1-35, lines 39–41 ("it is anticipated that the emissions, particularly $PM_{10}$ and $PM_{2.5}$, would be lower than Alternative B due to fewer well pads and less surface disturbance"); pg. 4.2-11, lines 11–12; pg. 4.5-3, lines 23–24 ("The impacts to land use types would be similar to Alternative B except less acreage would be disturbed from activities under Alternative C, resulting in an anticipated

March 12, 2018
Page 9

reduction in impacts."); pg. 4.6-3, lines 36–38; pg. 4.7-5, lines 7–8 ("Noise impacts from Alternative C activities would be similar in type but less in intensity then under Alternative B."); pg. 4.8-3, lines 6–8; pg. 4.9-6, lines 10–13; pg. 4.10-4, lines 11–12; pg. 4.11-45, lines 16–17; pg. 4.14-12, lines 17–18 ("The impacts to vegetation would be similar to Alternative B except 15,400 fewer acres would be disturbed, resulting in less impact."); pg. 4.17-4, lines 20–30; pg. 4.18-15, lines 19–28; pg. 4.18-36, lines 21–22; pg. 4.18-40, lines 4–5, 14–15, 24–25; pg. 4.18-79, lines 23–24 ("Impacts to greater sage-grouse under Alternative C would be similar to those from Alternative B, but the magnitude generally would be less."); pg. 4.18-91, lines 22–23; pg. 5-31, lines 41–43; pg. 5-47, lines 28–29.  The DEIS must recognize that application of timing stipulations under Alternative C will <u>increase</u> impacts to certain resources.

First, application of timing stipulations will increase the amount of time necessary to develop all wells on a given surface location.  Application of timing stipulations requires an Operator to stop development and move a drilling rig off a location.  By allowing year-round development, an Operator does not need to move the drilling rig off the location.  Thus, an Operator can finish operations on a four-well location between six months to a year more quickly than if the Operator adhered to timing stipulations[3]:



---

[3] This scenario is for demonstrative purposes only and may not necessary represent future activity from a single location.

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 10

      The amount of time on a location is further reduced depending on the time of year when an Operator commences development:



**Four-well scenario (November 1 start date)**

- Without Timing Stipulations: 366 days

- With Timing Stipulations Applied: 741 days**

- **Difference between With and Without Timing Stipulations: 375 days**

*4 Well (Nov 1 start)*

Legend:
- Construction
- Drilling
- Completions
- No Activity (TLS in effect)
- Production and Interim Reclamation

*(x-axis: Days — 0, 200, 400, 600, 800)*

*(categories: No TLS, TLS)*

*\*\*Note: Interim reclamation would need to begin in October to November (assumed here) or be pushed until after the timing stipulation period ends in August of the following season.*

      If eight wells are drilled from a single location,[4] development times associated with year-round development are reduced even more; depending on the time of year when development commences, year-round development can reduce the length of development by more than 18 months (567 days).

---

[4] This scenario is for demonstrative purposes only and may not necessary represent future activity from a single location.

March 12, 2018
Page 11

Comparison of heavy and light truck round trips for mobilization/
demobilization for an eight-well pad with and without TLS



Source: Drilling rig move data were obtained from the Converse County Emissions Inventory.

The analysis of Alternative C does not acknowledge the significant environmental benefits of fewer rig moves and substantially reduced development times.  Rather, the DEIS incorrectly assumes that application of timing stipulations under Alternative C will categorically reduce environmental impacts.  The DEIS must be revised to disclose the potential impacts resulting from application of timing stipulations under Alternative C.

Most notable, the DEIS assumes that the same number of wells will be drilled during the 10-year Project timeframe, even though the development time for a given location will be extended by as long as a year on four-well pads and nearly two years for eight-well pads, even though Alternative C would increase the number of eight-well pads in the Project.  *See* DEIS, pg. 2-35, lines 7–10 (stating Alternative C "would provide for drilling the same number of wells (5,000) at the same drilling rate (500 wells per year) as Alternative B").  Because application of timing stipulations significantly increases the length of time necessary to develop a single pad, and because timing stipulations limit access to much of the Project Area for six months of the year, BLM cannot assume that the same number of wells can be drilled at the same rate over a 10-year period under Alternative C as will be drilled under Alternative B.  Although the analysis of socioeconomic impacts notes the increased drilling time, *see id.* pg. 4.11-45, lines 21–22, the analysis of other resources fails to account for increased drilling time.

The DEIS also fails to account for increased impacts resulting from the additional time necessary to develop a single pad.  The additional six to 18 months necessary to develop a well pad delays interim reclamation of the well pad, resulting in an increased potential for erosion.  The DEIS, however, fails to note this potential impact, instead incorrectly stating that "Alternative C would have very similar impacts to Alternative B . . . ."  *See* DEIS, pg. 4.12-5, lines 9–7.  The increased time for interim reclamation also can increase air impacts, specifically $PM_{10}$ emissions, yet the DEIS did not disclose this impact. *See id.* pg. 4.1-35 (anticipating $PM_{10}$ emissions "would be lower than Alternative B due to fewer well pads and less surface disturbance").  Furthermore,

March 12, 2018
Page 12

the increased time for reclamation slows the return of vegetative cover.  The DEIS does not acknowledge this impact, instead stating that because of timing stipulations, "indirect disturbance of vegetation due to fugitive dust emissions would be <u>less</u> than under Alternative B because development would not occur on a year-round basis."  DEIS, pg. 4.14-12, lines 21–22.

Application of timing stipulations also requires Operators to move drilling rigs on and off locations during the season when activities are limited.  Moving drilling rigs throughout the Project Area carries its own set of impacts.  Most significant, moving drilling rigs increases truck traffic.  The Operator Group estimates that application of timing limitations to development of an eight-well pad will increase truck traffic three-fold:



Comparison of heavy and light truck round trips for mobilization/demobilization for an eight-well pad with and without TLS

Source: Drilling rig move data were obtained from the Converse County Emissions Inventory.

The DEIS, however, projects the exact same number of rig moves and truck trips under Alternative C as under Alternative B.  *Compare* DEIS, pg. 4.13-3, tbl. 4.13-1 *with id.* pg. 4.13-9, tbl. 4.13-6 (assuming 10 light truck and 300 heavy truck trips per well).  Elsewhere, the DEIS predicts that "[t]he overall number of rig mobilization and demobilization activities would be lower under Alternative C than under Alternative B."  *Id.* pg. 4.11-45, lines 16–17.  The DEIS must be revised to account for the increased truck traffic resulting from application of timing stipulations.  Furthermore, because truck traffic trips will increase, Alternative C presents a risk of increased vehicle emissions and fugitive dust resulting in higher emissions of $PM_{10}$ and $PM_{2.5}$, but the DEIS does not disclose such potential impacts.  *See id.* pg. 4.1-35, lines 30–42.  Increased truck traffic also can increase noise levels, yet the DEIS describes noise impacts under Alternative C as "similar in type but less in intensity than under Alternative B."  *Id.* pg. 4.7-5, lines 15–16.  Increased truck traffic could also increase the risks of traffic accidents and accidental releases, yet the DEIS also does not discuss these risks.  *See id.* pgs. 4.4-8 – 4.4-9.  Finally, the DEIS does not account for potential disruptions to wildlife resulting from increased traffic.  *See id.* pgs. 4.18-18, lines 30–35; pg. 4.18-35, lines 29–38.

March 12, 2018
Page 13

The increased duration of development and the increased rig moves result in impacts that must be acknowledged and analyzed in the DEIS. Accordingly, BLM must, at a minimum, revise the following discussions of Alternative C in the DEIS to account for these increased impacts: rate of development (section 2.5.1); air quality (section 4.1.3); noise (section 4.7-5); soils (section 4.12.3); vegetation (section 4.14.3); truck traffic (section 4.13.3); and wildlife (section 4.18.3).

C.    BLM Must Correct the DEIS to Reflect Current National and Departmental Policies.

The DEIS either directly or indirectly refers to outdated policies of the Executive, the Department of the Interior, and BLM. First, the DEIS does not acknowledge Solicitor Opinion No. M-37050 (Dec. 22, 2017), in which the Solicitor of the Interior determined that the MBTA does not prohibit incidental take of migratory birds. Second, the DEIS references numerous policies and guidance related to mitigation that have been rescinded or superseded or both. Specifically, the DEIS references BLM's Manual MS-1794 (Rel. 1-1782 Dec. 22, 2016), BLM Handbook H-1794-1 (Rel. 1-1783 Dec. 22, 2016), and Departmental Manual 600 DM 6. *See* DEIS, pg. 4.2-10, lines 40–42; pg. 4.2-13, lines 11–14; pg. 6-1, lines 32–24; pg. 6-2, lines 8–12; pg. 6-6, lines 7–8, 26–27; pg. 6-7, lines 6–7. This guidance, however, was rescinded via Secretarial Order No. 3360 § 4(a) (Dec. 22, 2017). Furthermore, Secretarial Order No. 3360 directed BLM to revise and reissue Instruction Memorandum No. 2008-204 (Sept. 30, 2008). BLM must update the DEIS to remove references to these outdated policies and guidance. Finally, the DEIS must acknowledge that BLM and USFS are reviewing their land use plan amendments that impose regulatory measures related to the greater sage-grouse. *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (BLM Notice of Intent); 82 Fed. Reg. 50,666 (Nov. 1, 2017) (errata); 82 Fed. Reg. 55,346 (Nov. 21, 2017).

D.    BLM Should Analyze Management of Greater Sage-Grouse that is Consistent with the Wyoming Core Area Strategy.

As BLM is aware, BLM and USFS are evaluating whether and how to adjust their greater sage-grouse management measures through amendments to RMPs and land use plans, including the Casper RMP and TBNG LRMP. *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (BLM Notice of Intent); 82 Fed. Reg. 50,666 (Nov. 1, 2017) (errata); 82 Fed. Reg. 55,346 (Nov. 21, 2017). The State of Wyoming has consistently requested that BLM adjust its management of greater sage-grouse to be consistent with the State's Core Area Strategy. *See* Wyoming Exec. Order No. 2015-4 (July 29, 2015).

The Project FEIS and ROD must account for potential changes to the federal regulatory framework for management greater sage-grouse. If BLM and USFS have completed their land use planning processes prior to issuance of the Project ROD, the ROD must incorporate any new management measures. Alternatively, if the Project ROD is issued before BLM and USFS have completed their land use planning processes, the ROD should provide the flexibility for BLM to manage the Project under the terms of any new land use plan amendments without the need for additional programmatic NEPA review of the Project.

March 12, 2018
Page 14

        To achieve these goals, the Operator Group requests that the FEIS analyze and adopt an adaptive management strategy to allow BLM to manage the Project in accordance with the outcome of the ongoing land use plan revisions.  In anticipation of potential changes to federal sage-grouse management, the Operator Group recommends that the adaptive management strategy allow for adherence to the Wyoming Core Area Strategy, which the U.S. Fish and Wildlife Service (USFWS) concluded is an "effective regulatory mechanism for conservation" and a key reason that the greater sage-grouse does not warrant protection under the Endangered Species Act.  80 Fed. Reg. 59,858, 59,882 (Oct. 2, 2015).  This adaptive management strategy should include the following management measures that are included in Wyoming Executive Order No. 2015-4 but not in the 2015 amendments to the Casper RMP ("9-Plan RMPA")[5] and USFS Greater Sage-Grouse ROD[6]:

> ➢ Allowing construction activities outside of seasonal restrictions without an exception or waiver.  *Compare* Wyoming Exec. Order No. 2015-4, Attachment B, at 6 (July 29, 2015) *with* 9-Plan RMPA, MD SSS 5, MD SSS 6, at 36; USFS Greater Sage-Grouse ROD at 99.

> ➢ Allowing the placement of semi-permanent structures in no surface occupancy areas around occupied leks.  *Compare* Wyoming Exec. Order No. 2015-4, Attachment B, at 6 *with* 9-Plan RMPA at 102 (definition of surface occupancy).

> ➢ Excepting production and maintenance activities from seasonal restrictions on activities.  *See* Wyoming Exec. Order No. 2015-4, Attachment B, at 6.

> ➢ Excluding no surface occupancy areas around occupied leks from seasonal restrictions on activities.  *Compare* Wyoming Exec. Order No.2015-4, Attachment B, at 6 *with* 9-Plan RMPA, MD SSS 7–9, at 36; USFS Greater Sage-Grouse ROD at 99.

> ➢ Limiting noise only within Core Population Areas.  *See* Wyoming Exec. Order No. 2015-4, Attachment B, at 8.

> ➢ Providing for compensatory mitigation only when an activity does not comply with prescribed avoidance and minimization measures.  Compensatory mitigation should be determined in accordance with the State of Wyoming's Mitigation Framework and should not require a net conservation gain.  *See* Wyoming Exec. Order No. 2015-4 § 7; Wyoming Revised Greater Sage-Grouse Compensatory Mitigation Framework at 1 (July 10, 2017).

> ➢ Requiring coordination with permitting agencies for monitoring and data collection if adaptive management triggers are met, rather than requiring the development of adaptive

---

[5] BLM Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region including the Greater Sage-Grouse Sub-Regions of: Lewistown, North Dakota, Northwest Colorado and Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, and Worland, Attachment 4, BLM Casper, Kemmerer, Newcastle, Pinedale, Rawlins, and Rock Springs Field Offices Approved Resource Management Plan Amendment for Greater Sage-Grouse (2015).
[6] USFS Greater Sage-Grouse Record of Decision for Northwest Colorado & Wyoming (2015)

March 12, 2018
Page 15

management plans or the deferment of discretionary authorizations.  *See* Wyoming Exec. Order No. 2015-4, Attachment B, at 10.

      E.      <u>BLM Must Utilize Updated Greater Sage-Grouse Core Area Maps.</u>

The DEIS's analysis of impacts to greater sage-grouse and proposed management of greater sage-grouse relies on the State of Wyoming's Core Area Version 3 maps.  Furthermore, the DEIS would impose operational restrictions in PHMA that reflects the Version 3 maps. *See* DEIS, pg. 4.18-46, lines 37–39; pgs. 3.18-48 (throughout); pg. 3.18-49, fig. 3.18-12; pg. 3.18-52, tbls. 3.18-7, 3.18-9; pg. 4.18-46, lines 37–39; pg. 4.18-47, tbl. 4.18-20; pg. 4.18-49, fig. 4.18-1; pg. 4.18-62, lines 17–18, tbl. 4.18-26; pg. 4.18-74, lines 3–8; pg. 4.18-74, fig. 4.18-2; pg. 5-69, tbl. 5.3-34; pg. 6-30, lines 2–8.  The State of Wyoming, however, has updated these maps and replaced them with Version 4 maps.  In October 2017, the Wyoming BLM State Office issued a maintenance action updating RMPs across Wyoming with the Version 4 map.  *See* Plan Maintenance, Change #1 (Oct. 27, 2017).[7]  This action took place well in advance of the publication of the DEIS and should have been addressed by BLM.

BLM must remove references to and any analysis that relies on the Version 3 Map and instead wholly rely on the Version 4 map.  Further, any greater sage-grouse management measures that the governing RMP prescribes for PHMAs may only be applied in PHMAs that exactly correlate with Version 4 maps.

