# DAVIS GRAHAM & STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

July 25, 2019

*Via electronic mail*
blm_wy_casper_wymail@blm.gov

Bureau of Land Management
Casper Field Office
2987 Prospector Drive
Casper, Wyoming 82604

Attn: Mike Robinson, Project Manager

Re:     **Converse County Oil and Gas Supplement to the Draft Environmental Impact Statement**

Dear Mr. Robinson,

Anadarko Petroleum Corporation, Chesapeake Energy Corporation, Devon Energy Corporation, EOG Resources, Inc., and Northwoods Energy (collectively, "the Operator Group") appreciate the opportunity to submit comments on the Supplement to the Draft Environmental Impact Statement (SDEIS) for the Converse County Oil and Gas Project ("Project"), 84 Fed. Reg. 17,884 (Apr. 26, 2019). Members of the Operator Group are the Project applicants. These comments adopt and incorporate by reference comments submitted by the Petroleum Association of Wyoming on the SDEIS. These comments also supplement any individual comments submitted separately by members of the Operator Group. These comments are in addition to the Operator Group's comments on the Converse County Oil and Gas Project Draft Environmental Impact Statement (DEIS) dated March 12, 2018.

## I.     Executive Summary

➢ The Operator Group strongly recommends that the Bureau of Land Management (BLM) select Option 3 as its preferred option to amend the Casper Resource Management Plan (RMP). Option 3 is most consistent with the Operator Group's Proposed Action and BLM's preferred alternative in the DEIS (Alternative B). Option 3 provides a straightforward process for timing limitation stipulation (TLS) relief that is efficient for operators to utilize and straightforward for BLM to administer. It provides operators necessary certainty as to when and how operations can occur in non-eagle raptor nest buffers. Option 3 also protects active nests, tailors timing of TLS to individual non-eagle raptor species, and reduces burdens on BLM in granting TLS relief. The Operator Group is willing to discuss with BLM additional measures to further enhance the conservation benefits of Option 3.

➢ BLM must utilize the United States Fish and Wildlife Service's (USFWS) definition of "active" nests. Relying on the definition of "active" and "inactive" nest in the SDEIS will needlessly limit

Davis Graham & Stubbs LLP  ▪  1550 17th Street, Suite 500  ▪  Denver, CO 80202  ▪  303.892.9400  ▪  fax 303.893.1379  ▪  dgslaw.com

4586111

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **2** of **31**

activities around nests that do not contain nesting raptors, yielding little if any conservation benefit.

➢ Option 4 does not meet the Proposed Action's goal of programmatic year-round development and must not be selected by BLM. Option 4 does not provide a clear path to TLS relief and does not provide actual year-round development. It also imposes a more onerous process to obtain TLS relief than the current exception process. Option 4 imposes limitations that burden development with minimal conservation benefit. Further, the process for TLS relief under Option 4 is cumbersome, inefficient, and confusing.

➢ Option 5 does not provide a meaningful alternative and should be removed from the Converse County Final Environmental Impact Statement (FEIS).

➢ BLM incorrectly inflates potential impacts to non-eagle raptors from Options 2 and 3 and understates potential impacts from Options 4 and 5. BLM unreasonably assumes that 50 percent of non-eagle raptors nests will be active annually, despite recent wildlife survey data to the contrary. BLM erroneously concludes that impacts from Options 2 and 3 will be "moderate to major" by inflating nest activity levels, disregarding the conservation measures proposed under Option 3, and incorrectly assuming that the loss of a non-eagle raptor nest location will result in the loss of a successful nest. By contrast, BLM misleadingly assumes that Options 4 and 5 will have "no impacts." BLM has not justified its characterization of the impacts of any of the options.

## II.    BLM Should Adopt Option 3 as Its Preferred Option to Amend the Casper RMP.

### A.    Option 3 is Consistent with the Proposed Action and BLM's Preferred Alternative in the DEIS.

An essential component of the Operator Group's Proposed Action is the ability to develop year-round by obtaining relief from non-eagle TLS. DEIS at 2-1. BLM analyzed the Proposed Action as Alternative B in the DEIS and identified this alternative as its preferred alternative in the DEIS. *See id.* Option 3 is most consistent with the Proposed Action and BLM's preferred alternative because it outlines a clear process by which operators can obtain TLS relief and allows for programmatic year-round development. Because Option 3 provides a straightforward process that yields certainty for operators as to when and how they may conduct operations in TLSs, Option 3 is directly responsive to and fully consistent with the Proposed Action. BLM should select Option 3.

The benefits of the conservation measures and process provided in Option 3 include:

➢ Option 3 promotes operator certainty by eliminating BLM's case-by-case determination of when to grant relief for non-eagle raptor TLS. Instead, if an operator adheres to the conservation measures outlined in Option 3, it automatically receives TLS relief. *See SDEIS*

Exhibit B to Declaration of Rebecca Byram

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **3** of **31**

at 2-4 ("If the applicant applies the conservation measures set forth in the RMP Appendix XXX, these timing limit stipulations **will not** be applied within the Converse County Project Area . . . ." (emphasis added)). This structure benefits both operators and BLM by implementing agreed-to and certain conservation measures that protect non-eagle raptors while also permitting regulated development. Further, by eliminating case-by-case review of relief for non-eagle raptor TLS, Option 3 reduces administrative burdens on BLM of administering TLS relief and eliminates the risk of inconsistent decision-making.

➤ Unlike other options, Option 3 promotes flexibility for operators while protecting non-eagle raptors. Operators can begin oil and gas activities within nest buffers before the seasonal buffer period and continue into the stipulation season if the operator maintains continuous operations (no break for more than 72 hours). Or, after the start of the seasonal buffer period, operators can begin oil and gas activities, or resume after a break of more than 72 hours, within nest buffers, but only if a nest has been determined to be inactive. *See* SDEIS at S1-1 (Features 1 and 2). These limitations are tailored to protect active nests from new disturbance or disruption caused by the commencement of development activities. At the same time, these limitations assume that ongoing oil and gas development activities will not disturb or disrupt non-eagle raptors that initiated nesting after the development activities commenced.

➤ Option 3 requires targeted and meaningful monitoring. The determination of whether a nest is inactive requires monitoring of the nest for seven days before beginning or resuming oil and gas activities. By monitoring for seven days before activities would begin, operators would collect the most relevant and recent data regarding current nest use. *See* SDEIS at S1-1.

➤ Option 3 maximizes conservation and regulatory resources by focusing protections on active nests (i.e., nests containing nesting non-eagle raptors, eggs, or chicks). Approximately 20 percent of the more than 1,200 non-eagle raptor nests in the Project area have been active between 2016 and 2018. Option 3 encourages operators to conduct operations outside of TLS buffers and focuses protective measures on active nests, while employing conservation measures to benefit raptors throughout the Project area. By contrast, the existing process for TLS relief under Option 1 and BLM's proposed process under Option 4 protect nests that are not active in a given year, yielding overly broad, unnecessary, and inefficient protection measures.

➤ Option 3 requires operators seeking TLS relief to apply conservation measures throughout the Project area that avoid raptor contact with development facilities such as reserve pits, ponds, containers, dehydrator rubs, and stacks. *See* SDEIS at S1-1. These conservation measures reduce impacts to non-eagle raptors throughout the Project area, inside or outside of buffer areas, and regardless of activity at nearby nests.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **4** of **31**

> ➢ Option 3 tailors the TLS season to the species that have historically used a given nest, rather than imposing an overly broad TLS season that invariable changes in actual nesting and breeding duration year over year. Where monitoring data identify the raptor species that uses a given nest, BLM would observe the TLS season that the USFWS's Ecological Services Field Office recommends for a particular species. *See* SDEIS at S1-2, tbl. S1-1. These seasonal buffers are listed in Table S1-1 in Appendix S1. By requiring heightened procedures during scientifically supported TLS seasons, Option 3 would avoid unnecessary regulatory burdens.

These benefits of Option 3 wholly support BLM's selection of Option 3 as its preferred option to amend the Casper RMP. Nonetheless, the Operator Group is willing to discuss with BLM additional measures to further enhance the conservation benefits of Option 3.

### B.    BLM Must Clarify that BLM will Modify Existing Leases in the Project Area under Option 3.

In the FEIS, BLM must add language clarifying that, under Option 3, BLM will modify existing leases in the Project area that contain raptor TLS to specify that the TLS will not apply to non-eagle raptors if the applicant applies the conservation measures specified in Option 3. This is an administrative clarification to Option 3 because Option 2 already includes and analyzes the potential impacts of the proposal to modify existing leases within the Project area to remove non-eagle TLS. *See* SDEIS at 2-7, lines 9–12, S2-1, lines 11–14. As drafted, Option 3 does not propose to modify existing leases, and the Operator Group believes this omission was an oversight in drafting. A lease modification would implement Option 3 as proposed because Option 3 would eliminate the requirement that BLM grant exceptions to the TLS on a case-by-case basis. *See* SDEIS at 2-4 tbl. 2.4-1 ("If the applicant applies the conservation measures set forth in the RMP Appendix XXX, these timing limit stipulations **will not apply** within the Converse County Project Area (CCPA) . . . ." (emphasis added)).

BLM should also clarify that public comment on this amendment to the Casper RMP satisfies any obligation to offer the lease modification for public review. BLM's regulation governing modifications and waivers of oil and gas lease terms directs that, "[i]f subsequent to lease issuance the authorized officer determines that a modification or waiver of a lease term or stipulation is substantial, the modification or waiver shall be subject to public review for at least a 30-day period." 43 C.F.R. § 3101.1-4. To the extent BLM determines the lease modification is "substantial," BLM's Federal Register notice and 90-day comment period on the proposed amendment to the Casper RMP amply satisfy the obligation to subject the modification for public review. Thus, BLM should confirm in the FEIS that no additional public review is necessary to modify leases with raptor TLS in the Project area.

### III.    BLM Must Utilize the U.S. Fish and Wildlife Service's Definition of "Active" Nests and Should Not Limit Activities Around "Occupied" Nests.

