Exhibit C to Rebacca Byram Declaration

# DAVIS GRAHAM & STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

August 31, 2020

*Submitted via e-planning and via FedEx*

BLM Director (210)
Attention: Protest Coordinator
20 M Street SE, Room 2134LM
Washington, D.C. 20003

**Re:    Converse County Oil and Gas Project, Converse County, Wyoming
Protest of Proposed Resource Management Plan Amendment
Comments on Final Environmental Impact Statement**

Dear Director,

In accordance with 43 C.F.R. § 1610.5-2(a), Chesapeake Energy Corporation, Devon Energy Corporation, EOG Resources, Inc., Northwoods Energy, and Occidental Petroleum Corporation (collectively, "the Operator Group") hereby protest the Proposed Resource Management Plan Amendment (PRMPA) of the Casper Resource Management Plan (RMP) associated with the Converse County Oil and Gas Project (the "Project"). Additionally, the Operator Group offers comments on the Final Environmental Impact Statement (FEIS) prepared for the Project and that accompanies the PRMPA. The Operator Group appreciates the Bureau of Land Management's (BLM) extensive effort preparing this FEIS and PRMPA and consideration of the Operator Group's protest and comments. The Operator Group looks forward to prompt issuance of a Record of Decision (ROD).

**Protest of Proposed Amendment to the Casper Resource Management Plan**

**I.     Statement of Interest**

The Operator Group constitutes the proponents of the Project. The Operator Group files this protest through its attorney, Kathleen C. Schroder at Davis Graham & Stubbs LLP, who can be contacted at:

> 1550 17th Street, Suite 500
> Denver, Colorado 80218
> (303) 892-7354
> katie.schroder@dgslaw.com

The Operator Group participated in the planning process by filing comments on the Supplement to the Draft Environmental Impact Statement (SDEIS) prepared for the Project, which proposed to amend the Casper RMP, *see* 84 Fed. Reg. 17,884 (Apr. 26, 2019) (enclosed as Attachment A). The Operator Group also filed comments on the Draft Environmental Impact Statement (DEIS) prepared for the Project, *see* 83 Fed. Reg. 3,767 (Jan. 26, 2018) (enclosed as Attachment B).

Davis Graham & Stubbs LLP  ▪  1550 17th Street, Suite 500  ▪  Denver, CO 80202  ▪  303.892.9400  ▪  fax 303.893.1379  ▪  dgslaw.com

4752306.9                                                                                                      4752306.9

August 31, 2020
Page **2** of 41

## II.    Introduction

The Operator Group protests BLM's proposed amendment of Decision No. 4047 in the Casper RMP with land use amendment Option 6 and proposed Appendix G4.  Although the Operator Group appreciates BLM's efforts to develop Option 6, Option 6 as presented in the PRMPA/FEIS does not allow for meaningful year-round development.  BLM must clarify and modify the process set forth in Option 6 to facilitate year-round development while still protecting nests that are "occupied active"— i.e., nests that actually contain young, eggs, or incubating raptors.  With the clarifications and modifications outlined in this protest and comment letter incorporated into the ROD, the Operator Group believes Option 6 can meaningfully accommodate BLM's intent to authorize year-round drilling under certain, well-considered conditions, as analyzed in the DEIS, SDEIS, and FEIS.  These protections ensure that, under any interpretation of the Migratory Bird Treaty Act (MBTA), BLM's authorization of year-round development will not authorize incidental take of non-eagle raptors.

> A.    Year-Round Development is Vital to Efficient Development of the Project Area.

Year-round development is essential to efficient development of the Project Area.  The Project Area contains more than 1,100 raptor nests—but more than 700 of these nests are unoccupied in a given season.[1]  FEIS at 4.18-22, 4.18-30 (stating that 33 percent of nests are occupied annually).  Most of these nests are for ferruginous hawks.  *Id.* at 3.18-27.  Though the overwhelming majority of these nests are unoccupied, the Casper RMP protects each of these nests, regardless of occupancy, with a stipulation imposing a half-mile buffer in which surface occupancy is prohibited for six months every year.  *See* Casper RMP, Decision No. 4047 (2007).  These stipulations require operators to cease drilling operations within a spatial buffer in February of every year and move equipment off the well pad; the operator cannot resume operations until August.

The concept of "year-round development," a key component of the FEIS, entails the ability to, at any time during the year, move equipment on and off well locations, begin development activities when nests are unoccupied, and continue development activities on well pads within spatial buffers.  Year-round development carries environmental benefits by reducing the overall time to drill multiple wells from a single pad, which, in turn, reduces the amount of time that well pads remain unreclaimed.  Year-round development also eliminates the need for rigs to move on and off a location when timing stipulations take effect, thus reducing truck traffic and associated air quality impacts.  Further, year-round development promotes continuous employment and economic returns because timing stipulations cause seasonal swings in activity, thereby avoiding the disruptive impacts of halting operations for six months of the year.  For these reasons, the Operator Group included year-round development in its Proposed Action for the Project.  FEIS at 2-26.

Although the Operator Group appreciates BLM's efforts to develop Option 6, Option 6 does not fully accommodate year-round development.  First, Option 6 does not outline a clear pathway to development around nests that were unoccupied during the prior breeding season.  Second, with respect to nests that were occupied active the prior breeding season, Option 6 is unnecessarily restrictive and

---

[1] This protest refers to nests that are not occupied active as "unoccupied."  As requested later in this protest, BLM should, in the ROD, define "unoccupied" nests as those that are not occupied active.

August 31, 2020
Page **3** of **41**

inflexible.  It only allows development activities to proceed in a nest buffer when the activities commence 30 days before the start of the breeding season, with limited ability for operations to cease and resume during the breeding season.  *See* FEIS at G4-2.  The Operator Group maintains that, so long as a nest is unoccupied, BLM should allow development activities to commence or resume within spatial nest buffers during the breeding season.

The limitations in Option 6 constrain development activities with little biological benefit.  The conditions limit an operator's ability to adjust its drilling schedule due to unforeseen circumstances, such as issues with surface access, drilling results, regulatory factors, infrastructure considerations, crew and capital availability, unpredictable takeaway capacity, and weather delays.  As detailed in the Operator Group's comments on the SDEIS, ferruginous hawks exhibit low nest fidelity.  *See* Operator Group Comments on SDEIS at 12–13 (July 25, 2019).  Moreover, as noted above, only one-third of nests are occupied in a given year. FEIS at 4.18-22, 4.18-30.  Therefore, BLM appears to achieve little if any biological benefit by restricting activities in spatial nest buffers simply because a nest was occupied active the prior year.

In this protest, the Operator Group maintains that BLM should incorporate elements of Option 3 into Option 6 so that Option 6 clearly accommodates year-round development.  The Operator Group continues to assert, however, that Option 3 outlines a straightforward process for year-round development while, at the same time, providing a streamlined process for BLM to administer and affording operators flexibility in development.  *See* Operator Group Comments on SDEIS at 2–4 (July 25, 2019).  Most significant, Option 3 would allow operators to initiate development activities within non-eagle raptor spatial nest buffers any time during the breeding season if a nest is unoccupied. *See* FEIS at G1-1.  Option 3 also clearly applies to all non-eagle raptor nests within the Project area, regardless of whether nests were classified as occupied active or unoccupied in the prior breeding season.

For these reasons, the Operator Group continues to encourage BLM to adopt Option 3 for the Resource Management Plan Amendment (RMPA) in the ROD.  At a minimum, however, BLM must incorporate the Operator Group's proposed modifications and clarification to Option 6, which include elements of Option 3, in the ROD so that this option can meaningfully facilitate year-round development while still protecting nests that are "occupied active."

B.    BLM's Approval of Year-Round Development Will Not Authorize Violations of the Migratory Bird Treaty Act.

None of the options for the land use plan amendments would authorize incidental take of migratory birds or otherwise violate the MBTA, under any interpretation of it.  Although the scope of the MBTA, and the question of whether it prohibits incidental take of migratory birds, is the source of ongoing debate, these questions have no bearing on whether BLM can adopt Alternative B in the ROD.

August 31, 2020
Page **4** of **41**

Neither Alternative B nor any of the land use plan amendment options will authorize incidental or direct take of migratory birds.[2]

The MBTA deems unlawful the "take" of migratory birds. 16 U.S.C. § 703(a). The U.S. Fish and Wildlife Service's (USFWS) general regulations define "take" as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect" or the attempt to do so. 50 C.F.R. § 10.12. "Incidental take" is generally considered to be take that results from an activity but is not the purpose of that activity. *E.g.*, Solicitor Op'n M-37050 (Dec. 22, 2017); 50 U.S.C. § 17.3 (defining "incidental take" in the context of the Endangered Species Act). Whether the MBTA prohibits incidental take is the subject of numerous competing statutory interpretations. *Compare* Solicitor Op'n M-37050 (Dec. 22, 2017) *with* Solicitor Op'n M-37041 (Jan. 10, 2017); *see also Natural Res. Defense Council v. U.S. Dep't of the Interior*, No. 18-CV-4596 (VEC) (S.D. N.Y. Aug. 11, 2020); 85 Fed. Reg. 5915 (Feb. 3, 2020).

Regardless of their holdings on the question of whether the MBTA prohibits incidental take, courts have consistently found that, without actual death or injury to migratory birds, habitat impacts do not constitute incidental take of migratory birds. *E.g.*, *Sierra Club v. Martin*, 933 F. Supp. 1559, 1565 (N.D. Ga. 1996), *rev'd on other grounds*, 110 F.3d 1551 (11th Cir. 1997) (observing that plaintiffs had "affirmative evidence of the number of deaths that will occur and are not merely relying upon assumptions"); *Sierra Club v. U.S. Dep't of Agric.*, No. 94–CV–4061–JPG, 1995 U.S. Dist. Lexis 21507, at *54-59 (S.D. Ill. Sept. 23, 1995); *Seattle Audubon Soc'y v. Robertson*, Nos. C89–160WD, C89–99(T)WD, 1991 WL 180099 (W.D. Wash. 1991), *aff'd sub nom. Seattle Audubon Soc'y v. Evans*, 952 F.2d 297 (9th Cir. 1991); *United States v. Corbin Farm Serv.*, 444 F. Supp. 510 (E.D. Cal. 1978), *aff'd* 578 F.2d 259 (9th Cir.1978) (application of pesticide to field caused death of 1,000 migratory ducks and violated MBTA).

In the ROD, BLM must recognize that no land use plan amendment option would authorize incidental take of non-eagle raptors because no land use plan amendment would authorize an oil and gas operator to initiate development within the spatial buffer of a nest that actually contains eggs, young, or an incubating raptor (i.e., an occupied active nest). Without eggs, young, or an incubating raptor, development operations cannot cause nesting non-eagle raptors to abandon eggs or young, resulting in actual death of migratory birds. This point is critical. Of the more than 1,000 raptor nests in the Project Area, most are ferruginous hawk nests and two-thirds are unoccupied in a given year on average. *See* FEIS at 3.18-27, 4.18-30. The Operator Group seeks relief from the stipulation in the Casper RMP that protects these unoccupied non-eagle raptor nests.

Two mechanisms ensure that BLM does not authorize the initiation of activities near occupied active nests. First, all land use plan amendment options require that oil and gas operations within spatial buffers begin prior to the start of the breeding season. *See* FEIS at G1-1 ("Commence oil and gas development within the spatial nest buffer either a) in advance of the season buffer period listed in Table X1-1 . . . ."); G2-2 ("Well location activities must initiate by February 15 in the year of the proposed construction."); G4-2 ("Commence oil and gas development within the non-eagle raptor nest spatial

---

[2] Further, courts have recognized the lack of a causal connection between BLM's land use authorizations and violations of the MBTA. *See, e.g.*, *Protect Our Cmty. Found. v. Jewell*, 825 F.3d 571 (9th Cir. 2016).

August 31, 2020
Page **5** of **41**

buffer 30 days in advance of the seasonal buffer period . . . ."). Prior to the breeding season (in
January), no incubating non-eagle raptor, eggs, or young will occupy the nest. Then, once beginning
operations, the operator must continue operations so that environmental conditions and noise levels
remain relatively constant. *See id.*

    Second, to the extent the land use plan amendment options allow the commencement of oil and
gas operations within spatial buffers during the breeding season, an operator must confirm that the nest
does not contain an incubating non-eagle raptor, eggs, or young before beginning or resuming
operations. *See* FEIS at G1-1 ("before oil and gas development can a) commence, or b) resume . . . then
the nest must first be determined to be inactive through the monitoring check"); G2-3 ("In order to
proceed from one drilling phase to another, where an increase in potential impact is realized, there also
must be a verification of inactivity"). This confirmation prevents commencement of operations within
the buffer of a nest with an incubating non-eagle raptor, eggs, or young. *See* Attachment C,
Memorandum from WEST to D. Applegate at 3 (Aug. 14, 2019).

    Because of these limitations, BLM's authorization of year-round development in the Project
Area would not authorize incidental take of non-eagle raptors. Indeed, the FEIS and WEST
Memorandum recognize that impacts to non-eagle raptors in the Project relate to disruption of breeding
patterns, rather than take of individual birds. FEIS at 5-66; WEST Memorandum. Accordingly,
approval of any of the land use plan amendment options will not authorize a violation of the MBTA,
under any interpretation of the statute.

    Notably, BLM has confirmed that the timing limitations for non-eagle raptors in the Casper
Resource Area serve a broad purpose of protecting raptor habitat, rather than the narrow purpose of
preventing incidental take under the MBTA. Using its general management authority to manage habitat
under the Federal Land Policy and Management Act, 43 U.S.C. § 1701(a)(8), BLM has promoted
nesting opportunities for raptors. The FEIS that accompanied the Casper RMP pointed to BLM's
general management authorities to protect raptor habitat as justification for raptor stipulations:

> Management direction for the BLM is identified in the *BLM and Fish and Wildlife 2000
> Raptor Habitat Management Plan* (BLM 1992c). Management procedures and activities
> for raptors have been identified by the USFWS management guidelines (USFWS 2002a)
> and Avian Protection Plan guidelines (APLIC and USFWS 2005). *The Wyoming Partners
> in Flight Wyoming Bird Conservation Plan Version 2.0* identifies habitat requirements and
> threats for raptor species (Nicholoff 2003). Currently, approximately 2,000 raptor nests
> have been documented in the planning area. Not all these nests are occupied; however, the
> BLM and the WGFD regularly survey and monitor raptor nest activity.

Casper PRMP/FEIS 3-63 (2007). Then, in the FEIS for the Project, BLM reaffirmed its role of habitat
protection, stating:

> Based on this and the BLM's RMP decisions calling for the protection of wildlife habitat,
> the EIS applies the WGFD definition of Occupied Territory or Site and the Carlisle et al.
> (2018) definition of annual nest use rate in the EIS analysis. The BLM does not consider
> the USFWS definition of "active nest" to be sufficiently broad to capture the range of

August 31, 2020
Page **6** of 41

reproductive efforts and behaviors that warrant protection under the RMP decisions to protect wildlife habitat.

FEIS at I-36.  Because raptor timing limitation stipulations serve BLM's broad objective of protecting raptor habitat, BLM can provide limited stipulation relief without authorizing incidental take of non-eagle raptors.

In the ROD, BLM should make one important clarification to avoid confusion by the public. Specifically, should BLM approve Option 6 as the preferred option in the ROD, BLM should clarify that the timing stipulation relief for "occupied active" nests afforded by Option 6 does not authorize an operator to initiate development within the buffer of a nest with an incubating non-eagle raptor, eggs, or young.  Rather, a nest's status as "occupied active" refers to whether it was surveyed as occupied active during the prior breeding season.  The Operator Group has never requested authorization to initiate development near a nest that contains incubating non-eagle raptor, eggs, or young as part of the Proposed Action for this Project.  The Operator Group recognizes and agrees that Option 6 does not authorize an operator to initiate development near a nest that contains an incubating non-eagle raptor, eggs, or young.  To avoid confusion by the public, the Operator Group requests that BLM clarify how Option 6 treats "occupied active" nests and, further, that Option 6 does not allow it to initiate development near a nest that contains an incubating non-eagle raptor, eggs, or young.

III.    **Statements of Protested Issues, Protested Parts of Plan, and Reasons for Protest**

BLM must revise the proposed amendment to Decision No. 4047 in the Casper Resource Management Plan (RMP) (2007) and Appendix G4.  First, BLM must clarify the availability of "stipulation relief" for non-eagle raptor nests that were occupied active in the prior season and the process applicable to such nests that were previously unoccupied.  Second, BLM must revise Option 6 to provide operators more flexibility to operate in spatial buffers throughout the year.  Third, the process for stipulation relief under Option 6 is unclear.  Fourth, the adaptive management provisions of Appendix G4 should clarify BLM's specific management objectives and direct timely finalization of the plan.  Finally, BLM should use consistent references to "occupied active" nests in the ROD.

Without these clarifications, adoption of Option 6 as proposed in the PRMPA/FEIS would adversely affect the Operator Group because it may lead to development delays for actions that BLM has already analyzed and authorized and inconsistent implementation of the PRMPA over the life of the Project.

For BLM's convenience, the Operator Group's proposed revisions to Decision No. 4047 are summarized as follows:

Within the Converse County Project Area (CCPA), as delineated in the Record of Decision (ROD) for the Converse County Oil and Gas Project Environmental Impact Statement (CC EIS) dated XX/XX/XXXX, if the operator commits to implement all of the measures contained in Section 1 of RMP Appendix [G4], one timing limitation stipulation relief request *__for nests that were occupied active during the prior breeding season__* will be granted for a well pad *__and associated infrastructure__* for 1 year. The number of stipulation reliefs *__for such nests__* allowed for the CCPA through the 10-year development phase

August 31, 2020
Page **7** of **41**

beginning on the signed date of the CCPA ROD will be 98. After 98 stipulation reliefs have been granted **_and used_**, additional reliefs **_for nests that were occupied active during the prior breeding season_** will only be granted upon implementation of an adaptive management plan that has been approved by BLM. This adaptive management plan will follow the guidance set forth in: "Adaptive Management: The U.S. Department of the Interior Technical Guide." **_For nests that were unoccupied during the prior breeding season, BLM will authorize operations within nest buffers ahead of the seasonal restriction period, or during the seasonal restriction period upon an operator's demonstration that the nest is unoccupied at the time the operator begins operations._**

The Operator Group's proposed changes to Appendix G4 are summarized in Appendix A of this protest.  The Operator Group's reasons and support for these proposed changes are detailed below.

A.    BLM Must Distinguish between the "Stipulation Relief" Process for Previously Occupied Active Nests and Management of Unoccupied Nests.

Option 6 does not distinguish between processes for BLM to authorize operations during the seasonal restriction period within non-eagle raptor buffers surrounding nests that were previously occupied active and nests that were unoccupied  Specifically, Decision No. 4047 and Appendix G4 do not identify when "stipulation reliefs" should be used.

If BLM adopts Option 6, as proposed in the PRMPA, amended Decision No. 4047 would state:

Avoid surface disturbance or occupancy within a ½-mile buffer of raptor nests, except for the species listed below, for which a ¼-mile buffer will be required:

> Red-tailed hawk
> Swainson's hawk
> American kestrel
> Osprey
> Great horned owl
> Long-eared owl
> Northern saw-whet owl
> Common barn owl
> Western screech owl

The seasonal restriction will be February 1 to July 31, or until young birds have fledged (TLS).

The authorized officer, on a case-by-case basis, may grant **exceptions** to seasonal stipulations.

Within the Converse County Project Area (CCPA), as delineated in the Record of Decision (ROD) for the Converse County Oil and Gas Project Environmental Impact Statement (CC EIS) dated XX/XX/XXXX, if the operator commits to implement all of the measures contained in Section 1 of RMP Appendix [G4], one **timing limitation stipulation relief**

August 31, 2020
Page **8** of **41**

request will be granted for a well pad for 1 year. The number of **stipulation reliefs** allowed for the CCPA through the 10-year development phase beginning on the signed date of the CCPA ROD will be 98. After 98 **stipulation reliefs** have been granted, additional **reliefs** will only be granted upon implementation of an adaptive management plan that has been approved by BLM. This adaptive management plan will follow the guidance set forth in: "Adaptive Management: The U.S. Department of the Interior Technical Guide."

*See* Casper RMP, Decision No. 4047 (2007); Converse County FEIS at 2-37 (emphasis added).

The proposed language is ambiguous because it does not identify when "stipulation reliefs" will be used and if and when exceptions are available in the Project Area. To resolve these ambiguities, BLM must revise Decision No. 4047 and Appendix G4 to make several clarifications. First, Decision No. 4047 must specify that BLM will only grant "stipulation reliefs" to authorize development in the buffers of nests that were occupied active in the prior breeding season. Second and similarly, Appendix G4 must specify that its process only applies when an operator seeks one of the 98 stipulation reliefs for nests that were occupied active during the prior breeding season. Third, BLM must clarify that Decision No. 4047 would authorize development in buffers surrounding nests that were unoccupied during the prior breeding season. Fourth, BLM must clarify the difference between "stipulation reliefs" and "exceptions." Finally, BLM must revise Appendix G4 to eliminate incorrect references to "exceptions."

> 1.      BLM Must Revise the Language Amending Decision No. 4047 to Specify When the 98 "Stipulation Reliefs" Will be Used.

The discussion in the FEIS demonstrates that BLM did not intend to use the 98 stipulation reliefs to authorize development in all nest buffers. Rather, the FEIS contemplates that BLM's use of the 98 "stipulation reliefs" is limited to nests that were previously occupied active. Accordingly, BLM must revise the proposed language amending Decision No. 4047 to specify when "stipulation reliefs" will be used.

> a.      *The RMPA Must Specify that the 98 Stipulation Reliefs are Only Available for Nests that Were Previously Occupied Active.*

The Operator Group bases its conclusion that the 98 stipulation reliefs are only available for nests that were previously occupied active on the analysis in the FEIS that explains how BLM arrived at the 98 stipulation relief threshold:

> Approximately 60 percent (298 of the 497 well pads potentially located within nest buffers) of the CCPA (6 percent BLM surface plus 54 percent split estate; see section 1.4.3) is under BLM management authority. Based on the analysis of nest use rate presented in Section 3.18.2.5 (Raptor Species subsection) only a portion of nests would be expected to be occupied at any given time. **Therefore, the BLM estimates that 33 percent of the 298 well pads under BLM management authority, or 98 well pads, would be expected to be located within the stipulation buffer for an occupied nest.**

FEIS at 4.18-30 (emphasis added). This analysis evidences that BLM did not intend that the 98 stipulation reliefs would apply to all nests. Rather, this analysis demonstrates that BLM would only

August 31, 2020
Page **9** of **41**

apply these 98 stipulation reliefs to nests that had been occupied active previously, presumably during the prior breeding season. Given that, on average, only one-third of nests in the Project Area are occupied active any given year, FEIS at 4.18-30, and given that the finite number of stipulation reliefs (98) discourages operators from developing in nests that were occupied active the prior year, the Operator Group anticipates that BLM will infrequently grant these stipulation reliefs.

Decision No. 4047, however, does not expressly recognize that the 98 stipulation reliefs only apply to nests that were previously occupied active and thus risks misinterpretation. Under this erroneous interpretation, the RMPA would authorize too few operations within non-eagle raptor buffers to meet the development level in the Proposed Action. The FEIS recognizes that to develop the 1,500 well pads proposed as part of the Project, the Operator Group may request approval to conduct operations within approximately 300 non-eagle raptor spatial buffers during the seasonal buffer period over the life of the Project. *See* FEIS at 4.18-30 ("Approximately 60 percent (298 of the 497 well pads potentially located within nest buffers) of the CCPA (6 percent BLM surface plus 54 percent split estate; see section 1.4.3) is under BLM management authority."). Without the requested clarification, BLM potentially could apply the 98 stipulation reliefs to all nests, regardless of prior occupancy—thus only authorizing a third of the necessary operations within spatial buffers for non-eagle raptors during the seasonal buffer period. This result leaves the Operator Group without the necessary flexibility to develop in the Project Area. Not only does this result adversely affect the Operator Group, it is manifestly inconsistent with BLM's intent to define a sound but narrow process for granting "stipulation relief" and the analysis set forth in the FEIS. *See* FEIS at 4.18-30.

                b.      *The RMPA Must Specify that Applicability of Stipulation Relief Depends on Whether a Nest was Occupied Active during the Prior Breeding Season.*

The Operator Group agrees with BLM's preference to use the term "occupied active" nest. *See* FEIS at 3.18-28. Further, the Operator Group supports BLM's definition of "occupied active" nest as "[a] nest or ledge in which eggs have been laid" and at least one of the following activities were documented: a) young were raised; b) eggs were laid; or 3) one adult was observed sitting low in the nest, presumably incubating. *See id.*

The PRMPA and Appendix G4 do not, however, explain what information an operator must obtain to classify a nest as previously "occupied active" or unoccupied and to avail itself of the 98 stipulation reliefs. The Operator Group maintains that, to determine which process to follow, nest status should be based on the prior year's survey data. Therefore, if a nest was occupied active during the prior season (for example, year 2019), an operator must follow the process in Appendix G4 to obtain one of the 98 stipulation reliefs to develop within the seasonal buffer during the following stipulation season (in this example, year 2020); the process in Appendix G4 ensures that an operator does not commence operations within the buffer of a nest that is actually occupied active. By contrast, if a nest was unoccupied during the prior season (2019), BLM will allow the operator to develop within the nest buffer during the stipulation season as long as the operator does not begin operators while the nest is occupied active.

BLM should not require an operator to provide survey data older than the prior season to determine whether stipulation relief applies. Rather, BLM should rely on survey data from the prior breeding season to determine occupancy. As the Operator Group detailed in its comments on the

August 31, 2020
Page **10** of **41**

SDEIS, non-eagle raptor species in the Project Area do not exhibit high nest fidelity.  *See* Operator Group Comments on SDEIS at 12–13.[3]  Therefore, evidence that a nest was occupied active or unoccupied before the preceding nest season should not determine whether one of the 98 stipulation reliefs will be used to authorize development within a nest buffer.

**Requested Change:**  The Operator Group maintains that BLM must make the following edits (bolded, italicized, and underlined text) to the final RMPA:

Within the Converse County Project Area (CCPA), as delineated in the Record of Decision (ROD) for the Converse County Oil and Gas Project Environmental Impact Statement (CC EIS) dated XX/XX/XXXX, if the operator commits to implement all of the measures contained in Section 1 of RMP Appendix [G4], one timing limitation stipulation relief request ***for nests that were occupied active during the prior breeding season***  will be granted for a well pad for 1 year. The number of stipulation reliefs ***for such nests*** allowed for the CCPA through the 10-year development phase beginning on the signed date of the CCPA ROD will be 98. After 98 stipulation reliefs have been granted, additional reliefs ***for nests that were occupied active during the prior breeding season*** will only be granted upon implementation of an adaptive management plan that has been approved by BLM. This adaptive management plan will follow the guidance set forth in: "Adaptive Management: The U.S. Department of the Interior Technical Guide.

2.    BLM Must Revise Appendix G4 to Specify that Its Process Will Only be Applied to Nests that were Occupied Active During the Prior Breeding Season.

Just as the proposed amendment to Decision No. 4047 does not specify that "stipulation reliefs" will be granted for nests that were occupied active during the prior breeding season, Appendix G4 does not explain that the process it outlines solely applies to obtain stipulation reliefs for nests that were occupied active during the prior breeding season.  BLM must revise Appendix G4 to clarify that it only applies when an operator seeks stipulation relief in non-eagle raptor buffers surrounding nests that were previously occupied active.   Further, BLM should define "unoccupied" nests as "not occupied active."

**Requested Changes:**  In the ROD, BLM must make the following edits (bolded, italicized, and underlined text) to the introductory paragraph of Appendix G4 clarifying its scope:

This appendix presents the measures that the BLM will require an operator to implement in order to obtain relief from the timing limitation stipulation for development activities within a non-eagle raptor nest buffer ***for nests that were occupied active during the prior breeding season***. ***These requirements do not apply to operations within a buffer for a***

---

[3] Citing "Interannual Golden eagle (Aquila Chrysaetos) Nest-use Patterns in Central Utah: Implications for Long-term Nest Protection," Steven J. Slater, Kent R. Keller, Robert N. Knight, *Journal Raptor Research* 51(2): 129-135, 2017; "Raptor nest-site use in relation to the proximity of coalbed-methane development," J.D. Carlisle, L.E. Sanders, A.D. Chalfoun, K.G. Gerow, 2018, *Animal Biodiversity and Conservation* 41.2: 227-243.

_**non-eagle raptor nest that was unoccupied during the prior breeding season. An "unoccupied" nest is the same as a nest that was not occupied active.**_

Additionally, BLM must modify section C ("Reporting") on page G4-2 to state: "By August 30 of each year, any operator who has conducted development of wells within stipulation buffers _**surrounding non-eagle raptor nests that were occupied active during the prior breeding season**_ ~~for non-eagle raptors~~ will submit . . . ."

> 3.    BLM Must Clarify the Process for Operations Near Nests that Were Unoccupied During the Prior Breeding Season.

Because the 98 stipulations reliefs only apply to nests that were occupied active during the prior breeding season, the ROD must clarify that BLM will authorize development around nests that were unoccupied during the prior breeding season. The discussion on page 4.18-30 of the FEIS makes clear that BLM intends to authorize development around nests that were unoccupied during the prior breeding season. The proposed language to Decision Record No. 4047, however, does not explicitly state how BLM will authorize development within buffers of unoccupied nests during the seasonal restriction period. To ensure that operators do not commence operations in the buffers of nests that are currently occupied active, BLM should specify that operators either must commence operations ahead of the seasonal restriction period, or must demonstrate that the nest is currently unoccupied before commencing operations during the seasonable restriction period.

The process in Appendix G4 to authorize development during the seasonal restriction period within buffers of nests that were occupied active during the prior breeding season confirms that no similar process applies to nests that were unoccupied during the prior breeding season. Therefore, an operator can operate within the buffers around nests that were previously unoccupied. Notably, the Operator Group recognizes that, in the unlikely event a previously unoccupied nest becomes occupied active, the operator cannot commence operations while the nest is occupied active. Therefore, for nests that were unoccupied during the prior year, an operator can begin operations within the nest buffer before the start of the breeding season. Alternatively, an operator can begin operations within the nest buffer during the breeding season upon a demonstration (through a nest check) that the nest is unoccupied at the time the operator begins operations.

The Operator Group maintains that the operator may commence activities with advance notice to BLM.

**Requested Change:** The Operator Group maintains that BLM add the following language to the end of the modification to Decision Record No. 4047:

_**For nests that were unoccupied during the prior breeding season, BLM will authorize operations within nest buffers ahead of the seasonal restriction period, or during the seasonal restriction period upon an operator's demonstration that the nest is unoccupied at the time the operator begins operations.**_

August 31, 2020
Page **12** of **41**

      4.      The ROD Must Distinguish between "Stipulation Reliefs" and "Exceptions."

In the PRMPA, BLM introduces a new mechanism to address non-eagle raptor timing limitation stipulations attached as conditions of approval (COAs) to applications for permit to drill (APDs)—"stipulation reliefs"—but BLM does not clarify how stipulation reliefs are different than exceptions. From the PRMPA, the Operator Group infers that stipulation reliefs *function* the same as exceptions but, unlike exceptions, stipulation reliefs are automatic authorizations. Further, the process and criteria to obtain stipulation reliefs are different. The process and criteria to obtain exceptions are outlined in Appendix F of the Casper RMP, whereas the process and criteria to obtain stipulation reliefs are outlined in Appendix G4 of the PRMPA FEIS. The result, however, is the same – a timing limitation stipulation does not apply for one non-eagle raptor breeding season.

**Requested Change:**  In the ROD, BLM should clarify that stipulation reliefs function the same as exceptions because both relieve an operator from a non-eagle raptor timing limitation stipulation for one non-eagle raptor breeding season.

      5.      BLM Must Revise Appendix G4 to Remove References to "Exceptions."

Although Appendix G4 appears to outline the process for stipulation reliefs, and not exceptions, Appendix G4 contains references to "exceptions." The Operator Group understands that Appendix G4 should instead refer to "stipulation reliefs." The references to "exceptions" compound the ambiguities as to when stipulation relief and exceptions apply and which process and criteria apply to each. BLM must revise Appendix G4 to use consistent terminology to avoid confusion as to which process applies to which authorization.

**Requested Changes:**  In the following statements in Appendix G4, the term "exception" should be replaced with "stipulation relief":

> "As discussed in the CCPA Final EIS, the BLM estimated that 98 ~~exceptions~~ **stipulation reliefs** or 6.5 percent of the proposed 1,500 well pads could be requested by operators for which the BLM would grant stipulation relief for non-eagle raptor nest buffers."

> The following commitments will be included in an application for permit to drill (APD) from the operator to allow for automatic ~~exceptions~~ **stipulation reliefs**:

> Any operator(s) requesting to use an automatic ~~exception~~ **stipulation relief** will support and assist in the development of monitoring and studies of non-eagle raptors in the Powder River Basin to inform the framework and possible decision on an Adaptive Management Strategy referred to in Section 2 of this document.

      6.      BLM Must Specify If and When Exceptions Will be Applied to Non-Eagle Raptor Timing Limitation Stipulations within the Project Area.

Decision Record No. 4047 does not specify whether BLM may grant exceptions to non-eagle raptor timing limitation stipulations within the Project Area in accordance with Appendix F of the Casper RMP (2007). If BLM will no longer grant exceptions to non-eagle raptor timing limitation

August 31, 2020
Page **13** of **41**

stipulations in the Project Area, BLM should include an explicit statement of this intent in the ROD.  If BLM intends to grant exceptions to non-eagle raptor timing limitation stipulations in the Project Area, then BLM should specifically identify the circumstances in which it will consider, and may grant, such exceptions.

B.    The Stipulation Relief Process in Option 6 is Unnecessarily Inflexible.

1.    BLM Should Revise Appendix G4 to Allow Operators to Begin Operations During the Seasonal Buffer Period When Nests are Currently Unoccupied.

BLM must revise Option 6 to afford flexibility to operators to begin operations during the seasonal buffer period around nests that were occupied active during the prior breeding season.  To receive relief from stipulations around such nests, Option 6 as drafted requires that operators "[c]ommence oil and gas development within the non-eagle raptor nest spatial buffer 30 days in advance of the seasonal buffer period documented in the APD conditions of approval . . . ."  *See* FEIS at G4-2. Because the seasonal buffer period for most non-eagle raptors begins February 1, this requirement results in an operational start date no later than January 2.

This requirement is unnecessarily inflexible, inconsistent with the Operator Group's proposed action for year-round drilling, and inconsistent with BLM's intent to authorize year-round drilling under certain, well-considered conditions.  This requirement is also inconsistent with analysis in the DEIS and FEIS that supports allowing operations to commence during the seasonal breeding season if the operator can demonstrate that the nest is currently unoccupied.  For numerous reasons, including weather conditions, availability of equipment, and drill rig schedules, operators may be unable to commence operations in January in order to receive stipulation relief, which would undermine the FEIS's stated intent to accommodate year-round development under limited and prescribed circumstances.  Further, no conservation reason exists to prohibit operators from beginning operations during the seasonal buffer period if a nest is not being used by a non-eagle raptor, particularly given the low rate of occupied active nests in the Project Area (33 percent).  BLM should instead revise Appendix G4 to authorize operators to commence operations any time during the breeding season if current nest monitoring demonstrates that a nest does not contain young, eggs, or an adult sitting low in the nest, presumably incubating, (i.e., an "occupied active" nest) prior to commencement of operations.

**Requested Change:**  BLM should revise the third bullet point on page G4-2 to delete the following sentence: "Commence oil and gas development within the non-eagle raptor nest spatial buffer 30 days in advance of the seasonal buffer period documented in the APD conditions of approval (COA) and maintain continuous operations throughout that seasonal buffer period."  In its place, BLM should add the following statement: "***BLM will allow the operator to commence operations during the seasonal buffer period only when the operator can demonstrate, during the 7 days prior to commencement of operations, that the nest does not contain young, eggs, or an adult sitting low in the nest, presumably incubating.***"

August 31, 2020
Page **14** of **41**

      2.      BLM Should Revise Appendix G4 to Allow Operators to Resume Operations After a Break of More than 72 Hours.

BLM must revise Option 6 to afford operators flexibility to resume operations after a break of more than 72 hours. Appendix G4 specifies that "[i]f a break in development operations occurs for more than 72 hours, all further development will cease until cessation of the seasonal buffer period referenced in the APD COA." FEIS at G4-2. This limitation is overly restrictive and is based on no discernible conservation reason if a non-eagle raptor does not become "occupied active" during the break in operations. Further, the term "development operations" is not defined or used elsewhere in Appendix G4. BLM should revise Appendix G4 to allow operators to resume operations after a break of more than 72 hours if nest monitoring shows the nest does not contain young, eggs, or an adult sitting low in the nest, presumably incubating, prior to commencement of operations.

**Requested Change:** BLM should revise page G4-2 as follows:

If a break in ~~development~~ operations occurs for more than 72 hours ***and the operator can demonstrate the nest does not contain young, eggs, or an adult sitting low in the nest, presumably incubating, BLM will verbally allow the operator to resume operations***, ~~all further development will cease until cessation of the seasonal buffer period referenced in the APD COA~~.

C.      BLM Must Revise the RMP Amendment and Appendix G4 to Clarify the Mechanics of Stipulation Relief.

      1.      The ROD Should Specify that BLM May Apply Stipulation Reliefs to Already-Approved APDs.

The ROD should specify that BLM may apply the stipulation reliefs authorized by Decision No. 4047 to already-approved APDs that contain a non-eagle timing limitation stipulation COA. The stipulation relief process should not be limited to future APD approvals.

**Requested Change:** BLM should include language in the ROD specifying that the stipulation reliefs authorized by Decision No. 4047 may be applied to APDs approved before issuance of the ROD to grant relief from COAs attached to these APDs.

      2.      BLM Must Revise Decision No. 4047 to Specify that the Use, Rather than the Grant, of 98 Stipulation Reliefs Will Trigger Adaptive Management.

BLM must revise the proposed amendment to Decision No. 4047 associated with Option 6 to specify that the *use*, rather than the *grant*, of 98 stipulation reliefs for occupied active nests will trigger adaptive management. The PRMPA for Option 6 states, "After 98 stipulation reliefs have been **granted**, additional reliefs will only be granted upon implementation of an adaptive management plan that has been approved by BLM." FEIS at 2-37 (emphasis added). Conceivably, however, an operator may not use a stipulation relief because of unanticipated changes in drilling schedules.

An unused stipulation relief should not be counted against the 98 reliefs or trigger adaptive management. Instead, BLM should "credit" the unused stipulation relief toward the stipulation reliefs available for future use, without triggering adaptive management.

**Requested Change:** In the ROD, BLM should revise Decision No. 4047 to state: "After 98 stipulation reliefs have been granted ***and used*** for ***such*** ~~occupied active~~ nests . . . ."

3.      BLM Must Revise Appendix G4 to Require an Operational Meeting After the Nesting Season for Non-Eagle Raptors, Rather than Before.

BLM must revise Appendix G4 to provide that operators will participate in an operational meeting after the non-eagle raptor breeding season, rather than before. Currently, Appendix G4 provides that "BLM will conduct an operational meeting before the raptor nesting season as development of the project progresses" and that the meeting "will include all operators seeking to use stipulation relief." FEIS at G4-2. At this meeting, BLM will provide "verbal approval" of "activities within non-eagle raptor buffer(s) during the forthcoming raptor season." *Id.*

The proposal to hold an operational meeting before the non-eagle raptor nesting season, rather than after, at which BLM will provide "verbal approval" of upcoming activities, presents a host of problems. First, because relief is "automatic," *see* FEIS at G4-2, no need exists for the meeting to be held ahead of the non-eagle raptor nesting season. Second, Appendix G4 does not allow a pathway for BLM to consider relief for well pads where the need arises after the operational meeting.

Finally, the proposal that BLM would provide "verbal approval" presents questions of process. Can BLM second-guess an operator's siting decision presented at the meeting? Notably, Appendix G4 does not specify whether BLM can verbally disapprove an operator's request for timing stipulation relief, suggesting that BLM cannot second-guess a siting decision when an operator has complied with the process and criteria in Appendix G4. Additionally, with respect to timing of APD submittals, must operators wait for BLM's verbal approval to submit an APD for activities within non-eagle raptor buffers, or must an APD be submitted before this meeting? Alternatively, Appendix G4 is unclear whether BLM will approve stipulation relief via a sundry notice and, if so, whether an operator must submit the sundry notice before or after the meeting.

To avoid these issues, the Operator Group maintains that BLM must revise Appendix G4 to provide that the operational meeting will be held after the non-eagle raptor nesting season, rather than before. Alternatively, Appendix G4 should include a clear statement that BLM cannot disapprove stipulation relief if the requirements of Appendix G4 have been met. Additionally, BLM must clarify the timing of APD submission with BLM's verbal approval.

**Requested Change:** Modify section (A) of Appendix G4 to state, "The BLM will conduct an operational meeting ***after*** the raptor nesting season . . ." Delete the last sentence of section (A).

**Alternative Requested Change:** Add the following text to the end of section (A), "Meetings with BLM," on **page G4-2**: "***If the operator has fulfilled the requirements of Appendix G4, the operator will receive automatic relief from the timing limitation attached as a COA for an APD(s) that is approved, pending, or submitted in the future; however, the relief is granted only for the upcoming***

***season.  BLM will document the relief in its records.  BLM may consider requests for relief submitted after the operational meeting.***"

    4.    BLM Must Revise Appendix G4 to Require Individual Operator Meetings, Rather than a Joint Operator Meeting.

BLM's proposal to hold joint meetings with operators before the non-eagle raptor nesting season is inappropriate and inconsistent with BLM's obligation to protect confidential commercial and financial information.  *See generally* 5 U.S.C. § 552(b)(4).  Appendix G4 directs that, "[d]uring the meeting, operators will be required to provide information all about possible activities within non-eagle raptor buffer(s) during the forthcoming raptor nesting season."  FEIS at G4-2.  Operators closely guard information about their drilling plans, priorities, and schedules, and consider this information to be proprietary and confidential.  Further, disclosure of this information to competitors raises anti-trust concerns.  BLM cannot compel operators to disclose this information in the presence of their competitors.

Even if BLM adjusts the operational meeting to be held after the non-eagle raptor nesting season, rather than before, a joint operational meeting among all operators still risks disclosure of confidential information, particularly if BLM questions an operators' future plans.  For this reason, BLM should eliminate the requirement of a joint operational meeting and provide that BLM will meet with operators individually.

**Requested Change:**  Modify section (A) of Appendix G4 to require that BLM hold meetings with individual operators:

The BLM will conduct ~~an~~ operational meeting**s** ~~before~~ ***after*** the raptor nesting season as development of the project progresses.  ***BLM will hold t***~~These~~ meetings ~~will include~~ with ~~all~~ ***individual*** operators seeking to use stipulation relief and other entities by invitation only.  Discussions will center on the operator~~s~~***'s*** activities in non-eagle raptor buffers during the prior raptor nesting season, the operator's documentation for placement of future APDs and efforts to avoid these buffers, any mitigations implemented, all studies conducted and any monitoring collected for the area.

    5.    BLM Must Clarify that One Stipulation Relief Can Authorize Operations Near Multiple Non-Eagle Raptor Nests.

BLM should include text in the ROD explaining that development of a single well pad and associated infrastructure will only result in one stipulation relief, even when the well pad and associated infrastructure are overlapped by the buffers of multiple non-eagle raptor nests that were previously occupied active.  Similarly, multiple non-eagle raptor nests can exist within one spatial buffer.

The PRMPA and FEIS currently contain conflicting language regarding the number of stipulations reliefs that will be required when a well pad has the potential to overlap multiple occupied active non-eagle raptor nests.  The PRMPA for Option 6 suggests that relief will be granted on a well pad basis, stating "*one timing limitation stipulation relief request will be granted for a well pad for 1 year*."  *See* FEIS at 2-37.  The FEIS, however, suggests that relief will be granted on a nest basis, stating,

August 31, 2020
Page **17** of **41**

"*Under this option there is an upper limit to the <u>number of nests</u> for which stipulation relief would be applied.*"  *See* FEIS at 4.18-33.

Similarly, Appendix G4 contains conflicting language regarding the number of stipulations reliefs that will be required when a well pad has the potential to overlap multiple occupied active non-eagle raptor nests.  In Appendix G4, BLM explained that, for the exceptions it granted between 2014 and 2019: "*There were 35 individual well pads for which stipulation relief was approved by BLM and <u>of these, 12 had multiple nests affecting the well pad</u> and 17 had one nest buffer affecting the well pad.*"  FEIS at G4-1.  Yet, in Appendix G4, BLM also stated: "*Based on this review, the BLM assumes a single non-eagle raptor nest would be associated with each well pad to which non-eagle raptor stipulation relief is applied.*"  *Id.*  These two statements conflict.

The ROD should clarify that, when multiple nests that were previously occupied active are within one spatial buffer, or when a well pad is within multiple buffers of nests that were occupied active, BLM can grant stipulation relief and, further, that only one stipulation relief is necessary to authorize development for a location that is overlapped by multiple buffers (one stipulation relief per pad, not per occupied active nest).

**Requested Change:**  In the ROD, BLM must include narrative language explaining that, when multiple occupied active non-eagle raptor nests are within a spatial buffer or when a well pad is within multiple buffers for occupied active non-eagle raptor nests, BLM can grant stipulation relief and, further, that only one stipulation relief is necessary to authorize development.  Additionally, BLM should delete the statement in Appendix G4 that, "Based on this review, the BLM assumes a single non-eagle raptor nest would be associated with each well pad to which non-eagle raptor stipulation relief is applied."

6.    The ROD Should Clarify that Stipulation Relief for Well Pads Encompasses the Access Road and Associated Infrastructure.

BLM should revise Decision No. 4047 to recognize that, when BLM grants stipulation relief for a well pad, that stipulation relief includes the access road and associated infrastructure.  As a result, the operator need not separately seek stipulation relief for the well pad and associated infrastructure, including access roads and other infrastructure (such as temporary water lines).  Therefore, BLM must revise Decision Record No. 4047 to expressly recognize that stipulation relief for a well pad also includes the access road and associated infrastructure.

**Requested Change:**  BLM must revise Decision Record No. 4047 to specify that a stipulation relief for a well pad will include relief for the access road and associated infrastructure:

Within the Converse County Project Area (CCPA), as delineated in the Record of Decision (ROD) for the Converse County Oil and Gas Project Environmental Impact Statement (CC EIS) dated XX/XX/XXXX, if the operator commits to implement all of the measures contained in Section 1 of RMP Appendix [G4], one timing limitation stipulation relief request ***for nests that were occupied active during the prior breeding season*** will be granted for a well pad ***and associated infrastructure*** for 1 year.

August 31, 2020
Page **18** of **41**

        D.      BLM Must Adjust the Adaptive Management Provisions of Appendix G4.

           1.      Appendix G4 Should Provide More Clarity Regarding an Adaptive Management Approach.

The Operator Group agrees with BLM's proposal to utilize adaptive management in administration of the Project.  The Council on Environmental Quality (CEQ) has recognized the benefits of agencies incorporating a model of "predict, mitigate, implement, monitor, and adapt" into NEPA decision-making.  *See* NEPA Task Force Report to the CEQ, *Modernizing NEPA Implementation* 45 (2003).  This approach "give[s] agencies the flexibility to address unanticipated results of project implementation to adjust decisions for practical reasons."  *Id.* at 48.

The approach proposed in Option 6, with the clarifications outlined in this protest, provides an opportunity for adaptive management.  First, BLM has access to, and has analyzed, substantial historical data, and is requiring the Operator Group to collect future data and support future studies.  These data and studies enable BLM to verify the anticipated impacts of the management decisions in the ROD.  As the FEIS notes, BLM has non-eagle raptor nesting data for the Project Area dating back to 2005.  *See* FEIS at 3.18-28.  The Operator Group has provided non-eagle raptor nest survey data from 2016 to 2018 for a portion of the Project Area.  *Id.*  Further, in order to avail itself of stipulation relief, the Operator Group must conduct raptor surveys to determine whether a nest was occupied active or unoccupied in a given year to determine whether one of the 98 stipulation reliefs apply to the nest.  Moreover, Appendix G4 calls for both the development of a monitoring framework and raptor studies during the lifetime of the Project.  FEIS at G4-2.  The existing historical data, future data collection efforts, and raptor studies render BLM particularly poised to confirm the expected impacts of its management decisions.

Second, the assumptions in the FEIS are appropriate for evaluation through adaptive management.  The FEIS assumes that of the 298 well pads that may be sited within the buffer of non-eagle raptor nests, 98 would be expected to be located within the stipulation buffers of nests that were occupied active during the prior breeding season.  *See* FEIS at 4.18-30 ("BLM estimates that 33 percent of the 298 well pads under BLM management authority, or 98 well pads, would be expected to be located within the stipulation buffer for an occupied nest.").  BLM, however, recognizes the uncertainty in its assumptions:

> While the total nests impacted were quantified based on the available historic nest data, there are unknowns associated with the historic data that could change the actual number of nests impacted. The dataset used to approximate impacts was developed by multiple sources (BLM, other governmental agencies, operators, and private consultants) in multiple areas within the CCPA. There has not been a comprehensive survey for the entirety of the CCPA creating the likelihood that unidentified nests occur within the CCPA. The quantitative estimate of well pad/nest buffer impact assumed equal spacing of the proposed 1,500 well pads throughout the CCPA area. Depending upon the actual placement and spacing of well pads it may be that the number of nests impacted could increase or decrease.

FEIS at 4.18-31.

August 31, 2020
Page **19** of **41**

Thus, the adaptive management proposed under Option 6 serves to confirm BLM's assumption that, over the Project's lifetime, stipulation relief will be used for only 98 well pads within the stipulation buffers of nests that were occupied active during the prior breeding season.  For clarity, however, BLM should expressly tie this assumption to its conclusion that Option 6 "has the potential to adversely impact non-eagle raptor species by causing nest abandonment, reduced reproductive success, and displacement of individuals from nesting territories."  FEIS at 5-66.  Further, the WEST Memorandum anticipates that impacts from the Project, as measured by forgone fledglings (individuals that would have fledged from disturbed nests, had no disturbance occurred), will be less than 2.26% and 1.61% of the ferruginous hawk population in Wyoming and the Badlands and Prairies Bird Conservation Region, respectively.  *See* WEST Memorandum at 7–8.  If and when stipulation relief is used for 98 well pads within the stipulation buffers of nests that were occupied active during the prior breeding season, adaptive management should inform the effect of future stipulation relief on region-wide non-eagle raptor populations.

The Operator Group recommends that the ROD specify that the final adaptive management plan will evaluate the presence of oil and gas operations near nests of common non-eagle raptor species in the Project Area (namely ferruginous hawks) and whether these operations result in nest abandonment, reduced reproductive success, and/or displacement of individuals from nesting territories.  Further, the ROD should specify that the final adaptive management plan will evaluate whether the presence of oil and gas operations near nests that were previously occupied active and, particularly, the stipulation reliefs authorized by the ROD result in an actual, measurable population-level impacts to non-eagle raptors in the Powder River Basin.

Finally, the ROD must articulate that the 98-well pad threshold will not constitute a hard cap on the stipulation relief that BLM may authorize under the ROD over the life of the Project.  Unless the studies and monitoring data described above reveal actual, measurable population-level impact to non-eagle raptors in the Powder River Basin attributable to the Project, BLM should continue to grant stipulation reliefs in excess of the 98-well pad threshold identified in Decision No. 4047.

**Requested Change:**  Section 2 of Appendix G4 should be revised to include the following statement:

***The final Adaptive Management Plan will evaluate whether the presence of oil and gas operations near nests of common non-eagle raptor species in the Project Area (namely ferruginous hawks) results in nest abandonment, reduced reproductive success, and displacement of individuals from nesting territories.  Further, the Adaptive Management Plan will evaluate whether the stipulation reliefs authorized by the ROD result in actual, measurable population-level impacts to non-eagle raptors in the Powder River Basin. Until there have been actual, measurable population-level impacts to non-eagle raptors in the Powder River Basin, BLM will continue to grant stipulation reliefs beyond the 98-well pad threshold identified in Decision No. 4047.***

2.      BLM Must Revise Appendix G4 to Provide Additional Information Regarding Stakeholders.

Appendix G4 states that BLM will invite "other pertinent entities" to participate in finalization of the adaptive management plan.  The Operator Group recommends that Appendix G4 specify that BLM will invite, at a minimum, the stakeholders that have been participating in this process for the past six years, which include the U.S. Fish and Wildlife Service, Wyoming Game and Fish Department, and Wyoming Governor's Office to participate in finalization of the adaptive management plan.

**Requested Change:**  Section 2 of Appendix G4 should be revised to state:

The operators will participate with the BLM and ~~any~~ other ~~pertinent~~ entities that the BLM invites in the development of an Adaptive Management Plan using the "Adaptive Management, The U.S. Department of the Interior Technical Guide" https://www.doi.gov/sites/doi.gov/files/migrated/ppa/upload/TechGuide.pdf.   ***The other entities that the BLM will invite include, at a minimum, the U.S. Fish and Wildlife Service, Wyoming Game and Fish Department, and Wyoming Governor's Office.***

3.      BLM Must Revise Appendix G4 to Direct Timely Approval of the Adaptive Management Plan.

BLM must revise Appendix G4 to specify that BLM will finalize the adaptive management plan within one year of signing the ROD and following submission of the 2021 nest survey data.  The Operator Group sees a risk to development within the Project Area if BLM delays finalization of the adaptive management plan until if and when 98 stipulation reliefs are used.  Further, principles of administrative efficiency require that the adaptive management plan be finalized as soon as possible, by the same BLM personnel who analyzed and authorized the Project.  These personnel understand not only the current baseline conditions based on the best available data but also the purpose of, justification for, and anticipated impact of the 98-stipulation reliefs.  Therefore, BLM should include a statement in Appendix G4 directing that it will complete the adaptive management plan within a year of signing the ROD and following submission of the 2021 nest survey data.

**Requested Change:**  BLM must revise Section 2 of Appendix G4 to add the following language: "***BLM will finalize and approve the Adaptive Management Plan within a year of the date it signs the Converse County Project ROD and after submission of the 2021 nest survey data.***"

4.      The Adaptive Management Plan Should Recognize BLM's Limited Management Authority in the Project Area.

The adaptive management plan should provide for an adjustment to the number of stipulation reliefs that BLM may grant if BLM revisits its determination of its management authority over lands within the Project Area.  BLM's adaptive management threshold of 98 stipulation reliefs is based on BLM's assessment of its management authority within the Project Area.  If BLM determines it has management authority over a greater portion of the Project Area, then the adaptive management strategy should provide that the 98-well pad threshold for stipulation relief should be proportionately increased without application of additional conservation measures.

August 31, 2020
Page **21** of **41**

   In the FEIS, BLM recognized it has limited management authority on lands in which the federal government lacks a surface and mineral interest.  Specifically, BLM explained:

> BLM has no authority to manage development activities on non-federal surface underlain by non-federal minerals except where a well is drilled horizontally to access federal minerals, a scenario known as "Fee-Fee-Fed." As detailed in Permanent Instruction Memorandum (PIM) No. 2018-014 BLM's authority under a Fee-Fee-Fed scenario is limited to assuring production accountability from Federal mineral leases. Hence, the BLM has no involvement in the management of development activities on the surface estate including mitigation actions or reclamation plans.

FEIS at 1-7.  Based on this assessment of its management authority, BLM determined that it has management authority over 60 percent of the Project Area and, thus, has management authority over 298 well pads that may be located within non-eagle nest buffers.  BLM then concluded that, of these 298 well pads, 98 could be located within the buffers for occupied active nests:

> Approximately 60 percent (298 of the 497 well pads potentially located within nest buffers) of the CCPA (6 percent BLM surface plus 54 percent split estate; see section 1.4.3) is under BLM management authority. Based on the analysis of nest use rate presented in Section 3.18.2.5 (Raptor Species subsection) only a portion of nests would be expected to be occupied at any given time. Therefore, the BLM estimates that 33 percent of the 298 well pads under BLM management authority, or 98 well pads, would be expected to be located within the stipulation buffer for an occupied nest.

> Approximately 36 percent of the CCPA (179 well pads potentially located within nest buffers) is not under BLM management authority. These lands are comprised of private and state surface estate with non-federal minerals where BLM's non-eagle raptor timing stipulations do not apply. Therefore, none of the Options analyzed below provide for the application of non-eagle raptor stipulations for this portion of the CCPA.

FEIS at 4.18-30.

   The Operator Group agrees with BLM's assessment of its management authority.  *See* Instruction Memorandum No. 2018-014 (June 12, 2018); *accord* 43 U.S.C. § 1701(a) (defining BLM's management authority as over the public lands); Instruction Memorandum No. 2009-078 (Feb. 20, 2009); BLM Wyoming State Director Review Decision No. WY-2011-010 (Feb. 25, 2011). Accordingly, the Operator Group requests that BLM restate its determination in the ROD.  Further, the adaptive management section in Appendix G4 should provide that, if BLM later determines it has management authority over a greater portion of the Project Area, the 98-well pad threshold should be proportionately increased without application of additional conservation measures.

   **Requested Changes:**  The ROD should restate BLM's assessment of its management authority on lands in the Project Area in which the United States lacks a surface or mineral interest:

> ***BLM has no authority to manage development activities on non-federal surface underlain by non-federal minerals except where a well is drilled horizontally to access***

August 31, 2020
Page **22** of **41**

*federal minerals, a scenario known as "Fee-Fee-Fed." BLM's authority under a Fee-Fee-Fed scenario is limited to assuring production accountability from Federal mineral leases. Hence, the BLM has no involvement in the management of development activities on the surface estate including mitigation actions or reclamation plans.*

Additionally, BLM must revise Appendix G4 to provide that, should BLM later determine it has management authority over a greater portion of the Project Area, the 98-well pad threshold will be proportionately increased without application of additional conservation measures. Specifically, section 2 of Appendix G4 must include the following statement:

*The Adaptive Management Plan will recognize that the 98 stipulation relief threshold in Decision No. 4047 is based on BLM's assessment that it has management authority over 60 percent of the CCPA. Should BLM determine that it has management authority over a greater portion of the CCPA, the Adaptive Management Plan will provide that BLM will proportionately increase the number of stipulation reliefs that it will grant without application of additional conservation measures.*

E.    The PRMPA Contains Inconsistent and Ambiguous References to Nest Status.

1.    The ROD Must Specify Non-Eagle Raptor Survey Requirements.

The FEIS suggests that BLM will require non-eagle raptor surveys but does not specify a survey requirement. Specifically, the FEIS states, "implementation of nesting surveys **would be required**, as opposed to voluntary, allowing for consistent implementation of nest surveys and the certainty that data would be collected to identify new nests." FEIS at 4.18-32 (emphasis added). However, neither PRMPA, Appendix G4, nor any mitigation measure in the FEIS expressly articulates an obligation for operators to conduct non-eagle raptor surveys.

The Operator Group recognizes that the PRMPA *implicitly* assumes that some surveys will occur because they are needed to establish whether a nest was occupied active or unoccupied during the prior breeding season and therefore whether BLM will grant one of the 98 stipulation reliefs. The PRMPA and FEIS, however, do not expressly establish a requirement that operators perform surveys.

**Requested Change:** BLM revise the ROD to specify any applicable survey requirements.

2.    The ROD Must Consistently Refer to "Occupied Active" Nests.

Despite BLM's preference for the term "occupied active" nest over the term "active" nest, *see* FEIS at 3.18-28, the FEIS continues to use the term "active" nest. *See* FEIS at 2-38, 3.18-29, 4.18-31, 4.18-32, 4.18-36, 6-29, G1-1, G1-2, G1-3. Elsewhere, the FEIS uses the term "occupied" nest. *See* FEIS at 3.18-24, 4.18-30, 4.18-31, 4.18-32, 4.18-33. Inconsistent use of these terms leads to ambiguity and confusion. In the ROD, BLM must consistently use the term "occupied active" nests.

**Requested Change:** The ROD must consistently use the term "occupied active" nests.

August 31, 2020
Page **23** of **41**

### Comments on Converse County Oil and Gas Project Final Environmental Impact Statement

**I.    BLM Should Not Adopt Certain Mitigation Measures Analyzed in the FEIS.**

Although BLM is obligated to analyze mitigation measures in environmental impact statements, it is not obligated to adopt these mitigation measures.  *See* 40 C.F.R. § 1502.14(f); 43 C.F.R. § 46.130(b).  BLM should not adopt the following mitigation measures for the reasons outlined below.

A.    <u>Air Quality Mitigation Measures</u>

The Operator Group agrees with BLM's statement that it lacks authority to require application of certain air quality mitigation measures.  *See* FEIS at 4.1-28.  Further, the Operator Group previously evaluated these measures and informed BLM that they are not technically or economically feasible in Wyoming; further, in some cases, the necessary technology may not be available.  Accordingly, BLM should not adopt these mitigation measures in the ROD.

1.    BLM Lacks Authority to Regulate Air Quality.

The Operator Group agrees with BLM's statement that it lacks authority to require application of air quality mitigation measures.  *See* FEIS at 4.1-28.  Accordingly, BLM should not adopt these mitigation measures in the ROD.

Under the express terms of the Clean Air Act, the U.S. Environmental Protection Agency (EPA), and not BLM, has the authority to regulate air emissions.  In Wyoming, the EPA has delegated its authority to the Wyoming Department of Environmental Quality (WDEQ).  *See* 42 U.S.C. §§ 7401–7671q; 40 C.F.R. pts. 50–99; 40 C.F.R. § 52.2620 (Wyoming's State Implementation Plan); Wyo. Stat. Ann. §§ 35-11-201–214; Wyo. Air Quality Stds. & Regs. chs. 1–14.  The law is well-settled that WDEQ, rather than BLM, manages air quality in Wyoming.  *See, e.g.*, *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 38 (D. D.C. 2014); *Powder River Basin Resource Council*, 183 IBLA 83, 94–95 (2012); *Wyo. Outdoor Council*, 176 IBLA 15, 26 (2008).

For that reason, BLM may not impose the air quality mitigation measures analyzed in the FEIS.  As BLM is aware, NEPA is a procedural statute intended to produce informed decision-making by federal agencies.  *Dep't of Transp.*, 541 U.S. 752, 756–57 (2004); *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015).  Although NEPA mandates that agencies follow specific procedures when reaching decisions that significantly affect the environment, NEPA does not impose any requirement on agencies to reach a particular decision.  *Dep't of Transp.*, 541 U.S. at 756–57; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *WildEarth Guardians*, 784 F.3d at 690.  Moreover, NEPA does not require agencies "to elevate environmental concerns over other valid concerns." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004) (citing *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2004)).  Once the agency adequately identifies and evaluates environmental concerns, "NEPA places no further constraint on agency actions." *Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004).  Although agencies must analyze mitigation measures as part of EISs, even when the agency lacks authority to implement such mitigation measures, the agencies' obligations begin and end with this analysis.  *See Forty Most Asked Questions Concerning CEQ's National Environmental Policy*

August 31, 2020
Page **24** of **41**

Regulations, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981) (Question 19b); *see generally* 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c) (requiring agencies to analyze mitigation measures in EISs). Accordingly, the fact that BLM analyzed air quality mitigation measures in the FEIS does not empower BLM to regulate air quality or obligate BLM to adopt air quality mitigation measures.

For these reasons, the Operator Group agrees with BLM's determination that it lacks authority to require application of the air quality mitigation measures. Therefore, BLM may not adopt them in the ROD.

      2.     Mitigation Measure AQ-1 (FEIS at 4.1-28, 6-23)

If located on BLM surface estate, gas plants and compressor stations will be located at least 2,000 meters from residences or other occupied dwellings.

BLM must revise AQ-1 to clearly state it does not apply to well pads and production facilities, including but not limited to pumps, pumping units, generators, gas flares, treaters, separators, storage tanks, and pits. The Operator Group also notes that a 500-foot setback for well pads, and production facilities, including but not limited to pumps, pumping units, compressors, generators, gas flares, treaters, separators, storage tanks, and pits, is already required by Wyoming Oil and Gas Conservation Commission rules.

      3.     Mitigation Measure AQ-2 (FEIS at 4.1-28, 6-23)

USEPA, NPS, and Powder River Basin Resource Council (PRBRC) recommended the use of Tier 4 diesel drill rig engines to reduce NOx emissions. NOx emission reductions can mitigate nitrogen deposition and visibility impacts and near-field short-term NO2 impacts.

Not only does BLM lack authority to adopt Mitigation Measure AQ-2 in the ROD, this mitigation measure is not technically and economically feasible. Tier 4 drill rigs are not available in sufficient numbers, particularly in Wyoming, for widespread use throughout the Project Area. Current commodity prices and the current economic environment make this equipment even more difficult to secure.

      4.     Mitigation Measure AQ-3 (FEIS at 4.1-28, 6-23)

USEPA, NPS, and PRBRC recommended the use of Tier 4 diesel engines for all engines used during well completion to reduce NOx emissions. NOx emission reductions can mitigate nitrogen deposition and visibility impacts and near-field short-term NO2 impacts.

Not only does BLM lack authority to adopt Mitigation Measure AQ-3 in the ROD, this mitigation measure is not technically and economically feasible. Tier 4 drill rigs are not available in sufficient numbers, particularly in Wyoming, for widespread use throughout the Project Area. Current commodity prices and the current economic environment make this equipment even more difficult to secure.

Exhibit C to Rebacca Byram Declaration

August 31, 2020
Page **25** of **41**

5.      Mitigation Measure AQ-5

USEPA and WOC recommended the electrification of compressor engines at the compressor stations to reduce NOx emissions. NOx emission reductions can mitigate nitrogen deposition and visibility impacts.

Logistical and technical issues make this mitigation measure infeasible, particularly on all locations throughout the Project Area.  The load required for these engines is significant and power availability would be an issue.  In addition to limited availability of grid power, right of way issues to run line power, either above or below ground, would not be logistically feasible or cost-effective for temporary sources in all sources.

6.      Mitigation Measure AQ-6

USEPA and NPS recommended the electrification of drill rig engines to reduce NOx emissions. NOx emission reductions can mitigate nitrogen deposition and visibility impacts and near-field short-term NO2 impacts.

Logistical and technical issues make this mitigation measure infeasible, particularly on all locations throughout the Project Area.  The load required for these engines is significant and power availability would be an issue.  In addition to limited availability of grid power, right of way issues to run line power, either above or below ground, would not be logistically feasible or cost-effective for temporary sources in all sources.

7.      Mitigation Measure AQ-7

USEPA and NPS recommended the electrification of frac pumping operations during completion operation to reduce NOx emissions. NOx emission reductions can mitigate nitrogen deposition and visibility impacts and near-field short-term NO2 impacts.

Logistical and technical issues make this mitigation measure infeasible, particularly on all locations throughout the Project Area.  The load required for these engines is significant and power availability would be an issue.  In addition to limited availability of grid power, right of way issues to run line power, either above or below ground, would not be logistically feasible or cost-effective for temporary sources in all sources.

8.      Mitigation Measure AQ-11 (FEIS at 4.1-35, 6-23)

For heater treaters, NPS recommended lowering the heater treater temperature and/or installing insolation on the separator to reduce NOx emissions. NOx emission reductions can mitigate nitrogen deposition and visibility impacts.

Not only does BLM lack authority to adopt Mitigation Measure AQ-11 in the ROD, this mitigation measure would increase, rather than lower, nitrogen oxide (NOx) emissions.  Reducing heater treater temperature would increase emissions of volatile organic compounds (VOCs) from storage tanks, which would then increase NOx emissions at the storage tank control devices.  The result would be

August 31, 2020
Page **26** of **41**

higher NOx emissions than if this mitigation measure was not implemented.  Accordingly, Mitigation Measure AQ-11 will not achieve the objective of reducing impacts to air quality.

    B.      <u>Mitigation Measure CR-1 (FEIS at 4.2-9, 6-24)</u>

    A qualified professional archaeologist will monitor surface disturbing activities during construction in areas that have been determined, through the NHPA process, to be likely to contain buried cultural resources. A monitoring and discovery plan may be developed for large or complex undertakings or areas known to contain buried cultural sites.

    This mitigation measure fails to recognize land ownership patterns in the Project Area.  Only 10 percent of the surface lands in the Project Area are federally owned, and 83 percent of the surface lands in the Project Area are privately owned.  Moreover, BLM has recognized that it lacks the authority to enter non-federal lands without the landowner's consent and has instructed its personnel of alternative methods of gathering information necessary to fulfill the agency's obligations under section 106.  *See* Instruction Memorandum No. 2018-014 (June 12, 2018); Onshore Order No. 1, 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007).  Given landowner sensitivities regarding cultural resources, BLM should not impose a broad, generic requirement for construction monitoring.

    Furthermore, this mitigation measure fails to recognize BLM's limited authority to require cultural resource monitoring when wells are developed from off-lease pads on fee surface overlying fee minerals.  BLM has recognized that in these "fee-fee-fed" situations, BLM's review of effects under section 106 will be limited only to downhole effects when development of the federal well would not cause new surface disturbance.  *See* Instruction Memorandum No. 2018-014.  Given that lands with non-federal surface and non-federal minerals comprise 36 percent of the Project Area, *see* FEIS at 1-7, a requirement for construction monitoring may have limited effect.

    Finally, BLM has not identified any heightened need for construction monitoring.  BLM's guidance on managing for cultural resources does not require or even mention the need for archaeological monitoring during surface disturbing activities.  *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Rel. 8-72 Dec. 3, 2004); BLM Manual 8140 – Protecting Cultural Resources (Rel. 8-77 Dec. 3, 2004).  BLM estimates the Proposed Action will affect only 52 eligible cultural resources.  FEIS at 4.2-7.  Accordingly, a requirement for construction monitoring appears unnecessary given the low likelihood for cultural resources in the Project Area.

    For these reasons, BLM should not adopt a requirement for construction monitoring in the Project Area.  Instead, BLM should only require construction monitoring when essential to fulfill its obligations under section 106 and, further, with landowner consent.  Accordingly, BLM should not adopt Mitigation Measure CR-1 in the ROD.

    C.      <u>Mitigation Measure CR-4 (FEIS at 4.2-10, 6-24)</u>

    A qualified tribal monitor will monitor sediment-disturbing activities during construction in areas that have been determined, through tribal consultation and the NHPA process, to contain or be likely to contain Indian sacred sites and/or TCPs. A monitoring and discovery

August 31, 2020
Page **27** of **41**

plan may be developed for large or complex undertakings or areas known to contain such resources.

Like Mitigation Measure CR-1, Mitigation Measure CR-4 fails to recognize land ownership patterns in the Project Area and the role of landowner consent to access. Only 10 percent of the surface lands in the Project Area are federally owned, and 83 percent of the surface lands in the Project Area are privately owned. BLM has recognized that it lacks the authority to enter non-federal lands without the landowner's consent and has instructed its personnel of alternative methods of gathering information necessary to fulfill the agency's obligations under section 106. *See* Instruction Memorandum No. 2018-014. Further, BLM has determined that the section 106 regulations "do[ ] not require that the tribes have access to a site when the agency official cannot reasonably provide such access." *Id.* (citing 36 C.F.R. § 800.2(c)(2)). Given these limitations, BLM should not impose a broad, generic requirement for tribal monitoring.

Furthermore, this mitigation measure fails to recognize BLM's limited authority to require cultural resource monitoring when wells are developed from off-lease pads on fee surface overlying fee minerals. BLM has recognized that in these "fee-fee-fed" situations, BLM's review of effects under section 106 may be limited, depending on whether or not development of the federal well would cause new surface disturbance. *See* Instruction Memorandum No. 2018-014. Given that lands with non-federal surface and non-federal minerals comprise 36 percent of the Project Area, *see* FEIS at 1-7, a requirement for monitoring may have limited effect.

Finally, BLM has not identified any heightened need for tribal monitoring. BLM's guidance on managing for tribal and cultural resources does not require or even mention the need for tribal monitoring during surface disturbing activities. *See* BLM Manual 1780 Tribal Relations (Re. 1-1780 Dec. 15, 2016); BLM Manual 8100 – The Foundations for Managing Cultural Resources (Rel. 8-72 Dec. 3, 2004); BLM Manual 8140 – Protecting Cultural Resources (Rel. 8-77 Dec. 3, 2004).

Because approximately 90 percent of the Project Area consists of non-federal surface for which landowner consent is required for access, BLM should not adopt a blanket requirement for tribal monitoring in the Project Area. Accordingly, BLM should not adopt Mitigation Measure CR-4.

D.    Mitigation Measure PALEO-2 (FEIS at 4.8-2, 6-24)

The operator will suspend all activities in the vicinity of such discovery until notified to proceed by the BLM AO and will protect the discovery from damage or looting. However, the operator may not be required to suspend all operations if activities can be adjusted to be continued elsewhere or otherwise avoid further impacts to a discovered locality.

We suggest revising the second sentence to: "However, the operator will not be required to suspend all operations if activities can be adjusted to be continued elsewhere or otherwise avoid further impacts to a discovered locality." If further impacts to the discovery can be avoided, suspension of operations should not be required.

August 31, 2020
Page **28** of **41**

    E.    <u>Mitigation Measures WLF-1 and WLF-2 (FEIS at 4.8-14, 6-28)</u>

WLF-1: Surface disturbance will be avoided at wildlife water **(excluding freshwater pits)** developments during final siting and development. If avoidance is not possible, the loss of any permanently impacted wildlife water developments will be offset by installing new developments of equal capacity, in coordination with the appropriate state wildlife agency and federal land management agencies.

WLF-2: In accordance with BLM, USFS, and USFWS BMPs for preventing wildlife mortality as a result of fluid mineral practices, all stacks, trenches, and other open structures (including water tanks) will be covered with wildlife enclosure covers and/or wildlife escape ramps will be installed in pits, trenches, and tanks to prevent entrapment and/or drowning. Any existing or proposed open poles or fence posts will be covered or filled with sand, soil, or gravel to prevent entrapment. "Bird cones" will be installed on open-vent stacks.

In comments on the DEIS, the Operator Group had requested that BLM revise WLF-2 to exclude freshwater pits from the requirement to net pits.  BLM appears to have included this exclusion in WLF-1 rather than WLF-2.  The Operator Group requests that BLM revise WLF-2 to exclude freshwater pits from the requirement to net pits.

    F.    <u>Mitigation Measure WLF-5 (FEIS at 4.8-14, 6-28)</u>

Noise reduction mufflers will be used on construction equipment, drilling equipment, and other motors/compressor used during drilling and production.  Also, temporary walls and distance will be considered for use to reduce sound levels in important habitats.

The requirement that temporary walls "will be considered" to reduce sound levels should be eliminated because it is vague and unjustified. The mitigation measure provides no direction as to when temporary walls should be used or for which "important habitats." Without more guidance, the mitigation measure will be applied unnecessarily and inconsistently. Furthermore, this general requirement may not benefit wildlife. Although operations generating noise may, under certain conditions, have the potential to disrupt normal behavior patterns of wildlife, correlating actual disruption of behavior patterns to noise is extremely uncertain. Further, wildlife may rapidly habituate to noises that they learn do not pose a threat. Temporary walls may also present a collision hazard. Accordingly, BLM should not adopt Mitigation Measure WLF-5.

    G.    <u>Mitigation Measure MIG-1 (FEIS at 4.18-36, 6-28)</u>

When surface-disturbing activities must occur during the avian breeding season (February 1 to July 31), a qualified biologist will conduct nest searches no more than 7 days prior to these activities. Occupied active nests will be identified and protected in accordance with the applicable BLM, USFS, USFWS, and/or the WGFD guidance.

MIG-1 was originally proposed in the DEIS, before BLM proposed Options 1 through 6 as possible amendments to the Casper RMP.  *See* DEIS at 4.18-33, 6-27.  BLM should evaluate MIG-1 in

August 31, 2020
Page **29** of **41**

light of the RMPA that BLM adopts in the ROD to ensure consistency in the process.  The requirement in MIG-1 that an operator perform a nest check is consistent with the Operator Group's requested revisions to Decision No. 4047 and Appendix G4.  Further, because a nest check is an element of Option 3, the analysis in the FEIS supports a nest check requirement.

By contrast, however, MIG-1 is unnecessary to the process proposed in Option 6 in the PRMPA/FEIS.  As Option 6 is proposed in the PRMPA/FEIS, it does not expressly allow activities to commence during the breeding season.  *See* FEIS, Appx. G4.  Option 6 would require that surface-disturbing activities commence 30 days before the start of the seasonal buffer period, thus rendering a nest check unnecessary.  *See* FEIS at G4-2 ("Commence oil and gas development within the non-eagle raptor nest spatial buffer 30 days in advance of the seasonal buffer period documented in the APD conditions of approval (COA) and maintain continuous operations throughout that seasonal buffer period.").  Therefore, as Option 6 is proposed in the PRMPA/FEIS, MIG-1 would be unnecessary. Before adopting MIG-1, BLM should confirm it aligns with the RMPA selected in the ROD.

Further, BLM should clarify whether MIG-1, if adopted, would attach to all APDs within the Project Area or just those APDs with surface locations inside spatial non-eagle raptor buffers.  The FEIS suggests that MIG-1 would only apply to well pads within spatial non-eagle raptor buffers, but the FEIS does not include an express statement to this effect.

H.    Mitigation Measure MIG-2 (FEIS at 4.18-36, 6-28)

Disturbance within portions of the CCPA that are identified by federal or state wildlife management agency biologists as located in forest and woodland habitat areas will be avoided. At the time of development, the retention of snags, dead-topped trees, and live trees with cavities will be left in place if a safety concern is not present.

BLM should not adopt this mitigation measure.  Neither the Casper RMP nor the Land and Resource Management Plan (LRMP) for the Thunder Basin National Grassland requires avoidance of forest and woodland habitat areas.  *See* Casper RMP at 2-20 – 2-25; Thunder Basin National Grassland LRMP ROD 4, 23 (2002); Thunder Basin National Grassland LRMP at chs. 2, 3, Appx. D (2001); ROD Oil & Gas Leasing—West of Wyodak Coal Outcrop 8 (2006).  BLM must eliminate this mitigation measure because it is not consistent with the governing resource management plans.  *See* 36 C.F.R. § 219.15 (requiring that U.S. Forest Service authorizations be consistent with management plan); 43 C.F.R. § 1610.5-3(a) (requiring that BLM approval conform to the governing RMP).  Additionally, this measure is vague because the FEIS does not map these areas, creating a risk of arbitrary identification of areas to be avoided.  Finally, because BLM and USFS can protect areas on a site-specific basis, a broad avoidance measure is unnecessary.

I.    Mitigation Measure SSWS-2 (FEIS at 4.18-72, 6-29)

A Raven Management Plan will be developed that outlines active adaptive management strategies for controlling raven predation and nesting within the CCPA, including the post-construction monitoring for ravens and removal of raven nests.

August 31, 2020
Page **30** of **41**

BLM should not adopt this mitigation measure, for several reasons. Development of a raven management plan would be an onerous undertaking with no benefit given that ravens do not pose a significant predation threat in this part of Wyoming. *See generally* FEIS, ch.3; Casper RMP FEIS (2007) (not addressing ravens or prescribing raven management measures). Further, the removal of raven nests will be ineffective because non-eagle raptors and ravens can use the same nests. Moreover, BLM's RMP amendments for the greater sage-grouse did not identify the development of a raven management plan as a necessary mitigation measure for the greater sage-grouse. *See generally* Wyoming 9-Plan RMPA. Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document. Finally, this mitigation measure appears to value sage grouse over ravens—that is a subjective value judgment regarding one avian species over another—one special status species (sage grouse) and one an MBTA-protected species (raven).

## II.     The Development Scenario Contributing to the Highest Modeled Levels of Criteria Pollutants is Unlikely to Occur.

Although the FEIS discloses modeled levels of near-field criteria pollutants that exceed the National Ambient Air Quality Standards (NAAQS), BLM must recognize that the modeled development scenario is extremely unlikely to occur. BLM should not attempt to impose field-wide mitigation measures to account for this highly unusual and improbable development scenario.

Chapter 4 of the FEIS and the Air Quality Technical Support Document in Appendix A disclose modeled near-field levels of 1-hour nitrogen dioxide ($NO_2$), 24-hour $PM_{10}$, and 24-hour $PM_{2.5}$ that reached or exceeded the corresponding NAAQS. *See* FEIS at 4.1-15 (tbl. 4.1-5), Appx. A at 3-82 – 3-84 (tbls. 3.3-36 – 3.3-38). The highest modeled concentrations of near-field criteria pollutants occur in "Maximum Cases Nos. 1 and 2." *See* FEIS, Appx. 3-83 and 3-84. BLM, however, must recognize that the "worst case" emissions scenario is extremely unlikely to occur. These cases reflect a development scenario in which in which four 16-well pads are sited in the same section or within one square mile of each other:

August 31, 2020
Page **31** of **41**



*See* FEIS, Appx. A at 3-25 (fig. 3.3-2).

Given the nature of horizontal development and the use of long lateral wells in the Project Area, it is unlikely that four 16-well pads will be sited within one mile of one another. Generally, lateral wellbores run parallel to one another in the Project Area. Given this configuration, it would be difficult for 16 wells to be drilled in parallel from four well pads within a square mile of another, while allowing for adequate spacing between wellbore paths.

Compounding the conservative assumptions, the modeled scenario assumes simultaneous drilling and completion activity on each of these four well pads. *See* FEIS, Appx. A at 3-80. Not only is it unlikely that four 16-well pads would be sited within a square mile of each other, it is extremely unlikely that development would occur on each simultaneously.

Further, BLM correctly notes that while construction and completion activities in these scenarios are predicted to exceed the NAAQS and Wyoming Ambient Air Quality Standards (WAAQS), the

August 31, 2020
Page **32** of **41**

sources are transient and temporary; therefore, impacts would be expected to be localized in the immediate vicinity of the construction and completion activities. After construction and completion activities stop, the impacts would end and concentrations would return to background levels.

Finally, the Operator Group observes that the model used to estimate near-field air quality impacts from tihs unlikely development scenario (AERMOD) overstates impacts. Anadarko Petroleum Corporation (now Occidental Petroleum Corporation) compared model-predicted air quality impacts with observed impacts from operation of a gas plant. The results of the study demonstrate that the AERMOD model over-predicts ambient air concentrations by a factor of 2 to 4. Information about this study was provided in a June 2019 memorandum from the Operator Group to BLM.

For these reasons, the Operator Group maintains that the modeled levels of criteria pollutants in Maximum Cases Nos. 1 and 2 are extremely unlikely to occur. BLM should not attempt to impose mitigation measures on activities throughout the Project Area based on the potential that this development scenario will occur. Rather, in the unlikely event that this scenario ever occurs, BLM should conduct additional analysis of potential impacts to air quality and evaluate BLM's authority to impose site-specific mitigation measures.

## III.    The FEIS Incorrectly Suggests that Operators Will Not Request Exceptions to Timing Limitation Stipulations on Lands Managed by the U.S. Forest Service.

The Operator Group disagrees with BLM's unfounded conclusion that operators will not request exceptions to timing limitation stipulations on lands managed by the U.S. Forest Service (USFS). The FEIS assumes that the OG will not request case-by-case exceptions to timing limitation stipulations on USFS lands, stating: "Relief from timing stipulations **generally would not be requested** on lands administered by USFS," FEIS at 4.18-11 (emphasis added), and "Adherence to timing limitation stipulations would still apply for eagle nests, [no surface occupancy] areas, and on the [Thunder Basin National Grassland]," *id.* at 4.18-27. Although the Operator Group did not pursue an amendment to the Thunder Basin National Grassland LRMP to allow for programmatic relief from timing limitation stipulations, the lack of programmatic relief does not preclude operators from seeking stipulation relief on a case-by-case basis in accordance with USFS procedures under the applicable LRMP.

The LRMP for the Thunder Basin National Grassland explicitly states that "[w]aivers, exceptions, or modifications _will be considered_ in accordance with the requirements of 36 CFR 228.104." LRMP for the Thunder Basin National Grassland at D-1 (2001) (emphasis added). It recognizes that operators may request, and the Forest Service may grant, exceptions to timing limitation stipulations to protect ferruginous hawks and other non-eagle raptors, stating, "The authorizing officer may grant an exception to this stipulation if the operator submits a plan that demonstrates impacts from the proposed action are acceptable or can be adequately mitigated." *Id.* at D-16. In the ROD, BLM cannot unilaterally constrain operators' ability to seek exceptions consistent with the LRMP for the Thunder Basin National Grassland.

Therefore, the ROD should not include any statements that limit operators' ability to seek exceptions to timing limitation stipulations on USFS-managed lands and, further, should expressly recognize that operators may request such exceptions on a case-by-case basis.

August 31, 2020
Page **33** of **41**

## IV.    The Operator Group Confirms BLM's Assessment of Impacts to Non-Eagle Raptors and Particularly Ferruginous Hawks.

The Operator Group supports the conclusions in the FEIS regarding potential impacts to non-eagle raptors.  Further, an independent evaluation by Western EcoSystems Technology, Inc. ("WEST") of year-round development in the Project Area confirms that year-round development will not result in significant population-level impacts to non-eagle raptors and, particularly, ferruginous hawks.

WEST examined expected impacts from the Project on non-eagle raptors "in the context of the broader populations of the affected species," because this analysis "is necessary to understand how the proposed action will impact non-eagle raptor populations."  *See* Memorandum from WEST to D. Applegate at 4 (Aug. 14, 2019) (enclosed).  At the outset, WEST recognized that several species of non-eagle raptors would not be impacted by the Project because they are not observed or observed in low numbers in the Project area:

Based on the known nesting information, American kestrel, short-eared owl, and burrowing owl nests were rarely observed within the Project (e.g., <10), thus populations-level impacts as a result of the development are expected to be minimal based on the data that was included in the DEIS. In addition, great horned owls were observed in relatively low numbers (35) and are not considered a Species of Greatest Conservation Need (SGCN) by the state of Wyoming or considered a Wyoming BLM sensitive species, suggesting they are not of imminent conservation concern (Wyoming Game and Fish Department [WGFD] 2017, BLM 2019).

*Id.*  This analysis corresponds to BLM's analysis in the FEIS, which documented a low number of nests in the Project area.  *See* FEIS at 3.18-27.

WEST focused its analysis on the three most abundant non-eagle raptor species in the Project Area: ferruginous hawk, red-tailed hawk, and Swainson's hawk.  Memorandum from WEST to D. Applegate at 4; *accord* FEIS at 3.18-27.  WEST then evaluated the population-level impacts of year-round development on 90 active non-eagle raptor nests over the ten-year life of the Project.[4]  *See* Memorandum from WEST to D. Applegate at 3.

WEST concluded that "[r]ed-tailed hawk and Swainson's hawk populations appear to be stable and impacts to these populations from the proposed action with the implementation of minimization measures are not expected to result in population-level declines."  Memorandum from WEST to D. Applegate at 6.  With respect to ferruginous hawk, the most abundant species in the Project area, WEST concluded that, "[i]f the worst-case scenario is assumed" for this species, forgone fledglings  would represent 2.26% and 1.61% of the ferruginous hawk populations in Wyoming and Badlands and Prairies

---

[4] However, as detailed in section II.B of the Protest, the RMPA and Preferred Alternative would not authorize operators to begin development activities in the spatial buffer of a non-eagle raptor nest that is actually occupied active (i.e., a nest that contains eggs, young, or a non-eagle raptor sitting low in the nest, presumably incubating) during the breeding season.

August 31, 2020
Page **34** of **41**

Bird Conservation Region, respectively.  *Id.*  Yet WEST concluded that the worst-case scenario would not come to bear:

> The expected impacts, however, are lower than what is represented by the worst-case scenario.  Disturbance impacts will be limited through the implementation of Operator Committed Measures (OCMs, described below) stipulating when and where certain construction activities can occur near non-eagle raptor nests.  Furthermore, a portion of raptors nesting within the impact buffers are expected to successfully breed regardless of the construction activities, either at a nest within the buffer or by relocating to an alternate nest within their territory, thereby decreasing the foregone fledgling total (Travsky and Beauvais 2005, Wallace et al. 2016a).

*Id.* at 8.  Furthermore, WEST determined that operator committed measures would further reduce potential impacts to non-eagle raptor species.  *See id.*

WEST's conclusions reinforce BLM's analysis in the FEIS and, further, confirm that year-round development may proceed in the Project Area without population-impacts to ferruginous hawks and other prevalent non-raptor species.  Should BLM adopt Option 6 in the ROD with the Operator Group's proposed modifications, the WEST analysis justify BLM's conclusion that 98 non-eagle raptor stipulations can be granted over the life of the Project without population-level impacts to ferruginous hawks and other non-eagle raptors.

## V.    The FEIS Misapplies the Greater Sage-Grouse RMPs.

A.    The FEIS Incorrectly Suggests that No New Surface Disturbance Will be Permitted in Certain Priority Habitat Management Areas.

The FEIS incorrectly suggests that BLM will not authorize new surface disturbance in greater sage-grouse priority habitat management areas (PHMA) where disturbance exceeds five percent.  Specifically, the FEIS states:

➢ "Due to the current 5 percent disturbance cap being exceeded, further surface disturbance would be prohibited in three of the PHMAs (Douglas, North Glenrock, and Thunder Basin)."  FEIS at 4.18-50 (Alternative A).

➢ "Based on existing disturbance in DDCT assessment areas that already exceed 5 percent disturbance for three of the five PHMAs, new surface disturbance could only be considered within the Bill and M Creek PHMAs."  FEIS at 4.18-56 (Alternative A).

➢ 1,126 acres of new surface disturbance in M Creek PHMA only under Alternative B.  *See* FEIS at 4.18-71 (tbl. 4.18-31).

These statements are inconsistent with the Wyoming ARMPA for the greater sage-grouse, which recognizes that surface disturbance caps in PHMA are subject to valid existing rights.  *See* ROD and ARMPA for the Rocky Mountain Region at I-23 (2015); Casper, Kemmerer, Newcastle, Pinedale, Rawlins, and Rock Springs Field Offices ARMPA for the Greater Sage-Grouse at 34 (2015) (MD SSS

August 31, 2020
Page **35** of **41**

2).  In the ROD, BLM should recognize that authorizations for disturbance in PHMA will be assessed in accordance with the governing greater sage-grouse RMPA and that BLM is obligated to recognize valid existing rights.

### B.    The FEIS Does Not Recognize Updated State of Wyoming Core Area Maps.

The FEIS analyzes impacts to PHMA using Wyoming Game and Fish Department (WGFD) Core Area Version 3 Maps.  *See* FEIS at 4.18-64.  As the Operator Group explained in its comments on the DEIS, WGFD updated these maps to Version 4, and the Wyoming State Office adopted the updated maps in an October 27, 2017 maintenance action.  *See* Operator Group Comments on DEIS at 15.

In the response to comments on the DEIS, BLM declined to update the maps from Version 3 to Version 4, explaining "direction to analyze Version 3 Core Area Maps is based on the ARMPA and BLM managed lands and mineral estates within the Project Area."  FEIS at H-17 (comment no. 058). This explanation contradicts the maintenance action.  The Wyoming ARMPA for the greater sage-grouse no longer utilizes the Version 3 Core Area maps because they have been formally superseded by Version 4 through the maintenance action.  *See* 43 C.F.R. § 1610.5-4.  BLM should include a statement in the ROD recognizing that the Wyoming ARMPA for the greater sage-grouse may be updated periodically pursuant to maintenance actions in accordance with 43 C.F.R. § 1610.5-4 and that management decisions throughout the life of the Project will adhere to the most current plan, including the most current version of Core Area maps.

## VI.    BLM May Tier to the Converse County FEIS When Determining Whether to Modify Existing Oil and Gas Leasing Stipulations.

The Operator Group observes that BLM declined to analyze an alternative in the DEIS, SDEIS, and FEIS that allowed BLM to modify timing limitation stipulations attached to existing leases within the Project Area.  BLM made this decision even though modification of existing lease stipulations is well within the scope of the Proposed Action.  *See* DEIS at 2-1 (describing the Proposed Action as "year-round development in areas where timing limitation restrictions serve to protect several wildlife species").  As justification, BLM explained that "modification of leases is a function under the [oil and gas] regulations that have a very stringent process with strict criteria for modification of leases. NEPA cannot be used to shortcut that process as NEPA is for disclosure of impacts."  *See* FEIS at I-10.

The Operator Group observes that, should an operator seek modification or waiver of a timing limitation stipulation attached to an oil and gas lease in the Project Area, BLM may tier to the analysis in the Converse County FEIS when evaluating whether to modify or waive the stipulation.  BLM's criteria to modify or waive leases is found at 43 C.F.R. § 3101.1-4.  It provides that "[a] stipulation included in an oil and gas lease shall be subject to modification or waiver only if the authorized officer determines that the factors leading to its inclusion in the lease have changed sufficiently to make the protection provided by the stipulation no longer justified or if proposed operations would not cause unacceptable impacts."  The conservation measures adopted as part of the amendment to the Casper RMP could serve as the basis for BLM to determine that a lease modification or waiver would not cause "unacceptable impacts."

August 31, 2020
Page **36** of **41**

BLM's National Office has recognized that "[t]he criteria for approval of exceptions, waivers, and modifications should be supported by National Environmental Policy Act (NEPA) analysis, either **through the land use planning process** or site-specific environmental review."  BLM Instruction Memorandum No. 2008-032, Attachment 1 (Nov. 19, 2007) (emphasis added).  Therefore, should an operator seek modification or waiver of a timing limitation stipulation attached to an oil and gas lease in the Project Area, BLM may tier to the analysis in the Converse County FEIS.

For these reasons, the ROD must include a statement recognizing that BLM may tier to the analysis in the Converse County FEIS when fulfilling NEPA obligations associated with a modification or waiver of a timing limitation stipulation.

## VII.    Other Comments.

### A.    Greater Sage-Grouse Management

In the ROD, BLM should provide flexibility to manage the Project Area under the terms of any new land use plan amendments, including those for the greater sage-grouse, without the need for additional programmatic NEPA of the Project.  The Operator Group notes the following language appeared in BLM's ROD for the Moneta Divide Natural Gas and Oil Development Project:

> For the management of Greater Sage-Grouse habitat, the management decisions, as presented in the Moneta Divide ROD, are in conformance with the BLM Wyoming ROD for Greater Sage-Grouse (2019).  The BLM is currently enjoined from implementing the decisions in the 2019 Greater Sage-Grouse RODs and is relying on the 2015 Greater Sage-Grouse RODs for implementation of Greater Sage-Grouse management actions.  Depending on the court's resolution of the ongoing litigation, the BLM will implement the appropriate management for Greater Sage-Grouse.

*See* Moneta Divide Natural Gas and Oil Development Project ROD 16 (2020).  The Operator Group supports inclusion of a similar statement into the ROD for the Project.

### B.    BLM Should Correct Typographic Errors in Its Discussion of Greenhouse Gas Emissions.

In the FEIS, BLM did not update the greenhouse gas emissions for year 10 of the Project under each alternative that are listed in the summaries in Table ES-2 (page ES-14) and Table 2.7-2 (page 2-58).  These figures reflect the figures listed in the DEIS; however, they do not match the analysis in Tables 4.1-16 and 4.1-17 of the FEIS (pages 4.1-40 – 4.1-41 and 4.1-42 – 4.1-43) and page 2-4 of Appendix A.  In the ROD, BLM should clarify that the figures in Table ES-2 and Table 2.7-2 should be consistent with the analysis elsewhere in the FEIS.

### C.    BLM Should Fully Identify All Scientific Literature Referenced in the FEIS.

BLM should review the FEIS and confirm that citations to all referenced literature appear in section 8.0, References.  Page 3.18-31 of the FEIS cites U.S. Fish and Wildlife Service literature from 2019, but no correspondence reference appears in section 8.  Specifically, page 3.18-31 states:

August 31, 2020
Page **37** of **41**

These disturbances could represent long-term impacts that limit nesting potential in the CCPA (USFWS 2019). Oil and gas combined with other types of human disturbance could lead to population level declines in the northern Great Plains Badlands and Prairies region (USFWS 2019).

In the ROD or an erratum to the FEIS, BLM should identify the literature referenced in section 3.18-31.

D.    The FEIS Should Use Terminology that Aligns with the RMPA.

Page 4.18-38 of the FEIS suggests that exceptions, rather than stipulation relief, will be granted for operations near occupied active nests (emphasis added):

Alternative B includes the potential for **exceptions** to timing limit stipulations in the vicinity of **occupied raptor nests**. Potential disturbance to nesting raptors would impact local raptor species and populations as a result of nest abandonment, dependent on the drilling schedule for each pad over the course of development. Relief from timing limit stipulations would not be requested for the remainder of migratory bird nests, which would be protected by MIG-1. and the application of avoidance and minimization mitigation, OG-committed design features and the additional mitigation measures (Section 4.18.2.3).

The PRMPA and Appendix G4, however, provide that stipulation relief, rather than exceptions, will be granted for operations near occupied active nests. To be consistent with the RMPA and Appendix G4, BLM should issue an erratum to the FEIS that replaces the language "exceptions to" with "relief from."

E.    Produced Water Management

On page 2-14, the FEIS states, "There will be no point source discharge of flowback water, produced water, or any other waste streams to surface water." BLM appears to have included this statement at the request of the Wyoming Department of Environmental Quality. *See* FEIS at H-165. This statement implies, however, that BLM intends to prohibit surface water discharges as a condition of the ROD. BLM cannot use the FEIS to prohibit water discharges, which are allowed by EPA's regulations at 40 C.F.R. subpart E and BLM's Onshore Order 7. The Operator Group recognizes that BLM and WDEQ likely intended to capture the fact that the Proposed Action did not include a proposal for discharges into surface water. The Operator Group requests that BLM must clarify this statement in the ROD by noting that the Proposed Action did not include a proposal for discharges into surface water and that, by approving the ROD, BLM does not approve such discharges.

F.    Water Requirements, Supply, and Use

The Operator Group observes that BLM adjusted the volume of water per well associated with drillings and completions. *See* FEIS at 2-28. The Operator Group agrees with the overall water usage anticipated for the Project. The Operator Group further agrees with the statement on page 2-28 of the FEIS that "actual water needs for drilling and completions may vary depending on the length of the

August 31, 2020
Page **38** of **41**

lateral and the number of fracturing stages" but that "the overall estimated water needs for the Project would not change as longer laterals would result in fewer wells within a given area."

    G.    <u>WOGCC Permitting Authority</u>

    Table 1-13 on page 1-13 of the FEIS omits that the Wyoming Oil and Gas Conservation Commission (WOGCC) has permitting authority over commercial disposal wells for oil and gas wastes. The Wyoming Legislature passed Senate Enrolled Act 0012 (SEA No. 0012) during the 2020 Budget Session. SEA No. 0012 amends the WOGCC's authority to regulate underground disposal, adding the authority to regulate commercial disposal wells. The WOGCC is currently amending its rules to implement SEA No. 0012.

    H.    <u>The Operator Group Continue to Oppose Adoption of Alternative C and Land Use Plan Amendment Options 4 and 5.</u>

    The Operator Group continues to oppose BLM's adoption of Alternative C and land use plan amendment Options 4 and 5, or elements thereof. The Operator Group hereby reaffirms and expressly incorporates its objections to Alternative C and land use plan amendment Options 4 and 5 outlined in its comments on the DEIS and SDEIS.

<strong>Conclusion</strong>

    The Operator Group thanks BLM for its extensive efforts to prepare the FEIS and PRMPA. It looks forward to BLM's prompt resolution of this protest and appreciates BLM's consideration of these comments. If BLM has any questions about the information presented in this letter, please contact me via email or telephone.

Sincerely,

Kathleen C. Schroder

Enclosures

cc:    Via email to protest@blm.gov
       Via FedEx to BLM Wyoming State Office

August 31, 2020
Page **39** of **41**

## Appendix A to Protest

## Revisions to Appendix G4

### Introduction

This appendix presents the measures that the BLM will require an operator to implement in order to obtain relief from the timing limit stipulation for development activity within a non-eagle raptor nest buffer in the Converse County Project Area (CCPA) for nests that were occupied active during the prior breeding season.  These requirements do not apply to development operations within a buffer for a non-eagle raptor nest that was unoccupied during the prior breeding season.  An "unoccupied" nest is the same as a nest that was not occupied active.

The BLM reevaluated the non-eagle raptor nest data is response to comments and found that there is a similar number of well pads proposed (1500) by the proponents relative to the number of non-eagle raptor nests (1475) in the CCPA. The BLM reviewed samples of Casper Field Office's (CFO) applications for permit to drill (APDs) to examine the number of nests and associated timing limitation stipulation buffers that affected a given pad location. A random sampling of 50 well files that had raptor stipulations applied, found that 11 had raptor nest buffers only affected the pad while the rest had buffers affecting the pad and access road or just the access road. Of those 11 pads, only one had more than one raptor nest buffer affecting the well pad.

CFO also reviewed the APDs associated with raptor stipulation exception requests from years 2014 to 2019. These requests were considered because the well development was restricted by the application of the timing limit stipulation. There were 35 individual well pads for which stipulation relief was approved by BLM and of these, 12 had multiple nests affecting the well pad and 17 had one nest buffer affecting the well pad. Six locations affected the access road only. Further analysis by the BLM confirmed that when multiple nests are nearby, a single pair of birds are predominantly tending these nests as a nesting territory.

Based on this review, the BLM assumes a single non-eagle raptor nest would be associated with each well pad to which non-eagle raptor stipulation relief is applied.

As discussed in the CCPA Final EIS, the BLM estimated that 98 stipulation reliefs exceptions or 6.5 percent of the proposed 1,500 well pads could be requested by operators for which the BLM would grant stipulation relief for non-eagle raptor nest buffers.

### Section 1, Commitments from the Operator

#### Measures

The following commitments will be included in an application for permit to drill (APD) from the operator to allow for automatic stipulation reliefsexceptions:

• Pits, ponds, and open-pit containers will be kept free of liquids harmful to wildlife and routinely inspected.

• Pits will be dewatered and backfilled within 6 months of completion of the last well. The pit can be reopened for future drilling of new wells at a later date in needed.

• Exhaust stacks greater than 2 inches in diameter on fired vessels (e.g., line heaters and heater-treaters) will be fitted with protective measures.

• Natural gas dehydrator tubs will be screened to exclude entry of birds.

• Load lines will be covered to prevent entry of birds.

August 31, 2020
Page **40** of **41**

• A qualified individual with knowledge of avian identification and a good working knowledge of all federal regulations related to migratory bird species will train all company, contractors and other personnel. Training will include information related to avian issues, specifically regarding nest management protocols that prevent take of migratory birds. Training will provide information to personnel that will allow project components to comply with existing regulations and outlines the consequences of non-compliance. Training of personnel also will include the procedures to be followed when finding an injured bird or carcass.

• Assistance and support for monitoring, studies and development of the Adaptive Management Plan for the Converse County Oil and Gas Project Area.

• Annual reporting of stipulation relief usage (see Reporting subsection below).

• Commence oil and gas development within the non-eagle raptor nest spatial buffer 30 days in advance of the seasonal buffer period documented in the APD conditions of approval (COA) and maintain continuous operations throughout that seasonal buffer period. BLM will allow the operator to commence operations during the seasonal buffer period only when the operator can demonstrate, during the 7 days prior to commencement of operations, that the nest does not contain young, eggs, or an adult sitting low in the nest, presumably incubating.

Development activitiesOperations will not cease during these seasonal buffer period for more than 72 hours. If a break in development operations occurs for more than 72 hours and the operator can demonstrate the nest does not contain young, eggs, or an adult sitting low in the nest, presumably incubating, BLM will verbally allow the operator to resume operations, all further development will cease until cessation of the seasonal buffer period referenced in the APD COA. In the event that a raptor or raptors occupy a nest while operations are occurring, the continuous operations need not cease.

**Avoidance and minimization efforts**

Prior to submitting an APD within a non-eagle raptor stipulation buffer, an operator will consider alternative locations outside of the non-eagle raptor buffer. The operator will document the location of potentially impacted nest(s), any alternative location(s) that it considered and the final well pad location. The operator also will document the factor(s) it considered in selecting a final location. If an alternative location falls within a different non-eagle raptor buffer than the final location, the operator will document the factor(s) it considered in selecting a final location within one buffer rather than another. When an operator is evaluating whether to site a location within one or more non-eagle raptor buffers, the operator will consider and document the following: available monitoring data for the respective nest(s), recent activity in nest(s), past species that have utilized the nest, the visibility and proximity of the well pad from the nest, nest condition, existing anthropogenic features, and proximity to other resources. This documentation is to be submitted to the BLM with the APD to further facilitate the annual planning meeting with BLM, described below.

*A. Meetings with BLM*

The BLM will conduct an operational meetings before after the raptor nesting season as development of the project progresses. BLM will hold tThese meetings will include with individual all operators seeking to use stipulation relief and other entities by invitation only. Discussions will center on the operator's's activities in non-eagle raptor buffers during the prior raptor nesting season, the operator's documentation for placement of future APDs and efforts to avoid these buffers, any mitigations implemented, all studies conducted and any monitoring collected for the area. During the meeting, operators will be required to provide information all about possible activities within non-eagle raptor buffer(s) during the forthcoming raptor nesting season to receive verbal approval from the authorized officer at this meeting.

Exhibit C to Rebacca Byram Declaration

August 31, 2020
Page **41** of **41**

*B. Monitoring and raptor studies*

Any operator(s) requesting to use an automatic stipulation relief exception will support and assist in the development of monitoring and studies of non-eagle raptors in the Powder River Basin to inform the framework and possible decision on an Adaptive Management Strategy referred to in Section 2 of this document. The operator(s) will work with BLM and other entities to define the specific parameters of these monitoring and studies. Support and assistance may be in the form of compensation to the pertinent agency tasked with oversight of these monitoring and studies, whether monetary or otherwise, or facilitation of access and coordination with landowners. The operator(s) may seek support from the Governor's Office for landowner coordination.

The operator(s) will work with BLM and other entities as appropriate to develop monitoring frameworks designed to support any further studies on non-eagle raptors in the CCPA.

*C. Reporting*

By August 30 of each year, any operator who has conducted development of wells within stipulation buffers surrounding non-eagle raptor nests that were occupied active during the prior breeding season for non-eagle raptors will submit a report to the BLM documenting the number and location of stipulation relief used. This reporting requirement will apply to all operators in the CCPA in order to qualify for the following year's stipulation relief.

## Section 2, Adaptive Management

The operators will participate with the BLM and any other pertinent entities that the BLM invites in the development of an Adaptive Management Plan using the "Adaptive Management, The U.S. Department of the Interior Technical Guide" https://www.doi.gov/sites/doi.gov/files/migrated/ppa/upload/TechGuide.pdf. The other entities that the BLM will invite include, at a minimum, the U.S. Fish and Wildlife Service, Wyoming Game and Fish Department, and Wyoming Governor's Office.

The final Adaptive Management Plan will evaluate whether the presence of oil and gas operations near nests of common non-eagle raptor species in the Project Area (namely ferruginous hawks) results in nest abandonment, reduced reproductive success, and displacement of individuals from nesting territories. Further, the Adaptive Management Plan will evaluate whether the stipulation reliefs authorized by the ROD result in actual, measurable population-level impacts to non-eagle raptors in the Powder River Basin. Until there have been actual, measurable population-level impacts to eagle-raptors raptors in the Powder River Basin, BLM will continue to grant stipulation reliefs beyond the 98-well pad threshold identified in Decision No. 4047.

BLM will finalize and approve the Adaptive Management Plan within a year of the date it signs the Converse County Project ROD.

The Adaptive Management Plan will recognize that the 98 stipulation relief threshold in Decision No. 4047 is based on BLM's assessment that it has management authority over 60 percent of the CCPA. Should BLM determine that it has management authority over a greater portion of the CCPA, the Adaptive Management Plan will provide that BLM will proportionately increase the number of stipulation reliefs that it will grant without application of additional conservation measures.

Exhibit C to Rebecca Byram Declaration Operator Group Attachment A

## DAVIS GRAHAM & STUBBS

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

July 25, 2019

*Via electronic mail*
blm_wy_casper_wymail@blm.gov

Bureau of Land Management
Casper Field Office
2987 Prospector Drive
Casper, Wyoming 82604

Attn: Mike Robinson, Project Manager

**Re:     Converse County Oil and Gas Supplement to the Draft Environmental Impact Statement**

Dear Mr. Robinson,

Anadarko Petroleum Corporation, Chesapeake Energy Corporation, Devon Energy Corporation, EOG Resources, Inc., and Northwoods Energy (collectively, "the Operator Group") appreciate the opportunity to submit comments on the Supplement to the Draft Environmental Impact Statement (SDEIS) for the Converse County Oil and Gas Project ("Project"), 84 Fed. Reg. 17,884 (Apr. 26, 2019). Members of the Operator Group are the Project applicants. These comments adopt and incorporate by reference comments submitted by the Petroleum Association of Wyoming on the SDEIS. These comments also supplement any individual comments submitted separately by members of the Operator Group. These comments are in addition to the Operator Group's comments on the Converse County Oil and Gas Project Draft Environmental Impact Statement (DEIS) dated March 12, 2018.

## I.     Executive Summary

➢ The Operator Group strongly recommends that the Bureau of Land Management (BLM) select Option 3 as its preferred option to amend the Casper Resource Management Plan (RMP). Option 3 is most consistent with the Operator Group's Proposed Action and BLM's preferred alternative in the DEIS (Alternative B). Option 3 provides a straightforward process for timing limitation stipulation (TLS) relief that is efficient for operators to utilize and straightforward for BLM to administer. It provides operators necessary certainty as to when and how operations can occur in non-eagle raptor nest buffers. Option 3 also protects active nests, tailors timing of TLS to individual non-eagle raptor species, and reduces burdens on BLM in granting TLS relief. The Operator Group is willing to discuss with BLM additional measures to further enhance the conservation benefits of Option 3.

➢ BLM must utilize the United States Fish and Wildlife Service's (USFWS) definition of "active" nests. Relying on the definition of "active" and "inactive" nest in the SDEIS will needlessly limit

Davis Graham & Stubbs LLP   ▪   1550 17th Street, Suite 500   ▪   Denver, CO 80202   ▪   303.892.9400   ▪   fax 303.893.1379   ▪   dgslaw.com

4586111

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **2** of **31**

activities around nests that do not contain nesting raptors, yielding little if any conservation benefit.

➢ Option 4 does not meet the Proposed Action's goal of programmatic year-round development and must not be selected by BLM. Option 4 does not provide a clear path to TLS relief and does not provide actual year-round development. It also imposes a more onerous process to obtain TLS relief than the current exception process. Option 4 imposes limitations that burden development with minimal conservation benefit. Further, the process for TLS relief under Option 4 is cumbersome, inefficient, and confusing.

➢ Option 5 does not provide a meaningful alternative and should be removed from the Converse County Final Environmental Impact Statement (FEIS).

➢ BLM incorrectly inflates potential impacts to non-eagle raptors from Options 2 and 3 and understates potential impacts from Options 4 and 5. BLM unreasonably assumes that 50 percent of non-eagle raptors nests will be active annually, despite recent wildlife survey data to the contrary. BLM erroneously concludes that impacts from Options 2 and 3 will be "moderate to major" by inflating nest activity levels, disregarding the conservation measures proposed under Option 3, and incorrectly assuming that the loss of a non-eagle raptor nest location will result in the loss of a successful nest. By contrast, BLM misleadingly assumes that Options 4 and 5 will have "no impacts." BLM has not justified its characterization of the impacts of any of the options.

## II.    BLM Should Adopt Option 3 as Its Preferred Option to Amend the Casper RMP.

### A.    Option 3 is Consistent with the Proposed Action and BLM's Preferred Alternative in the DEIS.

An essential component of the Operator Group's Proposed Action is the ability to develop year-round by obtaining relief from non-eagle raptor TLS. DEIS at 2-1. BLM analyzed the Proposed Action as Alternative B in the DEIS and identified this alternative as its preferred alternative in the DEIS. *See id.* Option 3 is most consistent with the Proposed Action and BLM's preferred alternative because it outlines a clear process by which operators can obtain TLS relief and allows for programmatic year-round development. Because Option 3 provides a straightforward process that yields certainty for operators as to when and how they may conduct operations in TLSs, Option 3 is directly responsive to and fully consistent with the Proposed Action. BLM should select Option 3.

The benefits of the conservation measures and process provided in Option 3 include:

➢ Option 3 promotes operator certainty by eliminating BLM's case-by-case determination of when to grant relief for non-eagle raptor TLS. Instead, if an operator adheres to the conservation measures outlined in Option 3, it automatically receives TLS relief. *See* SDEIS

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **3** of **31**

at 2-4 ("If the applicant applies the conservation measures set forth in the RMP Appendix XXX, these timing limit stipulations **will not** be applied within the Converse County Project Area . . . ." (emphasis added)). This structure benefits both operators and BLM by implementing agreed-to and certain conservation measures that protect non-eagle raptors while also permitting regulated development. Further, by eliminating case-by-case review of relief for non-eagle raptor TLS, Option 3 reduces administrative burdens on BLM of administering TLS relief and eliminates the risk of inconsistent decision-making.

➢ Unlike other options, Option 3 promotes flexibility for operators while protecting non-eagle raptors. Operators can begin oil and gas activities within nest buffers before the seasonal buffer period and continue into the stipulation season if the operator maintains continuous operations (no break for more than 72 hours). Or, after the start of the seasonal buffer period, operators can begin oil and gas activities, or resume after a break of more than 72 hours, within nest buffers, but only if a nest has been determined to be inactive. *See* SDEIS at S1-1 (Features 1 and 2). These limitations are tailored to protect active nests from new disturbance or disruption caused by the commencement of development activities. At the same time, these limitations assume that ongoing oil and gas development activities will not disturb or disrupt non-eagle raptors that initiated nesting after the development activities commenced.

➢ Option 3 requires targeted and meaningful monitoring. The determination of whether a nest is inactive requires monitoring of the nest for seven days before beginning or resuming oil and gas activities. By monitoring for seven days before activities would begin, operators would collect the most relevant and recent data regarding current nest use. *See* SDEIS at S1-1.

➢ Option 3 maximizes conservation and regulatory resources by focusing protections on active nests (i.e., nests containing nesting non-eagle raptors, eggs, or chicks). Approximately 20 percent of the more than 1,200 non-eagle raptor nests in the Project area have been active between 2016 and 2018. Option 3 encourages operators to conduct operations outside of TLS buffers and focuses protective measures on active nests, while employing conservation measures to benefit raptors throughout the Project area. By contrast, the existing process for TLS relief under Option 1 and BLM's proposed process under Option 4 protect nests that are not active in a given year, yielding overly broad, unnecessary, and inefficient protection measures.

➢ Option 3 requires operators seeking TLS relief to apply conservation measures throughout the Project area that avoid raptor contact with development facilities such as reserve pits, ponds, containers, dehydrator rubs, and stacks. *See* SDEIS at S1-1. These conservation measures reduce impacts to non-eagle raptors throughout the Project area, inside or outside of buffer areas, and regardless of activity at nearby nests.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **4** of **31**

> ➢ Option 3 tailors the TLS season to the species that have historically used a given nest, rather than imposing an overly broad TLS season that invariable changes in actual nesting and breeding duration year over year. Where monitoring data identify the raptor species that uses a given nest, BLM would observe the TLS season that the USFWS's Ecological Services Field Office recommends for a particular species. *See* SDEIS at S1-2, tbl. S1-1. These seasonal buffers are listed in Table S1-1 in Appendix S1. By requiring heightened procedures during scientifically supported TLS seasons, Option 3 would avoid unnecessary regulatory burdens.

These benefits of Option 3 wholly support BLM's selection of Option 3 as its preferred option to amend the Casper RMP. Nonetheless, the Operator Group is willing to discuss with BLM additional measures to further enhance the conservation benefits of Option 3.

### B.    BLM Must Clarify that BLM will Modify Existing Leases in the Project Area under Option 3.

In the FEIS, BLM must add language clarifying that, under Option 3, BLM will modify existing leases in the Project area that contain raptor TLS to specify that the TLS will not apply to non-eagle raptors if the applicant applies the conservation measures specified in Option 3. This is an administrative clarification to Option 3 because Option 2 already includes and analyzes the potential impacts of the proposal to modify existing leases within the Project area to remove non-eagle TLS. *See* SDEIS at 2-7, lines 9–12, S2-1, lines 11–14. As drafted, Option 3 does not propose to modify existing leases, and the Operator Group believes this omission was an oversight in drafting. A lease modification would implement Option 3 as proposed because Option 3 would eliminate the requirement that BLM grant exceptions to the TLS on a case-by-case basis. *See* SDEIS at 2-4 tbl. 2.4-1 ("If the applicant applies the conservation measures set forth in the RMP Appendix XXX, these timing limit stipulations **will not apply** within the Converse County Project Area (CCPA) . . . ." (emphasis added)).

BLM should also clarify that public comment on this amendment to the Casper RMP satisfies any obligation to offer the lease modification for public review. BLM's regulation governing modifications and waivers of oil and gas lease terms directs that, "[i]f subsequent to lease issuance the authorized officer determines that a modification or waiver of a lease term or stipulation is substantial, the modification or waiver shall be subject to public review for at least a 30-day period." 43 C.F.R. § 3101.1-4. To the extent BLM determines the lease modification is "substantial," BLM's Federal Register notice and 90-day comment period on the proposed amendment to the Casper RMP amply satisfy the obligation to subject the modification for public review. Thus, BLM should confirm in the FEIS that no additional public review is necessary to modify leases with raptor TLS in the Project area.

## III.    BLM Must Utilize the U.S. Fish and Wildlife Service's Definition of "Active" Nests and Should Not Limit Activities Around "Occupied" Nests.

USFWS has established the appropriate definition of an "active" nest, and BLM must revise the SDEIS to utilize it. In national guidance, USFWS has defined an active nest as "one that contains viable

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **5** of **31**

eggs and/or chicks." Memorandum to Regional Directors from Assistant Director, Migratory Birds at 1 n.2 (June 14, 2018). USFWS considers nests to be inactive when they "are empty, contain nonviable eggs, or are being built but do not yet have an egg in them." *Id.* USFWS has explained that "[a] nest becomes active when the first egg is laid and remains active until fledged young are no longer dependent on the nest." *Id.*

Despite this guidance, BLM in the SDEIS defines an "active" nest as "a nest that contains viable eggs or chicks or is considered occupied." SDEIS at 3-2, lines 24. BLM explained that "[t]he presence of raptors (adults, eggs, or young), evidence of nest repair or marking, freshly molted features or plucked down, or current year whitewash all are considered signs suggesting the nest site is active." SDEIS at 3-2, lines 28–30. BLM defines an "occupied" nest "one that is repaired or tended in the current year by a pair of raptors." SDEIS at 3-2, lines 24–25. In BLM's view, a nest is occupied "throughout the periods of initial courtship and pair bonding, egg laying, incubation, brooding, fledging, and post-fledging dependency on the young." SDEIS at 3-2, lines 26–27 (internal citation omitted).

BLM inappropriately relies on its own definition of active nests, which is significantly broader than USFWS's definition of active nests by including "occupied" nests. USFWS, and not BLM, is charged with administering the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703–712; 50 C.F.R. pt. 21 (migratory bird permits). The fact that two agencies, both within the Department of the Interior, are using starkly different definitions for the same term will result in confusion for regulated entities that may be subject to BLM restrictions for species protected under the MBTA on federal lands and are mindful of USFWS authority to administer this act. Given the substance of this particular issue, and that NEPA documents are developed in consultation with other federal agencies, BLM must adopt and apply USFWS's definition.

BLM's proposed protection of both active and occupied nests would unnecessarily restrict activities within non-eagle raptor buffers. Option 4 inappropriately limits activities around both active and occupied nests. Under Option 4, activities can only begin after February 1 when nests are verified to be inactive and unoccupied, and activities that began before February 1 can only continue to a new development phase, or resume operations after a break of more than 72 hours, between February 1 and June 15 if a nest is determined to be inactive and unoccupied. *See* DEIS at S2-2, lines 23–26, 45–46, S2-3, lines 1–3, 6–8, 31–33.

In the SDEIS, BLM has not demonstrated any conservation benefits to support the proposed restrictions on development activities near occupied but inactive non-eagle raptor nests that will undoubtedly occur relying on the definitions in the SDEIS. BLM offers no explanation, rationale, or justification for limiting activities around occupied but inactive nests. BLM's unwarranted protection of occupied nests will limit more development activities while providing little if any conservation benefit. If development activities disturb non-eagle raptors while they are engaged in activities that result in nest occupancy, such as repair and tending of nests, courtship behavior, and pair bonding, such disruption will not necessarily prevent the pair from nesting because they can select an alternative nest away from oil and gas development activities. Studies have demonstrated that ferruginous hawks, which are the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **6** of **31**

most prevalent raptor in the Project area, maintain several potential nest sites within their territory. Carlisle et al., 2018; Slater et al., 2017. BLM's own synthesis of existing scientific literature notes that ferruginous hawks can construct or renovate between one and five nests within their territories and that 86 percent of nesting pairs constructing alternate nests. BLM Technical Note 434, *Artificial Nest Structures as Mitigation for Natural-Gas Development Impacts to Ferruginous Hawks (*Buteo regalis*) in South-Central Wyoming* 11. "Ferruginous [h]awks typically play a 'shell game' centering on suites of accessible nests that are proximate to prey resources." *Id.* Thus, utilizing USFWS's definition of "active" nests and confining protections to such nests will not impact non-eagle raptor populations in the Project area.

To align with the Proposed Action, the Operator Group requests that BLM revise its definition of "active" nests to adhere to USFWS's definition of "active" nests as "one that contains viable eggs and/or chicks." Further, BLM should revise statements throughout the DEIS to remove all references to "occupied" nests so that these statements only refer to "active" nests. Finally, because "tended" nests are a subset of occupied nests, BLM should also remove all references to "tended" nests.

## IV.   Option 4 Does Not Meet the Proposed Action's Goal of Year-Round Development.

### A.    Option 4 Does Not Respond to the Operator Group's Proposed Action and BLM's Preferred Alternative.

Option 4 does not respond to the Operator Group's Proposed Action, which is the DEIS's preferred alternative, because it does not allow a clear process for TLS relief or allow for year-round development, as detailed below. An essential component of the Operator Group's Proposed Action is year-round development to maximize horizontal development from multi-well pads. *See* DEIS at 2-1, lines 15–16 ("This alternative would include analysis of year-round development in areas where timing limitation restrictions serve to protect several wildlife species."), 2-25, lines 7–8 ("To the extent possible, drilling and development operations within the CCPA would be conducted on a year-round basis to maximize the use of horizontal development from multi-well pads."). In the DEIS, BLM identified the Operator Group's Proposed Action as its preferred alternative. *See* DEIS at 2-1, lines 17–18, 2-26, lines 12–15. BLM explained that it "believes that the Proposed Action has the necessary elements that would address the purpose and need for the Draft EIS . . . ." DEIS at 2-26, lines 12–15.

BLM must eliminate Option 4 from further consideration because it does not respond to the Operator Group's Proposed Action. In its NEPA documents, BLM must analyze reasonable alternatives, which are those that respond to the purpose and need the agency articulated in an EIS. *See* 40 C.F.R. § 1502.13. When articulating its purpose and need and defining alternatives, BLM must give "substantial weight" to the goals and objectives of project proponents, such as the Operator Group, as well as the public interest. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002); *see* 43 C.F.R. § 46.420(a)(2). "Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor." *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030. BLM need not consider alternatives that do not correspond to the applicant's

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **7** of **31**

purpose and need. *See Biodiversity Conservation All. v. Bureau of Land Mgmt.*, 608 F.3d 709, 715 (10th Cir. 2010) (holding BLM properly rejected a phased development alternative because it would not accomplish the project's goals); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) (similar). Because Option 4 does not respond to, and is inconsistent with, the Proposed Action, BLM should eliminate Option 4 from further consideration.

> **B.    Option 4 Does Not Provide a Clear Path to TLS Relief or Allow for Year-Round Development.**

Option 4 does not respond to the Operator Group's proposed action, which is the DEIS's preferred alternative, because it does not provide a clear pathway to TLS relief and does not allow for year-round development.

> 1.    Option 4's Case-by-Case Approach to Exceptions Creates Unnecessary Uncertainty.

Option 4 does not provide operators certainty for year-round development—a critical component of the Proposed Action. Option 4 creates unnecessary review by BLM on a case-by-case basis in contradiction to the Proposed Action.

Unlike Option 3, which automatically relieves TLS when certain, specified conditions are met, Option 4 provides relief from TLS solely on a case-by-case basis, even when nests are demonstrably inactive. The proposed language for Option 4 states that BLM "**may** grant exceptions to seasonal stipulations" and that TLS "**may** be relieved" within the Project area. *See* SDEIS 2-4, Table 2.4-1 (emphasis added). This case-by-case review does not provide operators certainty that BLM will grant exception requests and may lead to delays and inconsistent application of TLS relief. Indeed, under BLM's current case-by-case review of exceptions to non-eagle raptor TLS, operators have experienced delays of up to six months.

Option 4 not only contemplates case-by-case reviews of requests for non-eagle TLS relief, it outlines vague and subjective criteria to determine when BLM may grant such relief—creating the risk of inconsistent interpretation and disagreement as to when TLS relief is appropriate. Appendix S2 accompanying Option 4 requires several highly subjective determinations from BLM in order to grant TLS relief, including:

> ➢ A requirement that an operator develop "adequate" operator-committed measures with BLM. *See* SDEIS at S2-1, lines 11–14, S2-4, lines 17–23;
> ➢ A requirement that an operator demonstrate that it has "avoided the TLS buffer to the degree possible" and/or set forth "sufficient information" to display there was a "legitimate attempt" to avoid the potentially impacted TLS buffer. SDEIS at S2-2, line 14, S2-3, lines 44–46; and

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **8** of **31**

> ➢ An ability to develop a site-specific raptor protection plan (RPP) in consultation with USFWS that "displays the necessary components of this relief" from TLS. *See* SDEIS at S2-1, lines 40–41.

The SDEIS does not provide information or guidance as to how BLM should make these subjective determinations. Thus, implementation of Option 4 will lead to delays as BLM grapples with these subjective determinations and inconsistent decision-making between individual requests for TLS relief. These uncertainties are inconsistent with the programmatic year-round development contemplated by the Proposed Action, which requires an objective, consistent, and streamlined regulatory framework for TLS relief. Accordingly, Option 4 does not further the Operator Group's Proposed Action.

        2.      Option 4 Does Not Allow Operators to Engage in Year-Round Development Activities.

Option 4 does not allow operators to engage in year-round development activities. It only allows development activities that commence before February 15 to continue—and only if a nest does not become active during that period. *See* SDEIS at S2-2, lines 12–13, 20–21, and at S2-4, lines 38–42. These restrictions unreasonably limit an operator's ability to adjust its drilling schedule due to unforeseen circumstances, such as issues with surface access, drilling results, regulatory factors, infrastructure considerations, crew and capital availability, unpredictable takeaway capacity, and weather delays. Further, if a nest becomes active, an operator may be allowed to complete its current phase of activities but cannot continue development through the TLS season. *See* SDEIS at S2-3, lines 17–30. These restrictions do not allow operators to reliably engage in year-round development and therefore do not promote certainty as to when operations can occur.

By contrast, Option 3 allows operators to initiate development activities within non-eagle raptor spatial nest buffers any time during the TLS season if a nest is inactive. *See* SDEIS at S1-1 lines 35–39. Even if a nest becomes active while development activities are occurring, activities that were commenced prior to the start of the TLS season may continue under the rationale that they are not disturbing or disrupting the non-eagle raptor that chose to nest near development activities. *See* SDEIS at S1-1 at lines 29–32. Long-term monitoring of nesting raptors suggests that they can become tolerate of activities associated with industrial uses. *See* Antelope Coal LLC, 2017 Annual Wildlife Monitoring Report VIIIB-28 (2017) ("Long-term data demonstrate that many raptors nesting in the Antelope Mine raptor monitoring area have developed a high tolerance to mine-related disturbances. Several raptor pairs from at least four different species have illustrated this acceptance by repeatedly nesting in the permit area despite ongoing and/or encroaching mine operations.").

The reasonable limitations imposed by Option 3 protect nesting non-eagle raptors while allowing operators to anticipate initiating and continuing development throughout the TLS season.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **9** of **31**

**B.**     **Option 4 Imposes a More Onerous Process to Obtain TLS Relief than the Current Exception Process.**

The Operator Group strongly opposes Option 4 because it imposes a more onerous process, and more restrictions on development, to obtain year-round development than BLM's current process to obtain TLS relief under the existing Casper RMP. The Casper RMP outlines the following process to obtain TLS relief:

➢ BLM approves exceptions to TLS on a case-by-case basis. *See generally* Casper RMP app. F.
➢ Operators must submit exception requests to BLM approximately two weeks before conducting the proposed work. Casper RMP at F-1.
➢ BLM must individually analyze each request for compliance with the National Environmental Policy Act. *Id.*
➢ BLM must consult with Wyoming Game and Fish Department regarding exception requests. *Id.*
➢ BLM may grant an exception if it will not jeopardize the raptor population. When making this assessment, BLM will consider factors including resource concerns, animal conditions, climate/weather, habitat condition and availability, and spatial considerations. *Id.* at F-1 – F-2.

By contrast, Option 4 outlines the following process to obtain TLS relief:

➢ BLM may approve activities within nest buffers during stipulation season on a case-by-case basis. *See generally* SDEIS app. S2.
➢ BLM may only grant TLS relief for activities commencing before February 15 or after June 15. Operators cannot commence activities between February 15 and June 15, even if a nest is inactive. *See* SDEIS at S2-2, lines 12–13 and 20–21.
➢ Prior to requesting TLS relief, operators must:
  o Collect two consecutive years of monitoring data for a given nest. *See* SDEIS at S2-2, lines 1–2;
  o Affirmatively demonstrate to BLM that they have tried to avoid the nest buffer. *See* SDEIS at S2-2, lines 14–16; and
  o Develop operator-committed measures with BLM. *See* SDEIS at S2-1, lines 11–14.
➢ Operators must attend an annual meeting with BLM at which they must identify those wells for which they will initiate drilling prior to February 1. *See* SDEIS at S2-1, lines 23–39.
➢ If BLM grants TLS relief for activities commencing before February 15:
  o Operators must notify BLM of intent to construct a well location within nest buffers by February 1. *See* SDEIS at S2-2, lines 18–19;
  o Prior to commencing construction, operators must verify to BLM that the nest is inactive. *See* SDEIS at S2-2, lines 23–26;
  o Biologists must conduct weekly nest surveys between March 1 and June 15. *See* SDEIS at S2-3, lines 13–16;

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **10** of **31**

- o Activities cannot cease for more than 72 hours between March 1 and June 15. If activities cease for more than 72 hours, the operator must verify to BLM that the nest is inactive before commencing additional activity. *See* SDEIS at S2-2, lines 39–44;
- o Before an operator may proceed to another drilling phase (drilling, completion, production, etc.), the operator must contact BLM. BLM must coordinate with the U.S. Fish and Wildlife Service to determine whether the different drilling phase has an increased potential to impact nests. *See* SDEIS at S2-3, lines 6–8. If the new phase has an increased potential to impact nests, operators must verify to BLM the nest is inactive. *See* SDEIS at S2-3, lines 9–12; and
- o If a nest becomes active during one phase of development, the operator must cease activities upon reaching a logical stopping point and coordinate with BLM and USFWS. BLM may allow the operator to resume activities if they are not likely to reduce the nest success and if the operator employs a biological monitor. *See* SDEIS at S2-3, lines 17–30.

➢ BLM will approve requests for TLS relief for activities commencing after June 15 if a nest is inactive and unoccupied. *See* SDEIS at S2-3, lines 31–33.

➢ Operators must monitor nests for two years after well development. *See* SDEIS at 4-8, lines 11–12.

Additionally, Option 4 contains the following substantive limitations to obtain TLS relief that the existing Casper RMP does not require:

➢ Option 4 prohibits BLM from granting TLS relief for a nest that has ever been occupied by an eagle. *See* SDEIS at 2-8, lines 5–7.

➢ Option 4 may limit operators' ability to commence maintenance activities during TLS season. *See* SDEIS at S2-2, lines 45–46, and S2-3, lines 1–5. Operators currently may maintain and produce well-sites during stipulation period without a requirement to verify non-eagle raptor nest activity.

➢ Option 4 would limit operators' ability to commence reclamation activities during the TLS season and would require that reclamation activities occur without a break of more than 72 hours. *See* SDEIS at S2-2, lines 39–44. Currently, however, BLM does not prohibit reclamation activities during the stipulation period.

The requirements to obtain TLS relief are more onerous than the requirements under the current RMP. Given that TLS relief is uncertain because BLM requires subjective reviews based on vague criteria, operators have no incentive to support Option 4 over the current exception process in the Casper RMP.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **11** of **31**

### C.    Option 4 Imposes Unnecessary Limitations that Burden Development with Minimal Conservation Benefit.

Option 4 is unnecessarily cumbersome because it includes several requirements that yield little, if any, conservation benefit but increase the burden on operators attempting to develop within non-eagle raptor buffers during the TLS season.

#### 1.    The Prohibition on TLS Relief for Any Nest an Eagle Has Ever Used is Unsupported by Science and Arbitrary.

The prohibition on TLS relief for any nest that eagles have once used is arbitrary and inflexible and yields little conservation benefit. *See* SDEIS at 2-8, lines 5–7 ("If a nest has ever been occupied by eagles, it will be considered an eagle nest regardless of being inactive, used by other species, or if eagle occupancy occurred greater than two years ago."). This prohibition essentially treats such nests as active for use by eagles. BLM, however, does not provide any scientific support for this prohibition. *See generally* SDEIS. Thus, this prohibition limits TLS relief for no apparent conservation benefit. BLM must eliminate the prohibition on TLS relief for all nests that eagles have ever used and instead recognize that, after a period of nonuse by eagles, nests become inactive.

#### 2.    The Requirement that Development Activities Begin Before February 15 is Unnecessarily Inflexible.

The requirement that development activities begin before February 15 is unnecessarily inflexible. *See* SDEIS at S2-3, lines 10–12. Given that nearly 80 percent of non-eagle raptor nests in the Project area are likely to be inactive, *see* SDEIS at 3-6, tbl. 3-18-5X, BLM should provide a process to commence oil and gas activities later in the TLS season near inactive nests.

Such flexibility is essential to the ability to conduct year-round development activities. An operator may need to commence development activities later in the TLS season to accommodate a fluctuating drilling schedule or another operational delay, such as the rig or other equipment not being ready or available. Indeed, because the February 15 start date occurs during the winter, weather or related conditions could delay operations during any stage in the process. Although Option 4 may allow operators to continue activities into the TLS season that started beforehand, those activities will ultimately conclude in a matter of weeks and the operator will have no additional ability for TLS relief to later drill or complete additional wells, leaving potentially several months of the TLS window free from development. Because nearly 80 percent of the nests in the Project area are likely to be inactive in a given year, BLM's requirement that activities commence before February 15 will result in many inactive nests unnecessarily receiving TLS protection. BLM should eliminate the requirement in Option 4 that development activities begin before February 15.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **12** of **31**

     3.     The Requirement that Operators Identify the Pads for which They Seek TLS
               Relief is Unnecessarily Rigid.

The requirement that operators identify the pads for which they seek TLS relief at an annual meeting is unnecessarily rigid. SDEIS at S2-1, lines 23–26. Although an operator may be able to identify some pads for which it will seek TLS relief, the operator may select different pads for TLS relief during the time between the annual meeting and initiation of the TLS season. BLM must afford operators flexibility to identify pads for which they may seek TLS relief after the annual meeting occurs and after the TLS season begins. Drilling plans are highly unpredictable because operators change priorities for development for a variety of reasons, including changes in the asset profile, economics, rate of return, information from exploratory wells, commodity prices, personnel and equipment availability, regulatory delays and constraints, and political and other factors.

Further, the provision that failure to attend the annual meeting results in forfeiture of the ability to drill year-round is unreasonable. SDEIS at S2-1, lines 27–29. If an operator cannot attend an annual meeting due to unforeseen circumstances, the operator should be afforded another opportunity to discuss exceptions.

Finally, BLM must hold individual meetings with operators to protect confidential information regarding drilling programs, rather than a single meeting with multiple operators. Due to the sensitivity of the information discussed, this meeting should not be open to the public; meeting participants should be limited to BLM and an operator's employees and contractors to protect confidential commercial and financial information and information related to oil and gas wells. *See* 5 U.S.C. § 552(b)(4) and (9).

     4.     The Requirement that Operators Provide Two Years of Monitoring Data Does
               Not Predict Future Nest Activity.

The requirement that operators provide BLM with two years of monitoring data with a request for TLS relief yields little meaningful information to BLM because prior years of monitoring data do not predict future nest activity. SDEIS at S2-2, lines 1–2. The assumption that two years of monitoring data will predict whether a nest will be active in the future rests upon the incorrect premise that non-eagle raptors in the Project exhibit high nest fidelity. In fact, ferruginous hawks, which are the most common raptor in the Project area, will tend several nests before choosing one to nest. "Some raptor species, such as golden eagles and ferruginous hawks, maintain several potential nest sites within their territory among which they can rotate in different years." Carlisle et al., 2018. Other raptor species exhibit similar behavior. "Inspection of 21 territories monitored for 26-38 yr. without interruption suggested [golden] eagles use individual nests an average of every 3.3 years, laid nests in any nest within territories an average of every 1.8 yr. and switched nests between 43.3% of consecutive nesting attempts (i.e., egg-laying in discrete breeding season)." Slater et al., 2017. "The average proportion of nests in use varied across species, as did the magnitude of changes in use from year to year . . . . Bald eagles had the highest overall average use (63.6%), whereas ferruginous hawks had the lowest (8.2%). All other species averages ranged from 19.5-42.6% . . . ." Carlisle et al., 2018. Further, "nest success or failure in one year

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **13** of **31**

did not influence whether a pair switched nests in the following year." Slater et al., 2017. Indeed, BLM itself recognizes that "[t]he number of nests is not an indicator of raptor abundance." DEIS at 3-5 n.1.

Because non-eagle raptors in the Project area will not necessarily return to a given nest in successive years, BLM's requirement that operators provide two years of monitoring data is unnecessary and will not predict whether a nest is likely to become active.

The requirement that operators provide two years of monitoring data also may create uncertainty in BLM's process for TLS relief. Appendix S2 does not address whether BLM may grant TLS relief if monitoring data shows previous non-eagle raptor activity in a nest. This omission will likely lead to confusion if monitoring data reveals prior activity at a nest because previous nest activity does not dictate future activity.

Moreover, this requirement lacks flexibility. Appendix S2 does not offer any mechanism to allow TLS relief in situations where two years of monitoring data is not available. *See* SDEIS, app. S2. Similarly, Appendix S2 would require two years of monitoring data regardless of the condition of the nest.

BLM must provide flexibility on the requirement that operators provide two years of monitoring data. Two years of monitoring data will provide less timely and less relevant data than a requirement to employ a biological monitor before and during activity in a TLS. Biological monitors can assess the actual, on-the-ground operational impacts, if any, on non-eagle raptors. This concrete data allows BLM to make more informed decisions regarding impacts of oil and gas operations, if any, on non-eagle raptors.

5.    The Role of USFWS in Granting TLS Relief is Unclear and Negates the Very Constructions of Options 4 and 5.

The suggestion that operators consult with USFWS to develop an RPP for each request for TLS relief is confusing and onerous. Appendix S2 of the SDEIS states that a site-specific RPP "could" be developed "in consultation with the USFWS." SDEIS at S2-1, lines 40–42. This provision does not clearly indicate whether BLM would require an operator to develop an RPP with USFWS or whether an operator has discretion to consult with USFWS.

This provision must be removed. Any requirement that operators consult with USFWS to develop an RPP under Option 4 essentially conflates Option 4 with Option 5, which proposes to allow TLS relief if an operator works with BLM and USFWS to develop a Migratory Bird Conservation Plan (MBCP). *See* SDEIS at 1-3, lines 1–4. Further, if BLM intends to require USFWS consultation, this requirement provides USFWS with a potential veto power over TLS relief.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **14** of **31**

> 6.    The Requirement to Cease Activities if a Nest Becomes Active Will Lead to Unnecessary Delay.

The requirement that operators would cease activity following completion of a development stage if a nest becomes active will lead to unnecessary delay. *See* SDEIS at S2-3, lines 17–24, S2-4, lines 42–43. If a bird begins nesting during operations, BLM may reasonably assume the bird is tolerant of that activity level and allow activities to continue, uninterrupted. Long-term monitoring of nesting raptors suggests that they can become tolerate of activities associated with industrial uses. *See* Antelope Coal LLC, 2017 Annual Wildlife Monitoring Report VIIIB-28 (2017) ("Long-term data demonstrate that many raptors nesting in the Antelope Mine raptor monitoring area have developed a high tolerance to mine-related disturbances. Several raptor pairs from at least four different species have illustrated this acceptance by repeatedly nesting in the permit area despite ongoing and/or encroaching mine operations.").

Further, Option 4 provides that if a nest becomes active while development activities are occurring between February 15 and June 15, BLM may allow an operator to continue to the next development stage upon a determination by BLM and USFWS that the activity "is not causing impacts that would lead to diminished nest success" or is "not likely to cause a reduction in TLS success." *See* SDEIS at S2-3, lines 20–21, S2-4, lines 42–43. The SDEIS, however, does not define or explain when an activity "is not causing impacts that would lead to diminished nest success" or is "not likely to cause a reduction in TLS success." *See id.* This subjective standard does not give operators any certainty as to when they can expect to continue operations through the TLS season.

> 7.    The Requirement to Monitor for Two Years After TLS Relief is Unnecessary.

The requirement in Option 4 to monitor for two consecutive years "to ensure that the conservation measures are effective" is unnecessary and burdensome. *See* SDEIS at 4-8, lines 11–12. First, BLM offers no scientific justification for this requirement. *See id.* This requirement assumes that monitoring after TLS relief will reveal potential long-term impacts—but this assumption rests on the incorrect premise that non-eagle raptors in the Project area exhibit high levels of nest fidelity. In fact, ferruginous hawks, which are the most common raptor in the Project area, will tend several nests before choosing one to nest. "Some raptor species, such as golden eagles and ferruginous hawks, maintain several potential nest sites within their territory among which they can rotate in different years." Carlisle et al., 2018. Other raptor species exhibit similar behavior. "Inspection of 21 territories monitored for 26-38 yr. without interruption suggested [golden] eagles use individual nests an average of every 3.3 years, laid nests in any nest within territories an average of every 1.8 yr. and switched nests between 43.3% of consecutive nesting attempts (i.e., egg-laying in discrete breeding season)." Slater et al., 2017. "The average proportion of nests in use varied across species, as did the magnitude of changes in use from year to year . . . . Bald eagles had the highest overall average use (63.6%), whereas ferruginous hawks had the lowest (8.2%). All other species averages ranged from 19.5-42.6% . . . ." Carlisle et al., 2018. Further, "nest success or failure in one year did not influence whether a pair switched nests in the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **15** of **31**

following year." Slater et al., 2017. Indeed, BLM itself recognizes that "[t]he number of nests is not an indicator of raptor abundance." DEIS at 3-5 n.1.

Second, this monitoring may not yield any relevant information. If the nest had not been used or active during the years immediately before the TLS relief, BLM would not gain any information about whether the TLS relief impacted non-eagle raptor use.

Finally, Option 4 does not provide BLM with any mechanism to adjust management to respond to monitoring data. Because this monitoring data requirement will not yield information that BLM can utilize, BLM must remove this requirement from Option 4. At a minimum, BLM must offer scientific justification for this requirement.

> 8.    Option 4 Does Not Impose Timeframes on BLM to Reach Decisions.

Option 4 requires that operators provide information to BLM with no obligation on BLM as to how quickly it must review and turnaround feedback to operators. For example, where BLM requires operators to verify inactivity of a nest, the process does not ensure that, between the time of verification submission to BLM's response, the nest does not then become active. *See* SDEIS at S2-2, lines 23–26. Likewise, Option 4 does not impose timeframes as to how quickly BLM must grant TLS relief. *See generally* SDEIS app. S2. Further, if a nest becomes active and BLM must determine whether to allow an operator to continue to the next development stage, Option 4 does not require BLM to make this determination within a specific timeframe. *See* SDEIS at S2-3, lines 20–21, S2-4, lines 42–43. The lack of timetables contributes to operator uncertainties and may cause delays in necessary BLM decisions.

> 9.    BLM Should Not Require TLS Relief for Maintenance and Reclamation Activities.

Appendix S2 states, "Once activities have commenced in any of the development phases (construction, drilling, completion, production, **maintenance, and reclamation**) there must be no break in activity of more than 72 hours from March 1 to June 15." SDEIS at S2-2, lines 39–41. Currently, operators may maintain and produce well sites without verifying that an area lacks active non-eagle raptor nests; they may also initiate reclamation activities in the TLS season. *See* Casper RMP at 2-63. Limiting an operator's ability to perform routine maintenance during the TLS season would present safety concerns. BLM must eliminate the reference to maintenance and reclamation activities from Appendix S2. Furthermore, for clarity, the phrase on page S2-2, rows 39–41, should be revised to replace "and" with "and/or."

## V.    Option 5 Does Not Provide a Meaningful Alternative and Should be Removed from the FEIS.

Option 5 does not contain enough detail to be meaningfully analyzed as an alternative to the Proposed Action. Option 5 merely observes that an operator can develop an MBCP with USFWS and outlines the elements of an MBCP. *See* SDEIS at 2-8, lines 15–20, app. S3. Yet Option 5 lacks the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **16** of **31**

specificity necessary to be a meaningful alternative. An EIS must "[d]evote substantial treatment to each alternative considered in detail including the proposed action **so that reviewers may evaluate their comparative merits**." 40 C.F.R. § 1502.14(b) (emphasis added). The discussion of alternatives must contain sufficient detail "to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) (quoting *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972)). Courts have rejected EIS that simply list alternatives. *See Envtl. Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 350 (8th Cir. 1972). Because Option 5 of the SDEIS lacks any substantive measures to conserve or protect non-eagle raptors in the Project area, *see* SDEIS at 2-8, lines 8–20, it lacks the specificity to be a meaningful alternative.

Further, adopting Option 5 is entirely possible without amending the Casper RMP—the sole reason for this SDEIS—because Option 5 is only an undetailed derivative of Option 1. The ability to negotiate an MBCP with USFWS does not require an RMP amendment. Indeed, in the DEIS, BLM observed that the Operator Group had been working with USFWS to explore a possible Umbrella MBCP to serve as a programmatic guide for the development of site-specific migratory bird conservation plans within the planning area. *See* Converse County DEIS at 4.18-30.

Finally, like Option 4, Option 5 does not give operators certainty as to whether and when development during the TLS season will be allowed. The discussion of Option 5 in the DEIS provides no information, let alone a hint, of the circumstances in which BLM will grant TLS relief and under what terms. *See* SDEIS at 2-8, lines 8–20, 4-8, lines 23–35. For these reasons, BLM should remove Option 5 from consideration in the FEIS.

## VI.    BLM Incorrectly Assesses Impacts to Non-Eagle Raptor Nests, Thus Distorting Its Analysis of Options.

### A.    BLM Has Not Justified Its Characterizations of Impacts from Options 1 through 5.

BLM's analysis of the potential impacts of Options 1 through 5 in the SDEIS includes virtually no citations to scientific literature. NEPA requires agencies to take a "hard look at the environmental consequences of proposed actions utilizing public comment and the best available scientific information . . . ." *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001) (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171–72 (10th Cir. 1999)). NEPA analysis must utilize "high quality" information. 40 U.S.C. § 1500.1(b). "Accurate scientific information . . . [is] essential to implementing NEPA." *Id.* BLM's assessment of potential impacts from Options 1 through 5 contains no references to scientific literature in support of its conclusions. *See* SDEIS at 4-7 – 4-8.

BLM's analysis of the potential impacts of Options 1 through 5 in Chapter 4 of the SDEIS includes minimal citations to scientific literature. Similarly, BLM's assessment of cumulative impacts to migratory birds under all alternatives contains no references to scientific literature. *See* SDEIS at 5-2 – 5-3, § 5.3.18.2. Rather, in Chapter 4, BLM references scientific literature **only** in support of the following statement: "[A]lterations in feather properties [from decreased thermoregulatory and

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **17** of **31**

buoyancy properties of feathers that become covered in salt crystals or surfactants] could lead to hypothermia or drowning of affected individuals (Ramirez 2009)." SDEIS at 4-3, lines 28–31. Further, Section 8.0 of the SDEIS (References) only references **one** unpublished study: "Ecosystem Research Group, Editors. 2015. Raptor Symposium. 2015 Campbell County, Wyoming Raptor Symposium Proceedings. Gillette, Wyoming. March 11th and 12th, 2015." *See* SDEIS at 8-1. The remaining references in Section 8.0 relate to compiled data and communications between BLM, USFWS, and Wyoming Game and Fish Department regarding the Project. *See id.*

BLM must revise its discussion of impacts from Options 1 through 5 in Chapter 4 to incorporate the findings of the following studies, which are attached and reflect the highest quality scientific information regarding raptors. Additionally, BLM must include these studies in Chapter 8.0, References:

➤ "Human-Made Structures, Vegetation, and Weather Influence Ferruginous Hawk Breeding Performance," Zachary P. Wallace, Patricia L. Kennedy, John R. Squires, Lucretia E. Olson, and Robert J Oakleaf, *The Journal of Wildlife Management* 80(1): 78-90; 2016.
➤ "Interannual Golden eagle (Aquila Chrysaetos) Nest-use Patterns in Central Utah: Implications for Long-term Nest Protection," Steven J. Slater, Kent R. Keller, Robert N. Knight, *Journal Raptor Research* 51(2): 129-135, 2017.
➤ "Raptor nest-site use in relation to the proximity of coalbed-methane development," J.D. Carlisle, L.E. Sanders, A.D. Chalfoun, K.G. Gerow, 2018, *Animal Biodiversity and Conservation* 41.2: 227-243.
➤ BLM Technical Note 433, J.P. Smith et al., "An Assessment of the Effects of Oil and Gas Field Activities on Nesting Raptors in the Rawlins, Wyoming and Price, Utah Field Offices of the Bureau of Land Management."
➤ BLM Technical Note 434, Mike C. Neal et al., "Artificial Nest Structures as Mitigation for Natural-Gas Development Impacts to Ferruginous Hawks (*Buteo regalis*) in South-Central Wyoming."

     **B.**     **The Assumption that 50 Percent of Non-Eagle Raptor Nests in the Project Area Will be Active Annually is Unsupported and Inaccurately Inflates Potential Impacts.**

          1.     Monitoring Data Do Not Support BLM's Conclusion that 50 Percent of Non-Eagle Raptor Nests Will be Active.

BLM unreasonably and incorrectly assumes that 50 percent of non-eagle raptor nests will be active annually by cherry-picking data more than 12 years old that is well above average activity levels and is contradicted by recent data. *See* SDEIS at 3-7, lines 12–13. BLM represents that monitoring data from six years over a 13-year period reflect that between five and 50 percent of nests in the Project area and its vicinity were active. *See* SDEIS at 3-6, tbl. 3.18-5X. BLM also references a report of a 2015 symposium finding that between 12 and 51 percent of nests in Campbell County were active. SDEIS at 3-7, lines 4–13. Based on this information, BLM "conservatively" assumes that 50 percent of nests in the Converse County Project area will be active in a given year. SDEIS at 3-7, lines 12–13.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **18** of **31**

BLM's assumption that 50 percent of nests will be active annually relies on data more than 12 years old that are inconsistent with average activity levels and recent monitoring data. Fifty percent of nests were observed as active in 2006—more than 12 years ago. Yet as BLM admits in the SDEIS, the average percentage of active nests is 22 percent, *see* SDEIS at 3-6, lines 14–15, and the median percentage of active nests is between 16 and 22 percent. Similarly, the study "Effects of CBM Development on Raptor Nest Site Occupancy in the Powder River Basin" (Carlisle et al.) referenced in the SDEIS found that an average of approximately 30 percent of nests in a study area within the Powder River Basin were active over an eight-year period. *See* Campbell County, Wyoming Raptor Symposium Proceedings 10 (2015). Further, the activity levels of 50 percent were recorded in 2006 but monitoring data from the last several years consistently recorded much lower activity levels; in 2018, less than 10 percent of nests in some areas were recorded as active. *See* SDEIS at 3-6, tbl. 3.18-5X. **BLM cannot discount recent monitoring data in favor of data more than 10 years old without explanation.**

The differences in assumptions are significant. Using the assumption that 50 percent of the 1,283 nests in the Project area will be active, BLM concludes that 642 nests have the potential to be active. *See* SDEIS at 4-5, lines 6–9. Yet, using the lowest levels of recorded activity (five or six percent), only between 64 and 77 of nests would be active in a given year—a ten-fold difference. The lowest levels of recorded activity are more indicative of non-eagle raptor use in the Project area because they were observed in 2018, rather than in 2006 when the highest levels of recorded activity were observed. *See* DEIS at 3-6, tbl. 3.18-5X. Even using the average level of recorded activity (22 percent) would yield approximately 282 potentially active nests in the Project area—less than half of BLM's assumption. BLM must account for the significant differences in activity levels.

BLM's assumption that 50 percent of nests will be active in a given year is unsupported and does not align with recent data submitted by the Operator Group. BLM's decision to rely on the highest level of recorded activity discards consistently recorded lower levels of activity. BLM would more reasonably rely on the average percentage of active nests (between 22 and 30 percent) and simply observe that the percentage of active nests can be as low as five percent or as high as 50 percent.

2.    Comparisons of Active and Occupied Nests Distort Impacts.

BLM's discussion of raptor monitoring data inappropriately compares active and occupied nest data without distinction. As a result, BLM may interpret survey data from 2006 as reflecting that 50 percent of nests were active when in fact this data may reflect that 50 percent of nests were occupied. "Active" and "occupied" nests are distinct. Active nests "contain[ ] viable eggs and/or chicks." Memorandum to Regional Directors from Assistant Director, Migratory Birds at 1 n.2 (June 14, 2018). By contrast, an "occupied" nest is "one that is repaired or tended in the current year by a pair of raptors." SDEIS at 3-2, lines 24–25. A nest can be occupied without ever becoming active.

Statements in the SDEIS suggest that raptor nest surveys referenced in Table 3.18-5X recorded both occupied and active nests, but BLM does not distinguish between these data sets. For example, Table 3.18-5X on page 3-6 refers to "active" nests, but Figure 3.18-10X on page 3-7 references "occupied" nests. Moreover, BLM's own definition of "active" nests in the SDEIS, which includes

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **19** of **31**

occupied nests, *see* SDEIS at 3-2, line 24, conflates the distinction between these types of nest uses and suggests that the analysis in Chapter 3 may compare monitoring data identifying active and occupied nests without distinction.

Furthermore, inconsistencies in data sets may also cause BLM to compare active with occupied nests. Because the SDEIS references monitoring data from multiple different surveys, some surveys may have monitored and observed nest occupancy while others may have monitored and observed nest activity. Importantly, surveys between 2016 and 2018 provided by the Operator Group, the results of which are reflected in Table 3.18-5X, observed "active" nests consistent with USFWS's definition.

BLM itself has observed that nest monitoring data from the mid-2000s in Wyoming conflate these two distinct categories of use. Specifically, BLM has observed:

We found great inconsistencies in the terminology used over the years to code nesting events in the Rawlins dataset, in particular, and more generally found that, based on notes recorded in the available databases, that various nest-status designations were not always consistently applied due to variations in field personnel and attendant differences in interpretation or levels of rigor in applying those designations. For example, **in the Rawlins dataset, it became clear that designations of "used" and "active" were often used inter-changeably without clarity as to whether or not egg-laying was actually confirmed** (accurate definition of "active," indicating an actual breeding attempt), such that it was frequently impossible to differentiate between occupied but inactive nests/ territories and those in which a breeding attempt actually occurred.

BLM Technical Note 436, Recommendations for Improved Raptor Nest Monitoring in Association with Oil and Gas Development Activities, at 3 (emphasis added). Likewise, the study "Effects of CBM Development on Raptor Nest Site Occupancy in the Powder River Basin" upon which BLM relied examined "use" of nests by raptors, but the study did not specify whether it observed nest use generally or use of nests for active nesting behavior. *See* SDEIS at 3-7, lines 4–13.

BLM cannot compare narrower data reflecting nest activity with broader data reflecting nest occupancy. BLM must revise the discussion in Chapter 3 regarding nest activity and occupancy to disclose these differences. Further, BLM must confirm that the 2006 data it interprets as reflecting 50 percent active nests in fact capture active rather than occupied nests.

3.      BLM Must Disclose More Detail about the Data Regarding Non-Eagle Raptor
        Nest Use and Activity Levels in Table 3.18-5X.

Because of the risk that BLM inappropriately compares data regarding nest activity with data regarding nest occupancy, BLM should provide the data underlying the survey results described in Table 3.18-5X for examination by the Operator Group and the public.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **20** of **31**

At a minimum, BLM must revise or clarify its data regarding non-eagle raptor nest use and activity levels. First, Table 3.18-5X includes Hayden-Wing Associates data from 2016 and 2018 but not 2017. *See* SDEIS at 3-6, tbl. 3.18-5X. BLM should revise Table 3.18-5X to include Hayden-Wing Associates data from 2017.

Second, BLM should clarify whether Table 3.18-5X includes all data provided by Devon Energy or just data from 2018. *See* SDEIS at 3-6, tbl. 3.18-5X.

Finally, although BLM references the study "Effects of CBM Development on Raptor Nest Site Occupancy in the Powder River Basin," *see* SDEIS at 3-7, lines 4–13, BLM does not incorporate the findings of this study into Table 3.18-5X. BLM must explain why it chose to reference but not incorporate the data from this study into Table 3.18-5X.

**C.     BLM Inappropriately Concludes that Impacts from Options 2 and 3 Will be Moderate to Major.**

BLM lacks any rationale or supportable basis to characterize the impacts from Options 2 and 3 as moderate to major. *See* DEIS at ES-5, lines 34–36, 4-6, lines 26–30, 4-7, lines 28–33.

1.     BLM's Conclusion that 45 to 141 Nests Could be Impacted by Options 2 and 3 is Not Based on Sound Scientific Data.

BLM has no basis to conclude that 45 to 141 nests could be impacted under Option 2. *See* SDEIS at 4-6, lines 20–21. BLM reaches this conclusion by relying on several flawed and scientifically unsupportable assumptions. Notably, BLM does not specify whether 45 to 141 nests could be impacted annually or over the lifetime of the project. *See id.* ("approximately 45 to 141 nests could be impacted **during project development**" (emphasis added)). Based on BLM's calculation, it appears that these figures reflect total impacts to nests over the life of the Project and therefore that between 4.5 and 14.1 nests could be impacted annually; however, BLM must clarify this point in the FEIS.

BLM's conclusion that 45 to 141 nests could be impacted under Option 2 is predicated on BLM's determination that 642 nests will be active in the Project area. BLM determines that 642 nests will be active by incorrectly assuming that 50 percent of non-eagle raptor nests in the Project area will be active annually; 642 is approximately half of the 1,283 non-eagle raptor nests in the Project area. SDEIS at 3-7, lines 12–13, 4-5, lines 7–10. For the reasons detailed in section VI.B.1, above, monitoring data do not support the assumption that 50 percent of non-eagle raptor nests in the Project area will be active annually. Rather, applying the average monitored activity level of 22 percent active nests, only 282 nests will be active annually in the Project area.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **21** of **31**

      2.     Options 2 and 3 Have the Potential to Impact Only Six Pairs of Non-Eagle
                 Raptors Annually.

      The Operator Group estimates that TLS relief under Options 2 and 3 have the potential to site development within TLS buffers around only six active non-eagle raptor nests annually—or between two and three percent of all nesting pairs annually. The Operator Group concludes that Options 2 and 3 have the potential to site development within TLS buffers around only six pairs of nesting non-eagle raptors annually via the following analysis:

➢ Under the Proposed Action, 150 well pads would be construed annually. *See* SDEIS at ES-3, lines 9–10.

➢ Based on a conceptual example of well pad placement in the Project area  that the Operator Group previously provided to BLM, the Operator Group estimates that 28 percent of these 150 well pads—42 well pads—may be sited within non-eagle raptor nest buffers throughout the Project area. *See* Comments of Anadarko Petroleum Corporation on Converse County Oil & Gas Project DEIS at 3–4 (Mar. 9, 2018).

➢ Not all of these 42 well pads will impact active nests. Monitoring data reflects that an average of 22 percent of non-eagle raptor nests are active annually in the Project area. *See* SDEIS at 3-6, tbl. 3.18-5X. Based on this average monitored activity level, BLM can conclude that, annually, well pads may be sited within non-eagle raptor nests buffers surrounding approximately nine nests (22 percent of 42).

➢ Not all of these nine nests, however, will be subject to a BLM TLS. BLM can only prescribe surface management measures on approximately 60 percent federal oil and gas development within the Project area because it owns 64 percent of the minerals, and less than 10 percent of the surface, in the Project area. *See* DEIS at 2-1, lines 42–43; BLM Instruction Memorandum No. 2018-014 (June 12, 2018) ("RMPs do not govern the use of non-Federal lands. Management actions in an RMP meant for the protection of Federal surface resources should not be applied to a Fee/Fee/Fed APD unless, and only to the extent that, activities authorized under the APD will impact Federal lands."). Because BLM can prescribe surface management measures on approximately 60 percent federal oil and gas development within the Project area, the Operator Group estimates that approximately six of the nine active nests are subject to BLM TLS annually.

      Therefore, BLM's decision to authorize year-round development within the Project area only has the potential to site development within TLS buffers around six active non-eagle raptor nests annually. These six nests are less than three percent of the 282 active nests within the Project (assuming 22 percent of nests in the Project area are active). This analysis demonstrates a risk to few active non-eagle raptor nests from BLM approval of year-round development. Furthermore, although BLM's decision to authorize year-round development in these TLS buffers has the potential impact six active non-eagle

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **22** of **31**

raptor nests, Option 3 would protect these active nests. *See* Section II.A, above. Therefore, BLM lacks a
basis to conclude that impacts from Option 3 would be moderate to major.

> 3.    BLM Does Not Justify Its Characterization of the Potential Impacts from
>         Option 3.

BLM characterizes the impacts of Option 3 as "moderate to major" but does not justify this
characterization. BLM describes "moderate to major" impacts as "meaning effects would be either
sufficient to cause a change in the population or subpopulation (e.g., abundance, distribution, quantity,
or viability), however, the effects would be local; or substantial and could be permanent in their effect
on population or subpopulation survival." SDEIS at 30–33. BLM, however, does not provide any
analysis or explanation of why impacts to between 45 and 141 nests over the lifetime of the Project
would be moderate to major.

Although the Operator Group disagrees with BLM's determination of the number of impacted
nests, BLM's calculations purport that less than three percent of nests would be impacted in a given year
(4.5 and 14.1 compared to 642) for the 10-year development phase of the Project. BLM offers no
explanation or scientific rationale as to why such a low number of purportedly impacted nests would
cause permanent changes in populations. Furthermore, BLM does not compare the total number of nests
it believes will be impacted over the lifetime of the Project to the non-eagle raptor population over the
lifetime of the Project. BLM simply offers no assessment of these figures or justification as to why it
determine these impacts are moderate to major.

> 4.    BLM Incorrectly Discounts the Conservation Benefits of Option 3.

BLM incorrectly discounts the conservation benefits of Option 3 by assuming that Feature 1 will
not apply mitigation to active nests. *See* SDEIS at 4-7, lines 3–4 ("Similar to Option 2, Feature 1 could
impact a similar number of nests each year and over the life of the project by not applying any
mitigation to active nests within the [Converse County Project area]."). Contrary to BLM's statement,
Feature 1 does apply mitigation measures; it requires that operators either begin development activities
before the start of the TLS season or verify that a nest is inactive before beginning development
activities during the TLS season. *See* SDEIS at S1-1, lines 26–34. BLM must revise the statement on
page 4-7 and, further, revise its analysis of the impacts of Option 3 to account for the conservation
measures it would require.

> 5.    BLM's Assessment of Impacts Relies on Incorrect Assumptions Regarding Non-
>         Eagle Raptor Nest Fidelity.

BLM overstates impacts from Option 3 resulting from loss of potential nesting locations by
assuming that non-eagle raptors exhibit strong nest fidelity. BLM incorrectly reasons that Option 3 does
"not prevent the loss of a nesting location and possibly a nesting territory, if operations are too close to
the nest, and secure nesting substrate in the territory is limited." SDEIS at 4-7, lines 16–18. Further,
BLM incorrectly reasons that "[u]nder Option 3, disturbance to raptor nest sites could occur for multiple

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page 23 of 31

years compounding the lack of nest productivity over generations and possibly resulting in eventual loss of nesting territories." SDEIS at 4-7, lines 22–24.

BLM has no basis or information to assume that the temporary loss of potential nesting locations will impact individual non-eagle raptors or overall non-eagle raptor populations. Rather, BLM's assessment of impacts assumes that non-eagle raptors exhibit nest fidelity and thus equates the loss of a nest location with the loss of a successful nest. In fact, recent scientific studies support the conclusion that non-eagle raptors will find an alternative nest when a nest is lost.

Ferruginous hawks, which are the most common raptor in the Project area, will tend several nests before choosing one to nest. "Some raptor species, such as golden eagles and ferruginous hawks, maintain several potential nest sites within their territory among which they can rotate in different years." Carlisle et al., 2018. Other raptor species exhibit similar behavior. "Inspection of 21 territories monitored for 26-38 yr. without interruption suggested [golden] eagles use individual nests an average of every 3.3 years, laid nests in any nest within territories an average of every 1.8 yr. and switched nests between 43.3% of consecutive nesting attempts (i.e., egg-laying in discrete breeding season)." Slater et al., 2017. "The average proportion of nests in use varied across species, as did the magnitude of changes in use from year to year . . . . Bald eagles had the highest overall average use (63.6%), whereas ferruginous hawks had the lowest (8.2%). All other species averages ranged from 19.5-42.6% . . . ." Carlisle et al., 2018. Further, "nest success or failure in one year did not influence whether a pair switched nests in the following year." Slater et al., 2017. Indeed, BLM itself recognizes that "[t]he number of nests is not an indicator of raptor abundance." DEIS at 3-5 n.1.

BLM must revise its discussion of impacts from Option 3 to incorporate the findings of these scientific studies and, specifically, to eliminate the assumption that the loss of one nesting location will necessarily prevent a successful nest. Without this assumption, BLM cannot conclude that impacts from Option 3 will be "moderate to major."

6.    BLM Lacks a Basis to Assume that Non-Eagle Raptor Nests Will be Adversely Impacted Under Option 3.

BLM's conclusion that Option 3 will adversely impact non-eagle raptor nests and, in turn, non-eagle raptor populations is unsupported and based on faulty assumptions. In addition to the assumption that non-eagle raptors exhibit high nest fidelity, described in section VI.C.5 above, BLM's analysis makes numerous incorrect assumptions. First, BLM incorrectly states that, "[u]nder Options 2 and 3, year-round development, if allowed, would adversely impact non-eagle raptor species by causing nest abandonment, reduced reproductive success, and displacements of individuals from nesting territories." SDEIS at 5-3, lines 17–20. BLM, however, has no basis to assume that Option 3 will result in nest abandonment. In fact, elsewhere in the SDEIS, BLM recognizes that design features prevent a nest from becoming active. *See* DEIS at 4-7, lines 15–16 ("The design features under Option 3 could prevent a nest from becoming active and thus prevent it from being abandoned."). BLM must revise the discussion in Chapter 4 to recognize that the design features in Option 3 presents a low likelihood of nest abandonment.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **24** of **31**

Second, BLM erroneously concludes that under Option 3, disturbance to non-eagle raptor nest sites could occur for multiple years, thereby compounding the lack of nest productivity over generations and possibly resulting in eventual loss of nesting territories. *See* SDEIS at 4-7, lines 22–24 and 35–39. BLM offers no support for this assertion. Furthermore, this statement ignores scientific findings that the density of oil and gas infrastructure, including roads and well pads, did not influence the breeding performance of raptors. "Our results provided no evidence that breeding performance was influenced by density of roads and oil and gas well pads, or distance to well pads. . . . Average density of active oil and gas well pads in occupied territories with >1 pad considered in this study was considerable lower (1.34 well pads/km$^2$) than some current and proposed developments in Wyoming . . . ." (Wallace et al. 2016) Notably, the density of well pads considered in the Wallace et al. study (1.34 well pads/km$^2$) is considerably higher than the density of well pads proposed by the Project, which is expected to be 0.83 well pads per square mile. DEIS at 4.18-11, lines 26–29. BLM must revise its assessment of the impacts to non-eagle raptor sites over multiple years.

Moreover, BLM suggests that the current non-eagle raptor TLS under the Casper RMP (Option 1) risks the same impacts as under Option 3. The Casper RMP limits surface disturbing activities or occupancy (drilling and completions) during certain times of the year within defined proximities of non-eagle raptor nests, but it does not prohibit all activities around non-eagle raptor nests. *See* Casper RMP at 2-26. Therefore, activity will occur during the nesting period for many years after the well is drilled. Applying the logic of BLM's analysis of Option 3, Option 1 (adherence to the Casper RMP) will also result in impacts to non-eagle raptor nest productivity over multiple years.

Third, BLM explains that Feature 2 of Option 3 assumes that, because the nest is inactive at the time of the survey, it would not become active during anytime within the nesting period of that year. DEIS at 4-6, lines 47–49. Feature 2 of Option 3 is not based on this assumption. Rather, Feature 2 of Option 3 assumes that if a nest is inactive at the time of survey, non-eagle raptors that begin nesting after activities commence are not disturbed or disrupted by the activities.

Fourth, BLM overstates effects of Option 3 by asserting that it does not ensure that nests would not be disturbed. At SDEIS at 4-7, line 14, BLM states, "Neither feature within Option 3 would ensure that there would be no disturbance to the nest." This statement should be revised to reference only "active" nests.

Finally, BLM ignores the environmental benefits of year-round development under Options 2 and 3. These benefits include less truck traffic, less dust, less overall disruption year over year, timely reclamation, and other benefits, as detailed in the Operator Group's comments on the DEIS. *See* Operator Group Comments on Converse County Oil & Gas Project DEIS at 8–13 (Mar. 12, 2018). BLM's analysis of impacts of Options 1 – 5 must account for the benefits of year-round development and how these reduced impacts benefit raptor populations.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **25** of **31**

D.      **The SDEIS Understates the Impacts of Options 4 and 5.**

First, BLM uses different terms to assess effects from Option 3 and from Options 4 and 5. BLM states that Option 3 would not prevent "disturbance" of nests. *See* SDEIS at 4-7, line 14. By contrast, BLM concludes that "no active nests would be impacted," rather than disturbed, under Option 4. *See* SDEIS at 4-8, line 15. Because BLM evaluated the possibility of "disturbance" of nests under Option 3, BLM must also evaluate the possibility that Options 4 and 5 would result in disturbance of nests.

Finally, BLM concludes that year-round development under Options 2 and 3 "would adversely impact non-eagle raptor species by causing nest abandonment, reduced reproductive success, and displacements of individuals from nesting territories." SDEIS at 5-3, lines 18–20. Options 2 through 5 result in different impacts related to reduced productivity and displacement when development is allowed within non-eagle raptor buffers. Option 3 limits impacts to productivity by prohibiting development activities from beginning in TLS buffers around active nests. *See* DEIS at 2-7, lines 25–40. The SDEIS lacks any discussion of how Options 4 and 5 will alleviate reduced reproductive success and displacement. SDEIS at 5-3, lines 18–20. BLM must evaluate the impacts of each option on reduced reproductivity and displacement.

E.      **BLM's Inflated Assessment of Impacts from Options 2 and 3, and Understated Assessment of Impacts from Options 4 and 5, Distort BLM's Analysis of the Options.**

BLM's incorrect characterizations of the impacts of Option 2 and 3 as "moderate to major," and the impacts of Options 4 and 5 as "negligible to minor," distort BLM's analysis of the options and ultimately its decision to select Option 4 as its preferred option in the SDEIS. *See* SDEIS at ES-5, lines 34–36. BLM concludes that the "net result of Options 4 and 5 would be that relief from TLS would be allowed by implementing a non-eagle raptor management plan that would avoid or reduce impacts." SDEIS at ES-5, lines 36–38. However, BLM's basis for the comparing the options is incorrect. Impacts from Options 2 and 3 are dramatically less than BLM forecasted, while Options 4 and 5 are more impactful than BLM assessed. Therefore, BLM's comparative basis for selecting Option 4 is erroneous. BLM must reevaluate its preferred option after it reassesses the impacts of Options 2 through 5.

VII.    **BLM's Impact Analysis in Chapter 4 Must Distinguish Those Activities over Which BLM Lacks Jurisdiction.**

BLM's analysis of the impacts of Options 1 through 4 must distinguish between impacts to nests within BLM jurisdiction and those outside BLM jurisdiction (i.e., fee/fee/fed scenarios). Throughout the SDEIS, BLM discusses impacts to non-eagle raptor nests throughout the Project area and does not distinguish that it lacks jurisdiction over some of these actions. Specifically, BLM lacks authority to impose non-eagle raptor TLS on APDs for federal wells drilled from off-lease, non-federal surface locations overlying private minerals ("fee/fee/fed" scenarios) where the federal oil and gas lease lacks a non-eagle raptor TLS. *See* BLM Instruction Memorandum No. 2018-014 (June 12, 2018). BLM has recognized that in fee/fee/fed scenarios, "RMPs do not govern the use of non-Federal lands."

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **26** of 31

Although BLM may not impose the non-eagle raptor TLS in fee/fee/fed scenarios, BLM's NEPA analysis assumes that all non-eagle raptor nests within a TLS buffer may be impacted by its decision to adopt Options 1, 2, 3, or 4. BLM's analysis does not differentiate between those impacts that would occur regardless of which option BLM adopts (i.e., impacts from fee/fee/fed development) and those impacts that would occur (or not occur) depending on the option BLM selects. *See, e.g.*, SDEIS at 1-1, lines 18–19 ("The BLM and USFS decisions would apply only to federal surface and mineral estate; however, the analysis in this EIS considers the impacts for all proposed activities regardless of surface or mineral ownership."); *see also* SDEIS at 4-5, lines 2–15, 4-6, lines 19–21. This distinction is significant because approximately 90 percent of the surface and 36 percent of the mineral interest in the Project area are not federally owned. *See* SDEIS at ES-1, lines 16–17. Thus, the analysis in the SDEIS must assume that some proportion of wells will be drilled in fee/fee/fed scenarios and that BLM could not apply the TLS in this scenario. In the FEIS, BLM must describe the limits of its management authority in fee/fee/fed scenarios and revise the analysis of impacts to non-eagle raptors to recognize that BLM does not have management authority over all nests.

Furthermore, Appendix S2 identifies prerequisite conditions to obtain TLS relief. One condition is that "[c]onditions must exist for a TLS condition of approval (COA) to be applied to the application of permit to drill (APD)." SDEIS at S2-1, lines 5–7. BLM should include a statement in Appendix S2 clarifying that a COA will not be applied in fee/fee/fed scenarios where the underlying oil and gas lease also lacks a TLS.

Notably, BLM states, "Of the 45 to 141 nests within the [Converse County Project area], 3 to 9 could be impacted by project development on the BLM lands that make up 6 percent of the [Converse County Project area]." SDEIS at 4-7, lines 9–11. This statement is confusing and unnecessary; it is unclear why BLM limited its analysis to federal surface when BLM also exercises management authority on split-estate lands with federally owned minerals. BLM must revise this analysis to recognize the extent of its management authority.

## VIII.   The Process Set Forth in Appendix S2 for TLS Relief under Option 4 is Cumbersome and Confusing.

### A.   Appendix S2 Uses Inconsistent and Ambiguous Terminology.

BLM inappropriately uses the terms "active," "occupied," and "utilized" interchangeably to describe nest use when the terms have distinct meanings. For example, BLM states that "[i]n order for development activities to be considered further, the information gathered from the prior two years must display that no eagle has **utilized** the nest. If a nest has ever been **occupied** by eagles, it will be considered an eagle nest regardless of being **inactive**, **used** by other species, or if eagle **occupancy** occurred greater than two years ago." SDEIS at S2-2, lines 4–9. The terms "active" and "occupied" have distinct meanings, as discussed in section III above. BLM must revise this discussion to use consistent terminology.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **27** of **31**

Similarly, Appendix S2 uses inconsistent terms to describe operators' conduct that must occur prior to the start of the TLS season and the conduct that may occur during the TLS season. Appendix S2 refers to "activity[ies]," SDEIS at S2-1, line 33, S2-2, line 39, S2-3, line 20, S2-4, line 44; "operation[s]," SDEIS, at S2-1, line 37, S2-3, line 28, S2-4, line 20; "oil and gas related development," SDEIS at S2-1, lines 1–2; "development activities," SDEIS at S2-2, line 4, S2-4, lines 2, 11 and 29; "well location activities," SDEIS at S2-2, lines 12–13 and 20; "drilling," S2-1, lines 30–33; and "construction," SDEIS at S2-2, line 24. BLM must clarify what conduct may occur before and during the TLS season. In particular, the references to "well location activities" and "construction" appear to refer to different activities than "drilling." BLM must revise this discussion to clarify what activities may occur when in relation to the TLS season.

Further, Appendix S2 uses terms that are not defined in the document. Page S2-2, row 15, references the "Location Adjustment Strategy," which is not defined in the document. Likewise, page S2-2, row 28, references the "Rigorous Monitoring Strategy," which is also not defined. BLM must eliminate these undefined references from Appendix S2.

## B.    Appendix S2 Does Not Establish a Clear Standard to Avoid TLS Buffers.

Appendix S2 sets forth ambiguous standards by which operators must demonstrate they attempted to avoid TLS buffers. Appendix S2 requires that a request for TLS relief include "sufficient information" that there was a "legitimate attempt" to avoid the TLS buffer. SDEIS at S2-3, lines 44–48. Elsewhere, Appendix S2 requires that the operator must "display" that they have avoided the TLS buffer "to the degree possible." SDEIS at S2-2, line 14. First, these standards conflict. Second, Appendix S2 does not define any of these terms, leaving significant discretion with BLM in reviewing and determining whether to approve a request for TLS relief. This discretion risks inconsistent, if not arbitrary, decision-making within BLM. Finally, these ambiguous terms give operators no guidance as to what information they must provide, or demonstration they must make, to BLM.

## C.    Appendix S2 Does Not Explain the Process for Modifying Existing Leases.

The SDEIS states that "[o]perators who request relief from [TLS] upon submission of an APD would receive a modification of the lease . . . ." SDEIS at S2-1, lines 11–13. BLM's regulation at 43 C.F.R. § 3101.1-4 requires a 30-day public review period for issues of "major concern" to the public. The SDEIS does not explain whether a 30-day public review period would be required prior to modification of leases or whether, if a public review period is required, BLM's 90-day public comment period on the draft RMP satisfies this requirement.

BLM's regulation governing modifications and waivers of oil and gas lease terms directs that, "[i]f subsequent to lease issuance the authorized officer determines that a modification or waiver of a lease term or stipulation is substantial, the modification or waiver shall be subject to public review for at least a 30-day period." 43 C.F.R. § 3101.1-4. If BLM determines this modification is "substantial," BLM's Federal Register notice and 90-day comment period on the RMP amendment amply satisfy the

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **28** of **31**

obligation to subject the modification for public review. Thus, in the FEIS, BLM should confirm that no additional public review is necessary to modify leases with raptor TLS in the Project area.

### D.    BLM Must Explain the Process for Verifying Nest Inactivity.

Appendix S2 requires that "to proceed from one drilling phase to another, where an increase in potential impact is realized, there must also be verification of inactivity." SDEIS at S2-3, lines 6–8. This requirement appears to be inconsistent with the requirement that activities not break for more than 72 hours. *See* SDEIS at S2-2, lines 39–44. At a minimum, this requirement appears to put continuous operations at risk because, if a bird moves to a nest location within a TLS buffer while development activities are occurring, an operator must obtain a determination by BLM and USFWS that the activity is not likely to impact the success of the nest. SDEIS at S2-3, lines 6–8.

### E.    BLM Must Clarify When Activities Must Commence.

Appendix S2 contains confusing language about when activities subject to TLS relief must commence. Appendix S2 directs that, when an operator requests TLS relief concurrently with submission of an APD, the operator represent at the annual meeting that it intends to initiate "drilling" prior to February 1. SDEIS at S2-1, lines 30–33. Elsewhere in Appendix S2, "well location activities" must begin before February 15. *See* SDEIS at S2-2, lines 20–21. BLM must explain both the relationship between the February 1 and February 15 start dates and why drilling activities must begin earlier than well location activities.

### F.    BLM Must Clarify the Process for Commencing Activity After APD Approval.

BLM must clarify the statement in Appendix S2 that "BLM would then ensure conditions have not changed since the approval of the APD." *See* SDEIS at S2-1, lines 20–21. First, this statement should be revised to state that "**The operator** would then ensure . . . ." rather than BLM. Second, BLM should define "conditions" because this term is unclear and may lead to inconsistent application.

### G.    BLM Must Evaluate the Direction that it Review APDs for TLS Conditions of Approval.

The direction in Appendix S2 that BLM examine whether a TLS condition of approval is attached to an APD is confusing. *See* SDEIS at S2-1, lines 5–10, S2-3, lines 39–43. Because an operator is unlikely to submit a sundry for an APD that does not require TLS relief, this direction is unnecessary.

## IX.    Technical Comments

### A.    BLM Should Clarify the Effect of Changed Laws on Option 2.

On page 2-7, lines 9–14, the SDEIS states:

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **29** of **31**

Option 2 consists of an amendment to the Casper RMP that would modify all existing leases and development within the Converse County Oil and Gas Project area, removing all non-eagle raptor nest timing limitations in lease stipulations, conditions of approval, mitigations or other stipulations through the operation of the pertinent resource's laws, rules, and regulations. Future leases or development within the CCPA area would not include the non-eagle raptor nest timing limitations.

Although the SDEIS references the "pertinent resource's laws, rules, and regulations," the SDEIS does not clarify how changes in law, and changed interpretations of law, could affect Option 2, if adopted. Most notably, the SDEIS does not discuss the relationship between Option 2 and Solicitor Opinion No. M-37050 (Dec. 22, 2017), "The Migratory Bird Treaty Act Does Not Prohibit Incidental Take." The SDEIS should clarify the effect, if any, of changed interpretations of the MBTA and any associated regulations that may be promulgated on Option 2.

**B.       BLM Should Consider the Cedar Springs Wind Project.**

The Operator Group encourages BLM to reference the Cedar Springs Wind Project in its analysis of cumulative impacts to non-eagle raptors. The Cedar Springs Wind Project has been proposed to be located in Converse County approximately 10 miles north of Douglas, Wyoming, The permit application filed with the Wyoming Industrial Siting Commission contains a discussion of potential impacts to raptors. *See* Wyo. Industrial Development Information and Siting Act Section 109 Permit Application at 198 – 203 (2019).[1] Additionally, BLM should include any other wind projects that BLM determines to be reasonably foreseeable and that may contribute to cumulative impacts to populations of non-eagle raptors.

**C.       Other Technical Comments**

➢ The Executive Summary notes that the Operator Group proposed Option 2 but does not note that the Operator Group also proposed Option 3. *See* SDEIS at ES-1, line 38 ("Option 2 (Proposed by the OG) . . . ."). As a result, the Executive Summary incorrectly implies that the Operator Group prefers Option 2 over Option 3. To avoid confusion by the public, the Executive Summary should expressly recognize that the Operator Group supports Option 3.

➢ In the description of the proposed RMP amendments, BLM should clarify that the proposal under Option 3 to allow oil and gas development within the spatial nest buffer of a non-eagle

---

[1] Available at
http://deq.wyoming.gov/media/attachments/Industrial%20Siting/Application%20and%20Permits/Cedar%20Springs%20Wind%20Project%20/2019%200222_ISD_Cedar%20Springs%20Wind%20Application_18-05.pdf.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **30** of **31**

raptor nest would not allow destruction of the actual nest, notwithstanding the 2018 USFWS guidance regarding the destruction or removal of nests. *See* SDEIS at 2-7, lines 25–32; Memorandum from Asst. Dir., Migratory Birds to Reg'l Dirs. Re: Destruction and Relocation of Migratory Bird Nest Contents (June 14, 2018). Although the Operator Group understands this limitation, the general public may not.

➢ On page 2-8, rows 15–16, the DEIS states that "Key elements of the MBCP would include regulatory background and required **bird permits** . . . " (emphasis added). This statement incorrectly implies that operators require a USFWS permit to operate within TLS buffers. BLM should revise this statement to eliminate the reference to bird permits.

➢ The SDEIS does not disclose the source of data for Figure 3.18-9 on page 3-3; it identifies the source as "AECOM 2015" but this source is not listed in Section 8.0, References. BLM should disclose the source of this data and, further, should only use data that is five years old or newer.

➢ The sources of data displayed in Table 3.18-1 on page 3-5 are varied and dated. BLM should only utilize nest data that is five years old or newer.

➢ The SDEIS contains several references to Table 3.18-4, historic non-eagle raptor nests in the Converse County Project area, but the actual table does not appear to be included in the document. BLM must include this table in the FEIS.

➢ The statement on page 4-8, lines 9–11, "Based on planning and coordination between the applicant and the BLM and USFWS, conservation measures would be described in a raptor protection plan and followed to protect **nesting raptors**" (emphasis added) should be revised to reference "non-eagle raptors."

➢ BLM should add language specifying that USFWS generated Table S1-1 on page S1-2 because the SDEIS does not identify the source of this information.

➢ Page S2-4, row 38, contains the statement, "If **the TLS** becomes active at any point from February 1 to June 15 . . . " (emphasis added). The reference to "TLS" should be changed to "nest."

## X.    **Conclusion**

The Operator Group appreciates BLM's consideration of these comments. If BLM has any questions about the information presented in these comments, please contact Kathleen Schroder at katie.schroder@dgslaw.com or (303) 892-7354.

July 25, 2019
Comments of Converse County Operator Group
on Converse County Oil & Gas Project SDEIS
Page **31** of **31**

Sincerely,

DAVIS GRAHAM & STUBBS LLP

Kathleen C. Schroder

on behalf of

Anadarko Petroleum Corporation
Chesapeake Energy Corporation
Devon Energy Corporation
EOG Resources, Inc.
Northwoods Energy

Exhibit C to Rebacca Byram Declaration    Operator Group Attachment B

**DAVIS GRAHAM & STUBBS**

Kathleen C. Schroder
303 892 7354
Katie.Schroder@dgslaw.com

March 12, 2018

Bureau of Land Management
Attn: Mike Robinson
Casper Field Office
2987 Prospector Drive
Casper, Wyoming 82604
WY_CasperMail@blm.gov

Dear Mr. Robinson:

Anadarko Petroleum Corporation, Chesapeake Energy Corporation, Devon Energy Corporation, EOG Resources, Inc., and SM Energy (collectively, "the Operator Group") appreciate the opportunity to submit comments on the Draft Environmental Impact Statement (DEIS) for the Converse County Oil and Gas Project ("Project"), 83 Fed. Reg. 3,767 (Jan. 26, 2018). These comments supplement any individual comments submitted separately by members of the Operator Group (individually "Operator"). The Operators are the Project applicants. The Operators' ability to exercise their valid existing rights within the acreage encompassing the Project (the "Project Area") depends on BLM's issuance of a Final Environmental Impact Statement (FEIS) and Record of Decision (ROD).

## I.    Executive Summary

- ➤ The Project will generate significant economic benefit to the citizens and State of Wyoming.

- ➤ BLM should adopt the Preferred Alternative and issue a FEIS and ROD before the end of 2018.

- ➤ Although the Operator Group's Proposed Action includes year-round development in the Project Area, the DEIS does not outline a clear process or mechanism to allow year-round development. The DEIS does not outline how or when BLM may grant exceptions to raptor and greater sage-grouse timing stipulations. BLM should amend the Casper Resource Management Plan (RMP) to waive or modify timing stipulations around raptor nests consistent with the Operator Group's Proposed Action.

- ➤ The FEIS must highlight the environmental and economic benefits of year-round development.

- ➤ BLM must correct the DEIS to reflect current national and Departmental policies, particularly Department policies related to compensatory mitigation.

- ➤ The FEIS must recognize BLM is reviewing its RMP amendments for the greater sage-grouse and allow for management of greater sage-grouse that is consistent with the

Davis Graham & Stubbs LLP    ▪    1550 17th Street, Suite 500    ▪    Denver, CO 80202    ▪    303.892.9400    ▪    fax 303.893.1379    ▪    dgslaw.com

4438598

March 12, 2018
Page 2

       Wyoming Core Area Strategy.  Additionally, BLM must update the DEIS to incorporate the State of Wyoming Core Area Version 4 maps.

➢ The DEIS must recognize the limits of BLM's authority on nonfederal lands.

➢ BLM must manage historic trails in accordance with the National Historic Preservation Act (NHPA).

➢ BLM may not label or manage the Pine Ridge area as a "special management area" when the Casper RMP does not designate the Pine Ridge area as such.

➢ BLM must recognize lessees' valid existing rights.

➢ BLM must revise mitigation measures in Chapter 4 and 6 to be technically and economically feasible and consistent with BLM's management authority.

➢ Alternative C must be revised because it contains management measures beyond BLM's authority.

## II.    The Project Will Generate Significant Economic Benefit to the Citizens and State of Wyoming.

       BLM should approve the Operator Group's Proposed Action because it will generate significant economic benefit to the citizens and State of Wyoming.  These economic benefits cannot be discounted.  First, the Project will generate between $5.1 billion and $7.9 billion in severance tax revenues to the State of Wyoming.  DEIS, pg. 4.11-36.  Of these, between $2.1 billion and $3.3 billion will go to the permanent Wyoming Mineral Trust Fund and between $1.0 billion and $1.5 billion will go to the state's general fund.  *Id.*  Second, the Project will yield between $8.3 billion and $12.8 billion in federal mineral royalties over its lifetime.  DEIS, pg. 4.11-37.  Forty nine percent of these royalties will be allocated to the State of Wyoming.  *Id.*  Between $1.36 billion and $2.09 billion will be distributed to the Wyoming School Foundation.  *Id.*  Third, between $4.59 billion and $7.07 billion in ad valorem tax revenues will be allocated to Converse County, Converse County school districts, and the Wyoming School Foundation.  *Id.* pg. 4.11-38.  Fourth, between $760 million and $1.37 billion in sales and use tax revenues will be generated for state, county, and municipal governments.  *Id.* pg. 4.11-39.  Finally, between $19.9 billion and $30.8 billion in total taxes and royalty revenues will be generated from the Project for public-sector and private royalty owners.  *Id.* pg. 4.11-40.

       BLM should not deprive the State of Wyoming, the State's public school system, Converse County and adjacent counties, municipal governments, the federal Treasury, and citizens of Wyoming these substantial economic benefits, especially given the relatively low commodity prices over the last several years.  Therefore, BLM should approve the Project.

March 12, 2018
Page 3

## III.    BLM Should Adopt the Preferred Alternative.

The Operator Group supports BLM's decision to identify the Operator Group's Proposed Action as the preferred alternative.  *See* 40 C.F.R. § 1502.14(e).  The Operator Group encourages BLM to select the Proposed Action in its Record of Decision (ROD), after adjusting the environmental analysis in the FEIS as requested herein and appropriately responding to public comment.

## IV.    BLM Must Promptly Issue a FEIS.

The Operator Group encourages BLM to issue a FEIS and ROD that appropriately respond to comments and incorporate any necessary adjustments to the environmental analysis before the end of 2018.  To implement Executive Order No. 13,807, "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects," Secretary Zinke has directed BLM to complete each FEIS within one year from the issuance of a Notice of Intent.  Secretarial Order No. 3355 § 4(a)(2) (Aug. 31, 2017). The DEIS, however, has already taken 45 months to prepare since release of the Notice of Intent.  During this time, the State of Wyoming, Converse County, mineral owners, and the United States have been unable to realize the economic benefits of development of the Project.  To be consistent with Secretarial Order No. 3355 and to promote the economic benefits of development, the Operator Group encourages BLM to commit to completing the FEIS and ROD before the end of 2018.

## V.    Key Issues

    A.    <u>The DEIS Does Not Outline a Clear Process or Mechanism to Allow for Year-Round Development.</u>

An essential component to the Operator Group's Proposed Action is the ability to develop year-round by obtaining relief from raptor and greater sage-grouse timing stipulations outside of core areas,[1] but the DEIS does not clearly explain how BLM will programmatically allow for year-round development.  The analysis of Alternative B in Chapter 4 of the DEIS clearly contemplates that year-round development will occur and appropriately analyzes the impacts from such development.  *See* DEIS at pg. 4.7-6, line 31; pg. 4.9-4, lines 18, 22, 25; pg. 4.9-6, line 28; pg. 4.11-15, line 30; pg. 4.11-17, line 32; pg. 4.11-19, line 28; pg. 4.11-46, line 43; pg. 4.11-47, lines 4, 44; pg. 4.11-48, line 14; pg. 4.14-12, line 22; pg. 4.18-10, lines 42, 48; pg. 4.18-15, line 11; pg. 4.18-27, line 15; pg. 4.18-35, line 18; pg. 4.18-72, line 3; pg. 4.5-4, line 13; pg. 4.7-5; pg. 4.9-4, lines 18–29; pg. 4.11-15, line 30; pg. 4.11-19, lines 27–28; pg. 4.11-46, lines 42–44; pg. 4.11-47, lines 43–45; pg. 4.11-48, lines 1–7, 13–14; pg. 4.14-12, lines 19–22; pg. 4.18-10, lines 42–48; pg. 4.18-11, lines 1–3; pg. 4.18-15, lines 11–13; pg. 4.18-27, lines 13–15; pg. 4.18-35, lines 17–23.  The discussion of Alternative B, however, fails to clearly outline the mechanism by which programmatic year-round development can be achieved.

---

[1] The Operator Group does not seek programmatic exceptions to timing stipulations for bald and golden eagles.

March 12, 2018
Page 4

A clear mechanism to facilitate year-round development is critical to efficient development in the Project Area and to reduce impacts to air quality, soils, vegetation, truck traffic, and other resources resulting from adherence to timing stipulations. As reflected by the map below, at least 1,400 nest buffers exist in the project area. Multiple buffers frequently overlap with one another, and siting development outside of buffers often is not feasible, particularly in the northern eastern portions of the Project Area. A modeling exercise conducted by the Operator Group suggests approximately 45 percent of all pads in the Project Area would fall within greater sage-grouse or raptor nest buffers.[2]



Year-round development produces numerous environmental benefits. Year-round development reduces the overall time to drill multiple wells from a single pad which, in turn, reduces the amount of time that well pads remain unreclaimed. Year-round development also eliminates the needs for rigs to move on and off a location when timing stipulations take effect, thus reducing truck traffic and associated air quality impacts. Year-round development also promotes continuous employment and economic returns because timing stipulations cause seasonal swings in activity.

---

[2] To demonstrate the number of well pads potentially impacted by nest buffers across the Project Area, the Operator Group applied a conceptual development scenario of one pad per two sections (i.e., one pad per one 1280-acre drilling and spacing unit) to the overall project area.

March 12, 2018
Page 5

The DEIS, however, does not outline a clear process for year-round development within the Project Area or identify when the circumstances under which BLM will allow year-round development. These omissions create uncertainty for the Operator Group. Further, BLM attempts to impose unnecessary and burdensome limitations on exceptions, such as the requirement for an environmental assessment and the limits on the length of lapses in development.

1.    The DEIS Does Not Define How or When BLM May Grant Exceptions to Timing Stipulations.

The DEIS states that year-round development may be achieved by utilizing BLM's process for exceptions to stipulations that limit activities near raptor nests and greater sage-grouse leks outside of Priority Habitat Management Areas (PHMA). DEIS, pg. 2-25. The DEIS, however, provides no guidance as to: (1) the circumstances in which BLM will grant (or deny) exceptions to seasonal timing stipulations; (2) any measures that BLM expects Operators to adopt in lieu of adhering to timing stipulations; and (3) whether Operators may request and receive exceptions when they submit Applications for Permit to Drill (APDs) or well in advance of the proposed work to be excepted if an APD has already been approved, rather than waiting to request exceptions only two weeks before initiating proposed work as suggested by the Casper RMP, *see* Casper RMP ROD, pg. F-1. The description of the process to obtain exceptions in the DEIS does not give operators the certainty they need to rely on the ability to develop year-round within the Project Area. Furthermore, the requirement that an environmental assessment accompany each exception request will slow the process for obtaining exceptions.

The DEIS's unclear procedures for exceptions are highlighted by breaking down the DEIS's references for exceptions and noting the flaws with each:

➢ **Exceptions may be granted or denied in undefined circumstances, based on undefined criteria.** The DEIS recognizes that exceptions will be granted on a case-by-case basis and also recognizes that exception requests may be denied. *See* DEIS, pgs. 4.18-27, line 16 (stating "[e]xceptions generally would be granted on a case-by-case basis"), 4.18-27, line 20–22; pg. 4.18-60, lines 21–23 (stating "[w]here seasonal wildlife stipulations are required, and exceptions are not available, drilling and completion of wells would be scheduled outside of the stipulation windows"). The DEIS, however, does not specify the circumstances in which exceptions would be granted or denied. *See id.*

➢ **The DEIS does not identify when Operators may submit requests for exceptions.** Onshore Order No. 1 and the Casper RMP contain conflicting direction on the timing of exception requests. Onshore Order No. 1 allows exception requests to be submitted with a Notice of Staking or APD. *See* 72 Fed. Reg. 10,307, 10,337 (Mar. 7, 2007). The Casper RMP, however, directs that "[a]s a general rule," an exception request "should be made within 2 weeks of conducting the proposed work." Casper RMP, F-1. In order to promote certainty, allow for sufficient processing time, and avoid delays in operations, BLM should consider exceptions and approve requests that are submitted with Notices of Staking or APDs or, for previously approved APDs, well in advance of the proposed work to be excepted.

March 12, 2018
Page 6

> **An environmental assessment is unnecessary to obtain an exception.** Each exception request "would require an environmental assessment to be completed that would allow the BLM to analyze the effects of development on wildlife within the site-specific project area." DEIS, pg. 2-25, lines 15–18. This requirement presents an unnecessary regulatory impediment and will cause significant delay in Operators' ability to timely obtain exceptions. The Casper RMP does not contain any requirement that an environmental assessment accompany an exception; in fact, the Casper RMP's suggestion that exception requests be made within two weeks of conducting proposed work would not allow time for the preparation of an environmental assessment. *See* Casper RMP, pgs. F-1 – F-2. Furthermore, given the extensive analysis of the impacts of year-round development in the Project DEIS, additional environmental analysis is unnecessary. *See* 40 C.F.R. § 1502.20 (encouraging agencies to tier to existing environmental analysis). Developing an environmental assessment for one or more exception requests will deter operators from pursuing exception requests, undermine the year-round development proposed as part of the Operator Group's Proposed Action, and unnecessarily duplicate analyses under the National Environmental Policy Act (NEPA).

> **An exception request and environmental assessment must be accompanied by a wildlife monitoring plan.** An "intensive wildlife monitoring plan" would "be developed by the [Operator Group] for BLM review." DEIS, pg. 2-25, lines 20–21. The plan would require monitoring during and possibly after the allowed development and "would include items such as notifications to BLM of when activities begin and end, reports on wildlife monitoring, and any other site-specific information developed under the environmental assessment." *Id.* pg. 2-25, lines 21–24. The DEIS fails to explain how the requirement for a wildlife monitoring plan would interact with the migratory bird conservation plan referenced elsewhere in the DEIS.

> **Operators must implement unspecified avoidance, minimization, and compensatory mitigation measures.** The DEIS states that BLM "would work with the operator" to implement "avoidance, minimization, and compensatory mitigation." DEIS, pg. 2-25, lines 13–15. The DEIS does not identify such measures. It also does not specify whether an operator must implement all three forms of mitigation (avoidance, minimization, and compensation) or whether an operator may implement one form of mitigation, such as minimization, in lieu of another form of mitigation, such as compensatory mitigation. Furthermore, the suggestion that compensatory mitigation may be necessary conflicts with a statement elsewhere in the DEIS that "[d]ue to the temporary nature of disturbance to migratory birds and the application of avoidance and minimization mitigation, OG-committed design features and the additional mitigation measures (Section 4.18.2.3), compensatory mitigation would not be warranted to offset the impacts resulting from development under Alternative B." *Id.* pg. 4.18-35, lines 24–27. Finally, the reference to a requirement of compensatory mitigation is inappropriate in light of changed Departmental policies. *See, e.g.*, Secretarial Order No. 3360 (Dec. 22, 2017).

March 12, 2018
Page 7

> **An Operator must adhere to operational limitations to obtain an exception, regardless of whether the limitations are feasible.** The DEIS explains that "the operator would be required to begin activities at the well pad no less than 30 days before the date of the timing limitation outlined in the [Conditions of Approval], with no break in activities on the well pad longer than 72 hours during the stipulations season." DEIS, pg. 2-25, lines 18–20. First, BLM offers no justification for these limitations, and none exists. BLM offers no explanation for the maximum 72-hour break in activities; 72 hours appears to be entirely arbitrary. Second, this limitation is ambiguous because BLM does not define which "activities" may not cease for more than 72 hours, thus burdening operators to determine the conduct necessary to allow year-round development. These limitations unnecessarily constrain Operators' ability to conduct year-round development and defeat the year-round development proposal in the Operator Group's Proposed Action. Finally, BLM must consider the unintended consequences of unnecessarily constraining breaks in activity; for example, BLM risks personnel safety by creating an incentive to resume activities to avoid losing the ability to continue operations.

> **Operators may develop site-specific migratory bird conservation plans, but the DEIS does not specify (1) when plans will be used or (2) whether the plans may be used to obtain an exception to a raptor stipulation.** The DEIS states that site-specific migratory bird conservation plans "would provide a strategy for assessing impacts, avoiding and minimizing impacts, guiding actions, and planning future impact assessments and actions to conserve raptors and their habitats." DEIS, pg. 4.18-30, lines 11–13. The DEIS, however, ignores one use of the Umbrella Migratory Bird Conservation Plan, if finalized, upon which site-specific plans could be based: to streamline the process of obtaining exceptions from raptor stipulations. The DEIS does not explain when plans will be used or whether they may be used to obtain an exception to a raptor timing stipulation. Further, the DEIS does not explain how the site-specific migratory bird conservation plans will integrate with the wildlife monitoring plans and conservation measures that BLM will require to obtain exceptions to raptor stipulations.

Given the density of raptor nests within the Project Area, *see* DEIS, pg. 3.18-25, fig. 3.18-9, the Operator Group is concerned that the exception process will not provide it with certainty as to how year-round development can proceed efficiently in the Project Area. Because the exception process may not provide the Operator with the relief they need to accommodate year-round development consistent with the Proposed Action, the Operator Group encourages BLM adopt a more durable solution: amendment of the Casper RMP to eliminate raptor timing stipulations within the Project Area and to permanently waive or modify raptor timing stipulations attached to existing leases.

          2.     BLM Should Amend the Casper RMP to Allow Year-Round Development within the Project Area.

An RMP amendment is advantageous to the exception process for several reasons. First, it would not require BLM to consider exception requests on a case-by-case basis, thus reducing the burden of the permitting process on BLM. Second, because BLM would not consider

March 12, 2018
Page 8

exception requests on a case-by-case basis, it would streamline the permitting process and avoid delays to Operators' APDs.  Third, this process eliminates the uncertainties surrounding when and how Operators could obtain relief from raptor stipulations.

The Operator Group maintains that BLM can efficiently amend the Casper RMP because waiving or modifying raptor stipulations only within the Project Area is a narrow amendment. BLM has already issued a Notice of Intent for and conducted public scoping on a proposed RMP amendment.  BLM's Notice of Intent released for the Project specifically notified the public that BLM "may also prepare land-use plan amendments to the Casper Resource Management Plan" and "announc[ed] the beginning of the scoping process to solicit public comments and identify issues."  79 Fed. Reg. 28,538 (May 16, 2014).

Because BLM has properly noticed and scoped an amendment to the Casper RMP, *see* 43 C.F.R. § 1610.2(c), a targeted amendment can be accomplished without additional process before the FEIS is released if BLM analyzes the amendment in an environmental assessment (EA) or in the FEIS itself.  *See* 43 C.F.R. § 1610.5-5; BLM's Land Use Planning Handbook, H-1601 § III(B) (Rel. 1-1693 Mar. 11, 2005).  The Operator Group is willing to discuss with BLM measures that can avoid or minimize any impacts to raptors if necessary to allow BLM to determine the RMP amendment will not have significant impacts.  Furthermore, because Chapter 4 of the DEIS analyzes the impacts of year-round development under Alternative B on a variety of resources, little if any additional analysis is necessary.

The Operator Group also requests that the United States Forest Service (USFS) consider amending the Thunder Basin National Grassland Land and Resource Management Plan (TBNG LRMP) to similarly waive raptor timing stipulations.  In the Notice of Intent for the Project, BLM advised the public that authorization of the Project "may require amendments of the 2007 Casper resource management plan or the 2001 Thunder [Basin] land and resources management plan because resource impacts will likely exceed those analyzed in the existing plans."  79 Fed. Reg. at 28,538.  The Operator Group seeks a discussion with the USFS to assess the feasibility of an amendment and whether it would delay issuance of the ROD.

B.    The FEIS Must Highlight the Environmental and Economic Benefits of Year-Round Development.

Although the DEIS analyzes the environmental impacts associated with year-round development, it does not adequately disclose and compare the environmental impacts of adhering to raptor stipulations under Alternative C.   Year-round development carries multiple environmental benefits, primarily for two reasons:  the drilling rig does not need to move off the surface location during the stipulation period, and the amount of time to drill all wells from a single location is reduced.   The DEIS, however, incorrectly assumes that application of timing stipulations under Alternative C generally will underline reduce environmental impacts.  *See* DEIS, pgs. 4.1-35, lines 39–41 ("it is anticipated that the emissions, particularly $PM_{10}$ and $PM_{2.5}$, would be lower than Alternative B due to fewer well pads and less surface disturbance"); pg. 4.2-11, lines 11–12; pg. 4.5-3, lines 23–24 ("The impacts to land use types would be similar to Alternative B except less acreage would be disturbed from activities under Alternative C, resulting in an anticipated

March 12, 2018
Page 9

reduction in impacts."); pg. 4.6-3, lines 36–38; pg. 4.7-5, lines 7–8 ("Noise impacts from Alternative C activities would be similar in type but less in intensity then under Alternative B."); pg. 4.8-3, lines 6–8; pg. 4.9-6, lines 10–13; pg. 4.10-4, lines 11–12; pg. 4.11-45, lines 16–17; pg. 4.14-12, lines 17–18 ("The impacts to vegetation would be similar to Alternative B except 15,400 fewer acres would be disturbed, resulting in less impact."); pg. 4.17-4, lines 20–30; pg. 4.18-15, lines 19–28; pg. 4.18-36, lines 21–22; pg. 4.18-40, lines 4–5, 14–15, 24–25; pg. 4.18-79, lines 23–24 ("Impacts to greater sage-grouse under Alternative C would be similar to those from Alternative B, but the magnitude generally would be less."); pg. 4.18-91, lines 22–23; pg. 5-31, lines 41–43; pg. 5-47, lines 28–29.  The DEIS must recognize that application of timing stipulations under Alternative C will <u>increase</u> impacts to certain resources.

First, application of timing stipulations will increase the amount of time necessary to develop all wells on a given surface location.  Application of timing stipulations requires an Operator to stop development and move a drilling rig off a location.  By allowing year-round development, an Operator does not need to move the drilling rig off the location.  Thus, an Operator can finish operations on a four-well location between six months to a year more quickly than if the Operator adhered to timing stipulations[3]:



---

[3] This scenario is for demonstrative purposes only and may not necessary represent future activity from a single location.

Exhibit C to Rebacca Byram Declaration Operator Group Attachment B

March 12, 2018
Page 10

The amount of time on a location is further reduced depending on the time of year when an Operator commences development:



If eight wells are drilled from a single location,[4] development times associated with year-round development are reduced even more; depending on the time of year when development commences, year-round development can reduce the length of development by more than 18 months (567 days).

---

[4] This scenario is for demonstrative purposes only and may not necessary represent future activity from a single location.

March 12, 2018
Page 11

Comparison of heavy and light truck round trips for mobilization/
demobilization for an eight-well pad with and without TLS



Source: Drilling rig move data were obtained from the Converse County Emissions Inventory.

The analysis of Alternative C does not acknowledge the significant environmental benefits of fewer rig moves and substantially reduced development times. Rather, the DEIS incorrectly assumes that application of timing stipulations under Alternative C will categorically reduce environmental impacts. The DEIS must be revised to disclose the potential impacts resulting from application of timing stipulations under Alternative C.

Most notable, the DEIS assumes that the same number of wells will be drilled during the 10-year Project timeframe, even though the development time for a given location will be extended by as long as a year on four-well pads and nearly two years for eight-well pads, even though Alternative C would increase the number of eight-well pads in the Project. *See* DEIS, pg. 2-35, lines 7–10 (stating Alternative C "would provide for drilling the same number of wells (5,000) at the same drilling rate (500 wells per year) as Alternative B"). Because application of timing stipulations significantly increases the length of time necessary to develop a single pad, and because timing stipulations limit access to much of the Project Area for six months of the year, BLM cannot assume that the same number of wells can be drilled at the same rate over a 10-year period under Alternative C as will be drilled under Alternative B. Although the analysis of socioeconomic impacts notes the increased drilling time, *see id.* pg. 4.11-45, lines 21–22, the analysis of other resources fails to account for increased drilling time.

The DEIS also fails to account for increased impacts resulting from the additional time necessary to develop a single pad. The additional six to 18 months necessary to develop a well pad delays interim reclamation of the well pad, resulting in an increased potential for erosion. The DEIS, however, fails to note this potential impact, instead incorrectly stating that "Alternative C would have very similar impacts to Alternative B . . . ." *See* DEIS, pg. 4.12-5, lines 9–7. The increased time for interim reclamation also can increase air impacts, specifically $PM_{10}$ emissions, yet the DEIS did not disclose this impact. *See id.* pg. 4.1-35 (anticipating $PM_{10}$ emissions "would be lower than Alternative B due to fewer well pads and less surface disturbance"). Furthermore,

March 12, 2018
Page 12

the increased time for reclamation slows the return of vegetative cover. The DEIS does not acknowledge this impact, instead stating that because of timing stipulations, "indirect disturbance of vegetation due to fugitive dust emissions would be <u>less</u> than under Alternative B because development would not occur on a year-round basis." DEIS, pg. 4.14-12, lines 21–22.

Application of timing stipulations also requires Operators to move drilling rigs on and off locations during the season when activities are limited. Moving drilling rigs throughout the Project Area carries its own set of impacts. Most significant, moving drilling rigs increases truck traffic. The Operator Group estimates that application of timing limitations to development of an eight-well pad will increase truck traffic three-fold:



Comparison of heavy and light truck round trips for mobilization/demobilization for an eight-well pad with and without TLS

Source: Drilling rig move data were obtained from the Converse County Emissions Inventory.

The DEIS, however, projects the exact same number of rig moves and truck trips under Alternative C as under Alternative B. *Compare* DEIS, pg. 4.13-3, tbl. 4.13-1 *with id.* pg. 4.13-9, tbl. 4.13-6 (assuming 10 light truck and 300 heavy truck trips per well). Elsewhere, the DEIS predicts that "[t]he overall number of rig mobilization and demobilization activities would be lower under Alternative C than under Alternative B." *Id.* pg. 4.11-45, lines 16–17. The DEIS must be revised to account for the increased truck traffic resulting from application of timing stipulations. Furthermore, because truck traffic trips will increase, Alternative C presents a risk of increased vehicle emissions and fugitive dust resulting in higher emissions of $PM_{10}$ and $PM_{2.5}$, but the DEIS does not disclose such potential impacts. *See id.* pg. 4.1-35, lines 30–42. Increased truck traffic also can increase noise levels, yet the DEIS describes noise impacts under Alternative C as "similar in type but less in intensity than under Alternative B." *Id.* pg. 4.7-5, lines 15–16. Increased truck traffic could also increase the risks of traffic accidents and accidental releases, yet the DEIS also does not discuss these risks. *See id.* pgs. 4.4-8 – 4.4-9. Finally, the DEIS does not account for potential disruptions to wildlife resulting from increased traffic. *See id.* pgs. 4.18-18, lines 30–35; pg. 4.18-35, lines 29–38.

March 12, 2018
Page 13

The increased duration of development and the increased rig moves result in impacts that must be acknowledged and analyzed in the DEIS. Accordingly, BLM must, at a minimum, revise the following discussions of Alternative C in the DEIS to account for these increased impacts: rate of development (section 2.5.1); air quality (section 4.1.3); noise (section 4.7-5); soils (section 4.12.3); vegetation (section 4.14.3); truck traffic (section 4.13.3); and wildlife (section 4.18.3).

  C. <u>BLM Must Correct the DEIS to Reflect Current National and Departmental Policies.</u>

The DEIS either directly or indirectly refers to outdated policies of the Executive, the Department of the Interior, and BLM. First, the DEIS does not acknowledge Solicitor Opinion No. M-37050 (Dec. 22, 2017), in which the Solicitor of the Interior determined that the MBTA does not prohibit incidental take of migratory birds. Second, the DEIS references numerous policies and guidance related to mitigation that have been rescinded or superseded or both. Specifically, the DEIS references BLM's Manual MS-1794 (Rel. 1-1782 Dec. 22, 2016), BLM Handbook H-1794-1 (Rel. 1-1783 Dec. 22, 2016), and Departmental Manual 600 DM 6. *See* DEIS, pg. 4.2-10, lines 40–42; pg. 4.2-13, lines 11–14; pg. 6-1, lines 32–24; pg. 6-2, lines 8–12; pg. 6-6, lines 7–8, 26–27; pg. 6-7, lines 6–7. This guidance, however, was rescinded via Secretarial Order No. 3360 § 4(a) (Dec. 22, 2017). Furthermore, Secretarial Order No. 3360 directed BLM to revise and reissue Instruction Memorandum No. 2008-204 (Sept. 30, 2008). BLM must update the DEIS to remove references to these outdated policies and guidance. Finally, the DEIS must acknowledge that BLM and USFS are reviewing their land use plan amendments that impose regulatory measures related to the greater sage-grouse. *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (BLM Notice of Intent); 82 Fed. Reg. 50,666 (Nov. 1, 2017) (errata); 82 Fed. Reg. 55,346 (Nov. 21, 2017).

  D. <u>BLM Should Analyze Management of Greater Sage-Grouse that is Consistent with the Wyoming Core Area Strategy.</u>

As BLM is aware, BLM and USFS are evaluating whether and how to adjust their greater sage-grouse management measures through amendments to RMPs and land use plans, including the Casper RMP and TBNG LRMP. *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (BLM Notice of Intent); 82 Fed. Reg. 50,666 (Nov. 1, 2017) (errata); 82 Fed. Reg. 55,346 (Nov. 21, 2017). The State of Wyoming has consistently requested that BLM adjust its management of greater sage-grouse to be consistent with the State's Core Area Strategy. *See* Wyoming Exec. Order No. 2015-4 (July 29, 2015).

The Project FEIS and ROD must account for potential changes to the federal regulatory framework for management greater sage-grouse. If BLM and USFS have completed their land use planning processes prior to issuance of the Project ROD, the ROD must incorporate any new management measures. Alternatively, if the Project ROD is issued before BLM and USFS have completed their land use planning processes, the ROD should provide the flexibility for BLM to manage the Project under the terms of any new land use plan amendments without the need for additional programmatic NEPA review of the Project.

March 12, 2018
Page 14

      To achieve these goals, the Operator Group requests that the FEIS analyze and adopt an adaptive management strategy to allow BLM to manage the Project in accordance with the outcome of the ongoing land use plan revisions.  In anticipation of potential changes to federal sage-grouse management, the Operator Group recommends that the adaptive management strategy allow for adherence to the Wyoming Core Area Strategy, which the U.S. Fish and Wildlife Service (USFWS) concluded is an "effective regulatory mechanism for conservation" and a key reason that the greater sage-grouse does not warrant protection under the Endangered Species Act.  80 Fed. Reg. 59,858, 59,882 (Oct. 2, 2015).  This adaptive management strategy should include the following management measures that are included in Wyoming Executive Order No. 2015-4 but not in the 2015 amendments to the Casper RMP ("9-Plan RMPA")[5] and USFS Greater Sage-Grouse ROD[6]:

> ➢ Allowing construction activities outside of seasonal restrictions without an exception or waiver.  *Compare* Wyoming Exec. Order No. 2015-4, Attachment B, at 6 (July 29, 2015) *with* 9-Plan RMPA, MD SSS 5, MD SSS 6, at 36; USFS Greater Sage-Grouse ROD at 99.

> ➢ Allowing the placement of semi-permanent structures in no surface occupancy areas around occupied leks.  *Compare* Wyoming Exec. Order No. 2015-4, Attachment B, at 6 *with* 9-Plan RMPA at 102 (definition of surface occupancy).

> ➢ Excepting production and maintenance activities from seasonal restrictions on activities.  *See* Wyoming Exec. Order No. 2015-4, Attachment B, at 6.

> ➢ Excluding no surface occupancy areas around occupied leks from seasonal restrictions on activities.  *Compare* Wyoming Exec. Order No.2015-4, Attachment B, at 6 *with* 9-Plan RMPA, MD SSS 7–9, at 36; USFS Greater Sage-Grouse ROD at 99.

> ➢ Limiting noise only within Core Population Areas.  *See* Wyoming Exec. Order No. 2015-4, Attachment B, at 8.

> ➢ Providing for compensatory mitigation only when an activity does not comply with prescribed avoidance and minimization measures.  Compensatory mitigation should be determined in accordance with the State of Wyoming's Mitigation Framework and should not require a net conservation gain.  *See* Wyoming Exec. Order No. 2015-4 § 7; Wyoming Revised Greater Sage-Grouse Compensatory Mitigation Framework at 1 (July 10, 2017).

> ➢ Requiring coordination with permitting agencies for monitoring and data collection if adaptive management triggers are met, rather than requiring the development of adaptive

---

[5] BLM Record of Decision and Approved Resource Management Plan Amendments for the Rocky Mountain Region including the Greater Sage-Grouse Sub-Regions of: Lewistown, North Dakota, Northwest Colorado and Wyoming, and the Approved Resource Management Plans for Billings, Buffalo, Cody, HiLine, Miles City, Pompeys Pillar National Monument, South Dakota, and Worland, Attachment 4, BLM Casper, Kemmerer, Newcastle, Pinedale, Rawlins, and Rock Springs Field Offices Approved Resource Management Plan Amendment for Greater Sage-Grouse (2015).
[6] USFS Greater Sage-Grouse Record of Decision for Northwest Colorado & Wyoming (2015)

March 12, 2018
Page 15

management plans or the deferment of discretionary authorizations.  *See* Wyoming Exec. Order No. 2015-4, Attachment B, at 10.

E.    BLM Must Utilize Updated Greater Sage-Grouse Core Area Maps.

The DEIS's analysis of impacts to greater sage-grouse and proposed management of greater sage-grouse relies on the State of Wyoming's Core Area Version 3 maps.  Furthermore, the DEIS would impose operational restrictions in PHMA that reflects the Version 3 maps. *See* DEIS, pg. 4.18-46, lines 37–39; pgs. 3.18-48 (throughout); pg. 3.18-49, fig. 3.18-12; pg. 3.18-52, tbls. 3.18-7, 3.18-9; pg. 4.18-46, lines 37–39; pg. 4.18-47, tbl. 4.18-20; pg. 4.18-49, fig. 4.18-1; pg. 4.18-62, lines 17–18, tbl. 4.18-26; pg. 4.18-74, lines 3–8; pg. 4.18-74, fig. 4.18-2; pg. 5-69, tbl. 5.3-34; pg. 6-30, lines 2–8.  The State of Wyoming, however, has updated these maps and replaced them with Version 4 maps.  In October 2017, the Wyoming BLM State Office issued a maintenance action updating RMPs across Wyoming with the Version 4 map.  *See* Plan Maintenance, Change #1 (Oct. 27, 2017).[7]  This action took place well in advance of the publication of the DEIS and should have been addressed by BLM.

BLM must remove references to and any analysis that relies on the Version 3 Map and instead wholly rely on the Version 4 map.  Further, any greater sage-grouse management measures that the governing RMP prescribes for PHMAs may only be applied in PHMAs that exactly correlate with Version 4 maps.

F.    BLM Must Recognize the Limits of Its Authority on Nonfederal Lands.

Because BLM and USFS manage a combined total of only ten percent of lands within the Project Area, BLM must recognize the limits of its authority over surface resources.  First, BLM must recognize its limited authority to impose surface management stipulations when well pads are located off of the federal lease and on non-federal surface, as described in BLM Instruction Memorandum No. 2009-078 (Feb. 20, 2009) (commonly known as the "fee-fee-fed" situation).  In this situation, the federal lessee's ability to use the surface is based on its contractual relationship with the surface owner rather than the federal oil and gas lease.  Thus, BLM has recognized that, in this situation, it lacks authority to require mitigation of impacts to surface resources.  *See id.* Indeed, the BLM Wyoming State Office has set aside conditions of approval attached to APDs after finding they were not necessary to comply with a statutory or regulatory mandate.  *See* Decision, SDR No. WY-2011-010, at 9 (Feb. 25, 2011).

BLM's limited authority to mitigate surface impacts when well pads are located off federal leases and on non-federal surface is particularly significant to the Project.  Presumably, given the amount of horizontal development proposed for the Project, a significant number of the 1,500 proposed wells will be located on off-lease pads on private surface.  BLM therefore must recognize that it lacks authority to impose mitigation measures to surface resources.  In particular, BLM must recognize that, given the interpretation of the Migratory Bird Treaty Act (MBTA) in Solicitor

---

[7] Available at https://eplanning.blm.gov/epl-front-office/projects/lup/36597/130805/159604/RMP_Maint_2017-001_Sage-Grouse_Core_V4.pdf.

March 12, 2018
Page 16

Opinion M-37050 (Dec. 22, 2017), it has no statutory obligation to prevent incidental take of migratory birds and, therefore, may not impose conditions of approval on APDs to prevent such take.

Second, for purposes of complying with NEPA, the Endangered Species Act (ESA), and NHPA, BLM's review of impacts from well pads located off federal leases on nonfederal surface is narrow if the well pad already exists or if the well pad was not placed to access a federal lease. Instruction Memorandum No. 2009-078 directs that, in such situations, NEPA analysis is limited to discussion of the environmental effects of the downhole operations, such as protection of aquifers and subsurface resources. Further, "[c]ultural, non-special status species, or other related surveys are typically not required unless the act of drilling, completing, and/or operating the Federal well(s) has the potential to have an impact on the protected resource." *Id.* Additionally, NEPA review "may be limited to a discussion of environmental effects of the downhole operations to be approved . . . and the effects related to drilling and operating the well, such as the effect of noise generated by the Federal well drilling." *Id.* BLM "is not required to consider a range of alternatives in siting surface facilities because the actual location (and, therefore, more specific, site-determined effects), is not based on the Federal wells." *Id.* BLM must recognize the narrow scope of its review under NEPA, ESA, and NHPA.

Finally, BLM must recognize the limits of its authority to manage for surface resources on split-estate lands within the boundaries of federal leases. The Associate Solicitor of the Interior has recognized that "[a]ctivities and use of the surface are not subject to planning requirements under the Federal Land Policy and Management Act (FLPMA), in part because BLM has no authority over use of the surface by the surface owner." Memorandum from Associate Solicitor, Energy & Resources, to BLM Director 2 (April 1, 1988). BLM need only consider the impacts of development under NEPA, NHPA, and ESA. *Id.* Similarly, in the FEIS accompanying the Casper Proposed RMP, BLM stated, "The private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner." Casper FEIS/Proposed RMP, pg. A-3. Because 90 percent of the Project Area is privately owned surface, BLM must recognize that it may not condition APDs to achieve surface management goals.

The Operator Group requests that BLM include a discussion in Chapter 1 of the FEIS recognizing that BLM lacks authority to mitigate surface impacts from well pads located off federal leases on non-federal surface. This discussion should also recognize BLM's limited authority over split-estate lands.

Additionally, BLM should revise the following statements in the DEIS to recognize BLM's limited authority to manage activities on non-federal surface:

➢ Section 1.4.1, Page 1-5, Lines 8–11: This section suggests that site-specific environmental review would always occur prior to development, stating:

> Although the RODs may approve the proposed oil and gas wellfield development on a conceptual basis, a site specific environmental review of

March 12, 2018
Page 17

areas proposed for surface disturbance and sub-surface mineral extraction
would be completed to determine the final location of facilities based on
environmental considerations.

This statement is misleading because it ignores that not all authorizations require
environmental review. BLM may utilize categorical exclusions set forth in the Section 390
of the Energy Policy Act of 2005 to permit five statutorily-specified activities without
preparation of an environmental assessment or EIS.[8] *See* 42 U.S.C. § 15942. Additionally,
even if site-specific review is required, such review frequently will have a narrow scope
because of the substantial amount of private land in the Project Area and because oil and
gas wells in the Project Area will be drilled horizontally. As explained in BLM Instruction
Memorandum No. 2009-078 (Feb. 20, 2009), NEPA does not require that BLM analyze
the surface impacts of the development of a well pad located off-lease on non-federal
surface, except when the well pad is placed to access the federal mineral estate. Rather, in
these situations, BLM's review is limited to the downhole impacts from development.
Accordingly, BLM should revise this language to state:

> Although the RODs may approve the proposed oil and gas wellfield
> development on a conceptual basis, a site specific ~~environmental~~ review of
> areas proposed for surface disturbance and sub-surface mineral extraction
> would be completed <u>only to the extent required by NEPA</u> ~~to determine the~~
> ~~final location of facilities based on environmental considerations~~.

➢ Section 1.5, Page 1-6, Lines 9–14: This section states:

> Where wells are proposed to be located on private land directly above
> private minerals but would penetrate and produce from federal mineral
> estate (i.e., in a fee-fee-fed scenario; WO IM 2009-078), BLM and USFS
> authority to regulate and/or mitigate impacts for surface resources is
> severely limited to compliance only with required federal statutes beyond
> NEPA.

This language does not fully capture the limited nature of BLM's NEPA review of, and
authority to impose, mitigation on wells drilled from pads located off the federal lease on
private surface (i.e., fee-fee-fed scenario). This language should be revised to outline
BLM's NEPA obligations for, and authority to mitigate impacts from, wells drilled from

---

[8] These activities are: (1) individual surface disturbances of less than five acres so long as the total surface disturbance
on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to NEPA has been
previously completed; (2) drilling an oil and gas well at a location or well pad site at which drilling has occurred
previously within five years prior to the date of spudding the well; (3) drilling an oil or gas well within a developed
field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such
drilling as a reasonably foreseeable activity, so long as such plan or document was approved within five years prior to
the date of spudding the well; (4) placement of a pipeline in an approved right-of-way corridor, so long as the corridor
was approved within five years prior to the date of placement of the pipeline; and (5) maintenance of a minor activity,
other than any construction or major renovation of a building or facility. 42 U.S.C. § 15942(b)(1)–(5).

March 12, 2018
Page 18

off-lease pads on private surface, as explained above. Furthermore, this section should note that Instruction Memorandum No. 2009-078 is currently being reviewed and revised by BLM; the FEIS must fully account for any revisions to the Instruction Memorandum. In practice, BLM has appeared to overreach in its application of NEPA and exercise of authority toward wells drilled from off-lease pads on private surface. Revisions to Instruction Memorandum No. 2009-078 are intended to provide clarity and reduce overreach.

➢ <u>Section 6.2.1, Page 6-4, Lines 19–20</u>: This section states, "Resources within the CCPA to be spatially and temporally avoided include the following: . . . ." The FEIS must expressly recognize that BLM may only impose these avoidance measures where it has the authority to do so and that BLM may not impose these avoidance measures on off-lease, non-federal surface ("fee-fee-fed" scenario). *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

➢ <u>Section 6.5, Page 6-22, Lines 36–40</u>: This section states, "The Converse County Oil and Gas EIS establishes mitigation measures in addition to the regulations, goals and objectives, BMPs, and OG-committed design features to reduce or eliminate impacts to the resources analyzed in Chapter 4.0. The following is a summary of proposed mitigation measures by resource." The FEIS must expressly recognize that BLM may only impose these mitigation measures where it has the authority to do so and that BLM may not impose these mitigation measures on off-lease, non-federal surface ("fee-fee-fed" scenario). *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

G.    <u>BLM Must Manage Trails in Accordance with the National Historic Preservation Act.</u>

The DEIS inappropriately attempts to manage impacts to the historic trails within the Project Area. Most significant, the DEIS attempts to impose a requirement that Operators provide compensatory mitigation to offset impacts to historic trails. Page 6-28, line 44, of the DEIS states that impacts to the setting along contributing segments of historic trails may require compensatory mitigation. Section 6.6.2.1 then outlines potential compensatory mitigation strategies for impacts to trails. Additionally, Alternative B calls for the development and implementation of mitigation measures to reduce adverse impacts to historic trails; such mitigation measures would be developed with BLM or USFS, the State Historic Preservation Officer (SHPO), tribes and other interested parties. *See* DEIS, pg. 4.2-8, lines 33–35. Alternative B also states that "[c]ompensatory mitigation would be warranted for residual impacts to historic trails because historic trails are single resources, and impacts to specific segments would affect the integrity and [National Register of Historic Places] eligibility of the trail as a whole." *Id.* pg. 4.2-10, lines 38–40; *see also id.* pg. 4.2-8, lines 33–35.

First, BLM's requirement to provide compensatory mitigation to offset impacts to trails is inconsistent with the Casper RMP. BLM's decision to authorize the Project must conform to the Casper RMP. 43 C.F.R. § 1610.5-3. The Casper RMP, however, does not contain any requirement for compensatory mitigation to offset impacts to trails. *See* Casper RMP at 2-47 – 2-48. Because

March 12, 2018
Page 19

a requirement for compensatory mitigation does not conform to the Casper RMP, BLM must remove it from the FEIS.

Second, BLM may not rely on the NEPA process to manage impacts to historic trails or require compensatory mitigation to offset impacts to trails from the Project. To the extent BLM seeks to manage impacts to trails, section 106 of the National Historic Preservation Act provides the appropriate legal mechanism to avoid, minimize and, if appropriate, mitigate impacts to historic properties such as trails or their segments that are eligible for inclusion on the National Register of Historic Places. *See* 54 U.S.C. § 306108; 36 C.F.R. part 800.

Third, the DEIS's statement that mitigation measures would be developed to offset impacts to trails is inconsistent with the Casper RMP. The Casper RMP directs that the viewshed along segments that do not contribute to eligibility for the National Register of Historic Places (NRHP) would be managed as Visual Resource Management (VRM) Class III. *See id.* at 2-48. BLM may allow "moderate" changes to the characteristic landscape in areas managed as Class III; activities in Class III-managed areas may attract attention and should repeat the basic elements found in the predominant natural features of the characteristic landscape. BLM Manual 8431 – Visual Contrast Rating, appx. 2 (Rel. 8-30 Jan. 17, 1986). Because VRM Class III management contemplates impacts to the landscape, compensatory mitigation is unnecessary.

Finally, the DEIS inappropriately treats all trails as comparable resources with comparable management designations. In fact, the three primary trails within the Project Area have different designations. Child's Cutoff has been designated as a segment of the California National Historic Trail; further, the National Park Service is conducting a feasibility study to determine whether Child's Cutoff should be designated as a segment of the Oregon National Historic Trail. DEIS, pg. 3.2-18. The Bozeman Trail is eligible overall for the NRHP. *Id.* pg. 3.2-19. The DEIS does not disclose whether the Rock Creek to Fort Fetterman Stage Route has been evaluated for eligibility on the NRHP. *See id.* pg. 3.2-19. The DEIS also discloses that segments of other trails, including the Overland Trail and Yellowstone Highway, run through the Project Area. *Id.*

BLM cannot impose a uniform requirement of compensatory mitigation for impacts to all trails within the Project Area because each is managed under a different standard. Child's Cutoff is managed in accordance with BLM Manual 6280, which prescribes specific analysis that BLM must undertake in NEPA documents. *See* BLM Manual MS-6280, Management of National Scenic and Historic Trails and Trails under Study or Recommended as Suitable for Congressional Designation 1-18 – 1-19 (Rel. 6-139 Sept. 14, 2012). Impacts to the Bozeman Trail must be evaluated through the section 106 process under the NHPA because the Bozeman Trail is eligible for the NRHP. *See* 36 C.F.R. part 800; BLM Manual 8110 – Identifying and Evaluating Cultural Resources § .33C1b (Rel. 8-73 Dec. 3, 2004). To the extent other trails are not eligible for the NRHP, they may not be evaluated through the section 106 process. *See* 36 C.F.R. § 800.1 (explaining purposes of identifying, assessing effects to, and resolving adverse effects to historic properties). Given these different management directions, BLM's attempt to impose a uniform requirement of compensatory mitigation to all trails impacted by the Project is inappropriate. For all of these reasons, the BLM must remove the proposals to require compensatory mitigation in Section 6.6.2.1 and under Alternative B of the DEIS.

March 12, 2018
Page 20

H.    BLM May Not Treat the Pine Ridge Area as a "Special Management Area."

BLM inappropriately treats the Pine Ridge area as a "special management area."  *See* DEIS, pg. 2-39, lines 4–10.  The Casper RMP prescribes one management action for the Pine Ridge area: procedures for cultural resources surveys in the Pine Ridge area.  *See* Casper RMP, pg. 2-30.  This single management action does not transform the Pine Ridge area.  The DEIS, however, suggests the opposite, characterizing the Pine Ridge area as the "Pine Ridge Special Management Area." DEIS, pg. 2-41, fig. 2.5-1.  The DEIS also specifies that tribal consultation will occur for activities within the Pine Ridge area.  *Id.* pg. 4.2-12, lines 10–24; pg. 4.11-51, lines 6–10.  BLM should revise the discussions of the Pine Ridge area in the DEIS to clarify that it is not a special management area and is not afforded any substantive protections under the Casper RMP.

I.    Valid Existing Rights

1.    BLM Must Recognize Lessees' Valid Existing Rights.

Oil and gas project approval, including a large project approval such as the Project approval contemplated in the DEIS, is an implementation-level decision by BLM under FLPMA and is subject to FLPMA's provisions.  The authority conferred in FLPMA, in turn, is expressly made subject to valid existing rights.  *See* Pub. L. No. 94–579, § 701(h), 90 Stat. 2743, f2786, reprinted in 43 U.S.C. § 1701, historical note.  An implementation-level programmatic EIS prepared to analyze a large oil and gas project is likewise subject to existing rights.  *See Colo. Envtl. Coal.,* 165 IBLA 221, 228 (2005).  The DEIS, FEIS, and ROD cannot defeat or materially restrain Operators' valid existing rights to develop their leases through conditions of approval or other means.  *See id.* (citing *Colo. Envtl. Coal.*, 135 IBLA 356, 360 (1996), *aff'd*, *Colo. Envtl. Coal. v. Bureau of Land Mgmt.*, 932 F.Supp. 1247 (D.Colo. 1996); *Mitchell Energy Corp.*, 68 IBLA 219, 224 (1982) (citing Solicitor's Opinion, M-36910, 88 Interior Dec. 908, 913 (1981)); BLM Manual 1601 – Land Use Planning, 1601.06.G (Rel. 1-1666 11/22/00) ("All decisions made in land use plans, and subsequent implementation decisions, will be subject to valid existing rights.  This includes, but is not limited to, valid existing rights associated with oil and gas leases. . . .").

Federal courts have interpreted the phrase "valid existing rights" to mean that federal agencies cannot impose restrictions that make development on existing leases either uneconomic or unprofitable.  *See Utah v. Andrus*, 486 F. Supp. 995, 1011 (D. Utah 1979); *see also Conner v. Burford*, 84 F.2d 1441, 1449-50 (9th Cir. 1988).  If BLM issues a federal oil and gas lease without No Surface Occupancy stipulations, then, absent a nondiscretionary statutory prohibition against development, BLM cannot completely deny development on the leasehold.  *Nat'l Wildlife Fed'n*, 150 IBLA 385, 403 (1999).  Only Congress has the right to completely prohibit development once a lease has been issued.  *W. Colo. Cong.*, 130 IBLA 244, 248 (1994).

Furthermore, BLM may not impose requirements on operators that are inconsistent with lease rights.  *See, e.g.*, 43 C.F.R. § 3101.1-2 (stating that measures are consistent with lease rights provided they do not require relocation of proposed operations by more than 200 meters, require that operations be sited off the leasehold, or prohibit new surface disturbance in excess of 60 days in any year).  BLM cannot, for example, impose conditions that are inconsistent with Operators'

March 12, 2018
Page 21

existing, contractual lease rights, and BLM cannot restrict operations to the point that economic development on a lease is precluded. *Sierra Club v. Hodel*, 848 F.2d 1068, 1087-88 (10th Cir. 1988) (upholding BLM interpretation of duty not to impair wilderness study areas as not allowing BLM to prohibit a road improvement on a R.S. 2477 right of way grant), *overruled on other grounds*, *Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992); *Colo. Envtl. Coal.*, 165 IBLA 221, 228 (2005) (determining that an RMP may not impose restrictions on the exercise of existing oil and gas leases that defeat or materially restrain existing rights); *Colo. Open Space Council*, 73 IBLA 226, 229 (1983) (holding that regulation of existing oil and gas leases may not "unreasonably interfere" with the rights previously conveyed in such leases).

BLM often cites the Interior Board of Land Appeals' *Yates* decision for the proposition that the agency can modify existing leases by imposing conditions of approval on APDs. *Yates Petroleum Corp.*, 176 IBLA 144 (2008). The *Yates* decision does not stand for the proposition that BLM can impose conditions of approval whenever it deems necessary or in broad programmatic documents such as the Draft EIS. Rather, in *Yates*, the IBLA merely affirmed the imposition of an additional condition of approval based on site-specific information including recent and directly applicable scientific research. *Yates*, 176 IBLA at 157; *see William P. Maycock*, 177 IBLA 1, 16-17 (2009). The *Yates* decision does not authorize BLM to ignore relevant lease terms or BLM's regulation at 43 C.F.R. § 3101.1-2. Further, BLM must recall that it cannot impose new, unreasonable mitigation requirements on existing leases. Courts have recognized that once BLM has issued an oil and gas lease conveying the right to access and develop the leasehold, BLM cannot later impose unreasonable mitigation measures that take away those rights. *See Conner v. Burford*, 84 F.2d at 1449-50; 43 C.F.R. § 3101.1-2 (BLM can impose only "reasonable mitigation measures . . . to minimize adverse impacts . . . to the extent consistent with lease rights granted").

In its FEIS and ROD, BLM should clearly state that an oil and gas lease is a contract between the federal government and the lessee, that the lessee has certain rights thereunder, and that neither the ROD nor any decisions implementing the ROD will limit, restrain, or unreasonably interfere with these rights. BLM must also state that it will only apply reasonable measures through conditions of approval or otherwise if such measures appear in the terms and provisions of Operators' original leases or if an Operator has otherwise agreed to such measures.

BLM must also clearly acknowledge in the FEIS and ROD that it must recognize Operators' existing contractual rights and may not impose unreasonable restrictions on development, whether through conditions of approval or otherwise. It is well established that federal oil and gas leases are contracts that cannot be unilaterally modified by BLM. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 620 (2000) (recognizing that federal oil and gas leases are contracts and that the federal government's breach of lessees' right to explore for and develop oil and gas entitles lessees to refunds); *Oxy USA, Inc. v. Babbitt*, 268 F.3d 1001, 1006-7 (10th Cir. 2001) (noting that the Tenth Circuit has long held that federal oil and gas leases are contracts), *rev'd on other grounds*, *BP America Production Co. v. Burton*, 549 U.S. 84 (2006).

March 12, 2018
Page 22

After BLM accepts the bid and the lessee fully pays for the lease, a contract exists between the lessee and BLM based solely on those terms and conditions identified at the lease sale. *See, e.g., Coastal States Energy Co.*, 80 IBLA 274, 279 (1984); BLM Manual MS-3120 – Competitive Leases, § 3120.64.A (Rel. 3-337, 2/18/13) ("A properly signed bid on a BLM-approved lease bid form constitutes a legally binding lease offer and acceptance of a lease, including all terms and conditions of the lease."). The unilateral addition of new terms by BLM, through the addition of unreasonable conditions of approval or otherwise, is a breach of this contract and violates "the equal opportunity for all bidders to compete on a common basis for leases." *See Anadarko Prod. Co.*, 66 IBLA 174, 176 (1982), *aff'd*, Civ. No. 82-1278C (D. N.M. 1983). BLM must acknowledge Operators' contractual rights in the FEIS and ROD and ensure any future decisions implementing the ROD do not unilaterally alter the original terms and conditions of the Operators' leases.

2.    BLM Must Recognize Valid Existing Rights in Greater Sage-Grouse Core Areas.

As drafted, the DEIS suggests that oil and gas development could not occur in greater sage-grouse core areas in which surface disturbance caps have been exceeded. For example, the DEIS provides:

➢ Page 4.18-63, lines 2–4: "[D]evelopment could be approved on a site-specific basis consistent with the DDCT process if found to be under the 5 percent cap."

➢ Page 4.18-66, lines 6–7: "Based on existing disturbance in DDCT assessment areas that already exceed 5 percent disturbance for four of the five PHMAs, new surface disturbance could only be considered within the M Creek PHMA."

➢ Page 4.18-74, lines 20–21: "Due to the current 5 percent disturbance cap being exceeded, further surface disturbance would be prohibited in three of the PHMAs (Douglas, North Glenrock, and Thunder Basin)."

➢ Page 4.18-79, lines 29–31: "Under Alternative C, existing disturbance in DDCT assessment areas already exceeds 5 percent disturbance for three of the five PHMAs and no new surface disturbance would be considered within the Bill and M Creek PHMAs."

➢ Page 4.18-84, lines 22–23: "Compensatory mitigation would not be warranted for greater sage-grouse under Alternative C because disturbance would be prohibited within PHMA."

Although the development in core areas is not a specific element of the Proposed Action, the DEIS essentially forecloses the possibility that such development could occur where disturbance caps have been exceeded. If a PHMA contains oil and gas leases, this outcome would essentially extinguish this lease right.

March 12, 2018
Page 23

In the FEIS, BLM must recognize that the Wyoming Core Area Strategy, as well as the 9-Plan RMPA, provides mechanisms for disturbance in core areas above surface disturbance and density caps where necessary to honor valid existing rights. *See* Wyoming Exec. Order No. 2015-4, Attachment B, pg. 4; 9-Plan RMPA, pgs. 23, 34 (MD SSS 2). In the FEIS, BLM must revise the statements listed above to specifically acknowledge that development may be permitted in accordance with the Core Area Strategy.

## VI.    Proposed Mitigation Measures in Chapters 4 and 6

Chapters 4 and 6 of the DEIS include proposed mitigation measures intended to benefit a variety of resources. The Operator Group offers comments on Chapters 4 and 6 and the associated mitigation measures:

### A.    BLM Policies Promoting Landscape-Scale and Compensatory Mitigation Have Been Withdrawn.

The introduction to Chapter 6 of the DEIS makes clear that the purpose of Chapter 6 is to guide the use of compensatory mitigation as part of a larger effort to promote landscape-scale mitigation. BLM, Departmental, and national policies related to compensatory and landscape-scale mitigation, however, have been withdrawn. Both Secretarial Order No. 3330, Improving Mitigation Policies and Practices of the Department of the Interior (Oct. 31, 2013), and the Presidential Memorandum on Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment (2015) ("Presidential Memorandum"), promoted the use of landscape-scale mitigation. At the direction of these policies, the Department of the Interior's Landscape-Scale Mitigation Policy Manual 600 DM 6 (2015), and the BLM Mitigation Manual MS-1794 (2016) and Handbook H-1794-1 (2016) were developed. All of these policies, however, have been revoked or rescinded. Executive Order 13783 revoked the Presidential Memorandum. Executive Order 13783, § 3(a)(iii), 82 Fed. Reg. 16,093 (Mar. 31, 2017). Similarly, Secretarial Order No. 3349 (Mar. 29, 2017) revoked Secretarial Order No. 3330, while Secretarial Order No. 3360 (Dec. 22, 2017) rescinded Manual 600 DM 6 and BLM's Mitigation Manual and Handbook.

Although the Operator Group recognizes that the CEQ regulations require agencies to analyze "appropriate" mitigation in an EIS, *see* 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1508.20, BLM must revise Chapters 4 and 6 to remove the emphasis on compensatory mitigation. BLM cannot require compensatory mitigation as part of the Project ROD. Although compensatory mitigation may be appropriate in certain circumstances, BLM should identify appropriate mitigation in consultation with the federal lessee or operator. Furthermore, BLM cannot require compensatory mitigation whenever it determines that impacts cannot be "adequately" minimized. *See* DEIS, pg. 6-6, lines 25–26. BLM may authorize land use activities that impact the public lands, even significantly, as long as the impacts do not result in unnecessary or undue degradation. *See* 43 U.S.C. § 1732(b). Moreover, BLM may not reinterpret its existing RMPs to require compensatory mitigation when the concept of compensatory mitigation was not disclosed to the public. *See id.* pg. 6-6, lines 32–33 ("When impacts that exceed RMP thresholds cannot be avoided

March 12, 2018
Page 24

or adequately minimized to an acceptable degree, compensatory mitigation may be necessary"). The Final EIS must recognize this limitation.

BLM instead must analyze any compensatory mitigation under the direction of Instruction Memorandum No. 2008-204 (Sept. 30, 2008), which it must revise and reissue. *See* Secretarial Order 3360 § 4(c) (Dec. 22, 2017).  Though it has not yet been revised, this guidance does not require mitigation but identifies circumstances when compensatory mitigation may be warranted. It provides (emphasis added):

> There <u>may</u> be a need for offsite mitigation when:
>
> - Impacts of the proposal cannot be mitigated to an acceptable level onsite; <u>and</u>
>
> - It is expected that the proposed land use authorization as submitted would not be in compliance with law or regulations or consistent with land use plan decisions or other important resource objectives.

Furthermore, though not yet revised, Instruction Memorandum No. 2008-204 cautions that "[o]ffsite mitigation is <u>not to become the default resource mitigation practice</u> for projects permitted by the BLM" (emphasis added).  Rather, it directs that "[o]ffsite mitigation is a <u>supplemental</u> mitigation practice identified on a <u>case-by-case basis</u> and must be based on the need to address important resource issues that cannot be acceptably mitigated onsite" (emphasis added).  BLM must review and revise the compensatory mitigation measures in the DEIS to ensure compliance with this guidance.

Additionally, because Secretarial Order No. 3330 (Oct. 31, 2013), the Presidential Memorandum, the Department of the Interior's Landscape-Scale Mitigation Policy Manual 600 DM 6 (2015), the BLM Mitigation Manual MS-1794, and BLM Handbook H-1794-1 have been revoked or rescinded by Executive Order No. 13783 and Secretarial Order Nos. 3349 and 3360, BLM must also eliminate references to "no net loss" and "net gain" from the Final EIS.  *See* DEIS, pg. 6-6, lines 27–28.  In sum, in the FEIS, BLM must ensure that all references to compensatory mitigation are consistent with current policy and that all references to withdrawn or outdated policies have been removed.

B.    <u>Applicability of Mitigation Measures</u>

The FEIS must expressly state that BLM may only impose the mitigation measures listed in Chapters 4 and 6 where it has the authority to do so and that BLM may not impose these mitigation measures on off-lease, non-federal surface ("fee-fee-fed" scenario).  *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

March 12, 2018
Page 25

      C.    <u>Compensatory Mitigation for Greater Sage-Grouse</u>

The Operator Group agrees with the statement on page 6-30, line 16, that mitigation will be calculated to comply with Wyoming Executive Order No. 2015-4. The Operator Group encourages BLM's management of greater sage-grouse and, particularly, any compensatory mitigation to align with Wyoming Executive Order No. 0215-4.

Furthermore, the discussion in Section 6.2.2.2, pg. 6-30, that outlines compensatory mitigation for greater sage-grouse should recognize that not all project-level impacts must be mitigated. For example, the 9-Plan RMPA Regional Mitigation Guidelines provide:

> Not all adverse or unavoidable impacts can or must be fully mitigated, either onsite or outside the area of impact. A certain level of adverse or unavoidable impact may be acceptable, and the BLM will identify these impacts during the NEPA analysis and acknowledge them in the decision document (such as a decision record or record of decision).

9-Plan RMPA, app. F, pg. 218. The FEIS should recognize and provide for the possibility that not all impacts to greater sage-grouse or its habitat require mitigation.

      D.    <u>Specific Mitigation Measures in Chapters 4 and 6</u>

        1.    AQ-1 (Sections 4.1-35, 6.5.1)

If located on BLM surface estate, gas plants and compressor stations will be located at least 2,000 meters from residences or other occupied dwellings.

BLM must revise AQ-1 to clearly state it does not apply to well pads. The Operator Group also notes that a 500-foot setback for well pads is already required by Wyoming Oil and Gas Conservation Commission rules.

        2.    CR-1 (Sections 4.2.2.4, 6.5.2)

A qualified professional archaeologist will monitor surface disturbing activities during construction in areas that may contain buried cultural materials.

BLM must remove the requirement for an archaeological monitor during construction, for several reasons. The DEIS fails to identify any "areas that may contain buried cultural materials." Rather, the DEIS states that "distribution of recorded sites is spread across the analysis area," thus suggesting that the entire Project Area may contain buried cultural materials. *See* DEIS, pg. 3.2-12. Furthermore, the DEIS fails to identify "cultural materials," a phrase which may cover more materials that "historic properties" that are offered procedural protections through the Section 106 consultation process. *See* 36 C.F.R. § 800.16(l)(1).

No legal justification exists for the monitoring requirement, particularly one that could be interpreted to apply throughout the entire Project Area. BLM's guidance on managing for cultural

March 12, 2018
Page 26

resources does not require or even mention the need for archaeological monitoring during surface disturbing activities. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Rel. 8-72 Dec. 3, 2004); BLM Manual 8140 – Protecting Cultural Resources (Rel. 8-77 Dec. 3, 2004). Furthermore, to the extent BLM anticipates archaeological monitoring may be necessary for a particular activity, BLM should rely on Section 106 consultation to identify where monitoring is necessary; BLM should not attempt to end-run the Section 106 process by imposing monitoring requirements through the NEPA process. Accordingly, BLM lacks any legal or policy basis to require archaeological monitors throughout large portions of the Project Area.

Furthermore, the requirement for monitoring throughout essentially the entire Project Area is unnecessary. Although monitoring may be appropriate if site-specific information, such as a Class III survey, indicates a likelihood that construction activities may disturb a historic property, grave, or funerary object, BLM acts arbitrarily and capriciously by imposing a monitoring requirement through most or all of the Project Area absent site-specific information. BLM estimates that the 1.5 million acre Project Area contains only 1,487 cultural resources that are eligible for the NRHP. *Id.* pg. 4.2-3. Furthermore, BLM estimates the Proposed Action will affect only 52 eligible cultural resources. *Id.* pg. 4.2-7, 4.2-9. Based on the estimated 52,667 acres of surface disturbance that will occur with the Project, *see id.* pg. 2-25, an average of one eligible cultural resource may be affected with every 1,012 acres of surface disturbance (or 84 well pads). Given that the likelihood of affecting a cultural resource is low, BLM lacks any factual basis to require archaeological monitors throughout the entire Project Area.

Finally, BLM should not arbitrarily impose mitigation measures that require access by third parties to private surface, particularly when 90 percent of the Project Area includes non-federal surface. Moreover, BLM lacks authority to require access to private surface for a monitoring requirement imposed through the NEPA process. BLM has only asserted it may request that an Operator access private surface for the purposes of complying with the NHPA and ESA. *See* Onshore Order No. 1, 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007). Here, because BLM is not purporting to require monitoring to fulfill its obligations under the NHPA and ESA, the monitoring requirement must be removed from the EIS.

Monitoring imposes costs associated with surface disturbance and, conceivably, the DEIS may require both an archaeological monitor and a tribal monitor for a given activity. *See* DEIS, Mitigation Measure CR-4, pg. 6-23, lines 14–15. Additionally, monitoring creates a risk of delay because construction cannot proceed if a monitor is not available, which is a risk given the number of Operators within the Project Area and possible lack of available monitors. Given that no factual, legal, or policy basis exists for requiring archaeological and tribal monitors, BLM should not impose unnecessary costs and delay on the Operators. Accordingly, the Operator Group requests that BLM remove the requirement for archaeological monitors from the FEIS.

      3.    CR-1 (Sections 4.2.2.4, 6.5.2)

A site specific monitoring and discovery plan may be developed for large or complex undertakings or areas known to contain buried cultural sites.

March 12, 2018
Page 27

     This requirement is too vague; the phrase "areas known to contain buried cultural sites" could apply to the entire Project Area. Additionally, this requirement should not be included as a mitigation measure in a NEPA document. The Advisory Council on Historic Preservation regulations implementing Section 106 of the NHPA specifically address discoveries of historic properties. *See* 36 C.F.R. § 800.13. BLM should utilize this existing mechanism under the Section 106 process rather than imposing a vague and arbitrary requirement through the NEPA process.

          4.    CR-3 (Sections 4.2.2.4, 6.5.2)

     Mandatory training will be provided to all construction personnel and contractors regarding cultural resources and the federal regulations that protect them.

     BLM should remove this requirement from the FEIS because it is not customarily included in RODs for oil and gas projects or as a condition of approval attached to individual APDs.

          5.    CR-4 (Sections 4.2.2.4, 6.5.2)

     For areas most likely to contain resources of Native American Concern, tribal monitors will monitor sediment-disturbing activities during construction.

     BLM must remove the blanket requirement for tribal monitors. First, BLM fails to specify where tribal monitors will be required. The DEIS only provides that tribal monitors will be required in "areas most likely to contain resources of Native American Concern." *Id.* pg. 4.2-10, lines 12–13; pg. 6-23, lines 14-15. The DEIS does not, however, identify the areas "most likely" to contain such resources. Further, the DEIS offers no concrete definition of "resources of Native American Concern," defining it only as "those identified through tribal consultation as being culturally sensitive" and including "Indian Sacred Sites, properties of traditional religious and cultural importance, and [traditional cultural properties]." *Id.* pg. 3.2-20. Similarly, BLM does not distinguish between "sediment-disturbing activities" and "surface disturbing activities." BLM's failure to specify where tribal monitoring would be required will lead to confusion and monitoring throughout significant portions of the Project.

     No legal justification exists for the monitoring requirement. BLM's guidance on managing for cultural resources does not require or even mention the need for monitoring during surface disturbing activities. *See* BLM Manual 8100 – The Foundations for Managing Cultural Resources (Rel. 8-72 Dec. 3, 2004); BLM Manual 8140 – Protecting Cultural Resources (Rel. 8-77 Dec. 3, 2004). Furthermore, to the extent BLM anticipates tribal monitoring may be necessary for a particular activity, BLM should rely on the Section 106 consultation to identify where monitoring is necessary; BLM should not attempt to end-run the Section 106 process by imposing monitoring requirements through the NEPA process. Accordingly, BLM lacks any legal or policy basis to require tribal monitors throughout large portions of the Project Area.

     Furthermore, the requirement for tribal monitoring potentially throughout large portions of the Project Area is unnecessary. BLM estimates that the 1.5 million acre Project Area contains only 1,495 eligible cultural resources of possible concern to tribes. DEIS, pg. 4.2-3, tbl. 4.2-1.

March 12, 2018
Page 28

BLM anticipates the Proposed Action will affect only 16 eligible cultural resources of possible concern to tribes over the 10-year life of the Project.  *Id.* pgs. 4.2-7, 4.2-9.  Based on the estimated 52,667 acres of surface disturbance that will occur with the Project, *see id.* pg. 2-25, an average of one eligible cultural resource of possible concern to tribes may be affected with every 3,291 acres of surface disturbance (or 274 well pads).  Given that the likelihood of affecting a cultural resource of possible concern to tribes is low, BLM lacks any factual basis to require tribal monitors throughout large portions of the Project Area.

Finally, BLM should not arbitrarily impose mitigation measures that require access by third parties to private surface, particularly when 90 percent of the Project Area includes privately owned surface.  Moreover, BLM lacks authority to require access to private surface for a monitoring requirement imposed through the NEPA process.  BLM has only asserted it may request that an Operator access private surface for the purposes of complying with the NHPA and ESA.  *See* Onshore Order No. 1, 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007).  Here, because BLM is not purporting to require monitoring to fulfill its obligations under the NHPA and ESA, the monitoring requirement must be removed from the EIS.

Monitoring imposes costs associated with surface disturbance and, conceivably, the DEIS may require both an archaeological monitor and a tribal monitor for a given activity.  Additionally, monitoring creates a risk of delay because construction cannot proceed if a monitor is not available.  Tribal monitoring may also present logistical concerns because BLM does not specify which tribe would provide a monitor; conceivably, multiple tribes may have an interest in monitoring the same area.  Given that no factual, legal, or policy basis exists for requiring archaeological and tribal monitors, BLM should not impose unnecessary costs and delay on the Operators.  Accordingly, the Operator Group requests that BLM remove the requirement for tribal monitors from the FEIS.

6.    PALEO-1 (Section 4.8.2.2, 6.5.8)

On the ground surveys will be conducted by a qualified, permitted BLM consulting paleontologist to determine the presence or absence of paleontological resources in any areas of surface disturbance currently ranked PFYC 3-5 (moderate to high).  Recommendations will be made, and the appropriate mitigation and monitoring measures will follow.

The Operator Group strenuously objects to this mitigation measure because it is unconventional, overly broad, and burdensome.  Because all but 54,203 acres of the entire 1.5 million acre Project Area are classified as PFYC ranks 3 through 5, *see* DEIS, pg. 3.8-2, tbl. 3.8-1, this mitigation measure effectively would require paleontological surveys throughout the entire Project Area.

Not only is this survey requirement excessive in scope, it is unnecessary.  First, paleontological surveys generally are not required to comply with Section 106 of the NHPA.  Second, most of the Project area (approximately 90 percent) is PFYC rank 3, *see* DEIS, pg. 4.8-1, line 37, which BLM characterizes as "moderate."  *See* Instruction Memorandum No. 2016-124, Attachment 1, unpaginated 3 (July 8, 2016).  Specifically, BLM describes "[t]he potential for an

March 12, 2018
Page 29

authorized land use to impact a significant paleontological resource is known to be low-to-moderate." *Id.* In contrast, BLM recommends surveys in PFYC rank 5, where paleontological resources can occur consistently. *Id.* Given the low potential for impacts to paleontological resources throughout most of the Project Area, the DEIS's requirement for paleontological surveys throughout the Project Area is overly broad and unjustified. Accordingly, this mitigation measure must be deleted.

       7.     PALEO-2 (Sections 4.8.2.2, 6.5.8)

The operator will suspend all activities in the vicinity of such discovery until notified to proceed by the BLM AO and will protect the discovery from damage or looting. However, the operator may not be required to suspend all operations if activities can be adjusted to be continued elsewhere or otherwise avoid further impacts to a discovered locality.

We suggest revising the second sentence to: "However, the operator <u>will</u> not be required to suspend all operations if activities can be adjusted to be continued elsewhere or otherwise avoid further impacts to a discovered locality." If further impacts to the discovery can be avoided, suspension of operations should not be required.

       8.     RANGE-4 (Sections 4.9.2.2, 6.5.9)

Where deemed necessary, the oil and gas operator will install signage and gates to notify of trespass and secure privately owned wells.

The Operator Group requests that BLM delete this requirement. First, BLM just revised Onshore Order No. 3, and the regulations that replace Onshore Order No. 3 contain specific signage requirements for federal wells and facilities. *See* 43 C.F.R. § 3162.6(b). Additional signage requirements are unnecessary and conceivably could present conflicts with BLM's regulations. Second, an Operator usually negotiates gates and fencing on private lands with the surface owner and memorializes these agreements in surface use agreements. *See* 72 Fed. Reg. 10,307, 10,336 (Mar. 7, 2007). BLM should not interfere with existing contractual arrangements with surface owners or attempt to dictate the terms of future surface use agreements, particularly given the amount of privately owned surface within the Project Area.

       9.     SOIL-1 (Sections 4.12.2.2, 6.5.12)

Soils will be analyzed by a qualified soil scientist prior to disturbance to determine soil characteristics, vegetation composition and ground cover, proposed seed mixtures and application rates, and the need for potential soil amendments.

The Operator Group requests that BLM make several revisions to this mitigation measure. First, this requirement is inappropriately applied to privately owned surface because BLM lacks management authority over such lands. *See* Casper FEIS/Proposed RMP, pg. A-3 ("The private surface is not public land; thus, it is not subject to the planning and management requirements of

March 12, 2018
Page 30

the FLPMA. The BLM has no authority over use of the surface by the surface owner."). BLM should only impose any requirement to collect and analyze soil on federally owned surface. Second, the language stating that soils "will be analyzed by a qualified soil scientist" should be removed. Instead, BLM should require that, at a minimum, the ecological setting, such as soils, vegetation composition, and ground cover, would be evaluated as part of the reclamation planning process. This evaluation could be done onsite or by a remote desktop analysis. Finally, although the mitigation measure requires soil analysis, it does not direct the Operator to submit this analysis and data to BLM or another entity. Any mitigation measure requiring soil analysis should identify where the analysis should be submitted.

        10.     SOIL-3 (Sections 4.12.2.2, 6.5.12)

The upper 12 inches of the soil will be separated, salvaged and used when revegetating disturbed areas.

The Operator Group requests that BLM revise this mitigation measure to read: "All available topsoil, not to exceed 12 inches of topsoil, will be separated, salvaged and used when revegetating disturbed areas. Operators should use care not to mix soils with limiting characteristics (subsoil) with topsoil." Often, 12 inches of topsoil is not available in the Project Area; frequently only four to six inches of topsoil are available, and some locations may even have less topsoil. Topsoil segregation and amount salvaged should be based on individual site characteristics, not arbitrary numbers. Furthermore, an arbitrary requirement to salvage 12 inches of topsoil renders Mitigation Measure SOIL-1 superfluous; an Operator need not undertake the effort of characterizing soil for reclamation potential when Mitigation Measures SOIL-3 imposes a uniform requirement to salvage 12 inches of topsoil.

        11.     TRANS-2 (Sections 4.13.2.2, 6.5.13)

Pipelines will be buried at road crossings. The operator will bury all pipelines crossing county roads to a minimum depth of 5 feet.

The Operator Group requests that BLM revise this Mitigation Measure to clarify that the requirement to bury pipelines only applies to permanent pipelines; BLM should not require temporary pipelines that cross county roads to be buried.

        12.     VEG-1 (Sections 4.14.2.4, 6.5.14)

The OG will organize native seed collection efforts to increase native local seed stock.

The Operator Group requests that BLM remove this Mitigation Measure because it is unreasonably onerous and unnecessary. This requirement raises questions about which entity or entities will be responsible for overseeing quality control, processing, and preservation of seed collection. Furthermore, the University of Wyoming is already engaged in this effort. The Operator Group supports the University of Wyoming's existing efforts to collect native seeds and

March 12, 2018
Page 31

other third-party efforts; however, the requirement that the Operator Group independently undertake a similar effort is unnecessary.

13.    VEG-2 (Sections 4.14.2.4, 6.5.14)

Prior to surface disturbance, the oil and gas operator will arrange for infestations of noxious weeds and invasive plant species to be mapped and submitted to the land manager to develop a treatment plan.

The Operator Group requests that BLM remove this Mitigation Measure because it is unreasonably onerous.  Furthermore, this requirement is inappropriate given the amount of privately owned surface within the Project Area over which BLM lacks management authority.  *See* Casper FEIS/Proposed RMP, pg. A-3 ("The private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner.").

14.    SSPS-2 (Sections 4.14.2.4, 6.5.14)

Known individuals and populations of Ute ladies'-tresses orchid and areas identified as suitable habitat through consultation with the USFWS will be avoided. If potential habitat cannot be avoided, two years of surveys in suitable habitat will be required and consultation with USFWS may be necessary.

This Mitigation Measure uses the term "potential habitat" and "suitable habitat" interchangeably; to avoid confusion, the Mitigation Measure should be revised to use the term "suitable habitat" throughout.

15.    VIS-1 (Sections 4.15.2.2, 6.5.15)

Pinon-juniper and conifer woodlands will be removed only when necessary for construction and operation.  If removal is necessary, edges of any openings will be feathered to mimic the natural characteristics of the landscape.

The requirement to retain pinon juniper conflicts with a mitigation measure to benefit the greater sage-grouse identified later in Chapter 6 to "[r]emove pinon and juniper growth that is encroaching into sagebrush habitat." DEIS, pg. 6-30, line 11.  BLM must revise either Mitigation Measure VIS-1 or the mitigation measure identified in Chapter 6 so that the two measures provide consistent management directives.

16.    WLF-2 (Sections 4.18.1.3, 6.5.18)

All stacks, trenches, and other open structures (including water tanks) will be covered with wildlife enclosure covers and/or wildlife escape ramps will be installed in pits, trenches, and tanks to prevent entrapment and/or drowning.  Any existing or proposed open poles or fence posts will be covered or filled with sand,

Exhibit C to Rebacca Byram Declaration Operator Group Attachment B

March 12, 2018
Page 32

soil, or gravel to prevent entrapment. "Bird cones" will be installed on open-vent stacks.

The requirement to net pits should be revised to exclude fresh water pits. Additionally, the requirement to install bird cones should be revised to include specific details such as the opening size (one inch or less).

17.    WLF-3 (Sections 4.18.1.3, 6.5.18)

If reserve pits or other open pits for storage of water or other fluids are used, they will fenced and covered with netting (properly installed, monitored, and maintained).

The requirement to net pits is inappropriate because it is solely aimed at preventing incidental take of migratory birds. In light of the Solicitor's Opinion No. M-37050 (Dec. 22, 2017), in which the Solicitor determined that the MBTA does not prohibit incidental take of migratory birds, a mitigation measure that prevents such incidental take is unnecessary, arbitrary, and beyond BLM's authority. Accordingly, BLM should remove this requirement. At a minimum, this requirement should be modified to exclude fresh water pits, which do not require fencing or netting.

18.    WLF-5 (Sections 4.18.1.3, 6.5.18)

Noise reduction mufflers will be used on construction equipment, drilling equipment, and other motors/compressor used during drilling and production. Also, temporary walls and distance will be considered for use to reduce sound levels in important habitats.

The requirement that temporary walls "will be considered" to reduce sound levels should be eliminated because it is vague and unjustified. The mitigation measure provides no direction as to when temporary walls should be used or for which "important habitats." Without more guidance, the mitigation measure will be applied unnecessarily and inconsistently. Furthermore, this general requirement may not benefit wildlife. Although activities generating noise may, under certain conditions, have the potential to disrupt normal behavior patterns of wildlife, correlating actual disruption of behavior patterns to noise is extremely uncertain. Further, wildlife may rapidly habituate to noises that they learn do not pose a threat. Temporary walls may also present a collision hazard. Accordingly, BLM should remove this mitigation measure from the FEIS.

19.    MIG-1 (Sections 4.18.2.3, 6.5.18)

When surface-disturbing activities must occur during the avian breeding season (February 1 to July 31), a qualified biologist will conduct nest searches no more than 7 days prior to these activities. Active nests will be identified and protected in accordance with applicable BLM, USFS, USFWS and/or the WGRD guidance.

March 12, 2018
Page 33

    This requirement should be removed.  First, the requirement that surveys occur only seven days before surface disturbing activities is overly restrictive and could impede or unnecessarily delay development.  Second, the DEIS does not define an "active" nest.  Currently, the Casper Field Office will deny requests for exceptions to raptor timing stipulations even though a survey determines the nest is unoccupied.  Third, to the extent this mitigation measure is intended to protect raptors, the procedures for and timing of surveys can be refined through the RMP amendment process proposed above.  To the extent this mitigation measure is intended to protect migratory birds other than raptors, *see* DEIS, pg. 4.18-33, lines 34–35 ("the following additional mitigation measures would be applied to further minimize impacts to migratory birds and habitats"), this restriction is unnecessary.  The Casper RMP does not afford migratory birds other than raptors any heightened management.  Furthermore, because the MBTA does not prohibit incidental take of migratory birds, *see* Solicitor Opinion No. M-37050 (Dec. 22, 2017), general mitigation measures to limit impacts to migratory birds are unnecessary.

    20.    MIG-1 (Sections 4.18.2.3, 6.5.18)

Disturbance within portions of the CCPA that are identified by federal or state wildlife management agency biologists as located in forest and woodland habitat areas will be avoided. Downed woody debris greater than 3 inches in diameter (not including merchantable timber) will be left in place.

    This mitigation measure should be removed.  BLM has not justified this measure, which calls for avoidance in areas identified as forest and woodland habitat areas.  Additionally, this measure is vague because BLM has not mapped these areas in the DEIS.  This measure leaves BLM with significant discretion and may result in the arbitrary identification of areas to be avoided.  Identifying avoidance areas after the ROD is signed could prevent an operator from exercising valid existing lease rights.

    21.    SSWS-1 (Sections 4.18.3.3, 6.5.18)

A vehicle speed limit of 15 mph will be implemented on roads without posted speed limits in areas of occupied sage-grouse habitat.

    This mitigation measure should be modified to increase the speed limit to 25 miles per hour, which is the generally accepted speed limit in the oil field.  Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document.

    22.    SSWS-2 (Sections 4.18.3.3, 6.5.18)

A Raven Management Plan will be developed that outlines active adaptive management strategies for controlling raven predation and nesting with the CCPA, including the post construction monitoring for ravens and removal of raven nests.

March 12, 2018
Page 34

The Operator Group requests that BLM remove this mitigation measure, for several reasons. First, ravens are not an issue in this part of Wyoming. Indeed, Chapter 3 of the DEIS does not address or even mention impacts of ravens on other wildlife. Second, ravens are protected under the MBTA and therefore cannot be purposefully killed or taken. Third, development of a raven management plan would be an onerous undertaking with no benefit given that ravens are not an issue in this part of Wyoming. Fourth, the removal of raven nests will be ineffective because raptors and ravens can use the same nests. Fifth, BLM's RMP amendments for the greater sage-grouse did not identify the development of a raven management plan as a necessary mitigation measure for the greater sage-grouse. *See generally* Wyoming 9-Plan RMPA. Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document. Finally, this mitigation measure appears to value sage grouse over ravens—that is a subjective value judgment regarding one avian species over another—one special status species (sage grouse) and one an MBTA-protected species (raven).

23.    SSWS-3 (Sections 4.18.3.3, 6.5.18)

Bird diverters/markers will be installed on fencing in PHMA.

The Operator Group requests that BLM remove this mitigation measure. Given that BLM spent years revising its RMPs to incorporate greater sage-grouse conservation measures and did not identify this measure, BLM should not now attempt to impose it in a project-specific NEPA document. Furthermore, the mitigation measure does not specify whether markers must be installed on fencing around well pads and facilities or on any fencing in PHMA. Because 90 percent of the surface estate within the Project Area is privately owned, an Operator may lack the authority to mark fences.

24.    SSWS-5 & SSWS-6 (Sections 4.18.3.3, 6.5.18)

A 0.25-mile no surface use buffer will be maintained in any areas identified as occupied special status bat roosts.

Any areas where herbicides would be used for vegetation treatment will be searched for bat roosts prior to spraying and a 0.5 mile no-spray buffer will be established around roost sites.

BLM should either clarify or remove these mitigation measures. Because BLM has not mapped the locations of known special status bat roosts, the Operator Group cannot assess the impacts of these mitigation measures on their operations or assess the feasibility of implementing them. BLM should either provide maps of bat roosts to the Operator Group or remove these requirements.

Additionally, the mitigation measure requiring searches prior to herbicide spraying is overly broad and vague. Because bat roosts are not widespread in the Project Area, BLM should

March 12, 2018
Page 35

limit the areas to be searched to areas that BLM defines as potential bat roosting habitat. Additionally, this measure should specify the size of the area to be searched.

## VII.    BLM Should Update Water Usage Information in the DEIS

The FEIS should account for updated information regarding water usage. The DEIS assumes that approximately 6.5 to 16.0 acre feet of water per well would be required during drilling and completions. DEIS, pg. 2-27, lines 35–36. These figures are based on estimates of water usage the Operator Group provided BLM in 2014. Due to technological and operational changes in development, however, these figures may under-estimate future water usage. The Operator Group anticipates that water usage may be 50 percent to 100 percent more than originally estimated. The increased volumes are due to operators developing with longer lateral wells and using larger water volumes during well completions.

Although the FEIS should account for the additional water volumes and analyze the impact of increased water usage, the Operator Group anticipates the increased volumes will not result in additional impacts that differ in nature or magnitude than the impacts already analyzed in the DEIS because the increased volumes will not materially change the amount of groundwater that will be withdrawn. The Operator Group anticipates relying on additional sources of water, namely through recycling of flowback water and leasing supplemental water from the North Platte River.

Notably, disposal volumes are not expected to increase from the estimates currently within the DEIS as recycling of flowback water is expected to become prevalent in the play. It is also anticipated that recycling of produced water will become economic at some point in the execution of the project but the timing and volume of recycling cannot be predicted. *See* DEIS, pg. 2-27.

Consistent with the increased water volumes, BLM should make the following changes to the DEIS:

- Section 4.16 states: "Groundwater would be the primary source for the proposed development's water needs." DEIS, pg. 4.16-2, line 10. This statement should be changed to account for additional water sources.

- Sections 2.2.2.4 and 2.4.3.4, DEIS pgs. 2-12, 2-27, should state that recycling of flowback water and supplemental water from the North Platte River are additional sources for completion water.

- Sections 2.2.3.4 and 2.4.4.3, DEIS pgs. 2-13, 2-29, should state that recycling of flowback water is anticipated in the play.

Finally, the FEIS must recognize groundwater well permitting is the responsibility of the State Engineer. The DEIS states that "to prevent drawdown of 10 feet or greater reaching any existing water wells, any proposed new well would need to be located 2,000 feet or greater from existing wells." DEIS, app. E, pg. E-78. Potential impacts to surrounding water wells falls under the jurisdiction of the State Engineer. Presenting modeling results is appropriate in an EIS.

March 12, 2018
Page 36

Assessing the impact of noted drawdown effects and potential permitting requirements or mitigations associated with potential drawdown effects are within the jurisdiction of the State Engineer, not BLM.

## VIII.  BLM Must Modify Alternative C and the Alternatives Excluded from Detailed Analysis.

BLM must modify Alternative C or add to the alternatives excluded from detailed analysis because it is infeasible and unreasonable.  NEPA requires BLM only to consider "reasonable" alternatives, or those that meet the purpose and need of the proposed action and that are technically and economically practical or feasible.  43 C.F.R. § 46.420(b); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027, Question 2a (Mar. 23, 1981).  An alternative is reasonable if it is "objectively feasible" and reasonable in light of the agency's objectives.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011).  Further, the agency's purpose and need for the proposed action necessarily "delimit the universe of the action's reasonable alternatives."  *Id.* (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991)).  To ensure a project applicant's proposal receives adequate consideration, federal courts and the Department of the Interior's NEPA regulations recognize that when a private party submits a proposal or application, agencies are required to consider the needs and goals of the project applicant in formulating the purpose and need statement.  *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72; *Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 608 F.3d 709, 715 (10th Cir. 2010); 43 C.F.R. § 46.420(a)(2).  As the United States Supreme Court has explained, "Congress did expect agencies to consider an applicant's wants when the agency formulates the goals of its own proposed action.  Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).

With respect to the DEIS, numerous elements of Alternative C are unreasonable because they are infeasible or outside of BLM's authority.  If BLM elects to retain any elements of Alternative C that are outside of BLM's authority, *see* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 2b), the FEIS must affirmatively recognize that BLM lacks the authority to adopt these elements.

### A.    BLM May Not Limit the Use of Exceptions as Proposed under Alternative C.

BLM lacks authority to limit approvals of exceptions to timing stipulations as proposed under Alternative C.  Under Alternative C, BLM proposes to only allow exceptions to timing stipulations "for short-term uses for emergencies or to finish tasks."  DEIS, pg. ES-5, line 36; pg. 2-36 lines 11–12.  This limitation is inconsistent with both BLM's regulation governing modifications and waivers and the Casper RMP.

BLM's limitation on the use of exceptions, modifications, and waivers is arbitrary and capricious because it is inconsistent with 43 C.F.R. § 3101.1-4, which allows waivers, which

March 12, 2018
Page 37

include exceptions, (1) "if [BLM] determines that the factors leading to [the stipulation's] inclusion in the lease have changed sufficiently to make the protection provided by the stipulation no longer justified, or (2) "if proposed operations would not cause unacceptable impacts."  The two allowable grounds for exceptions identified under Alternative C are far narrower than the grounds identified in 43 C.F.R. § 3101.1-4.  BLM cannot read new requirements into its regulations without formally amending them.  *See Christensen v. Harris County*, 529 U.S. 576, 6588 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").  Accordingly, BLM's limitation on exceptions under Alternative C is arbitrary and capricious.  *See Lewis v. Babbitt*, 998 F.2d 880, 882 (10th Cir. 1993) (stating an agency's interpretation of its regulations will be set aside as arbitrary and capricious if "inconsistent with the regulation's plain meaning") (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 738 (10th Cir.1993)).

Additionally, the limitation on exceptions is inconsistent with the Casper RMP.  The Casper RMP expressly allows exceptions to seasonal restrictions "if the BLM, in consultation with the WGFD, feels that granting an exception would not jeopardize the wildlife population being protected."  Casper RMP, pg. F-1.  The Casper RMP then details at length the factors BLM should consider when determining whether to grant an exception request.  *See id.* pgs. F-1 – F-2.  The Casper RMP does not limit exceptions "for short-term uses for emergencies or to finish tasks."  BLM cannot impose new exception criteria within the Casper Field Office that do not conform to the Casper RMP.  *See* 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).  Accordingly, BLM may not adopt the limitation on exceptions in Alternative C.

Because BLM may not adopt the limitation on exceptions outlined in Alternative C, it is not a reasonable alternative and therefore must be removed from Alternative C as analyzed in the FEIS.  If BLM retains this limitation for the purpose of analysis in the FEIS, BLM must acknowledge and consider that it lacks the authority to implement this limitation.  *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 2b).

B.    BLM May Not Direct Reclamation on Privately Owned Surface.

Page 2-40, lines 35–38, the DEIS states that on split estate lands, "interim and final reclamation would be required to comply with BLM or USFS policy and land use plan requirements for suitable wildlife habitat (i.e., pre-disturbance baseline conditions)."  BLM cannot require reclamation beyond landowner preference and any relevant terms of a surface use agreement.  BLM has recognized that "[t]he private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner."  Casper FEIS/Proposed RMP, pg. A-3.  Indeed, the Gold Book recognizes that revegetation will occur at the direction of the surface owner.  *Gold Book* 44 (2007) ("Native perennial species or other plant materials specified by the surface management agency or private surface owner will be used.").  Accordingly, this requirement must be removed from Alternative C.

Exhibit C to Rebacca Byram Declaration Operator Group Attachment B

March 12, 2018
Page 38

C.    The Required Design Features Identified in Alternative C Are Infeasible.

The design features identified in Alternative C are infeasible and must be revised.  In particular, the requirements to install oil gathering pipelines, water pipelines, and water recycling for all completion and production activities by year five of the Project are not feasible.  *See* DEIS, pg. ES-5, lines 42–45; pg. 2-39, lines 44–45; pg. 2-40, lines 1–4, 6–7, 20–21.  Although the Operator Group anticipates that water recycling will be used more widely over the lifetime of the Project, use of recycled water for all completion and production activities by year five of the Project is not feasible.  A myriad of factors beyond BLM's and the Operator Group's control, such as technological limitations, economic feasibility, commodity prices, and availability of equipment and crews, prevent the Operator Group from committing to these measures by year five of the Project.

NEPA only requires BLM to analyze "reasonable" alternatives to a proposed action.  40 C.F.R. § 1502.14(a); 43 C.F.R. § 46.415(b).  Reasonable alternatives "that are practical or feasible from the technical and economic standpoint."  Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) (Question 2a).  Because the required design features in Alternative C are not feasible, BLM must eliminate them from further detailed study in the FEIS.  *See* 40 C.F.R. § 1502.14(a).

D.    Management of Trails under Alternative C is Inconsistent with the Casper RMP.

Under Alternative C, BLM proposes to prohibit surface development along segments of the Child's Cutoff of the Oregon-California National Historic Trail, the Bozeman Trail, and the Rock Creek to Fort Fetterman Stage Route within the Project Area.  DEIS, pg. 2-38, lines 12–14.  This management is inconsistent with the Casper RMP, which only prohibits surface disturbance on "selected parcels" of the Bozeman Trail; additional parts will be added as inventory and evaluation disclose suitable trail segments.  Casper RMP, pg. 2-48.  Similarly, the Casper RMP only prohibits surface disturbance on selected segments of the Oregon Trail.  *Id.*

BLM's decision to authorize the Project must conform to the Casper RMP.  43 C.F.R. § 1610.5-3.  Accordingly, BLM must remove the proposals to prohibit surface disturbance along segments of the historic trails within the Project Area that do not conform to the Casper RMP from Alternative C.

E.    BLM Must Include Additional Alternatives Considered but Eliminated from Detailed Analysis in Section 2.6.

The Operator Group agrees that BLM appropriately eliminated the alternatives identified in Section 2.6 (pgs. 2-43 – 2-46) from detailed analysis.  BLM's decision to eliminate these alternatives from detail analysis reflects a good-faith effort not to analyze unreasonable, unfeasible, or uneconomic actions.  That said, the Operator Group recommends that BLM add to the list of alternatives considered but eliminated from detailed analysis the proposal in Alternative C to limit exceptions to timing stipulations and the design features required under Alternative C, for the reasons described above.

March 12, 2018
Page 39

## IX.    Comments on Chapter 1

Page 1-6, lines 19–21, identifies *BLM Greater Sage-grouse Land Use Plan Amendment ROD for the Rocky Mountain Region (BLM 2015b) and Approved Resource Management Plan Amendment for the Wyoming Greater Sage-grouse Sub-region (Attachment 4 to BLM 2015b)* as a document containing land use decisions for federal lands and minerals within the Project Area. The FEIS must note that this plan is being reviewed in accordance with Secretarial Order No. 3353 (June 7, 2017) and Instruction Memorandum No. 2018-026 (Dec. 12, 2017). *See* 82 Fed. Reg. 47,248 (Oct. 11, 2017) (BLM Notice of Intent); 82 Fed. Reg. 50,666 (Nov. 1, 2017) (errata); 82 Fed. Reg. 55,346 (Nov. 21, 2017).

Additionally, the Operator Group encourages BLM to provide in Chapter 1 more explanation as to the programmatic nature of the EIS for the Project. As BLM is aware, programmatic NEPA documents will streamline site-specific reviews and approvals once proposed. "[W]hen a 'programmatic EIS is sufficiently detailed, and there is no change in circumstances or departure from the policy in the programmatic EIS, no useful purpose would be served by requiring a site-specific EIS.'" *S. Utah Wilderness Alliance*, 123 IBLA 302, 307 (1992) (quoting *Ventling v. Bergland*, 479 F. Supp. 174, 180 (D. S.D. 1979)). Indeed, the CEQ's NEPA regulations "encourage[ ]" tiering of site-specific reviews to broader EISs. *See* 40 C.F.R. § 1502.20. BLM should also note that the pace, timing, and amount of development will depend on economics, production success, engineering technology, pricing, rig availability, regulatory approvals, and corporate strategies.

Consistent with the programmatic nature of the Project, the FEIS and ROD also should afford flexibility for implementation of the Project. As a practical matter, the Project analyzed in the EIS will adapt over time. The EIS contemplates development over 10 years; during this time, technological changes may cause Operators to adjust how they develop the Project Area. Operators may be able to apply different technology or techniques to achieve the same results with fewer impacts. Similarly, site-specific conditions may require adjustments to how the Project is implemented for individual approvals.

The FEIS, once issued, will remain valid so long as the impacts of development remain of the same nature and intensity as the impacts analyzed in the EIS. *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 374 (1989) ("[i]f there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared"); *accord* 40 C.F.R. § 1509.2(c). The ROD should recognize that implementation of the Project may shift or vary for a variety of reasons, such as technological changes or site-specific conditions, and afford the necessary flexibility to accommodate such advancements consistent with the scope of impacts analyzed in the FEIS.

## X.    Comments on Chapter 2

Page 2-3, tbl. 2.2-1, lists the following Required Design Feature (RDF) for Reclamation Activities as identified in the Wyoming 9-Plan RMPA for the greater sage-grouse: "Address post-

March 12, 2018
Page 40

reclamation management in reclamation plan such that goals and objectives are to enhance or restore sage-grouse habitat." The RDF contained in the Wyoming 9-Plan RMPA contains inconsistent language with respect to reclamation. The excerpted language appears in the list of RDFs that apply in General Greater Sage-Grouse Habitat and requires a reclamation plan with goals and objectives to "enhance or restore" sage-grouse habitat. *See* Wyoming 9-Plan RMPA, at 134. The list of reclamation RDFs, however, contains a requirement to "[a]ddress post-reclamation management in reclamation plan such that goals and objectives are to protect and improve sage-grouse habitat needs." *Id.* at 131 (emphasis added). BLM must clarify this discrepancy. Furthermore, reclamation plans may appropriately have goals and objectives designed to improve habitat but reclamation plans should not obligate Operators to "restore" habitat where no such habitat previously existed.

Page 2-12, lines 6–7, states that, under all alternatives, "[a]ll flaring would occur at a distance from the wellhead that protects equipment, structures, and personnel." The Operator Group recommends using an API standard to define the appropriate distance from the wellhead. Although the language of the DEIS allows flexibility, it also may lead to greater risk of fire/explosion or other incidents related to flare placement too close to wells and facilities. Using an API standard would encourage safe practices.

Page 2-13, lines 18–19, states, "Some workover operations may be subject to timing restrictions." The Operator requests that BLM clarify which workover operations would be subject to timing restrictions and which timing restrictions would apply. The Operator Group maintains that timing restrictions should not apply to workover operations, particularly timing restrictions for migratory birds and particularly if operators submit requisite notice to BLM (Form 3160-5) and provide additional information if surface disturbance increases during workover operations.

Page 2-36, lines 14 – 20, explains that approximately 15 to 20 percent of lands in the Project Area would be subject to timing limitations on federally managed lands. BLM based this figure on the percentage of federal APDs that were subject to timing limitation stipulations across the nation. The Operator Group disagrees with BLM's methodology. The Operator Group modeled hypothetical well pad locations within several drilling and spacing areas within the Project Area and analyzed their locations in relation to buffers around known raptor and greater sage-grouse leks. Based on this analysis, the Operator Group estimates that 45 percent of well pads within the Project Area will be within raptor nest and greater sage-grouse buffers. Of these well pads, however, many will be located on non-federal surface and located off the federal oil and gas lease (fee-fee-fed); therefore, BLM cannot impose timing limitations stipulations on all wells drilled from these pads. The Operator Group cannot, however, precisely determine the percentage of wells that will be drilled from the 45 percent of well pads within timing stipulation buffers. Nonetheless, to provide more accurate and site-specific information, the Operator Group requests that BLM revise its analysis of the amount of land within the Project Area that would be subject to timing limitation stipulations.

Page 2-39, lines 33–35, states, "At the Notice of Staking/APD stage, the BLM would require all development over Federal mineral estate to be located outside of a 0.25 mile setback from occupied dwellings and structure." This setback is not a term of the Casper RMP. Further,

March 12, 2018
Page 41

it conflicts with the setback required by the Wyoming Oil and Gas Conservation Commission, which currently is 500 feet from an occupied structure. Accordingly, the Operator Group requests this setback requirement be removed from the FEIS.

## XI.    Comments on Chapter 3

### A.    Resources of Native American Concern

Section 3.2.1 uses the term "resources of Native American concern." The Operator Group requests that BLM clarify the resources that it considers "of Native American concern." This term is not a term found in BLM regulations or guidance and is not a term of art associated with cultural resources laws or guidance. The DEIS Glossary also does not define this term. Section 3.2.1 vaguely defines "resources of Native American concern" as resources "identified through tribal consultation as being culturally sensitive." DEIS, pg. 3.2-20, lines 21–22. Section 3.2.1 states that resources of Native American concern "include Indian Sacred Sites, properties of traditional religious and cultural importance, and [traditional cultural properties (TCPs)]." The DEIS is unclear, however, whether "resources of Native American concern" are limited to Indian Sacred Sites, properties of traditional religious and cultural importance, and TCPs, or whether "resource of Native American concern" include any resources identified through consultation as being "culturally sensitive." This distinction is critical to understanding management within the Project Area. For example, Mitigation Measure CR-4 requires tribal monitoring of certain activities within areas most likely to contain "resources of Native American concern" that BLM proposes to include in Sections 4.2.2.4 and 6.5.2. Additionally, the DEIS states that resources of Native American concern will be avoided, minimized, and mitigated. *See* DEIS, pgs. 4.2-7, lines 10–17.

BLM must define "resources of Native American concern" in the FEIS. Furthermore, BLM should limit the definition of "resources of Native American concern" only to Indian Sacred Sites, properties of traditional religious and cultural importance, and TCPs. The Operator Group understands the practical need for a single term to encompass resources that are concretely defined in existing law or policy. BLM should not, however, define "resources of Native American concern" to include any resources identified through consultation as being "culturally sensitive." Such a definition is highly subjective and, therefore, inappropriate for inclusion in a NEPA document. Accordingly, the Operator Group requests that BLM (1) define "resources of Native American concern" and (2) limit this definition only to Indian Sacred Sites, properties of traditional religious and cultural importance, and TCPs.

### B.    Migratory Birds & Raptors

#### 1.    Migratory Bird Treaty Act

The discussions of the MBTA on page 3.18-18, lines 9–25, and Executive Order No. 13,186, 66 Fed. Reg. 3,853 (Jan. 17, 2001), on page 3.18-18, lines 26–36, must acknowledge Solicitor Opinion No. M-73050 (Dec. 22, 2017), in which the Solicitor of the Interior determined that the MBTA does not prohibit incidental take of migratory birds. In particular, the discussion

March 12, 2018
Page 42

of the definition of "take" as defined by regulation at lines 18–20 must acknowledge the recent Solicitor Opinion.

It is worthwhile to note that Chapter 3 includes an extensive discussion of migratory birds. *See* DEIS, pgs. 3.18-17 – 3.18-36. The Casper RMP, however, only imposes heightened management of raptors and other specific migratory birds, not migratory birds generally.

      2.      Definition of "Occupied" Nests

Page 3.18-24, lines 30–33, defines an "occupied" raptor nest as a nest "that is repaired or tended in the current year by a pair of raptors (Romin and Muck 2002). The presence of raptors (adults, eggs, or young), evidence of nest repair or marking, freshly molted feathers or plucked down, or current year whitewash all are considered signs suggesting nest site occupancy."

BLM's use of the term "occupied" in Chapter 3 is inconsistent with the BLM's characterization of raptor nests in Chapter 4 of the DEIS. Throughout Section 4.18 in Chapter 4 of the DEIS, BLM refers to "active" raptor nests rather than "occupied" nests:

> ➢ Page 4.18-11, line 10: "Additionally, not all raptor nests and greater sage-grouse leks are <u>active</u> every year."

> ➢ Page 4.18-15, lines 11–13: "This alternative includes the potential for year-round development with regard to timing stipulations for <u>active</u> raptor nests and greater sage-grouse breeding habitat that otherwise provide protection to other seasonal wildlife habitats."

> ➢ Page 4.18-33, lines 38–39: "<u>Active</u> nests will be identified and protected in accordance with the applicable BLM, USFS, USFWS, and/or the WGFD guidance."

> ➢ Page 4.18-34, lines 4–5: "Natural areas would be maintained between human activity and around the <u>active</u> nest (landscape buffer)."

> ➢ Page 4.18-35, lines 18–19: "Alternative B includes the potential for year-round development if exceptions are granted for timing limit stipulations in the vicinity of <u>active</u> raptor nests."

> ➢ Page 4.18-60, lines 36–37: "Additionally, not all raptor nests and greater sage-grouse leks are <u>active</u> every year."

Additionally, the TBNG LRMP refers to "active" nets. *See* DEIS, pg. 4.18-35, tbl. 4.18-16.

The Operator Group requests that BLM revise the reference to "occupied" nests in Chapter 3 to "active" nests. Additionally, the Operator Group requests that BLM modify the definition set forth in Chapter 3. The Casper RMP does not define "occupied" or "active" raptor nests for the purpose of administering raptor timing stipulations and, therefore, BLM has flexibility to

March 12, 2018
Page 43

reasonably define "active." Through discussions with the United States Fish and Wildlife Service (USFWS) related to the Umbrella Migratory Bird Conservation Plan, the Operator Group understands that the following definitions of "active" and "inactive nests" are acceptable: "a nest that contains viable eggs or chicks is **Active**, while a nest that does not contain viable eggs or chicks is **Inactive**." Given that both the Operator Group and the USFWS have identified an acceptable definition, the Operator Group requests that BLM replace the definition of "occupied" in Chapter 3 of the DEIS with the definitions of "active" and "inactive.

> 3. Migratory Bird Breeding Seasons

Page 3.18-35, lines 35–40, states:

> Many migratory bird species are sensitive to disturbance during the breeding season. During the breeding season, the integrity of the nest and foraging habitat used by adult birds is crucial to survival of young. In addition, young birds are at greater risk of predation during the nestling period and immediately post-fledging, when their motor skills and foraging behaviors are developing. Consequently, the majority of measures to protect birds involve avoidance of construction activities in the immediate vicinity of nests to reduce potential impacts during the breeding season.

This language does not delineate whether construction and other activities would impact active versus inactive nests. Impacts would only be felt on active nests and language should be amended as such.

> C. Greater Sage-Grouse

On page 3.18-51, lines 9–13, the DEIS explains that applicants for activities in PHMA must demonstrate the activities will not exceed density and disturbance calculations. Both Wyoming Executive Order No. 2015-7 and the BLM 9-Plan RMPA, however, recognize valid existing rights within core areas and PHMA and provide processes for accommodating Operators' valid existing rights. *See* Wyoming Exec. Order No. 2015-7 (July 29, 2015), attachment B, pg. 4; *see, e.g.*, Wyoming 9-Plan RMPA, pg. 28. The DEIS should make clear that, in some instances, Operators have valid, existing rights that predate core designations under Wyoming Executive Orders or the designation of PHMA that will be honored.

## XII. Comments on Chapter 4

> A. Air Quality Impacts

> 1. Near-Field Modeling: Hazardous Air Pollutants

Regarding the reference to exposure analysis on page 4.1-5, exposure analysis adjustment factors for maximum exposed individual and maximum likely exposure are based on older

March 12, 2018
Page 44

Environmental Protection Agency (EPA) methodology (1993).[9]  Current exposure analyses are generally done with more advanced exposure assessment models, such as the Hazardous Air Pollutant Exposure Model (HAPEM) and the Air Pollutants Exposure Model (APEX).  While the Operator Group does not believe additional modeling is required for this analysis, we recommend noting that more advanced exposure assessment models would likely show lower risks, particularly for sparsely populated areas like the Converse County study area.

Additionally, with respect to the discussion of estimated cancer risks on page 4.1-5, lines 10–15, the Operator Group disagrees with the use of an overly conservative one in a million cancer risk increment in the BLM's Near Field Modeling.  Unlike criteria pollutants, air toxics have no pre-defined risk levels that clearly represent acceptable or unacceptable thresholds.  However, EPA has made case-specific determinations for particular regulatory programs.  EPA's 1989 National Emission Standard for Hazardous Air Pollutants (NESHAP) rule set up a two-step, risk based decision framework for the NESHAP program.  This rule and framework are described in EPA's 1999 Residual Risk Report to Congress.[10]  The rule sets an upper limit of risk acceptability at 100 in a million lifetime cancer risk for the most exposed individual.  EPA's criteria also consider other health and risk factors (e.g., chronic hazard index) to complete an overall judgement on air toxics acceptability.  EPA typically uses a chronic hazard index (maximum concentration/chronic reference exposure level) value of 1 as its impact threshold.  Chronic hazard index values for the Converse County project are well below 1 for all air toxics (formaldehyde is the highest at 0.21).  EPA would generally find a chronic hazard index of less than 1 in conjunction with less than 100 in a million lifetime cancer risk to be an acceptable level of risk.  We thus recommend the use of a 10 in a million benchmark, which is typically used as a benchmark level to warrant considering additional mitigation measures.

Use of a one in a million cancer risk increment appears to the driving factor in BLM's application of a two-kilometer (km) setback distance for the gas plants and compressor stations from residences.  The Operator Group recommends use of a still-conservative ten in a million increment and subsequent reduction in this setback distance.  Please also note that Wyoming Department of Environmental Quality (DEQ) can require changes to stack heights for gas plants and compressor stations during permitting; addressing the issue of cancer risk at the DEQ permitting stage is current standard practice, and is more appropriate then application of a blanket two-km setback distance.  The Operator Group also notes that gas processing plants and compressor stations are not typically located within one mile of each other.  If such a necessity arose during development, site specific permitting and near field modeling would be performed as part of DEQ's New Source Review Program.  This analysis is required prior to start of construction and would include the risk assessment.

---

[9] U.S. Environmental Protection Agency (USEPA). 1993. USEPA, Superfund Standard Default Exposure Factors for Central Tendency and Reasonable Maximum Exposure, Report, Research Triangle Park, North Carolina. Published in Federal Register, U-007-307.18, March 5, 1993.
[10] U.S. Environmental Protection Agency (USEPA). 1999. USEPA, Residual Risk Report to Congress. EPA-453/R-99-001, March 1999. Available online at: https://www.epa.gov/sites/production/files/2013-08/documents/risk_rep.pdf.

March 12, 2018
Page 45

2.    Emission Control Measures

EPA fuel standards require the use of ULSD fuel construction and reclamation heavy equipment. Please note in Table 4.1-1, Emissions Control Measures, on page 4.1-2 that use of ULSD fuel is a control measure. The BLM does not appear to have included use of ULSD in project emissions inventory or modeling, and the Operator Group requests the document clearly state that use of this fuel during construction and reclamation would reduce Project emissions compared to the scenarios BLM presents in the Draft EIS.

Additionally, BLM must revise Table 4.1-1 on pages 4.1-2 – 4.1-3 to clarify the 98 percent control requirement applies only to pneumatic pumps. Although pneumatic pumps are subject to the 98 percent control requirements, pneumatic controllers are required to be low-bleed or intermittent vent; high-bleed pneumatic controllers are not authorized. The Operators comply with all current DEQ and federal (40 CFR Part 60, Subpart 0000/0000a) requirements, and if regulations are revised for pneumatic controllers in the future, the Operator Group would comply with any new applicable control requirements.

3.    Near-field Modeling

With respect to the discussion on page 4.1-4, air quality background data used in the near field modeling for evaluating National Ambient Air Quality Standard (NAAQS) compliance should be reviewed for possible exceptional events (e.g., a fire in 2015 affecting the Blizzard Heights monitor, see http://wildfiretoday.com/2015/07/page/15/), as well as any other known events with high $PM_{10}$ and $PM_{2.5}$ measurements (e.g., high wind events). This review is needed to ensure that the $PM_{10}$ and $PM_{2.5}$ background concentrations used in the NAAQS compliance evaluation were accurately characterized and evaluated in the Draft EIS.

With respect to Tables 4.1-7 and 4.1-8 on pages 4.1-19 through 4.1-21, the BLM's analysis considered four, 16 well pads in a one square-mile area. As noted by the Operator Group in our memo entitled "AECOM Question for Operator Groups on Near-field Modeling (OG Response Final)," this is not the typical practice for the operators in Converse County, and represents a highly conservative worst-case scenario for emissions. Such a scenario is especially conservative for construction due to the resources needed to drill this number of wells at the same time.

Modeling this unlikely scenario drives the most problematic analysis of the 24-hr $PM_{10}$ exceedance at three times the standard. There is a similar issue with the 24-hr $PM_{2.5}$ emissions, but this is reduced to three percent over the standard when modeled for two simultaneous 16 well pads. The Operator Group is not requesting a revision to the model protocol, but requests clarification in the Final EIS that this scenario is unlikely to occur and therefore represents a worst case.

4.    Regional Modeling Results for Criteria Pollutants

Page 4.1-23, lines 22–24, explains that the CMAQ (regional) cumulative modeling predicts exceedance of the 24-hour $PM_{10}$ NAAQS due to using "large fires in the vicinity of the assessment

March 12, 2018
Page 46

area."  The language "large fires in the vicinity" implies emissions from these events were included every day in the CMAQ modeling.  The Operators Group maintains that the inclusion of wildfire emissions represents a highly conservative assumption.  BLM must include additional explanation in the FEIS of its rationale for including wildfire in the regional cumulative emission inventory.

> 5.      Mitigation and Mitigation Effectiveness

Page 4.1-35, lines 7–9, states that "[m]itigation measure AQ-1 would reduce the potential health risks associated with activities at gas plants, compressor stations, and well pads."  BLM should revise this statement to reflect that AQ-1 does not apply to well pads.  The Operator Group also notes that a 500-foot setback is already required by WOGCC rules.

> 6.      Climate Change

The Operator Group requests that BLM include the following documents in the administrative record that address climate change trends and impacts, which are also attached to these comments.

> ➢ The Climate Change Supplementary Information Report for Montana, North Dakota, and South Dakota;

> ➢ Wyoming Greenhouse Gas Inventory and Reference Case Projections 1990–2020, prepared by the Center for Climate Strategies in 2007 for the Wyoming Department of Environmental Quality;

> ➢ The Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2013 prepared by EPA in 2015;

> ➢ Energy Information Administration's (EIA) Annual Energy Outlook 2006 With Projections to 2030 (Annual Energy Outlook); and

> ➢ Wyoming 9-Plan RMPA FEIS, tbl. 4-4.

> B.      Impacts to Cultural Resources

Page 4.2-7, lines 10 – 13, states that "resources of Native American concern" should be avoided and, if avoidance is not possible, impacts should be mitigated.  "Resources of Native American concern" is not properly defined in the DEIS.  To the extent "resources of Native American concern" generally refers to cultural resources identified through tribal consultation as of concern, no federal law or policy requires avoidance of or mitigation of impacts to such resources.

Page 4.2-10, lines 38–40, states that visual impacts to historic trails warrant compensatory mitigation "because historic trails are single resources, and impacts to specific segments would affect the integrity and NRHP eligibility of the trail as a whole."  This requirement is inconsistent with the Casper RMP and the VRM management of the resource area.  The Casper RMP does not

March 12, 2018
Page 47

require mitigation to offset impacts to trails.  *See* Casper RMP, pgs. 2-47 – 2-48.  Furthermore, the Casper RMP directs that the viewshed along segments that do not contribute to NRHP eligibility would be managed as VRM Class III.  *See id.* at 2-48.  BLM may allow "moderate" changes to the characteristics landscape in areas managed as VRM Class III; activities in VRM Class III-managed areas may attract attention and should repeat the basic elements found in the predominant natural features of the characteristic landscape.  BLM Manual 8431 – Visual Contrast Rating, appx. 2 (Rel. 8-30 Jan. 17, 1986).  The Final EIS must eliminate the reference to compensatory mitigation.

      C.      <u>Impacts to Migratory Birds</u>

Section 4.18.2.2 repeatedly assumes that exceptions to raptor timing stipulations would adversely impact raptors and raptor populations.  Page 4.18-28, lines 17–23, states:

> If exceptions are granted to timing limitation stipulations for raptor nests, it potentially would disrupt breeding activities and success for species that inhabit the CCPA and increase the likelihood of a take occurring from oil and gas activities.  These impacts likely would result in reduced nesting attempts and breeding success for multiple species, reduced recruitment, and incremental reductions in overall local population health and sustainability.  Long-term changes in migratory bird species occurrence and diversity could occur as a result of changes in habitat composition, quality, continuity, and breeding success.

Similarly, page 4.18-60, lines 22–28, states:

> Granting exceptions to timing limit stipulations could adversely impact sensitive wildlife species by causing nest abandonment for raptors or sensitive bird species, sage-grouse nest abandonment or reduced reproductive success, reductions in lek attendance, and displacements from other sensitive seasonal ranges.  These impacts temporarily or permanently would reduce or limit growth of local populations.  In addition, species destruction and abundance would change depending on a variety of factors related to development and reclamation, species-specific tolerance of disturbance, and resilience.

The DEIS overstates the impacts to raptors.  First, to approve an exception, BLM must only demonstrate it will not result it "unacceptable impacts."  43 C.F.R. § 3101.1-4; Instruction Memorandum No. 2008-032 (Nov. 19, 2007), Attachment 1-1.  Second, this analysis ignores that Operators would implement avoidance and minimization measures to mitigate impacts to raptors.  At a minimum, the DEIS must mention that exceptions are only granted if risks are minimized and impacts are "unacceptable."  Third, BLM's analysis overstates the impacts associated with granted exceptions because that activity would likely occur in proximity to unoccupied (inactive) nests.  Finally, BLM's analysis ignores that impacts to raptors vary.  The USFWS Wyoming Ecological Services Field office website[11] notes:

---

[11] https://www.fws.gov/wyominges/Species/Raptors.php

March 12, 2018
Page 48

Buffer recommendations may be modified on a site-specific or project-specific basis based on field observations and local conditions. The sensitivity of raptors to disturbance may depend on local topography, density of vegetation, and intensity of activities. Additionally, individual birds may be habituated to varying levels of disturbance and human-induced impacts. Modification of protective buffer recommendations may be considered where biologically supported and developed in coordination with the Service's Wyoming Ecological Services Field Office.

Given that the Project Area is a landscape where raptors are already accustomed to a certain level of disturbance, BLM cannot assume that any activities within buffer distances will necessarily adversely impact raptors. Given the significant development within the Powder River Basin, raptors as well as many other species have acclimated to the infrastructure and machinery utilized in an oil and gas development program. In a 1993 helicopter overflight study involving red-tailed hawks (Buteo jamaicensis), Anderson et al.[12] found that nine out of 12 birds flushed at a site with no previous experience with helicopter overflights, versus one out of 12 at a site with a history of exposure. Habituation is inferred, and presumed to reduce, the impact of disturbance. Based on this study and other studies such as Knight and Temple, 1986,[13] it can be assumed that effects resultant from infrastructure presence have likely been mitigated through past exposure and acclimation through the region encompassing oil and gas activity in the Powder River Basin. It is important to note that additional disturbances within already altered environments may be less disruptive than disturbances associated with isolated breeding pairs of raptors in unaltered habitats.

For these reasons, the Operator Group requests that BLM revise the discussions of potential impacts to raptors on pages 4.18-28 and 4.18-60 to recognize that (1) exceptions, by definition, will not cause unacceptable impacts; (2) Operators will implement avoidance and minimization measures; (3) exceptions will be granted near unoccupied or inactive nests; and (4) raptors within the Project Area likely have acclimated to human activity.

BLM must also revise the discussion on page 4.18-28 listed above to remove the suggestions that raptor exceptions will increase the likelihood of "take." In Solicitor Opinion No. M-37050 (Dec. 22, 2017), the Solicitor of the Interior determined that incidental take is not prohibited "take" under the MBTA.

D.    Migratory Bird Conservation Plan

Page 4.18-30, lines 1–13, explains:

The OG is working with the USFWS to develop and Umbrella Migratory Bird Conservation Plan to serve as a programmatic guide for the development of site-specific migratory bird conservation plans within the CCPA. The Umbrella

---

[12] Andersen D. E., O. J. Rongstad, and W. R. Mytton 1993. Response of nesting red-tailed hawks to helicopter overflights. Condor 91(2): 296–299.

[13] Knight. R. L. And S.A. Temple. 1995. Wildlife and Recreationists: Coexistence Through Management. In Wildlife and Recreationists: Coexistence Through Research and   Management. R.L. Knight and K.J. Gutzwiller, Eds. Island Press. California. 372 pp.

March 12, 2018
Page 49

Migrations Bird Conservation Plan will address impact identification, avoidance, or minimization for other migratory bird avian species and habitats. The Umbrella Migratory Bird Conservation Plan would be developed as to achieve three primary goals:

- Promote migratory gird conservation throughout the CCPA;

- Allow for greater flexibility for oil and gas activities to occur during the year; and

- Facilitate a collaborative process among Project proponents and regulatory agencies.

The DEIS, however, ignores the purpose of any Umbrella Migratory Bird Conservation Plan, if finalized: to streamline the process of obtaining exceptions from raptor stipulations and allow programmatic year-round development. The DEIS does not explain when site-specific plans may be used or whether they may be used to obtain an exception to a raptor timing stipulation. Finally, BLM's description does not explain that any site-specific migratory bird conservation plans could be used to offset impacts to raptors when exceptions are granted.

E.      Impacts to Greater Sage-Grouse

1.      No Information Suggests the Project Will Lead to Lek Abandonment.

The DEIS improperly suggests that approval of the Project under either Alternative B or Alternative C will lead to lek abandonment. The discussion of "residual impacts" under Alternative B on page 4.18-72, lines 6–7, states that "all sage-grouse leks in the [Project Area] would be at risk of being abandoned as development would continue to increase in surrounding areas." Similarly, the discussion of impacts from Alternative C on page 4.18-78, lines 5–6, states that "all sage-grouse leks in the [Project Area] would be at risk of being abandoned as development would continue to increase in surrounding areas." These statements, however, are not supported by the record. There is no evidence that the well pad density contemplated by the Project will cause lek abandonment. BLM's failure to base its conclusions on adequate support in the administrative record renders environmental analysis deficient. *See Backcountry Against Dumps*, 179 IBLA 148, 161–62 (2010) ("Where, in assessing significant impacts, BLM properly relies on the professional opinion of its technical experts concerning matters within the realm of their expertise, which is reasonable and supported by record evidence, an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the experts.") (citing *Fred E. Payne*, 159 IBLA 69, 77–78 (2003)).

BLM points to the combination of peak male attendance patterns and increased oil and gas activity as justification for its conclusions that leks in the Project Area would be at risk of abandonment. *See* DEIS, pgs. 4.18-72, lines 5–14; pg. 4.18-78, lines 4–6. BLM entirely ignores, however, that development in the Project Area would proceed in accordance with the Wyoming Core Area Strategy. USFWS has determined that the Core Area Strategy "would provide adequate

March 12, 2018
Page 50

protection for sage-grouse and their habitats" in Wyoming if implemented by all land users. State of Wyoming Exec. Order No. 2015-4, pg. 3. Furthermore, when USFWS determined that the greater sage-grouse did not warrant protections under the Endangered Species Act, USFWS stated the Core Area Strategy "has demonstrated its conservation value" and provides "an effective regulatory mechanism for conservation." 80 Fed. Reg. 59,858, 59,882, 59,883 (Oct. 2, 2015). In the DEIS, BLM dismisses the stringent management measures imposed by the Core Area Strategy. Furthermore, BLM dismisses the beneficial elements of the Proposed Action itself that minimize impacts on greater sage-grouse, including use of horizontal wells and multi-well pads. *See id.* at 59,890 (noting that increases in "applications for directional and horizontal drilling permits, which congregate disturbance from multiple wells into one area" represent "a decrease in sage-grouse habitat lost to nonrenewable energy development"). Because BLM offers no support for its conclusion that the Project may cause lek abandonment, and because this conclusion ignores the conservation benefits of the Core Area Strategy, BLM must remove these statements from the FEIS.

Notably, BLM's discussion of Alternative B suggests that exceptions to timing stipulations "within sensitive sage-grouse habitat" could impact lek attendance. *See* DEIS, pg. 4.18-72, lines 10–11. This statement is incorrect because Operators would only seek exceptions to timing stipulations in the two-mile buffer around leks outside of core areas. These areas do not constitute "sensitive sage-grouse habitat." The reference to "sensitive sage-grouse habitat," however, implies that Operators will seek exceptions to greater sage-grouse timing stipulations within core areas when, in fact, the Operator Group has only proposed exceptions outside of core areas. *See* DEIS, pg. 2-25, lines 9–10 ("the operators would request exceptions to timing limitations for raptor nests and greater sage-grouse leks in non-core areas"). Further, any exceptions to greater sage-grouse timing stipulations would occur in accordance with the Core Area Strategy. In the FEIS, BLM must clarify that the Operator Group's Proposed Action only contemplates requests to exceptions to greater sage-grouse timing stipulations outside of core areas.

2. The DEIS Contains Conflicting Information about Surface Disturbance in PHMA.

Page 4.18-62, lines 26–28, states that the five percent surface disturbance threshold imposed in PHMA is currently exceeded in four out of the five PHMAs in the Project Area. Similarly, page 4.18-66, lines 6–7, assumes that new surface disturbance will only occur in one PHMA because disturbance thresholds have been exceeded in the other four PHMAs in the Project Area. These statements conflict with the analysis under Alternative A, which states that thresholds are currently exceeded in three of the five PHMAs. *See* DEIS, pg. 4.18-46. BLM must review the DEIS's analysis of surface disturbance thresholds in PHMA and ensure it is consistent throughout the document.

Page 4.18-66, lines 6–7, states that BLM will only consider new surface disturbance within the M Creek PHMA. This statement suggests that the Operators will not propose new surface disturbance in other PHMAs. BLM, however, must recognize that Operators may hold valid, existing lease rights in other PHMAs that can only be exercised through new surface disturbance in the other PHMAs. For this reason, both Wyoming Executive Order No. 2015-4, the Wyoming

March 12, 2018
Page 51

9-Plan RMPA, and the USFS Greater Sage-Grouse Plan Amendment all allow new development within PHMA or core areas, subject to certain requirements, in order to recognize valid existing rights. BLM must revise the statement at page 4.18-66, lines 6–7, to recognize that new surface disturbance will be allowed in the other PHMAs, subject to additional requirements.

      F.     Residual Impacts

The Operator Group objects to the DEIS's discussions of "residual impacts" and proposals to mitigate residual impacts to certain resources. The DEIS defines a "residual impact" as an "[u]navoidable adverse impact to a resource that remain (sic) after implementation of mitigation has been applied." DEIS, pg. 9-4. BLM's consideration of residual impacts and proposal to mitigate residual impacts for certain resources, *see* DEIS, pgs. 6-28 – 6-30, is inconsistent with NEPA and FLPMA.

NEPA is a wholly procedural statute that only requires the disclosure and analysis of significant impacts. In *Robertson v. Methow Valley Citizens Council*, the United States Supreme Court explained that if the "adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." 490 U.S. 332, 350–51 (1989). Similarly, the Interior Board of Land Appeals has recognized that "[s]ignificant impacts are expected when an agency prepares an EIS." *Western Exploration Inc.*, 169 IBLA 388, 399 (2006). "NEPA does not bar actions which affect the environment, even adversely. Rather, the process assures that decision-makers are fully apprised of likely effects of alternative courses of action so that selection of an action represents a fully informed decision." *Biodiversity Conservation Alliance*, 174 IBLA 1, 13–14 (2008). Accordingly, NEPA does not require mitigation of residual impacts.

Similarly, FLPMA does not require mitigation of residual impacts. FLPMA only requires BLM to prevent unnecessary or undue degradation to the public lands; FLPMA's language contemplates that some degradation may occur that is necessary and due. *See* 43 U.S.C. § 1732(b). Certainly, FLPMA does not limit BLM from approving actions that merely have residual impacts. Furthermore, the Casper RMP developed in accordance with FLPMA contains no requirement that BLM mitigate residual impacts.

Because residual impacts are consistent with NEPA and FLPMA, the DEIS unnecessarily discusses them. The Operator Group requests that BLM revise the discussions of residual impacts to expressly recognize that BLM may approve the Project with residual impacts and has no obligation to mitigate them.

      G.     Impacts to Range Resources

The DEIS wildly overstates potential impacts to range resources from the Project. The DEIS incorrectly estimates that 5,760 Animal Unit Months (AUMs) would be lost on BLM-administered surface and 1,162 AUMs would be lost on USFS-administered surface. *See* DEIS, pg. 4.9-3, tbl. 4.9-2. The Operator Group attributes the overstatement of impacts to at least two errors. Most significant, the DEIS assumes that the Project will result in 28,801 acres of surface

Exhibit C to Rebacca Byram Declaration   Operator Group Attachment B

March 12, 2018
Page 52

disturbance on BLM-administered administered and 4,646 acres of surface disturbance on USFS-administered surface.  *See* DEIS, pg. 4.9-3, tbl. 4.9-2.  The DEIS explains that BLM reached these estimates "based on the total BLM/USFS allotment acreage multiplied by the total proposed disturbance as a percentage of the CCPA."  *Id.*  These assumptions do not comport with the limited amount of federally administered surface in the Project Area.  Only six percent of the Project Area is BLM-administered surface and four percent of the Project Area is USFS-administered surface. *Id.* pg. 1-1.  Presumably, surface disturbance will occur in proportion to surface ownership in the Project Area.  If so, then of the 52,667 acres of surface disturbance that BLM anticipates will occur under the Proposed Action,[14] *see id.* pg. 4.9-3, tbl. 4.9-2, only 3,160 acres would be on BLM-administered surface and 2,107 acres would be on USFS-administered surface.  Accordingly, the DEIS's determination that the Proposed Action will result in approximately 35,000 of surface disturbance on federally owned surface is grossly inaccurate.  Further, using BLM's assumption that the average public acres per permitted AUM is five for BLM-administered surface, *see id.* pg. 3.9-6, tbl. 3.9-1, then 632 AUMs would be lost annually on BLM-administered surface, rather than 5,760 AUMs.  This reduction is less than three percent of all AUMs on BLM-administered surface, not 33 percent as the DEIS estimates.[15]

Additionally, the Operator Group disagrees with BLM's inclusion of lands outside the Project Area to assess impacts to range resources.  The DEIS examined grazing allotments that "intersect" the Project Area.  *See* DEIS, pg. 3.9-5, tbl. 3.9-1.  A spot-check of certain allotments reveals, however, that some of the allotments that BLM characterized as "intersecting" the Project Area, in fact, are mostly outside of the Project Area.  BLM should only evaluate lands within the Project Area to assess impacts to range resources.

## XIII.  Comments on Chapter 5

### A.    Reclamation

Page 5-65, lines 14–17, states that "reclamation under Alternative C would occur as recommended by the BLM and USFS on federal surface as well as on private surface underlain by federal mineral estate (i.e., approximately 64 percent of the CCPA), increasing the opportunity for migratory bird habitats to return to suitable wildlife habitat."  BLM cannot require reclamation beyond landowner preference and any relevant terms of a surface use agreement.  BLM has recognized that "[t]he private surface is not public land; thus, it is not subject to the planning and management requirements of the FLPMA. The BLM has no authority over use of the surface by the surface owner."  Casper FEIS/Proposed RMP, pg. A-3.  Indeed, the Gold Book recognizes that revegetation will occur at the direction of the surface owner.  *Gold Book* 44 (2007) ("Native

---

[14] Notably, the 52,667-acre figure used in section 4.9.2 is surface disturbance that will occur from construction activities.  The DEIS notes that an additional 23,928 acres of surface disturbance will occur from operational activities. *See* DEIS, pg. 2-25, tbl. 2.4-1.

[15] The Operator Group has not performed a similar comparison for AUMs on USFS-administered surface because Tables 4.9-1, 4.9-2, and 4.9-3 all appear to use a different average acre per AUM for USFS-administered surface, which creates confusion as to the appropriate value.

March 12, 2018
Page 53

perennial species or other plant materials specified by the surface management agency or private surface owner will be used."). Accordingly, this requirement must be removed from Alternative C.

      B.    <u>Migratory Birds</u>

      Page 5-65, lines 4–5, states, "Based on the MBTA, additional surveys typically are required in potential or known habitats of migratory birds prior to disturbance during the nesting period." Although a valuable tool used in the pursuit of exception requests and year-round development, surveys are not required under MBTA. Furthermore, because the Solicitor of the Interior has interpreted the MBTA as not prohibiting incidental take of migratory birds, *see* Solicitor Opinion No. M-37050 (Dec. 22, 2017), surveys are not necessary to a violation of the MBTA does not occur. This sentence should be revised.

**XIV.   Comments on Chapter 6**

      A.    <u>Compensatory Mitigation</u>

      Page 6-1, lines 16–18, states, "Any compensatory mitigation enacted on the site-specific proposals must be commensurate to the expected impacts, and demonstrate timeliness and additionality when compared to the action alternatives." This requirement should be removed for several reasons. First, the requirements that mitigation be commensurate to impacts, timely, and additional are elements of BLM policies that have been rescinded by Secretarial Order No. 3360 (Dec. 22, 2017). *See* BLM MS-1794 – Mitigation (Rel. 1-1782 Dec. 22, 2016); BLM H-1794-1 – Mitigation (Dec. 1-1783 Dec. 22, 2016). Second, BLM has recognized it may not require mitigation of off-lease impacts to privately owned surface. *See* Instruction Memorandum No. 2009-078 (Feb. 20, 2009).

      Page 6-1, lines 32–34, references Mitigation Handbook H-1794-1, and page 6-2, lines 8–12, reference Mitigation Policy (600 DM 6). Both these documents were rescinded by Secretarial Order No. 3360 (Dec. 22, 2017) and therefore must be removed.

      B.    <u>Goals of the Casper RMP</u>

      Section 6.3 of the DEIS unnecessarily restates the goals and objectives of the Casper RMP and TBNG LRMP. The DEIS's listing of these goals is not relevant to BLM's decision to approve the Project. The Casper RMP identifies management actions that are anticipated to achieve the RMP's goals and objectives. *See* Casper RMP at 2-1 (stating the purpose of the Casper RMP revision is to "[i]dentify management actions and allowable uses anticipated to achieve the established goals and objectives and reach desired outcomes"). BLM's land use authorizations, including approval of the Project, then must conform to these management actions. 43 C.F.R. § 1610.5-3. Given that BLM has identified the management actions necessary to achieve goals of the Casper RMP, BLM should not impose additional compensatory mitigation requirements to achieve the RMP goals.

March 12, 2018
Page 54

    C.    <u>Avoidance Measures</u>

The DEIS proposes to require avoidance of raptor nests within the buffers and times listed on page 6-4, lines 39–40, and page 6-5, lines 1–6.  These buffer distances and seasonal restrictions are required on USFS lands under the TBNG LRMP.  BLM's Casper RMP, however, imposes different buffer distances and timing limitations.  *See* DEIS, pg. 4.18-34, tbl. 4.18-16.  BLM should revise the DEIS to impose buffer distances and timing limitations consistent with the Casper RMP.

## XV.    Comments on Air Quality Technical Support Document

    A.    <u>Attachment A:  HAP Fugitive Emissions at a Gas Plant</u>

The total emissions for Gas Plant fugitives (Table 4-44 HAP Fugitive Emissions at a Gas Plant) do not match what was included in Version 7 of the Emissions Inventory (EI V7), Tab 45b.  Although the individual component emissions match those provided in EI V7, the total provided in Table 4-44 does not equal the sum of those component emissions.  The reference for the emission factors of the individual components ("Oil and Gas Production Facilities Chapter 6, Section 2 Permitting Guidance" [WDEQ 2013]) matches the values used in the Emissions Inventory (values given in reference are per day, values in Emissions Inventory are divided by 24).

Additionally, the fugitive estimates did not include a control efficiency for a leak detection and repair program that will be required for all new facilities under the Federal Regulations (OOOOa).  EPA guidance allows for 96 percent control on gas valves, 95 percent light liquid valve, 88 percent light liquid pump, and 81 percent connectors.[16]

The Operator Group requests that BLM confirm that emissions were entered into Table 4-44 correctly and that the correct emissions total was used in the modeling.  Additionally, BLM must acknowledge the application of the control efficiency means the uncontrolled fugitives represented in the Emissions Inventory are conservative.

    B.    <u>Attachment A:  Fugitive Emission Factors</u>

This comment relates to fugitive emission factors in Tables 4-10, 4-11, 4-43, 4-44, 4-52, and 4-53.  For production fugitive emissions, Leak Detection and Repair programs are required under state and federal regulations (40 CFR Part 60, Subpart 0000a). While the Operator Group does not believe additional modeling is required for this analysis, we recommend noting the application of Leak Detection and Repair programs by Operators.  Application of these programs means the uncontrolled fugitives represented in the Emissions Inventory are conservative.

---

[16] Protocol for Equipment Leak Emission Estimates, EPA-453/R-95/017, Nov 1995.

March 12, 2018
Page 55

## XVI.  Technical Comments

➢ All language and references need to be consistent throughout the document.  The Operator Group requests that BLM review the DEIS for consistent terms and make appropriate revisions.

➢ Page ES-5, lines 34–40:  This section discusses limitations BLM would impose under Alternative C, including limitations on Operators' ability to obtain exceptions to timing stipulations and certain required design features.  Section VIII of these comments objects to these requirements and requests they be removed from the FEIS.  The Executive Summary should be updated in accordance with these changes.

➢ Page 4.2-2, lines 40–42, states, "The qualities that make a cultural resource eligible for the NRHP or important under NEPA <u>dictate</u> the types of impacts and the avoidance, minimization, and mitigation strategies appropriate to address effects to historic properties" (emphasis added).  Because both the NHPA and NEPA impose procedural, rather than substantive, directives, BLM should use the term "guide" rather than "dictate."

➢ Page 4.2-5, line 26, references "Rural Historic Landscapes" but no such landscapes have been identified in the Project Area.

➢ Page 4.7-6, lines 28–30:  There appears to be a typo in the second bullet of this section where it states that impacts would be less under Alternative B.  Although the Operator Group does not necessarily agree with this conclusion, we believe BLM intended the language to state:  "Potential noise impacts to tourists at historic trails and to recreationists such as hunters and dispersed campers would be less under <u>Alternative C</u> because the construction footprint would be 29 percent less than under Alternative B . . . ."

➢ Page 4.18-84, lines 22–23, states, "Compensatory mitigation would not be warranted for greater sage-grouse under Alternative C because disturbance would be prohibited within PHMA."  Alternative C, however, would not prohibit disturbance in PHMA; rather, Alternative C expressly contemplates that some disturbance may occur.  *See* DEIS, pg. 2-39, lines 21–23 ("The Bill and M Creek PHMA are calculated at less than 1 percent disturbance within their respective DDCT areas; therefore, development could occur in those areas."); pg. 2-54, tbl. 2.7-2 (estimating 7,279 acres of disturbance within PHMA under Alternative C).

➢ Page 6-6, lines 34–35, states, "Compensatory mitigation likely would be required if residual impacts were to result in any of the conditions discussed below."  No conditions are listed below, however.  Furthermore, BLM should not require compensatory mitigation for residual impacts.

March 12, 2018
Page 56

## XVII.  Conclusion

The Operator Group appreciates BLM's consideration of these comments.  If BLM has any questions about the information presented in these comments, please contact Kathleen Schroder at katie.schroder@dgslaw.com or (303) 892-7354.

Sincerely,

DAVIS GRAHAM & STUBBS LLP

Kathleen C. Schroder

on behalf of

Anadarko Petroleum Corporation
Chesapeake Energy Corporation
Devon Energy Corporation
EOG Resources, Inc.
SM Energy

KCS:

Enclosures

Exhibit C to Rebecca Byram Declaration Operator Group Attachment C



**ENVIRONMENTAL & STATISTICAL CONSULTANTS**

1610 East Reynolds Street, Laramie, Wyoming 82072
Phone: 307-721-3172 ♦ www.west-inc.com ♦ Fax: 307-721-3815

## TECHNICAL MEMORANDUM

**Date:** August 14, 2019

**To:** Dave Applegate; Anadarko Petroleum

**From:** Chad LeBeau, Victoria Zero, Jason Carlisle, and Eric Hallingstad; Western EcoSystems Technology, Inc.

**Subject:** Review of Converse County Supplemental Draft Environmental Impact Statement, Impacts to Non-eagle Raptors

## BACKGROUND

Anadarko Petroleum Corporation requested that Western EcoSystems Technology, Inc. (WEST) conduct an independent analysis of the Operator Group's (OG) Year-round Development alternative within the Converse County Supplemental Draft Environmental Impact Statement (SDEIS). The OG has developed a method to estimate the impacts of the Year-round Development on non-eagle nesting raptors. This method incorporates a high-level conceptual development plan that includes information from site-specific raptor nest monitoring studies. The non-raptor species found to be nesting within the Project included American kestrel (*Falco sparverius*), short-eared owl (*Asio flammeus*), burrowing owl (*Athene cunicularia*), great horned owl (*Bubo virginianus*), red-tailed hawk (*Buteo jamaicensis*), Swainson's hawk (*Buteo swainsoni*), and ferruginous hawk (*Buteo regalis*). The purpose of this assessment was to review the OG methodology for calculating impacts to active non-eagle raptor species and proposed minimization measures to minimize calculated impacts.

## SUMMARY OF OG-PROPOSED ACTIONS AND OPTIONS

As proposed to the Bureau of Land Management (BLM), the Converse County Oil and Gas Project (Project) contemplates that certain drilling and development operations within the Project area will be conducted on a year-round basis to maximize the efficient construction of multi-well pads with minimal drilling rig mobilizations. To achieve this result, the OG is requesting relief from the non-eagle active raptor nest timing limitation stipulation set forth in the 2007 Casper Resource Management Plan and attached to existing federal oil and gas leases or added as conditions of approval to Applications for Permits to Drill (BLM 2007). The SDEIS examines five options, but we only evaluated Option 3, under which the non-eagle raptor timing limit stipulations would not apply within the Project area if OG applied a set of conservation measures. Some of the OG-

Case 1:22-cv-02696-TSC    Document 20-6    Filed 11/01/22    Page 130 of 139
Exhibit C to Rebacca Byram Declaration Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

committed design features are aimed at minimizing impacts to migratory birds by avoiding contact with development facilities such as reserve pits, artificial ponds, containers, dehydrator tubs, and stacks. Two additional design feature options are proposed regarding operations and active/inactive nests:

1) Commence Oil and Gas Development Activities within the spatial nest buffer either a) in advance of the seasonal buffer period listed in Appendix A of the SDEIS and maintain "Continuous Operations"[1] throughout the seasonal buffer period (or until such Activities are completed) or b) following the conclusion of the applicable seasonal buffer period listed in Appendix A. If a non-eagle raptor nest becomes active while Continuous Operations are occurring within a spatial nest buffer during a seasonal buffer period, it is assumed that the species is tolerant of the surrounding conditions. Hence, if a nest becomes active while Continuous Operations are occurring, the Continuous Operations need not cease because they are presumed to impose negligible, if any, additional disturbance or negative impacts to the active nest.

   Or

2) During an applicable seasonal buffer period as listed in Appendix A of the SDEIS, before Oil and Gas Development Activities can a) commence or b) resume after a break of more than 72 hours of such activities, then the nest must first be determined to be inactive through a monitoring check that occurs within seven days before Oil and Gas Development Activities commence or resume. If the monitoring check reveals the nest is active, Oil and Gas Development Activities cannot commence or resume until the nest becomes inactive. To lessen the overall amount of time for disruption to non-eagle raptors, Continuous Operations will be pursued to the extent practical.

The OG-committed minimization measures and two additional design features were evaluated for their effectiveness at minimizing impacts to breeding non-eagle raptors. In addition, we evaluated the methodology used to estimate impacts to non-eagle raptors.

## REVIEW OF METHODS FOR PREDICTING IMPACTS TO NON-EAGLE RAPTORS

The SDEIS and the OG used various methods to calculate the total expected number of active non-eagle raptor nests that would be impacted by the proposed action. Each of these methods uses site-specific information regarding the use of the Project area by non-eagle breeding raptors; however, there are key differences between the two, all of which are discussed below.

### Key Results

---

[1] "Continuous Operations" is defined as Oil and Gas Development Activities that continue without a break of more than 72 contiguous hours.

Case 1:22-cv-02696-TSC   Document 20-6   Filed 11/01/22   Page 131 of 139
Exhibit C to Rebecca Byram Declaration Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

*SDEIS*: The SDEIS concluded that 45 – 141 active non-eagle raptor nests (4.5 – 14.1 per year) would be impacted during the 10-year development period.

*OG*:  The analysis by OG concluded that 90 active non-eagle raptor nests (9 per year) would be impacted during the 10-year development period. The OG estimated that approximately 28% of well pads are expected to intersect the nest buffer of a non-eagle raptor nest (including active and inactive nests). Assuming 22% of non-eagle raptor nests are active, approximately 6% of well pads are expected to intersect the nest buffer of an active non-eagle raptor nest. It is assumed that 1,500 well pads would be constructed during the 10-year development period.

## Inputs

1. Non-eagle raptor nest locations

2. Nest activity rate

3. Nest buffer distance

## Evaluation of Inputs and Recommended Modifications

1. **Non-eagle raptor nest locations**: The BLM nest dataset contains species information, but the SDEIS and OG analyses appear to treat all non-eagle raptor nests equally. Given that not all species are of equal conservation concern, and given that the BLM recommends species-specific nest buffers (see #3, below), a species-specific analyses could provide a more accurate assessment of expected impacts. Almost half of known nests were assigned to unknown species (SDEIS Table 3.18-1); however, nests of unknown species could be assigned to a species based on the composition of known-species nests (e.g., 52% of known-species nests belonged to ferruginous hawks, so 52% of unknown-species nests could be assumed ferruginous hawk nests). We recommend calculating expected impacts separately for each species.

2. **Nest activity rate**: The SDEIS conservatively assumed that 50% of raptor nests would be active in any given year (SDEIS section 3.18.2, page 3-7). The SDEIS stated that the average non-eagle raptor nest activity rate in the Project area was 22% (SDEIS Table 3.18-5X), and the OG assumed this average nest-activity rate in their analysis (22%). A re-analysis of the nest-activity rates presented in SDEIS Table 3.18-5X that weights each data source's contribution based on the number of nests surveyed suggests the average nest-activity rate was lower (19% instead of 22%). Furthermore, the SDEIS referenced an unpublished study from the adjacent Powder River Basin (referenced as "Ecosystem Research Group, Editors 2015" in the SDEIS) which found raptor nest activity ranged from 12 – 51%, but these values included eagles as well as non-eagle raptors. The unpublished study was later updated to remove nests with potential data-integrity issues and was published after peer review (Carlisle et al. 2018). Table 2s in Carlisle et al. 2018 reports the weighted proportion of nests in use for 12 raptor species during nine years of study adjacent to the Project area. The mean nest-use rate for non-eagle raptor species was 29%. The mean nest-use rate for non-eagle raptor species documented within Converse County (according to SDEIS Table 3.18-1) was also 29%. A weighted mean nest-use rate

Case 1:22-cv-02696-TSC    Document 20-6    Filed 11/01/22    Page 132 of 139
Exhibit C to Rebacca Byram Declaration Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

(with weights proportional to the species composition of nests presented in SDEIS Table 3.18-1) for non-eagle raptor species documented within Converse County (according to SDEIS Table 3.18-1) was 18%. The best available science suggests that the average nest-activity rate of non-eagle raptors in the Project area would likely be approximately one-half or one-third of the 50% value assumed in the SDEIS. The value assumed in the OG (22%) is within the range of nest activity rates according to the best available science. We recommend using species-specific nest-use rates based on the best available science.

3. **Nest buffer distance**: The SDEIS presents a range of expected impacts by assuming each active non-eagle raptor nest has a buffer of either 0.25 or 0.5 miles – the minimum and maximum buffer distances specified by the Casper Field Office (BLM 2007) for non-eagle raptors. We understand that OG assumed all nests would have a 0.5-mile buffer. Based on the species-specific buffer sizes (BLM 2007) and assuming the species composition in the SDEIS (Table 3.18-1), the weighted mean nest buffer size would be 0.41 miles. Moreover, the SDEIS analysis assumed there would be no overlap between non-eagle raptor nest buffers. If nest buffers overlap, the SDEIS method would overestimate the proportion of the Project area within nest buffers. We recommend using species-specific nest buffer distances, and considering the spatial context (i.e., overlap) of nest buffers when calculating the proportion of the Project area covered by nest buffers.

## REVIEW OF POPULATION IMPACTS

The BLM and the OG acknowledge that a number of non-eagle raptor nests are expected to be impacted regardless of the methodology used to estimate the total number. However, viewing these expected impacts in the context of the broader populations of the affected species is necessary to understand how the proposed action will impact non-eagle raptor populations. Sensitive species designations, impacts observed from oil and gas development, and population trend information were used to evaluate the expected impact of the proposed action on non-eagle raptor populations. Based on the known nesting information, American kestrel, short-eared owl, and burrowing owl nests were rarely observed within the Project (e.g., <10), thus populations-level impacts as a result of the development are expected to be minimal based on the data that was included in the DEIS. In addition, great horned owls were observed in relatively low numbers (35) and are not considered a Species of Greatest Conservation Need (SGCN) by the state of Wyoming or considered a Wyoming BLM sensitive species, suggesting they are not of imminent conservation concern (Wyoming Game and Fish Department [WGFD] 2017, BLM 2019). Our review covered red-tailed hawk, Swainson's hawk, and ferruginous hawk populations, as these are BLM or SGCN sensitive species or are considered the most abundant non-eagle raptors in the Project area.

**Status of Populations**

*Ferruginous Hawk*

The Wyoming population of ferruginous hawks is considered to be moderately stressed and moderately vulnerable, and is classified as a Species of Greatest Conservation Need (SGCN) in

the state and a BLM sensitive species (WGFD 2017, BLM 2019). Based on results from Breeding Bird Survey (BBS) data, Partners in Flight estimates the Wyoming population of ferruginous hawks to be 11,000 (95% confidence interval [CI]: 6,200 – 19,000). This represents approximately 10% of the estimated global population of 110,000 birds (Partners in Flight 2019). Trend data from BBS routes in Wyoming from 1966–2015 suggest that the overall population is likely stable; however, results are not conclusive due to data deficiencies (Sauer et al. 2017). Partners in Flight has also developed a ranking system to classify species of concern at multiple spatial scales. This index is made of five factors contributing to a total score that can range from 5 (lowest concern or importance) to 30 (highest concern). Ferruginous hawks are of regional concern (PIF Score = 17) in the Badlands and Prairies Bird Conservation Region (BCR), in which Converse County lies. This is mainly because of their small population size, threats to breeding success, and low relative density (Partners in Flight 2019).

The development of energy resources was identified by the WGFD as the main concern for ferruginous hawks (WGFD 2017). It was noted that what little has been documented on interactions of ferruginous hawks and energy development is from post-construction data, and that more information is needed on impacts before and after development occurs.

### Swainson's Hawk

The Swainson's hawk is also classified as an SGCN in Wyoming "due to extrinsic stressors, and lack of information regarding nesting and current populations within the state" (WGFD 2017). The WGFD's best management practices for this species include "the management of nesting habitat to minimize loss of nesting pairs, avoiding pesticide use in nesting habitats during the breeding season, and maintaining functioning grassland and riparian habitats" (WGFD 2017).

Based on results from BBS data, the Wyoming population of Swainson's hawk is estimated to be 17,000 birds (95% CI: 10,000 – 27,000; Partners in Flight 2019). This represents approximately 2% of the global population of 900,000 birds (Partners in Flight 2019). Trend data from BBS routes in Wyoming from 1966–2015 suggest that the overall population is likely stable, however, results are not conclusive due to data deficiencies (Sauer et al. 2017). Swainson's hawks are not of regional concern (PIF Score = 11) in the Badlands and Prairies BCR (Partners in Flight 2019).

### Red-tailed Hawk

Based on results from BBS data, the Wyoming population of red-tailed hawks is estimated to be 60,000 birds (95% CI: 41,000 – 88,000; Partners in Flight 2019). This represents approximately 2% of the global population of 3,100,000 birds (Partners in Flight 2019). Trend data from BBS routes in Wyoming from 1966–2015 suggest that the overall population is likely stable to slightly increasing (Sauer et al. 2017). Red-tailed hawks are not of regional concern (PIF Score = 11) in the Badlands and Prairies BCR (Partners in Flight 2019), and they have no special status in Wyoming.

**Estimated Impacts to Populations**

Case 1:22-cv-02696-TSC    Document 20-6    Filed 11/01/22    Page 134 of 139
Exhibit C to Rebecca Byram Declaration Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

Red-tailed hawk and Swainson's hawk populations appear to be stable and impacts to these populations from the proposed action with the implementation of minimizations measures are not expected to result in population-level declines. However, the population status of ferruginous hawks, the high breeding concentration within Wyoming, and the sensitivity to anthropogenic disturbance suggest that the number of nests expected to be impacted by the proposed development may lead to population-level declines for this species if minimization measures are not implemented. Below, we evaluate the likelihood of negative impacts on breeding ferruginous hawks resulting from Project development, and describe OG-committed minimization measures that are expected to be implemented to prevent population-level impacts.

Ferruginous hawks are thought to be sensitive to disturbance while nesting (Travsky and Beauvais 2005). Nest abandonment may result from human activities (Travsky and Beauvais 2005), such as would occur during the construction and maintenance of oil and gas wells. Nest use and activity of ferruginous hawks was greater with lower densities of roads and oil and gas development at a relatively small scale (up to 0.8 kilometer [km]; Fuller 2013). On the other hand, established anthropogenic structures, such as gas condensation tanks, may also serve as high-quality nesting habitat in Wyoming (Travsky and Beauvais 2005, Wallace et al. 2016a). In a statewide study of the breeding performance of ferruginous hawks, the number or proximity of oil and gas wells did not appear to have any negative consequences for breeding performance, as measured by daily nest survival and fledging production (Wallace et al. 2016a). Similarly, no relationship was found between well density and re-occupancy of territories by ferruginous hawks, although it was noted that the absence of an effect may have been due to the lack of pre-construction data (Wallace et al. 2016b). In Utah, ferruginous hawks selected nest sites near active oil and gas wells (Keough and Conover 2012). The proposed explanations for this relationship were that development was coincident with quality breeding habitat; there may have been a time lag in their response to development and that any impacts had not yet been manifested; and/or that prey densities increase or predation threat decreases in response to development (Keough and Conover 2012).

If the worst-case scenario is assumed for ferruginous hawk (low population size, high fledging rates, full disturbance impacts with no impact avoidance/minimization via conservation measures; Table 1, Table 2), we anticipate that the forgone fledglings (individuals that would have fledged from disturbed nests, had no disturbance occurred) would represent 2.26% and 1.61% of the ferruginous hawk population in Wyoming and the Badlands and Prairies BCR, respectively (Table 2). For relative comparison, if the worst-case scenario is assumed for red-tailed and Swainson's hawks, we anticipate that the forgone fledglings for either species would represent less than 0.1% of the species-specific populations in Wyoming or the Badlands and Prairies BCR (Table 2). A potential mitigation measure to offset these impacts is the installment of artificial nest structures in areas with limited nesting habitat or to enhance the potential for success in established territories (see below; Neal et al. 2010).

*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

**Table 1. Estimated forgone fledglings associated with the proposed 10-year development period of the Converse County Oil and Gas Project.**

| Species | Known Number of Nests [A] | Estimated Number of Nests [B] | Total Disturbed Nests [C] | Annual Fledging Rate [D] | Total Forgone Fledglings [E] |
|---|---|---|---|---|---|
| Ferruginous Hawk | 414 | 802 | 57 | 1.83 (1.42 – 2.45) | 105 (81 – 140) |
| Red-tailed Hawk | 184 | 357 | 26 | 1.22 | 32 |
| Swainson's Hawk | 24 | 47 | 4 | 1.35 | 6 |

[A] SDEIS Table 3.18-1

[B] Based on allocating the unknown-species nests in SDEIS Table 3.18-1 to known species based on species composition in SDEIS Table 3.18-1. This proportional allocation method assigned a species to each unknown-species nest without considering local topographic or vegetative characteristics that likely influence species-specific nest-site preferences. For example, if 50% of the known-species nests belonged to species A, then we assumed that 50% of the unknown-species nests also belong to species A, regardless of the habitat surrounding those unknown-species nests.

[C] Assumes that 90 active non-eagle raptor nests will be disturbed over the 10-year development period, based on the analysis by the Operator Group (OG). Species totals here assume disturbed nests will follow the same species composition in SDEIS Table 3.18-1. The column does not sum to 90 because nests of other non-eagle raptors are expected to be disturbed.

[D] Average annual number of fledglings per nesting attempt reported in reviewed literature. Literature on ferruginous hawk included a range of values, so a range is presented here.

[E] Individuals that would have fledged from disturbed nests, had no disturbance occurred. Assumes all disturbed nests produce no young during the year of well-pad construction, and that a breeding pair displaced from one nest site due to disturbance does not subsequently fledge young elsewhere in the year of well-pad construction (Total Disturbed Nests × Annual Fledging Rate).

**Table 2. Estimated population (Pop.) level impacts associated with the proposed 10-year development period of the Converse County Oil and Gas Project.**

| Species | Total Forgone Fledglings [A] | Wyoming | | Badlands and Prairies Bird Conservation Region | |
|---|---|---|---|---|---|
| | | Pop. Size [B] | Percent of Pop. Impacted [C] | Pop. Size [B] | Percent of Pop. Impacted [C] |
| Ferruginous Hawk | 105 (81 – 140) | 11,000 (6,200 – 19,000) | 0.95% (0.43 – 2.26%) | 16,000 (8,700 – 25,000) | 0.66% (0.32 – 1.61%) |
| Red-tailed Hawk | 32 | 60,000 (41,000 – 88,000) | 0.05% (0.04 – 0.08%) | 91,000 (66,000 – 120,000) | 0.04% (0.03 – 0.05%) |
| Swainson's Hawk | 6 | 17,000 (10,000 – 27,000) | 0.04% (0.02 – 0.06%) | 35,000 (22,000 – 51,000) | 0.02% (0.01 – 0.03%) |

[A] Same as in Table 1.

[B] Based on Breeding Bird Survey data reported by Partners In Flight 2019. Includes 95% confidence interval (CI).

[C] Ranges calculated using CIs of population size and ranges of total forgone fledglings (for Ferruginous Hawk only). Assumes all forgone fledglings would have recruited into the population, had no disturbance occurred.

Case 1:22-cv-02696-TSC    Document 20-6    Filed 11/01/22    Page 136 of 139

Exhibit C to Rebecca Byram Declaration  Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

The expected impacts, however, are lower than what is represented by the worst-case scenario. Disturbance impacts will be limited through the implementation of Operator Committed Measures (OCMs, described below) stipulating when and where certain construction activities can occur near non-eagle raptor nests. Furthermore, a portion of raptors nesting within the impact buffers are expected to successfully breed regardless of the construction activities, either at a nest within the buffer or by relocating to an alternate nest within their territory, thereby decreasing the foregone fledgling total (Travsky and Beauvais 2005, Wallace et al. 2016a). Lastly, supplementing the local breeding population with manmade nest platforms would also provide an opportunity to minimize the foregone fledgling total, particularly for ferruginous hawks (see below; Neal et al. 2010).

## REVIEW OF OPERATOR COMMITTED MEASURES

To reduce the potential for negative Project impacts on breeding non-eagle raptor species, the OG has committed to two OCMs within the defined spatial buffer zones of non-eagle raptor nests. The first OCM stipulates that all oil and gas development activities within these buffers will either 1) occur outside of the breeding season periods listed in Appendix A of the SDEIS, or 2) commence prior to and continue throughout the breeding season periods (i.e., Continuous Operations). Option 1 is a straightforward means of avoiding potential disturbance impacts on breeding raptors. Under Option 2, the assumption is that breeding pairs that initiate nesting attempts within the spatial buffers are tolerant of activity associated with Continuous Operations, and would not be disturbed by ongoing activity. This assumption is supported by the understanding that raptors are most susceptible to disturbance during the early stages of nesting (e.g., courtship, incubation; US Fish and Wildlife Service [USFWS] 2008). In other words, if breeding raptors are not disturbed by Continuous Operations during the courtship stage of the breeding cycle, they are unlikely to be disturbed by Continuous Operations during the brood-rearing or post-fledging stages. However, one caveat is required for this assumption to hold: the Continuous Operations must be maintained at a consistent level. More intensive construction activity (e.g., blasting, heavy equipment use) increases the chances of disturbance compared to light out-of-vehicle activity (e.g., surveying; USFWS 2008). Therefore, there is potential for nest disturbance under Option 2 if Continuous Operations result in increased human activity or increased level of disturbance over the course of the breeding season.

The second OCM proposed by the OG involves commencing or resuming Oil and Gas Development Activities within the seasonal buffer periods only after any applicable nests have been verified as inactive (i.e., no eggs or young present at the nest) no more than seven days before activity occurs. If the nests are inactive, Oil and Gas Development Activity can commence or resume, with Continuous Operation pursued to the extent practical. This OCM stipulates that a "monitoring check" will occur on the nest(s) to determine if it is active following the USFWS definition. We recommend that this monitoring check take place as close in time as possible to initiating Oil and Gas Development Activities to reduce the opportunity for a given nest to become active between the monitoring check and when development activities are commenced. However, this OCM does not eliminate the potential for negative impacts on breeding raptors through disturbance to pairs that are initiating nesting attempts but have not yet laid eggs (e.g., pairs in

nest building/tending or courtship stages). In such cases, the disturbed raptors could potentially have the opportunity to successfully breed by selecting a nest-site farther away from development areas.

## REVIEW OF POTENTIAL FOR DISTURBED RAPTORS TO AVOID IMPACTS BY UTILIZING ALTERNATE NESTS

There is potential for a displaced non-eagle raptor (assuming development occurs within their respective buffers) to use other unoccupied nests within the Project area. Specifically, both the male and female ferruginous are thought to participate in nest-site selection, typically visiting the same nests from year to year (Ng et al. 2017). A nest may be used for more than one year by the same pair, vacated, and then used again in subsequent years (Ng et al. 2017). Sometimes multiple nests are built or refurbished without being used in a particular breeding season (Ng et al. 2017; Table 4). While ferruginous hawks will use nesting substrate that is similar to other *Buteo* spp., ferruginous hawk nests are larger and built with bulky sticks from the ground. Other *Buteo* spp. (red-tailed and Swainson's hawks) tend to have relatively smaller nests which are often built using smaller twigs and herbaceous material (Ng et al. 2017). These differences in nest materials and construction between ferruginous hawks and other *Buteo* spp. provide distinguishing characteristics of ferruginous hawk nests.

In Wyoming, the probability of territory re-occupancy by ferruginous hawks during three years of monitoring ranged from 54% in 2013 to 74% in 2012 (Wallace et al. 2016b). While ferruginous hawks usually return to the same territory, they may switch between nests such that the probability of using any one nest site in a given year is low (approximately 8% in Wyoming; Carlisle et al. 2018). Based on this information and ferruginous hawk's negative response to higher densities of oil and gas development, it appears ferruginous hawks may prefer alternate nests within their territory that are located beyond 0.8 km of high densities of roads and oil and gas development (Fuller 2013). However, probability of use of these alternate nests will likely depend on the condition of alternate nests. For example, old dilapidated nests within a territory may be less likely to be used than nests better condition. A territory with relatively few nests that are in good condition can be supplemented with the use of artificial nest structures.

Ferruginous hawks will readily use artificial nest platforms and seem to have greater reproductive success using platforms as compared to natural nests (Tigner et al. 1996, Ng et al. 2017). It is thought that these artificial nest structures, which are raised off the ground, provide reduced access to nest predators and limit disturbance. HawkWatch International examined 18 years of data from south-central Wyoming to determine the effectiveness of artificial nest structures as mitigation for the impacts of natural gas development on ferruginous hawks (Neal et al. 2010). They found that the vast majority of nests platforms (85%) were used at some point during the study period, with annual occupancy rates of 52-70%. Nest success and productivity were consistently highest at nests that were both natural and inaccessible to mammalian predators (98% success, 3.19 fledglings), followed by manmade-inaccessible nests (92% success, 2.82 fledglings; Neal et al. 2010). Success rates were markedly lower for both natural and manmade nests that were accessible to predators (Neal et al. 2010). Most platforms were used within a year

Case 1:22-cv-02696-TSC    Document 20-6    Filed 11/01/22    Page 138 of 139
Exhibit C to Rebecca Byram Declaration    Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

of installation, and ferruginous hawks were more likely to return to inaccessible than accessible platforms in subsequent years. All of this should be qualified by the following: 1) artificial nest platforms are most likely to be effective mitigation in areas where natural nesting substrate is limiting, and 2) HawkWatch notes that post-fledgling survival has not been measured, thus attaching a caveat to the viability of artificial structures as mitigation (Neal et al. 2010). Nonetheless, the placement of artificial structures in ferruginous hawk territories that are being impacted with limited good quality alternate nests that are beyond impact buffers may increase the probability of an individual breeding pair's success if those individuals are displaced from nests closer to development activities.

## REFERENCES

Bureau of Land Management (BLM). 2007. Record of Decision and Approved Casper Resource Management Plan: updated with amendments and maintenance actions. Wyoming State Office – Casper Field Office. December 2007. Available online: https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=renderDefaultPlanOrProjectSite&projectId=63199#

Bureau of Land Management (BLM). 2019. Wyoming Threatened and Endangered Species. US Department of the Interior. Available online: https://www.blm.gov/programs/fish-and-wildlife/threatened-and-endangered/state-te-data/wyomingCarlisle, J. D., L. E. Sanders, A. D. Chalfoun, and K. G. Gerow. 2018. Raptor nest–site use in relation to the proximity of coalbed–methane development. Animal Biodiversity and Conservation, 41.2: 227–243.

Fuller, M. R. 2013. Raptor nesting near oil and gas development: an overview of key findings and implications for management based on four reports by HawkWatch International (No. 432). Bureau of Land Management.

Keough, H. L. and M. R. Conover. 2012. Breeding-site selection by ferruginous hawks within Utah's Uintah Basin. Journal of Raptor Research, 46(4), 378-389.

Neal, M. C., J. P. Smith, and S. J. Slater. 2010. Artificial nest structures as mitigation for natural-gas development impacts to ferruginous hawks (*Buteo regalis*) in south-central Wyoming. US Department of the Interior, Bureau of Land Management.

Ng, J., M. D. Giovanni, M. J. Bechard, J. K. Schmutz, and P. Pyle. 2017. Ferruginous Hawk (*Buteo regalis*), version 2.0. In The Birds of North America (P. G. Rodewald, Editor). Cornell Lab of Ornithology, Ithaca, NY, USA. https://doi.org/10.2173/bna.ferhaw.02

Partners in Flight. 2019. Population Estimates Database, version 3.0. Available at http://pif.birdconservancy.org/PopEstimates. Accessed on July 14, 2019.

Sauer, J. R., D. K. Niven, J. E. Hines, D. J. Ziolkowski, Jr., K. L. Pardieck, J. E. Fallon, and W. A. Link. 2017. The North American Breeding Bird Survey, Results and Analysis 1966 - 2015. Version 2.07.2017 USGS Patuxent Wildlife Research Center, Laurel, Maryland.

Tigner, J. R., M. W. Call, and M. N. Kochert. 1996. Effectiveness of artificial nesting structures for ferruginous hawks in Wyoming. Raptors in Human Landscapes: Adaptations to Built and Cultivated Environments. Academic Press, New York, 137-144.

Case 1:22-cv-02696-TSC    Document 20-6    Filed 11/01/22    Page 139 of 139
Exhibit C to Rebacca Byram Declaration    Operator Group Attachment C
*Review of Converse County SDEIS, Impacts to Non-Eagle Raptors*

Travsky, A. and G. P. Beauvais. 2005. Species Assessment for the Ferruginous Hawak (*Buteo regalis*) in Wyoming. Available online: http://www.uwyo.edu/wyndd/_files/docs/reports/speciesassessments/ferruginoushawk-jan2005.pdf

Wallace, Z. P., P. L. Kennedy, J. R. Squires, L. E. Olson., and R. J. Oakleaf. 2016a. Human-made structures, vegetation, and weather influence ferruginous hawk breeding performance. The Journal of Wildlife Management. 80(1): 78-90.

Wallace, Z. P., P. L. Kennedy, J. R. Squires, R. J. Oakleaf, L. E. Olson, and K. M. Dugger. 2016b. Re-Occupancy of Breeding Territories by Ferruginous Hawks in Wyoming: Relationships to Environmental and Anthropogenic Factors. PLoS ONE 11(4): e0152977.

US Fish and Wildlife Service (USFWS). 2008. Guidelines for Raptor Conservation in the Western United States. Draft. USFWS, Region 9, Division of Migratory Bird Management, Washington D.C. February 2008. Accessed July 2014. Available online at: http://www.blm.gov/pgdata/etc/medialib/blm/ut/lands_and_minerals/oil_and_gas/february_20120.Par.52166.File.dat/FWSRaptorGuidelines.pdf

Wyoming Game and Fish Department (WGFD). 2017. Wyoming Game and Fish Department (WGFD). 2017. State Wildlife Action Plan. WGFD, Cheyenne, Wyoming. Available online: https://wgfd.wyo.gov/Habitat/Habitat-Plans/Wyoming-State-Wildlife-Action-Plan