**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **POWDER RIVER BASIN** ) | |
| **RESOURCE COUNCIL,** *et. al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 22-cv-2696 (TSC) |
| ) | |
| **U.S. DEPT OF INTERIOR,** *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs Powder River Basin Resource Council ("Resource Council") and Western

Watersheds Project ("Western Watersheds") seek to stop certain federally approved oil drilling

in Wyoming's Powder River Basin, as well as the approval of any additional drilling, claiming

that Defendants United States Department of the Interior ("Interior") and Bureau of Land

Management ("BLM") failed to follow statutorily mandated procedures meant to protect against,

or at least mitigate, environmental harm.

On December 23, 2020, Interior approved the development of the Converse County Oil

and Gas Project ("Converse County Project"), authorizing 5,000 new oil wells on over 1.5

million acres of federal, private, and Wyoming-owned land in the Powder River Basin, subject to

subsequent drilling permit approvals.  Five days later, on December 28, 2020, BLM approved the

first of 407 separate drilling permits that are challenged in this action, the last of which was

approved on November 28, 2022.  *See* Am. Compl., ECF No. 44 at 37, 70.  Plaintiffs filed this

action, seeking declaratory and injunctive relief, on September 7, 2022.

Plaintiffs allege that Interior's initial approval of the project violated (i) the National Environmental Policy Act ("NEPA"), for failing to take a "hard look" at relevant environmental issues, (ii) the Federal Land Policy and Management Act ("FLPMA"), for failing to protect greater sage-grouse and prevent undue degradation to raptors and their habitats, and (iii) the Mineral Leasing Act ("MLA") and FLPMA for failing to mitigate certain air pollutants.  They also claim that each of the 407 separately approved Applications for Permits to Drill ("APDs") violate (i) FLPMA with respect to greater sage-grouse and raptors, (ii) MLA and FLPMA with respect to air pollutants and for failing to regulate certain types of drilling wells, and (iii) NEPA, for failing to submit environmental impact statements.

On March 13, 2023, the parties filed a flurry of motions, including Plaintiffs' Motion for Preliminary Injunction, ECF No. 64; Private-Intervenors' Joint Motion to Transfer, ECF No. 66; and Private-Intervenors' Joint Motion to Dismiss, ECF No. 67.  On July 14, 2023, the court held oral argument on Plaintiffs' preliminary injunction motion and the standing arguments presented in Private-Intervenors' Joint Motion to Dismiss.

Having considered the parties' briefing, their presentations at oral argument, and the record, the court will GRANT in part Private-Intervenor's Joint Motion to Dismiss; DENY Private-Intervenors' Joint Motion to Transfer; and DENY Plaintiffs' Motion for Preliminary Injunction.

## I.     BACKGROUND

### A.  The Parties

Plaintiff Resource Council is a Wyoming-based conservation group with approximately 1,000 members, the "majority of whom reside locally within the Powder River Basin."  ECF No. 44 ¶ 13.  Its mission is "working for responsible oil and gas development, addressing the impacts of fossil fuel development on rural people and communities, and working for the

preservation and enrichment of Wyoming's agricultural heritage and the responsible use of land, mineral, water, and air resources." *Id*. It alleges that the Converse County Project will "directly affect" its members "who depend on the region for its recreational opportunities, and for some, their livelihoods." *Id*.

Plaintiff Western Watersheds is a non-profit organization headquartered in Hailey, Idaho. Its mission is "protecting and restoring western watersheds and wildlife through education, public policy initiatives, and litigation." *Id*. ¶ 14. It has "over 12,000 members and supporters . . . who live, work, and recreate in Wyoming lands that will be impacted by the Converse County Project." *Id*.

Defendants Interior and BLM are statutorily responsible for managing the nation's federal lands. *Id*. ¶¶ 20–21.

Defendant-Intervenors are Continental Resources, Inc. ("Continental"), Devon Energy Production Company L.P. ("Devon"), Petroleum Association of Wyoming, Anschutz Exploration Corp. ("Anschutz"), and the State of Wyoming. *See* Min. Order, Dec. 30, 2022; Min. Order, Jan. 17, 2023. Devon, Continental, and Anschutz are oil and natural gas exploration and production companies, who collectively hold 179 of the APDs that Plaintiffs seek to terminate. *See* Byram Decl., ECF No. 20-3 ¶¶ 3, 16; Cozyris Decl., ECF No. 20-8 ¶¶ 3, 11; DeDominic Decl., ECF No. 47-1 ¶¶ 2, 6. Petroleum Association of Wyoming is a petroleum industry trade association, and twelve of its members hold 355 of the APDs that Plaintiffs seek to terminate. *See* Obermueller Decl., ECF No. 31-1 ¶¶ 2, 5. The State of Wyoming manages or owns seven percent or 101,012 surface acres of the Converse County Project area. *See* Pls.' Ex. 7, ECF No. 64-9 at PIR-0147.

**B. Legal Framework**

<em>i.</em>    <u>FLPMA</u>

FLPMA requires BLM to manage public lands "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands," 43 U.S.C. § 1701(a)(12), "under principles of multiple use and sustained yield" unless otherwise directed by law, *id*. § 1732(a).  FLPMA defines "public lands" as "any land and interest in land owned by the United States" and administered by the Secretary of the Interior through the BLM, *id*. § 1702(e), such as federal surface lands and federal mineral estate.  On one hand, the multiple use principle requires BLM to balance "various competing uses of land," such as "'recreation, range, timber minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values'" in order "to optimally manage the land." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010) (quoting 43 U.S.C. § 1702(c)).  On the other hand, the sustained yield principle "requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future.'" *Id.* (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (citing 43 U.S.C. § 1702(h))).

Under FLPMA, BLM must "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a), also known as "resource management plans" ("RMPs").  As relevant here, BLM is authorized to issue leases and permits, and is also required to "take any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).

