**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **POWDER RIVER BASIN RESOURCE COUNCIL and WESTERN WATERSHEDS PROJECT**, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. DEPARTMENT OF THE INTERIOR and U.S. BUREAU OF LAND MANAGEMENT**, <br><br> Defendants, <br><br> and <br><br> **STATE OF WYOMING, et al.**, <br><br> Defendant-Intervenors. | Case No. 1:22-cv-2696-TSC |

**PRIVATE DEFENDANT-INTERVENORS'
COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ...............................................................................4

    I.    The Project. ...............................................................................4

    II.    Current Development. ................................................................6

LEGAL STANDARDS ........................................................................................6

ARGUMENT ........................................................................................................7

    I.    BLM Satisfied NEPA. ..............................................................7

        A.    BLM Took a "Hard Look" at Groundwater Modeling and Use. .................7

        B.    BLM Took a "Hard Look" at Cumulative Greenhouse Gas Emissions. ...15

        C.    BLM Considered a Reasonable Range of Alternatives and Adequately Justified Its Decision to Eliminate Certain Alternatives From Further Analysis ................................................................20

    II.    BLM Properly Relied on the State of Wyoming's Authority to Regulate Air Quality ................................................................27

        A.    BLM Did Not Disclaim Its Authority to Regulate Air Quality in the ROD. ................................................................28

        B.    BLM Properly Relies on the Clean Air Act to Protect Air Quality. ..........29

    III.    The RMPA Does Not Run Afoul of BLM's Obligation to Prevent Unnecessary or Undue Degradation of Public Lands. ...........................................31

        A.    The Hallmark Feature of the Operator Group's Proposed Action Is Limited Relief from Raptor Timing Limitation Stipulations to Facilitate Efficient Development. ................................................................31

        B.    The RMPA Will Not Result in Unnecessary or Undue Degradation. .......36

        C.    Plaintiffs Improperly Attempt to Transform BLM's Obligation to Prevent Unnecessary or Undue Degradation Into a Procedural Requirement. ................................................................42

    IV.    Remedy. ................................................................44

**A.**    Not One of BLM's Purported Errors is Sufficiently Serious to Warrant Vacating the FEIS, ROD, or RMPA.............................................45

**B.**    The Disruptive Consequences of Vacating the FEIS, ROD, or RMPA Would be Severe, Further Counseling Against Vacatur...........................47

CONCLUSION.................................................................................................................49

4870-8994-5009.4

## GLOSSARY OF TERMS

| Abbreviation | Term |
|---|---|
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| Casper RMP | Casper Resource Management Plan |
| Defendant-Intervenors | Continental Resources, Inc., Devon Energy Production Company LP, Anschutz Exploration Corporation, and the Petroleum Association of Wyoming |
| Project | Converse County Oil and Gas Project |
| DEIS | Draft Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| Fed. Defs.' Br. | Federal Defendants' Combined Cross Motion for Summary Judgment & Response Brief in Opposition (Mar. 28, 2024), ECF No. 118 |
| FLPMA | Federal Land Policy and Management Act |
| FEIS | Final Environmental Impact Statement |
| GHG | Greenhouse Gas |
| IBLA | Interior of Board of Land Appeals |
| Pls.' Br. | Memorandum of Points & Authorities In Support. of Plaintiffs' Motion for Summary Judgment. J. (Jan. 26, 2024), ECF No. 116-1 |
| MBTA | Migratory Bird Treaty Act |
| MLA | Mineral Leasing Act |
| NEPA | National Environmental Policy Act |
| PAW | Petroleum Association of Wyoming |
| ROD | Record of Decision |
| RMPA | Resource Management Plan Amendment |
| SUPO | Surface Use Plan of Operations |

## <u>TABLE OF AUTHORITIES</u>

*\* Authorities upon which we chiefly rely are marked with asterisks.*

**Page(s)**

**Cases**

*Alabama v. U.S. Army Corps of Eng'rs,*
  __ F. Supp. 3d __, 2023 WL 7410054 (D.D.C. Nov. 9, 2023)..........................................6, 7, 9

**\*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ................................................................45, 46, 47, 49

*Allina Health Servs. v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) ...............................................................................45

*American Great Lakes Port Ass'n. v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020) ................................................................................47

*Bd. of County Comm'rs of San Miguel County v. BLM,*
  584 F. Supp. 3d 949 (D. Colo. 2022) ......................................................................43

*Biodiversity Conservation All. v. BLM,*
  No. 09-CV-08-J, 2010 WL 3209444 (D. Wyo. June 10, 2010)..............................42

*Citizens Against Burlington, Inc. v. Busey,*
  938 F.2d 190 (D.C. Cir. 1991) ..................................................................................8

*City of Alexandria v. Slater,*
  198 F.3d 862 (D.C. Cir. 1999) ..........................................................................21, 25

*Conservation Law Found. v. Ross,*
  374 F. Supp. 3d 77 (D.D.C. 2019) ....................................................................21, 24

*Ctr. for Biological Diversity v. FERC,*
  67 F.4th 1176 (D.C. Cir. 2023)..........................................................................26, 27

*Ctr. for Food Safety v. Regan,*
  56 F.4th 648 (9th Cir. 2022) ...................................................................................48

*Dakota Res. Council v. DOI,*
  No. 22-cv-1853 (CRC), 2024 WL 1239698 (D.D.C. Mar. 22, 2024)....................16

*DOT v. Pub. Citizen,*
  541 U.S. 752 (2004).................................................................................................27

*Humane Soc'y v. United States,*
  No. 19-cv-2458 (BAH), 2023 WL 3433970 (D.D.C. 2023)...................................48

i

*Me. Lobstermen's Ass'n v. NMFS*,
    70 F.4th 582 (D.C. Cir. 2023) ................................................................46

*Milk Train, Inc.v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ..............................................................47

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ..............................................................................45

*N. Plains Res. Council Inc. v. BLM*,
    No. CV 14-60-BLG-SPW, 2016 WL 1270983 (D. Mont. Mar. 31, 2016) ..............................7

*Nat. Res. Def. Council v. Pena*,
    972 F. Supp. 9 (D. D.C. 1997) ..............................................................21

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................................38

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C. 2005) .....................................................25

*Protect Our Cmtys. Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ................................................................40

*Public Citizen, Inc. v. FERC*,
    92 F.4th 1124 (D.C. Cir. 2024) .............................................................45

*Quechan Tribe of the Fort Yuma Indian Rsrv. v. DOI*,
    927 F. Supp. 2d 921 (S.D. Cal. 2013) ..................................................42

*San Juan Citizens All. v. Stiles*,
    No. 08-cv-00144-RPM, 2010 WL 1780816 (D. Colo. May 3, 2010) ....................................30

*Solar Energy Indus. Ass'n v. FERC*,
    80 F.4th 956 (9th Cir. 2023) ................................................................46

*Sovereign Iñupiat for a Living Arctic v. BLM*,
    No. 3:23-cv-00058 & -00061-SLG (D. Alaska Nov. 9, 2023) ...............................24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F. Supp. 3d 91 (D.D.C. 2017) .......................................................46

*Texas v. EPA*,
    690 F.3d 670 (5th Cir. 2012) ................................................................29

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    605 F. Supp. 2d 263 (D.D.C. 2009) .......................................................8

4870-8994-5009.4

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    616 F.3d 497 (D.C. Cir. 2010) ........................................................................38

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    661 F.3d 66 (D.C. Cir. 2011) .........................................................................36

*United States v. Texas,*
    599 U.S. 670, 143 S. Ct. 1964 (2023) (Gorsuch, J., concurring)..............................45

*Vt. Yankee Nuclear Power Corp. v. NRDC,*
    435 U.S. 519 (1978)......................................................................................25

*W. Watersheds Project v. BLM,*
    76 F.4th 1286 (10th Cir. 2023) ...............................................................18, 43

*W. Watersheds Project v. Haaland,*
    22 F.4th 828 (9th Cir. 2022) ........................................................................22

*WildEarth Guardians v. BLM,*
    8 F. Supp. 3d 17 (D.D.C. 2014) ...................................................................30

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) .....................................................................16

*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019) ...............................................................18

*Wilderness Soc'y v. DOI,*
    No. 22-cv-1871 (CRC), 2024 WL 1241906 (D.D.C. Mar. 22, 2024)...................24

\*\**Wyoming v. DOI,*
    493 F. Supp. 3d 1046 (D. Wyo. 2020) ...............................................27, 29, 30

**Statutes**

30 U.S.C. § 21a.............................................................................................22

42 U.S.C. § 4332(2)(C)(iii)..........................................................................3, 20

43 U.S.C. § 1732(b) .................................................................................31, 36

\*\*Administrative Procedure Act (APA) ................................................6, 7, 45, 49

Clean Air Act ...............................................................3, 27, 28, 29, 30, 31

\*\*Federal Land Policy and Management Act (FLPMA)........................... 4, 23, 24, 30, 31, 36, 42

Migratory Bird Treaty Act (MBTA).................................................................4, 39, 40

4870-8994-5009.4

**National Environmental Policy Act (NEPA)
................................1, 2, 3, 6, 7, 8, 9, 10, 15, 18, 19, 20, 21, 23, 24, 25, 26, 28, 34, 35, 44, 46

**Other Authorities**

43 C.F.R. Part 1600 .................................................................................................43

43 C.F.R. § 4.1 ........................................................................................................30

43 C.F.R. § 1601.0-6 ..............................................................................................43

43 C.F.R. § 1610.3-2(e) ..........................................................................................43

43 C.F.R. § 1610.5-2 ..............................................................................................43

43 C.F.R. § 1702(c) ................................................................................................37

43 C.F.R. § 1702(l) .................................................................................................37

43 C.F.R. § 3162.1(a) .......................................................................................23, 25

46 Fed. Reg. 18,026 (Mar. 23, 1981) .....................................................................28

88 Fed. Reg. 47,562 (Jul. 24, 2023) ..................................................................21, 22

89 Fed. Reg. 9920 (Feb. 12, 2024) .........................................................................40

*Coal. for Responsible Mammoth Dev.*,
    187 IBLA 141 (2016) .........................................................................................30

*Colorado Env't Coal.*,
    165 IBLA 221 (2005) .........................................................................................36

Executive Order 13186 ......................................................................................39, 41

Federal Rule of Civil Procedure Rule 56 ...........................................................1, 6, 7

Local Civil Rule 7(h) ................................................................................................1

*Powder River Basin Res. Council*,
    183 IBLA 83 (2012) ...........................................................................................30

*Tempest Expl. Co.*,
    196 IBLA 386 (2021) .........................................................................................22

U.S. Energy Information Administration, Annual Energy Outlook (2022),
    https://www.eia.gov/outlooks/aeo/pdf/AEO2022_ReleasePresentation.pdf
    (last visited, Mar. 24, 2024) ..............................................................................25

*Wyo. Outdoor Council,*
    176 IBLA 15 (2008)..................................................................................................... 30

4870-8994-5009.4

Private Defendant-Intervenors—Continental Resources, Inc., Devon Energy Production Company LP, Anschutz Exploration Corporation, and the Petroleum Association of Wyoming ("PAW") (collectively, the "Defendant-Intervenors")—respectfully cross move for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h) and submit this response to Plaintiffs' Motion for Summary Judgment, ECF No. 116.

## <u>INTRODUCTION</u>

After failing to obtain a preliminary injunction and having their claims against individual applications for permit to drill ("APD") dismissed—*see* Mem. Op. (Nov. 6, 2023), ECF No. 105— Plaintiffs now ask the Court to invalidate the record of decision ("ROD"), final environmental impact statement ("FEIS"), and accompanying resource management plan amendment ("RMPA") for the Converse County Oil and Gas Project ("Project"). Plaintiffs, however, have not shown error in the Bureau of Land Management's ("BLM") nearly six-year analysis and subsequent approval of the Project.

Plaintiffs attack the Project on three primary grounds. First, Plaintiffs contend the BLM failed to satisfy the National Environmental Policy Act ("NEPA") in its analysis of groundwater impacts, greenhouse-gas ("GHG") emissions, and reasonable alternatives. Second, Plaintiffs argue BLM inappropriately "disclaimed" authority to require air-quality mitigation measures. Third, Plaintiffs complain that the RMPA violates BLM's duty under the Federal Land Policy and Management Act ("FLPMA") to avoid unnecessary and undue degradation. Each of Plaintiffs' complaints fails to establish reversible error in BLM's analysis and approval of the Project.

