# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **POWDER RIVER BASIN RESOURCE COUNCIL and WESTERN WATERSHEDS PROJECT**, | |
| Plaintiffs, | |
| v. | |
| **U.S. DEPARTMENT OF THE INTERIOR and U.S. BUREAU OF LAND MANAGEMENT**, | Case No. 1:22-cv-2696-TSC |
| Defendants, | |
| and | |
| **STATE OF WYOMING, et al.,** | |
| Defendant-Intervenors. | |

**PRIVATE DEFENDANT-INTERVENORS'
REPLY IN SUPPORT OF THEIR
COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

   I.   Plaintiffs' Improperly Raise Waived Fee/Fee/Fed Arguments............................ 2

   II.   BLM Complied With NEPA............................................................................... 4

      A.   BLM's Groundwater Analysis Complied With NEPA. ................................4

      B.   BLM Adequately Analyzed Future Cumulative GHG Emissions.........................7

      C.   BLM's Decision to Eliminate Certain Alternatives from Further Analysis Was Valid...9

          i.   BLM's Explanation for Eliminating the Reduced-Development Alternative Is Reasonable. ..................................................................................9

          ii.   BLM's Explanation for Eliminating the Greenhouse Gas Reduction Alternative Is Reasonable. ................................................................................14

   III.   BLM Properly Relied on Wyoming's Authority to Regulate Air Quality....................... 15

   IV.   The RMPA Does Not Run Afoul of BLM's Obligation to Prevent Unnecessary or Undue Degradation of Public Lands. ........................................................................ 16

      A.   Plaintiffs Continue to Urge the Court to Find a Procedural Requirement in FLPMA's Requirement that BLM Prevent Unnecessary or Undue Degradation. ...........................17

      B.   The RMPA Will Not Result in Unnecessary or Undue Degradation.................................19

   V.   REMEDY....................................................................................................... 21

CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. U.S. Army Corps of Engineers*, No. 15-cv-699 (EGS), 2023 WL
7410054 (D.D.C. Nov. 9, 2023)........................................................................4

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)...................................................................22, 25

*Alston v. Dist. of Colombia*,
561 F. Supp. 2d 29 (D.D.C. 2008) ................................................................2

*Am. Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008) ....................................................................18

*BDPCS, Inc. v. FCC*,
351 F.3d 1177 (D.C. Cir. 2003) ...................................................................10

*Cigar Ass'n of Am. v. FDA*,
No. 16-CV-01460 (APM), 2023 WL 5094869 (D.D.C. Aug. 9, 2023)...................22

*Cigar Association of America v. FDA*,
964 F.3d 56 (D.C. Cir. 2020) ......................................................................17

*Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*,
279 F. Supp. 3d 898 (D. Ariz. 2017) ...............................................................8

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*,
628 F. Supp. 3d 189 (D.D.C. 2022)...............................................................14

*Ctr. for Biological Diversity v. Raimondo*,
610 F. Supp. 3d 252 (D.D.C. 2022), *vacated*, No. CV 18-112 (JEB), 2024 WL
324103 (D.D.C. Jan. 29, 2024) ....................................................................22

*Ctr. for Biological Diversity v. Ross*,
613 F. Supp. 3d 336 (D.D.C. 2020) ..............................................................22

*Dakota Res. Council v. DOI*,
No. 22-cv-1853 (CRC), 2024 U.S. Dist. LEXIS 51013 (D.D.C. Mar. 22, 2024).....................9

*Dickson v. Secretary of Defense*,
68 F.3d 1396 (D.C. Cir. 1995).....................................................................18

*Entek GRB, LLC v. Stull Ranches, LLC*,
763 F.3d 1252 (10th Cir. 2014) ....................................................................3

i

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*,
    769 F.3d 1127 (D.C. Cir. 2014) ................................................................................9, 16

*Friends of the Earth v. Haaland*,
    583 F. Supp. 3d 113 (D.D.C. 2022), *appeal dismissed in part sub nom.*, No.
    22-5036, 2022 WL 4293098 (D.C. Cir. Apr. 15, 2022) ........................................22

*Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2002) ................................................................................18

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986) ..............................................................................18

*Int'l Union, United Mine Workers v. Dep't of Labor*,
    358 F.3d 40 (D.C. Cir. 2004) ............................................................................9, 16

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ................................................................................23

*National Wildlife Federation v. EPA*, 286 F.3d 554 (D.C. Cir. 2002) ...........................4

*N. Alaska Envtl. Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ..................................................................................12

*N. Plains Res. Council v. BLM*,
    No. CV 03-78-BLG-RWA, 2005 U.S. Dist. LEXIS 4678 (D. Mont. Feb. 25,
    2005) ..................................................................................................................10, 11

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
    177 F. Supp. 3d 1 (D.D.C. 2016) ............................................................................12

*Northern Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) ..................................................................................11

*Pac. Shores Subdivision, Cai. Water Dist. v. U.S. Corps of Eng'rs*,
    448 F. Supp. 2d 1 (D.D.C. 2006) ..............................................................................5

*Powder River Basin Res. Council Montana Dep't of Health & Env't Scis. Montana
    Dep't of Nat. Res. & Conservation*,
    120 IBLA 47 (1991) ................................................................................................11

*Prill v. Nat'l Labor Relations Bd.*,
    755 F.2d 941 (D.C. Cir. 1985) ................................................................................16

*Public Citizen v. Federal Motor Carrier Safety Administration*,
    374 F.3d 1209 (D.C. Cir. 2004) ..............................................................................18

ii

*Sea-Land Serv. Inc. v. Dept. of Transp.*,
    137 F.3d 640 (D.C. Cir. 1998) ................................................................................................23

*Sovereign Iñupiat for a Living Arctic*, Nos. 3:23-cv-00058-SLG; 3:23-cv-00061-
    SLG, 2023 U.S. Dist. LEXIS 201981 (D. Alaska Nov. 9, 2023) ....................................11, 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ...............................................................................................23

*Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ..........................8

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    661 F.3d 66 (D.C. Cir. 2011) ...................................................................................................14

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996) ...................................................................................................18

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ..................................................................................................16

*Walker v. Pharm. Rsch. & Mfg. of Am.*,
    461 F. Supp. 2d 52 (D.D.C. 2006) .............................................................................................2

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................................................21, 22

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) .................................................................................................10

*Wilderness Soc'y v. Dep't of Interior*,
    No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 51011 (D.D.C. Mar. 22, 2024) .....................9

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) ...................................................................................................9

*Williston Basin Interstate Pipeline Co. v. FERC*,
    519 F.3d 497 (D.C. Cir. 2008) .................................................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .....................................................................................................................25

*Wyo. Outdoor Council*,
    176 IBLA 15 (2008) .................................................................................................................17

**Statutes**

Clean Air Act ...............................................................................................................................15

Endangered Species Act ...............................................................................................................18

iii

National Environmental Policy Act ............................................4, 5, 7, 9, 11, 14, 16, 17, 20, 21, 23

Tobacco Control Act .........................................................................................................18

**Other Authorities**

43 C.F.R. § 3162.1(a)..........................................................................................................12

Conservation and Landscape Health 89 Fed. Reg. 40,308, 40,341 (May 9, 2024) ......................18

Waste Prevention, Production Subject to Royalties, and Resource Conservation,
   89 Fed. Reg. 25,378 (Apr. 10, 2024) ...........................................................................15

Private Defendant-Intervenors—Continental Resources, Inc., Devon Energy Production Company LP, Anschutz Exploration Corporation, and the Petroleum Association of Wyoming (collectively, the "Defendant-Intervenors")—respectfully submit this Reply in support of their Cross Motion for Summary Judgment, ECF No. 121.