      F.      <u>BLM Must Recognize the Limits of Its Authority on Nonfederal Lands.</u>

Because BLM and USFS manage a combined total of only ten percent of lands within the Project Area, BLM must recognize the limits of its authority over surface resources.  First, BLM must recognize its limited authority to impose surface management stipulations when well pads are located off of the federal lease and on non-federal surface, as described in BLM Instruction Memorandum No. 2009-078 (Feb. 20, 2009) (commonly known as the "fee-fee-fed" situation).  In this situation, the federal lessee's ability to use the surface is based on its contractual relationship with the surface owner rather than the federal oil and gas lease.  Thus, BLM has recognized that, in this situation, it lacks authority to require mitigation of impacts to surface resources.  *See id.*  Indeed, the BLM Wyoming State Office has set aside conditions of approval attached to APDs after finding they were not necessary to comply with a statutory or regulatory mandate.  *See* Decision, SDR No. WY-2011-010, at 9 (Feb. 25, 2011).

BLM's limited authority to mitigate surface impacts when well pads are located off federal leases and on non-federal surface is particularly significant to the Project.  Presumably, given the amount of horizontal development proposed for the Project, a significant number of the 1,500 proposed wells will be located on off-lease pads on private surface.  BLM therefore must recognize that it lacks authority to impose mitigation measures to surface resources.  In particular, BLM must recognize that, given the interpretation of the Migratory Bird Treaty Act (MBTA) in Solicitor

---

[7] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/36597/130805/159604/RMP_Maint_2017-001_Sage-Grouse_Core_V4.pdf.

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 16

Opinion M-37050 (Dec. 22, 2017), it has no statutory obligation to prevent incidental take of migratory birds and, therefore, may not impose conditions of approval on APDs to prevent such take.

Second, for purposes of complying with NEPA, the Endangered Species Act (ESA), and NHPA, BLM's review of impacts from well pads located off federal leases on nonfederal surface is narrow if the well pad already exists or if the well pad was not placed to access a federal lease. Instruction Memorandum No. 2009-078 directs that, in such situations, NEPA analysis is limited to discussion of the environmental effects of the downhole operations, such as protection of aquifers and subsurface resources. Further, "[c]ultural, non-special status species, or other related surveys are typically not required unless the act of drilling, completing, and/or operating the Federal well(s) has the potential to have an impact on the protected resource." *Id.* Additionally, NEPA review "may be limited to a discussion of environmental effects of the downhole operations to be approved . . . and the effects related to drilling and operating the well, such as the effect of noise generated by the Federal well drilling." *Id.* BLM "is not required to consider a range of alternatives in siting surface facilities because the actual location (and, therefore, more specific, site-determined effects), is not based on the Federal wells." *Id.* BLM must recognize the narrow scope of its review under NEPA, ESA, and NHPA.

Finally, BLM must recognize the limits of its authority to manage for surface resources on split-estate lands within the boundaries of federal leases. The Associate Solicitor of the Interior has recognized that "[a]ctivities and use of the surface are not subject to planning requirements under the Federal Land Policy and Management Act (FLPMA), in part because BLM has no authority over use of the surface by the surface owner." Memorandum from Associate Solicitor, Energy & Resources, to BLM Director 2 (April 1, 1988). BLM need only consider the impacts of development under NEPA, NHPA, and ESA. *Id.* Similarly, in the FEIS accompanying the Casper Proposed RMP, BLM stated, "The private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner." Casper FEIS/Proposed RMP, pg. A-3. Because 90 percent of the Project Area is privately owned surface, BLM must recognize that it may not condition APDs to achieve surface management goals.

The Operator Group requests that BLM include a discussion in Chapter 1 of the FEIS recognizing that BLM lacks authority to mitigate surface impacts from well pads located off federal leases on non-federal surface. This discussion should also recognize BLM's limited authority over split-estate lands.

Additionally, BLM should revise the following statements in the DEIS to recognize BLM's limited authority to manage activities on non-federal surface:

➢ Section 1.4.1, Page 1-5, Lines 8–11: This section suggests that site-specific environmental review would always occur prior to development, stating:

> Although the RODs may approve the proposed oil and gas wellfield development on a conceptual basis, a site specific environmental review of

March 12, 2018
Page 17

areas proposed for surface disturbance and sub-surface mineral extraction
would be completed to determine the final location of facilities based on
environmental considerations.

This statement is misleading because it ignores that not all authorizations require
environmental review.  BLM may utilize categorical exclusions set forth in the Section 390
of the Energy Policy Act of 2005 to permit five statutorily-specified activities without
preparation of an environmental assessment or EIS.[8]  *See* 42 U.S.C. § 15942.  Additionally,
even if site-specific review is required, such review frequently will have a narrow scope
because of the substantial amount of private land in the Project Area and because oil and
gas wells in the Project Area will be drilled horizontally.  As explained in BLM Instruction
Memorandum No. 2009-078 (Feb. 20, 2009), NEPA does not require that BLM analyze
the surface impacts of the development of a well pad located off-lease on non-federal
surface, except when the well pad is placed to access the federal mineral estate.  Rather, in
these situations, BLM's review is limited to the downhole impacts from development.
Accordingly, BLM should revise this language to state:

> Although the RODs may approve the proposed oil and gas wellfield
> development on a conceptual basis, a site specific ~~environmental~~ review of
> areas proposed for surface disturbance and sub-surface mineral extraction
> would be completed <u>only to the extent required by NEPA</u> ~~to determine the~~
> ~~final location of facilities based on environmental considerations~~.

➢ Section 1.5, Page 1-6, Lines 9–14:  This section states:

> Where wells are proposed to be located on private land directly above
> private minerals but would penetrate and produce from federal mineral
> estate (i.e., in a fee-fee-fed scenario; WO IM 2009-078), BLM and USFS
> authority to regulate and/or mitigate impacts for surface resources is
> severely limited to compliance only with required federal statutes beyond
> NEPA.

This language does not fully capture the limited nature of BLM's NEPA review of, and
authority to impose, mitigation on wells drilled from pads located off the federal lease on
private surface (i.e., fee-fee-fed scenario).  This language should be revised to outline
BLM's NEPA obligations for, and authority to mitigate impacts from, wells drilled from

---

[8] These activities are: (1) individual surface disturbances of less than five acres so long as the total surface disturbance
on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to NEPA has been
previously completed; (2) drilling an oil and gas well at a location or well pad site at which drilling has occurred
previously within five years prior to the date of spudding the well; (3) drilling an oil or gas well within a developed
field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such
drilling as a reasonably foreseeable activity, so long as such plan or document was approved within five years prior to
the date of spudding the well; (4) placement of a pipeline in an approved right-of-way corridor, so long as the corridor
was approved within five years prior to the date of placement of the pipeline; and (5) maintenance of a minor activity,
other than any construction or major renovation of a building or facility.  42 U.S.C. § 15942(b)(1)–(5).

March 12, 2018
Page 18

off-lease pads on private surface, as explained above.  Furthermore, this section should note that Instruction Memorandum No. 2009-078 is currently being reviewed and revised by BLM; the FEIS must fully account for any revisions to the Instruction Memorandum. In practice, BLM has appeared to overreach in its application of NEPA and exercise of authority toward wells drilled from off-lease pads on private surface.  Revisions to Instruction Memorandum No. 2009-078 are intended to provide clarity and reduce overreach.

➢ Section 6.2.1, Page 6-4, Lines 19–20:  This section states, "Resources within the CCPA to be spatially and temporally avoided include the following: . . . ."  The FEIS must expressly recognize that BLM may only impose these avoidance measures where it has the authority to do so and that BLM may not impose these avoidance measures on off-lease, non-federal surface ("fee-fee-fed" scenario).  *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

➢ Section 6.5, Page 6-22, Lines 36–40:  This section states, "The Converse County Oil and Gas EIS establishes mitigation measures in addition to the regulations, goals and objectives, BMPs, and OG-committed design features to reduce or eliminate impacts to the resources analyzed in Chapter 4.0.  The following is a summary of proposed mitigation measures by resource."  The FEIS must expressly recognize that BLM may only impose these mitigation measures where it has the authority to do so and that BLM may not impose these mitigation measures on off-lease, non-federal surface ("fee-fee-fed" scenario).  *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

G.    BLM Must Manage Trails in Accordance with the National Historic Preservation Act.

The DEIS inappropriately attempts to manage impacts to the historic trails within the Project Area.  Most significant, the DEIS attempts to impose a requirement that Operators provide compensatory mitigation to offset impacts to historic trails.  Page 6-28, line 44, of the DEIS states that impacts to the setting along contributing segments of historic trails may require compensatory mitigation.  Section 6.6.2.1 then outlines potential compensatory mitigation strategies for impacts to trails.  Additionally, Alternative B calls for the development and implementation of mitigation measures to reduce adverse impacts to historic trails; such mitigation measures would be developed with BLM or USFS, the State Historic Preservation Officer (SHPO), tribes and other interested parties.  *See* DEIS, pg. 4.2-8, lines 33–35.  Alternative B also states that "[c]ompensatory mitigation would be warranted for residual impacts to historic trails because historic trails are single resources, and impacts to specific segments would affect the integrity and [National Register of Historic Places] eligibility of the trail as a whole."  *Id.* pg. 4.2-10, lines 38–40; *see also id.* pg. 4.2-8, lines 33–35.

First, BLM's requirement to provide compensatory mitigation to offset impacts to trails is inconsistent with the Casper RMP.  BLM's decision to authorize the Project must conform to the Casper RMP.  43 C.F.R. § 1610.5-3.  The Casper RMP, however, does not contain any requirement for compensatory mitigation to offset impacts to trails.  *See* Casper RMP at 2-47 – 2-48.  Because

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 19

a requirement for compensatory mitigation does not conform to the Casper RMP, BLM must remove it from the FEIS.

Second, BLM may not rely on the NEPA process to manage impacts to historic trails or require compensatory mitigation to offset impacts to trails from the Project. To the extent BLM seeks to manage impacts to trails, section 106 of the National Historic Preservation Act provides the appropriate legal mechanism to avoid, minimize and, if appropriate, mitigate impacts to historic properties such as trails or their segments that are eligible for inclusion on the National Register of Historic Places. *See* 54 U.S.C. § 306108; 36 C.F.R. part 800.

Third, the DEIS's statement that mitigation measures would be developed to offset impacts to trails is inconsistent with the Casper RMP. The Casper RMP directs that the viewshed along segments that do not contribute to eligibility for the National Register of Historic Places (NRHP) would be managed as Visual Resource Management (VRM) Class III. *See id.* at 2-48. BLM may allow "moderate" changes to the characteristic landscape in areas managed as Class III; activities in Class III-managed areas may attract attention and should repeat the basic elements found in the predominant natural features of the characteristic landscape. BLM Manual 8431 – Visual Contrast Rating, appx. 2 (Rel. 8-30 Jan. 17, 1986). Because VRM Class III management contemplates impacts to the landscape, compensatory mitigation is unnecessary.

Finally, the DEIS inappropriately treats all trails as comparable resources with comparable management designations. In fact, the three primary trails within the Project Area have different designations. Child's Cutoff has been designated as a segment of the California National Historic Trail; further, the National Park Service is conducting a feasibility study to determine whether Child's Cutoff should be designated as a segment of the Oregon National Historic Trail. DEIS, pg. 3.2-18. The Bozeman Trail is eligible overall for the NRHP. *Id.* pg. 3.2-19. The DEIS does not disclose whether the Rock Creek to Fort Fetterman Stage Route has been evaluated for eligibility on the NRHP. *See id.* pg. 3.2-19. The DEIS also discloses that segments of other trails, including the Overland Trail and Yellowstone Highway, run through the Project Area. *Id.*

BLM cannot impose a uniform requirement of compensatory mitigation for impacts to all trails within the Project Area because each is managed under a different standard. Child's Cutoff is managed in accordance with BLM Manual 6280, which prescribes specific analysis that BLM must undertake in NEPA documents. *See* BLM Manual MS-6280, Management of National Scenic and Historic Trails and Trails under Study or Recommended as Suitable for Congressional Designation 1-18 – 1-19 (Rel. 6-139 Sept. 14, 2012). Impacts to the Bozeman Trail must be evaluated through the section 106 process under the NHPA because the Bozeman Trail is eligible for the NRHP. *See* 36 C.F.R. part 800; BLM Manual 8110 – Identifying and Evaluating Cultural Resources § .33C1b (Rel. 8-73 Dec. 3, 2004). To the extent other trails are not eligible for the NRHP, they may not be evaluated through the section 106 process. *See* 36 C.F.R. § 800.1 (explaining purposes of identifying, assessing effects to, and resolving adverse effects to historic properties). Given these different management directions, BLM's attempt to impose a uniform requirement of compensatory mitigation to all trails impacted by the Project is inappropriate. For all of these reasons, the BLM must remove the proposals to require compensatory mitigation in Section 6.6.2.1 and under Alternative B of the DEIS.

March 12, 2018
Page 20

     H.    <u>BLM May Not Treat the Pine Ridge Area as a "Special Management Area."</u>

    BLM inappropriately treats the Pine Ridge area as a "special management area." *See* DEIS, pg. 2-39, lines 4–10. The Casper RMP prescribes one management action for the Pine Ridge area: procedures for cultural resources surveys in the Pine Ridge area. *See* Casper RMP, pg. 2-30. This single management action does not transform the Pine Ridge area. The DEIS, however, suggests the opposite, characterizing the Pine Ridge area as the "Pine Ridge Special Management Area." DEIS, pg. 2-41, fig. 2.5-1. The DEIS also specifies that tribal consultation will occur for activities within the Pine Ridge area. *Id.* pg. 4.2-12, lines 10–24; pg. 4.11-51, lines 6–10. BLM should revise the discussions of the Pine Ridge area in the DEIS to clarify that it is not a special management area and is not afforded any substantive protections under the Casper RMP.

     I.    <u>Valid Existing Rights</u>

     1.    BLM Must Recognize Lessees' Valid Existing Rights.

    Oil and gas project approval, including a large project approval such as the Project approval contemplated in the DEIS, is an implementation-level decision by BLM under FLPMA and is subject to FLPMA's provisions. The authority conferred in FLPMA, in turn, is expressly made subject to valid existing rights. *See* Pub. L. No. 94–579, § 701(h), 90 Stat. 2743, f2786, reprinted in 43 U.S.C. § 1701, historical note. An implementation-level programmatic EIS prepared to analyze a large oil and gas project is likewise subject to existing rights. *See Colo. Envtl. Coal.,* 165 IBLA 221, 228 (2005). The DEIS, FEIS, and ROD cannot defeat or materially restrain Operators' valid existing rights to develop their leases through conditions of approval or other means. *See id.* (citing *Colo. Envtl. Coal.*, 135 IBLA 356, 360 (1996), *aff'd*, *Colo. Envtl. Coal. v. Bureau of Land Mgmt.*, 932 F.Supp. 1247 (D.Colo. 1996); *Mitchell Energy Corp.*, 68 IBLA 219, 224 (1982) (citing Solicitor's Opinion, M-36910, 88 Interior Dec. 908, 913 (1981)); BLM Manual 1601 – Land Use Planning, 1601.06.G (Rel. 1-1666 11/22/00) ("All decisions made in land use plans, and subsequent implementation decisions, will be subject to valid existing rights. This includes, but is not limited to, valid existing rights associated with oil and gas leases. . . .").