USFWS has established the appropriate definition of an "active" nest, and BLM must revise the SDEIS to utilize it. In national guidance, USFWS has defined an active nest as "one that contains viable

Exhibit B to Declaration of Rebecca Byram

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **5** of **31**

eggs and/or chicks." Memorandum to Regional Directors from Assistant Director, Migratory Birds at 1 n.2 (June 14, 2018). USFWS considers nests to be inactive when they "are empty, contain nonviable eggs, or are being built but do not yet have an egg in them." *Id.* USFWS has explained that "[a] nest becomes active when the first egg is laid and remains active until fledged young are no longer dependent on the nest." *Id.*

Despite this guidance, BLM in the SDEIS defines an "active" nest as "a nest that contains viable eggs or chicks or is considered occupied." SDEIS at 3-2, lines 24. BLM explained that "[t]he presence of raptors (adults, eggs, or young), evidence of nest repair or marking, freshly molted features or plucked down, or current year whitewash all are considered signs suggesting the nest site is active." SDEIS at 3-2, lines 28–30. BLM defines an "occupied" nest "one that is repaired or tended in the current year by a pair of raptors." SDEIS at 3-2, lines 24–25. In BLM's view, a nest is occupied "throughout the periods of initial courtship and pair bonding, egg laying, incubation, brooding, fledging, and post-fledging dependency on the young." SDEIS at 3-2, lines 26–27 (internal citation omitted).

BLM inappropriately relies on its own definition of active nests, which is significantly broader than USFWS's definition of active nests by including "occupied" nests. USFWS, and not BLM, is charged with administering the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703–712; 50 C.F.R. pt. 21 (migratory bird permits). The fact that two agencies, both within the Department of the Interior, are using starkly different definitions for the same term will result in confusion for regulated entities that may be subject to BLM restrictions for species protected under the MBTA on federal lands and are mindful of USFWS authority to administer this act. Given the substance of this particular issue, and that NEPA documents are developed in consultation with other federal agencies, BLM must adopt and apply USFWS's definition.

BLM's proposed protection of both active and occupied nests would unnecessarily restrict activities within non-eagle raptor buffers. Option 4 inappropriately limits activities around both active and occupied nests. Under Option 4, activities can only begin after February 1 when nests are verified to be inactive and unoccupied, and activities that began before February 1 can only continue to a new development phase, or resume operations after a break of more than 72 hours, between February 1 and June 15 if a nest is determined to be inactive and unoccupied. *See* DEIS at S2-2, lines 23–26, 45–46, S2-3, lines 1–3, 6–8, 31–33.

In the SDEIS, BLM has not demonstrated any conservation benefits to support the proposed restrictions on development activities near occupied but inactive non-eagle raptor nests that will undoubtedly occur relying on the definitions in the SDEIS. BLM offers no explanation, rationale, or justification for limiting activities around occupied but inactive nests. BLM's unwarranted protection of occupied nests will limit more development activities while providing little if any conservation benefit. If development activities disturb non-eagle raptors while they are engaged in activities that result in nest occupancy, such as repair and tending of nests, courtship behavior, and pair bonding, such disruption will not necessarily prevent the pair from nesting because they can select an alternative nest away from oil and gas development activities. Studies have demonstrated that ferruginous hawks, which are the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **6** of **31**

most prevalent raptor in the Project area, maintain several potential nest sites within their territory. Carlisle et al., 2018; Slater et al., 2017. BLM's own synthesis of existing scientific literature notes that ferruginous hawks can construct or renovate between one and five nests within their territories and that 86 percent of nesting pairs constructing alternate nests. BLM Technical Note 434, *Artificial Nest Structures as Mitigation for Natural-Gas Development Impacts to Ferruginous Hawks (*Buteo regalis*) in South-Central Wyoming* 11. "Ferruginous [h]awks typically play a 'shell game' centering on suites of accessible nests that are proximate to prey resources." *Id.* Thus, utilizing USFWS's definition of "active" nests and confining protections to such nests will not impact non-eagle raptor populations in the Project area.

To align with the Proposed Action, the Operator Group requests that BLM revise its definition of "active" nests to adhere to USFWS's definition of "active" nests as "one that contains viable eggs and/or chicks." Further, BLM should revise statements throughout the DEIS to remove all references to "occupied" nests so that these statements only refer to "active" nests. Finally, because "tended" nests are a subset of occupied nests, BLM should also remove all references to "tended" nests.

## IV.    Option 4 Does Not Meet the Proposed Action's Goal of Year-Round Development.

### A.    Option 4 Does Not Respond to the Operator Group's Proposed Action and BLM's Preferred Alternative.

Option 4 does not respond to the Operator Group's Proposed Action, which is the DEIS's preferred alternative, because it does not allow a clear process for TLS relief or allow for year-round development, as detailed below. An essential component of the Operator Group's Proposed Action is year-round development to maximize horizontal development from multi-well pads. *See* DEIS at 2-1, lines 15–16 ("This alternative would include analysis of year-round development in areas where timing limitation restrictions serve to protect several wildlife species."), 2-25, lines 7–8 ("To the extent possible, drilling and development operations within the CCPA would be conducted on a year-round basis to maximize the use of horizontal development from multi-well pads."). In the DEIS, BLM identified the Operator Group's Proposed Action as its preferred alternative. *See* DEIS at 2-1, lines 17–18, 2-26, lines 12–15. BLM explained that it "believes that the Proposed Action has the necessary elements that would address the purpose and need for the Draft EIS . . . ." DEIS at 2-26, lines 12–15.

BLM must eliminate Option 4 from further consideration because it does not respond to the Operator Group's Proposed Action. In its NEPA documents, BLM must analyze reasonable alternatives, which are those that respond to the purpose and need the agency articulated in an EIS. *See* 40 C.F.R. § 1502.13. When articulating its purpose and need and defining alternatives, BLM must give "substantial weight" to the goals and objectives of project proponents, such as the Operator Group, as well as the public interest. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002); *see* 43 C.F.R. § 46.420(a)(2). "Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030. BLM need not consider alternatives that do not correspond to the applicant's

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **7** of **31**

purpose and need. *See Biodiversity Conservation All. v. Bureau of Land Mgmt.*, 608 F.3d 709, 715 (10th Cir. 2010) (holding BLM properly rejected a phased development alternative because it would not accomplish the project's goals); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) (similar). Because Option 4 does not respond to, and is inconsistent with, the Proposed Action, BLM should eliminate Option 4 from further consideration.

**B.  Option 4 Does Not Provide a Clear Path to TLS Relief or Allow for Year-Round Development.**

Option 4 does not respond to the Operator Group's proposed action, which is the DEIS's preferred alternative, because it does not provide a clear pathway to TLS relief and does not allow for year-round development.

  1. Option 4's Case-by-Case Approach to Exceptions Creates Unnecessary Uncertainty.

Option 4 does not provide operators certainty for year-round development—a critical component of the Proposed Action.  Option 4 creates unnecessary review by BLM on a case-by-case basis in contradiction to the Proposed Action.

Unlike Option 3, which automatically relieves TLS when certain, specified conditions are met, Option 4 provides relief from TLS solely on a case-by-case basis, even when nests are demonstrably inactive. The proposed language for Option 4 states that BLM "**may** grant exceptions to seasonal stipulations" and that TLS "**may** be relieved" within the Project area. *See* SDEIS 2-4, Table 2.4-1 (emphasis added). This case-by-case review does not provide operators certainty that BLM will grant exception requests and may lead to delays and inconsistent application of TLS relief. Indeed, under BLM's current case-by-case review of exceptions to non-eagle raptor TLS, operators have experienced delays of up to six months.

Option 4 not only contemplates case-by-case reviews of requests for non-eagle TLS relief, it outlines vague and subjective criteria to determine when BLM may grant such relief—creating the risk of inconsistent interpretation and disagreement as to when TLS relief is appropriate. Appendix S2 accompanying Option 4 requires several highly subjective determinations from BLM in order to grant TLS relief, including:

➢ A requirement that an operator develop "adequate" operator-committed measures with BLM. *See* SDEIS at S2-1, lines 11–14, S2-4, lines 17–23;

➢ A requirement that an operator demonstrate that it has "avoided the TLS buffer to the degree possible" and/or set forth "sufficient information" to display there was a "legitimate attempt" to avoid the potentially impacted TLS buffer. SDEIS at S2-2, line 14, S2-3, lines 44–46; and

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **8** of **31**

> ➢ An ability to develop a site-specific raptor protection plan (RPP) in consultation with USFWS that "displays the necessary components of this relief" from TLS. *See* SDEIS at S2-1, lines 40–41.

The SDEIS does not provide information or guidance as to how BLM should make these subjective determinations. Thus, implementation of Option 4 will lead to delays as BLM grapples with these subjective determinations and inconsistent decision-making between individual requests for TLS relief. These uncertainties are inconsistent with the programmatic year-round development contemplated by the Proposed Action, which requires an objective, consistent, and streamlined regulatory framework for TLS relief. Accordingly, Option 4 does not further the Operator Group's Proposed Action.

> 2.  Option 4 Does Not Allow Operators to Engage in Year-Round Development Activities.

Option 4 does not allow operators to engage in year-round development activities. It only allows development activities that commence before February 15 to continue—and only if a nest does not become active during that period. *See* SDEIS at S2-2, lines 12–13, 20–21, and at S2-4, lines 38–42. These restrictions unreasonably limit an operator's ability to adjust its drilling schedule due to unforeseen circumstances, such as issues with surface access, drilling results, regulatory factors, infrastructure considerations, crew and capital availability, unpredictable takeaway capacity, and weather delays. Further, if a nest becomes active, an operator may be allowed to complete its current phase of activities but cannot continue development through the TLS season. *See* SDEIS at S2-3, lines 17–30. These restrictions do not allow operators to reliably engage in year-round development and therefore do not promote certainty as to when operations can occur.