<em>ii.</em>    <u>MLA</u>

MLA, 30 U.S.C. §§ 181, *et seq.*, directs the Secretary of the Interior to offer federal oil and gas resources for leasing and development, and grants the agency broad authority to "regulate all surface-disturbing activities conducted pursuant to any lease issued under [the

MLA]" and "determine reclamation and other actions as required in the interest of conservation of surface resources." *Id*. § 226(a), (g); *see also* 43 C.F.R. §§ 3100, *et seq.*, §§ 3160, *et seq.*, §§ 3170, *et seq.* (Interior's regulations implementing statutory authority to regulate oil and gas leasing).

### iii.  *NEPA*

NEPA requires agencies to prepare a "detailed statement" of the environmental impact of "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  If an action could have significant environmental impacts, the agency must ordinarily prepare an Environmental Impact Statement ("EIS") that analyzes such impacts and identifies reasonable alternatives to avoid or minimize them.  *Id.*; 40 C.F.R. § 1502.1 (1979, 2021).  There are several scenarios, however, that do not require an EIS: (i) the agency determines that the "proposed action will not have a significant impact on the environment," 40 C.F.R. § 1501.5(a) (2021); *see* 40 C.F.R. § 1508.9(2) (1979); (ii) the action falls within certain "categories of actions that normally do not have a significant effect on the human environment," 40 C.F.R. § 1501.4(a) (2021); and (iii) the agency determines that an existing environmental analysis "adequately assesses the environmental effects of the proposed action and reasonable alternatives," 43 C.F.R. § 46.120(c).

In the oil and gas context, Onshore Order No. 1 provides for the submission of a Master Development Plan to facilitate development and NEPA review of similar APDs.  *See* 72 Fed. Reg. 10308, 10335 (2007) ("After the Master Development Plan is approved, subsequent APDs can reference the Master Development Plan and be approved using the NEPA analysis for the Master Development Plan, absent substantial deviation from the Master Development Plan previously analyzed or significant new information relevant to environmental effects.").

*iv.*   <u>*BLM Land Use Approval Process*</u>

BLM employs a three-stage decision-making process for managing oil and gas leasing and development on federal land: (i) land use planning, (ii) leasing, and (iii) drilling.  Each stage culminates in a separate agency decision.

In the land use planning stage, a BLM field office issues an RMP assessing the resources in a specific geographic area.  43 C.F.R. § 1601.0-5(n).  The RMP determines which portions of the planning area will be open to oil and gas leasing, and under what conditions.  43 U.S.C. § 1712(a).

In the leasing stage, BLM identifies parcels eligible for leasing and holds a competitive lease sale.  43 C.F.R. §§ 3120.1-3, 3120.5-1, 3120.5-3.  An oil and gas lease confers "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold," *id.* § 3101.1-2, subject to any stipulations attached to the lease, *id.* § 3101.1-3.

Finally, after a lease is issued, a leaseholder must apply to BLM for an APD to drill for oil and gas on the leased land.  *Id.* § 3162.3-1(c).  An APD is required whenever a leaseholder seeks to produce minerals from the leased federal mineral estate—regardless of whether the surface facilities are located on federal lands.  *Id.*; *see id.* § 9239.0-7 (defining as unlawful trespass the unauthorized extraction of federal minerals under the jurisdiction of the Department of the Interior).  BLM may condition APD approval on the lessee's adoption of "reasonable measures," delimited by the lease and the lessee's surface use rights, to mitigate the drilling's environmental impacts.  *Id.* § 3101.1-2.  Before approving an APD, BLM must confirm that the APD complies with the RMP, *see id.* § 1610.5-3.

*v.*      *Fee/Fee/Fed Wells*

Fee/Fee/Fed wells are "wells that are drilled on non-federal surface overlying non-federal mineral estate that drill horizontally into leased federal minerals." ECF No. 44 ¶ 58.

On June 12, 2018, the BLM Deputy Director of Policy and Programs issued Permanent Instruction Memorandum 2018-014 ("PIM 2018-014") establishing policies and procedures for processing Fee/Fee/Fed APDs. ECF No. 64-17. PIM 2018-014 provides guidance on how to analyze APDs for three common Fee/Fee/Fed scenarios: (i) an APD will be located on a pre-existing well pad without resulting in new surface disturbance, (ii) an APD will be located on a pre-existing well pad but additional surface disturbance is anticipated because of development of the federal minerals (*e.g.*, to expand the size of the well pad), and (iii) an APD proposes development of a new well pad.

## C.  The Converse County Project

In December 2007, BLM approved the Casper RMP, identifying oil and gas development as allowable public uses on approximately 8.5 million acres of land in most of Natrona County and all of Converse, Platte, and Goshen counties in east central Wyoming. Defs.' Ex. 2, ECF No. 83-2 at 1-1. In December 2013, a group of energy companies submitted a proposed development plan to BLM to conduct drilling operations within the Converse County Project area. *See* Pls.' Ex. 6, ECF No. 64-8 at PIR-0004.

On January 26, 2018, BLM issued a Draft EIS evaluating the proposed Converse County Project and a land-use-plan amendment to the Casper RMP, and Plaintiffs submitted comments on the Draft EIS. *See* 83 Fed. Reg. 3767 (2018). On August 10, 2020, BLM issued the final EIS. ECF No. 44 ¶¶ 61, 63; *see also* 85 Fed. Reg. 46, 171 (2020).

The final EIS examined three alternatives to the Converse County Project proposal: (A) no action alternative allowing no new drilling; (B) authorization of 5,000 new wells on 1,500

new well pads over ten years, subject to APD analysis and approval; and (C) requiring "additional mitigation measures such as water recycling and clustering of wells to reduce surface disturbance."  ECF No. 64-9 at PIR-0091.