*First*, BLM complied with NEPA in analyzing groundwater impacts, GHG emissions, and reasonable alternatives.

**Groundwater.** BLM used an industry-standard and Environmental Protection Agency ("EPA") verified model to analyze potential impacts from development. BLM carefully considered and addressed comments on the model from federal and state agencies. BLM only has a duty to give those comments careful consideration, which BLM did. Furthermore, BLM adequately analyzed or otherwise explained its analysis of increased groundwater use. Plaintiffs' assertions to the contrary cannot overcome BLM's response to comments. BLM's groundwater model predicted no excessive groundwater drawdowns even with increased water use up to 100-percent more than initially predicted.

**GHG Emissions.** Plaintiffs repeat their previously unsuccessful arguments on BLM's analysis of the cumulative impacts of GHG emissions. They disagree with the Court's determination, *see* Mem. Op. at 26–28 (Nov. 6, 2023), ECF No. 105, that they were unlikely to succeed on the merits of this claim but provide nothing to undermine the Court's conclusion that BLM met NEPA's hard-look requirement. Consistent with NEPA, agency guidance, and this Court's precedent, BLM quantified the total GHG emissions anticipated from the Project and the no-action alternative, quantified the total GHG emissions from other oil-and-gas development at the local, state, and national levels, and then compared the alternatives' values to the estimated emissions at each level for context. Plaintiffs do not challenge BLM's chosen methodology; instead, they argue that BLM failed to include estimates of *future* GHG emissions in its quantifications and comparisons. Plaintiffs are wrong—as demonstrated by the record. BLM expressly included estimates of *future*, predicted GHG emissions from the Project, the no-action alternative, and at the local, state, and national levels in its analysis. Then the agency provided the necessary context for its quantifications by also disclosing the real-world impacts of GHG emissions on climate change. That is all that was required of BLM.

**Reasonable Alternatives.** BLM considered a reasonable range of alternatives. Plaintiffs argue that BLM violated NEPA by eliminating from further analysis a reduced-rate-of-development alternative and a GHG-reduction alternative. But because NEPA requires BLM to consider only those alternatives that are "technically and economically feasible, and meet the purpose and need of the proposal," 42 U.S.C. § 4332(2)(C)(iii), BLM rejected further consideration of Plaintiffs' proposed alternatives because—among several other reasons—those proposals were infeasible, did not meet the purpose and need of the Project's proposal, and, crucially, went beyond BLM's authority to implement. In so rejecting the alternatives, BLM satisfied its obligation to provide a reasoned explanation for having eliminated the rejected alternatives. BLM satisfied NEPA.

*Second*, in the ROD, BLM properly declined to impose air-quality mitigation measures and instead opted to rely on the State of Wyoming's authority to regulate air quality. Plaintiffs point to BLM's statements in the FEIS to argue that BLM improperly disclaimed authority to regulate air quality. But BLM never made such statements in the ROD. Instead, BLM explained in the ROD that it would rely on the State of Wyoming's authority under the Clean Air Act to protect air quality. BLM's statements in the ROD, and not the FEIS, represent its final decision that is the subject of this Court's review. Furthermore, both courts and the Interior of Board of Land Appeals ("IBLA") have recognized that BLM may properly rely on states' authority under the Clean Air Act to regulate air quality.

*Finally*, consistent with FLPMA's multiple use mandate, BLM balanced different resources and land uses when amending the Casper Resource Management Plan ("Casper RMP") to substitute one raptor management tool for another. Specifically, BLM amended the Casper RMP to allow operators to substitute a blanket prohibition on occupancy around raptor nests with a suite

of management measures aimed at protecting raptors while allowing operators flexibility in development. Plaintiffs do not demonstrate that the RMPA will result in unnecessary or undue degradation because they do not demonstrate it will cause effects greater than the usual effects of development, that BLM violated its obligations under federal law and policy, or that the RMPA will result in unnecessary harm. Plaintiffs overlook that BLM specifically responded to comments about both the "unnecessary or undue degradation" standard and allegations that the RMPA would lead to violations of the Migratory Bird Treaty Act ("MBTA"). To both sets of comments, BLM pointed to its adoption of Option 6 in approving the RMPA. WY_012311 at 12337 (responding to comment about undue degradation by pointing to "a new option (Option 6) . . . which is the agency's preferred alternative");  WY_016639 at 16652 (explaining that the RMPA "is consistent with the MBTA and associated agency regulation;" and that in "selecting Option 6, which includes avoidance and minimization measures and other procedure considerations" for future projects within raptor buffers, BLM has met its obligations under "FLPMA, and the MBTA"); *id.* at 16654–55 (same). Plaintiffs also cannot transform BLM's obligation to prevent unnecessary or undue degradation into a procedural requirement. The RMPA reflects BLM's careful balancing of multiple uses and does not violate FLPMA.

In sum, Plaintiffs have not demonstrated error in BLM's analysis or approval of the Project. Plaintiffs' motion for summary judgment should be denied and Federal Defendants' and Defendant-Intervenors' cross motions should be granted.

**FACTUAL BACKGROUND**

I.    **The Project.**

In 2014, a group of five oil-and-gas operators—all PAW members, including Devon and Continental's predecessor-in-interest (collectively the "Operator Group")—proposed the Project to BLM to facilitate the exploration and production of oil and gas. WY_016733 at 16736. The

Project allows the development of 5,000 oil and natural gas wells in Converse County, Wyoming. *Id.* Any operator developing oil-and-gas resources in Converse County can rely on the ROD and its associated FEIS when permitting oil-and-gas wells. *See, e.g.*, 1st Am. Compl., App. A (Dec. 14, 2022), ECF No. 44 (listing all APDs submitted under the Project from operators, including those not in the Operator Group). After nearly six years of exhaustive environmental analysis, public comment, and study, BLM approved the Project in December 2020. WY_016733 at 16735.

The Project covers 1.5 million acres in southeast Wyoming, one of the nation's foremost producers of energy, where mineral extraction and energy development have occurred in Converse County for decades. More than 1,500 oil-and-gas wells already operate in the Project area. WY_012362 at 12600. Uranium development occurs in the Project area, and historically coal was mined there as well. *Id.* More recently, multiple centers for wind energy have been constructed within the Project area. *Id.* at 12600–01. In addition to mineral extraction and energy development, cattle and sheep grazing is a significant land use. *Id.* at 12597. The Project will yield significant economic benefits to the region, *see id.* at 13053–88, without altering the balance of land uses in the area.

The Project is unique in three respects. First, the Project contemplates development of oil and natural gas through horizontally drilled wells. Horizontal wells are first drilled vertically to the target mineral formation and then turn and run parallel to the surface for one to two miles (or more). *Id.* at 12450; *see also* ECF No. 80-3, Illustration of Horizontal Well. Because of their length, these wells may traverse and develop multiple mineral estates. Depending on its location, a single well can develop minerals owned privately (i.e., in "fee"), federally, and by the State. Because of their length, several wells can be drilled from a single well pad, thus reducing the surface footprint and associated impacts. *See* WY_012362 at 12376 (predicting 5,000 wells will be drilled from

1,500 well pads in the Project area).

Second, about 90 percent of the Project surface area is owned privately or by the State. *Id.* at 12372, 12597. Thus, most development will occur on privately or State-owned surface, with relatively little development occurring on federally owned surface.

Third, this combination of horizontal wells and limited federal surface ownership creates unique considerations for BLM when approving APDs. Some wells in the Project area that extract from federal oil-and-gas leases will be drilled on fee lands above nonfederal minerals, outside of federal lease boundaries. *Id.* at 12426. These wells are known as "Fee/Fee/Fed" wells. *Id.*

## II.    **Current Development.**

Through the ROD and FEIS, BLM studied and approved the environmental impacts of the development of 5,000 oil-and-gas wells over ten years at an anticipated rate of 500 wells per year. *See, e.g.*, WY_012362 at 12374. To date, however, actual development has occurred far slower than anticipated. As of December 14, 2022—nearly two years after approval of the ROD, *see* WY_016733 at 16735—only 407 APDs had been approved for the Project. *See* 1st Am. Compl., App. A (Dec. 14, 2022), ECF No. 44. In other words, even if all the approved APDs were drilled (and they have not been), development is occurring at less than half the rate analyzed and approved.

## **LEGAL STANDARDS**[1]

Federal Rule of Civil Procedure 56 governs motions for summary judgment, except when litigants seek review under the Administrative Procedure Act ("APA"). *Alabama v. U.S. Army Corps of Eng'rs*, __ F. Supp. 3d __, 2023 WL 7410054, at *15 (D.D.C. Nov. 9, 2023). In the APA context, "'it is the role of the agency to resolve factual issues to arrive at a decision that is supported

---

[1] Defendant-Intervenors specifically incorporate by reference Federal Defendants' Legal Background, but emphasize the deference due to BLM and its technical expertise in performing its NEPA analysis. *See* Fed. Defs.' Combined Cross Mot. for Summ. J. & Resp. Br. in Opp'n at 2–6 (Mar. 28, 2024), ECF No. 118 ("Fed. Defs.' Br.").

4870-8994-5009.4

by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). In the APA context, Rule 56 is the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

Agency decisions under NEPA "involve 'complex judgments about sampling methodology and data analysis that are within the agency's technical expertise,' and are therefore accorded 'an extreme degree of deference.'" *Id.* at *16 (quoting *Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009)). "In other words, deference to the agency's judgment is particularly appropriate where, as here, the decision at issue 'requires a high level of technical expertise.'" *Id.* (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)).

## ARGUMENT

### I.    BLM Satisfied NEPA.

#### A.    *BLM Took a "Hard Look" at Groundwater Modeling and Use.*

BLM analyzed the Project's potential impacts to groundwater by modeling various scenarios for the Project through a model known as "MODFLOW." WY_011983 at 12009. MODFLOW is an industry-standard model and has been verified by the EPA. *See N. Plains Res. Council Inc. v. BLM*, No. CV 14-60-BLG-SPW, 2016 WL 1270983, at *11 (D. Mont. Mar. 31, 2016) ("To look at the hydrologic impacts on the groundwater, BLM used an industry standard and EPA-verified software package called MODFLOW-SURFACT.").

Plaintiffs first attack the BLM's compliance with NEPA based on allegedly faulty inputs and assumptions for BLM's groundwater model. Mem. of Points & Authorities In Supp. of Pls.' Mot. for Summ. J. at 17–24 (Jan. 26, 2024), ECF No. 116-1 ("Pls.' Br."). Although Plaintiffs

present these arguments first, the arguments were not important enough for Plaintiffs to raise them with BLM during the extensive public comment process. Plaintiffs never raised any issue with specific storage, annual water use, recycling, groundwater pumping rates, or existing groundwater wells. *See* WY_003387 (Western Watersheds Project's March 12, 2018, comment letter on the DEIS); WY_006329 at 6333–34 (Powder River Basin Resource Council's March 12, 2018, comment letter on the DEIS, addressing general concerns of "Impacts to Water Resources" but never mentioning the specific items raised in Plaintiffs' Brief);[2] WY_015114 (Western Watersheds Project August 31, 2020, protest to RMPA and FEIS comments). Plaintiffs decided that this issue was not significant enough to alert BLM to their concern during the administrative process. But now it has become their leading argument.

Plaintiffs instead primarily rely on comments submitted by the EPA and Wyoming State Engineer's Office. *See* Pls.' Br. at 15–24. They fail to recognize, however, that those comments are merely advisory and cannot dictate the outcome of BLM's NEPA analysis. "Although an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees." *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 276 (D.D.C. 2009) (citing *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999)); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991) ("[U]nder the rule of reason, a lead agency does not have to follow the EPA's comments slavishly—it just has to take them seriously."). BLM did just that. BLM carefully considered and responded to both EPA's and the Wyoming State Engineer's Office's comments on the groundwater modeling. *See* WY_012131 at 12179–82 (responding to EPA comments); *id.* at

---

[2] *See also* WY_008778 (National Parks Conservation Association and Powder River Basin Resource Council July 23, 2019 comments on SDEIS); WY_008783 (Powder River Basin Resource Council July 24, 2019 comments on SDEIS).

8

12307–08 (responding to Wyoming State Engineer's Office comments). BLM need not defer to EPA or the Wyoming State Engineer's Office; BLM's careful consideration and responses satisfy NEPA.

Defendant-Intervenors incorporate by reference Federal Defendants' arguments on the NEPA groundwater analysis. *See* Fed. Defs.' Br. at 12–27. Defendant-Intervenors next add additional contentions on specific storage and groundwater consumption.