## **<u>INTRODUCTION</u>**

Plaintiffs' Combined Reply in Support of Summary Judgment Motion and Response to Cross-Motions for Summary Judgment, ECF No. 124 ("Plaintiffs' Reply"), assigns approximately 25 discrete errors to the Federal Defendants' Final Environmental Impact Statement ("FEIS"), the Record of Decision ("ROD"), and the 2020 amendment to the Casper Field Office Resource Management Plan ("RMPA"). Defendant-Intervenors adopt and incorporate the arguments in the Federal Defendants' Reply Brief in Support of Combined Cross Motion for Summary Judgment and Response Brief in Opposition, ECF No. 125 ("Federal Defendants' Reply"). Defendant-Intervenors supplement those arguments here.

While it is difficult to identify a single overarching theme from the 25 alleged errors Plaintiffs identify, two themes dominate. First, nearly every argument the Federal Defendants make is, in Plaintiffs' view, a "post-hoc rationalization." Thirty-seven times Plaintiffs use that phrase, even while Plaintiffs cite as the source of the "rationalization" documents in the administrative record on or before the Secretary's final decision. Second, many of the errors Plaintiffs allege are that the Federal Defendants "failed to respond" to comments on the FEIS, ROD, and RMPA, even though the topics on which there was a failure to respond were topics Plaintiffs never raised until after filing this suit. When Federal Defendants explain what the record does show on those topics, Plaintiffs retreat to their claim that these explanations are post-hoc rationalizations.

Plaintiffs are not allowed to quibble that the Federal Defendants' responses in the record are not nuanced enough to address claims Plaintiffs have waited until now to raise. The record shows the agency gave reasoned analysis and responses. Plaintiffs' motion for summary judgment should be denied. Defendant-Intervenors' motion for summary judgment should be granted.

## ARGUMENT

### I.    Plaintiffs' Improperly Raise Waived Fee/Fee/Fed Arguments.

Plaintiffs devote over six pages to argue that the Bureau of Land Management ("BLM") has erred in not applying stipulations regulating the use of the surface of purely non-federal lands. Pls.' Reply at 3-9. They cite arguments they raised at the preliminary injunction stage and in response to the Devon-Continental motion for judgment on the pleadings. *Id.* at 6. They make no mention of this argument, however, in their initial brief on summary judgment. There is none.

None of the parties on the Defendants' side of the case raised the Fee/Fee/Fed issue as a ground on which they sought summary judgment. Thus, Plaintiffs' argument cannot be in response to those motions. Instead, the argument is a reply to defense arguments opposing Plaintiffs' Motion for Summary Judgment, ECF No. 116 ("Pls.' Br."). Plaintiffs concede as much. They characterize what they are replying to as responses. "Laced throughout the response briefs are repeated references to BLM's lack of authority over non-federal land." Pls.' Reply at 3 (citing Fed. Defs.' Br. at 11, 45, 53, and 54). Those "repeated references" are in the administrative record. If Plaintiffs believe BLM's FEIS relied on an unlawful premise about BLM's authority over pure non-federal surface, Plaintiffs were obligated to attack that premise in their opening brief. Therefore, this argument cannot be considered. "Generally, arguments raised for the first time in a reply are waived." *Alston v. Dist. of Columbia*, 561 F. Supp. 2d 29, 37 (D.D.C. 2008); *Walker v. Pharm. Rsch. & Mfg. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).

4875-5142-8295.6

Even if Plaintiffs' argument were considered now, it can be readily rejected. Although Plaintiffs assert BLM's references to its lack of authority "overstate the issue by ignoring the distinction between split estate and Fee/Fee/Fed wells[,]" Pls.' Reply at 3, Plaintiffs actually argue there is no distinction between the two. Plaintiffs essentially contend that if BLM regulates surface operations on split estate land, it must also regulate surface operations of wells drilled on purely non-federal surface above non-federal minerals. *Id.* at 6-7. Plaintiffs misunderstand a fundamental point of oil and gas law. Where BLM holds the mineral title, it also possesses the right to use of the surface that is reasonably incident to development of the federal oil and gas estate. *See generally Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254-56 (10th Cir. 2014) (explaining rights to access and use of surface overlaying minerals owned by BLM and its mineral lessee on split estate lands). A federal lease of split estate land authorizes the lessee's surface activity. A federal mineral lessee has no such rights over private surface above private minerals (i.e., Fee/Fee/Fed). That is why BLM is not empowered to regulate surface operations on Fee/Fee/Fed land.

Plaintiffs insist that, in the Fee/Fee/Fed circumstance, "the federal lease is still what authorizes the extraction of federal minerals from those [fee] surface facilities." Pls.' Reply at 7. On the contrary, the federal lease merely allows the lessee's well to remove the federal minerals; it does not authorize the use of fee surface facilities. No one has adopted Plaintiffs' view.[1]

---

[1] Rather than belabor the point further, Defendant-Intervenors incorporate their arguments on the Fee/Fee/Fed issue in Private Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction, at 14-20, ECF No. 80, ("Priv. Intvs.' PI Opp.").

## II.       BLM Complied With National Environmental Policy Act ("NEPA").

### A.       BLM's Groundwater Analysis Complied With NEPA.[2]

Plaintiffs again open their briefing by relying on a suite of alleged groundwater issues they never raised to BLM during the administrative process—specific storage, groundwater pumping rates, water recycling, and existing groundwater wells. *See* Pls.' Reply at 9-23.[3] What Plaintiffs neglected to raise when BLM could have addressed it, now spans nearly half of Plaintiffs' briefing.

Plaintiffs begin their criticism of BLM's groundwater modeling and data by alleging "Intervenors and Defendants both distort the relevant legal standard in their response briefs." *Id.* at 9; *see also id.* at 9-12. According to Plaintiffs, the standard applied in *Alabama v. U.S. Army Corps of Engineers* only relates to the *choice of model* not the data in the model. No. 15-cv-699 (EGS), 2023 WL 7410054 (D.D.C. Nov. 9, 2023); Pls.' Reply at 11-12. As Federal Defendants highlight, *Alabama* applied that standard to both the agency's choice of model *and the data fed into it*. Fed. Defs.' Reply at 6-7. Even the additional cases Plaintiffs cite do the same. *See* Pls.' Reply at 11. For example, in *National Wildlife Federation v. EPA*, the court applied the standard to EPA's decision to use "data from only a single year" in modeling predicted bankruptcies. 286 F.3d 554, 565-66 (D.C. Cir. 2002) (rejecting challenge to agency's choice of model and the data fed into it). Fundamentally, it is difficult to imagine how the standard applied in *Alabama* could not apply to the data inputs as "the resulting findings" must bear a "rational relationship *to the characteristics of the data* to which it is applied." 2023 WL 7410054, at *48 (emphasis added). In

---

[2] Defendant-Intervenors incorporate by reference Federal Defendants' arguments on the NEPA groundwater analysis. *See* Fed. Defs.' Reply at 2-11.