    Federal courts have interpreted the phrase "valid existing rights" to mean that federal agencies cannot impose restrictions that make development on existing leases either uneconomic or unprofitable. *See Utah v. Andrus*, 486 F. Supp. 995, 1011 (D. Utah 1979); *see also Conner v. Burford*, 84 F.2d 1441, 1449-50 (9th Cir. 1988). If BLM issues a federal oil and gas lease without No Surface Occupancy stipulations, then, absent a nondiscretionary statutory prohibition against development, BLM cannot completely deny development on the leasehold. *Nat'l Wildlife Fed'n*, 150 IBLA 385, 403 (1999). Only Congress has the right to completely prohibit development once a lease has been issued. *W. Colo. Cong.*, 130 IBLA 244, 248 (1994).

    Furthermore, BLM may not impose requirements on operators that are inconsistent with lease rights. *See, e.g.*, 43 C.F.R. § 3101.1-2 (stating that measures are consistent with lease rights provided they do not require relocation of proposed operations by more than 200 meters, require that operations be sited off the leasehold, or prohibit new surface disturbance in excess of 60 days in any year). BLM cannot, for example, impose conditions that are inconsistent with Operators'

March 12, 2018
Page 21

existing, contractual lease rights, and BLM cannot restrict operations to the point that economic development on a lease is precluded. *Sierra Club v. Hodel*, 848 F.2d 1068, 1087-88 (10th Cir. 1988) (upholding BLM interpretation of duty not to impair wilderness study areas as not allowing BLM to prohibit a road improvement on a R.S. 2477 right of way grant), *overruled on other grounds*, *Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992); *Colo. Envtl. Coal.*, 165 IBLA 221, 228 (2005) (determining that an RMP may not impose restrictions on the exercise of existing oil and gas leases that defeat or materially restrain existing rights); *Colo. Open Space Council*, 73 IBLA 226, 229 (1983) (holding that regulation of existing oil and gas leases may not "unreasonably interfere" with the rights previously conveyed in such leases).

BLM often cites the Interior Board of Land Appeals' *Yates* decision for the proposition that the agency can modify existing leases by imposing conditions of approval on APDs. *Yates Petroleum Corp.*, 176 IBLA 144 (2008). The *Yates* decision does not stand for the proposition that BLM can impose conditions of approval whenever it deems necessary or in broad programmatic documents such as the Draft EIS. Rather, in *Yates*, the IBLA merely affirmed the imposition of an additional condition of approval based on site-specific information including recent and directly applicable scientific research. *Yates*, 176 IBLA at 157; *see William P. Maycock*, 177 IBLA 1, 16-17 (2009). The *Yates* decision does not authorize BLM to ignore relevant lease terms or BLM's regulation at 43 C.F.R. § 3101.1-2. Further, BLM must recall that it cannot impose new, unreasonable mitigation requirements on existing leases. Courts have recognized that once BLM has issued an oil and gas lease conveying the right to access and develop the leasehold, BLM cannot later impose unreasonable mitigation measures that take away those rights. *See Conner v. Burford*, 84 F.2d at 1449-50; 43 C.F.R. § 3101.1-2 (BLM can impose only "reasonable mitigation measures . . . to minimize adverse impacts . . . to the extent consistent with lease rights granted").

In its FEIS and ROD, BLM should clearly state that an oil and gas lease is a contract between the federal government and the lessee, that the lessee has certain rights thereunder, and that neither the ROD nor any decisions implementing the ROD will limit, restrain, or unreasonably interfere with these rights. BLM must also state that it will only apply reasonable measures through conditions of approval or otherwise if such measures appear in the terms and provisions of Operators' original leases or if an Operator has otherwise agreed to such measures.

BLM must also clearly acknowledge in the FEIS and ROD that it must recognize Operators' existing contractual rights and may not impose unreasonable restrictions on development, whether through conditions of approval or otherwise. It is well established that federal oil and gas leases are contracts that cannot be unilaterally modified by BLM. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 620 (2000) (recognizing that federal oil and gas leases are contracts and that the federal government's breach of lessees' right to explore for and develop oil and gas entitles lessees to refunds); *Oxy USA, Inc. v. Babbitt*, 268 F.3d 1001, 1006-7 (10th Cir. 2001) (noting that the Tenth Circuit has long held that federal oil and gas leases are contracts), *rev'd on other grounds*, *BP America Production Co. v. Burton*, 549 U.S. 84 (2006).

March 12, 2018
Page 22

After BLM accepts the bid and the lessee fully pays for the lease, a contract exists between the lessee and BLM based solely on those terms and conditions identified at the lease sale.  *See, e.g.*, *Coastal States Energy Co.*, 80 IBLA 274, 279 (1984); BLM Manual MS-3120 – Competitive Leases, § 3120.64.A (Rel. 3-337, 2/18/13) ("A properly signed bid on a BLM-approved lease bid form constitutes a legally binding lease offer and acceptance of a lease, including all terms and conditions of the lease.").  The unilateral addition of new terms by BLM, through the addition of unreasonable conditions of approval or otherwise, is a breach of this contract and violates "the equal opportunity for all bidders to compete on a common basis for leases."  *See Anadarko Prod. Co.*, 66 IBLA 174, 176 (1982), *aff'd*, Civ. No. 82-1278C (D. N.M. 1983).  BLM must acknowledge Operators' contractual rights in the FEIS and ROD and ensure any future decisions implementing the ROD do not unilaterally alter the original terms and conditions of the Operators' leases.

       2.       BLM Must Recognize Valid Existing Rights in Greater Sage-Grouse Core Areas.

As drafted, the DEIS suggests that oil and gas development could not occur in greater sage-grouse core areas in which surface disturbance caps have been exceeded.  For example, the DEIS provides:

> ➢ Page 4.18-63, lines 2–4: "[D]evelopment could be approved on a site-specific basis consistent with the DDCT process if found to be under the 5 percent cap."

> ➢ Page 4.18-66, lines 6–7:  "Based on existing disturbance in DDCT assessment areas that already exceed 5 percent disturbance for four of the five PHMAs, new surface disturbance could only be considered within the M Creek PHMA."

> ➢ Page 4.18-74, lines 20–21:  "Due to the current 5 percent disturbance cap being exceeded, further surface disturbance would be prohibited in three of the PHMAs (Douglas, North Glenrock, and Thunder Basin)."

> ➢ Page 4.18-79, lines 29–31:  "Under Alternative C, existing disturbance in DDCT assessment areas already exceeds 5 percent disturbance for three of the five PHMAs and no new surface disturbance would be considered within the Bill and M Creek PHMAs."

> ➢ Page 4.18-84, lines 22–23:  "Compensatory mitigation would not be warranted for greater sage-grouse under Alternative C because disturbance would be prohibited within PHMA."

Although the development in core areas is not a specific element of the Proposed Action, the DEIS essentially forecloses the possibility that such development could occur where disturbance caps have been exceeded.  If a PHMA contains oil and gas leases, this outcome would essentially extinguish this lease right.

March 12, 2018
Page 23

In the FEIS, BLM must recognize that the Wyoming Core Area Strategy, as well as the 9-Plan RMPA, provides mechanisms for disturbance in core areas above surface disturbance and density caps where necessary to honor valid existing rights. *See* Wyoming Exec. Order No. 2015-4, Attachment B, pg. 4; 9-Plan RMPA, pgs. 23, 34 (MD SSS 2). In the FEIS, BLM must revise the statements listed above to specifically acknowledge that development may be permitted in accordance with the Core Area Strategy.

## VI.    Proposed Mitigation Measures in Chapters 4 and 6

Chapters 4 and 6 of the DEIS include proposed mitigation measures intended to benefit a variety of resources. The Operator Group offers comments on Chapters 4 and 6 and the associated mitigation measures:

A.    <u>BLM Policies Promoting Landscape-Scale and Compensatory Mitigation Have Been Withdrawn.</u>

The introduction to Chapter 6 of the DEIS makes clear that the purpose of Chapter 6 is to guide the use of compensatory mitigation as part of a larger effort to promote landscape-scale mitigation. BLM, Departmental, and national policies related to compensatory and landscape-scale mitigation, however, have been withdrawn. Both Secretarial Order No. 3330, Improving Mitigation Policies and Practices of the Department of the Interior (Oct. 31, 2013), and the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015) ("Presidential Memorandum"), promoted the use of landscape-scale mitigation. At the direction of these policies, the Department of the Interior's Landscape-Scale Mitigation Policy Manual 600 DM 6 (2015), and the BLM Mitigation Manual MS-1794 (2016) and Handbook H-1794-1 (2016) were developed. All of these policies, however, have been revoked or rescinded. Executive Order 13783 revoked the Presidential Memorandum. Executive Order 13783, § 3(a)(iii), 82 Fed. Reg. 16,093 (Mar. 31, 2017). Similarly, Secretarial Order No. 3349 (Mar. 29, 2017) revoked Secretarial Order No. 3330, while Secretarial Order No. 3360 (Dec. 22, 2017) rescinded Manual 600 DM 6 and BLM's Mitigation Manual and Handbook.

Although the Operator Group recognizes that the CEQ regulations require agencies to analyze "appropriate" mitigation in an EIS, *see* 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1508.20, BLM must revise Chapters 4 and 6 to remove the emphasis on compensatory mitigation. BLM cannot require compensatory mitigation as part of the Project ROD. Although compensatory mitigation may be appropriate in certain circumstances, BLM should identify appropriate mitigation in consultation with the federal lessee or operator. Furthermore, BLM cannot require compensatory mitigation whenever it determines that impacts cannot be "adequately" minimized. *See* DEIS, pg. 6-6, lines 25–26. BLM may authorize land use activities that impact the public lands, even significantly, as long as the impacts do not result in unnecessary or undue degradation. *See* 43 U.S.C. § 1732(b). Moreover, BLM may not reinterpret its existing RMPs to require compensatory mitigation when the concept of compensatory mitigation was not disclosed to the public. *See id.* pg. 6-6, lines 32–33 ("When impacts that exceed RMP thresholds cannot be avoided

March 12, 2018
Page 24

or adequately minimized to an acceptable degree, compensatory mitigation may be necessary").
The Final EIS must recognize this limitation.

BLM instead must analyze any compensatory mitigation under the direction of Instruction
Memorandum No. 2008-204 (Sept. 30, 2008), which it must revise and reissue. *See* Secretarial
Order 3360 § 4(c) (Dec. 22, 2017).  Though it has not yet been revised, this guidance does not
require mitigation but identifies circumstances when compensatory mitigation may be warranted.
It provides (emphasis added):

> There <u>may</u> be a need for offsite mitigation when:
>
> - Impacts of the proposal cannot be mitigated to an acceptable level onsite;
>   <u>and</u>
>
> - It is expected that the proposed land use authorization as submitted would
>   not be in compliance with law or regulations or consistent with land use
>   plan decisions or other important resource objectives.

Furthermore, though not yet revised, Instruction Memorandum No. 2008-204 cautions that
"[o]ffsite mitigation is <u>not to become the default resource mitigation practice</u> for projects permitted
by the BLM" (emphasis added).  Rather, it directs that "[o]ffsite mitigation is a <u>supplemental</u>
mitigation practice identified on a <u>case-by-case basis</u> and must be based on the need to address
important resource issues that cannot be acceptably mitigated onsite" (emphasis added).  BLM
must review and revise the compensatory mitigation measures in the DEIS to ensure compliance
with this guidance.

Additionally, because Secretarial Order No. 3330 (Oct. 31, 2013), the Presidential
Memorandum, the Department of the Interior's Landscape-Scale Mitigation Policy Manual 600
DM 6 (2015), the BLM Mitigation Manual MS-1794, and BLM Handbook H-1794-1 have been
revoked or rescinded by Executive Order No. 13783 and Secretarial Order Nos. 3349 and 3360,
BLM must also eliminate references to "no net loss" and "net gain" from the Final EIS.  *See* DEIS,
pg. 6-6, lines 27–28.  In sum, in the FEIS, BLM must ensure that all references to compensatory
mitigation are consistent with current policy and that all references to withdrawn or outdated
policies have been removed.

B.    <u>Applicability of Mitigation Measures</u>

The FEIS must expressly state that BLM may only impose the mitigation measures listed
in Chapters 4 and 6 where it has the authority to do so and that BLM may not impose these
mitigation measures on off-lease, non-federal surface ("fee-fee-fed" scenario).  *See* Instruction
Memorandum No. 2009-078 (Feb. 20, 2009).

March 12, 2018
Page 25

      C.      <u>Compensatory Mitigation for Greater Sage-Grouse</u>

The Operator Group agrees with the statement on page 6-30, line 16, that mitigation will be calculated to comply with Wyoming Executive Order No. 2015-4. The Operator Group encourages BLM's management of greater sage-grouse and, particularly, any compensatory mitigation to align with Wyoming Executive Order No. 0215-4.

Furthermore, the discussion in Section 6.2.2.2, pg. 6-30, that outlines compensatory mitigation for greater sage-grouse should recognize that not all project-level impacts must be mitigated. For example, the 9-Plan RMPA Regional Mitigation Guidelines provide:

> Not all adverse or unavoidable impacts can or must be fully mitigated, either onsite or outside the area of impact. A certain level of adverse or unavoidable impact may be acceptable, and the BLM will identify these impacts during the NEPA analysis and acknowledge them in the decision document (such as a decision record or record of decision).

9-Plan RMPA, app. F, pg. 218. The FEIS should recognize and provide for the possibility that not all impacts to greater sage-grouse or its habitat require mitigation.

      D.      <u>Specific Mitigation Measures in Chapters 4 and 6</u>

      1.      AQ-1 (Sections 4.1-35, 6.5.1)

If located on BLM surface estate, gas plants and compressor stations will be located at least 2,000 meters from residences or other occupied dwellings.

BLM must revise AQ-1 to clearly state it does not apply to well pads. The Operator Group also notes that a 500-foot setback for well pads is already required by Wyoming Oil and Gas Conservation Commission rules.

      2.      CR-1 (Sections 4.2.2.4, 6.5.2)

A qualified professional archaeologist will monitor surface disturbing activities during construction in areas that may contain buried cultural materials.

BLM must remove the requirement for an archaeological monitor during construction, for several reasons. The DEIS fails to identify any "areas that may contain buried cultural materials." Rather, the DEIS states that "distribution of recorded sites is spread across the analysis area," thus suggesting that the entire Project Area may contain buried cultural materials. *See* DEIS, pg. 3.2-12. Furthermore, the DEIS fails to identify "cultural materials," a phrase which may cover more materials that "historic properties" that are offered procedural protections through the Section 106 consultation process. *See* 36 C.F.R. § 800.16(l)(1).

No legal justification exists for the monitoring requirement, particularly one that could be interpreted to apply throughout the entire Project Area. BLM's guidance on managing for cultural

March 12, 2018
Page 26

resources does not require or even mention the need for archaeological monitoring during surface disturbing activities. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Rel. 8-72 Dec. 3, 2004); BLM Manual 8140 – Protecting Cultural Resources (Rel. 8-77 Dec. 3, 2004). Furthermore, to the extent BLM anticipates archaeological monitoring may be necessary for a particular activity, BLM should rely on Section 106 consultation to identify where monitoring is necessary; BLM should not attempt to end-run the Section 106 process by imposing monitoring requirements through the NEPA process. Accordingly, BLM lacks any legal or policy basis to require archaeological monitors throughout large portions of the Project Area.