By contrast, Option 3 allows operators to initiate development activities within non-eagle raptor spatial nest buffers any time during the TLS season if a nest is inactive. *See* SDEIS at S1-1 lines 35–39. Even if a nest becomes active while development activities are occurring, activities that were commenced prior to the start of the TLS season may continue under the rationale that they are not disturbing or disrupting the non-eagle raptor that chose to nest near development activities. *See* SDEIS at S1-1 at lines 29–32. Long-term monitoring of nesting raptors suggests that they can become tolerate of activities associated with industrial uses. *See* Antelope Coal LLC, 2017 Annual Wildlife Monitoring Report VIIIB-28 (2017) ("Long-term data demonstrate that many raptors nesting in the Antelope Mine raptor monitoring area have developed a high tolerance to mine-related disturbances. Several raptor pairs from at least four different species have illustrated this acceptance by repeatedly nesting in the permit area despite ongoing and/or encroaching mine operations.").

The reasonable limitations imposed by Option 3 protect nesting non-eagle raptors while allowing operators to anticipate initiating and continuing development throughout the TLS season.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **9** of **31**

B.     **Option 4 Imposes a More Onerous Process to Obtain TLS Relief than the Current Exception Process.**

The Operator Group strongly opposes Option 4 because it imposes a more onerous process, and more restrictions on development, to obtain year-round development than BLM's current process to obtain TLS relief under the existing Casper RMP. The Casper RMP outlines the following process to obtain TLS relief:

➢ BLM approves exceptions to TLS on a case-by-case basis. *See generally* Casper RMP app. F.
➢ Operators must submit exception requests to BLM approximately two weeks before conducting the proposed work. Casper RMP at F-1.
➢ BLM must individually analyze each request for compliance with the National Environmental Policy Act. *Id.*
➢ BLM must consult with Wyoming Game and Fish Department regarding exception requests. *Id.*
➢ BLM may grant an exception if it will not jeopardize the raptor population. When making this assessment, BLM will consider factors including resource concerns, animal conditions, climate/weather, habitat condition and availability, and spatial considerations. *Id.* at F-1 – F-2.

By contrast, Option 4 outlines the following process to obtain TLS relief:

➢ BLM may approve activities within nest buffers during stipulation season on a case-by-case basis. *See generally* SDEIS app. S2.
➢ BLM may only grant TLS relief for activities commencing before February 15 or after June 15. Operators cannot commence activities between February 15 and June 15, even if a nest is inactive. *See* SDEIS at S2-2, lines 12–13 and 20–21.
➢ Prior to requesting TLS relief, operators must:
  o Collect two consecutive years of monitoring data for a given nest. *See* SDEIS at S2-2, lines 1–2;
  o Affirmatively demonstrate to BLM that they have tried to avoid the nest buffer. *See* SDEIS at S2-2, lines 14–16; and
  o Develop operator-committed measures with BLM. *See* SDEIS at S2-1, lines 11–14.
➢ Operators must attend an annual meeting with BLM at which they must identify those wells for which they will initiate drilling prior to February 1. *See* SDEIS at S2-1, lines 23–39.
➢ If BLM grants TLS relief for activities commencing before February 15:
  o Operators must notify BLM of intent to construct a well location within nest buffers by February 1. *See* SDEIS at S2-2, lines 18–19;
  o Prior to commencing construction, operators must verify to BLM that the nest is inactive. *See* SDEIS at S2-2, lines 23–26;
  o Biologists must conduct weekly nest surveys between March 1 and June 15. *See* SDEIS at S2-3, lines 13–16;

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **10** of **31**

- o Activities cannot cease for more than 72 hours between March 1 and June 15. If activities cease for more than 72 hours, the operator must verify to BLM that the nest is inactive before commencing additional activity. *See* SDEIS at S2-2, lines 39–44;
- o Before an operator may proceed to another drilling phase (drilling, completion, production, etc.), the operator must contact BLM. BLM must coordinate with the U.S. Fish and Wildlife Service to determine whether the different drilling phase has an increased potential to impact nests. *See* SDEIS at S2-3, lines 6–8. If the new phase has an increased potential to impact nests, operators must verify to BLM the nest is inactive. *See* SDEIS at S2-3, lines 9–12; and
- o If a nest becomes active during one phase of development, the operator must cease activities upon reaching a logical stopping point and coordinate with BLM and USFWS. BLM may allow the operator to resume activities if they are not likely to reduce the nest success and if the operator employs a biological monitor. *See* SDEIS at S2-3, lines 17–30.

➢ BLM will approve requests for TLS relief for activities commencing after June 15 if a nest is inactive and unoccupied. *See* SDEIS at S2-3, lines 31–33.

➢ Operators must monitor nests for two years after well development. *See* SDEIS at 4-8, lines 11–12.

Additionally, Option 4 contains the following substantive limitations to obtain TLS relief that the existing Casper RMP does not require:

➢ Option 4 prohibits BLM from granting TLS relief for a nest that has ever been occupied by an eagle. *See* SDEIS at 2-8, lines 5–7.

➢ Option 4 may limit operators' ability to commence maintenance activities during TLS season. *See* SDEIS at S2-2, lines 45–46, and S2-3, lines 1–5. Operators currently may maintain and produce well-sites during stipulation period without a requirement to verify non-eagle raptor nest activity.

➢ Option 4 would limit operators' ability to commence reclamation activities during the TLS season and would require that reclamation activities occur without a break of more than 72 hours. *See* SDEIS at S2-2, lines 39–44. Currently, however, BLM does not prohibit reclamation activities during the stipulation period.

The requirements to obtain TLS relief are more onerous than the requirements under the current RMP. Given that TLS relief is uncertain because BLM requires subjective reviews based on vague criteria, operators have no incentive to support Option 4 over the current exception process in the Casper RMP.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **11** of **31**

      **C.**      **Option 4 Imposes Unnecessary Limitations that Burden Development with Minimal Conservation Benefit.**

Option 4 is unnecessarily cumbersome because it includes several requirements that yield little, if any, conservation benefit but increase the burden on operators attempting to develop within non-eagle raptor buffers during the TLS season.

      1.      The Prohibition on TLS Relief for Any Nest an Eagle Has Ever Used is Unsupported by Science and Arbitrary.

The prohibition on TLS relief for any nest that eagles have once used is arbitrary and inflexible and yields little conservation benefit. *See* SDEIS at 2-8, lines 5–7 ("If a nest has ever been occupied by eagles, it will be considered an eagle nest regardless of being inactive, used by other species, or if eagle occupancy occurred greater than two years ago."). This prohibition essentially treats such nests as active for use by eagles. BLM, however, does not provide any scientific support for this prohibition. *See generally* SDEIS. Thus, this prohibition limits TLS relief for no apparent conservation benefit. BLM must eliminate the prohibition on TLS relief for all nests that eagles have ever used and instead recognize that, after a period of nonuse by eagles, nests become inactive.

      2.      The Requirement that Development Activities Begin Before February 15 is Unnecessarily Inflexible.

The requirement that development activities begin before February 15 is unnecessarily inflexible. *See* SDEIS at S2-3, lines 10–12. Given that nearly 80 percent of non-eagle raptor nests in the Project area are likely to be inactive, *see* SDEIS at 3-6, tbl. 3-18-5X, BLM should provide a process to commence oil and gas activities later in the TLS season near inactive nests.

Such flexibility is essential to the ability to conduct year-round development activities. An operator may need to commence development activities later in the TLS season to accommodate a fluctuating drilling schedule or another operational delay, such as the rig or other equipment not being ready or available. Indeed, because the February 15 start date occurs during the winter, weather or related conditions could delay operations during any stage in the process. Although Option 4 may allow operators to continue activities into the TLS season that started beforehand, those activities will ultimately conclude in a matter of weeks and the operator will have no additional ability for TLS relief to later drill or complete additional wells, leaving potentially several months of the TLS window free from development. Because nearly 80 percent of the nests in the Project area are likely to be inactive in a given year, BLM's requirement that activities commence before February 15 will result in many inactive nests unnecessarily receiving TLS protection. BLM should eliminate the requirement in Option 4 that development activities begin before February 15.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **12** of **31**

        3.      The Requirement that Operators Identify the Pads for which They Seek TLS
              Relief is Unnecessarily Rigid.

The requirement that operators identify the pads for which they seek TLS relief at an annual
meeting is unnecessarily rigid. SDEIS at S2-1, lines 23–26. Although an operator may be able to
identify some pads for which it will seek TLS relief, the operator may select different pads for TLS
relief during the time between the annual meeting and initiation of the TLS season. BLM must afford
operators flexibility to identify pads for which they may seek TLS relief after the annual meeting occurs
and after the TLS season begins. Drilling plans are highly unpredictable because operators change
priorities for development for a variety of reasons, including changes in the asset profile, economics,
rate of return, information from exploratory wells, commodity prices, personnel and equipment
availability, regulatory delays and constraints, and political and other factors.

Further, the provision that failure to attend the annual meeting results in forfeiture of the ability
to drill year-round is unreasonable. SDEIS at S2-1, lines 27–29. If an operator cannot attend an annual
meeting due to unforeseen circumstances, the operator should be afforded another opportunity to discuss
exceptions.

Finally, BLM must hold individual meetings with operators to protect confidential information
regarding drilling programs, rather than a single meeting with multiple operators. Due to the sensitivity
of the information discussed, this meeting should not be open to the public; meeting participants should
be limited to BLM and an operator's employees and contractors to protect confidential commercial and
financial information and information related to oil and gas wells. *See* 5 U.S.C. § 552(b)(4) and (9).

        4.      The Requirement that Operators Provide Two Years of Monitoring Data Does
              Not Predict Future Nest Activity.