On December 23, 2020, the Secretary of Interior signed the Converse County Record of Decision, selecting Alternative B and authorizing the Casper RMP Amendment.  ECF No. 44 ¶ 65.  While the Record of Decision did not approve any APDs, as of April 3, 2023, BLM has approved sixteen federal APDs, 148 split estate APDs, and 322 Fee/Fee/Fed APDs.  *See* Defs.' Ex. 1, ECF No. 83-1 ¶ 4.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(1) Motion for Lack of Subject Matter Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss an action or claims for lack of subject matter jurisdiction.  In considering the motion, "the Court must accept the allegations of the complaint as true and must construe 'the complaint in the light most favorable to the non-moving party,'" *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 189 (D.D.C. 2022) (citation omitted), but the court does not assume the truth of legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Further, "'the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim," *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quotation marks and citation omitted), and a "court may consider materials outside the pleadings" to decide the motion, *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  To survive a Rule 12(b)(1) motion the plaintiff must establish that the court has subject matter jurisdiction as to each claim.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### B. Motion to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "Even if a plaintiff has brought a case in a proper venue, a district court may transfer it to another district." *Def. Servs., Inc. v. Mayorkas*, No. 21-cv-1314, 2022 WL 910335, at *2 (D.D.C. Mar. 29, 2022). Courts use a two-step test to determine if a case should be transferred: whether (1) the action "might have been brought" in the movant's choice of forum, and (2) the private and public "interest factors" that weigh in favor of or against transfer. *Ctr. for Env't Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 356 (D.D.C. 2014). The movant bears the burden of demonstrating that transfer is proper. *Def. Servs., Inc.*, 2022 WL 910335, at *2.

### C. Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic" remedy that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). A movant must demonstrate (i) a likelihood of success on the merits, (ii) a likelihood of irreparable harm absent injunctive relief, (iii) that the balance of equities tips in their favor, and (iv) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Councils, Inc.*, 555 U.S. 7, 20 (2008). Because "a preliminary injunction is an extraordinary and drastic remedy," the court should not grant one "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis in original).

Courts in this Circuit have typically applied a "sliding-scale" approach in analyzing these four factors, whereby a particularly strong showing in one factor could outweigh weakness in another. *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011); *see also Changji Esquel*

*Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (explaining that the Circuit has yet to revisit the validity of the sliding scale approach following the Supreme Court's decision in *Winter*).  Still, the movant bears the burden of showing that "all four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  To satisfy its burden, a movant may rely on "evidence that is less complete than in a trial on the merits" so long as it is "credible."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (internal citations omitted).

## III.    ANALYSIS

### A.  Plaintiffs' Standing

Before deciding a preliminary injunction motion the court must first determine whether it has jurisdiction.  *See Aamer v. Obama*, 742 F.3d 1023, 1028, 1038 (D.C. Cir. 2014).

An "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue in federal court.  *Lujan*, 504 U.S. at 560.  To have standing, a plaintiff must plead (i) an "injury in fact," that is (ii) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (iii) can "likely" be "redressed by a favorable decision."  *Id.* at 560–61 (cleaned up).

When alleging a procedural violation, a plaintiff cannot allege injury based simply on a general interest "common to all members of the public."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (citation omitted).  Rather, the alleged procedural injury must "be tethered to some concrete interest adversely affected by the procedural deprivation."  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).  Moreover, a plaintiff "must show not only that the defendant's acts omitted some procedural requirement, but also that it is

substantially probable that the procedural breach will cause the essential injury to the plaintiff's

own interest." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C.

Cir. 2009) (emphasis added; citation omitted); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496

(2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the

deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").

Because these "are not mere pleading requirements but rather an indispensable part of the

plaintiff's case, each element must be supported in the same way as any other matter on which

the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at

the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (citations omitted). These

requirements apply regardless of whether an organization asserts standing to sue in its own right

or on behalf of its members. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

And because "standing is not dispensed in gross, . . . a plaintiff must demonstrate standing for

each claim [that they] press and for each form of relief" that they seek. *Town of Chester v. Laroe*

*Ests., Inc.*, 581 U.S. 433, 439 (2017) (quotation marks and citations omitted).

An association may assert standing on behalf of its members by alleging that "its

members, or any one of them, are suffering immediate or threatened injury as a result of the

challenged action." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To satisfy the constitutional

standing requirement, an association must show that: "(a) its members would otherwise have

standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *United Food and Com. Workers Union*

*Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple*

*Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25

(D.C. Cir. 2002).  Moreover, the organization must show that "at least one specifically-identified member has suffered an injury-in-fact . . . [i]t is not enough to show . . . there is a substantial likelihood that at least one member may have suffered an injury-in-fact," rather, "the identity of the party suffering an injury in fact must be firmly established."  *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006).

Defendant-Intervenors argue that Plaintiffs lack standing for all their claims, ECF No. 67 at 5, and all Defendants contend that Plaintiffs lack standing to pursue their APD claims but do not join Defendant-Intervenor's argument that Plaintiffs lack standing to challenge the Converse County Record of Decision, ECF No. 86 at 1–2.  Plaintiffs respond that they have associational standing to sue on behalf of their members who would otherwise have standing to sue in their own right.  *See* Pls.' Opp'n re ECF No. 67, ECF No. 81 at 3–16.

i.    *Standing for APD-Related Claims*

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  A plaintiff must allege a "concrete and particularized injury which has occurred or is imminent due to geographic proximity to the action challenged."  *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 61 (D.D.C. 2019) (quoting *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002)) (emphasis omitted).

Here, Plaintiffs lack standing to pursue their APD claims because they have not alleged an affected area for any of the APDs they challenge, and therefore have not alleged that any of their members use the affected areas such that enjoining the APDs would provide the relief they seek.  At most, Plaintiffs allege that their members "reside locally within the Powder River

Basin," ECF No. 44 ¶ 13, that they "visit and recreate on . . . public lands," *id*.  ¶ 16, and that the entire Project will contribute to "air pollution, noise pollution, water pollution, visual disruptions, and general disturbance," *id*. ¶ 17.  These allegations are supported by their members' declarations.  *See, e.g.*, Katherman Decl., ECF No. 64-4 ¶¶ 5, 8, 12–14 (averring that she lives in the project area, that her frequent use of Highway 93 will be more dangerous because of increased truck traffic, and air and light pollution will negatively impact her view of Laramie Mountain).  But the declarations do not allege that Plaintiffs' members use an area affected by any challenged APD.  Although Plaintiffs' motion for preliminary injunction and supporting exhibits total more than 5,000 pages, they have not specified any particular APD or any surrounding area affected by any pollutants traceable to any particular APD (air, noise, water, visual etc.).  Nor have Plaintiffs specified that any of their members use (recreate, live in, travel through, visit) any such area.