> 1.   *BLM's Specific Storage Value Bears a Rational Relationship to the Actual Data.*

"As the D.C. Circuit has explained, an agency's modeling must be deferred to unless it is 'so flawed' that the resulting findings 'bore no rational relationship to the characteristics of the data to which it is applied.'" *Alabama*, 2023 WL 7410054, at *48 (quoting *Alaska Airlines*, 588 F.3d at 1120). Specific storage was but one of numerous inputs to BLM's groundwater model. *See* Fed. Defs.' Br. at 12–17 (explaining the complexity of the groundwater model and related inputs). Although Plaintiffs criticize the BLM's use of 0.001 for a specific-storage value, they neglect to acknowledge that the value bears a rational relationship to the *actual* specific-storage values observed in the applicable aquifers. That is, for each of the aquifers, the 0.001 value falls within the minimum and maximum specific storage *actually observed*:

**Table 4.2-5**
**Comparison Between Reported Specific Storage Values and Those Used in the CMGM**

| Aquifer Unit | Model Layer | Reported Specific Storage Values (per meter) | | | Model-specific Storage Values (per meter) | | |
|---|---|---|---|---|---|---|---|
| | | Minimum | Maximum | Geometric Mean | Minimum | Maximum | Predominant |
| Alluvium[1] | 1 and 2 | 0.001 | 0.23 | 0.018 | 0.05 | 0.05 | 0.05 |
| Wasatch | 1, 2, and 3 | 7.00E-07 | 0.03 | 4.30E-05 | 4.9E-06 | 1.0E-05 | 7.0E-06 |
| Confining Layer | 4 | 6.4E-08 | .11 | 9.1E-05 | 1.0E-03 | 0.001 | 1.0E-03 |
| Upper Fort Union | 5 | 6.408E-08 | 0.11 | 9.1E-05 | 1.08E-07 | 1.08E-07 | 1.08E-07 |
| Lower Fort Union | 6 | – | – | – | 1.00 E-05 | 1.00 E-05 | 1.00 E-05 |

[1]Alluvium values are specific yield (dimensionless).
Source: ESI 2006.

WY_018245 at 128363 (2006 version of ESI groundwater study for Powder River Basin). While other iterations of the groundwater model for other projects may have used a different value, BLM's use of 0.001 bears a rational relationship to the specific storage values actually observed in the applicable aquifers. That is all that is required and, therefore, BLM's model must be given deference.

### 2. BLM Adequately Analyzed Increased Groundwater Consumption and the Use of Recycling and Surface Water.

Plaintiffs' next three arguments focus on one basic point: BLM failed to account for new representations or data that showed increased groundwater use. *See* Pls.' Br. at 17–24.[3] Whether Plaintiffs attack through updated information (that arose *after* BLM's cutoff date for analysis) on (1) groundwater pumping rates, (2) assumptions related to recycling, or (3) existing groundwater wells, their underlying assertion is that BLM's groundwater model failed to account for potential increased water consumption in the Project area. *See id.* But these arguments are quickly dispelled by BLM's recognition that its model accounted for groundwater consumption up to 100 percent greater than what was initially proposed without excessive drawdown. Specifically:

> Even if water consumption for the project may be 50 to 100 percent greater than initially proposed, the model indicates that drawdown would not be excessive, and water levels would recover at some point after pumping would cease.

WY_012131 at 12307. Plaintiffs fail to explain why BLM's characterization of the output of its groundwater modeling is arbitrary even under Plaintiffs' feared increase in consumption rates. *See* Pls.' Br. at 17–24. Rather, BLM acknowledged the various comments from EPA and the Wyoming State Engineer's Office and rationally explained that BLM's groundwater model indicated no

---

[3] Defendant-Intervenors specifically incorporate by reference Federal Defendants' arguments on the NEPA groundwater analysis specific to groundwater pumping rates and existing groundwater wells. *See* Fed. Defs.' Br. at 18-23, 24-27.

excessive groundwater drawdown even at consumption rates 50 to 100 percent greater than initially proposed. WY_012131 at 12307.

Plaintiffs next attack BLM's groundwater analysis based on annual consumption and water recycling. Pls.' Br. at 20–23. But their arguments rest entirely on a misinterpretation of the Operator Group's comments. Plaintiffs argue, "to avoid updating the model," BLM claimed the increased annual consumption "'would not increase the use of groundwater as the additional water would be expected to come from water recycling and leasing of existing surface water.'" *Id.* at 20 (quoting WY_012313 at 12179). Plaintiffs claim that "BLM offered no rational basis for that critical assumption." *Id.* Specifically, Plaintiffs contend "the central assumption driving the 'no increase' claim was that the operators would recycle enough water to offset the doubling of demand." *Id.* at 20. They argue the Operator Group claimed that "it could not achieve a 50% recycling rate by year five of the Project" in comments responsive to Alternative C in the Draft Environmental Impact Statement ("DEIS")—a recycling rate that Plaintiffs contend the Operator Group said was "infeasible." *Id.* at 20–21.

But that is not what the Operator Group's comments stated. Instead, the Operator Group explained that it was infeasible to implement water recycling for "all completion and production activities" for 50 percent of well pads—not that water *recycling itself* or any given *rate* of recycling was infeasible. *See* WY_005408 at 5445; WY_011451 at 11453.

The Operator Group explained this in comments addressing Alternative C in the DEIS. Alternative C includes a consideration of certain "design features" for water recycling. Alternative C would require "[w]ater recycling for *all completion and production activities for 50 percent of the well pads by year five*." WY_001183 at 1193 (emphasis added); *see also* WY_001253 at 1292

(explaining the DEIS's water-recycling design features). In other words, Alternative C proposed

that "all completion and production activities" for half the well pads must utilize recycled water.

In response to the DEIS's proposed requirement, the Operator Group stated:

> The design features identified in Alternative C are infeasible and must be revised. In particular, the requirements to install oil gathering pipelines, water pipelines, *and water recycling for all completion and production activities are not feasible. Although the Operator Group anticipates that water recycling will be used more widely over the lifetime of the Project, use of recycled water for all completion and production activities by year five of the Project is not feasible.* A myriad of factors beyond BLM's and the Operator Group's control, such as technological limitations, economic feasibility, commodity prices, and availability of equipment and crews, prevent the Operator Group from committing to these measures by year five of the Project.

WY_005408 at 5445 (emphasis added). The Operator Group further commented that the design

features "would be difficult if not impossible to implement" because of the differences in

infrastructure and conditions of each well pad where BLM would require that all water would be

recycled: "[a]mounts of recycled produced water for drilling and completion operations will vary

by well depending on factors such as available methods of transporting produced water between

well pads, the location of the well, available produced water volumes, and a given operator's

economics." WY_011451 at 11453. What the Operator Group said was infeasible was

implementing water recycling for "all completion and production activities" for 50 percent of well

pads—not that water *recycling itself* or any given *rate* of recycling was infeasible. WY_005408 at

5445. Plaintiffs created a strawman argument for water recycling by misrepresenting Alternative

C and the Operator Group's comments on its requirements.

In contrast, the Operator Group did provide BLM examples of potential recycling rates for

the Project, although the collective group could not commit to any set recycling percentage across

all development. *See* WY_011451 at 11453. "One operator anticipates using recycled water for as

much as 60% of total water usage per well in a nearby oil and gas field." *Id.* Plaintiffs attack the

12

Operator Group's number by asserting that one operator just "hopes" to recycle "in a *different* field." Pls.' Br. at 21 (emphasis in original). Contrary to Plaintiffs' characterization, the Operator Group's comments never use the word "hope" and the comparison to a different field makes sense because the Operator Group submitted these particular comments in September 2019—over a year before BLM approved Project development. Conveniently, Plaintiffs ignore the additional recycling estimates the Operator Group provided in 2019 based on whether the to-be-recycled produced water was trucked or transported through pipelines—the very same infrastructure limitations the Operator Group previously raised:

> [O]ne operator estimates that approximately between 5,000 bbls and 8,000 bbls of produced water can be trucked to a well for use in the drilling and completion phases. By contrast, the same operator estimates that, if a pad is serviced by permanent produced water transmission pipelines, approximately 20,000 to 30,000 bbls of produced water could be used in drilling and completion operations per well.

WY_011451 at 11453. Contrary to Plaintiffs' spin on the record, the Operator Group submitted estimates of the recycling rates that could be obtained in the Project area.

Plaintiffs also aver that BLM failed to "independently evaluate" the Operator Group's comments about water recycling, particularly when it "was readily possible" using information in existing Surface Use Plans of Operations ("SUPO"). Pls.' Br. at 22. But the FEIS contradicts Plaintiffs' assertion. The FEIS states: "***According to the BLM's recent experience in the CCPA [Project area] water recycling is anticipated.***" WY_012362 at 12453 (emphasis in original) (explaining produced water management and disposal was common to all Alternatives); *id.* at 12469 (same for Alternative B). What is BLM's "recent experience" in the Project area? It is just what Plaintiffs incorrectly say that BLM did not do—i.e., analyzing and approving the information submitted in APDs and SUPOs to support BLM's analysis of the potential for water recycling.

13

WY_012362 at 12453, 12469. Furthermore, BLM included a discussion of the potential and incentives for water recycling in hydraulic fracturing:

> Recycling of water used in hydraulic fracturing has increased as hydraulic fracturing demand for water has increased (Barnes et al. 2015). However, efforts to reduce the consumption of fresh water for hydraulic fracturing have led the oil and gas industry to increasingly turn to the treatment of flowback and produced water to provide hydraulic fracturing water. The treatment process need not result in fresh water, but water that meets the operational requirements and the tolerances of oil and gas reservoirs in a given area. . . . An important limitation for recycling would be that the costs of treatment must be competitive with the cost of fresh water. However, the costs of treatment for recycling of fracturing water also could be mitigated by the economic benefits in that the costs for purchasing freshwater and ultimate disposal would be reduced or eliminated (Barnes et al. 2015). For example, in the Piceance and Uintah basins in Colorado and Utah, respectively, the use of recycled water has been reported to be as high as 90 to 100 percent (Chidsey 2015; USEPA 2015e).

WY_012362 at 13160 (water recycling analysis for Alternative C). BLM independently evaluated the Operator Group's representations by referencing BLM's own experience in the Project area, analyzing trends in recycling, addressing scholarly work on the topic, and analogizing to other oil-and-gas fields where significant recycling rates had been obtained. *Id.*

Furthermore, the administrative record before the Court proves that the Operator Group's—and other companies' within the Project area—recycling assertions were true. For example, the operator of multiple wells commits to BLM that "[a]pproximately 75 percent of the water will be recycled and reused at a future drilling site." WYP3_0019508 at 19512. The administrative record is replete with examples of water recycling occurring as the Project develops. *See, e.g.*, WYP3_0023959 at 23954 (committing to recycling approximately 75 percent of water); WYP3_0024059 at 24063 (same); WYP3_00224586 at 224597–98 ("[The operator] may recycle a portion of production water from existing, and future, [operator] wells by reuse in drilling and completion operations. . . . *Reuse of produced water would minimize the volume of fresh water required for drilling and completions*." (emphasis added)); WYP3_0001697 at 1701 (same);

WYP3_0007212 at 7216 (same); WYP3_0007303 at 7307 (same); WYP3_0007394 at 7398;

WYP3_0007484 7488 (same); WYP3_0007574 at 7578 (same); WYP3_0007664 at 7668 (same);

WYP3_00012895 at 12907 (same); WYP3_00014593 at 14597 (same); WYP3_00014702 at

14706 (same); WYP3_00016097 at 16101 (same); WYP3_00016238 at 16242 (same);

WYP3_00016355 at 16359 (same); WYP3_00016472 at 16476 (same); WYP3_00018603 at

18607 (same); WYP3_00018712 at 18716; *see also* WYP3_0003597 at 0003603 (utilizing "a

produced water recycle pond as Authorized by Wyoming Oil and Gas Conservation System" for

a water source). Despite Plaintiffs' attempts to characterize recycling as something the Operator

Group rejected or refused, recycling is something that BLM appropriately considered in its NEPA

analysis, and that it is indeed occurring on the ground.[4]

### B. *BLM Took a "Hard Look" at Cumulative Greenhouse Gas Emissions.*

BLM satisfied NEPA's hard look requirement by fully analyzing cumulative GHG

emissions impacts—consistent with NEPA, its implementing regulations, agency guidance, and

this Court's precedent. Fed. Defs.' Br. at 30–34. BLM quantified the total direct and indirect GHG

emissions anticipated from Alternative A (the no action alternative), Alternative B (the proposed

action), and other action alternatives through the life of the Project, quantified the total direct and

indirect, current and future GHG emissions from oil-and-gas development at the local, state, and

national levels, and then compared the alternatives' values to the estimated cumulative local, state,

and national emission levels for context. *See id.* at 30–32; WY_12362 at 13292–96. BLM also

---

[4] Additionally, the same is true for use of surface water for Project development. *See, e.g.*, WYP3_0022070 at 22072–73 (referencing fresh water storage ponds, Glendo Reservoir, and the North Platte river as water sources); WYP3_0022161 at 22163–64 (same); WYP3_0023059 at 23063–64 (same); WYP3_0023152 at 23156–57 (same); WYP3_0023246 at 23251–52 (same); WYP3_00023341 at 23345–46 (same); WYP3_0014060 at 14064–68 (listing multiple surface water sources for use); WYP3_0014097 at 14101–05 (same); WYP3_0011437 at 14439 (listing surface water as water source); WYP3_0014515 at 14517–18 (same); WYP3_0002587 at 2591–92 (same); WYP3_0002808 at 2812–13 (same); WYP3_0004723 at 4727–28 (same).

provided real-word comparisons for the public to appreciate the quantifications and explained the effects of GHG emissions on climate change. Fed. Defs.' Br. at 32; WY_012632 at 12963-64, 12531–33. That is all that was required of BLM. *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 309 (D.C. Cir. 2013); *Dakota Res. Council v. DOI*, No. 22-cv-1853 (CRC), 2024 WL 1239698, at *18–21 (D.D.C. Mar. 22, 2024).