[3] Defendants-Intervenors' Combined Cross Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment, ECF No. 121 at 7-9 & n.2 ("Intvs.' Br.") (collecting Plaintiffs' comments during the administrative process, which all failed to raise groundwater issues related to specific storage, annual water use, recycling, groundwater pumping rates, or existing groundwater wells).

4875-5142-8295.6

other words, for specific storage, BLM selected a value within the actual values observed in the applicable aquifers, and Plaintiffs have failed to show that the resulting findings of the groundwater modeling bear no rational relationship to those data characteristics.

Plaintiffs next claim that Federal Defendants and Defendant-Intervenors create a "post-hoc" rationalization by directing the Court to the fact that the specific storage value BLM used is within the range of "Reported Specific Storage Values" from a 2006 study. Pls.' Reply at 13-14. First, it is hard to imagine how hard data published in *2006* and used throughout various NEPA analyses in the region equates to a post-hoc rationalization for groundwater modeling done *over a decade later*. Second, "ESI 2006" refers to data used in the "Task 1B Report for the Powder River Basin Coal Review: Current Water Resources Conditions." WY_018245. BLM specifically listed these Task 1 studies and reports as sources for the EIS. WY_012427. Third, BLM included ESI 2006 in the Administrative Record for this case. *See* WY_018245 (2006 version of ESI groundwater study for Powder River Basin). In APA review, the Administrative Record includes "all documents and materials that the agency *directly or indirectly considered* and nothing more or less." *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (emphasis added and internal quotations omitted). Fourth, in its opening brief, Plaintiffs themselves relied on the ESI 2006 study, attempting to discredit BLM's specific storage value—although omitting any reference to the specific storage values actually observed. Pls.' Br. at 29. Plaintiffs' attempt to spin ESI 2006 and its specific-storage data as a post-hoc rationalization fails because the data pre-dated the current modeling, was referenced by BLM in the FEIS, was considered by BLM in the decision making, and was used by Plaintiffs to attack the current model.

Furthermore, Plaintiffs have cited no document where an interested party in the administrative process suggested a different actual specific storage value to BLM. Plaintiffs

certainly did not because they never commented on it; neither did the Environmental Protection Agency ("EPA"). *See* WY_012131 at 12179-82 (responding to EPA comments, which never raised a suggested alternative for the specific-storage value). While Plaintiffs continually brandish the term "magnitude," they have not and cannot point to any other specific-storage value raised to BLM during the administrative process.

Plaintiffs then concoct theories to evade BLM's response to concerns about increases in water-well pumping rates and total water consumption. *See* Pls.' Reply at 16. Plaintiffs claim that BLM's response that increased water consumption of 50-100 "percent greater than initially proposed" would not result in excessive drawdown *only* relates to total water use not pumping rates. *Id.* Entertaining Plaintiffs' theory that nearly all Converse County Project ("Project") water use will come from groundwater—which is false—how does water consumption double from the same number of water wells? Increased pumping rates is how. Whether Plaintiffs characterize BLM's response about the flexibility of its groundwater model as related to total water consumption or obtaining that additional water through higher pumping rates, Plaintiffs have provided nothing to discredit BLM's explanation that "[e]ven if water consumption for the project may be 50 to 100 percent greater than initially proposed, the model indicates that drawdown would not be excessive." WY_012131 at 12307. BLM adequately explained that its groundwater modeling was robust enough to accommodate forecasted increases to water consumption—regardless of whether that increase is viewed in total or as an increase to pumping rates.

Plaintiffs finally turn to their mischaracterization of the Operator Group's comments on and BLM's analysis of water recycling within the Project. *See* Pls.' Reply at 17-20. As in their opening brief, Plaintiffs again attempt to spin the Operator Group's comments on the difficulties of implementing a *specific level* for water recycling across all development; Intervenor-Defendants

already corrected that mischaracterization in response. Intvs.' Br. 11-15. Plaintiffs then claim that the FEIS's comment that "[a]ccording to BLM's recent experience in the CCPA water recycling is anticipated" only relates to water disposal not recycling. Pls.' Reply at 19. This is difficult to fathom as the direct quote from the FEIS says "water recycling." WY_012362 at 12453. Furthermore, a discussion of produced water recycling should be included in an analysis of disposal because, if produced water is recycled, demand for produced-water disposal decreases. Finally, Plaintiffs avoid entirely BLM's explanation of water recycling related to hydraulic fracturing in the FEIS. *See* Intvs.' Br. at 14 (quoting WY_012362 at 13160). In that discussion, BLM relied on scholarly work on water recycling and observed rates of recycling in other fields as high as 90 to 100 percent. WY_012362 at 13160. In sum, BLM's groundwater analysis complied with NEPA.

### B.    BLM Adequately Analyzed Future Cumulative GHG Emissions.

All parties agree that BLM must consider reasonably foreseeable future oil and gas development when it evaluates cumulative greenhouse gas ("GHG") impacts. And Plaintiffs concede that BLM does *not* need to identify or list in its FEIS the project-specific sources of the future, quantified GHG emissions. *See* Pls.' Reply at 26. That concession renders the projects in Table 5.2-1 irrelevant. The disagreement thus boils down to whether *the record proves* that BLM considered future development. It does. *See* Federal Defendants' Combined Cross Motion for Summary Judgment and Response Brief in Opposition, ECF No. 118 at 30-34 ("Fed. Defs.' Br.") (providing record support); Intvs.' Br. at 15-20 (same); Fed. Defs.' Reply at 12-13 & n.9 (same).

Federal Defendants in their Reply spotlight Plaintiffs' only real criticism of the record: that future GHG emissions data, which BLM relied on, was "stale" by EIS finalization, and no longer represented future emissions. Fed. Defs.' Reply at 12. But Plaintiffs' "staleness" criticisms fail to prove a NEPA violation for at least three reasons. First, as Federal Defendants explain, NEPA does

not require an agency to constantly update its analyses before finalizing a NEPA document. *Id.*; *see also Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 919 (D. Ariz. 2017) (quoting *Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006) (2016 Environmental Assessment based on 2008-2013 data was "thorough and reasonable"; NEPA is not "a tool to stall new projects indefinitely . . . always awaiting updated information only to find the new information outdated by the time a decision is made")).