Furthermore, the requirement for monitoring throughout essentially the entire Project Area is unnecessary. Although monitoring may be appropriate if site-specific information, such as a Class III survey, indicates a likelihood that construction activities may disturb a historic property, grave, or funerary object, BLM acts arbitrarily and capriciously by imposing a monitoring requirement through most or all of the Project Area absent site-specific information. BLM estimates that the 1.5 million acre Project Area contains only 1,487 cultural resources that are eligible for the NRHP. *Id.* pg. 4.2-3. Furthermore, BLM estimates the Proposed Action will affect only 52 eligible cultural resources. *Id.* pg. 4.2-7, 4.2-9. Based on the estimated 52,667 acres of surface disturbance that will occur with the Project, *see id.* pg. 2-25, an average of one eligible cultural resource may be affected with every 1,012 acres of surface disturbance (or 84 well pads). Given that the likelihood of affecting a cultural resource is low, BLM lacks any factual basis to require archaeological monitors throughout the entire Project Area.

Finally, BLM should not arbitrarily impose mitigation measures that require access by third parties to private surface, particularly when 90 percent of the Project Area includes non-federal surface. Moreover, BLM lacks authority to require access to private surface for a monitoring requirement imposed through the NEPA process. BLM has only asserted it may request that an Operator access private surface for the purposes of complying with the NHPA and ESA. *See* Onshore Order No. 1, 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007). Here, because BLM is not purporting to require monitoring to fulfill its obligations under the NHPA and ESA, the monitoring requirement must be removed from the EIS.

Monitoring imposes costs associated with surface disturbance and, conceivably, the DEIS may require both an archaeological monitor and a tribal monitor for a given activity. *See* DEIS, Mitigation Measure CR-4, pg. 6-23, lines 14–15. Additionally, monitoring creates a risk of delay because construction cannot proceed if a monitor is not available, which is a risk given the number of Operators within the Project Area and possible lack of available monitors. Given that no factual, legal, or policy basis exists for requiring archaeological and tribal monitors, BLM should not impose unnecessary costs and delay on the Operators. Accordingly, the Operator Group requests that BLM remove the requirement for archaeological monitors from the FEIS.

3.    CR-1 (Sections 4.2.2.4, 6.5.2)

A site specific monitoring and discovery plan may be developed for large or complex undertakings or areas known to contain buried cultural sites.

March 12, 2018
Page 27

This requirement is too vague; the phrase "areas known to contain buried cultural sites" could apply to the entire Project Area. Additionally, this requirement should not be included as a mitigation measure in a NEPA document. The Advisory Council on Historic Preservation regulations implementing Section 106 of the NHPA specifically address discoveries of historic properties. *See* 36 C.F.R. § 800.13. BLM should utilize this existing mechanism under the Section 106 process rather than imposing a vague and arbitrary requirement through the NEPA process.

      4.    CR-3 (Sections 4.2.2.4, 6.5.2)

Mandatory training will be provided to all construction personnel and contractors regarding cultural resources and the federal regulations that protect them.

BLM should remove this requirement from the FEIS because it is not customarily included in RODs for oil and gas projects or as a condition of approval attached to individual APDs.

      5.    CR-4 (Sections 4.2.2.4, 6.5.2)

For areas most likely to contain resources of Native American Concern, tribal monitors will monitor sediment-disturbing activities during construction.

BLM must remove the blanket requirement for tribal monitors. First, BLM fails to specify where tribal monitors will be required. The DEIS only provides that tribal monitors will be required in "areas most likely to contain resources of Native American Concern." *Id.* pg. 4.2-10, lines 12–13; pg. 6-23, lines 14-15. The DEIS does not, however, identify the areas "most likely" to contain such resources. Further, the DEIS offers no concrete definition of "resources of Native American Concern," defining it only as "those identified through tribal consultation as being culturally sensitive" and including "Indian Sacred Sites, properties of traditional religious and cultural importance, and [traditional cultural properties]." *Id.* pg. 3.2-20. Similarly, BLM does not distinguish between "sediment-disturbing activities" and "surface disturbing activities." BLM's failure to specify where tribal monitoring would be required will lead to confusion and monitoring throughout significant portions of the Project.

No legal justification exists for the monitoring requirement. BLM's guidance on managing for cultural resources does not require or even mention the need for monitoring during surface disturbing activities. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Rel. 8-72 Dec. 3, 2004); BLM Manual 8140 – Protecting Cultural Resources (Rel. 8-77 Dec. 3, 2004). Furthermore, to the extent BLM anticipates tribal monitoring may be necessary for a particular activity, BLM should rely on the Section 106 consultation to identify where monitoring is necessary; BLM should not attempt to end-run the Section 106 process by imposing monitoring requirements through the NEPA process. Accordingly, BLM lacks any legal or policy basis to require tribal monitors throughout large portions of the Project Area.

Furthermore, the requirement for tribal monitoring potentially throughout large portions of the Project Area is unnecessary. BLM estimates that the 1.5 million acre Project Area contains only 1,495 eligible cultural resources of possible concern to tribes. DEIS, pg. 4.2-3, tbl. 4.2-1.

March 12, 2018
Page 28

BLM anticipates the Proposed Action will affect only 16 eligible cultural resources of possible concern to tribes over the 10-year life of the Project. *Id.* pgs. 4.2-7, 4.2-9. Based on the estimated 52,667 acres of surface disturbance that will occur with the Project, *see id.* pg. 2-25, an average of one eligible cultural resource of possible concern to tribes may be affected with every 3,291 acres of surface disturbance (or 274 well pads). Given that the likelihood of affecting a cultural resource of possible concern to tribes is low, BLM lacks any factual basis to require tribal monitors throughout large portions of the Project Area.

Finally, BLM should not arbitrarily impose mitigation measures that require access by third parties to private surface, particularly when 90 percent of the Project Area includes privately owned surface. Moreover, BLM lacks authority to require access to private surface for a monitoring requirement imposed through the NEPA process. BLM has only asserted it may request that an Operator access private surface for the purposes of complying with the NHPA and ESA. *See* Onshore Order No. 1, 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007). Here, because BLM is not purporting to require monitoring to fulfill its obligations under the NHPA and ESA, the monitoring requirement must be removed from the EIS.

Monitoring imposes costs associated with surface disturbance and, conceivably, the DEIS may require both an archaeological monitor and a tribal monitor for a given activity. Additionally, monitoring creates a risk of delay because construction cannot proceed if a monitor is not available. Tribal monitoring may also present logistical concerns because BLM does not specify which tribe would provide a monitor; conceivably, multiple tribes may have an interest in monitoring the same area. Given that no factual, legal, or policy basis exists for requiring archaeological and tribal monitors, BLM should not impose unnecessary costs and delay on the Operators. Accordingly, the Operator Group requests that BLM remove the requirement for tribal monitors from the FEIS.

6.      PALEO-1 (Section 4.8.2.2, 6.5.8)

On the ground surveys will be conducted by a qualified, permitted BLM consulting paleontologist to determine the presence or absence of paleontological resources in any areas of surface disturbance currently ranked PFYC 3-5 (moderate to high). Recommendations will be made, and the appropriate mitigation and monitoring measures will follow.

The Operator Group strenuously objects to this mitigation measure because it is unconventional, overly broad, and burdensome. Because all but 54,203 acres of the entire 1.5 million acre Project Area are classified as PFYC ranks 3 through 5, *see* DEIS, pg. 3.8-2, tbl. 3.8-1, this mitigation measure effectively would require paleontological surveys throughout the entire Project Area.

Not only is this survey requirement excessive in scope, it is unnecessary. First, paleontological surveys generally are not required to comply with Section 106 of the NHPA. Second, most of the Project area (approximately 90 percent) is PFYC rank 3, *see* DEIS, pg. 4.8-1, line 37, which BLM characterizes as "moderate." *See* Instruction Memorandum No. 2016-124, Attachment 1, unpaginated 3 (July 8, 2016). Specifically, BLM describes "[t]he potential for an

March 12, 2018
Page 29

authorized land use to impact a significant paleontological resource is known to be low-to-moderate." *Id.* In contrast, BLM recommends surveys in PFYC rank 5, where paleontological resources can occur consistently. *Id.* Given the low potential for impacts to paleontological resources throughout most of the Project Area, the DEIS's requirement for paleontological surveys throughout the Project Area is overly broad and unjustified. Accordingly, this mitigation measure must be deleted.

       7.     PALEO-2 (Sections 4.8.2.2, 6.5.8)

The operator will suspend all activities in the vicinity of such discovery until notified to proceed by the BLM AO and will protect the discovery from damage or looting. However, the operator may not be required to suspend all operations if activities can be adjusted to be continued elsewhere or otherwise avoid further impacts to a discovered locality.

We suggest revising the second sentence to: "However, the operator <u>will</u> not be required to suspend all operations if activities can be adjusted to be continued elsewhere or otherwise avoid further impacts to a discovered locality." If further impacts to the discovery can be avoided, suspension of operations should not be required.

       8.     RANGE-4 (Sections 4.9.2.2, 6.5.9)

Where deemed necessary, the oil and gas operator will install signage and gates to notify of trespass and secure privately owned wells.

The Operator Group requests that BLM delete this requirement. First, BLM just revised Onshore Order No. 3, and the regulations that replace Onshore Order No. 3 contain specific signage requirements for federal wells and facilities. *See* 43 C.F.R. § 3162.6(b). Additional signage requirements are unnecessary and conceivably could present conflicts with BLM's regulations. Second, an Operator usually negotiates gates and fencing on private lands with the surface owner and memorializes these agreements in surface use agreements. *See* 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007). BLM should not interfere with existing contractual arrangements with surface owners or attempt to dictate the terms of future surface use agreements, particularly given the amount of privately owned surface within the Project Area.

       9.     SOIL-1 (Sections 4.12.2.2, 6.5.12)

Soils will be analyzed by a qualified soil scientist prior to disturbance to determine soil characteristics, vegetation composition and ground cover, proposed seed mixtures and application rates, and the need for potential soil amendments.

The Operator Group requests that BLM make several revisions to this mitigation measure. First, this requirement is inappropriately applied to privately owned surface because BLM lacks management authority over such lands. *See* Casper FEIS/Proposed RMP, pg. A-3 ("The private surface is not public land; thus, it is not subject to the planning and management requirements of

March 12, 2018
Page 30

the FLPMA. The BLM has no authority over use of the surface by the surface owner.").  BLM should only impose any requirement to collect and analyze soil on federally owned surface. Second, the language stating that soils "will be analyzed by a qualified soil scientist" should be removed.  Instead, BLM should require that, at a minimum, the ecological setting, such as soils, vegetation composition, and ground cover, would be evaluated as part of the reclamation planning process.  This evaluation could be done onsite or by a remote desktop analysis.  Finally, although the mitigation measure requires soil analysis, it does not direct the Operator to submit this analysis and data to BLM or another entity.  Any mitigation measure requiring soil analysis should identify where the analysis should be submitted.

10.    SOIL-3 (Sections 4.12.2.2, 6.5.12)

The upper 12 inches of the soil will be separated, salvaged and used when revegetating disturbed areas.

The Operator Group requests that BLM revise this mitigation measure to read: "All available topsoil, not to exceed 12 inches of topsoil, will be separated, salvaged and used when revegetating disturbed areas.  Operators should use care not to mix soils with limiting characteristics (subsoil) with topsoil."  Often, 12 inches of topsoil is not available in the Project Area; frequently only four to six inches of topsoil are available, and some locations may even have less topsoil.  Topsoil segregation and amount salvaged should be based on individual site characteristics, not arbitrary numbers.  Furthermore, an arbitrary requirement to salvage 12 inches of topsoil renders Mitigation Measure SOIL-1 superfluous; an Operator need not undertake the effort of characterizing soil for reclamation potential when Mitigation Measures SOIL-3 imposes a uniform requirement to salvage 12 inches of topsoil.

11.    TRANS-2 (Sections 4.13.2.2, 6.5.13)

Pipelines will be buried at road crossings. The operator will bury all pipelines crossing county roads to a minimum depth of 5 feet.

The Operator Group requests that BLM revise this Mitigation Measure to clarify that the requirement to bury pipelines only applies to permanent pipelines; BLM should not require temporary pipelines that cross county roads to be buried.

12.    VEG-1 (Sections 4.14.2.4, 6.5.14)

The OG will organize native seed collection efforts to increase native local seed stock.

The Operator Group requests that BLM remove this Mitigation Measure because it is unreasonably onerous and unnecessary.  This requirement raises questions about which entity or entities will be responsible for overseeing quality control, processing, and preservation of seed collection.  Furthermore, the University of Wyoming is already engaged in this effort.  The Operator Group supports the University of Wyoming's existing efforts to collect native seeds and

March 12, 2018
Page 31

other third-party efforts; however, the requirement that the Operator Group independently undertake a similar effort is unnecessary.

      13.    VEG-2 (Sections 4.14.2.4, 6.5.14)

Prior to surface disturbance, the oil and gas operator will arrange for infestations of noxious weeds and invasive plant species to be mapped and submitted to the land manager to develop a treatment plan.

The Operator Group requests that BLM remove this Mitigation Measure because it is unreasonably onerous. Furthermore, this requirement is inappropriate given the amount of privately owned surface within the Project Area over which BLM lacks management authority. *See* Casper FEIS/Proposed RMP, pg. A-3 ("The private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner.").

      14.    SSPS-2 (Sections 4.14.2.4, 6.5.14)

Known individuals and populations of Ute ladies'-tresses orchid and areas identified as suitable habitat through consultation with the USFWS will be avoided. If potential habitat cannot be avoided, two years of surveys in suitable habitat will be required and consultation with USFWS may be necessary.

This Mitigation Measure uses the term "potential habitat" and "suitable habitat" interchangeably; to avoid confusion, the Mitigation Measure should be revised to use the term "suitable habitat" throughout.

      15.    VIS-1 (Sections 4.15.2.2, 6.5.15)

Pinon-juniper and conifer woodlands will be removed only when necessary for construction and operation. If removal is necessary, edges of any openings will be feathered to mimic the natural characteristics of the landscape.

The requirement to retain pinon juniper conflicts with a mitigation measure to benefit the greater sage-grouse identified later in Chapter 6 to "[r]emove pinon and juniper growth that is encroaching into sagebrush habitat." DEIS, pg. 6-30, line 11. BLM must revise either Mitigation Measure VIS-1 or the mitigation measure identified in Chapter 6 so that the two measures provide consistent management directives.

      16.    WLF-2 (Sections 4.18.1.3, 6.5.18)

All stacks, trenches, and other open structures (including water tanks) will be covered with wildlife enclosure covers and/or wildlife escape ramps will be installed in pits, trenches, and tanks to prevent entrapment and/or drowning. Any existing or proposed open poles or fence posts will be covered or filled with sand,

March 12, 2018
Page 32

soil, or gravel to prevent entrapment. "Bird cones" will be installed on open-vent stacks.

The requirement to net pits should be revised to exclude fresh water pits. Additionally, the requirement to install bird cones should be revised to include specific details such as the opening size (one inch or less).

       17.    WLF-3 (Sections 4.18.1.3, 6.5.18)

If reserve pits or other open pits for storage of water or other fluids are used, they will fenced and covered with netting (properly installed, monitored, and maintained).