The requirement that operators provide BLM with two years of monitoring data with a request
for TLS relief yields little meaningful information to BLM because prior years of monitoring data do not
predict future nest activity. SDEIS at S2-2, lines 1–2. The assumption that two years of monitoring data
will predict whether a nest will be active in the future rests upon the incorrect premise that non-eagle
raptors in the Project exhibit high nest fidelity. In fact, ferruginous hawks, which are the most common
raptor in the Project area, will tend several nests before choosing one to nest. "Some raptor species, such
as golden eagles and ferruginous hawks, maintain several potential nest sites within their territory
among which they can rotate in different years." Carlisle et al., 2018. Other raptor species exhibit similar
behavior. "Inspection of 21 territories monitored for 26-38 yr. without interruption suggested [golden]
eagles use individual nests an average of every 3.3 years, laid nests in any nest within territories an
average of every 1.8 yr. and switched nests between 43.3% of consecutive nesting attempts (i.e., egg-
laying in discrete breeding season)." Slater et al., 2017. "The average proportion of nests in use varied
across species, as did the magnitude of changes in use from year to year . . . . Bald eagles had the highest
overall average use (63.6%), whereas ferruginous hawks had the lowest (8.2%). All other species
averages ranged from 19.5-42.6% . . . ." Carlisle et al., 2018. Further, "nest success or failure in one year

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **13** of **31**

did not influence whether a pair switched nests in the following year." Slater et al., 2017. Indeed, BLM itself recognizes that "[t]he number of nests is not an indicator of raptor abundance." DEIS at 3-5 n.1.

Because non-eagle raptors in the Project area will not necessarily return to a given nest in successive years, BLM's requirement that operators provide two years of monitoring data is unnecessary and will not predict whether a nest is likely to become active.

 The requirement that operators provide two years of monitoring data also may create uncertainty in BLM's process for TLS relief. Appendix S2 does not address whether BLM may grant TLS relief if monitoring data shows previous non-eagle raptor activity in a nest. This omission will likely lead to confusion if monitoring data reveals prior activity at a nest because previous nest activity does not dictate future activity.

Moreover, this requirement lacks flexibility. Appendix S2 does not offer any mechanism to allow TLS relief in situations where two years of monitoring data is not available. *See* SDEIS, app. S2. Similarly, Appendix S2 would require two years of monitoring data regardless of the condition of the nest.

BLM must provide flexibility on the requirement that operators provide two years of monitoring data. Two years of monitoring data will provide less timely and less relevant data than a requirement to employ a biological monitor before and during activity in a TLS. Biological monitors can assess the actual, on-the-ground operational impacts, if any, on non-eagle raptors. This concrete data allows BLM to make more informed decisions regarding impacts of oil and gas operations, if any, on non-eagle raptors.

     5.     The Role of USFWS in Granting TLS Relief is Unclear and Negates the Very Constructions of Options 4 and 5.

The suggestion that operators consult with USFWS to develop an RPP for each request for TLS relief is confusing and onerous. Appendix S2 of the SDEIS states that a site-specific RPP "could" be developed "in consultation with the USFWS." SDEIS at S2-1, lines 40–42. This provision does not clearly indicate whether BLM would require an operator to develop an RPP with USFWS or whether an operator has discretion to consult with USFWS.

This provision must be removed. Any requirement that operators consult with USFWS to develop an RPP under Option 4 essentially conflates Option 4 with Option 5, which proposes to allow TLS relief if an operator works with BLM and USFWS to develop a Migratory Bird Conservation Plan (MBCP). *See* SDEIS at 1-3, lines 1–4. Further, if BLM intends to require USFWS consultation, this requirement provides USFWS with a potential veto power over TLS relief.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **14** of 31

      6.      The Requirement to Cease Activities if a Nest Becomes Active Will Lead to
            Unnecessary Delay.

      The requirement that operators would cease activity following completion of a development
stage if a nest becomes active will lead to unnecessary delay. *See* SDEIS at S2-3, lines 17–24, S2-4,
lines 42–43. If a bird begins nesting during operations, BLM may reasonably assume the bird is tolerant
of that activity level and allow activities to continue, uninterrupted. Long-term monitoring of nesting
raptors suggests that they can become tolerate of activities associated with industrial uses. *See* Antelope
Coal LLC, 2017 Annual Wildlife Monitoring Report VIIIB-28 (2017) ("Long-term data demonstrate
that many raptors nesting in the Antelope Mine raptor monitoring area have developed a high tolerance
to mine-related disturbances. Several raptor pairs from at least four different species have illustrated this
acceptance by repeatedly nesting in the permit area despite ongoing and/or encroaching mine
operations.").

      Further, Option 4 provides that if a nest becomes active while development activities are
occurring between February 15 and June 15, BLM may allow an operator to continue to the next
development stage upon a determination by BLM and USFWS that the activity "is not causing impacts
that would lead to diminished nest success" or is "not likely to cause a reduction in TLS success." *See*
SDEIS at S2-3, lines 20–21, S2-4, lines 42–43. The SDEIS, however, does not define or explain when
an activity "is not causing impacts that would lead to diminished nest success" or is "not likely to cause
a reduction in TLS success." *See id.* This subjective standard does not give operators any certainty as to
when they can expect to continue operations through the TLS season.

      7.      The Requirement to Monitor for Two Years After TLS Relief is Unnecessary.

      The requirement in Option 4 to monitor for two consecutive years "to ensure that the
conservation measures are effective" is unnecessary and burdensome. *See* SDEIS at 4-8, lines 11–12.
First, BLM offers no scientific justification for this requirement. *See id.* This requirement assumes that
monitoring after TLS relief will reveal potential long-term impacts—but this assumption rests on the
incorrect premise that non-eagle raptors in the Project area exhibit high levels of nest fidelity. In fact,
ferruginous hawks, which are the most common raptor in the Project area, will tend several nests before
choosing one to nest. "Some raptor species, such as golden eagles and ferruginous hawks, maintain
several potential nest sites within their territory among which they can rotate in different years." Carlisle
et al., 2018. Other raptor species exhibit similar behavior. "Inspection of 21 territories monitored for 26-
38 yr. without interruption suggested [golden] eagles use individual nests an average of every 3.3 years,
laid nests in any nest within territories an average of every 1.8 yr. and switched nests between 43.3% of
consecutive nesting attempts (i.e., egg-laying in discrete breeding season)." Slater et al., 2017. "The
average proportion of nests in use varied across species, as did the magnitude of changes in use from
year to year . . . . Bald eagles had the highest overall average use (63.6%), whereas ferruginous hawks
had the lowest (8.2%). All other species averages ranged from 19.5-42.6% . . . ." Carlisle et al., 2018.
Further, "nest success or failure in one year did not influence whether a pair switched nests in the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **15** of 31

following year." Slater et al., 2017. Indeed, BLM itself recognizes that "[t]he number of nests is not an indicator of raptor abundance." DEIS at 3-5 n.1.

Second, this monitoring may not yield any relevant information. If the nest had not been used or active during the years immediately before the TLS relief, BLM would not gain any information about whether the TLS relief impacted non-eagle raptor use.

Finally, Option 4 does not provide BLM with any mechanism to adjust management to respond to monitoring data. Because this monitoring data requirement will not yield information that BLM can utilize, BLM must remove this requirement from Option 4. At a minimum, BLM must offer scientific justification for this requirement.

> 8.    Option 4 Does Not Impose Timeframes on BLM to Reach Decisions.

Option 4 requires that operators provide information to BLM with no obligation on BLM as to how quickly it must review and turnaround feedback to operators. For example, where BLM requires operators to verify inactivity of a nest, the process does not ensure that, between the time of verification submission to BLM's response, the nest does not then become active. *See* SDEIS at S2-2, lines 23–26. Likewise, Option 4 does not impose timeframes as to how quickly BLM must grant TLS relief. *See generally* SDEIS app. S2. Further, if a nest becomes active and BLM must determine whether to allow an operator to continue to the next development stage, Option 4 does not require BLM to make this determination within a specific timeframe. *See* SDEIS at S2-3, lines 20–21, S2-4, lines 42–43. The lack of timetables contributes to operator uncertainties and may cause delays in necessary BLM decisions.

> 9.    BLM Should Not Require TLS Relief for Maintenance and Reclamation
>       Activities.

Appendix S2 states, "Once activities have commenced in any of the development phases (construction, drilling, completion, production, **maintenance, and reclamation**) there must be no break in activity of more than 72 hours from March 1 to June 15." SDEIS at S2-2, lines 39–41. Currently, operators may maintain and produce well sites without verifying that an area lacks active non-eagle raptor nests; they may also initiate reclamation activities in the TLS season. *See* Casper RMP at 2-63. Limiting an operator's ability to perform routine maintenance during the TLS season would present safety concerns. BLM must eliminate the reference to maintenance and reclamation activities from Appendix S2. Furthermore, for clarity, the phrase on page S2-2, rows 39–41, should be revised to replace "and" with "and/or."

# V.    Option 5 Does Not Provide a Meaningful Alternative and Should be Removed from the FEIS.

Option 5 does not contain enough detail to be meaningfully analyzed as an alternative to the Proposed Action. Option 5 merely observes that an operator can develop an MBCP with USFWS and outlines the elements of an MBCP. *See* SDEIS at 2-8, lines 15–20, app. S3. Yet Option 5 lacks the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **16** of 31

specificity necessary to be a meaningful alternative. An EIS must "[d]evote substantial treatment to each alternative considered in detail including the proposed action **so that reviewers may evaluate their comparative merits**." 40 C.F.R. § 1502.14(b) (emphasis added). The discussion of alternatives must contain sufficient detail "to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) (quoting *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972)). Courts have rejected EIS that simply list alternatives. *See Envtl. Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 350 (8th Cir. 1972). Because Option 5 of the SDEIS lacks any substantive measures to conserve or protect non-eagle raptors in the Project area, *see* SDEIS at 2-8, lines 8–20, it lacks the specificity to be a meaningful alternative.

Further, adopting Option 5 is entirely possible without amending the Casper RMP—the sole reason for this SDEIS—because Option 5 is only an undetailed derivative of Option 1. The ability to negotiate an MBCP with USFWS does not require an RMP amendment. Indeed, in the DEIS, BLM observed that the Operator Group had been working with USFWS to explore a possible Umbrella MBCP to serve as a programmatic guide for the development of site-specific migratory bird conservation plans within the planning area. *See* Converse County DEIS at 4.18-30.

Finally, like Option 4, Option 5 does not give operators certainty as to whether and when development during the TLS season will be allowed. The discussion of Option 5 in the DEIS provides no information, let alone a hint, of the circumstances in which BLM will grant TLS relief and under what terms. *See* SDEIS at 2-8, lines 8–20, 4-8, lines 23–35. For these reasons, BLM should remove Option 5 from consideration in the FEIS.