Plaintiffs do not challenge the standard as the court has articulated it, *see* ECF No. 81 at 10 (citing *Laidlaw*, 528 U.S. at 183), but instead argue that the standard is satisfied because "[t]he types of injuries that Plaintiffs allege here—decreased air quality, water pollution and drawdowns, viewshed disruptions, traffic hazards on major arteries, and wildlife impacts—will extend far beyond each wellsite, as will the roads, pipelines, powerlines, trucks, equipment, and workers required to support them."  *Id.*  In their view, the court should assume that the affected area for every APD is indeterminably "vast," *id*.  This assumption is valid, they argue, because their members live and travel in the project area and it is "substantially likely they will be injured from each" of the over 400 APDs which have indeterminably vast affected areas.  *Id*.  But Plaintiffs do not allege, in their Amended Complaint or in their declarations, that the affected area of every APD is "vast;" tellingly, they do not cite to the record in support of this argument.

At oral argument, the court asked Plaintiffs to indicate where in their Amended Complaint or member declarations they alleged affected areas for the APDs. They responded that the APDs collectively contribute to a vast affected area which can be gleaned from Defendants' environmental analysis in their final EIS. This is insufficient to establish standing.

Plaintiffs contend that three cases support their argument: *Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019) (*Diné*); *Zinke*, 368 F. Supp. 3d 41; and *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996). *See* ECF No. 81 at 10–12.

In *Diné*, the Tenth Circuit held that environmental groups had established injury in fact to support standing to challenge more than 300 APDs in the Mancos Shale area of the San Juan Basin in northeastern New Mexico because the group members had "a geographical nexus to and actually use the land in the allegedly affected area." 923 F.3d at 841–43. In that case, plaintiffs' members averred to "visit[ing] hundreds of well sites" and described affected areas that they noticed during their visits. *Id.* at 842. The Court was satisfied that members had (i) declared that they had and would continue to visit "specific areas [that] will be affected by oil and gas drilling," (ii) attached maps to their declarations "show[ing] the proximity of existing and new wells" to their areas of recreation, and (iii) alleged that the "affected area extends beyond the boundaries of the well sites and into the greater Chaco landscape." *Id.* at 843.

In *Zinke*, plaintiffs similarly challenged federally approved oil and gas leases in Wyoming. The Court found that plaintiffs had standing because their members had averred that the affected area for drilling rigs extended "up to a hundred miles away." 368 F. Supp. 3d at 62 (citation omitted).

Unlike the plaintiffs in *Diné* and *Zinke*, however, Plaintiffs here do not identify a single well site, drilling location, or APD in their member declarations. "[T]o establish standing plaintiffs must show that they 'use the area affected by the challenged activity and not an area roughly in the vicinity of' the project site." *Summers*, 555 U.S. at 499 (citation omitted); *Friends of the Earth, Bluewater Network Div. v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 21 (D.D.C. 2007) ("[W]here site-specific agency action is involved, . . . standing must be established at to specific locations."). Plaintiffs have not demonstrated as much with respect to the challenged APDs.

Indeed, had Plaintiffs challenged a single APD, they would have had to allege (i) the general location of a well site operating pursuant to an APD, (ii) an area affected by activities occurring at the well site, and (iii) that at least one of their members makes use of that area. Although Plaintiffs challenge over 400 agency actions, the bar to allege standing as to these APDs is not insurmountable. Despite amending their complaint and submitting member declarations in support of their motion for preliminary injunction, Plaintiffs' allegations do not specify any APD, an area affected by its pollutants, or their members' use of that area.

Accordingly, the court does not have subject matter jurisdiction over Plaintiffs' APD claims in Counts II, III, IV, V, and VI, and they will be dismissed.

ii.   <u>*Standing on Record of Decision Related Claims*</u>

On the other hand, the court is satisfied that Plaintiffs have established standing as to their Record of Decision claims in Counts I, III, IV, and VI. Plaintiffs' members allege that they regularly visit or live in the Converse County Project Area, which is subject to oil and gas development because of the Record of Decision. *See, e.g.*, ECF No. 64-4 ¶¶ 2–3, 5 (Maria Katherman declaring that she is a Resource Council member and lives in the Converse County Project Area); ECF No. 64-3 ¶¶ 2–3, 8, 10 (Shannon Anderson averring that he is a Resource

Council member and staff attorney who takes "regular field trips to the project area" as part of his work and intends to "return in the months and years to come"). Plaintiffs' members also claim they will suffer concrete harms from drilling in the project area. *See, e.g.*, ECF No. 64-4 ¶ 21 (Katherman Declaration stating that "temporary water pipelines and plastic-lined 'ponds'" will cause water waste and contaminate her drinking water). These allegations are sufficient to demonstrate injury in fact because the declarants aver that "they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quotation marks and citation omitted).

The aesthetic and recreational injuries that Plaintiffs' members claim they will suffer also satisfy the two remaining elements of standing: the injuries are "fairly traceable" to BLM's allegedly deficient procedures, and they would "be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations omitted). In environmental procedural-injury cases, an "adequate causal chain" contains two links: "one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an [adequate] EIS," and "one connecting that substantive decision to the plaintiff's particularized injury." *Fla. Audubon Soc'y*, 94 F.3d at 668. Here, Plaintiffs claim that BLM's failure to discharge its NEPA, FLPMA, and MLA obligations led directly to the issuance of the Record of Decision, authorizing the oil and gas development causing Plaintiffs' injuries. Indeed, Defendants conceded at oral argument that if the court were to vacate the Record of Decision—authorizing BLM to approve APDs in the Converse County Project Area—for violating NEPA, FLPMA, and MLA, Plaintiffs' members' injuries would be redressed, and the remedies they seek would be available. *See* Oral Arg. Tr., ECF No. 99 at 17:23–18:09.