Plaintiffs do not challenge BLM's chosen methodology. *See* Pls.' Br. at 24–25. They merely argue that BLM omitted all *future* oil-and-gas projects from its cumulative-effects analysis, including certain projects in the defined cumulative impacts area (listed in Table 5.2-1 of the FEIS). *See id.* at 25–26. But, as Federal Defendants explain, Plaintiffs' Table 5.2-1 arguments (1) wholly ignore BLM's robust cumulative GHG-emissions analysis, and (2) misinterpret the record. Fed. Defs.' Br. at 33–34. Beyond those two shortcomings, Plaintiffs also make incorrect statements lacking record support and seek to impose legal obligations on BLM that simply do not exist.

### 1. The Record Belies Plaintiffs' Claim That BLM Failed to Consider Reasonably Foreseeable Future Development.

In arguing that BLM failed to "quantify the greenhouse gas emissions from other reasonably foreseeable future projects," Plaintiffs incorrectly assert that BLM "simply compared the emissions from each Project alternative to *existing* local, state, and national emissions—figures which [Plaintiffs claim] *did not encompass future developments*." Pls.' Br. at 25 n.8 (emphasis added). The record directly rebuts their assertion.

While BLM quantified existing GHG emissions and compared those quantities to the Project's emissions, BLM also discussed, predicted, and quantified future emissions at the local, state, and national levels. *See* WY_012362 at 12533–36, 13293–95. For example, in estimating local GHG emissions from oil-and-gas development, BLM quantified reasonably foreseeable future emissions using a "*reasonably foreseeable well development scenario with associated*

*production estimates*, prepared by the BLM's Reservoir Management Group." WY_012362 at 13293 (emphasis added); *see also id.* at 12533 (explaining the local emission estimates were based on "the number of oil and gas wells that were *reasonably foreseeable* based on known reserves potential, information from operators, drilling technology and economics" (emphasis added)), *id.* (explaining "1,292 *new* oil and gas wells could be installed within the Casper Field Office [area]" and accounting for emissions from new wells in quantifying future local GHG emissions (emphasis added)).

To estimate statewide GHG emissions, BLM relied, in part, on a report that "presents a draft GHG emissions inventory and a 1990 to 2020 forecast for all Federal and non-Federal emission generating activities in Wyoming," as well as "an estimate of Wyoming's current and *possible future CO₂e emissions*." WY_012362 at 12534 (emphasis added).

And to assess future national GHG emissions, BLM relied on two reports (published in 2018 and 2019), one of which predicted that "*over a 10 year estimate*, emissions from fossil fuels produced on Federal lands represent, on average, 23.7 percent of national emissions of $CO_2e$" and another that predicted that "GHG emissions from natural gas combustion will continue to increase as natural gas becomes a main fuel source for electric generation." *Id.* at 12535 (emphasis added). However, BLM appropriately cabined all these predictions and estimates by explaining: "Future production is uncertain regarding the actual levels of development over time, levels of development over the life of the well, new technology, geologic conditions, and the ultimate level of production from any given well (whether reservoir related, or for economic reasons)." *Id.* at 13294–95.

4870-8994-5009.4

As demonstrated by BLM's explanations—and its caveats on the accuracy of its future-emissions estimates—BLM accounted for future GHG emissions in quantifying and comparing emissions levels.

>    2.    *Plaintiffs May Prefer That BLM Identify Every Future Project in its Cumulative GHG Impacts Analysis But That Is Not What NEPA Requires.*

Plaintiffs' criticisms of BLM's cumulative-impacts analysis rest on a false premise that BLM was required to list—either in describing the other projects considered reasonably foreseeable under Alternative A or in the cumulative GHG emissions-impacts analysis—each possible future source of GHG emissions by project name or location. *See* Pls.' Br. at 26–27. No court has *ever* required an agency to provide an itemized list of the project-specific sources of future GHG emissions considered in calculating the local, state, and national GHG emissions estimates. *Cf., e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 71 (D.D.C. 2019) (cited in Pls.' Br. at 26) (holding BLM failed to meet NEPA's hard look requirement "because it failed to quantify and forecast *aggregate* GHG emissions from oil and gas development" (emphasis added)); *see also W. Watersheds Project v. BLM*, 76 F.4th 1286, 1301 (10th Cir. 2023) (rejecting argument that BLM analyzed cumulative impacts "using units of analysis different from what the Groups would prefer" where "agency's decision to use broader units of analysis had a rational basis").

Here, BLM chose to rely on aggregate emissions data and predictions from published and reliable reports prepared by BLM and other state and federal agencies, rather than project-specific emissions data (even assuming such data were available), for quantifying the local, statewide, and national GHG emissions that the agency then used for the required comparison. *See* WY_012362 at 12533–36, 13293–95. That was reasonable and rational considering the existing case law requires exactly such comparisons. *See WildEarth Guardians*, 368 F. Supp. 3d at 77 (recognizing

in leasing challenge that "NEPA does not require the impossible"; it merely requires that BLM quantify emissions from other reasonably foreseeable leasing decisions "and compare those emissions to regional and national emissions").

Moreover, BLM's decision to rely on aggregate local, statewide, and national future emissions data demonstrates why Plaintiffs' continued gesturing at Table 5.2-1 is irrelevant. That Table lists other "past, present, and reasonably foreseeable oil and gas activity" in the cumulative impact area. WY_012362 at 13274. The cumulative impacts areas for oil-and-gas development, though larger than the Project Area, do not even cover the entire area managed by the Casper Field Office. *See id.* at 13279–80 (maps). Thus, if BLM limited its consideration of cumulative impacts from "local" sources to those in the cumulative impact area, it would omit the broader, yet still local, data points provided by the Casper Field Office's new well information. *See id.* at 12533, 13293. And courts have never directed BLM to quantify and consider cumulative GHG emissions from the EIS's defined cumulative-impact area separately from quantified local emissions. What Plaintiffs are asking for would thus add a new layer of NEPA review that simply is not required by case law or the statute.

Lastly, contrary to Plaintiffs' suggestion, BLM had no obligation to include "all projects listed in Table 5.2-1" in the agency's quantification of GHG emissions from Alternative A. *See* Pls.' Br. at 26. Alternative A is, by design, intended to encompass only the existing and new oil-and-gas development *within* the Project Area. *See* WY_012362 at 12455 (defining Alternative A), 12459–60 (identifying future oil-and-gas development within the Project Area). In that alternative, therefore, BLM did not need to incorporate disturbance or impacts from reasonably foreseeable future projects *outside* the Project Area—even if those projects might fall within the cumulative impacts area. *See* Pls.' Br. at 26. Indeed, incorporating reasonably foreseeable future projects

outside the Project area would make no sense. The no action alternative, Alternative A is meant to serve as the baseline against which the Project's impacts *within* the Project Area are to be measured. *See* BLM NEPA Handbook H-1790-1 at 51 (2008) ("The No Action alternative provides a useful baseline for comparison of environmental effects (including cumulative effects)").

As the Court correctly recognized in denying Plaintiffs' motion for preliminary injunction, Plaintiffs cannot demonstrate that BLM's cumulative GHG impacts analysis is flawed in any manner. *See* Mem. Op. at 27–28 (Nov. 6, 2023), ECF No. 105.

### C.    ***BLM Considered a Reasonable Range of Alternatives and Adequately Justified Its Decision to Eliminate Certain Alternatives From Further Analysis.***

Plaintiffs argue that BLM violated NEPA by eliminating from further analysis a reduced-rate-of-development alternative and a GHG-reduction alternative. Pls.' Br. at 28–32. Plaintiffs' arguments—for both alternatives—ask the Court to disregard the limitations of 42 U.S.C. § 4332(2)(C)(iii), which directs BLM to consider only alternatives that are "technically and economically feasible, and meet the purpose and need of the proposal." *See id.* at 30. They also ask the Court to demand more than NEPA requires for BLM to justify its decision to eliminate the alternatives from detailed study. *See id.* at 28–32. The Court should reject both invitations.

BLM followed its statutory and regulatory direction and expressly rejected further consideration of Plaintiffs' proposed alternatives because—among several other reasons—those proposals were infeasible, did not meet the purpose and need of the proposal, and, crucially, went beyond BLM's authority to implement. *See* Fed. Defs.' Br. at 35–40. Plaintiffs are dissatisfied with BLM's conclusion, but their dissatisfaction does not amount to a NEPA violation.

   1.    *BLM Properly Eliminated the Reduced-Rate-of-Development Alternative From Further NEPA Analysis.*

As Federal Defendants point out, BLM adequately justified eliminating the reduced-rate-of-development alternative. *See id.* at 35–38. The agency's reasoned explanation was sufficient: NEPA "permit[s] *summary rejections*, provided the agency '*briefly* discuss[es] the reasons for [the alternative] having been eliminated.'" *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 113 (D.D.C. 2019) (emphasis added) (citing 40 C.F.R. § 1502.14(a)). Moreover, because the agency eliminated the reduced-rate-of-development alternative after determining—soundly—that alternative was unreasonable, its decision is entitled to deference. *See, e.g.*, *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (courts grant "considerable deference to the agency's expertise and policy-making role" in evaluating "whether a particular alternative is reasonable in light of [the agency's chosen] objectives"); *Nat. Res. Def. Council v. Pena*, 972 F. Supp. 9, 18 (D. D.C. 1997) (agency "is entitled to some deference with respect to its internal decisions on which alternatives . . . were 'reasonable' and required full analysis").

Contrary to Plaintiffs' assertions, *see* Pls.' Br. at 29–31, BLM's conclusion that the reduced-rate-of-development alternative was unreasonable was substantively correct.