Second, Plaintiffs criticize BLM for relying on a 2015 EIS because BLM ultimately selected that document's year-2020 annual GHG estimates for its analysis. *See* Pls.' Reply at 25. That argument is misleading, too. Plaintiffs omit that BLM in the 2015 EIS calculated annual emissions for both 2020 and 2031 but ultimately concluded that "emissions in 2031 are less than in 2020" because early-phase construction activities generate the most emissions. WY_031524 at 031533-34. Thus, BLM's reliance here on 2020 numbers, rather than on estimated 2031 emissions, more generously estimates local annual GHG emissions. Plaintiffs also criticize BLM's reliance on the 2015 EIS, saying it is a "poor estimate" of GHG emissions because state and private wells, and production outside of sage-grouse habitat, were not considered then. Pls.' Br. at 25 n.10. But keep reading. In the next paragraph of the FEIS, BLM acknowledged that limitation and relied on more-recent Wyoming Oil and Gas Conservation Commission ("WOGCC") data to supplement the 2015 EIS data. WY_012362 at 012533-34; *see also id.* at 013293 ("[P]roduction of state and private minerals and federal minerals that did not occur within the Sage-grouse habitat were . . . included in the CCPA projections."). By incorporating the WOGCC data, BLM significantly increased its local GHG emissions estimates. *Id.* at 012534; *see also id.* at 013293.

Third, Plaintiffs' criticism of BLM's reliance on other older reports for past emissions data is misplaced. *See* Pls.' Reply at 25. Plaintiffs cherry-pick older citations in the FEIS, but do not

mention the updated data that BLM relied on. *See id.* (citing WY_012534 to criticize BLM's reliance on a 2007 report while ignoring 2019 reports cited on the same page).

As for the Table 5.2-1 data, Plaintiffs improperly attempt to place the burden on Defendants to prove that BLM did not violate NEPA. *See* Pls.' Reply at 26. That is backward. Rather, it is Plaintiffs who "carr[y] the[] burden of showing that the Bureau violated NEPA." *Dakota Res. Council v. DOI*, No. 22-cv-1853 (CRC), 2024 U.S. Dist. LEXIS 51013, at *31 (D.D.C. Mar. 22, 2024). In any event, because *all* the projects listed in Table 5.2-1 arise from source documents from 2013-2016, *see* WY_012362 at 013276, any emissions projections that BLM examined through 2019, *see id.* at 012534, likely accounted for those projects.

         **C.**     **BLM's Decision to Eliminate Certain Alternatives from Further Analysis Was Valid.**

    **i.**     ***BLM's Explanation for Eliminating the Reduced-Development Alternative Is Reasonable.***

Plaintiffs want this Court to adopt a novel standard to review BLM's elimination of the reduced-development alternative: that "[i]f the Court finds any one of the excuses improper, it must hold BLM's alternatives analysis unlawful because the record does not show that BLM 'would clearly have' rejected a pacing alternative on the other grounds alone." Pls.' Reply at 28-29. That is not the standard. Tellingly, Plaintiffs cite no NEPA case applying it.[4] That is because there is not one. Instead, a "[c]ourt reviews an agency's selection of [NEPA] alternatives *under a relaxed rule of reason standard*." *Wilderness Soc'y v. Dep't of Interior*, No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 51011, at *71 (D.D.C. Mar. 22, 2024) (citation omitted) (emphasis added).

---

[4] Plaintiffs' cases are inapposite. None deals with NEPA, let alone an agency's decision to eliminate alternatives. *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006) (Federal Energy Regulatory Commission order); *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127 (D.C. Cir. 2014) (Homeland Security decision); *Int'l Union, United Mine Workers v. Dep't of Labor*, 358 F.3d 40, 44-45 (D.C. Cir. 2004) (Mine Safety and Health Administration decision); *see* Fed. Defs.' Reply at 14 & n.10.

This "deferential rule of reason . . . govern[s] both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them[.]" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013) (citations omitted). As one of Plaintiffs' own cited cases emphasizes, "[t]his 'rule of reason' analysis is essentially *the same as an abuse of discretion standard*." *N. Plains Res. Council v. BLM*, No. CV 03-78-BLG-RWA, 2005 U.S. Dist. LEXIS 4678, at *15 (D. Mont. Feb. 25, 2005) (emphasis added).

Plaintiffs also mischaracterize their inapplicable new standard. A court is not required to overturn BLM's decision if any reason for the decision is infirm. Rather, "[w]hen an agency offers multiple grounds for a decision, [a court] will affirm the agency *so long as any one of the grounds is valid*, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) (emphasis added). Therefore, Plaintiffs must demonstrate that *the* basis upon which BLM made its decision was invalid and that other bases were unavailable. *See id.* Here, BLM relied on multiple grounds to eliminate the reduced-development alternative. Each was valid, particularly under NEPA's relaxed rule of reason standard.

**"Inconsistent with Lease Rights":** Plaintiffs argue that the reduced-development alternative "would *not* reduce the overall volume of oil and gas production." Pls.' Reply at 32 (emphasis added). Yet when pressed to describe how exactly BLM could implement that alternative in the highly checkerboarded Project area, Plaintiffs state that the alternative "does not require BLM to dictate how surface operations are conducted. It is a question of *if* and when *the federal minerals may be extracted at all*." *Id.* at 38 (emphasis added). This reveals the flaw in Plaintiffs' position and illustrates why BLM correctly concluded that it couldn't adopt the reduced-development alternative without trampling on lessees' rights. *See* WY_012362 at 012492, 012426

("neither the ROD nor any decisions implementing the ROD will limit, restrain, or unreasonably interfere with [lessees'] rights"). Indeed, "the sale of a non-NSO oil or gas lease constitutes the 'point of commitment;' after the lease is sold the government no longer has the ability to prohibit [lease development]." *Sovereign Iñupiat for a Living Arctic*, Nos. 3:23-cv-00058-SLG; 3:23-cv-00061-SLG, 2023 U.S. Dist. LEXIS 201981, at *20 (D. Alaska Nov. 9, 2023) (citations omitted).

The cases Plaintiffs cite to assert that BLM violated NEPA by not analyzing the reduced-development alternative are inapposite. *See* Fed. Defs.' Reply at 17. Unlike Alternative C here, in which BLM *did* consider reducing well pads (938 new well pads, compared with Alternative B's 1,500, *see* WY_012362 at 012374), all action-based alternatives in *Northern Plains* "failed to consider any lesser degree of development than *full-field development*." 2005 U.S. Dist. LEXIS 4678, at *18 (emphasis added).[5] This was despite an RMP amendment which had a purpose and need that was much broader, *see id.* at *19, and did not call for specific development, like the Project here does, *compare id.*, *with* WY_012362 at 012420. Similarly, the main issue in *Powder River Basin* was whether an EIS was required because an EA suggested possible significant environmental impacts. There, BLM attempted to bypass EIS preparation by assuming far fewer wells would be developed, but it never analyzed such a scenario. *See Powder River Basin Res. Council Montana Dep't of Health & Env't Scis. Montana Dep't of Nat. Res. & Conservation*, 120 IBLA 47, 53-55 (1991). That is not the case here.

**"Inconsistent with the Action's Purpose":** Even if the purpose and need statement required BLM to "minimize or avoid environmental impacts," as Plaintiffs suggest, Pls.' Reply at 34, the agency did so: it incorporated mitigation measures to reduce environmental impacts. *See,*

---

[5] Another case Plaintiffs cite, *Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007), addressed the same EIS involved in *Northern Plains*.