The requirement to net pits is inappropriate because it is solely aimed at preventing incidental take of migratory birds. In light of the Solicitor's Opinion No. M-37050 (Dec. 22, 2017), in which the Solicitor determined that the MBTA does not prohibit incidental take of migratory birds, a mitigation measure that prevents such incidental take is unnecessary, arbitrary, and beyond BLM's authority. Accordingly, BLM should remove this requirement. At a minimum, this requirement should be modified to exclude fresh water pits, which do not require fencing or netting.

       18.    WLF-5 (Sections 4.18.1.3, 6.5.18)

Noise reduction mufflers will be used on construction equipment, drilling equipment, and other motors/compressor used during drilling and production. Also, temporary walls and distance will be considered for use to reduce sound levels in important habitats.

The requirement that temporary walls "will be considered" to reduce sound levels should be eliminated because it is vague and unjustified. The mitigation measure provides no direction as to when temporary walls should be used or for which "important habitats." Without more guidance, the mitigation measure will be applied unnecessarily and inconsistently. Furthermore, this general requirement may not benefit wildlife. Although activities generating noise may, under certain conditions, have the potential to disrupt normal behavior patterns of wildlife, correlating actual disruption of behavior patterns to noise is extremely uncertain. Further, wildlife may rapidly habituate to noises that they learn do not pose a threat. Temporary walls may also present a collision hazard. Accordingly, BLM should remove this mitigation measure from the FEIS.

       19.    MIG-1 (Sections 4.18.2.3, 6.5.18)

When surface-disturbing activities must occur during the avian breeding season (February 1 to July 31), a qualified biologist will conduct nest searches no more than 7 days prior to these activities. Active nests will be identified and protected in accordance with applicable BLM, USFS, USFWS and/or the WGRD guidance.

March 12, 2018
Page 33

This requirement should be removed. First, the requirement that surveys occur only seven days before surface disturbing activities is overly restrictive and could impede or unnecessarily delay development. Second, the DEIS does not define an "active" nest. Currently, the Casper Field Office will deny requests for exceptions to raptor timing stipulations even though a survey determines the nest is unoccupied. Third, to the extent this mitigation measure is intended to protect raptors, the procedures for and timing of surveys can be refined through the RMP amendment process proposed above. To the extent this mitigation measure is intended to protect migratory birds other than raptors, *see* DEIS, pg. 4.18-33, lines 34–35 ("the following additional mitigation measures would be applied to further minimize impacts to migratory birds and habitats"), this restriction is unnecessary. The Casper RMP does not afford migratory birds other than raptors any heightened management. Furthermore, because the MBTA does not prohibit incidental take of migratory birds, *see* Solicitor Opinion No. M-37050 (Dec. 22, 2017), general mitigation measures to limit impacts to migratory birds are unnecessary.

20.     MIG-1 (Sections 4.18.2.3, 6.5.18)

Disturbance within portions of the CCPA that are identified by federal or state wildlife management agency biologists as located in forest and woodland habitat areas will be avoided. Downed woody debris greater than 3 inches in diameter (not including merchantable timber) will be left in place.

This mitigation measure should be removed. BLM has not justified this measure, which calls for avoidance in areas identified as forest and woodland habitat areas. Additionally, this measure is vague because BLM has not mapped these areas in the DEIS. This measure leaves BLM with significant discretion and may result in the arbitrary identification of areas to be avoided. Identifying avoidance areas after the ROD is signed could prevent an operator from exercising valid existing lease rights.

21.     SSWS-1 (Sections 4.18.3.3, 6.5.18)

A vehicle speed limit of 15 mph will be implemented on roads without posted speed limits in areas of occupied sage-grouse habitat.

This mitigation measure should be modified to increase the speed limit to 25 miles per hour, which is the generally accepted speed limit in the oil field. Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document.

22.     SSWS-2 (Sections 4.18.3.3, 6.5.18)

A Raven Management Plan will be developed that outlines active adaptive management strategies for controlling raven predation and nesting with the CCPA, including the post construction monitoring for ravens and removal of raven nests.

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 34

The Operator Group requests that BLM remove this mitigation measure, for several reasons. First, ravens are not an issue in this part of Wyoming. Indeed, Chapter 3 of the DEIS does not address or even mention impacts of ravens on other wildlife. Second, ravens are protected under the MBTA and therefore cannot be purposefully killed or taken. Third, development of a raven management plan would be an onerous undertaking with no benefit given that ravens are not an issue in this part of Wyoming. Fourth, the removal of raven nests will be ineffective because raptors and ravens can use the same nests. Fifth, BLM's RMP amendments for the greater sage-grouse did not identify the development of a raven management plan as a necessary mitigation measure for the greater sage-grouse. *See generally* Wyoming 9-Plan RMPA. Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document. Finally, this mitigation measure appears to value sage grouse over ravens—that is a subjective value judgment regarding one avian species over another—one special status species (sage grouse) and one an MBTA-protected species (raven).

23.    SSWS-3 (Sections 4.18.3.3, 6.5.18)

Bird diverters/markers will be installed on fencing in PHMA.

The Operator Group requests that BLM remove this mitigation measure. Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document. Furthermore, the mitigation measure does not specify whether markers must be installed on fencing around well pads and facilities or on any fencing in PHMA. Because 90 percent of the surface estate within the Project Area is privately owned, an Operator may lack the authority to mark fences.

24.    SSWS-5 & SSWS-6 (Sections 4.18.3.3, 6.5.18)

A 0.25-mile no surface use buffer will be maintained in any areas identified as occupied special status bat roosts.

Any areas where herbicides would be used for vegetation treatment will be searched for bat roosts prior to spraying and a 0.5 mile no-spray buffer will be established around roost sites.

BLM should either clarify or remove these mitigation measures. Because BLM has not mapped the locations of known special status bat roosts, the Operator Group cannot assess the impacts of these mitigation measures on their operations or assess the feasibility of implementing them. BLM should either provide maps of bat roosts to the Operator Group or remove these requirements.

Additionally, the mitigation measure requiring searches prior to herbicide spraying is overly broad and vague. Because bat roosts are not widespread in the Project Area, BLM should

March 12, 2018
Page 35

limit the areas to be searched to areas that BLM defines as potential bat roosting habitat. Additionally, this measure should specify the size of the area to be searched.

## VII.    BLM Should Update Water Usage Information in the DEIS

The FEIS should account for updated information regarding water usage. The DEIS assumes that approximately 6.5 to 16.0 acre feet of water per well would be required during drilling and completions. DEIS, pg. 2-27, lines 35–36. These figures are based on estimates of water usage the Operator Group provided BLM in 2014. Due to technological and operational changes in development, however, these figures may under-estimate future water usage. The Operator Group anticipates that water usage may be 50 percent to 100 percent more than originally estimated. The increased volumes are due to operators developing with longer lateral wells and using larger water volumes during well completions.

Although the FEIS should account for the additional water volumes and analyze the impact of increased water usage, the Operator Group anticipates the increased volumes will not result in additional impacts that differ in nature or magnitude than the impacts already analyzed in the DEIS because the increased volumes will not materially change the amount of groundwater that will be withdrawn. The Operator Group anticipates relying on additional sources of water, namely through recycling of flowback water and leasing supplemental water from the North Platte River.

Notably, disposal volumes are not expected to increase from the estimates currently within the DEIS as recycling of flowback water is expected to become prevalent in the play. It is also anticipated that recycling of produced water will become economic at some point in the execution of the project but the timing and volume of recycling cannot be predicted. *See* DEIS, pg. 2-27.

Consistent with the increased water volumes, BLM should make the following changes to the DEIS:

- Section 4.16 states: "Groundwater would be the primary source for the proposed development's water needs." DEIS, pg. 4.16-2, line 10. This statement should be changed to account for additional water sources.

- Sections 2.2.2.4 and 2.4.3.4, DEIS pgs. 2-12, 2-27, should state that recycling of flowback water and supplemental water from the North Platte River are additional sources for completion water.

- Sections 2.2.3.4 and 2.4.4.3, DEIS pgs. 2-13, 2-29, should state that recycling of flowback water is anticipated in the play.

Finally, the FEIS must recognize groundwater well permitting is the responsibility of the State Engineer. The DEIS states that "to prevent drawdown of 10 feet or greater reaching any existing water wells, any proposed new well would need to be located 2,000 feet or greater from existing wells." DEIS, app. E, pg. E-78. Potential impacts to surrounding water wells falls under the jurisdiction of the State Engineer. Presenting modeling results is appropriate in an EIS.

March 12, 2018
Page 36

Assessing the impact of noted drawdown effects and potential permitting requirements or mitigations associated with potential drawdown effects are within the jurisdiction of the State Engineer, not BLM.

## VIII. BLM Must Modify Alternative C and the Alternatives Excluded from Detailed Analysis.

BLM must modify Alternative C or add to the alternatives excluded from detailed analysis because it is infeasible and unreasonable. NEPA requires BLM only to consider "reasonable" alternatives, or those that meet the purpose and need of the proposed action and that are technically and economically practical or feasible. 43 C.F.R. § 46.420(b); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027, Question 2a (Mar. 23, 1981). An alternative is reasonable if it is "objectively feasible" and reasonable in light of the agency's objectives. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). Further, the agency's purpose and need for the proposed action necessarily "delimit the universe of the action's reasonable alternatives." *Id.* (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991)). To ensure a project applicant's proposal receives adequate consideration, federal courts and the Department of the Interior's NEPA regulations recognize that when a private party submits a proposal or application, agencies are required to consider the needs and goals of the project applicant in formulating the purpose and need statement. *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72; *Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 608 F.3d 709, 715 (10th Cir. 2010); 43 C.F.R. § 46.420(a)(2). As the United States Supreme Court has explained, "Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action. Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).

With respect to the DEIS, numerous elements of Alternative C are unreasonable because they are infeasible or outside of BLM's authority. If BLM elects to retain any elements of Alternative C that are outside of BLM's authority, *see* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 2b), the FEIS must affirmatively recognize that BLM lacks the authority to adopt these elements.

### A.    BLM May Not Limit the Use of Exceptions as Proposed under Alternative C.

BLM lacks authority to limit approvals of exceptions to timing stipulations as proposed under Alternative C. Under Alternative C, BLM proposes to only allow exceptions to timing stipulations "for short-term uses for emergencies or to finish tasks." DEIS, pg. ES-5, line 36; pg. 2-36 lines 11–12. This limitation is inconsistent with both BLM's regulation governing modifications and waivers and the Casper RMP.

BLM's limitation on the use of exceptions, modifications, and waivers is arbitrary and capricious because it is inconsistent with 43 C.F.R. § 3101.1-4, which allows waivers, which

March 12, 2018
Page 37

include exceptions, (1) "if [BLM] determines that the factors leading to [the stipulation's] inclusion in the lease have changed sufficiently to make the protection provided by the stipulation no longer justified, or (2) "if proposed operations would not cause unacceptable impacts." The two allowable grounds for exceptions identified under Alternative C are far narrower than the grounds identified in 43 C.F.R. § 3101.1-4. BLM cannot read new requirements into its regulations without formally amending them. *See Christensen v. Harris County*, 529 U.S. 576, 6588 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."). Accordingly, BLM's limitation on exceptions under Alternative C is arbitrary and capricious. *See Lewis v. Babbitt*, 998 F.2d 880, 882 (10th Cir. 1993) (stating an agency's interpretation of its regulations will be set aside as arbitrary and capricious if "inconsistent with the regulation's plain meaning") (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir.1993)).

Additionally, the limitation on exceptions is inconsistent with the Casper RMP. The Casper RMP expressly allows exceptions to seasonal restrictions "if the BLM, in consultation with the WGFD, feels that granting an exception would not jeopardize the wildlife population being protected." Casper RMP, pg. F-1. The Casper RMP then details at length the factors BLM should consider when determining whether to grant an exception request. *See id.* pgs. F-1 – F-2. The Casper RMP does not limit exceptions "for short-term uses for emergencies or to finish tasks." BLM cannot impose new exception criteria within the Casper Field Office that do not conform to the Casper RMP. *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a). Accordingly, BLM may not adopt the limitation on exceptions in Alternative C.

Because BLM may not adopt the limitation on exceptions outlined in Alternative C, it is not a reasonable alternative and therefore must be removed from Alternative C as analyzed in the FEIS. If BLM retains this limitation for the purpose of analysis in the FEIS, BLM must acknowledge and consider that it lacks the authority to implement this limitation. *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 2b).

B.    BLM May Not Direct Reclamation on Privately Owned Surface.

Page 2-40, lines 35–38, the DEIS states that on split estate lands, "interim and final reclamation would be required to comply with BLM or USFS policy and land use plan requirements for suitable wildlife habitat (i.e., pre-disturbance baseline conditions)." BLM cannot require reclamation beyond landowner preference and any relevant terms of a surface use agreement. BLM has recognized that "[t]he private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner." Casper FEIS/Proposed RMP, pg. A-3. Indeed, the Gold Book recognizes that revegetation will occur at the direction of the surface owner. *Gold Book* 44 (2007) ("Native perennial species or other plant materials specified by the surface management agency or private surface owner will be used."). Accordingly, this requirement must be removed from Alternative C.

March 12, 2018
Page 38

C.    The Required Design Features Identified in Alternative C Are Infeasible.

The design features identified in Alternative C are infeasible and must be revised.  In particular, the requirements to install oil gathering pipelines, water pipelines, and water recycling for all completion and production activities by year five of the Project are not feasible.  *See* DEIS, pg. ES-5, lines 42–45; pg. 2-39, lines 44–45; pg. 2-40, lines 1–4, 6–7, 20–21.  Although the Operator Group anticipates that water recycling will be used more widely over the lifetime of the Project, use of recycled water for all completion and production activities by year five of the Project is not feasible.  A myriad of factors beyond BLM's and the Operator Group's control, such as technological limitations, economic feasibility, commodity prices, and availability of equipment and crews, prevent the Operator Group from committing to these measures by year five of the Project.

NEPA only requires BLM to analyze "reasonable" alternatives to a proposed action.  40 C.F.R. § 1502.14(a); 43 C.F.R. § 46.415(b).  Reasonable alternatives "that are practical or feasible from the technical and economic standpoint."  Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 2a).  Because the required design features in Alternative C are not feasible, BLM must eliminate them from further detailed study in the FEIS.  *See* 40 C.F.R. § 1502.14(a).

D.    Management of Trails under Alternative C is Inconsistent with the Casper RMP.

Under Alternative C, BLM proposes to prohibit surface development along segments of the Child's Cutoff of the Oregon-California National Historic Trail, the Bozeman Trail, and the Rock Creek to Fort Fetterman Stage Route within the Project Area.  DEIS, pg. 2-38, lines 12–14.  This management is inconsistent with the Casper RMP, which only prohibits surface disturbance on "selected parcels" of the Bozeman Trail; additional parts will be added as inventory and evaluation disclose suitable trail segments.  Casper RMP, pg. 2-48.  Similarly, the Casper RMP only prohibits surface disturbance on selected segments of the Oregon Trail.  *Id.*

BLM's decision to authorize the Project must conform to the Casper RMP.  43 C.F.R. § 1610.5-3.  Accordingly, BLM must remove the proposals to prohibit surface disturbance along segments of the historic trails within the Project Area that do not conform to the Casper RMP from Alternative C.