## VI.    BLM Incorrectly Assesses Impacts to Non-Eagle Raptor Nests, Thus Distorting Its Analysis of Options.

### A.    BLM Has Not Justified Its Characterizations of Impacts from Options 1 through 5.

BLM's analysis of the potential impacts of Options 1 through 5 in the SDEIS includes virtually no citations to scientific literature. NEPA requires agencies to take a "hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information . . . ." *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001) (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171–72 (10th Cir. 1999)). NEPA analysis must utilize "high quality" information. 40 U.S.C. § 1500.1(b). "Accurate scientific information . . . [is] essential to implementing NEPA." *Id.* BLM's assessment of potential impacts from Options 1 through 5 contains no references to scientific literature in support of its conclusions. *See* SDEIS at 4-7 – 4-8.

BLM's analysis of the potential impacts of Options 1 through 5 in Chapter 4 of the SDEIS includes minimal citations to scientific literature. Similarly, BLM's assessment of cumulative impacts to migratory birds under all alternatives contains no references to scientific literature. *See* SDEIS at 5-2 – 5-3, § 5.3.18.2. Rather, in Chapter 4, BLM references scientific literature **only** in support of the following statement: "[A]lterations in feather properties [from decreased thermoregulatory and

buoyancy properties of feathers that become covered in salt crystals or surfactants] could lead to hypothermia or drowning of affected individuals (Ramirez 2009)." SDEIS at 4-3, lines 28–31. Further, Section 8.0 of the SDEIS (References) only references **one** unpublished study: "Ecosystem Research Group, Editors. 2015. Raptor Symposium. 2015 Campbell County, Wyoming Raptor Symposium Proceedings. Gillette, Wyoming. March 11th and 12th, 2015." *See* SDEIS at 8-1. The remaining references in Section 8.0 relate to compiled data and communications between BLM, USFWS, and Wyoming Game and Fish Department regarding the Project. *See id.*

BLM must revise its discussion of impacts from Options 1 through 5 in Chapter 4 to incorporate the findings of the following studies, which are attached and reflect the highest quality scientific information regarding raptors. Additionally, BLM must include these studies in Chapter 8.0, References:

➢ "Human-Made Structures, Vegetation, and Weather Influence Ferruginous Hawk Breeding Performance," Zachary P. Wallace, Patricia L. Kennedy, John R. Squires, Lucretia E. Olson, and Robert J Oakleaf, *The Journal of Wildlife Management* 80(1): 78-90; 2016.
➢ "Interannual Golden eagle (Aquila Chrysaetos) Nest-use Patterns in Central Utah: Implications for Long-term Nest Protection," Steven J. Slater, Kent R. Keller, Robert N. Knight, *Journal Raptor Research* 51(2): 129-135, 2017.
➢ "Raptor nest-site use in relation to the proximity of coalbed-methane development," J.D. Carlisle, L.E. Sanders, A.D. Chalfoun, K.G. Gerow, 2018, *Animal Biodiversity and Conservation* 41.2: 227-243.
➢ BLM Technical Note 433, J.P. Smith et al., "An Assessment of the Effects of Oil and Gas Field Activities on Nesting Raptors in the Rawlins, Wyoming and Price, Utah Field Offices of the Bureau of Land Management."
➢ BLM Technical Note 434, Mike C. Neal et al., "Artificial Nest Structures as Mitigation for Natural-Gas Development Impacts to Ferruginous Hawks (*Buteo regalis*) in South-Central Wyoming."

**B.    The Assumption that 50 Percent of Non-Eagle Raptor Nests in the Project Area Will be Active Annually is Unsupported and Inaccurately Inflates Potential Impacts.**

1.    Monitoring Data Do Not Support BLM's Conclusion that 50 Percent of Non-Eagle Raptor Nests Will be Active.

BLM unreasonably and incorrectly assumes that 50 percent of non-eagle raptor nests will be active annually by cherry-picking data more than 12 years old that is well above average activity levels and is contradicted by recent data. *See* SDEIS at 3-7, lines 12–13. BLM represents that monitoring data from six years over a 13-year period reflect that between five and 50 percent of nests in the Project area and its vicinity were active. *See* SDEIS at 3-6, tbl. 3.18-5X. BLM also references a report of a 2015 symposium finding that between 12 and 51 percent of nests in Campbell County were active. SDEIS at 3-7, lines 4–13. Based on this information, BLM "conservatively" assumes that 50 percent of nests in the Converse County Project area will be active in a given year. SDEIS at 3-7, lines 12–13.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **18** of 31

      BLM's assumption that 50 percent of nests will be active annually relies on data more than 12 years old that are inconsistent with average activity levels and recent monitoring data. Fifty percent of nests were observed as active in 2006—more than 12 years ago. Yet as BLM admits in the SDEIS, the average percentage of active nests is 22 percent, *see* SDEIS at 3-6, lines 14–15, and the median percentage of active nests is between 16 and 22 percent. Similarly, the study "Effects of CBM Development on Raptor Nest Site Occupancy in the Powder River Basin" (Carlisle et al.) referenced in the SDEIS found that an average of approximately 30 percent of nests in a study area within the Powder River Basin were active over an eight-year period. *See* Campbell County, Wyoming Raptor Symposium Proceedings 10 (2015). Further, the activity levels of 50 percent were recorded in 2006 but monitoring data from the last several years consistently recorded much lower activity levels; in 2018, less than 10 percent of nests in some areas were recorded as active. *See* SDEIS at 3-6, tbl. 3.18-5X. **BLM cannot discount recent monitoring data in favor of data more than 10 years old without explanation.**

      The differences in assumptions are significant. Using the assumption that 50 percent of the 1,283 nests in the Project area will be active, BLM concludes that 642 nests have the potential to be active. *See* SDEIS at 4-5, lines 6–9. Yet, using the lowest levels of recorded activity (five or six percent), only between 64 and 77 of nests would be active in a given year—a ten-fold difference. The lowest levels of recorded activity are more indicative of non-eagle raptor use in the Project area because they were observed in 2018, rather than in 2006 when the highest levels of recorded activity were observed. *See* DEIS at 3-6, tbl. 3.18-5X. Even using the average level of recorded activity (22 percent) would yield approximately 282 potentially active nests in the Project area—less than half of BLM's assumption. BLM must account for the significant differences in activity levels.

      BLM's assumption that 50 percent of nests will be active in a given year is unsupported and does not align with recent data submitted by the Operator Group. BLM's decision to rely on the highest level of recorded activity discards consistently recorded lower levels of activity. BLM would more reasonably rely on the average percentage of active nests (between 22 and 30 percent) and simply observe that the percentage of active nests can be as low as five percent or as high as 50 percent.

        2.      Comparisons of Active and Occupied Nests Distort Impacts.

      BLM's discussion of raptor monitoring data inappropriately compares active and occupied nest data without distinction. As a result, BLM may interpret survey data from 2006 as reflecting that 50 percent of nests were active when in fact this data may reflect that 50 percent of nests were occupied. "Active" and "occupied" nests are distinct. Active nests "contain[ ] viable eggs and/or chicks." Memorandum to Regional Directors from Assistant Director, Migratory Birds at 1 n.2 (June 14, 2018). By contrast, an "occupied" nest is "one that is repaired or tended in the current year by a pair of raptors." SDEIS at 3-2, lines 24–25. A nest can be occupied without ever becoming active.

      Statements in the SDEIS suggest that raptor nest surveys referenced in Table 3.18-5X recorded both occupied and active nests, but BLM does not distinguish between these data sets. For example, Table 3.18-5X on page 3-6 refers to "active" nests, but Figure 3.18-10X on page 3-7 references "occupied" nests. Moreover, BLM's own definition of "active" nests in the SDEIS, which includes

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **19** of **31**

occupied nests, *see* SDEIS at 3-2, line 24, conflates the distinction between these types of nest uses and suggests that the analysis in Chapter 3 may compare monitoring data identifying active and occupied nests without distinction.

Furthermore, inconsistencies in data sets may also cause BLM to compare active with occupied nests. Because the SDEIS references monitoring data from multiple different surveys, some surveys may have monitored and observed nest occupancy while others may have monitored and observed nest activity. Importantly, surveys between 2016 and 2018 provided by the Operator Group, the results of which are reflected in Table 3.18-5X, observed "active" nests consistent with USFWS's definition.

BLM itself has observed that nest monitoring data from the mid-2000s in Wyoming conflate these two distinct categories of use. Specifically, BLM has observed:

> We found great inconsistencies in the terminology used over the years to code nesting events in the Rawlins dataset, in particular, and more generally found that, based on notes recorded in the available databases, that various nest-status designations were not always consistently applied due to variations in field personnel and attendant differences in interpretation or levels of rigor in applying those designations. For example, **in the Rawlins dataset, it became clear that designations of "used" and "active" were often used inter-changeably without clarity as to whether or not egg-laying was actually confirmed** (accurate definition of "active," indicating an actual breeding attempt), such that it was frequently impossible to differentiate between occupied but inactive nests/ territories and those in which a breeding attempt actually occurred.

BLM Technical Note 436, Recommendations for Improved Raptor Nest Monitoring in Association with Oil and Gas Development Activities, at 3 (emphasis added). Likewise, the study "Effects of CBM Development on Raptor Nest Site Occupancy in the Powder River Basin" upon which BLM relied examined "use" of nests by raptors, but the study did not specify whether it observed nest use generally or use of nests for active nesting behavior. *See* SDEIS at 3-7, lines 4–13.

BLM cannot compare narrower data reflecting nest activity with broader data reflecting nest occupancy. BLM must revise the discussion in Chapter 3 regarding nest activity and occupancy to disclose these differences. Further, BLM must confirm that the 2006 data it interprets as reflecting 50 percent active nests in fact capture active rather than occupied nests.

3.    BLM Must Disclose More Detail about the Data Regarding Non-Eagle Raptor Nest Use and Activity Levels in Table 3.18-5X.