**B.  Transfer**

This court "may transfer any civil action to any other district or division where it might have been brought" in the first instance "for the convenience of parties and witnesses" and "in the interest of justice."  28 U.S.C. § 1404(a).  When a defendant is a federal agency, venue is proper in any judicial district where (i) "a defendant in the action resides;" (ii) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject of the action is situated;" or (iii) a "plaintiff resides if no real property is involved in the action."  28 U.S.C. § 1391(e)(1).  If an action could have been brought in the movant's chosen forum, the court then considers six private interest factors—

> (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants;
> (2) the defendant's choice of forum;
> (3) whether the claim arose elsewhere;
> (4) the convenience of the parties;
> (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and
> (6) the ease of access to sources of proof—

and three additional public interest factors: "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996).

Here, Private Intervenors barely addressed the issue of whether venue is proper in the District of Wyoming.  *See* Def.-Int.'s Joint Mot. to Transfer, ECF Nos. 66, 68 at 3–4 (devoting two short paragraphs to venue).  Moreover, because the court will dismiss Plaintiffs' APD-related claims for lack of subject matter jurisdiction, it is unclear whether this case could even have been brought in the District of Wyoming.  Further, Private-Intervenors' motion to transfer this action to the District of Wyoming primarily focuses on their own convenience in defending

against Plaintiffs' challenges to the APDs they hold.  But since the court will dismiss Plaintiffs' APD claims, Private-Intervenors' legal interest in this case is reduced.  Indeed, the remining claims are procedural challenges to an ROD that was signed in Washington D.C.—likely requiring few, if any witnesses and relying primarily on the administrative record.

In sum, Private-Intervenors have not satisfied their burden to demonstrate that this action might have been brought in the District of Wyoming or to show that the private interest and public interest factors weight in their favor, and consequently, their motion to transfer will be denied.

## C. Preliminary Injunction

Because the court will dismiss Plaintiffs' APD claims, it need only address the motion for preliminary injunction on their Record of Decision claims.

### i. <u>Likelihood of Success on the Merits</u>

Plaintiffs confined their argument on the likelihood of success on the merits to a subset of their claims, *see* ECF No. 64-1 at 15 n.3, and because the court will dismiss their APD claims, the court's analysis also is appropriately limited.

***First***, Plaintiffs argue that they are likely to succeed on their Sixth Claim challenging BLM's argument that they do not have legal authority to require air pollution mitigation. Plaintiffs contend that Defendants' failure to require certain "air quality mitigation measures" when approving the Converse County Record of Decision was arbitrary and capricious because the decision (i) wrongly concluded that BLM lacked authority to require such measures, and (ii) was an unexplained departure from past agency practice.  ECF No. 64-1 at 24–25.  At this stage, Plaintiffs have not demonstrated a likelihood of success on this claim.

The Administrative Procedures Act ("APA") requires a reviewing court to "set aside agency action . . . found to be . . . arbitrary, capricious . . . or otherwise not in accordance with

law." 5 U.S.C. § 706 (2)(A).  The review must be "highly deferential" and begins with a

presumption that the agency's actions are valid.  *Env't. Def. Fund, Inc. v. Costle*, 657 F.2d 275,

283 (D.C. Cir. 1981).  The court considers only "whether the agency acted within the scope of its

legal authority, whether the agency has explained its decision, whether the facts on which the

agency purports to have relied have some basis in the record, and whether the agency considered

the relevant factors."  *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (quoting *Fund*

*for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).  Here, Plaintiffs essentially argue

that Defendants did not follow the law and failed to provide a reasoned explanation for their

departure from past agency practice.

Defendants' opposition is grounded in the Constitution's Property Clause, which states

that "Congress shall have Power to dispose of and make all needful Rules and Regulations

respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV,

§ 3, cl. 2.  The Property Clause allows Congress to exercise plenary power over federal lands and

"is broad enough to reach beyond territorial limits."  *Kleppe v. New Mexico*, 426 U.S. 529, 538

(1976); *see also United States v. Lindsey*, 595 F.2d 5, 6 (9th Cir. 1979) (recognizing that the

United States may "regulate conduct on non-federal land when reasonably necessary to protect

adjacent federal property or navigable waters").

Under MLA, the Secretary of the Interior has broad congressionally delegated authority

"to prescribe necessary and proper rules and regulations and to do any and all things necessary to

carry out and accomplish" the promotion and protection of federal minerals.  30 U.S.C. § 189;

*see also Cal. Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961) ("The Secretary … has a

responsibility to [e]nsure that these resources are not physically wasted and that their extraction

accords with prudent principles of conservation.").  The Secretary is empowered to "regulate all

surface-disturbing activities conducted pursuant to any lease issued under [MLA]." 30 U.S.C.

§ 226(g).

When Defendants issued the 2020 Converse County Record of Decision, the decision

identified fourteen air quality mitigation measures that had been "recommended" during public

comment on the draft EIS, but which BLM found were "unlikely" to be implemented because it

did "not have authority to require the application of [those] measures." ECF No. 64-9 at PIR-

0678, PIR 0684–87; *see* ECF No. 64-8 at PIR-0055–56.

Plaintiffs argue that "[r]equiring air quality mitigation measures such as engine

requirements, dust abatement, and facilities consolidation . . . falls squarely within BLM's MLA

authority," ECF No. 64-1 at 27, and FLPMA provides further statutory support for BLM to

impose air quality mitigation measures for non-federal land extraction, *id*. at 26 (citing 43 U.S.C.

§§ 1701(a)(8), 1712(c)(8), 1732(b)).  Defendants agree that MLA "provides broad discretion to

the Secretary in regulating surface-disturbing activities," but argue that "like many statutes [it]

leaves it to the discretion of the Secretary to strike the right balance." Defs.' Opp'n re ECF

No. 64, ECF No. 83 at 17.  The issue before the court then is whether MLA requires Defendants

to impose air quality mitigation measures on drill operators who extract federal minerals by

drilling into non-federal lands.