*First*, BLM correctly rejected that alternative because it would interfere with existing lease rights. WY_012362 at 12492. Citing BLM's standard oil-and-gas lease and a *proposed* agency rule, Plaintiffs claim that BLM has "the right to specify 'rates of development'" for the leases in the project area. Pls.' Br. at 29 (citing Lease Form 3100-11[5] §§ 4, 6 and 88 Fed. Reg. 47,[562], 47,573 (Jul. 24, 2023)). But neither the standard lease nor the proposed rule supports Plaintiffs' arguments. BLM's standard lease provides BLM the authority to set "rates of development" to facilitate "diligence in developing and producing" oil-and-gas resources and to avoid "waste of

---

[5] Available at https://www.blm.gov/sites/blm.gov/files/uploads/Services_National-Operations-Center_Eforms_Fluid-and-Solid-Minerals_3100-011.pdf (last visited, Mar. 25, 2024).

leased resources"—the opposite of what Plaintiffs are asking for here. *See* Form 3100-11 § 4. In other words, BLM can "specify rates of development and production," but only to ensure that lessees are diligently developing their leases—not to keep them idle. *See id.*; 30 U.S.C. § 21a (leasing federal minerals is intended to "encourage . . . the *orderly and economic development* of domestic mineral resources" (emphasis added)). Indeed, "'not develop[ing] and produc[ing] the oil and gas resources on the leasehold would directly conflict with the [Mineral Leasing Act's ("MLA")] diligent development requirement.'" *Tempest Expl. Co.*, 196 IBLA 386, 390–91 (2021) (citing BLM's position statement). In addition, although Section 6 of the standard lease requires operations to be conducted "in a manner that minimizes adverse impacts to . . . other resources," *see* Form 3100-11 § 6 (cited by Plaintiffs), that provision says nothing about BLM's authority to restrict the rate of development. If anything, that provision expressly disclaims BLM's authority to implement measures that are not "consistent with lease rights granted," which includes the "exclusive right" to "dispose of all the oil and gas . . . in the lands described." *Id.* § 6 & p.1. Thus, if BLM restricted a lessee's ability to diligently develop its leases, that could amount to a breach of contract or a takings of a lessee's valid property interest. *See, e.g.*, *W. Watersheds Project v. Haaland*, 22 F.4th 828, 842 (9th Cir. 2022) (federal oil-and-gas lease conveys property interest that a lessee is entitled to protect).

The proposed rule that Plaintiffs cite likewise lends no support for BLM's authority to reduce the rate of development on existing leases. *See* Pls.' Br. at 29. That proposal would add a new provision (because none currently exists) authorizing BLM to take "reasonable measures" to mitigate surface impacts, including specifying "rates of development and production in the public interest." 88 Fed. Reg. at 47,622. But that is just a proposal—not a requirement that currently exists or that existed when BLM prepared the EIS. Rather, the existing regulations make clear that BLM

cannot restrict the rate of development. For example, BLM's regulations explicitly—and affirmatively—require a lessee to obtain maximum production from a lease: "The operating rights owner or operator, as appropriate, shall . . . conduct[ ] all operations in a manner . . . which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources." 43 C.F.R. § 3162.1(a); *see also id.* § 3161.2 (similar language). Any artificial limits on the rate of development of leased lands cannot be reconciled with these regulations, the MLA, or the language of the lease itself. BLM therefore appropriately eliminated the reduced-rate-of-development alternative after concluding—correctly—that the agency cannot "infringe upon existing lease rights by imposing limits on the pace of development or selecting which operator(s) are allowed to drill." WY_012362 at 12492.

*Second*, BLM appropriately determined that the reduced-rate-of-development alternative was beyond the purpose and need of the Project. *Id.* Plaintiffs argue that BLM incorrectly eliminated the alternative, because the "purpose and need" of the Project included "minimiz[ing] or avoid[ing] environmental impacts." Pls.' Br. at 30 (citing WY_012362 at 12370). In so arguing, Plaintiffs omit BLM's main description of the "purpose and need" that undercuts their position. WY_012362 at 12370, 12421. BLM first identified the proposal that triggered the NEPA analysis: "to conduct drilling to develop the hydrocarbon resources from oil and gas leases owned" by the Operator Group members. *Id.* at 12370, 12420. Then, citing FLPMA and the MLA, BLM "recognize[d] oil and gas development as one of the 'principal' uses of public lands." *Id.* at 12370, 12421. To that end, the agency made abundantly clear that the "need" for BLM's action was "to respond to *this proposal* while allowing the [Operator Group members] to exercise . . . valid existing lease rights under pertinent laws." *Id.* (emphasis added). Those pertinent laws, BLM explained, are FLPMA, the MLA, and their implementing regulations, all of which "recognize the

statutory right of lease holders to develop federal mineral resources to meet continuing national needs and economic demands." *Id.* The "purpose" of the EIS was to evaluate the impacts of "*this proposal.*" *Id.* (emphasis added). With this full description of the "purpose and need" in mind, BLM concluded that an alternative that restricts the rate of development squarely conflicts with this purpose and need. *See* WY_012362 at 12492; *Ross*, 374 F. Supp. 3d at 112 ("If 'it would be reasonable for the agency to conclude that [an] alternative does not bring about the ends of the federal action,' then it can properly exclude that alternative from consideration." (citations omitted)).

Just last month, another judge in this district rejected plaintiffs' similar argument that BLM violated NEPA when it declined to consider for further analysis a smaller-lease-sale alternative upon finding that BLM justifiably relied on its purpose-and-need statement to reject the proposed alternative. *See Wilderness Soc'y v. DOI*, No. 22-cv-1871 (CRC), 2024 WL 1241906, at *19–21 (D.D.C. Mar. 22, 2024). In that case, the purpose-and-need statement was strikingly similar to the statement in BLM's FEIS here: "to make mineral resources available for disposal and to encourage development of mineral resources to meet national, regional, and local needs" as directed by the MLA and FLPMA. *Id.* Similarly, last year, a court "reject[ed] Plaintiffs' assertion that BLM need only allow 'ConocoPhillips to produce *some* oil from its leases in order to satisfy the purpose and need for the Project.'" *Sovereign Iñupiat for a Living Arctic v. BLM*, No. 3:23-cv-00058 & -00061-SLG, at *7 (D. Alaska Nov. 9, 2023) (emphasis added). The court found "that BLM's decision to consider only those alternatives that constitute full field development . . . is consistent with the [applicable statute's] policy objectives and the purpose and need of the [project]." *Id.* at *14–15, 20–21. So too here. In BLM's own words, the Project is intended to ensure that federal minerals are developed to "meet continuing national needs and economic demands." WY_012362 at 12370.

Given an impending rise in energy demand,[6] not only would it be illegal, but also outright insensible, if BLM artificially constricted development of leased federal lands.

*Third*, Plaintiffs' qualms with BLM's other justifications for eliminating the reduced-rate-of-development alternative lack merit. *See* Pls.' Br. at 30–31. Plaintiffs criticize BLM's conclusion that the proposed alternative "would not address a known resource conflict" because reducing the number of wells would, in Plaintiffs' view, reduce a "resource conflict between fossil fuel extraction and air quality." *Id.* at 30. But Plaintiffs conflate resource conflict with environmental impact—here, air quality. In reality, a "resource conflict" is the "adverse effect" of the agency's chosen action "on ultimate recovery of *other mineral resources*" or resource uses—which is not a concern here. 43 C.F.R. § 3162.1(a) (emphasis added); *see also* BLM NEPA Handbook H-1790-1 at 79 (2008) (describing need for alternatives "if there are unresolved conflicts concerning alternative uses of available resources"). Plaintiffs also contest BLM's comparison of the reduced-rate-of-development alternative to existing alternatives. They argue that because existing alternatives were "distinguishable," the reduced-rate-of-development alternative was "reasonable." Pls.' Br. at 31. But "distinguishable" is not the test for "reasonableness." There are hundreds, if not more, of such "distinguishable" alternatives. "Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative . . . ." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978). Rather, the "goals of an action delimit the universe of the action's reasonable alternatives." *Slater*, 198 F.3d at 867 (internal citations omitted); *see also Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 241 (D.D.C. 2005) ("agency has discretion to choose a manageable number of alternatives to present

---

[6] *See* U.S. Energy Information Administration, Annual Energy Outlook, at 17 (2022), https://www.eia.gov/outlooks/aeo/pdf/AEO2022_ReleasePresentation.pdf (last visited, Mar. 24, 2024).

a reasonable spectrum of policy choices *that meet the goals of the action*" (emphasis added)). BLM concluded here that the reduced-rate-of-development alternative—even assuming it is distinguishable—was not viable and would not meet the Project's purpose and need. *See supra* at 22–23. This Court need not second guess that conclusion.

2.     <em>BLM Appropriately Eliminated the GHG-Reduction Alternative.</em>

BLM appropriately eliminated the GHG-reduction alternative from further analysis after explaining that such an alternative was infeasible—both technically and for safety reasons. Fed. Defs.' Br. at 38–40; *see also* WY_012362 at 12492; *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182 (D.C. Cir. 2023) (agencies may reject "alternatives [that] will be impractical" after only brief discussion); BLM NEPA Handbook H-1790-1 at 50 (2008) ("Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint." (citation omitted)).

In an apparent attempt to undermine BLM's justification, Plaintiffs mischaracterize the parameters of the requested GHG-reduction alternative, asserting that alternative merely asked for "*simple fixes*—such as more efficient flaring or leak detection and repair—to reduce emissions of methane, a potent greenhouse gas." Pls.' Br. at 21 (emphasis added). That is not what the record tells: the proposed GHG-reduction alternative was far from "simple." It "would require carbon-neutral processes" and would "prevent the venting or flaring of methane or other products." WY_012362 at 12491. Under that alternative, "drilling could only proceed if the operator eliminate[d] potential carbon emissions or otherwise secure[d] enforceable offsets that ensure no net increase in carbon emissions." *Id.* Even some environmental groups acknowledged that the no-net-emissions proposal "may be infeasible." WY_004435 at 4438.

To the extent Plaintiffs genuinely wanted BLM to evaluate an alternative with "simple fixes" to reduce GHG emissions, BLM did just that. *See* Fed. Defs.' Br. at 39–40. The agency's

26

Alternative B analyzed reasonable measures and practices to reduce GHG emissions. *Id.*; *see also* WY_012362 at 13295–96 (GHG emissions cumulative-impacts analysis assumes mitigation measures reduce impacts).

In any event, BLM has no obligation to consider alternatives that surpass the agency's statutory authority to implement. *See, e.g.*, *DOT v. Pub. Citizen*, 541 U.S. 752, 756 (2004); *Ctr. for Biological Diversity*, 67 F.4th at 1185. BLM has no statutory authority to require the "enforceable offsets" that Plaintiffs asked for in the GHG-reduction alternative, or to require carbon-neutral development of federal minerals. The agency's authority to limit GHG emissions is rightly limited, and BLM's past attempt to regulate emissions for the purpose of improving air quality or reducing GHG-emissions associated with oil-and-gas production has been struck down for exceeding the agency's statutory authority. *See Wyoming v. DOI*, 493 F. Supp. 3d 1046, 1067 (D. Wyo. 2020). Given this limitation, and the explained technical infeasibility of the proposed alternative, *see* Fed. Defs.' Br. at 38–40, BLM appropriately eliminated the GHG reduction alternative from further analysis.

## II.    BLM Properly Relied on the State of Wyoming's Authority to Regulate Air Quality.[7]

Plaintiffs attempt to manufacture agency error by pointing to BLM's statements in the FEIS, rather than the ROD, to argue that BLM disclaimed authority to regulate air quality when it declined to adopt air quality mitigation measures. *See* Pls.' Br. at 32–42; *see generally* WY_016733 at 16752–54. Plaintiffs ignore that the ROD and not the FEIS contains BLM's final decision. In the ROD, BLM properly relied on the State of Wyoming's authority under the Clean Air Act to regulate air quality when declining to adopt air quality mitigation measures.

---

[7] Defendant-Intervenors specifically incorporate by reference Federal Defendants' arguments in opposition to Plaintiffs' air-quality-mitigation contentions. *See* Fed. Defs.' Br. at 40–46.

**A.** **_BLM Did Not Disclaim Its Authority to Regulate Air Quality in the ROD._**

Plaintiffs cite the FEIS, and not the ROD, for BLM's purported "disclaimer of authority." *See* Pls.' Br. at 4 (citing WY_0123622 at 12951, 12959). Plaintiffs ignore that, in the ROD, which was signed by the Secretary of the Interior, *see* WY_016733 at 16735, BLM explained that it did not require certain air-quality mitigation measures because it "may rely on the State of Wyoming, which is subject to oversight by the EPA, to ensure permitted activities do not exceed or violate any State or Federal air quality standard under the Clean Air Act." WY_016733 at 16752–54. Additionally, Plaintiffs disregard applicant-committed measures to protect air quality that BLM both adopted in the ROD and will require in site-specific permitting. *See id.* at 16740.