*e.g.*, WY_012362 at 013366-379; WY_016733 at 016739-752. The Court should defer to BLM's judgment. BLM need not consider certain alternatives when the ones it evaluated incorporate reasonable mitigation measures. *See, e.g.*, *Sovereign Iñupiat*, 2023 U.S. Dist. LEXIS 201981, at *19-21 (evaluated alternatives sufficient where "right and the responsibility to fully develop [lessee's] oil and gas leases … [was] subject to reasonable restrictions and mitigation measures imposed by the federal government"); *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (agency's explanation, "coupled with [its] willingness to incorporate several" recommended mitigation measures "satisfied NEPA's requirement to consider or properly reject proposed alternatives"); *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, 177 F. Supp. 3d 1, 22 (D.D.C. 2016) (additional alternative consideration unnecessary where it "would not have resulted in any mitigation measure the [agency] did not already consider").

**"Would Not Address a Known Resource Conflict":** Plaintiffs' contention that BLM recognized and rejected a "resource conflict between fossil fuel extraction and air quality" is wrong. Pls.' Br. at 30 (citing WY_012362 at 012492); *see also* Pls.' Reply at 35. BLM's air-quality discussion on that EIS page had nothing to do with resource conflicts. *See* WY_012362 at 012492 (Section 2.6.8). Indeed, nothing in the record indicates that BLM viewed "resource conflict" as anything other than a potential conflict between competing mineral-interest owners. *Id*.[6] (Section 2.6.9). Even if BLM perceived a "resource conflict" between oil-and-gas development and air

---

[6] Plaintiffs claim that Defendant-Intervenors "made-up" the definition of "resource conflict" by citing to an "inapposite regulation that does not even contain that phrase." Pls.' Reply at 34 (referring to Defendant-Intervenors' citation to 43 C.F.R. § 3162.1(a)). Not so. BLM acknowledged that § 3162.1(a), which requires operators to avoid "adverse effect[s] on ultimate recovery of other mineral resources," precludes the "ability to throttle one lessee's ability to develop its lease for the benefit of another lessee." Fed. Defs.' Reply at 15. Thus, "resource conflict" is synonymous with the "adverse effect" one interest owner's production has on another's production. *See id.*

quality, the agency redressed it by analyzing air-quality impacts under every evaluated alternative, *see* WY_012362 at 012497, 012931-969, and impact-reduction measures, *see* WY_012362 at 013366, 012451 (flaring constraints), 013370-71, WY_012131 at 012253 ("Proposed Action includes . . . practices to limit flaring"), WY_016733 at 016739-40.

**"Already Considered Reduced Effects":** Plaintiffs argue that the reduced-development alternative is "significantly distinguishable" from others because it "would have been the *only* alternative to address the EPA's serious air quality concerns and … the socioeconomic impacts." Pls.' Reply at 36 (emphasis in original). Not so. First, every alternative addressed air quality. *See* WY_012362 at 012497, 012931-969. Second, the EPA asked BLM to consider "fewer but larger well pads, to help reduce the volume of water needed as well as to manage potential air quality impacts." WY_012131 at 012180. BLM did just that under Alternative C, offering 40% fewer well pads than Alternative B. *See* WY_012362 at 012374. Third, every alternative addressed socioeconomic impacts. *See id.* at 013036-99. BLM explained that even if a "well-defined and steady pace of development might be attractive" for socioeconomic reasons, that is not reality— "the actual pace of drilling would be variable and unpredictable because development decisions are dependent on variable factors" such as demand and pricing *Id.* at 013040. Moreover, in Wyoming, many factors other than the rate of oil-and-gas production—including other industries and recreation—impact local boom-and-bust cycles. *See id.* at 013041.

**"Inconsistent with Basic Policy Objectives":** Plaintiffs claim that the Casper RMP sets the Project "policy objectives." Pls.' Reply at 36. But BLM explained that the "[m]anagement objectives within the Casper RMP ROD include leasing, permitting, and development of oil and gas resources on BLM-administered surface and mineral estate within the planning area while minimizing impacts." WY_012362 at 012428; *see also* Fed. Defs.' Br. at 37 & n.10. The agency

4875-5142-8295.6

emphasized that "BLM management objectives for mineral resources also include the need to support the domestic need for energy resources." WY_012362 at 012428. Plaintiffs contend this alternative would "have better served [BLM], by allowing full development of the leased minerals while minimizing impacts to other resource values." Pls.' Reply at 37. But it is the expert agency's job—not Plaintiffs' or this Court's—to define policy objectives and how to achieve them. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73-74 (D.C. Cir. 2011).

"**Implementation Is Remote or Speculative**": BLM in the FEIS explained that because the federal government owns limited surface and mineral estates in the Project, even if BLM could administer a reduced-development alternative (it cannot), that would not discernably reduce impacts (i.e., "may not reduce surface disturbance"). So that alternative is "remote or speculative." WY_012362 at 012492; *see also id.* at 012425-26. That explanation surpasses the relaxed rule of reason standard, and it is not post hoc; it is in the record.

ii.    *BLM's Explanation for Eliminating the Greenhouse Gas Reduction Alternative Is Reasonable.*

Avoiding the argument that BLM's authority to regulate air emissions is limited, Plaintiffs double down on their assertion that BLM failed to analyze an alternative to "simply *reduce* emissions." Pls.' Reply at 41 (emphasis in original). Plaintiffs misunderstand BLM's authority. BLM cannot regulate air: doing so falls under the purview of EPA, states, and Tribal Nations. *See* Fed. Defs.' Br. at 41 & n.14; Fed. Defs.' Reply at 19. Under NEPA, BLM's role is limited to "adequately consider[ing] and disclos[ing] the environmental impacts of its actions" and reasonable alternatives. *See, e.g.*, *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 628 F. Supp. 3d 189, 198-99 (D.D.C. 2022). BLM fulfilled that role here. It quantified existing GHG emissions, compared those to the Project's emissions, and quantified predicted future emissions.

*See* WY_012362 at 012533-536, 013293-95. And it considered mitigation measures to minimize air-quality impacts. *See* WY_012362 at 013366, 013370-71; WY_016733 at 016740.

Plaintiffs' suggestion that BLM's recently finalized Waste Prevention Rule proves that BLM regulates air emissions also misses the mark. *See* Pls.' Reply at 42. In fact, BLM explicitly disclaimed its authority to regulate air quality: "BLM is not regulating air quality in this rule. The BLM is regulating to prevent waste and to assure payment of royalties pursuant to independent and express statutory authority." Waste Prevention, Production Subject to Royalties, and Resource Conservation, 89 Fed. Reg. 25,378, 25,394 (Apr. 10, 2024); *see also* Fed. Defs.' Reply at 19.

### III.    BLM Properly Relied on Wyoming's Authority to Regulate Air Quality.

In their Reply, Plaintiffs discount BLM's stated position in the ROD that it "may rely on the State of Wyoming, which is subject to oversight by the EPA, to ensure permitted activities do not exceed or violate any State or Federal air quality standard under the Clean Air Act." *See* Pls.' Reply at 44-55; WY_016733 at 16752-54. Plaintiffs do not assert or even suggest that BLM acted improperly by relying on the State of Wyoming's authority to protect air quality. *See* Pls.' Reply at 44-55. Rather, Plaintiffs accept as valid BLM's stated position in the ROD that it may rely on the State's authority to protect air quality. *See, e.g.*, *id.* at 50 (stating that BLM provided "additional rationales" for its decision in the ROD).