E.    BLM Must Include Additional Alternatives Considered but Eliminated from Detailed Analysis in Section 2.6.

The Operator Group agrees that BLM appropriately eliminated the alternatives identified in Section 2.6 (pgs. 2-43 – 2-46) from detailed analysis.  BLM's decision to eliminate these alternatives from detail analysis reflects a good-faith effort not to analyze unreasonable, unfeasible, or uneconomic actions.  That said, the Operator Group recommends that BLM add to the list of alternatives considered but eliminated from detailed analysis the proposal in Alternative C to limit exceptions to timing stipulations and the design features required under Alternative C, for the reasons described above.

March 12, 2018
Page 39

## IX.    Comments on Chapter 1

Page 1-6, lines 19–21, identifies *BLM Greater Sage-grouse Land Use Plan Amendment ROD for the Rocky Mountain Region (BLM 2015b) and Approved Resource Management Plan Amendment for the Wyoming Greater Sage-grouse Sub-region (Attachment 4 to BLM 2015b)* as a document containing land use decisions for federal lands and minerals within the Project Area. The FEIS must note that this plan is being reviewed in accordance with Secretarial Order No. 3353 (June 7, 2017) and Instruction Memorandum No. 2018-026 (Dec. 12, 2017).  *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (BLM Notice of Intent); 82 Fed. Reg. 50,666 (Nov. 1, 2017) (errata); 82 Fed. Reg. 55,346 (Nov. 21, 2017).

Additionally, the Operator Group encourages BLM to provide in Chapter 1 more explanation as to the programmatic nature of the EIS for the Project.  As BLM is aware, programmatic NEPA documents will streamline site-specific reviews and approvals once proposed. "[W]hen a 'programmatic EIS is sufficiently detailed, and there is no change in circumstances or departure from the policy in the programmatic EIS, no useful purpose would be served by requiring a site-specific EIS.'"  *S. Utah Wilderness Alliance*, 123 IBLA 302, 307 (1992) (quoting *Ventling v. Bergland*, 479 F. Supp. 174, 180 (D. S.D. 1979)).  Indeed, the CEQ's NEPA regulations "encourage[ ]" tiering of site-specific reviews to broader EISs.  *See* 40 C.F.R. § 1502.20.  BLM should also note that the pace, timing, and amount of development will depend on economics, production success, engineering technology, pricing, rig availability, regulatory approvals, and corporate strategies.

Consistent with the programmatic nature of the Project, the FEIS and ROD also should afford flexibility for implementation of the Project.  As a practical matter, the Project analyzed in the EIS will adapt over time.  The EIS contemplates development over 10 years; during this time, technological changes may cause Operators to adjust how they develop the Project Area. Operators may be able to apply different technology or techniques to achieve the same results with fewer impacts.  Similarly, site-specific conditions may require adjustments to how the Project is implemented for individual approvals.

The FEIS, once issued, will remain valid so long as the impacts of development remain of the same nature and intensity as the impacts analyzed in the EIS.  *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 374 (1989) ("[i]f there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared"); *accord* 40 C.F.R. § 1509.2(c).  The ROD should recognize that implementation of the Project may shift or vary for a variety of reasons, such as technological changes or site-specific conditions, and afford the necessary flexibility to accommodate such advancements consistent with the scope of impacts analyzed in the FEIS.

## X.    Comments on Chapter 2

Page 2-3, tbl. 2.2-1, lists the following Required Design Feature (RDF) for Reclamation Activities as identified in the Wyoming 9-Plan RMPA for the greater sage-grouse: "Address post-

March 12, 2018
Page 40

reclamation management in reclamation plan such that goals and objectives are to enhance or restore sage-grouse habitat." The RDF contained in the Wyoming 9-Plan RMPA contains inconsistent language with respect to reclamation. The excerpted language appears in the list of RDFs that apply in General Greater Sage-Grouse Habitat and requires a reclamation plan with goals and objectives to "enhance or restore" sage-grouse habitat. *See* Wyoming 9-Plan RMPA, at 134. The list of reclamation RDFs, however, contains a requirement to "[a]ddress post-reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs." *Id.* at 131 (emphasis added). BLM must clarify this discrepancy. Furthermore, reclamation plans may appropriately have goals and objectives designed to improve habitat but reclamation plans should not obligate Operators to "restore" habitat where no such habitat previously existed.

Page 2-12, lines 6–7, states that, under all alternatives, "[a]ll flaring would occur at a distance from the wellhead that protects equipment, structures, and personnel." The Operator Group recommends using an API standard to define the appropriate distance from the wellhead. Although the language of the DEIS allows flexibility, it also may lead to greater risk of fire/explosion or other incidents related to flare placement too close to wells and facilities. Using an API standard would encourage safe practices.

Page 2-13, lines 18–19, states, "Some workover operations may be subject to timing restrictions." The Operator requests that BLM clarify which workover operations would be subject to timing restrictions and which timing restrictions would apply. The Operator Group maintains that timing restrictions should not apply to workover operations, particularly timing restrictions for migratory birds and particularly if operators submit requisite notice to BLM (Form 3160-5) and provide additional information if surface disturbance increases during workover operations.

Page 2-36, lines 14 – 20, explains that approximately 15 to 20 percent of lands in the Project Area would be subject to timing limitations on federally managed lands. BLM based this figure on the percentage of federal APDs that were subject to timing limitation stipulations across the nation. The Operator Group disagrees with BLM's methodology. The Operator Group modeled hypothetical well pad locations within several drilling and spacing areas within the Project Area and analyzed their locations in relation to buffers around known raptor and greater sage-grouse leks. Based on this analysis, the Operator Group estimates that 45 percent of well pads within the Project Area will be within raptor nest and greater sage-grouse buffers. Of these well pads, however, many will be located on non-federal surface and located off the federal oil and gas lease (fee-fee-fed); therefore, BLM cannot impose timing limitations stipulations on all wells drilled from these pads. The Operator Group cannot, however, precisely determine the percentage of wells that will be drilled from the 45 percent of well pads within timing stipulation buffers. Nonetheless, to provide more accurate and site-specific information, the Operator Group requests that BLM revise its analysis of the amount of land within the Project Area that would be subject to timing limitation stipulations.

Page 2-39, lines 33–35, states, "At the Notice of Staking/APD stage, the BLM would require all development over Federal mineral estate to be located outside of a 0.25 mile setback from occupied dwellings and structure." This setback is not a term of the Casper RMP. Further,

March 12, 2018
Page 41

it conflicts with the setback required by the Wyoming Oil and Gas Conservation Commission, which currently is 500 feet from an occupied structure. Accordingly, the Operator Group requests this setback requirement be removed from the FEIS.

## XI.    Comments on Chapter 3

### A.    Resources of Native American Concern

Section 3.2.1 uses the term "resources of Native American concern." The Operator Group requests that BLM clarify the resources that it considers "of Native American concern." This term is not a term found in BLM regulations or guidance and is not a term of art associated with cultural resources laws or guidance. The DEIS Glossary also does not define this term. Section 3.2.1 vaguely defines "resources of Native American concern" as resources "identified through tribal consultation as being culturally sensitive." DEIS, pg. 3.2-20, lines 21–22. Section 3.2.1 states that resources of Native American concern "include Indian Sacred Sites, properties of traditional religious and cultural importance, and [traditional cultural properties (TCPs)]." The DEIS is unclear, however, whether "resources of Native American concern" are limited to Indian Sacred Sites, properties of traditional religious and cultural importance, and TCPs, or whether "resource of Native American concern" include any resources identified through consultation as being "culturally sensitive." This distinction is critical to understanding management within the Project Area. For example, Mitigation Measure CR-4 requires tribal monitoring of certain activities within areas most likely to contain "resources of Native American concern" that BLM proposes to include in Sections 4.2.2.4 and 6.5.2. Additionally, the DEIS states that resources of Native American concern will be avoided, minimized, and mitigated. See DEIS, pgs. 4.2-7, lines 10–17.

BLM must define "resources of Native American concern" in the FEIS. Furthermore, BLM should limit the definition of "resources of Native American concern" only to Indian Sacred Sites, properties of traditional religious and cultural importance, and TCPs. The Operator Group understands the practical need for a single term to encompass resources that are concretely defined in existing law or policy. BLM should not, however, define "resources of Native American concern" to include any resources identified through consultation as being "culturally sensitive." Such a definition is highly subjective and, therefore, inappropriate for inclusion in a NEPA document. Accordingly, the Operator Group requests that BLM (1) define "resources of Native American concern" and (2) limit this definition only to Indian Sacred Sites, properties of traditional religious and cultural importance, and TCPs.

### B.    Migratory Birds & Raptors

#### 1.    Migratory Bird Treaty Act

The discussions of the MBTA on page 3.18-18, lines 9–25, and Executive Order No. 13,186, 66 Fed. Reg. 3,853 (Jan. 17, 2001), on page 3.18-18, lines 26–36, must acknowledge Solicitor Opinion No. M-73050 (Dec. 22, 2017), in which the Solicitor of the Interior determined that the MBTA does not prohibit incidental take of migratory birds. In particular, the discussion

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 42

of the definition of "take" as defined by regulation at lines 18–20 must acknowledge the recent Solicitor Opinion.

It is worthwhile to note that Chapter 3 includes an extensive discussion of migratory birds. *See* DEIS, pgs. 3.18-17 – 3.18-36. The Casper RMP, however, only imposes heightened management of raptors and other specific migratory birds, not migratory birds generally.

2.      Definition of "Occupied" Nests

Page 3.18-24, lines 30–33, defines an "occupied" raptor nest as a nest "that is repaired or tended in the current year by a pair of raptors (Romin and Muck 2002). The presence of raptors (adults, eggs, or young), evidence of nest repair or marking, freshly molted feathers or plucked down, or current year whitewash all are considered signs suggesting nest site occupancy."

BLM's use of the term "occupied" in Chapter 3 is inconsistent with the BLM's characterization of raptor nests in Chapter 4 of the DEIS. Throughout Section 4.18 in Chapter 4 of the DEIS, BLM refers to "active" raptor nests rather than "occupied" nests:

➢ Page 4.18-11, line 10: "Additionally, not all raptor nests and greater sage-grouse leks are <u>active</u> every year."

➢ Page 4.18-15, lines 11–13: "This alternative includes the potential for year-round development with regard to timing stipulations for <u>active</u> raptor nests and greater sage-grouse breeding habitat that otherwise provide protection to other seasonal wildlife habitats."

➢ Page 4.18-33, lines 38–39: "<u>Active</u> nests will be identified and protected in accordance with the applicable BLM, USFS, USFWS, and/or the WGFD guidance."

➢ Page 4.18-34, lines 4–5: "Natural areas would be maintained between human activity and around the <u>active</u> nest (landscape buffer)."

➢ Page 4.18-35, lines 18–19: "Alternative B includes the potential for year-round development if exceptions are granted for timing limit stipulations in the vicinity of <u>active</u> raptor nests."

➢ Page 4.18-60, lines 36–37: "Additionally, not all raptor nests and greater sage-grouse leks are <u>active</u> every year."

Additionally, the TBNG LRMP refers to "active" nests. *See* DEIS, pg. 4.18-35, tbl. 4.18-16.

The Operator Group requests that BLM revise the reference to "occupied" nests in Chapter 3 to "active" nests. Additionally, the Operator Group requests that BLM modify the definition set forth in Chapter 3. The Casper RMP does not define "occupied" or "active" raptor nests for the purpose of administering raptor timing stipulations and, therefore, BLM has flexibility to

March 12, 2018
Page 43

reasonably define "active." Through discussions with the United States Fish and Wildlife Service (USFWS) related to the Umbrella Migratory Bird Conservation Plan, the Operator Group understands that the following definitions of "active" and "inactive nests" are acceptable: "a nest that contains viable eggs or chicks is **Active**, while a nest that does not contain viable eggs or chicks is **Inactive**." Given that both the Operator Group and the USFWS have identified an acceptable definition, the Operator Group requests that BLM replace the definition of "occupied" in Chapter 3 of the DEIS with the definitions of "active" and "inactive.

> 3.    Migratory Bird Breeding Seasons

Page 3.18-35, lines 35–40, states:

> Many migratory bird species are sensitive to disturbance during the breeding season. During the breeding season, the integrity of the nest and foraging habitat used by adult birds is crucial to survival of young. In addition, young birds are at greater risk of predation during the nestling period and immediately post-fledging, when their motor skills and foraging behaviors are developing. Consequently, the majority of measures to protect birds involve avoidance of construction activities in the immediate vicinity of nests to reduce potential impacts during the breeding season.

This language does not delineate whether construction and other activities would impact active versus inactive nests. Impacts would only be felt on active nests and language should be amended as such.

> C.    Greater Sage-Grouse

On page 3.18-51, lines 9–13, the DEIS explains that applicants for activities in PHMA must demonstrate the activities will not exceed density and disturbance calculations. Both Wyoming Executive Order No. 2015-7 and the BLM 9-Plan RMPA, however, recognize valid existing rights within core areas and PHMA and provide processes for accommodating Operators' valid existing rights. *See* Wyoming Exec. Order No. 2015-7 (July 29, 2015), attachment B, pg. 4; *see, e.g.*, Wyoming 9-Plan RMPA, pg. 28. The DEIS should make clear that, in some instances, Operators have valid, existing rights that predate core designations under Wyoming Executive Orders or the designation of PHMA that will be honored.

## XII.    Comments on Chapter 4

> A.    Air Quality Impacts

> 1.    Near-Field Modeling: Hazardous Air Pollutants

Regarding the reference to exposure analysis on page 4.1-5, exposure analysis adjustment factors for maximum exposed individual and maximum likely exposure are based on older

March 12, 2018
Page 44

Environmental Protection Agency (EPA) methodology (1993).[9]  Current exposure analyses are generally done with more advanced exposure assessment models, such as the Hazardous Air Pollutant Exposure Model (HAPEM) and the Air Pollutants Exposure Model (APEX).  While the Operator Group does not believe additional modeling is required for this analysis, we recommend noting that more advanced exposure assessment models would likely show lower risks, particularly for sparsely populated areas like the Converse County study area.

Additionally, with respect to the discussion of estimated cancer risks on page 4.1-5, lines 10–15, the Operator Group disagrees with the use of an overly conservative one in a million cancer risk increment in the BLM's Near Field Modeling.  Unlike criteria pollutants, air toxics have no pre-defined risk levels that clearly represent acceptable or unacceptable thresholds.  However, EPA has made case-specific determinations for particular regulatory programs.  EPA's 1989 National Emission Standard for Hazardous Air Pollutants (NESHAP) rule set up a two-step, risk based decision framework for the NESHAP program.  This rule and framework are described in EPA's 1999 Residual Risk Report to Congress.[10]  The rule sets an upper limit of risk acceptability at 100 in a million lifetime cancer risk for the most exposed individual.  EPA's criteria also consider other health and risk factors (e.g., chronic hazard index) to complete an overall judgement on air toxics acceptability.  EPA typically uses a chronic hazard index (maximum concentration/chronic reference exposure level) value of 1 as its impact threshold.  Chronic hazard index values for the Converse County project are well below 1 for all air toxics (formaldehyde is the highest at 0.21).  EPA would generally find a chronic hazard index of less than 1 in conjunction with less than 100 in a million lifetime cancer risk to be an acceptable level of risk.  We thus recommend the use of a 10 in a million benchmark, which is typically used as a benchmark level to warrant considering additional mitigation measures.