Because of the risk that BLM inappropriately compares data regarding nest activity with data regarding nest occupancy, BLM should provide the data underlying the survey results described in Table 3.18-5X for examination by the Operator Group and the public.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **20** of **31**

At a minimum, BLM must revise or clarify its data regarding non-eagle raptor nest use and activity levels. First, Table 3.18-5X includes Hayden-Wing Associates data from 2016 and 2018 but not 2017. *See* SDEIS at 3-6, tbl. 3.18-5X. BLM should revise Table 3.18-5X to include Hayden-Wing Associates data from 2017.

Second, BLM should clarify whether Table 3.18-5X includes all data provided by Devon Energy or just data from 2018. *See* SDEIS at 3-6, tbl. 3.18-5X.

Finally, although BLM references the study "Effects of CBM Development on Raptor Nest Site Occupancy in the Powder River Basin," *see* SDEIS at 3-7, lines 4–13, BLM does not incorporate the findings of this study into Table 3.18-5X. BLM must explain why it chose to reference but not incorporate the data from this study into Table 3.18-5X.

### C.   BLM Inappropriately Concludes that Impacts from Options 2 and 3 Will be Moderate to Major.

BLM lacks any rationale or supportable basis to characterize the impacts from Options 2 and 3 as moderate to major. *See* DEIS at ES-5, lines 34–36, 4-6, lines 26–30, 4-7, lines 28–33.

1.   BLM's Conclusion that 45 to 141 Nests Could be Impacted by Options 2 and 3 is Not Based on Sound Scientific Data.

BLM has no basis to conclude that 45 to 141 nests could be impacted under Option 2. *See* SDEIS at 4-6, lines 20–21. BLM reaches this conclusion by relying on several flawed and scientifically unsupportable assumptions. Notably, BLM does not specify whether 45 to 141 nests could be impacted annually or over the lifetime of the project. *See id.* ("approximately 45 to 141 nests could be impacted **during project development**" (emphasis added)). Based on BLM's calculation, it appears that these figures reflect total impacts to nests over the life of the Project and therefore that between 4.5 and 14.1 nests could be impacted annually; however, BLM must clarify this point in the FEIS.

BLM's conclusion that 45 to 141 nests could be impacted under Option 2 is predicated on BLM's determination that 642 nests will be active in the Project area. BLM determines that 642 nests will be active by incorrectly assuming that 50 percent of non-eagle raptor nests in the Project area will be active annually; 642 is approximately half of the 1,283 non-eagle raptor nests in the Project area. SDEIS at 3-7, lines 12–13, 4-5, lines 7–10. For the reasons detailed in section VI.B.1, above, monitoring data do not support the assumption that 50 percent of non-eagle raptor nests in the Project area will be active annually. Rather, applying the average monitored activity level of 22 percent active nests, only 282 nests will be active annually in the Project area.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **21** of **31**

    2.  Options 2 and 3 Have the Potential to Impact Only Six Pairs of Non-Eagle
       Raptors Annually.

   The Operator Group estimates that TLS relief under Options 2 and 3 have the potential to site
development within TLS buffers around only six active non-eagle raptor nests annually—or between
two and three percent of all nesting pairs annually. The Operator Group concludes that Options 2 and 3
have the potential to site development within TLS buffers around only six pairs of nesting non-eagle
raptors annually via the following analysis:

➢ Under the Proposed Action, 150 well pads would be construed annually. *See* SDEIS at ES-3,
  lines 9–10.

➢ Based on a conceptual example of well pad placement in the Project area  that the Operator
  Group previously provided to BLM, the Operator Group estimates that 28 percent of these
  150 well pads—42 well pads—may be sited within non-eagle raptor nest buffers throughout
  the Project area. *See* Comments of Anadarko Petroleum Corporation on Converse County Oil
  & Gas Project DEIS at 3–4 (Mar. 9, 2018).

➢ Not all of these 42 well pads will impact active nests. Monitoring data reflects that an
  average of 22 percent of non-eagle raptor nests are active annually in the Project area. *See*
  SDEIS at 3-6, tbl. 3.18-5X. Based on this average monitored activity level, BLM can
  conclude that, annually, well pads may be sited within non-eagle raptor nests buffers
  surrounding approximately nine nests (22 percent of 42).

➢ Not all of these nine nests, however, will be subject to a BLM TLS. BLM can only prescribe
  surface management measures on approximately 60 percent federal oil and gas development
  within the Project because it owns 64 percent of the minerals, and less than 10 percent of
  the surface, in the Project area. *See* DEIS at 2-1, lines 42–43; BLM Instruction Memorandum
  No. 2018-014 (June 12, 2018) ("RMPs do not govern the use of non-Federal lands.
  Management actions in an RMP meant for the protection of Federal surface resources should
  not be applied to a Fee/Fee/Fed APD unless, and only to the extent that, activities authorized
  under the APD will impact Federal lands."). Because BLM can prescribe surface
  management measures on approximately 60 percent federal oil and gas development within
  the Project area, the Operator Group estimates that approximately six of the nine active nests
  are subject to BLM TLS annually.

   Therefore, BLM's decision to authorize year-round development within the Project area only has
the potential to site development within TLS buffers around six active non-eagle raptor nests annually.
These six nests are less than three percent of the 282 active nests within the Project (assuming 22
percent of nests in the Project area are active). This analysis demonstrates a risk to few active non-eagle
raptor nests from BLM approval of year-round development. Furthermore, although BLM's decision to
authorize year-round development in these TLS buffers has the potential impact six active non-eagle

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **22** of **31**

raptor nests, Option 3 would protect these active nests. *See* Section II.A, above. Therefore, BLM lacks a basis to conclude that impacts from Option 3 would be moderate to major.

> 3.    BLM Does Not Justify Its Characterization of the Potential Impacts from Option 3.

BLM characterizes the impacts of Option 3 as "moderate to major" but does not justify this characterization. BLM describes "moderate to major" impacts as "meaning effects would be either sufficient to cause a change in the population or subpopulation (e.g., abundance, distribution, quantity, or viability), however, the effects would be local; or substantial and could be permanent in their effect on population or subpopulation survival." SDEIS at 30–33. BLM, however, does not provide any analysis or explanation of why impacts to between 45 and 141 nests over the lifetime of the Project would be moderate to major.

Although the Operator Group disagrees with BLM's determination of the number of impacted nests, BLM's calculations purport that less than three percent of nests would be impacted in a given year (4.5 and 14.1 compared to 642) for the 10-year development phase of the Project. BLM offers no explanation or scientific rationale as to why such a low number of purportedly impacted nests would cause permanent changes in populations. Furthermore, BLM does not compare the total number of nests it believes will be impacted over the lifetime of the Project to the non-eagle raptor population over the lifetime of the Project. BLM simply offers no assessment of these figures or justification as to why it determine these impacts are moderate to major.

> 4.    BLM Incorrectly Discounts the Conservation Benefits of Option 3.

BLM incorrectly discounts the conservation benefits of Option 3 by assuming that Feature 1 will not apply mitigation to active nests. *See* SDEIS at 4-7, lines 3–4 ("Similar to Option 2, Feature 1 could impact a similar number of nests each year and over the life of the project by not applying any mitigation to active nests within the [Converse County Project area]."). Contrary to BLM's statement, Feature 1 does apply mitigation measures; it requires that operators either begin development activities before the start of the TLS season or verify that a nest is inactive before beginning development activities during the TLS season. *See* SDEIS at S1-1, lines 26–34. BLM must revise the statement on page 4-7 and, further, revise its analysis of the impacts of Option 3 to account for the conservation measures it would require.

> 5.    BLM's Assessment of Impacts Relies on Incorrect Assumptions Regarding Non-Eagle Raptor Nest Fidelity.

BLM overstates impacts from Option 3 resulting from loss of potential nesting locations by assuming that non-eagle raptors exhibit strong nest fidelity. BLM incorrectly reasons that Option 3 does "not prevent the loss of a nesting location and possibly a nesting territory, if operations are too close to the nest, and secure nesting substrate in the territory is limited." SDEIS at 4-7, lines 16–18. Further, BLM incorrectly reasons that "[u]nder Option 3, disturbance to raptor nest sites could occur for multiple

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page 23 of 31

years compounding the lack of nest productivity over generations and possibly resulting in eventual loss of nesting territories." SDEIS at 4-7, lines 22–24.

BLM has no basis or information to assume that the temporary loss of potential nesting locations will impact individual non-eagle raptors or overall non-eagle raptor populations. Rather, BLM's assessment of impacts assumes that non-eagle raptors exhibit nest fidelity and thus equates the loss of a nest location with the loss of a successful nest. In fact, recent scientific studies support the conclusion that non-eagle raptors will find an alternative nest when a nest is lost.

Ferruginous hawks, which are the most common raptor in the Project area, will tend several nests before choosing one to nest. "Some raptor species, such as golden eagles and ferruginous hawks, maintain several potential nest sites within their territory among which they can rotate in different years." Carlisle et al., 2018. Other raptor species exhibit similar behavior. "Inspection of 21 territories monitored for 26-38 yr. without interruption suggested [golden] eagles use individual nests an average of every 3.3 years, laid nests in any nest within territories an average of every 1.8 yr. and switched nests between 43.3% of consecutive nesting attempts (i.e., egg-laying in discrete breeding season)." Slater et al., 2017. "The average proportion of nests in use varied across species, as did the magnitude of changes in use from year to year . . . . Bald eagles had the highest overall average use (63.6%), whereas ferruginous hawks had the lowest (8.2%). All other species averages ranged from 19.5-42.6% . . . ." Carlisle et al., 2018. Further, "nest success or failure in one year did not influence whether a pair switched nests in the following year." Slater et al., 2017. Indeed, BLM itself recognizes that "[t]he number of nests is not an indicator of raptor abundance." DEIS at 3-5 n.1.

BLM must revise its discussion of impacts from Option 3 to incorporate the findings of these scientific studies and, specifically, to eliminate the assumption that the loss of one nesting location will necessarily prevent a successful nest. Without this assumption, BLM cannot conclude that impacts from Option 3 will be "moderate to major."