Although MLA and FLPMA grant Defendants broad authority, they do not appear to

mandate these regulations on non-federal lands.  Plaintiffs have cited no legal authority

supporting that contention, and the law is clear that "an agency may justify its policy choice by

explaining why that policy 'is more consistent with statutory language' than alternative policies."

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223–24 (2016) (quoting *Long Island Care at

Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007) (internal quotation marks omitted)).

In 2018, BLM issued its Permanent Instruction Memorandum, titled "Directional Drilling into Federal Mineral Estate from Well Pads on Non-Federal Locations" ("PIM 2018-014"), in which it interpreted MLA as granting it authority to apply two types of regulations to operations on non-federal lands: regulations governing "downhole" activities or operations (*e.g.*, well drilling, casing, cementing, verification, testing, reporting, and plugging), and regulations relating to production accountability *(i.e.*, those that prevent waste or loss of federal oil and gas and ensure accurate measuring and collecting of royalties). *See* Pls.' Ex. 15, ECF No. 64-17. BLM explained however, that its "regulatory jurisdiction is limited," and it must "carefully examine" its regulations that affect non-federal lands. *Id*. at PIR-4664. It contends that FLPMA and MLA do not provide it with authority "to require mitigation of surface disturbances on non-Federal lands." *Id*. at PIR-4670.

When an agency changes its "existing polic[y]," it must "provide a reasoned explanation for the change," *Encino Motorcars*, 579 U.S. at 221, and it must "at least display[] awareness that it is changing position and showing that there are good reasons for the new policy." *Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 780 (D.C. Cir. 2022) (quoting *Encino Motorcars*, 579 U.S. at 221) (cleaned up). The record indicates that the 2020 Converse County Record of Decision is consistent with past agency policy. Indeed, Defendants explained their lack of authority to impose the regulations on non-federal lands in its 2018 memorandum, two years before the Converse County Record of Decision. ECF No. 64-17 at PIR 4670–71.

Plaintiffs further argue that the Record of Decision is inconsistent with two previous Records of Decisions—the Normally Pressured Lance ("NPL") gas project and the Jonah Infill Drilling Project. ECF No. 64-1 at 27. They claim that the NPL project included "specific dust abatement requirements; multi-well pads and operations consolidation to reduce dust and other

impacts from vehicle travel; waste capture and recovery; and use of Tier 3 drill rig engines, electric compression engines, and solar powered equipment to reduce impacts to air quality;" and the Jonah Infill Drilling Project "imposed a variety of air quality-related mitigation measures, including use of Tier II diesel engines and other requirements to reduce impacts of project air emissions." *Id.* at 27–28 (citing ECF No. 64-18 at PIR 4728–30, PIR 4795–96). Defendants respond that BLM has not "reversed course," and comparisons to the NPL project are "inapt," because that project "involved different highly deviated slant and directional wells . . . not subject to EPA or Wyoming Department Environmental Quality permitting," and was "almost entirely located on BLM-managed land and minerals." ECF No. 83 at 23–24. Given the highly fact-specific nature of these Record of Decision approvals, Plaintiffs have not demonstrated that the NPL gas project and the Jonah Infill Drilling Project are appropriate comparators to the Converse County Record of Decision.

Accordingly, Plaintiffs have not shown a likelihood of success in establishing that Defendants' disclaimer of statutory authority to impose air quality mitigation measures, in these circumstances, is arbitrary and capricious as an erroneous legal interpretation or an unexplained departure from past agency practice.

**Second**, Plaintiffs argue that they will succeed on their NEPA claims because (i) BLM did not meaningfully account for the unregulated nature of Fee/Fee/Fed wells in its NEPA analysis, and (ii) BLM's cumulative effects analysis underestimated the scale of other oil and gas developments in the Project area and did not quantify the greenhouse gas emissions and cumulative climate impacts of other projects in the region. ECF No. 64-1 at 28–36.

NEPA "requires federal agencies . . . to examine and report on the environmental consequences of their actions." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 476 (D.C.

Cir. 2012).  As explained, an agency may comply with NEPA by preparing an EIS that analyzes

those environmental impacts and identifies a range of reasonable alternatives to avoid or

minimize such impacts.  42 U.S.C. § 4332(C); *accord* 40 C.F.R. § 1502.16(a)(1).  This "hard

look" analysis, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989), requires

an assessment of direct, indirect, and "[c]umulative effects, which are effects on the environment

that result from the incremental effects of the action when added to the effects of other past,

present, and reasonably foreseeable actions."  40 C.F.R. § 1508.1(g)(3); *see also WildEarth

Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 247 (D.D.C. 2020) ("[A] NEPA cumulative

impact analysis must include discussion of 'other actions—past, present, and proposed, and

reasonably foreseeable—that have had or are expected to have impacts in the same area,' 'the

impacts or expected impacts from these other actions,' and 'the overall impact that can be

expected if the individual impacts are allowed to accumulate.'" (quoting *Grand Canyon Tr. v.

FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002))).  In reviewing an agency's hard look, the "role of the

courts is simply to ensure that the agency has adequately considered and disclosed the

environmental impact of its actions and that its decision is not arbitrary or capricious."  *Nevada

v. Dep't of Energy*, 457 F.3d 78, 87–88 (D.C. Cir. 2006) (quoting *Marsh v. Or. Natural Res.

Council*, 490 U.S. 360, 376 (1989)).

    Plaintiffs contend that Defendants failed to "meaningfully account for Fee/Fee/Fed wells

in conducting its NEPA analysis" because "many sections of the [EIS] assumed that BLM-

imposed protections would mitigate adverse effects for the entire project."  ECF No. 64-1 at 28–

29.  They claim that BLM assumed that implementation of certain mitigation measures would

diminish impacts on air quality, the visual landscape, greater sage-grouse, and traffic, even

though BLM would not require such mitigation measures for Fee/Fee/Fed wells.  *See id*. at 29

(citing final EIS, App. A at A-24; *id*. at 4.15–4; *id*. at 4.18–67; *id*. at 4.13–7).