The ROD, and not the FEIS, is the culmination of BLM's decision-making process. "[T]he terms of a [ROD] are enforceable by agencies and private parties." Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981) (Question 34d). An FEIS cannot substitute for a ROD. "An environmental impact statement is supposed to inform the decisionmaker *before* the decision is made." *Id.* at 18,037 (Question 34b) (emphasis added). One reason an FEIS cannot substitute for a ROD is that the public can comment on an FEIS. *See* 46 Fed. Reg. 18,036 (Question 34b) ("the public and other agencies can comment on the [FEIS] prior to the agency's final action on the proposal"). BLM then may adjust its decision in the ROD in response to comments. *See id.*

Here, BLM adjusted its decision on air quality mitigation measures in response to public comment. In comments on the FEIS, the Operator Group asserted that BLM lacked authority to implement the mitigation measures.[8] *See* WY_014975 at 14997. BLM, however, did not agree with the Operator Group. Instead, in response to the Operator Group's comments, BLM directed

---

[8] The Operator Group also expressed other objections to the mitigation measures, including their technical and economic feasibility. *See* WY_014975 at 14997–99.

the Operator Group to BLM's statement in the ROD that it may rely on the State of Wyoming's authority to protect air quality. *See* WY_016666 at 16685–87 ("This mitigation measure was not carried forward in the BLM's decision. Please see Section 3.3 of the ROD for more information."). In the ROD, BLM then affirmatively recognized that the ROD contains the "rationale as to why" the air quality mitigation measures were "not carried forward in this decision." WY_016733 at 16752. The fact that BLM did not in the ROD reiterate its statement in the FEIS that it lacks authority to regulate air quality confirms that the ROD contains and reflects BLM's final decision.

Therefore, Plaintiffs wrongly assert that BLM "disclaimed" its authority when it declined to adopt air quality mitigation measures. Plaintiffs' objections to BLM's decision not to adopt air quality mitigation measures fails for this reason alone.

### B.    *BLM Properly Relies on the Clean Air Act to Protect Air Quality.*

Plaintiffs string together cherry-picked BLM project approvals to argue that BLM has a "longstanding practice of imposing air quality measures as permit conditions when approving oil and gas projects." Pls.' Br. at 38. Plaintiffs, however, overlook that BLM has previously and properly relied on the State of Wyoming's enforcement of the Clean Air Act to ensure protection of air quality.

In the Clean Air Act, Congress vested states and the EPA with authority to manage air quality. "The Clean Air Act and the EPA supply 'the goals and basic requirements of state implementation plans, but the states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements.'" *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) (quoting *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003)). "When enacting the Clean Air Act in 1970, Congress directly addressed the issue of air pollution and created a *comprehensive* scheme for its prevention and control." *Wyoming*, 493 F. Supp. 3d at 1064 (emphasis in original).

By contrast, "[a]t its core, FLPMA is a land use planning statute." *Id.* at 1064 n.16. The
IBLA, acting on behalf of the Secretary of the Interior, *see* 43 C.F.R. § 4.1 (2023), has recognized
that FLPMA "imposes on BLM only an obligation to 'provide for' compliance with applicable air
quality standards, not to ensure or insure it, and that [the state] is the entity that is responsible for
regulating or enforcing compliance with such standards." *Powder River Basin Res. Council*, 183
IBLA 83, 95 (2012); *accord Coal. for Responsible Mammoth Dev.*, 187 IBLA 141, 231 (2016)
(recognizing that BLM "does not itself enforce the requirements of the [Clean Air Act] and its
State equivalent"); *Wyo. Outdoor Council*, 176 IBLA 15, 26 (2008) (explaining that "ensuring
compliance with federal and state air quality standards falls under the administrative jurisdiction
of [the state], subject to EPA oversight") (citation omitted).

For these reasons, BLM has historically relied on the Clean Air Act to ensure that BLM
authorizations and actions, such as oil-and-gas leases and development, do not degrade air quality.
*See WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 38 (D.D.C. 2014) (conditioning oil-and-gas
leases on compliance with air-quality standards); *San Juan Citizens All. v. Stiles*, No. 08-cv-00144-
RPM, 2010 WL 1780816, at *21 (D. Colo. May 3, 2010) (observing that if an oil-and-gas project
"violates NAAQS or other regulations," the Clean Air Act provides a remedy); *see also Coal. for
Responsible Mammoth Dev., et al.*, 187 IBLA 141, 231 (2016) (recognizing that BLM "does not
itself enforce the requirements of the CAA and its State equivalent"); *Wyo. Outdoor Council*, 176
IBLA at 26 (explaining that "ensuring compliance with federal and state air quality standards falls
under the administrative jurisdiction of [the state], subject to EPA oversight") (citation omitted).
And courts and the IBLA have upheld BLM's decision to rely on the State's management of air
quality. *See id.*

Therefore, BLM's decision not to require air quality mitigation measures in the ROD is not "an unexplained departure" from prior policy or practices. *See* Pls.' Br. at 38. Rather, BLM reasonably relied on the State of Wyoming's authority to enforce the Clean Air Act.

III.    **The RMPA Does Not Run Afoul of BLM's Obligation to Prevent Unnecessary or Undue Degradation of Public Lands.[9]**

With the RMPA, BLM allowed operators to replace a blunt management tool—"timing limitation stipulations," which are blanket prohibitions on surface disturbance and occupancy in areas between a quarter mile and a half mile from raptor nests during six months of a year—with a suite of management measures intended to balance raptor protections and efficient development in the Project area. *See generally* WY_016733 at 16737–38. Structuring more precise management in place of the existing tool is a hallmark feature of the Project. *See id.*

Plaintiffs now object to the RMPA on two grounds. First, they argue it will result in "unnecessary or undue degradation" of the public lands, which FLPMA obligates BLM to prevent. *See* Pls.' Br. at 44–47; 43 U.S.C. § 1732(b) ("In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."). Second, perhaps because Plaintiffs cannot demonstrate that the RMPA will result in unnecessary or undue degradation, Plaintiffs argue that FLPMA requires BLM to affirmatively determine and document that the RMPA will not result in unnecessary or undue degradation. Pls.' Br. at 47–52. Both arguments fail.

A.    ***The Hallmark Feature of the Operator Group's Proposed Action Is Limited Relief from Raptor Timing Limitation Stipulations to Facilitate Efficient Development.***

---

[9] Defendant-Intervenors specifically incorporate by reference Federal Defendants' arguments in opposition to Plaintiffs' FLPMA contentions. *See* Fed. Defs.' Br. at 46–53.

A signature feature of the Operator Group's Proposed Action, identified as Alternative B in the FEIS, is relief from the 2007 Casper RMP's raptor timing limitation stipulations to facilitate efficient development of the Project area. *See generally* WY_016733 at 16737–38. The existing timing limitation stipulations were a blunt tool because they categorically prohibited surface disturbance or occupancy within distances ranging from a quarter to a half-mile from raptor nests between February 1 and July 31. *See* WY_021922 at 21962. These timing limitation stipulations impact a vast portion of the Project area; the surface area covered by a half-mile buffer around a raptor nest is approximately 503 acres or more than three-quarters of a square mile—an area equivalent to more than 380 football fields.

The timing limitation stipulations prevented oil-and-gas operators from developing wells from a given location (known as a "well pad") for more than six months at a time. *See* WY_012362 at 12475. This timing constraint created a serious obstacle to efficient development of the Project. The Operator Group sought to drill horizontal wells more than a mile in length and to drill up to 16 such wells from a given well pad. *See id.* at 12450 (noting that horizontal wells in the Project area ranged from 1,590 to 11,276 feet), 12465. The Operator Group estimated that each well would require approximately 90 days (i.e., three months) to drill; additional time was needed to construct the well pad and complete the wells.[10] *See* WY_005408 at 5416–17. Therefore, operators could not construct a well pad and drill and complete multiple wells from the pad in the constrained six-month window created by the raptor timing limitation stipulations.

Because operators could not construct a well pad and drill and complete multiple wells from a given well pad in six months, operators would be forced to piecemeal their development activities over multiple years. For example, if four wells would be drilled from a single pad, the

---

[10] "Completion" is the process of initiating production of minerals after a well is drilled.

timing limitation stipulations required the operator to break up these activities over as many as three separate years, depending on the time of year when an operator initiated its activities:



*Id.* at 5417. If more than four wells would be drilled from a well pad, the timing limitation stipulations extended development times even more. *See id.*

Extending development over multiple periods results in additional environmental impacts. Operators must repeatedly bring equipment onto, and move equipment off of, each well pad at the start and end of each timing limitation stipulation season. Moving drilling rigs and associated equipment increases truck traffic and therefore increases vehicle emissions and fugitive dust. *See Id.* at 5419; WY_012362 at 12487, 13113.

Compounding the narrow window created by the timing limitation stipulations, and the associated environmental impacts, was the fact that raptor nests are present throughout the Project area. *See* WY_012362 at 12874 (935 known raptor nests within the Project area). As a result, the

timing limitation stipulations applied to more than a quarter of the 1.5 million-acre Project area. *Id.* at 12869.

Because of the inefficiencies and additional environmental impacts the timing limitation stipulations presented, the Operator Group proposed the Project with an express goal of allowing relief from the blanket timing limitation stipulations.[11] *E.g.*, WY_000151 at 156; WY_000824 at 829 ("The purpose of the Proposed Action is to allow the OG to conduct drilling and development operations *on a year-round basis* . . . ." (emphasis added)); *see also* WY_012362 at 12465.

BLM initiated an amendment to the Casper RMP "to allow for timing stipulation relief for non-eagle raptors only within the Converse County Oil and Gas Project area in Converse County, Wyoming." WY_000108. In a supplemental DEIS and the FEIS, BLM analyzed five options that would allow timing stipulation relief, including two options proposed by the Operator Group (Options 2 and 3), and a no action alternative (Option 1). *See* WY_008413 at 8433–35; WY_012362 at 12474–78. In the ROD, BLM ultimately adopted the option that it proposed (Option 6). WY_016733 at 16737.

Option 6 provides operators with an alternative to the timing limitation stipulations— operators can either adhere to them or obtain relief from them on a given well pad for one year by adopting a suite of management measures in lieu of the timing limitation stipulations. *See* WY_016733 at 16738. The ROD caps the total number of allowable grants of reliefs at 98 over the life of the Project before additional NEPA analysis is required. *Id.*

To use a timing limitation stipulation relief, an operator must adhere to a suite of management measures, including:

---

[11] The Project materials described the Operator Group's proposal as allowing "year-round development." *See, e.g.*, WY_000151 at 156; WY_000824 at 829.

> ➢ Consider alternative locations, WY_016729;

> ➢ Provide a wildlife report to BLM that includes monitoring data relevant to the nest at issue and recent and historical nest activity, *id.*;

> ➢ Begin surface operations and occupancy at least 30 days before the start of the timing limitation stipulations and conduct surface operations continuously throughout the limitation period without a break of more than 72 hours, *id.* at 16730. If operations cease for more than 72 hours, the operators must check the nest at issue to determine if raptors have occupied it, *id.* at 16730–31; and

> ➢ Monitor the nest during the year of relief and for the following two years' nesting seasons, *id.* at 16731.

The continuous development requirement is a significant component of the management measures. This requirement is intended to avoid the risk that the initiation of operations disrupts nesting raptors. Therefore, operations must begin 30 days before the start of the raptor nesting season. *Id.* at 16730. After then, operations must occur continuously to avoid the risk that raptors will begin nesting when operations are not being conducted and the subsequent initiation of operations disrupts the nesting.[12] *Id.*

These management measures apply if an operator elects to utilize timing limitation relief. But the ROD also imposes management measures to protect raptor species throughout the Project area, even when operators adhere to raptor timing limitation stipulations. For example, throughout the Project area, operators must conduct nest surveys to detect occupied raptor nests before starting surface-disturbing activities during the breeding season. WY_016733 at 16751. Operators also

---

[12] If operations cease for more than 72 hours, the operator must perform a "nest check" to determine whether a raptor began using the nest during the period of inactivity. WY_016729 at 16730–31.

must avoid disturbance in forest and woodland habitat areas within the Project area. *Id.* Accordingly, in addition to the timing limitation stipulation relief, the ROD adopts management measures that benefit raptors throughout the Project area.

Therefore, the RMPA's carefully crafted raptor management measures that allow for timing stipulation relief and that apply throughout the Project area reflect BLM's management discretion under FLPMA to carefully balance raptor conservation with efficient development within the Project area.

### B.    *The RMPA Will Not Result in Unnecessary or Undue Degradation.*

Plaintiffs incorrectly contend that BLM's approval of the RMPA will result in unnecessary or undue degradation to the public lands. *See* 43 U.S.C. § 1732(b). Because BLM has not formally defined "unnecessary or undue degradation," Plaintiffs look to judicial and administrative decisions for this term's contours. *See* Pls.' Br. at 43–44. They observe that unnecessary or undue degradation has been construed to mean "something more than the usual effects anticipated from appropriately mitigated development" and activities "conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology."[13] *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 76, 78 (D.C. Cir. 2011); *Colorado Env't Coal.*, 165 IBLA 221, 229 (2005).