Having accepted the propriety of BLM's justification in the ROD, Plaintiffs ask the Court to ignore it. For example, Plaintiffs absurdly characterize BLM's own justification in the ROD as a "post-hoc rationalization."[7] *See* Pls.' Reply at 48. Plaintiffs then tether their allegations of error

---

[7] Plaintiffs attempt to distract from the ROD by incorrectly asserting that Defendant-Intervenors argue BLM "changed its legal position" in the ROD. *See* Pls.' Reply at 48. Plaintiffs mischaracterize Defendant-Intervenors' argument. Defendant-Intervenors simply recite the reason that BLM presented in the ROD for declining to adopt air quality mitigation measures. *See* WY_016733 at 016752-54. The ROD represents the agency's final decision, and the Court should look to it.

4875-5142-8295.6

only to BLM's statement in the FEIS. *See* Pls.' Reply at 44-50. This position overlooks that the ROD represents BLM's final decision. *See* Intvs.' Br. at 28.

Similarly, Plaintiffs assert that the Court should set aside the ROD because the Court cannot "confidently say" that BLM "would clearly have acted" only on the justification stated in the ROD. In support, Plaintiffs cite cases in which an agency's decision cited multiple justifications, some of which were invalid or problematic. *See* Pls.' Reply at 49-50. These cases are inapposite because they involve review of justifications stated in an agency's final decision, rather than in documents preceding the agency's final decision. *See, e.g.*, *Fogo De Chao (Holdings) Inc.*, 769 F.3d at 1133-43, 1149 (finding agency decision denying visa contained legal error); *Int'l Union, United Mine Workers* , 358 F.3d at 42, 44 (finding stated reasons in agency decision to withdraw rule invalid); *Prill v. Nat'l Labor Relations Bd.*, 755 F.2d 941, 947 (D.C. Cir. 1985) (remanding National Labor Relations Board decision based on faulty justification); *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008) (remanding Federal Energy Regulatory Commission (FERC) decision due to ambiguity in decision); *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (reviewing FERC decision that expressly relies on flawed analysis in NEPA document). These cases in fact confirm that the ROD is the final agency decision the Court must review. Accordingly, the Court should uphold BLM's decision to rely on the State of Wyoming's authority to manage air quality.[8]

## IV.    The RMPA Does Not Run Afoul of BLM's Obligation to Prevent Unnecessary or Undue Degradation of Public Lands.

Plaintiffs fail to demonstrate that BLM violated the Federal Land Policy and Management Act ("FLPMA") by approving the RMPA. First, contrary to Plaintiffs' repeated assertions,

---

[8] Plaintiffs err in saying Defendant-Intervenors "agree" that BLM has authority to impose air quality controls. Pls.' Reply at 51. Defendant-Intervenors have already shown BLM lacks that authority. Intvs.' PI Opp. at 33-34. Accordingly, the Secretary was right to defer to Wyoming.

FLPMA's obligation that BLM prevent unnecessary or undue degradation of the public lands does not inject a procedural requirement into BLM decision-making. Second, BLM's approval of the RMPA will not result in unnecessary or undue degradation.

### A.     Plaintiffs Continue to Urge the Court to Find a Procedural Requirement in FLPMA's Requirement that BLM Prevent Unnecessary or Undue Degradation.

In their Reply, Plaintiffs continue to attempt to transform FLPMA's substantive obligation that BLM prevent unnecessary or undue degradation into a procedural one. *See* Pls.' Reply at 57-58 (arguing BLM should have "*considered*" this standard and provided a "*reasonable explanation*" why it would not result (emphasis in original)).  Their argument fails for three reasons.

First, Plaintiffs acknowledge that BLM did, in fact, consider unnecessary or undue degradation when approving the RMPA. Plaintiffs cite their own comments submitted during the NEPA process as "[c]onfirming" BLM's position that it was "clearly aware" of its obligation to prevent unnecessary or undue degradation.[9] *See* Pls.' Reply at 68. Plaintiffs cannot legitimately now argue otherwise. *See Wyo. Outdoor Council*, 176 IBLA 15, 46 (2008) (upholding BLM decision after finding the agency "was cognizant" of its obligation to prevent unnecessary or undue degradation).

Second, Plaintiffs improperly conflate FLPMA and its unnecessary or undue degradation requirement—which sets a substantive floor on the permissible effects of BLM's decisions but *not* specific factors that the agency must consider in its decision-making process—with statutes in which Congress has expressly directed agencies to consider specific factors when rendering certain decisions. *See* Pls.' Reply at 57-58. For example, Plaintiffs quote *Cigar Association of America v.*

---

[9] Plaintiffs say that they exhausted their unnecessary or undue degradation argument during the NEPA process. *See* Pls.' Reply at 68.  Elsewhere, however, they take a contradictory position, stating "BLM did not even *consider*" unnecessary or undue degradation.  *Id.* at 55 (emphasis at original).  Both cannot be true.

*FDA*, 964 F.3d 56 (D.C. Cir. 2020), in support of their argument that BLM did not adequately consider its obligation to prevent unnecessary or undue degradation.  Pls.' Reply at 58. But that case involved judicial review of an agency regulation promulgated under the Tobacco Control Act, which expressly directed the agency to "consider[ ] whether the regulation would likely increase or decrease the number of smokers." *Id.* at 60-61. Similarly, Plaintiffs cite *Public Citizen v. Federal Motor Carrier Safety Administration*, 374 F.3d 1209, 1212 (D.C. Cir. 2004), but that case involved an agency rule promulgated under a statute that required consideration of five enumerated factors. *Compare id.* at 1212, *with* Pls.' Reply at 57, 59. Other cases that Plaintiffs cite also are not analogous. *See Gerber v. Norton*, 294 F.3d 173, 175-76 (D.C. Cir. 2002) (reviewing permit issued pursuant to the Endangered Species Act, which required the agency to make multiple findings prior to permit issuance); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1054 (D.C. Cir. 1986) (finding agency did not consider statutorily directed factors); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1399-1400 (D.C. Cir. 1995) (finding decisionmaker did not adequately explain conclusion that statutory exception was inapplicable); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008) (dismissing information submitted during comment period); *Transactive Corp. v. United States*, 91 F.3d 232, 241 (D.C. Cir. 1996) (agency decision based on mistaken legal assumption). These cases are not relevant to evaluating BLM's compliance with FLPMA, which imposes a substantive floor on the permissible effects of BLM's decisions but does not require BLM to discuss or consider any particular factors.

Finally, a recent BLM rulemaking confirms that Plaintiffs' interpretation of FLPMA is wrong.  In its Conservation and Landscape Health rule finalized in May 2024, BLM adopted a general definition of "unnecessary or undue degradation." 89 Fed. Reg. 40,308, 40,341 (May 9, 2024) (to be codified at 43 C.F.R. § 6101.4(aa)).  Nowhere, however, does this rule adopt an

affirmative obligation that BLM consider unnecessary or undue degradation in all decisions. *See id.* at 40,339-49. Similarly, this rule does not require BLM to explain why its decisions will not result in unnecessary or undue degradation. Thus, the Court should reject Plaintiffs' attempt to transform FLPMA's substantive requirement that BLM prevent unnecessary or undue degradation into a procedural requirement.