Use of a one in a million cancer risk increment appears to the driving factor in BLM's application of a two-kilometer (km) setback distance for the gas plants and compressor stations from residences.  The Operator Group recommends use of a still-conservative ten in a million increment and subsequent reduction in this setback distance.  Please also note that Wyoming Department of Environmental Quality (DEQ) can require changes to stack heights for gas plants and compressor stations during permitting; addressing the issue of cancer risk at the DEQ permitting stage is current standard practice, and is more appropriate then application of a blanket two-km setback distance.  The Operator Group also notes that gas processing plants and compressor stations are not typically located within one mile of each other.  If such a necessity arose during development, site specific permitting and near field modeling would be performed as part of DEQ's New Source Review Program.  This analysis is required prior to start of construction and would include the risk assessment.

---

[9] U.S. Environmental Protection Agency (USEPA). 1993. USEPA, Superfund Standard Default Exposure Factors for Central Tendency and Reasonable Maximum Exposure, Report, Research Triangle Park, North Carolina. Published in Federal Register, U-007-307.18, March 5, 1993.

[10] U.S. Environmental Protection Agency (USEPA). 1999. USEPA, Residual Risk Report to Congress. EPA-453/R-99-001, March 1999. Available online at: https://www.epa.gov/sites/production/files/2013-08/documents/risk_rep.pdf.

March 12, 2018
Page 45

    2.      Emission Control Measures

EPA fuel standards require the use of ULSD fuel construction and reclamation heavy equipment. Please note in Table 4.1-1, Emissions Control Measures, on page 4.1-2 that use of ULSD fuel is a control measure. The BLM does not appear to have included use of ULSD in project emissions inventory or modeling, and the Operator Group requests the document clearly state that use of this fuel during construction and reclamation would reduce Project emissions compared to the scenarios BLM presents in the Draft EIS.

Additionally, BLM must revise Table 4.1-1 on pages 4.1-2 – 4.1-3 to clarify the 98 percent control requirement applies only to pneumatic pumps. Although pneumatic pumps are subject to the 98 percent control requirements, pneumatic controllers are required to be low-bleed or intermittent vent; high-bleed pneumatic controllers are not authorized. The Operators comply with all current DEQ and federal (40 CFR Part 60, Subpart 0000/0000a) requirements, and if regulations are revised for pneumatic controllers in the future, the Operator Group would comply with any new applicable control requirements.

    3.      Near-field Modeling

With respect to the discussion on page 4.1-4, air quality background data used in the near field modeling for evaluating National Ambient Air Quality Standard (NAAQS) compliance should be reviewed for possible exceptional events (e.g., a fire in 2015 affecting the Blizzard Heights monitor, see http://wildfiretoday.com/2015/07/page/15/), as well as any other known events with high $PM_{10}$ and $PM_{2.5}$ measurements (e.g., high wind events). This review is needed to ensure that the $PM_{10}$ and $PM_{2.5}$ background concentrations used in the NAAQS compliance evaluation were accurately characterized and evaluated in the Draft EIS.

With respect to Tables 4.1-7 and 4.1-8 on pages 4.1-19 through 4.1-21, the BLM's analysis considered four, 16 well pads in a one square-mile area. As noted by the Operator Group in our memo entitled "AECOM Question for Operator Groups on Near-field Modeling (OG Response Final)," this is not the typical practice for the operators in Converse County, and represents a highly conservative worst-case scenario for emissions. Such a scenario is especially conservative for construction due to the resources needed to drill this number of wells at the same time.

Modeling this unlikely scenario drives the most problematic analysis of the 24-hr $PM_{10}$ exceedance at three times the standard. There is a similar issue with the 24-hr $PM_{2.5}$ emissions, but this is reduced to three percent over the standard when modeled for two simultaneous 16 well pads. The Operator Group is not requesting a revision to the model protocol, but requests clarification in the Final EIS that this scenario is unlikely to occur and therefore represents a worst case.

    4.      Regional Modeling Results for Criteria Pollutants

Page 4.1-23, lines 22–24, explains that the CMAQ (regional) cumulative modeling predicts exceedance of the 24-hour $PM_{10}$ NAAQS due to using "large fires in the vicinity of the assessment

March 12, 2018
Page 46

area." The language "large fires in the vicinity" implies emissions from these events were included every day in the CMAQ modeling. The Operators Group maintains that the inclusion of wildfire emissions represents a highly conservative assumption. BLM must include additional explanation in the FEIS of its rationale for including wildfire in the regional cumulative emission inventory.

     5.     Mitigation and Mitigation Effectiveness

Page 4.1-35, lines 7–9, states that "[m]itigation measure AQ-1 would reduce the potential health risks associated with activities at gas plants, compressor stations, and well pads." BLM should revise this statement to reflect that AQ-1 does not apply to well pads. The Operator Group also notes that a 500-foot setback is already required by WOGCC rules.

     6.     Climate Change

The Operator Group requests that BLM include the following documents in the administrative record that address climate change trends and impacts, which are also attached to these comments.

> ➢ The Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota;

> ➢ Wyoming Greenhouse Gas Inventory and Reference Case Projections 1990–2020, prepared by the Center for Climate Strategies in 2007 for the Wyoming Department of Environmental Quality;

> ➢ The Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2013 prepared by EPA in 2015;

> ➢ Energy Information Administration's (EIA) Annual Energy Outlook 2006 With Projections to 2030 (Annual Energy Outlook); and

> ➢ Wyoming 9-Plan RMPA FEIS, tbl. 4-4.

    B.    Impacts to Cultural Resources

Page 4.2-7, lines 10 – 13, states that "resources of Native American concern" should be avoided and, if avoidance is not possible, impacts should be mitigated. "Resources of Native American concern" is not properly defined in the DEIS. To the extent "resources of Native American concern" generally refers to cultural resources identified through tribal consultation as of concern, no federal law or policy requires avoidance of or mitigation of impacts to such resources.

Page 4.2-10, lines 38–40, states that visual impacts to historic trails warrant compensatory mitigation "because historic trails are single resources, and impacts to specific segments would affect the integrity and NRHP eligibility of the trail as a whole." This requirement is inconsistent with the Casper RMP and the VRM management of the resource area. The Casper RMP does not

March 12, 2018
Page 47

require mitigation to offset impacts to trails.  *See* Casper RMP, pgs. 2-47 – 2-48.  Furthermore, the Casper RMP directs that the viewshed along segments that do not contribute to NRHP eligibility would be managed as VRM Class III.  *See id.* at 2-48.  BLM may allow "moderate" changes to the characteristics landscape in areas managed as VRM Class III; activities in VRM Class III-managed areas may attract attention and should repeat the basic elements found in the predominant natural features of the characteristic landscape.  BLM Manual 8431 – Visual Contrast Rating, appx. 2 (Rel. 8-30 Jan. 17, 1986).  The Final EIS must eliminate the reference to compensatory mitigation.

C.    Impacts to Migratory Birds

Section 4.18.2.2 repeatedly assumes that exceptions to raptor timing stipulations would adversely impact raptors and raptor populations.  Page 4.18-28, lines 17–23, states:

> If exceptions are granted to timing limitation stipulations for raptor nests, it potentially would disrupt breeding activities and success for species that inhabit the CCPA and increase the likelihood of a take occurring from oil and gas activities. These impacts likely would result in reduced nesting attempts and breeding success for multiple species, reduced recruitment, and incremental reductions in overall local population health and sustainability.  Long-term changes in migratory bird species occurrence and diversity could occur as a result of changes in habitat composition, quality, continuity, and breeding success.

Similarly, page 4.18-60, lines 22–28, states:

> Granting exceptions to timing limit stipulations could adversely impact sensitive wildlife species by causing nest abandonment for raptors or sensitive bird species, sage-grouse nest abandonment or reduced reproductive success, reductions in lek attendance, and displacements from other sensitive seasonal ranges.  These impacts temporarily or permanently would reduce or limit growth of local populations.  In addition, species destruction and abundance would change depending on a variety of factors related to development and reclamation, species-specific tolerance of disturbance, and resilience.

The DEIS overstates the impacts to raptors.  First, to approve an exception, BLM must only demonstrate it will not result it "unacceptable impacts."  43 C.F.R. § 3101.1-4; Instruction Memorandum No. 2008-032 (Nov. 19, 2007), Attachment 1-1.  Second, this analysis ignores that Operators would implement avoidance and minimization measures to mitigate impacts to raptors. At a minimum, the DEIS must mention that exceptions are only granted if risks are minimized and impacts are "unacceptable."  Third, BLM's analysis overstates the impacts associated with granted exceptions because that activity would likely occur in proximity to unoccupied (inactive) nests. Finally, BLM's analysis ignores that impacts to raptors vary.  The USFWS Wyoming Ecological Services Field office website[11] notes:

---

[11] https://www.fws.gov/wyominges/Species/Raptors.php

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 48

Buffer recommendations may be modified on a site-specific or project-specific basis based on field observations and local conditions. The sensitivity of raptors to disturbance may depend on local topography, density of vegetation, and intensity of activities. Additionally, individual birds may be habituated to varying levels of disturbance and human-induced impacts. Modification of protective buffer recommendations may be considered where biologically supported and developed in coordination with the Service's Wyoming Ecological Services Field Office.

Given that the Project Area is a landscape where raptors are already accustomed to a certain level of disturbance, BLM cannot assume that any activities within buffer distances will necessarily adversely impact raptors. Given the significant development within the Powder River Basin, raptors as well as many other species have acclimated to the infrastructure and machinery utilized in an oil and gas development program. In a 1993 helicopter overflight study involving red-tailed hawks (Buteo jamaicensis), Anderson et al.[12] found that nine out of 12 birds flushed at a site with no previous experience with helicopter overflights, versus one out of 12 at a site with a history of exposure. Habituation is inferred, and presumed to reduce, the impact of disturbance. Based on this study and other studies such as Knight and Temple, 1986,[13] it can be assumed that effects resultant from infrastructure presence have likely been mitigated through past exposure and acclimation through the region encompassing oil and gas activity in the Powder River Basin. It is important to note that additional disturbances within already altered environments may be less disruptive than disturbances associated with isolated breeding pairs of raptors in unaltered habitats.

For these reasons, the Operator Group requests that BLM revise the discussions of potential impacts to raptors on pages 4.18-28 and 4.18-60 to recognize that (1) exceptions, by definition, will not cause unacceptable impacts; (2) Operators will implement avoidance and minimization measures; (3) exceptions will be granted near unoccupied or inactive nests; and (4) raptors within the Project Area likely have acclimated to human activity.

BLM must also revise the discussion on page 4.18-28 listed above to remove the suggestions that raptor exceptions will increase the likelihood of "take." In Solicitor Opinion No. M-37050 (Dec. 22, 2017), the Solicitor of the Interior determined that incidental take is not prohibited "take" under the MBTA.

D.    Migratory Bird Conservation Plan

Page 4.18-30, lines 1–13, explains:

The OG is working with the USFWS to develop and Umbrella Migratory Bird Conservation Plan to serve as a programmatic guide for the development of site-specific migratory bird conservation plans within the CCPA. The Umbrella

---

[12] Andersen D. E., O. J. Rongstad, and W. R. Mytton 1993. Response of nesting red-tailed hawks to helicopter overflights. Condor 91(2): 296–299.

[13] Knight. R. L. And S.A. Temple. 1995. Wildlife and Recreationists: Coexistence Through Management. In Wildlife and Recreationists: Coexistence Through Research and Management. R.L. Knight and K.J. Gutzwiller, Eds. Island Press. California. 372 pp.

March 12, 2018
Page 49

Migrations Bird Conservation Plan will address impact identification, avoidance, or minimization for other migratory bird avian species and habitats. The Umbrella Migratory Bird Conservation Plan would be developed as to achieve three primary goals:

- Promote migratory gird conservation throughout the CCPA;

- Allow for greater flexibility for oil and gas activities to occur during the year; and

- Facilitate a collaborative process among Project proponents and regulatory agencies.

The DEIS, however, ignores the purpose of any Umbrella Migratory Bird Conservation Plan, if finalized: to streamline the process of obtaining exceptions from raptor stipulations and allow programmatic year-round development. The DEIS does not explain when site-specific plans may be used or whether they may be used to obtain an exception to a raptor timing stipulation. Finally, BLM's description does not explain that any site-specific migratory bird conservation plans could be used to offset impacts to raptors when exceptions are granted.

     E.     Impacts to Greater Sage-Grouse

     1.     No Information Suggests the Project Will Lead to Lek Abandonment.

The DEIS improperly suggests that approval of the Project under either Alternative B or Alternative C will lead to lek abandonment. The discussion of "residual impacts" under Alternative B on page 4.18-72, lines 6–7, states that "all sage-grouse leks in the [Project Area] would be at risk of being abandoned as development would continue to increase in surrounding areas." Similarly, the discussion of impacts from Alternative C on page 4.18-78, lines 5–6, states that "all sage-grouse leks in the [Project Area] would be at risk of being abandoned as development would continue to increase in surrounding areas." These statements, however, are not supported by the record. There is no evidence that the well pad density contemplated by the Project will cause lek abandonment. BLM's failure to base its conclusions on adequate support in the administrative record renders environmental analysis deficient. *See Backcountry Against Dumps*, 179 IBLA 148, 161–62 (2010) ("Where, in assessing significant impacts, BLM properly relies on the professional opinion of its technical experts concerning matters within the realm of their expertise, which is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the experts.") (citing *Fred E. Payne*, 159 IBLA 69, 77–78 (2003)).

BLM points to the combination of peak male attendance patterns and increased oil and gas activity as justification for its conclusions that leks in the Project Area would be at risk of abandonment. *See* DEIS, pgs. 4.18-72, lines 5–14; pg. 4.18-78, lines 4–6. BLM entirely ignores, however, that development in the Project Area would proceed in accordance with the Wyoming Core Area Strategy. USFWS has determined that the Core Area Strategy "would provide adequate

March 12, 2018
Page 50

protection for sage-grouse and their habitats" in Wyoming if implemented by all land users. State of Wyoming Exec. Order No. 2015-4, pg. 3. Furthermore, when USFWS determined that the greater sage-grouse did not warrant protections under the Endangered Species Act, USFWS stated the Core Area Strategy "has demonstrated its conservation value" and provides "an effective regulatory mechanism for conservation." 80 Fed. Reg. 59,858, 59,882, 59,883 (Oct. 2, 2015). In the DEIS, BLM dismisses the stringent management measures imposed by the Core Area Strategy. Furthermore, BLM dismisses the beneficial elements of the Proposed Action itself that minimize impacts on greater sage-grouse, including use of horizontal wells and multi-well pads. *See id.* at 59,890 (noting that increases in "applications for directional and horizontal drilling permits, which congregate disturbance from multiple wells into one area" represent "a decrease in sage-grouse habitat lost to nonrenewable energy development"). Because BLM offers no support for its conclusion that the Project may cause lek abandonment, and because this conclusion ignores the conservation benefits of the Core Area Strategy, BLM must remove these statements from the FEIS.