      6.    BLM Lacks a Basis to Assume that Non-Eagle Raptor Nests Will be Adversely Impacted Under Option 3.

BLM's conclusion that Option 3 will adversely impact non-eagle raptor nests and, in turn, non-eagle raptor populations is unsupported and based on faulty assumptions. In addition to the assumption that non-eagle raptors exhibit high nest fidelity, described in section VI.C.5 above, BLM's analysis makes numerous incorrect assumptions. First, BLM incorrectly states that, "[u]nder Options 2 and 3, year-round development, if allowed, would adversely impact non-eagle raptor species by causing nest abandonment, reduced reproductive success, and displacements of individuals from nesting territories." SDEIS at 5-3, lines 17–20. BLM, however, has no basis to assume that Option 3 will result in nest abandonment. In fact, elsewhere in the SDEIS, BLM recognizes that design features prevent a nest from becoming active. *See* DEIS at 4-7, lines 15–16 ("The design features under Option 3 could prevent a nest from becoming active and thus prevent it from being abandoned."). BLM must revise the discussion in Chapter 4 to recognize that the design features in Option 3 presents a low likelihood of nest abandonment.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **24** of 31

Second, BLM erroneously concludes that under Option 3, disturbance to non-eagle raptor nest sites could occur for multiple years, thereby compounding the lack of nest productivity over generations and possibly resulting in eventual loss of nesting territories. *See* SDEIS at 4-7, lines 22–24 and 35–39. BLM offers no support for this assertion. Furthermore, this statement ignores scientific findings that the density of oil and gas infrastructure, including roads and well pads, did not influence the breeding performance of raptors. "Our results provided no evidence that breeding performance was influenced by density of roads and oil and gas well pads, or distance to well pads. . . . Average density of active oil and gas well pads in occupied territories with >1 pad considered in this study was considerable lower (1.34 well pads/km$^2$) than some current and proposed developments in Wyoming . . . ." (Wallace et al. 2016) Notably, the density of well pads considered in the Wallace et al. study (1.34 well pads/km$^2$) is considerably higher than the density of well pads proposed by the Project, which is expected to be 0.83 well pads per square mile. DEIS at 4.18-11, lines 26–29. BLM must revise its assessment of the impacts to non-eagle raptor sites over multiple years.

Moreover, BLM suggests that the current non-eagle raptor TLS under the Casper RMP (Option 1) risks the same impacts as under Option 3. The Casper RMP limits surface disturbing activities or occupancy (drilling and completions) during certain times of the year within defined proximities of non-eagle raptor nests, but it does not prohibit all activities around non-eagle raptor nests. *See* Casper RMP at 2-26. Therefore, activity will occur during the nesting period for many years after the well is drilled. Applying the logic of BLM's analysis of Option 3, Option 1 (adherence to the Casper RMP) will also result in impacts to non-eagle raptor nest productivity over multiple years.

Third, BLM explains that Feature 2 of Option 3 assumes that, because the nest is inactive at the time of the survey, it would not become active during anytime within the nesting period of that year. DEIS at 4-6, lines 47–49. Feature 2 of Option 3 is not based on this assumption. Rather, Feature 2 of Option 3 assumes that if a nest is inactive at the time of survey, non-eagle raptors that begin nesting after activities commence are not disturbed or disrupted by the activities.

Fourth, BLM overstates effects of Option 3 by asserting that it does not ensure that nests would not be disturbed. At SDEIS at 4-7, line 14, BLM states, "Neither feature within Option 3 would ensure that there would be no disturbance to the nest." This statement should be revised to reference only "active" nests.

Finally, BLM ignores the environmental benefits of year-round development under Options 2 and 3. These benefits include less truck traffic, less dust, less overall disruption year over year, timely reclamation, and other benefits, as detailed in the Operator Group's comments on the DEIS. *See* Operator Group Comments on Converse County Oil & Gas Project DEIS at 8–13 (Mar. 12, 2018). BLM's analysis of impacts of Options 1 – 5 must account for the benefits of year-round development and how these reduced impacts benefit raptor populations.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **25** of **31**

> ### D.    The SDEIS Understates the Impacts of Options 4 and 5.

First, BLM uses different terms to assess effects from Option 3 and from Options 4 and 5. BLM states that Option 3 would not prevent "disturbance" of nests. *See* SDEIS at 4-7, line 14. By contrast, BLM concludes that "no active nests would be impacted," rather than disturbed, under Option 4. *See* SDEIS at 4-8, line 15. Because BLM evaluated the possibility of "disturbance" of nests under Option 3, BLM must also evaluate the possibility that Options 4 and 5 would result in disturbance of nests.

Finally, BLM concludes that year-round development under Options 2 and 3 "would adversely impact non-eagle raptor species by causing nest abandonment, reduced reproductive success, and displacements of individuals from nesting territories." SDEIS at 5-3, lines 18–20. Options 2 through 5 result in different impacts related to reduced productivity and displacement when development is allowed within non-eagle raptor buffers. Option 3 limits impacts to productivity by prohibiting development activities from beginning in TLS buffers around active nests. *See* DEIS at 2-7, lines 25–40. The SDEIS lacks any discussion of how Options 4 and 5 will alleviate reduced reproductive success and displacement. SDEIS at 5-3, lines 18–20. BLM must evaluate the impacts of each option on reduced reproductivity and displacement.

> ### E.    BLM's Inflated Assessment of Impacts from Options 2 and 3, and Understated Assessment of Impacts from Options 4 and 5, Distort BLM's Analysis of the Options.

BLM's incorrect characterizations of the impacts of Option 2 and 3 as "moderate to major," and the impacts of Options 4 and 5 as "negligible to minor," distort BLM's analysis of the options and ultimately its decision to select Option 4 as its preferred option in the SDEIS. *See* SDEIS at ES-5, lines 34–36. BLM concludes that the "net result of Options 4 and 5 would be that relief from TLS would be allowed by implementing a non-eagle raptor management plan that would avoid or reduce impacts." SDEIS at ES-5, lines 36–38. However, BLM's basis for the comparing the options is incorrect. Impacts from Options 2 and 3 are dramatically less than BLM forecasted, while Options 4 and 5 are more impactful than BLM assessed. Therefore, BLM's comparative basis for selecting Option 4 is erroneous. BLM must reevaluate its preferred option after it reassesses the impacts of Options 2 through 5.

## VII.    BLM's Impact Analysis in Chapter 4 Must Distinguish Those Activities over Which BLM Lacks Jurisdiction.

BLM's analysis of the impacts of Options 1 through 4 must distinguish between impacts to nests within BLM jurisdiction and those outside BLM jurisdiction (i.e., fee/fee/fed scenarios). Throughout the SDEIS, BLM discusses impacts to non-eagle raptor nests throughout the Project area and does not distinguish that it lacks jurisdiction over some of these actions. Specifically, BLM lacks authority to impose non-eagle raptor TLS on APDs for federal wells drilled from off-lease, non-federal surface locations overlying private minerals ("fee/fee/fed" scenarios) where the federal oil and gas lease lacks a non-eagle raptor TLS. *See* BLM Instruction Memorandum No. 2018-014 (June 12, 2018). BLM has recognized that in fee/fee/fed scenarios, "RMPs do not govern the use of non-Federal lands."

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **26** of 31

Although BLM may not impose the non-eagle raptor TLS in fee/fee/fed scenarios, BLM's NEPA analysis assumes that all non-eagle raptor nests within a TLS buffer may be impacted by its decision to adopt Options 1, 2, 3, or 4. BLM's analysis does not differentiate between those impacts that would occur regardless of which option BLM adopts (i.e., impacts from fee/fee/fed development) and those impacts that would occur (or not occur) depending on the option BLM selects. *See, e.g.*, SDEIS at 1-1, lines 18–19 ("The BLM and USFS decisions would apply only to federal surface and mineral estate; however, the analysis in this EIS considers the impacts for all proposed activities regardless of surface or mineral ownership."); *see also* SDEIS at 4-5, lines 2–15, 4-6, lines 19–21. This distinction is significant because approximately 90 percent of the surface and 36 percent of the mineral interest in the Project area are not federally owned. *See* SDEIS at ES-1, lines 16–17. Thus, the analysis in the SDEIS must assume that some proportion of wells will be drilled in fee/fee/fed scenarios and that BLM could not apply the TLS in this scenario. In the FEIS, BLM must describe the limits of its management authority in fee/fee/fed scenarios and revise the analysis of impacts to non-eagle raptors to recognize that BLM does not have management authority over all nests.

Furthermore, Appendix S2 identifies prerequisite conditions to obtain TLS relief. One condition is that "[c]onditions must exist for a TLS condition of approval (COA) to be applied to the application of permit to drill (APD)." SDEIS at S2-1, lines 5–7. BLM should include a statement in Appendix S2 clarifying that a COA will not be applied in fee/fee/fed scenarios where the underlying oil and gas lease also lacks a TLS.

Notably, BLM states, "Of the 45 to 141 nests within the [Converse County Project area], 3 to 9 could be impacted by project development on the BLM lands that make up 6 percent of the [Converse County Project area]." SDEIS at 4-7, lines 9–11. This statement is confusing and unnecessary; it is unclear why BLM limited its analysis to federal surface when BLM also exercises management authority on split-estate lands with federally owned minerals. BLM must revise this analysis to recognize the extent of its management authority.

## VIII. The Process Set Forth in Appendix S2 for TLS Relief under Option 4 is Cumbersome and Confusing.

### A. Appendix S2 Uses Inconsistent and Ambiguous Terminology.

BLM inappropriately uses the terms "active," "occupied," and "utilized" interchangeably to describe nest use when the terms have distinct meanings. For example, BLM states that "[i]n order for development activities to be considered further, the information gathered from the prior two years must display that no eagle has **utilized** the nest. If a nest has ever been **occupied** by eagles, it will be considered an eagle nest regardless of being **inactive**, **used** by other species, or if eagle **occupancy** occurred greater than two years ago." SDEIS at S2-2, lines 4–9. The terms "active" and "occupied" have distinct meanings, as discussed in section III above. BLM must revise this discussion to use consistent terminology.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **27** of **31**

Similarly, Appendix S2 uses inconsistent terms to describe operators' conduct that must occur prior to the start of the TLS season and the conduct that may occur during the TLS season. Appendix S2 refers to "activity[ies]," SDEIS at S2-1, line 33, S2-2, line 39, S2-3, line 20, S2-4, line 44; "operation[s]," SDEIS, at S2-1, line 37, S2-3, line 28, S2-4, line 20; "oil and gas related development," SDEIS at S2-1, lines 1–2; "development activities," SDEIS at S2-2, line 4, S2-4, lines 2, 11 and 29; "well location activities," SDEIS at S2-2, lines 12–13 and 20; "drilling," S2-1, lines 30–33; and "construction," SDEIS at S2-2, line 24. BLM must clarify what conduct may occur before and during the TLS season. In particular, the references to "well location activities" and "construction" appear to refer to different activities than "drilling." BLM must revise this discussion to clarify what activities may occur when in relation to the TLS season.