But BLM acknowledged its limited authority to impose certain mitigation measures on

non-federal land.  *See, e.g.*, ECF No. 64-9 at PIR-1075 ("The BLM's ability to require

application of mitigation measures is limited by the extent of the agency's authority as it relates

to the surface and fluid mineral estate ownership patterns within the CCPA.").  Further, Plaintiffs

appear to misread the final EIS' "mitigation and mitigation effectiveness" sections.  Closer

scrutiny reveals that BLM, consistent with its regulations, considered the impact of mitigation

measures irrespective of whether those measures would be imposed.  *See* 43 CFR § 46.130(a)–

(b) ("The analysis of the proposed action and any alternatives must include an analysis of the

effects of the proposed action or alternative as well as analysis of the effects of any appropriate

mitigation measures or best management practices that are considered.  The mitigation measures

can be analyzed either as elements of alternatives or in a separate discussion of mitigation. . . .

The analysis of these mitigation measures can be structured as a matter of consideration of

alternatives to approving the applicant's proposal or as separate mitigation measures to be

imposed on any alternative selected for implementation.").  Here, BLM considered the "impacts"

of the proposed action on identified environmental elements, *e.g.*, ECF No. 64-9 at PIR-0827,

separate from "[m]itigation and [m]itigation [e]ffectiveness," *e.g., id.* at PIR-0830.

Plaintiffs also read the "mitigation and mitigation effectiveness" sections to assume

federal mitigation measures would apply, even though federal mitigation measures do not apply

to most of the Project's wells.  ECF No. 64-1 at 29; *see also* ECF No. 91 at 16.  Even if Plaintiffs

are correct, they point to no prohibition against considering the EIS in federal mitigation

measures if the Project includes Fee/Fee/Fed wells.  Nor do Plaintiffs explain how the EIS may

have been different without assuming typical mitigation measures.

Plaintiffs also argue that BLM's cumulative-effects analysis is legally erroneous because

it "grossly misstated the scale of existing and future oil and gas development" in the Project area

by choosing January 9, 2015 "as an arbitrary cut off-date" for evaluating existing oil projects,

and then failing to account for 3,854 new wells that started producing in the Project area between

2016 and 2019.  ECF No. 64-1 at 30–31.  Defendants respond that the cut-off date was

"necessary to avoid continual reanalysis," and reflected "the first full year of available data after

the completion of scoping in 2014."  ECF No. 83 at 26.

At this stage, Plaintiffs have not shown that Defendants' reliance on 2015 baseline data

was unreasonable given that the NEPA analysis began in 2014.  *See Theodore Roosevelt*

*Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 273 (D.D.C. 2009), *aff'd*, 616 F.3d 497

(D.C. Cir. 2010) (holding that use of "outdated data is not arbitrary or capricious" where agency

had a considered reason for doing so).  Moreover, on April 26, 2019, BLM issued a supplemental

draft EIS, recognizing 1,828 additional wells within the Project area as of March 22, 2019.  *See*

ECF No. 64-9 at PIR-0151–52; ECF No. 83-4 at ES-2; 40 C.F.R. § 1502.9(d)(1)(ii) (BLM must

prepare a supplemental EIS when "[t]here are significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its impacts").  Thus,

Plaintiffs' argument that BLM arbitrarily cut off consideration of existing wells based on 2015

data is unavailing.

In addition, Plaintiffs have not shown that Defendants' cumulative effects analysis is

deficient for failure to account for approximately 2,000 additional wells or 3,8554 unaccounted

horizontal wells based on Wyoming Oil and Gas Conservation Commission ("WOGCC") data

that Plaintiffs referenced in their comment to the draft EIS.  *See* ECF No. 64-1 at 31 (citing Pls.'

Ex. 9, ECF No. 64-11 at PIR-1809–10, PIR-1827–2394).  Defendants were required to "assess

the impact the [Converse County Project] will have in conjunction with other projects in the

same and surrounding areas . . . and must include past, present, and reasonably foreseeable future

actions of any agency or person." *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d

17, 31 (D.D.C. 2014) (quoting *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503).  In

response to Plaintiffs' comment on the draft EIS, Defendants explained that Plaintiffs'

interpretation of WOGCC data was incorrect because "not all of these . . . APDs resulted in wells

that have been drilled, will be drilled, or are within the portions of Converse or Campbell

counties that fall within the cumulative impact study area.  The analysis conducted for this EIS

was based on this same WOGCC data, which was then filtered for these parameters." Pls.'

Ex. 8, ECF No. 64-10 at PIR-1615.  Wyoming has since reviewed its data in response to this

motion and submits that commenters "erroneously applied WOGCC data," as shown by the

listing of duplicate wells and the inclusion of wells drilled as early as 1974.  Wyoming's Opp'n

re ECF No. 64, ECF No. 77 at 34–36 (citing Kropatsch Decl., ECF No. 77-1 ¶ 28).

Plaintiffs also argue that BLM's cumulative effects analysis was deficient because it

failed to quantify greenhouse gas emissions from "other projects in the region," either "in

isolation or when added to the Converse County Project," and instead "simply compared" the

Converse County Project emissions to existing emission levels, which cannot "serve as the

quantification of cumulative greenhouse emissions since they predated the Project by many

years, failing to account for projects that had come online in recent years."  ECF No. 64-1 at 35

(quotation marks and internal citations omitted).  They further assert that BLM did not "capture[]

future wells" in its statewide and nationwide emissions quantifications.  Pls.' Reply re ECF
No. 64, ECF No. 91 at 18–19.