Plaintiffs rely on these constructions of "unnecessary or undue degradation" to argue that the RMPA will cause it. Specifically, they argue that the RMPA will cause effects greater than the usual effects from appropriately mitigated development, violations of federal laws and standards, and unnecessary harm. Pls.' Br. at 47–52. Plaintiffs, however, misunderstand both the RMPA and BLM's legal obligations.

---

[13] Citing these definitions, Federal Defendants correctly recognize that FLPMA's unnecessary or undue degradation standard is a "lenient one." Fed. Defs.' Br. at 47.

  1. *The RMPA Will Not Cause Effects Greater than the Usual Effects from Appropriately Mitigated Development.*

Plaintiffs argue that, because the RMPA adjusts the existing raptor timing limitation stipulations, it will result in "something more than the usual effects anticipated from appropriately mitigated development." Pls.' Br. at 48 (quoting *Theodore Roosevelt*, 661 F.3d at 76). Plaintiffs characterize stipulations in the 2007 Casper RMP as "standard practice" and then argue that any adjustment to them to improve flexibility necessarily results in unnecessary or undue degradation. *See id.* This argument fails for three reasons.

First, Plaintiffs' argument is inconsistent with FLPMA's mandate that BLM manage the public lands for "multiple use." Congress defined "multiple use" as "a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and non-renewable resources, including but not limited to . . . minerals . . . [and] wildlife[.]" 43 C.F.R. § 1702(c); *see also id.* § 1702(l) (defining "principal or major uses" of the public lands to include "mineral exploration and development"). Plaintiffs, however, essentially contend that BLM cannot tailor management measures in an RMP to accommodate productive land uses, such as mineral development, because they may yield additional impacts to wildlife resources.[14]

Yet FLPMA's multiple-use mandate demands that BLM have the flexibility to adjust and tailor management measures in its RMPs to accommodate the multiple uses of the public lands. "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put,

---

[14] Notably, however, BLM recognized in the 2007 Casper RMP that buffers cannot prevent all impacts to raptors. "Protective buffers help to minimize, but cannot completely prevent, impacts to raptors because most species are highly mobile well beyond any buffers." WY_020474 at 20901.

including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and uses serving natural scenic, scientific and historical values." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004). BLM thus has "substantial discretion to decide how to achieve the multiple use and sustained yield objectives." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 518 (D.C. Cir. 2010). BLM requires the flexibility to adjust and tailor management measures to accommodate other land uses. BLM's efforts to do so do not run afoul of FLPMA's unnecessary or undue degradation provision.

Second, Plaintiffs' argument that the timing limitation stipulation in the 2007 Casper RMP is a "standard practice" ignores the less restrictive management measures that agencies have applied and continue to apply to benefit raptors. For example, the Forest Service imposes only a quarter-mile buffer around the active nests of certain raptor species that the Casper RMP protected with a half-mile buffer, including Swainson's and ferruginous hawks, and imposes only an eighth-mile buffer around other raptor species' active nests. *See* WY_012362 at 12481. And, prior to 2007, BLM's governing land use plan applied a more flexible management measure to raptors; it allowed BLM to set buffer distances on a case-by-case basis that "usually" would range between a quarter and a half mile. WY_020474 at 20594 (describing the "no action" alternative (Alternative A) in the Casper RMP FEIS). Plaintiffs' contention that unnecessary or undue degradation would result from more flexible management than the timing limitation stipulation in the Casper RMP undermines the efficacy of the Forest Service's current management and BLM's historic management of raptors.

Finally, Plaintiffs assert that the RMPA will cause effects greater than the usual effects of development because "[m]ost (*if not all*)" of the management measures imposed by the RMPA "are already legally required so offer no additional protection." *See* Pls.' Br. at 49 (emphasis

added). Not only is this assertion wrong, it also disregards the most significant management measure—that operations begin before the start of the nesting season and occur continuously. *See* WY_016729 at 16730. This management measure is unique and essential to the RMPA and is not otherwise required by law. Additionally, the management measures require monitoring and reporting, which also are not legally required. *See id.* at 16731. Because the RMPA exchanges buffer distances for a set of management measures that are not otherwise required by law, Plaintiffs have no basis to contend that the RMPA will cause effects greater than the usual effects of development.

2.     *The RMPA Will Not Cause Violations of Federal Laws and Standards, Including the Migratory Bird Treaty Act and Executive Order 13186.*

Plaintiffs also contend that the RMPA will result in unnecessary or undue degradation "by allowing degradation that exceeds federal laws and standards," including the MBTA and Executive Order 13186. *See* Pls.' Br. at 49–50. This contention is predicated on two erroneous assumptions— first, that the RMPA will cause incidental take of migratory birds protected by the MBTA and, second, that BLM did not fulfill its obligations under federal laws and standards.

The management measures adopted in the RMPA are specifically intended to limit the risk of incidental take of raptors. BLM specifically recognized that "Option 6 includes avoidance and minimization measures for impacts on migratory birds, which fulfills the BLM's obligation under Executive Order 13186 to implement the MBTA and reduce incidental take of migratory birds to the greatest extent practicable[.]" WY_016639 at 16654. Particularly, Option 6 ensures that operators do not incidentally take raptors by requiring operators to commence activities near a nest

30 days before the start of the nesting season and to engage in continuous development.[15] *See generally* WY_016729 at 16730.

Plaintiffs, however, repeatedly misquote the FEIS to assert that BLM directly found that Option 6 will increase the likelihood of incidental take of migratory birds. *See* Pls.' Br. at 10 ("The [FEIS] thus acknowledged that BLM's chosen Option 6 'could adversely impact or *increase the likelihood of a take of migratory bird species*'") (quoting WY_012362 at 13196) (emphasis in Plaintiffs' Memorandum in Support) & 49 ("BLM acknowledged the RMPA could 'increase the likelihood of a take'") (quoting WY_012362 at 13196). In fact, BLM generally stated in the FEIS that "*[g]ranting exceptions to timing limit stipulations* could adversely impact or increase the likelihood of a take of migratory bird species." WY_012362 at 13196 (emphasis added). BLM's statement is not specific to Option 6. *See* WY_016639 at 16654. More important, BLM's statement does not account for the management measures included in Option 6 that will reduce the risk of incidental take. *See id.* Accordingly, Plaintiffs' allegation of unnecessary or undue degradation discounts the management measures adopted in the RMPA.

Plaintiffs also erroneously suggest that, by adopting the RMPA, BLM did not comply with federal laws and standards. *See* Pls.' Br. at 50. Federal Defendants correctly explain that the MBTA applies to private parties and not the federal government.[16] *See* Fed. Defs.' Br. at 52–53; *Protect*

---

[15] Although Plaintiffs characterize the continuous development requirement as "untested," *see* Pls.' Br. at 10, the U.S. Fish and Wildlife Service's recent rule permitting take of bald and golden eagles adopts the same principle—birds that nest near ongoing operations can tolerate the activity. *See* 89 Fed. Reg. 9920, 9964 (Feb. 12, 2024) (to be codified at 50 C.F.R. § 22.280(a)) ("A permit is not required when an activity that may ordinarily disturb eagles is ongoing at the time an eagle pair initiates nesting because the nesting eagles are presumed to tolerate the activity.").

[16] Consistent with this conclusion, the 2007 Casper RMP did not adopt the raptor timing stipulation, which the RMP Amendment adjusted, with the intent of limiting violations of the MBTA. The Casper Proposed RMP/FEIS (2007) contains only one passing reference to the MBTA, stating generally that "raptors and neotropical migrants are afforded protection under the Migratory Bird Treaty Act." WY_020474 at 20709.

*Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 586 (9th Cir. 2016). Furthermore, BLM specifically found that the RMPA satisfies the direction in Executive Order 13186, stating that "[i]n selecting Option 6, . . . BLM is fulfilling its obligation under Executive Order 13186, while still meeting the purpose and need of the FEIS and the agency mission." WY_016639 at 16654.

Finally, Plaintiffs' contention that the RMPA "runs afoul" of BLM's Special Status Species Manual misunderstands this policy. Initially, Plaintiffs misconstrue the manual's definition of the term "conservation" to be a mandate. *Compare* Pls.' Br. at 50 *with* WY_022907 at 22950 (defining "conservation" to include "the use of programs, plans, and management practices to reduce or eliminate threats affecting the status of species"). Instead, this manual "provide[s] policy and guidance" to BLM. *See* WY_022907 at 22908. More significant, however, Plaintiffs ignore that the RMPA in fact reduces threats to raptors through management measures that otherwise do not apply to activities on non-federal lands. *See* WY_012362 at 13199. Accordingly, the RMPA is consistent with BLM's Special Status Species Manual, and Plaintiffs have not demonstrated that it will result in unnecessary or undue degradation.

### 3. The RMPA Will Not Allow "Unnecessary" Harm.

Finally, Plaintiffs incorrectly argue that the RMPA will lead to "unnecessary" degradation because "there were less degrading approaches to year-round drilling." *See* Pls.' Br. at 50–52. Even accepting as true Plaintiffs' erroneous assertion that "less degrading" alternatives exist, Plaintiffs' argument would improperly transform FLPMA's direction that BLM prevent "unnecessary" degradation into an affirmative obligation that BLM select the least impactful alternative. FLPMA's unnecessary or undue degradation provision, however, does not constrain BLM's discretion to balance multiple uses and associated management measures. BLM has a "'great deal of discretion in deciding how to achieve' these objectives [of preventing unnecessary or undue degradation] . . . because it does not specify precisely how the BLM is to meet them,

41

other than permitting the BLM to manage public lands by regulation or otherwise." *Quechan Tribe of the Fort Yuma Indian Rsrv. v. DOI*, 927 F. Supp. 2d 921, 939 (S.D. Cal. 2013) (quoting *Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011)).

Furthermore, Plaintiffs assume without any certainty that Options 4 and 5 of the RMPA will be less impactful than Option 6. *See* Pls.' Br. at 51. Option 4 called for development of site-specific raptor management plans, and Option 5 called for development on a migratory bird conservation plan. WY_012362 at 13201. Neither had been developed. Accordingly, BLM concluded it could not determine that Options 4 and 5 would provide a greater level of protection than other options until a site-specific raptor-management plan and a migratory bird conservation plan were developed.[17] *Id.* Plaintiffs therefore have failed to establish that adoption of the RMP will result in unnecessary harm.

### C.    *Plaintiffs Improperly Attempt to Transform BLM's Obligation to Prevent Unnecessary or Undue Degradation Into a Procedural Requirement.*

Plaintiffs contend that BLM has a procedural obligation to affirmatively find and memorialize that BLM's amendment of the RMP will not result in unnecessary or undue degradation. *See* Pls.' Br. at 44–47. As Federal Defendants correctly explain, Plaintiffs incorrectly attempt "to turn FLPMA's substantive requirement into a procedural one." *See* Fed. Defs.' Br. at 52; *Biodiversity Conservation All. v. BLM*, No. 09-CV-08-J, 2010 WL 3209444, at *27 (D. Wyo. June 10, 2010) (affirming an IBLA decision rejecting an attempt to convert the unnecessary or undue degradation provision of FLPMA "into a procedural requirement that BLM identify a

---

[17] Plaintiffs' references to BLM's characterization of Options 4 and 5 resulting in only "minor" impacts are incorrect. Those characterizations appear in the supplemental DEIS. *See* WY_009413 at 8440. BLM, however, abandoned these characterizations in the FEIS. *See* WY_012311 at 12334, 12348.

specific threshold beyond which any impacts would be considered unnecessary or undue"); *Bd. of County Comm'rs of San Miguel County v. BLM*, 584 F. Supp. 3d 949, 977-79 (D. Colo. 2022).

BLM's land-use-planning regulations at 43 C.F.R. Part 1600 reinforce that FLPMA's unnecessary or undue degradation provision does not impose procedural obligations on BLM. These regulations set forth detailed procedures that BLM must follow to adopt, revise, or amend an RMP. 43 C.F.R. pt. 1600. For example, they require that BLM prepare an environmental impact statement when approving an RMP. *See* 43 C.F.R. § 1601.0-6. They also set forth a process to ensure that RMPs are consistent with plans, policies, and programs of state and local governments. *Id.* § 1610.3-2(e). Yet these regulations do not use the phrase "unnecessary or undue degradation"—let alone require that BLM affirmatively determine and document that the management prescriptions in an RMPA will not result in unnecessary or undue degradation. *See* 43 C.F.R. pt. 1600. Plaintiffs' attempt to fashion such a procedural requirement simply has no basis.

Finally, to the extent Plaintiffs argue that "grave concerns from commenters should have prompted BLM's serious consideration" of FLPMA's unnecessary or undue provision, *see* Pls.' Br. at 44, this argument is a thin attempt to mask the fact that Plaintiffs failed to raise this issue in their protests on the RMPA. "[C]ourts often cast a skeptical eye towards plaintiffs that have been involved throughout the administrative process yet rely on a peripheral or newfound theory only when thrust before a federal court." *W. Watersheds Project*, 76 F.4th at 1294.

BLM's regulations provide a formal process by which interested parties may file protests and object to a proposed RMP or amendment. *See* 43 C.F.R. § 1610.5-2. The BLM Director must issue a decision on the protests, which becomes the final decision for the Department. 43 C.F.R. § 1610.5-2(a)(3), (b); *see also* WY_016639 at 16665. Here, coalitions of environmental,

nongovernmental organizations, including Plaintiffs, filed two separate protests on the RMPA. Neither protest asserted either that modification of the raptor timing limitation stipulations would result in unnecessary or undue degradation or that BLM had a statutory obligation to find otherwise. *See* WY_014375 at 14375–95; WY_015114 at 15114–36. Plaintiffs cannot now allege that BLM fatally failed to make a precise finding when they never identified this alleged deficiency to BLM. Plaintiffs do not establish error.

**IV.    Remedy.**

Briefing on remedy is premature at this stage of the litigation. In asking the Court to "vacate the Converse County EIS, ROD, and RMPA and to remand to BLM to prepare a revised EIS," Plaintiffs fail to follow their own analysis. Pls.' Br. at 53. They argue that any one of the violations they allege warrant vacatur. *Id.* (their success on "any of these claims" requires vacatur). Later in Plaintiffs' Brief, however, they acknowledge a distinction depending on where the Court finds error. "Vacatur of the RMPA" would return to "case-by-case exceptions to raptor Timing Limit Stipulations." *Id.* at 55. If the flaw is instead with the ROD or the FEIS, then vacatur would require BLM to perform "adequate NEPA study" and "reconsider[] the proposed air quality mitigation measures before approving individual drilling permits (APDs)." *Id.* In so acknowledging, Plaintiffs appear to agree, for example, that an error in the RMPA alone would not warrant vacating the ROD or the FEIS or delaying further approval of APDs.

Given the nuance, Federal Defendants urge that, if the Court were to find fault with some part of BLM's decisions, the Court request "additional briefing be ordered on the topic of remedy."

Fed. Defs.' Br. at 53–54.[18] Defendant-Intervenors join that request and offer additional argument

on why postponing briefing on remedy is the way of wisdom here.[19]

If the Court reaches remedy without additional briefing, it should apply the *Allied-Signal*

test, which Plaintiffs agree applies. *See* Pls.' Br. at 53; *see also Allied–Signal, Inc. v. U.S. Nuclear

*Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). That test for remand-without-vacatur

weighs (1) the seriousness of the agency's errors, and (2) the disruptive consequences that would

result from vacatur. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)

(quoting *Allied-Signal*, 988 F.2d at 150–51). Defendant-Intervenors briefly address the *Allied-*

*Signal* test below; however, additional briefing is warranted to fully analyze the appropriate

remedy.

A.   ___Not One of BLM's Purported Errors is Sufficiently Serious to Warrant
     Vacating the FEIS, ROD, or RMPA.___

Under the first prong of *Allied-Signal*, Plaintiffs offer no persuasive argument that any of

their alleged errors is "serious." Pls.' Br. at 53. This is critical: "because in circumstances in which

the first prong of *Allied-Signal* supports remand without vacatur, the second prong 'is only barely

---

[18] Although this and other courts have, in the past, applied vacatur as a remedy in APA challenges, a recent concurring opinion from the U.S. Supreme Court has cast some doubt on the availability of the remedy. *See United States v. Texas*, 599 U.S. 670, 143 S. Ct. 1964, 1980–85 (2023) (Gorsuch, J., concurring) (quoting *id*. at 1996 n.7 (Alito, J., dissenting)); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010) ("[W]e assume without deciding that the District Court acted lawfully in vacating the [agency's] decision."). Additional briefing on remedy would also allow the parties to fully present this development to the Court.

[19] That another round of briefing may cause some delay should not dissuade the Court from ordering it. Plaintiffs have already failed to show any current irreparable harm that would require injunctive relief. Mem. Op. (Nov. 6, 2023), ECF No. 105. And like a preliminary injunction, vacatur under the APA is itself an equitable remedy, *see generally Public Citizen, Inc. v. FERC*, 92 F.4th 1124, 1131 (D.C. Cir. 2024) ("we will exercise our equitable authority to vacate"), one appropriately addressed only if Plaintiffs have prevailed on the merits, under the circumstances as they exist at that time. Plaintiffs have failed to show that their interests would be harmed if the Court waited to address remedies until after the merits. *See* Mem. Op. at 29 (Nov. 6, 2023), ECF No. 105 ("Plaintiffs have failed to allege, with any specificity, when these alleged irreparable harms will occur.").

relevant.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 108 (D.D.C. 2017) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002)).

Courts following *Allied-Signal* have clarified that the deficiencies in the agency's action cannot be measured simply by attaching the adjective "serious" to them. "[W]hen considering whether to vacate an order, we do not evaluate the seriousness of the agency's error in the abstract." *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 997 (9th Cir. 2023). Instead, the test for "seriousness" is whether the agency, after employing better reasoning or complying with procedural rules, could likely still adopt the same decision on remand. *Id.* (remanding, without vacating, a decision where FERC failed to prepare an EA or EIS after the court found the agency could have still adopted the same decision after the NEPA violation was cured)*; see also Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 601–02 (D.C. Cir. 2023) (although a biological opinion warranted vacatur, the court allowed the challenged rule to remain in force because the court was "not convinced the error is fatal to the rule").

Here, Plaintiffs rely heavily on the adjective "serious" with little effort to show that there is no serious possibility that BLM could reaffirm the FEIS, ROD, and RMPA after a remand to cure any deficiencies identified by this Court. For example, they argue that BLM's analysis of groundwater drawdowns was "seriously misleading" because it assumed a wrong value for "specific storage" in its groundwater model. Pls.' Br. at 24. They do so without indicating why BLM could not plausibly reach the same decision on remand, given that the specific storage rate it used was within the range of reported values for specific storage. WY_018245 at 18363 (Table 4.2-5 showing minimum and maximum values for the five aquifer units). And all agree that the authority to limit groundwater withdrawal rests with Wyoming's State Engineer's Office. "[T]he

WSEO retains statutory authority to declare a groundwater control area and place a cap on water permitting and production, or exercise other means of regulation for both surface water and ground water uses[.]" WY_012362 at 13154. Therefore, Plaintiffs' disagreements over the future extent of groundwater drawdowns do not negate the serious possibility that BLM could reaffirm its decisions on remand.

Similarly, Plaintiffs fault BLM for failing to consider that it has discretionary authority to impose emissions controls on lessees' equipment "to avoid ambient air quality violations." Pls.' Br. at 54. Even if the Court agreed, it is easy for the Court to see a "serious possibility," *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) that BLM on remand would still rationally explain its conclusion that it can rely on the State of Wyoming and the EPA to maintain compliance with the Clean Air Act's ambient air quality standards and controls on emissions of GHGs. These examples illustrate the broader point: at this stage in the briefing, Plaintiffs have failed to muster a cogent argument for why there is no serious possibility that BLM could reaffirm its decisions after a remand to the agency to cure any deficiencies—i.e., that BLM's infractions were "serious" under the *Allied-Signal* test.

### B.    *The Disruptive Consequences of Vacating the FEIS, ROD, or RMPA Could be Severe, Further Counseling Against Vacatur.*

Vacating the FEIS, ROD, and RMPA is unwarranted not only because BLM's purported infractions were not sufficiently serious but also because the disruptive consequences stemming from vacatur could be substantial.

When evaluating the consequences factor under the *Allied-Signal* test, the Court should consider (among other things) whether vacatur "would disrupt settled transactions." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). Vacatur could do so here. As in *American Great Lakes Ports Ass'n*, judicial review here "comes nearly four years after," 962 F.3d

47

at 519, the decisions under review. In the meantime, Defendant-Intervenors have made myriad investments and contractual commitments. They identified many of these commitments last year when opposing Plaintiffs' Motion for Preliminary Injunction. *See* ECF No. 80 at 36–40 and supporting declarations ECF Nos. 80-2, 80-4, 80-7, 80-8, 60-9, 80-10, 80-11, 80-12, 80-15, and 80-16 (showing a series of unrecoverable costs and irremediable harms that they and third parties would suffer from a preliminary injunction). While many of these harms would occur if BLM's decisions were vacated, new disruptions from vacatur also could occur. *See Humane Soc'y v. United States*, No. 19-cv-2458 (BAH), 2023 WL 3433970, at *12 (D.D.C. 2023) (vacatur would put industry immediately out of compliance and eliminate the intervenor's 2023 season).

At this stage in the briefing, it is apparent that many of the disruptions caused by vacatur could cause economic harm and job loss, and some disruptions could leave environmental interests *less* protected. For example, vacating the RMPA would restrict the Defendant-Intervenors' ability to obtain relief from the six-month timing limitation stipulation. A lessee that is already drilling may be required to remove its equipment, creating additional traffic, dust, and emissions, only to bring this equipment back on to the location and resume its activities once the timing limitation stipulation expires. *See* WY_012103 at 12133, 12190. Even if a lessee has already completed drilling, it is still required to maintain mandatory nesting surveys and data collection for two additional years. With that mandate gone, government and the public would lose the benefit of additional data useful to assess future impacts on raptors. *See Ctr. for Food Safety v. Regan*, 56 F.4th 648, 668 (9th Cir. 2022) (court must consider whether vacatur would cause a net environmental harm). These economic and environmental disruptive consequences of vacatur are substantial, and outweigh the harms, if any, that Plaintiffs might suffer if the Court remands without vacatur so that BLM can simply correct any mistakes the Court might identify.

In sum, even if vacatur is an available remedy under the APA, vacatur is not warranted here under the *Allied-Signal* test: (1) none of BLM's purported infractions are sufficiently serious to warrant vacatur because there is at least a serious possibility that BLM could reaffirm its decisions on remand, and (2) the disruptive consequences flowing from vacatur could be severe.

## **<u>CONCLUSION</u>**

For these reasons, Defendant-Intervenors respectfully request that this Court grant their cross motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Respectfully submitted this 11th day of April, 2024.

/s/ *L. Poe Leggette*

L. Poe Leggette (D.C. Bar No. 430136)
Bailey A. Bridges
Baker & Hostetler LLP
811 Main St., Suite 1100
Houston, Texas 77002
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
bbridges@bakerlaw.com

Alexander K. Obrecht (CO. Bar No. 46937)
Baker & Hostetler LLP
1801 California Street, Suite 4400
Denver, Colorado 80202-2662
Telephone: 303.861.0600
Facsimile: 303.861.7805
aobrecht@bakerlaw.com

*Attorneys for Defendant-Intervenors*
*Continental Resources, Inc. and Devon*
*Energy Production Company, L.P.*

49

/s/ *Andrew C. Lillie*

Andrew C. Lillie
Mark D. Gibson
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, Colorado 80302
Telephone: 303.447.7100
Facsimile: 303.295.5111
aclillie@hollandhart.com
mdgibson@hollandhart.com

*Attorneys for Defendant-Intervenor*
*Anschutz Exploration Corporation*

/s/ *Mark Champoux*

DAVIS GRAHAM & STUBBS LLP
Mark Champoux (Bar No. CO00114)
Kathleen C. Schroder (admitted *pro hac vice*)
1550 Seventeenth St., Suite 500
Denver, Colorado 80202
Telephone: 303-892-9400
Katie.Schroder@dgslaw.com
Mark.Champoux@dgslaw.com
*Attorneys for Defendant-Intervenor*
*Petroleum Association of Wyoming*

50

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 11th day of April, 2024, I served a true and correct copy of the foregoing **PRIVATE DEFENDANT-INTERVENORS' COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** via the Court's electronic case filing system which will cause the foregoing to be served upon all counsel of record.


*/s/ L. Poe Leggette*
L. Poe Leggette