### B. The RMPA Will Not Result in Unnecessary or Undue Degradation.

In their Reply, Plaintiffs recycle the same objections to the RMPA raised in their opening brief but again fail to establish agency error. *Compare* Pls.' Reply at 59-66, *with* Pls.' Br. at 47-52. They continue to question the management measures that BLM adopted as a substitute for the raptor timing stipulation. Pls.' Reply at 60, 61-62. They continue to assert that a timing stipulation is the only mechanism that can prevent unnecessary or undue degradation. *Id.* at 61. They continue to argue, without evidence, that the RMPA will cause "take" of migratory birds. *Id.* at 63-64. And they continue to question BLM's judgment in balancing competing uses of the public lands. *Id.* at 64-67. Defendant-Intervenors addressed these contentions in their opening brief and need not repeat those discussions here. *See* Intvs.' Br. at 37-42. Instead, Defendant-Intervenors offer two responses to Plaintiffs' Reply.

First, Plaintiffs incorrectly suggest that BLM has eliminated raptor timing stipulations throughout the Project area. *See* Pls.' Reply at 60 ("BLM simply waived the requirement for non-eagle raptor nests in the Project area under one key condition[.]"). Plaintiffs overstate the scope of BLM's decision. In the FEIS, BLM estimated the Project area contains more than 1,475 raptor nests,[10] of which 33% may be occupied. *See* WY_012362 at 013199; *id.* at 012873 (defining "occupied"). Therefore, approximately 487 occupied nests are under BLM's management

---

[10] *See* WY_012362 at 012872, 013199. BLM's estimate is higher than the 935 nests that the Operator Group had separately identified through surveys. *See id.* at WY_012875.

authority in the Project area.[11]  By authorizing only 98 instances of timing stipulation relief, the ROD leaves intact BLM's management of 80% of the raptor nests in the Project area within BLM's jurisdiction. Plaintiffs fail to explain how this change to management of a fraction of the raptor nests in the Project area leads to unnecessary or undue degradation.

Second, the administrative record does not support Plaintiffs' characterizations of impacts from the timing stipulation relief adopted in the ROD. Plaintiffs base their characterizations of potential impacts on comments submitted during the early stages of the NEPA process.[12] The State of Wyoming, however, has recognized that BLM engaged in dialogue with stakeholders over the course of the NEPA process and ultimately adopted mitigation measures to mitigate impacts to raptors. *See* State of Wyoming's Combined Cross-Motion for Summary Judgment, Memorandum in Support, and Response Brief in Opposition at 37-38, ECF No. 120 ("Wyo. Br.").  Further, Plaintiffs overstate that commenters "advocated" for Options 4 and 5 when, in fact, commenters simply advised on BLM's assessment of potential impacts. *Compare* Pls.' Reply at 66-67, *with* WY_008732 at 008733; WY_009424 at 009424-25; WY_008312 at 8313-14; WY_008357 at 008359-60; WY_011198 at 011198-202. And, to the extent Plaintiffs suggest that the plans contemplated by Options 4 and 5 in the FEIS have been developed, that suggestion simply is not true; neither BLM nor the Fish and Wildlife Service ("FWS") finalized any plan and, more significantly, did not release any plan for public review and comment. *See* Pls.' Reply at 67;

---

[11] Thirty-three percent of 1,475 nests is 487.  *See* WY_012362 at WY_013199.

[12] *See* Pls.' Reply at 62 (citing WY_008359; WY_008358 (comments on Preliminary Supplemental Draft Environmental Impact Statement (SDEIS)), 64 (citing WY_000112-13 (scoping comments submitted before BLM had released any alternatives); WY_007812 (comments on unadopted raptor plan)), 66 (citing WY_008358-59 (comments on preliminary SDEIS); WY_008329 (comments on SDEIS); WY_008733 (comments on SDEIS)), 67 (citing WY_004642 (comments on DEIS, which did not include the raptor timing stipulation relief BLM ultimately adopted), WY_008360 (comments on Preliminary SDEIS)).

WY_012362 at 012425 (referring to an "example process for an approval of a plan" under Option 4 and a "proposed outline" for a migratory bird conservation plan under Option 5). The record does not support Plaintiffs' argument that the RMPA will result in "unnecessary" impacts. For these reasons, Plaintiffs have not established the RMPA will result in unnecessary or undue degradation.

### V.    Remedy

Plaintiffs seek vacatur of the ROD, the FEIS, and the RMPA. Vacatur of those decisions in the ordinary course would invalidate all the permits and other decisions based upon them. Yet that is not what Plaintiffs really seek. They say "vacating the ROD and EIS would not enjoin development of existing permits[.]"[13] "Vacating the RMP amendment will also simply reinstate the prior status quo of case-by-case exceptions to raptor Timing Limit Stipulations."[14] New permitting could resume "after proper NEPA study."[15] Plaintiffs are not seeking vacatur but an injunction against future permitting, although exactly how their remedy against the RMPA would apply to activities already underway under existing permits is unspecified. It is little wonder the Federal Defendants seek briefing on remedy. What exactly do Plaintiffs want?

Plaintiffs do not dispute that vacatur, like a preliminary or final injunction, is an equitable remedy.[16] The Supreme Court has clarified that an equitable remedy "is not a remedy which issues as of course[.]" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (internal quotation and citations omitted) (reversing order that the Navy be permanently enjoined from training activities off Puerto Rico until it first obtained a permit under the Clean Water Act). A court in equity is to shape its relief to the needs of the particular case. *Id.* at 312. *Allied-Signal, Inc. v. U.S. Nuclear*

---

[13] Pls.' Reply at 72-73.
[14] Pls.' Reply at 73.
[15] *Id.*
[16] Intvs.' Br. at 45 n.19 (citing *Public Citizen, Inc. v. FERC*, 92 F.4th 1124, 1131 (D.C. Cir. 2024)).

*Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), and its progeny adopt an equitable test to balance the competing interests of the parties and the public. No vacatur is ordered if the violations are not "serious" enough or if vacatur would be too "disruptive."

Plaintiffs oppose the Federal Defendants' request for separate briefing on remedy if the Court finds any error in BLM's decision making.[17] They argue "the Court has all it needs to award the presumptive remedy, and to avoid prejudicial delay, the Court should proceed to order vacatur."[18] But courts in this district have frequently ordered additional briefing on remedy to assure the court is fully informed before applying *Allied-Signal*.[19]

Under *Allied-Signal*, separate briefing is particularly appropriate given the number of issues raised on summary judgment, with Plaintiffs having identified not one or two, but 25 discrete errors in BLM's decision making. Which assertions, if any, the Court will agree with could not be forecast by the defendant parties, and how "serious" they would be under *Allied-Signal* is a topic on which the Court needs to be better informed. Additionally, when the Court, with its heavy

---

[17] Plaintiffs assert separate briefing on remedy would be pointless because "[v]acatur is statutorily required in a successful APA challenge[.]" Pls.' Reply at 69. But that argument can be dismissed quickly because *Allied-Signal* is the law in this Circuit.

[18] Pls.' Reply at 69. Plaintiffs do not demonstrate, let alone prove, what the prejudice is if the Court calls for briefing on remedy.

[19] *Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252, 280 (D.D.C. 2022) (ordering "additional briefing as to potential remedies, which may include remand with or without vacatur"), *vacated*, No. CV 18-112 (JEB), 2024 WL 324103 (D.D.C. Jan. 29, 2024), *and dismissed*, No. 24-5071, 2024 WL 2061696 (D.C. Cir. May 3, 2024); *Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 348 (D.D.C. 2020) (ordering additional "briefing from the parties on the issue of an injunctive remedy"); *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 156 (D.D.C. 2022) (explaining that the court requested "further briefing on the question of whether the lease sale would necessarily need to be reinitiated and the impact of remand with or without vacatur on the agency's options"), *appeal dismissed in part sub nom.*, No. 22-5036, 2022 WL 4293098 (D.C. Cir. Apr. 15, 2022), *and vacated and remanded*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023); *Cigar Ass'n of Am. v. FDA*, No. 16-CV-01460 (APM), 2023 WL 5094869, at *1 (D.D.C. Aug. 9, 2023) (explaining that the court "invited further briefing from the parties" on remedies "because the issue . . . had not been briefed").

docket, will be able to rule on the motions is one factor determining the extent of "disruption" a vacatur would cause. Even Plaintiffs admit as much. They acknowledge that the increase in environmental harm from a vacatur of the RMP amendment (allowing departures from the timing limitation near raptor nests) will depend on whether "the Court issues its ruling when the timing limit is in effect (February 1 to July 31)."[20] And that is just the disruption *Plaintiffs* acknowledge; Defendant-Intervenors have already shown that disruptions like those that would have resulted from a preliminary injunction will likely recur. Granting the Federal Defendants' request for additional briefing is the prudent judicial course.

Plaintiffs also cite inappositely a handful of cases to support the immediate imposition of their remedy. They cite *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021), to hold that any "nontrivial" violation of NEPA requires vacatur.[21] But, unlike here,  that case involved an agency's failure to prepare an EIS at all. *Id.* at 1042. Failure to prepare a required EIS necessarily means the agency improperly found all impacts insignificant, making the risk of agency error high. In contrast, the seriousness of any error the Court may find in the FEIS prepared here is a topic for the Court's careful consideration. Similarly, they argue that *Sea-Land Services Inc. v. Department of Transportation*, 137 F.3d 640 (D.C. Cir. 1998), holds than any misunderstanding by BLM about its authority over air quality requires vacatur,[22] but they fail to respond to Defendant-Intervenors' showing that under *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002), the Court would find a serious possibility that on remand BLM

---

[20] Pls.' Reply at 74.
[21] Pls.' Reply at 70.
[22] Pls.' Reply at 72.

would still lawfully defer to the authority of Wyoming and the EPA over what mitigation measures to require.[23] The Court would likely benefit from further briefing on this point.

Plaintiffs raise similarly inapposite authorities on the issue of the disruptive effects of vacatur. Defendant-Intervenors had reminded the Court of the kinds of harm a preliminary injunction would have caused and indicated further briefing would show similar harms would follow from vacatur.[24] Only slightly responsive to this point, Plaintiffs argue that what was shown at the preliminary injunction stage concerned harms from the enjoining of drilling on existing permits, while here Plaintiffs seek to enjoin future permits only; as a result, they urge, the Defendant-Intervenors' claims are speculative.[25] But Defendant-Intervenors' proof in further briefing will not be speculative. It will include quantified showings of unrecoverable financial loss and showings of environmental damage resulting from Plaintiffs' requested remedy. All that is needed is to know what error the Court finds and when the period of vacatur is likely to begin.

Finally, if the Court grants further briefing on the remedy, Plaintiffs ask that the Court enter an interim injunction against BLM issuing further permits pending the Court's later ruling. Here at least four roadblocks stand in Plaintiffs' way. First, they still have not cured the lack of standing this Court found with respect to permit challenges at the preliminary injunction stage.[26] Second, they have not demonstrated activities under permits are likely to cause harm to Plaintiffs' members. Third, Defendant-Intervenors request a fact-finding hearing on the issue of harm, because Plaintiffs must offer more than speculation to obtain an interim injunction. Fourth,

---

[23] Intvs.' Br. at 47. Plaintiffs still have not identified a single piece of air quality control equipment BLM would require that Wyoming and EPA would not.

[24] Intvs.' Br. at 47-48.

[25] Pls.' Reply at 73 (citing *Pub. Emps. For Env't Resp. v. U.S. Fish & Wildlife Serv.*, 189 F. Supp.3d 1 (D.D.C. 2016)).

[26] *See* Mem. Op., ECF No. 105 at 12 ("Plaintiffs lack standing to pursue their APD claims . . . .").

Plaintiffs must show they are likely to succeed on their claim that vacatur is required after the *Allied-Signal* factors are considered, for that question in this context is the proper application of the "likelihood of success on the merits" test. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (describing elements required to grant preliminary injunction). Defendant-Intervenors oppose the interim injunction.

## <u>CONCLUSION</u>

Therefore, Defendant-Intervenors respectfully request this Court deny Plaintiffs' Motion for Summary Judgment and grant Defendant-Intervenors' Cross Motion for Summary Judgment.

4875-5142-8295.6

Respectfully submitted this 20th day of June, 2024.

/s/ *L. Poe Leggette*

L. Poe Leggette (D.C. Bar No. 430136)
Bailey A. Bridges
Baker & Hostetler LLP
811 Main St., Suite 1100
Houston, Texas 77002
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
bbridges@bakerlaw.com

Alexander K. Obrecht (CO. Bar No. 46937)
Baker & Hostetler LLP
1801 California Street, Suite 4400
Denver, Colorado 80202-2662
Telephone: 303.861.0600
Facsimile: 303.861.7805
aobrecht@bakerlaw.com

*Attorneys for Defendant-Intervenors*
*Continental Resources, Inc. and Devon*
*Energy Production Company, L.P.*

/s/ *Mark Gibson*

Andrew C. Lillie
Mark D. Gibson
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, Colorado 80302
Telephone: 303.447.7100
Facsimile: 303.295.5111
aclillie@hollandhart.com
mdgibson@hollandhart.com

*Attorneys for Intervenor-Defendant*
*Anschutz Exploration Corporation*

26

/s/ *Kathleen C. Schroder*

Mark Champoux, Bar No. CO00114
Kathleen C. Schoder (admitted *pro hac vice*)
Davis Graham & Stubbs LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Telephone: 303.892.9400
mark.champoux@dgslaw.com
katie.schroder@ dgslaw.com

*Attorneys for Defendant-Intervenor*
*Petroleum Association of Wyoming*

27

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 20th day of June, 2024, I served a true and correct copy of the foregoing **PRIVATE DEFENDANT-INTERVENORS' REPLY IN SUPPORT OF THEIR COMBINED CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** via the Court's electronic case filing system which will cause the foregoing to be served upon all counsel of record.

*/s/ L. Poe Leggette*

L. Poe Leggette

28

4875-5142-8295.6