Notably, BLM's discussion of Alternative B suggests that exceptions to timing stipulations "within sensitive sage-grouse habitat" could impact lek attendance. *See* DEIS, pg. 4.18-72, lines 10–11. This statement is incorrect because Operators would only seek exceptions to timing stipulations in the two-mile buffer around leks outside of core areas. These areas do not constitute "sensitive sage-grouse habitat." The reference to "sensitive sage-grouse habitat," however, implies that Operators will seek exceptions to greater sage-grouse timing stipulations within core areas when, in fact, the Operator Group has only proposed exceptions outside of core areas. *See* DEIS, pg. 2-25, lines 9–10 ("the operators would request exceptions to timing limitations for raptor nests and greater sage-grouse leks in non-core areas"). Further, any exceptions to greater sage-grouse timing stipulations would occur in accordance with the Core Area Strategy. In the FEIS, BLM must clarify that the Operator Group's Proposed Action only contemplates requests to exceptions to greater sage-grouse timing stipulations outside of core areas.

2.    The DEIS Contains Conflicting Information about Surface Disturbance in PHMA.

Page 4.18-62, lines 26–28, states that the five percent surface disturbance threshold imposed in PHMA is currently exceeded in four out of the five PHMAs in the Project Area. Similarly, page 4.18-66, lines 6–7, assumes that new surface disturbance will only occur in one PHMA because disturbance thresholds have been exceeded in the other four PHMAs in the Project Area. These statements conflict with the analysis under Alternative A, which states that thresholds are currently exceeded in three of the five PHMAs. *See* DEIS, pg. 4.18-46. BLM must review the DEIS's analysis of surface disturbance thresholds in PHMA and ensure it is consistent throughout the document.

Page 4.18-66, lines 6–7, states that BLM will only consider new surface disturbance within the M Creek PHMA. This statement suggests that the Operators will not propose new surface disturbance in other PHMAs. BLM, however, must recognize that Operators may hold valid, existing lease rights in other PHMAs that can only be exercised through new surface disturbance in the other PHMAs. For this reason, both Wyoming Executive Order No. 2015-4, the Wyoming

March 12, 2018
Page 51

9-Plan RMPA, and the USFS Greater Sage-Grouse Plan Amendment all allow new development within PHMA or core areas, subject to certain requirements, in order to recognize valid existing rights. BLM must revise the statement at page 4.18-66, lines 6–7, to recognize that new surface disturbance will be allowed in the other PHMAs, subject to additional requirements.

      F.     Residual Impacts

The Operator Group objects to the DEIS's discussions of "residual impacts" and proposals to mitigate residual impacts to certain resources. The DEIS defines a "residual impact" as an "[u]navoidable adverse impact to a resource that remain (sic) after implementation of mitigation has been applied." DEIS, pg. 9-4. BLM's consideration of residual impacts and proposal to mitigate residual impacts for certain resources, *see* DEIS, pgs. 6-28 – 6-30, is inconsistent with NEPA and FLPMA.

NEPA is a wholly procedural statute that only requires the disclosure and analysis of significant impacts. In *Robertson v. Methow Valley Citizens Council*, the United States Supreme Court explained that if the "adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." 490 U.S. 332, 350–51 (1989). Similarly, the Interior Board of Land Appeals has recognized that "[s]ignificant impacts are expected when an agency prepares an EIS." *Western Exploration Inc.*, 169 IBLA 388, 399 (2006). "NEPA does not bar actions which affect the environment, even adversely. Rather, the process assures that decision-makers are fully apprised of likely effects of alternative courses of action so that selection of an action represents a fully informed decision." *Biodiversity Conservation Alliance*, 174 IBLA 1, 13–14 (2008). Accordingly, NEPA does not require mitigation of residual impacts.

Similarly, FLPMA does not require mitigation of residual impacts. FLPMA only requires BLM to prevent unnecessary or undue degradation to the public lands; FLPMA's language contemplates that some degradation may occur that is necessary and due. *See* 43 U.S.C. § 1732(b). Certainly, FLPMA does not limit BLM from approving actions that merely have residual impacts. Furthermore, the Casper RMP developed in accordance with FLPMA contains no requirement that BLM mitigate residual impacts.

Because residual impacts are consistent with NEPA and FLPMA, the DEIS unnecessarily discusses them. The Operator Group requests that BLM revise the discussions of residual impacts to expressly recognize that BLM may approve the Project with residual impacts and has no obligation to mitigate them.

      G.     Impacts to Range Resources

The DEIS wildly overstates potential impacts to range resources from the Project. The DEIS incorrectly estimates that 5,760 Animal Unit Months (AUMs) would be lost on BLM-administered surface and 1,162 AUMs would be lost on USFS-administered surface. *See* DEIS, pg. 4.9-3, tbl. 4.9-2. The Operator Group attributes the overstatement of impacts to at least two errors. Most significant, the DEIS assumes that the Project will result in 28,801 acres of surface

March 12, 2018
Page 52

disturbance on BLM-administered administered and 4,646 acres of surface disturbance on USFS-administered surface. *See* DEIS, pg. 4.9-3, tbl. 4.9-2. The DEIS explains that BLM reached these estimates "based on the total BLM/USFS allotment acreage multiplied by the total proposed disturbance as a percentage of the CCPA." *Id.* These assumptions do not comport with the limited amount of federally administered surface in the Project Area. Only six percent of the Project Area is BLM-administered surface and four percent of the Project Area is USFS-administered surface. *Id.* pg. 1-1. Presumably, surface disturbance will occur in proportion to surface ownership in the Project Area. If so, then of the 52,667 acres of surface disturbance that BLM anticipates will occur under the Proposed Action,[14] *see id.* pg. 4.9-3, tbl. 4.9-2, only 3,160 acres would be on BLM-administered surface and 2,107 acres would be on USFS-administered surface. Accordingly, the DEIS's determination that the Proposed Action will result in approximately 35,000 of surface disturbance on federally owned surface is grossly inaccurate. Further, using BLM's assumption that the average public acres per permitted AUM is five for BLM-administered surface, *see id.* pg. 3.9-6, tbl. 3.9-1, then 632 AUMs would be lost annually on BLM-administered surface, rather than 5,760 AUMs. This reduction is less than three percent of all AUMs on BLM-administered surface, not 33 percent as the DEIS estimates.[15]

Additionally, the Operator Group disagrees with BLM's inclusion of lands outside the Project Area to assess impacts to range resources. The DEIS examined grazing allotments that "intersect" the Project Area. *See* DEIS, pg. 3.9-5, tbl. 3.9-1. A spot-check of certain allotments reveals, however, that some of the allotments that BLM characterized as "intersecting" the Project Area, in fact, are mostly outside of the Project Area. BLM should only evaluate lands within the Project Area to assess impacts to range resources.

## XIII.    Comments on Chapter 5

### A.    Reclamation

Page 5-65, lines 14–17, states that "reclamation under Alternative C would occur as recommended by the BLM and USFS on federal surface as well as on private surface underlain by federal mineral estate (i.e., approximately 64 percent of the CCPA), increasing the opportunity for migratory bird habitats to return to suitable wildlife habitat." BLM cannot require reclamation beyond landowner preference and any relevant terms of a surface use agreement. BLM has recognized that "[t]he private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner." Casper FEIS/Proposed RMP, pg. A-3. Indeed, the Gold Book recognizes that revegetation will occur at the direction of the surface owner. *Gold Book* 44 (2007) ("Native

---

[14] Notably, the 52,667-acre figure used in section 4.9.2 is surface disturbance that will occur from construction activities. The DEIS notes that an additional 23,928 acres of surface disturbance will occur from operational activities. *See* DEIS, pg. 2-25, tbl. 2.4-1.

[15] The Operator Group has not performed a similar comparison for AUMs on USFS-administered surface because Tables 4.9-1, 4.9-2, and 4.9-3 all appear to use a different average acre per AUM for USFS-administered surface, which creates confusion as to the appropriate value.

March 12, 2018
Page 53

perennial species or other plant materials specified by the surface management agency or private surface owner will be used."). Accordingly, this requirement must be removed from Alternative C.

B.    Migratory Birds

Page 5-65, lines 4–5, states, "Based on the MBTA, additional surveys typically are required in potential or known habitats of migratory birds prior to disturbance during the nesting period." Although a valuable tool used in the pursuit of exception requests and year-round development, surveys are not required under MBTA. Furthermore, because the Solicitor of the Interior has interpreted the MBTA as not prohibiting incidental take of migratory birds, *see* Solicitor Opinion No. M-37050 (Dec. 22, 2017), surveys are not necessary to a violation of the MBTA does not occur. This sentence should be revised.

**XIV.    Comments on Chapter 6**

A.    Compensatory Mitigation

Page 6-1, lines 16–18, states, "Any compensatory mitigation enacted on the site-specific proposals must be commensurate to the expected impacts, and demonstrate timeliness and additionality when compared to the action alternatives." This requirement should be removed for several reasons. First, the requirements that mitigation be commensurate to impacts, timely, and additional are elements of BLM policies that have been rescinded by Secretarial Order No. 3360 (Dec. 22, 2017). *See* BLM MS-1794 – Mitigation (Rel. 1-1782 Dec. 22, 2016); BLM H-1794-1 – Mitigation (Dec. 1-1783 Dec. 22, 2016). Second, BLM has recognized it may not require mitigation of off-lease impacts to privately owned surface. *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

Page 6-1, lines 32–34, references Mitigation Handbook H-1794-1, and page 6-2, lines 8–12, reference Mitigation Policy (600 DM 6). Both these documents were rescinded by Secretarial Order No. 3360 (Dec. 22, 2017) and therefore must be removed.

B.    Goals of the Casper RMP

Section 6.3 of the DEIS unnecessarily restates the goals and objectives of the Casper RMP and TBNG LRMP. The DEIS's listing of these goals is not relevant to BLM's decision to approve the Project. The Casper RMP identifies management actions that are anticipated to achieve the RMP's goals and objectives. *See* Casper RMP at 2-1 (stating the purpose of the Casper RMP revision is to "[i]dentify management actions and allowable uses anticipated to achieve the established goals and objectives and reach desired outcomes"). BLM's land use authorizations, including approval of the Project, then must conform to these management actions. 43 C.F.R. § 1610.5-3. Given that BLM has identified the management actions necessary to achieve goals of the Casper RMP, BLM should not impose additional compensatory mitigation requirements to achieve the RMP goals.

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 54

     C.      <u>Avoidance Measures</u>

The DEIS proposes to require avoidance of raptor nests within the buffers and times listed on page 6-4, lines 39–40, and page 6-5, lines 1–6. These buffer distances and seasonal restrictions are required on USFS lands under the TBNG LRMP. BLM's Casper RMP, however, imposes different buffer distances and timing limitations. *See* DEIS, pg. 4.18-34, tbl. 4.18-16. BLM should revise the DEIS to impose buffer distances and timing limitations consistent with the Casper RMP.

## XV.    **Comments on Air Quality Technical Support Document**

     A.      <u>Attachment A: HAP Fugitive Emissions at a Gas Plant</u>

The total emissions for Gas Plant fugitives (Table 4-44 HAP Fugitive Emissions at a Gas Plant) do not match what was included in Version 7 of the Emissions Inventory (EI V7), Tab 45b. Although the individual component emissions match those provided in EI V7, the total provided in Table 4-44 does not equal the sum of those component emissions. The reference for the emission factors of the individual components ("Oil and Gas Production Facilities Chapter 6, Section 2 Permitting Guidance" [WDEQ 2013]) matches the values used in the Emissions Inventory (values given in reference are per day, values in Emissions Inventory are divided by 24).

Additionally, the fugitive estimates did not include a control efficiency for a leak detection and repair program that will be required for all new facilities under the Federal Regulations (OOOOa). EPA guidance allows for 96 percent control on gas valves, 95 percent light liquid valve, 88 percent light liquid pump, and 81 percent connectors.[16]

The Operator Group requests that BLM confirm that emissions were entered into Table 4-44 correctly and that the correct emissions total was used in the modeling. Additionally, BLM must acknowledge the application of the control efficiency means the uncontrolled fugitives represented in the Emissions Inventory are conservative.

     B.      <u>Attachment A: Fugitive Emission Factors</u>

This comment relates to fugitive emission factors in Tables 4-10, 4-11, 4-43, 4-44, 4-52, and 4-53. For production fugitive emissions, Leak Detection and Repair programs are required under state and federal regulations (40 CFR Part 60, Subpart 0000a). While the Operator Group does not believe additional modeling is required for this analysis, we recommend noting the application of Leak Detection and Repair programs by Operators. Application of these programs means the uncontrolled fugitives represented in the Emissions Inventory are conservative.

---

[16] Protocol for Equipment Leak Emission Estimates, EPA-453/R-95/017, Nov 1995.

March 12, 2018
Page 55

## XVI.   Technical Comments

➤ All language and references need to be consistent throughout the document.  The Operator Group requests that BLM review the DEIS for consistent terms and make appropriate revisions.

➤ Page ES-5, lines 34–40:  This section discusses limitations BLM would impose under Alternative C, including limitations on Operators' ability to obtain exceptions to timing stipulations and certain required design features.  Section VIII of these comments objects to these requirements and requests they be removed from the FEIS.  The Executive Summary should be updated in accordance with these changes.

➤ Page 4.2-2, lines 40–42, states, "The qualities that make a cultural resource eligible for the NRHP or important under NEPA <u>dictate</u> the types of impacts and the avoidance, minimization, and mitigation strategies appropriate to address effects to historic properties" (emphasis added).  Because both the NHPA and NEPA impose procedural, rather than substantive, directives, BLM should use the term "guide" rather than "dictate."

➤ Page 4.2-5, line 26, references "Rural Historic Landscapes" but no such landscapes have been identified in the Project Area.

➤ Page 4.7-6, lines 28–30:  There appears to be a typo in the second bullet of this section where it states that impacts would be less under Alternative B.  Although the Operator Group does not necessarily agree with this conclusion, we believe BLM intended the language to state:  "Potential noise impacts to tourists at historic trails and to recreationists such as hunters and dispersed campers would be less under <u>Alternative C</u> because the construction footprint would be 29 percent less than under Alternative B . . . ."

➤ Page 4.18-84, lines 22–23, states, "Compensatory mitigation would not be warranted for greater sage-grouse under Alternative C because disturbance would be prohibited within PHMA."  Alternative C, however, would not prohibit disturbance in PHMA; rather, Alternative C expressly contemplates that some disturbance may occur.  *See* DEIS, pg. 2-39, lines 21–23 ("The Bill and M Creek PHMA are calculated at less than 1 percent disturbance within their respective DDCT areas; therefore, development could occur in those areas."); pg. 2-54, tbl. 2.7-2 (estimating 7,279 acres of disturbance within PHMA under Alternative C).

➤ Page 6-6, lines 34–35, states, "Compensatory mitigation likely would be required if residual impacts were to result in any of the conditions discussed below."  No conditions are listed below, however.  Furthermore, BLM should not require compensatory mitigation for residual impacts.

Exhibit A to Declaration of Rebecca Byram

March 12, 2018
Page 56

## XVII.  Conclusion

The Operator Group appreciates BLM's consideration of these comments.  If BLM has any questions about the information presented in these comments, please contact Kathleen Schroder at katie.schroder@dgslaw.com or (303) 892-7354.

Sincerely,

DAVIS GRAHAM & STUBBS LLP

Kathleen C. Schroder

on behalf of

Anadarko Petroleum Corporation
Chesapeake Energy Corporation
Devon Energy Corporation
EOG Resources, Inc.
SM Energy

KCS:

Enclosures