Further, Appendix S2 uses terms that are not defined in the document. Page S2-2, row 15, references the "Location Adjustment Strategy," which is not defined in the document. Likewise, page S2-2, row 28, references the "Rigorous Monitoring Strategy," which is also not defined. BLM must eliminate these undefined references from Appendix S2.

### B.    Appendix S2 Does Not Establish a Clear Standard to Avoid TLS Buffers.

Appendix S2 sets forth ambiguous standards by which operators must demonstrate they attempted to avoid TLS buffers. Appendix S2 requires that a request for TLS relief include "sufficient information" that there was a "legitimate attempt" to avoid the TLS buffer. SDEIS at S2-3, lines 44–48. Elsewhere, Appendix S2 requires that the operator must "display" that they have avoided the TLS buffer "to the degree possible." SDEIS at S2-2, line 14. First, these standards conflict. Second, Appendix S2 does not define any of these terms, leaving significant discretion with BLM in reviewing and determining whether to approve a request for TLS relief. This discretion risks inconsistent, if not arbitrary, decision-making within BLM. Finally, these ambiguous terms give operators no guidance as to what information they must provide, or demonstration they must make, to BLM.

### C.    Appendix S2 Does Not Explain the Process for Modifying Existing Leases.

The SDEIS states that "[o]perators who request relief from [TLS] upon submission of an APD would receive a modification of the lease . . . ." SDEIS at S2-1, lines 11–13. BLM's regulation at 43 C.F.R. § 3101.1-4 requires a 30-day public review period for issues of "major concern" to the public. The SDEIS does not explain whether a 30-day public review period would be required prior to modification of leases or whether, if a public review period is required, BLM's 90-day public comment period on the draft RMP satisfies this requirement.

BLM's regulation governing modifications and waivers of oil and gas lease terms directs that, "[i]f subsequent to lease issuance the authorized officer determines that a modification or waiver of a lease term or stipulation is substantial, the modification or waiver shall be subject to public review for at least a 30-day period." 43 C.F.R. § 3101.1-4. If BLM determines this modification is "substantial," BLM's Federal Register notice and 90-day comment period on the RMP amendment amply satisfy the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **28** of 31

obligation to subject the modification for public review. Thus, in the FEIS, BLM should confirm that no additional public review is necessary to modify leases with raptor TLS in the Project area.

### D.     BLM Must Explain the Process for Verifying Nest Inactivity.

Appendix S2 requires that "to proceed from one drilling phase to another, where an increase in potential impact is realized, there must also be verification of inactivity." SDEIS at S2-3, lines 6–8. This requirement appears to be inconsistent with the requirement that activities not break for more than 72 hours. *See* SDEIS at S2-2, lines 39–44. At a minimum, this requirement appears to put continuous operations at risk because, if a bird moves to a nest location within a TLS buffer while development activities are occurring, an operator must obtain a determination by BLM and USFWS that the activity is not likely to impact the success of the nest. SDEIS at S2-3, lines 6–8.

### E.     BLM Must Clarify When Activities Must Commence.

Appendix S2 contains confusing language about when activities subject to TLS relief must commence. Appendix S2 directs that, when an operator requests TLS relief concurrently with submission of an APD, the operator represent at the annual meeting that it intends to initiate "drilling" prior to February 1. SDEIS at S2-1, lines 30–33. Elsewhere in Appendix S2, "well location activities" must begin before February 15. *See* SDEIS at S2-2, lines 20–21. BLM must explain both the relationship between the February 1 and February 15 start dates and why drilling activities must begin earlier than well location activities.

### F.     BLM Must Clarify the Process for Commencing Activity After APD Approval.

BLM must clarify the statement in Appendix S2 that "BLM would then ensure conditions have not changed since the approval of the APD." *See* SDEIS at S2-1, lines 20–21. First, this statement should be revised to state that "**The operator** would then ensure . . . ." rather than BLM. Second, BLM should define "conditions" because this term is unclear and may lead to inconsistent application.

### G.     BLM Must Evaluate the Direction that it Review APDs for TLS Conditions of Approval.

The direction in Appendix S2 that BLM examine whether a TLS condition of approval is attached to an APD is confusing. *See* SDEIS at S2-1, lines 5–10, S2-3, lines 39–43. Because an operator is unlikely to submit a sundry for an APD that does not require TLS relief, this direction is unnecessary.

## IX.     Technical Comments

### A.     BLM Should Clarify the Effect of Changed Laws on Option 2.

On page 2-7, lines 9–14, the SDEIS states:

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **29** of 31

Option 2 consists of an amendment to the Casper RMP that would modify all existing leases and development within the Converse County Oil and Gas Project area, removing all non-eagle raptor nest timing limitations in lease stipulations, conditions of approval, mitigations or other stipulations through the operation of the pertinent resource's laws, rules, and regulations. Future leases or development within the CCPA area would not include the non-eagle raptor nest timing limitations.

Although the SDEIS references the "pertinent resource's laws, rules, and regulations," the SDEIS does not clarify how changes in law, and changed interpretations of law, could affect Option 2, if adopted. Most notably, the SDEIS does not discuss the relationship between Option 2 and Solicitor Opinion No. M-37050 (Dec. 22, 2017), "The Migratory Bird Treaty Act Does Not Prohibit Incidental Take." The SDEIS should clarify the effect, if any, of changed interpretations of the MBTA and any associated regulations that may be promulgated on Option 2.

**B.    BLM Should Consider the Cedar Springs Wind Project.**

The Operator Group encourages BLM to reference the Cedar Springs Wind Project in its analysis of cumulative impacts to non-eagle raptors. The Cedar Springs Wind Project has been proposed to be located in Converse County approximately 10 miles north of Douglas, Wyoming, The permit application filed with the Wyoming Industrial Siting Commission contains a discussion of potential impacts to raptors. *See* Wyo. Industrial Development Information and Siting Act Section 109 Permit Application at 198 – 203 (2019).[1] Additionally, BLM should include any other wind projects that BLM determines to be reasonably foreseeable and that may contribute to cumulative impacts to populations of non-eagle raptors.

**C.    Other Technical Comments**

➢ The Executive Summary notes that the Operator Group proposed Option 2 but does not note that the Operator Group also proposed Option 3. *See* SDEIS at ES-1, line 38 ("Option 2 (Proposed by the OG) . . . ."). As a result, the Executive Summary incorrectly implies that the Operator Group prefers Option 2 over Option 3. To avoid confusion by the public, the Executive Summary should expressly recognize that the Operator Group supports Option 3.

➢ In the description of the proposed RMP amendments, BLM should clarify that the proposal under Option 3 to allow oil and gas development within the spatial nest buffer of a non-eagle

---

[1] Available at
http://deq.wyoming.gov/media/attachments/Industrial%20Siting/Application%20and%20Permits/Cedar%20Springs%20Wind%20Project%20/2019%200222_ISD_Cedar%20Springs%20Wind%20Application_18-05.pdf.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **30** of 31

raptor nest would not allow destruction of the actual nest, notwithstanding the 2018 USFWS guidance regarding the destruction or removal of nests. *See* SDEIS at 2-7, lines 25–32; Memorandum from Asst. Dir., Migratory Birds to Reg'l Dirs. Re: Destruction and Relocation of Migratory Bird Nest Contents (June 14, 2018). Although the Operator Group understands this limitation, the general public may not.

➢ On page 2-8, rows 15–16, the DEIS states that "Key elements of the MBCP would include regulatory background and required **bird permits** . . . " (emphasis added). This statement incorrectly implies that operators require a USFWS permit to operate within TLS buffers. BLM should revise this statement to eliminate the reference to bird permits.

➢ The SDEIS does not disclose the source of data for Figure 3.18-9 on page 3-3; it identifies the source as "AECOM 2015" but this source is not listed in Section 8.0, References. BLM should disclose the source of this data and, further, should only use data that is five years old or newer.

➢ The sources of data displayed in Table 3.18-1 on page 3-5 are varied and dated. BLM should only utilize nest data that is five years old or newer.

➢ The SDEIS contains several references to Table 3.18-4, historic non-eagle raptor nests in the Converse County Project area, but the actual table does not appear to be included in the document. BLM must include this table in the FEIS.

➢ The statement on page 4-8, lines 9–11, "Based on planning and coordination between the applicant and the BLM and USFWS, conservation measures would be described in a raptor protection plan and followed to protect **nesting raptors**" (emphasis added) should be revised to reference "non-eagle raptors."

➢ BLM should add language specifying that USFWS generated Table S1-1 on page S1-2 because the SDEIS does not identify the source of this information.

➢ Page S2-4, row 38, contains the statement, "If **the TLS** becomes active at any point from February 1 to June 15 . . . " (emphasis added). The reference to "TLS" should be changed to "nest."

## X.  Conclusion

The Operator Group appreciates BLM's consideration of these comments. If BLM has any questions about the information presented in these comments, please contact Kathleen Schroder at katie.schroder@dgslaw.com or (303) 892-7354.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **31** of **31**


Sincerely,

DAVIS GRAHAM & STUBBS LLP

Kathleen C. Schroder

on behalf of

Anadarko Petroleum Corporation
Chesapeake Energy Corporation
Devon Energy Corporation
EOG Resources, Inc.
Northwoods Energy