The final EIS, however, shows that BLM quantified and disclosed emissions from: (i) all
existing wells in the Casper Field Office area as of 2014, (ii) all existing oil and gas systems on
federal land in Wyoming in 2014, (iii) all future emissions from 1,300 non-Project wells in all
Wyoming BLM Field Office areas, (iv) all oil and gas systems on all lands in Wyoming as of
2018 (which includes the future wells BLM predicted would come online after 2015), and (v) all
oil and gas development in the country as of 2017 (also accounting for post-2015 wells).  *See*
ECF No. 64-9 at PIR-1020–21.  BLM also compared estimated direct and indirect emissions for
Alternatives A and B, listing each Project's emissions as a percentage of local, state, and national
emission levels.  *Id.*

In their motion and Amended Complaint, Plaintiffs did not identify specific projects—
past, present, or reasonably foreseeable—that BLM failed to analyze.  In their reply, they
contend that BLM excluded "every single future project outlined in Table 5.2-1," ECF No. 91 at
18 (citing ECF No. 64-9 at PIR-1002, PIR-1020), but they presented no evidence to support that
contention.  Table 5.2-1 is a list of additional well pads and associated facilities that would be
developed under Alternative A, as well as other "past, present, and reasonably foreseeable oil
and gas activity" in the larger cumulative impact study area.  ECF No. 64-9 at PIR-1001.[1]  In

---

[1] "Under Alternative A, an additional 386 well pads and 26 associated facilities remain to be
developed within the [Project area] . . . . Table 5.2-1 provides a list of these and other past,
present, and reasonably foreseeable oil and gas activity in the larger general [cumulative impact
study area] for the proposed Project.  The projects listed as reasonably foreseeable include those
for which NEPA decision documents are anticipated or in process but have not yet been
completed, excluding the proposed Project.  These projects also are displayed on Figure 5.2-1.

Table 5.2-1 also provides information on the five gas plants within the [Project area] associated
with existing oil and gas production as of December 31, 2015."

Table 5.3-7, BLM compared direct, indirect, and total greenhouse gas emissions under Alternative A and B.  ECF No. 64-9 at PIR-1020.  Plaintiffs have not demonstrated, through argument or evidence, that BLM's comparative cumulative effects analysis in Table 5.3-7 failed to account for the emissions identified in Table 5.2-1.  Nor is such a failure apparent when reviewing the tables.

Consequently, at this stage of the litigation, Plaintiffs have not demonstrated a likelihood of success on the merits on any of their claims.

### ii.   Likelihood of Irreparable Harm

To demonstrate irreparable harm, a movant for a preliminary injunction must show that the harm is (i) "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and (ii) "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up).  The movant must also "substantiate the claim that irreparable injury is 'likely' to occur" by providing "proof indicating that the harm is certain to occur in the near future."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  "[T]he degree of proof required for 'irreparable harm' is 'high,' and . . . failure to surmount it provides 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.'"  *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Plaintiffs argue that their members' ability to "live, work, and recreate" in the Project area "will [be] irreparably impair[ed]" if drilling in the Project area is permitted to move forward.  ECF No. 64-1 at 39.  They further argue that "[u]nless enjoined, a significant portion of the Project will be constructed before a merits decision is reached, polluting the air they breathe, threatening their water supplies, destroying the landscape's natural character, generating noise

and light pollution, and decreasing opportunities for wildlife viewing, quiet solitude, and recreation." *Id*.  In support, they rely on BLM's final EIS, in which BLM acknowledged a plethora of potential environmental harms to air quality, wildlife populations, outdoor recreation, and noise in the Project area and surrounding areas.  *See* ECF No. 64-1 at 40 (citing ECF No. 64-9).  In addition, five of Plaintiffs' members aver that they live in or regularly visit the Project area for recreation or work, that they enjoy many activities such as hiking, wildlife viewing, spiritual renewal, and solitude, and that Defendants' approval of drilling activities will irreparably harm them due to loss of recreational opportunities, scarcity of wildlife, noise pollution, air pollution, and so forth.  *See* ECF No. 64-3 ¶¶ 8–16; ECF No. 64-4 ¶¶ 2, 3, 5, 7–22; ECF No. 64-5 ¶¶ 3–5, 8, 12, 18, 19; ECF No. 64-6 ¶¶ 12, 19–26; ECF No. 64-7 ¶¶ 6, 8–14.

But Plaintiffs have failed to allege, with any specificity, when these alleged irreparable harms will occur.  They ignore language in the final EIS explaining that many of these impacts are temporary or subject to mitigation, and therefore not irreparable.  *See, e.g.*, ECF No. 64-9 at PIR-0701 (observing that "indirect effects such as visual disturbances from well pad construction and temporary pipelines could be avoided over the long term if their causes are removed").  At oral argument, when asked about the paucity of their irreparable harm analysis, Plaintiffs argued that their members' declarations show that they are already being harmed from increased traffic and dust due to ongoing construction from the Project.  But this type of harm is not beyond remediation.  *See W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) (finding temporary increased traffic and associated air impacts were not irreparable harm).

Plaintiffs have not alleged that they will suffer imminent and irreparable harm to their enjoyment of recreational or aesthetic activities on federal land—or that Katherman will suffer

such harm on her own land.  They rely mainly on the final EIS, but merely pointing to "any potential environmental injury" is not enough to establish irreparable harm on a motion for a preliminary injunction.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010).

Further, a balance of the equities weighs against granting preliminary injunctive relief because Plaintiffs waited nearly 21 months after Defendants issued the Converse County Record of Decision to bring this suit.  At oral argument, Plaintiffs admitted that they knew that Defendants had issued the Record of Decision, and that they had commented on the final EIS as well as many of the subsequently approved APDs.  But they claimed that they lacked the financial and human capital—apparently for nearly two years—to initiate this suit.  Even after they filed suit, however, Plaintiffs waited more than six months to move for a preliminary injunction, *see* ECF No. 64, and subsequently sought an eleven-day extension to file their reply due to a conflict with their counsel's planned two-week leave, *see* ECF No. 76.  "These unexplained delays in seeking emergency relief undermine their contention that they will be irreparably harmed absent an injunction."  *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 50 (D.D.C. 2020) (citing *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).

### III.    CONCLUSION

For the reasons explained, the court will DENY Plaintiffs' Motion for a Preliminary Injunction; DENY Private-Intervenor's Motion to Transfer; and GRANT in part Private-Intervenors' Motion to Dismiss.

Three corresponding Orders will accompany this Opinion.

Date: November 6, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge