UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| **POWDER RIVER BASIN RESOURCE COUNCIL**, *et. al.*, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 22-cv-2696 (TSC) |
| **U.S. DEPT OF INTERIOR**, *et al.*, | )<br>)<br>) |
| Defendants. | )<br>)<br>) |

## MEMORANDUM OPINION

Plaintiffs Powder River Basin Resource Council ("Powder River") and Western Watersheds Project challenged the U.S. Department of the Interior and the U.S. Bureau of Land Management's ("BLM") approval of the Converse County Oil and Gas Project ("Project"), alleging violations of the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), the Federal Land Policy and Management Act ("FLPMA"), and the Mineral Leasing Act ("MLA"). The State of Wyoming intervened along with two energy companies—Devon Energy Production Company, L.P. and Continental Resources, Inc. ("Energy Intervenors"). This court previously denied Plaintiffs' motion for a preliminary injunction, granted in part and denied in part Energy Intervenors' motion to dismiss, and denied a motion to transfer the case.

Having considered the briefing and the record, the court will GRANT in part Plaintiffs' Motion for Summary Judgment, DENY Defendants' Cross Motion for Summary Judgment, DENY Energy Intervenors' Cross Motion for Summary Judgment, and DENY Wyoming's Cross Motion for Summary Judgment. The court will also order additional briefing on remedy and

enjoin further application for permits to drill ("APD") approvals based on the Project Environmental Impact Statement ("EIS") in the interim.

## I. BACKGROUND

### A. Factual Background

The Secretary of Interior approved the Record of Decision authorizing the Project on December 23, 2020. AR16735. The Project covers approximately 52,667 acres of the BLM-administered surface and federal mineral estate in Wyoming and will result in the drilling of approximately 500 wells per year over 10 years. AR16737. Before issuing the decision, BLM created an EIS analyzing the Project's anticipated environmental effects. *See* AR12362–13469. It used the Groundwater Model Report to assess the Project's effect on groundwater supplies, including groundwater drawdown, which is the change in water level that results from well pumping. One of the necessary inputs for the groundwater model is the specific storage value, which estimates the aquifer's capacity to release groundwater in response to pumping. Higher specific storage values mean that more water is released, resulting in less groundwater drawdown.

Before finalizing the EIS, BLM first publicized a draft and allowed interested entities to comment. *See* AR1183; AR1190–93; AR1277–78; AR1292; AR3143–234 (excerpts from the Draft EIS). The draft provided that a specific storage value of 0.001 was used for the groundwater model, citing a 2014 Powder River Basin report. AR3183. In its comment, the Environmental Protection Agency ("EPA") noted that that BLM used "what appears to be an unrepresentatively high specific storage value (by at least an order of magnitude)," which "may result in a substantial underestimation of both the magnitude and extent of drawdown caused by pumping." AR4651. BLM responded to EPA's comment, explaining again that it derived the specific storage value from "previous Powder River Basin groundwater modeling for the Powder

River Basin Coal Review," and citing the same 2014 report. AR12179. That 2014 report, however, lists specific storage values ranging from 0.78 E-08 to 1.20 E-07, which are off from BLM's 0.001 value by a factor of 10,000. Pls.' Reply in Supp. of Summ. J. Mot. & Resp. to Cross-Mots. for Summ. J., ECF No. 124 at 11 ("Pls.' Reply") (Table 2-2). There is, however, a 2006 report that includes a range of specific storage values between 6.4 E-08 through 0.11, *see* Private Defs.'-Intervenors' Combined Cross Mot. for Summ. J., ECF No. 121 at 9 (Table 4.2-5), which encompasses the 0.001 value used in the EIS.

### B. Procedural Background

Plaintiffs—two environmental advocacy groups—filed this action challenging the Project approval in September 2022. Compl., ECF No. 1. Powder River's mission is to "ensure responsible development of Wyoming's oil and gas resources," Decl. of Shannon Anderson, ECF No. 64-3 ¶¶ 5–6, and Western Watersheds Project seeks to "protect and preserve watersheds, native habitats, fish and wildlife, and other natural resources on public lands across the West," including in Wyoming, Decl. of Erik Molvar, ECF No. 64-6 ¶¶ 4–5. Plaintiffs allege that Defendants violated NEPA, the APA, the FLPMA, and the MLA in approving the Project and in approving hundreds of APDs based on the Project's approval. Am. Compl., ECF No. 44 ¶¶ 1, 112, 121–58.

Plaintiffs moved for a preliminary injunction, seeking to enjoin the Project and any further APDs pending the court's decision on the merits, ECF No. 64, and Energy Intervenors moved to dismiss, ECF No. 67, arguing in relevant part that Plaintiffs lacked standing. This court concluded that Plaintiffs have standing to challenge the Project itself, but not to challenge any specific APD. Mem. Op., ECF No. 105 at 12–16. It then denied the motion for a preliminary injunction, holding that Plaintiffs had not demonstrated a likelihood of success on

the merits or a likelihood of irreparable harm. *Id.* at 18–30. Plaintiffs moved for summary judgment, and Defendants, Energy Intervenors, and Wyoming all separately cross moved.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a), which typically supplies the legal standard on summary judgment, does not apply to motions for summary judgment in APA cases "because of the court's limited role in reviewing the administrative record." *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013). Instead, the court must decide as a matter of law "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 240. The APA standard of review similarly applies to NEPA, FLPMA, and MLA claims because none of these statutes "provides a private right of action." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011) (NEPA and FLPMA); *see Amoco Prod. Co. v. Watson*, 410 F.3d 722, 727–28 (D.C. Cir. 2005) (MLA).

The court must be "highly deferential" to agency action, *Env't. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981), only setting it aside if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2). The court may not "substitute its judgment for that of the agency," but instead must consider whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*Motor Vehicle Mfrs.*"). The plaintiff bears the burden of establishing that the agency's action is invalid. *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014).

### III.    STANDING

Although this court has already held that Plaintiffs have standing to challenge the Project approval at the motion to dismiss stage, Mem. Op. at 15–16, Wyoming raises the issue again at summary judgment, *see* Intervenor State of Wyoming's Cross Mot. for Summ. J. & Resp. Br. in Opp'n, ECF No. 120 at 6–20 ("Wyoming's Cross. Mot."). For the reasons set forth below, Wyoming's objections remain unpersuasive.

**A.    Article III Standing**

*i.    Legal framework*

It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff must establish Article III standing to sue in federal court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing at summary judgment, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *accord Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023).

The associational standing doctrine allows environmental organizations to establish standing by demonstrating that "(a) its members [or any one of them] would otherwise have standing to sue in their own right; (b) the interests [the entity] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The first standing requirement is injury in fact. "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold

defendants accountable for legal infractions." *TransUnion LLC*, 141 S. Ct. at 2205. Consequently, only "plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* In the environmental context, that means that care and concern for the aesthetics or the well-being of the environment alone does not suffice to establish injury in fact. *See id.* Typically, a plaintiff challenging the effect of a ruling or decision on the environment must demonstrate "geographic proximity to the action challenged" to establish injury in fact. *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002). Put another way, a plaintiff may establish standing to challenge environmental harms by alleging "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *accord Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023) (post–*TransUnion LLC*).

The D.C. Circuit has found an injury in fact in several cases where plaintiffs have aesthetic and recreational interests in specific areas of land or species that may be harmed by agency action. *E.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 593 (D.C. Cir. 2019) (aesthetic and recreational interest in observing whooping cranes); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) ("recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests" in "observing the Valley Elderberry Longhorn Beetle in its natural California habitat"); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (members had aesthetic interests in the land surrounding West Antelope II tracts, where an agency had authorized mining that would increase "local air, water and land pollution").

Because Plaintiffs allege "archetypal procedural injur[ies]," the second element of standing—known as traceability or causation—bears particular importance. *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 592 (citation omitted). In the procedural injury context, a plaintiff "need not show that a harm to a member 'has in fact resulted from the [agency's] procedural failures,'" but rather that "there is a 'substantial probability'" that the challenged agency action caused the plaintiff's injury. *Id.* (citation omitted). This inquiry requires two causal links: one connecting the procedural deficiency to the substantive agency action, and another connecting that substantive agency action to the plaintiff's injury. *Ctr. for Biological Diversity*, 861 F.3d at 184. For the first link, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (citation omitted).

The final standing requirement—redressability—is "relaxed" in cases involving procedural injuries. *Ctr. for Biological Diversity*, 861 F.3d at 185. A plaintiff need only show that the agency revisiting its action "*could*" lead to "a different conclusion." *Id.*; *accord Jewell*, 738 F.3d at 306. The D.C. Circuit has found this requirement met where "[t]here 'remains at least the possibility that the [agency] could set a different standard[].'" *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 595 (citation omitted).

    *ii.*    *Plaintiffs have Article III standing*

As the court explained in ruling on Plaintiffs' motion for a preliminary injunction, Plaintiffs have associational standing. Mem. Op. at 15–16. Powder River submitted declarations demonstrating that at least two of its members—Maria Katherman and Shannon Anderson—regularly visit or live in the Project area. *See, e.g.*, Decl. of Maria Katherman, ECF No. 64-4 ¶¶ 2–3 (lives in the Project Area); Decl. of Shannon Anderson ¶¶ 3, 8, 10 (takes "regular field

trips to the project area" as part of his work and intends to "return in the months and years to come"). Consequently, Plaintiffs' members have established "geographic proximity to the action challenged." *City of Olmsted Falls*, 292 F.3d at 267. These members are also likely to suffer concrete harms from drilling in the project area, including water contamination, Decl. of Maria Katherman ¶ 21, destruction of wildlife in the area, Decl. of Shannon Anderson ¶ 17, and negative effects on air quality, *id.* ¶ 20. *Accord, e.g.*, *Jewell*, 738 F.3d at 305–06.

These injuries are "fairly traceable" to Defendants' alleged violations of environmental and administrative statutes. *See Lujan*, 504 U.S. at 560–61 (citations omitted). For example, BLM's choice of specific storage value in the groundwater model likely caused the agency to underestimate the extent of the groundwater drawdown resulting from the Project. *See Ctr. for Biological Diversity*, 861 F.3d at 184; *infra* Section IV.B. And because it underestimated groundwater drawdown, BLM may have provided for fewer mitigating measures than it would have otherwise in approving the Project, worsening Plaintiffs' environmental injuries. *See Ctr. for Biological Diversity*, 861 F.3d at 184. Plaintiffs' members' injuries are also redressable because, if the court vacates the Project approval, BLM "*could*" reach "a different conclusion" upon revisiting it. *See id.* at 185. Consequently, Plaintiffs have individual members with Article III standing.

The additional requirements for associational standing—that the interests Plaintiffs seek to protect are "germane to" their purposes and that the case does not require the participation of individual members—are easily satisfied. *See Brown Grp.*, 517 U.S. at 553. Powder River "works to protect landscapes, wildlife, and natural resources," in the Powder River Basin. Decl. of Shannon Anderson ¶ 3. By seeking a more thorough analysis of the Project's environmental impacts, Plaintiffs advance their goal of protecting the environment in the Project area. There is

also no indication that this case would benefit from participation of individual members. Individual participation "is not normally necessary when an association seeks prospective or injunctive relief for its members," but may be required "in an action for damages." *Brown Grp.*, 517 U.S. at 546 (citation omitted). This is a quintessential case for prospective relief—not damages. Am. Compl. Req. for Relief ¶¶ 1–7.

Wyoming first argues that Plaintiffs' members do not have standing because they have not suffered a groundwater-based injury. Wyoming's Cross Mot. at 10–11.[1] But Plaintiffs are not required to demonstrate an environmental injury that is precisely the same as the environmental impacts alleged by their procedural claim. As the D.C. Circuit explained in reversing the district court in *Jewell*, 738 F.3d at 307, requiring "that the specific type of pollution causing [plaintiffs'] aesthetic injury . . . be the same type that was inadequately considered in the []EIS" "sliced the salami too thin." Consequently, the Circuit held that plaintiffs' "aesthetic injury follows from an inadequate []EIS whether or not the inadequacy concerns the same environmental issue that causes their injury." *Id.* So too here.

Wyoming also argues that the remaining associational standing factors are not met because Plaintiffs' "declarations are ambiguous as to how their respective missions are relevant to groundwater users" and they "have not explained why 'neither the claim asserted nor relief requested' requires the participation of" individual members. Wyoming's Cross Mot. at 17–18. Again, Plaintiffs' missions need not be groundwater-specific for deficiencies in the EIS to be germane to those missions. *See Jewell*, 738 F.3d at 307. Moreover, Plaintiffs seek to protect the environment in the Powder River Basin, and groundwater is part of the environment. Finally,

---

[1] Wyoming also contends that Powder River member Leland Turner does not have Article III standing. Wyoming's Cross Mot. at 13–17. The court need not address this issue, however, because it finds that Anderson and Katherman have Article III standing.

individual member participation is not warranted in this case because Plaintiffs seek prospective and injunctive relief, not damages for its members. *See Brown Grp.*, 517 U.S. at 546 (citation omitted).

### B.  Prudential Standing

"To establish prudential standing, plaintiffs generally must show that 'the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute.'" *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000) (citation omitted). This test "is not meant to be especially demanding." *Id.* at 955 (citation omitted). A plaintiff "who is not itself the subject of the agency action is outside the zone of interests only if its interests are 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (citation omitted). This analysis is conducted "not by reference to the overall purpose of the Act in question, but by reference to the particular provision of the law upon which the plaintiff relies." *Id.* at 956 (citation omitted).

The D.C. Circuit has explained that in NEPA cases, "the EIS requirement obviously seeks to protect environmental interests." *Id.* at 959. Thus, "aesthetic and environmental interests in the quality of public lands" where one "hikes, camps, fishes, etc.," are "plainly within the zone of interests protected by NEPA." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996). The kinds of interests not plainly within NEPA's zone of interests, by contrast, are "purely economic" interests and those in "avoiding unnecessary delays, regulatory uncertainty, and considerable cost to their members." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (citation and quotation marks omitted).

Plaintiffs' injuries are plainly within NEPA's zone of interest.[2] Powder River's mission is to ensure "responsible development of Wyoming's oil and gas resources," Decl. of Shannon Anderson ¶ 5, because this development "disturbs wildlife habitat and the prairie landscape," in addition to "noise, light, and visual impacts," including "truck traffic," *id.* ¶¶ 17–18. Katherman, who is a member of Powder River's Board of Directors, also explained that she joined Powder River because she is "deeply concerned about the harmful effects of fossil fuel development on our health, wildlife, aquifers, air quality, and livelihoods." Decl. of Maria Katherman ¶ 5. These "aesthetic and environmental interests in the quality of public lands" are precisely within NEPA's zone of interests. *See Mountain States Legal Found.*, 92 F.3d at 1236.

Wyoming again argues that Plaintiffs lack prudential standing because their members "do not allege an environmental interest associated with groundwater use." Wyoming's Cross Mot. at 18–20. But Wyoming has no support for its position that Plaintiffs' groundwater claims limit NEPA's zone of interests to only groundwater. *See Jewell*, 738 F.3d at 307. Wyoming's argument is unpersuasive; Plaintiffs have standing.

## IV.   NEPA

### A.   Legal Framework

"NEPA 'declares a broad national commitment to protecting and promoting environmental quality,' and brings that commitment to bear on the operations of the federal government." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citation omitted). As part of that commitment, NEPA requires agencies to prepare environmental documents for most proposed final agency actions. 42 U.S.C. § 4336(a). NEPA does not, however, require

---

[2] Plaintiffs also claim violations of the FLPMA and the MLA (through the APA). But the court need not determine whether they have prudential standing to bring these claims because it considers only the NEPA claim on the merits. *Infra* Section IV.

agencies "to take one type of action or another." *Sierra Club*, 867 F.3d at 1367 (citation omitted).

The environmental document that is required depends on the proposed agency action's potential effect on the environment. An agency must "issue an environmental impact statement with respect to a proposed agency action . . . that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). But, if the agency action "does not have a reasonably foreseeable significant effect on the quality of the human environment," the agency "shall prepare an environmental assessment" instead. *Id.* § 4336(b)(2).

If an agency determines that an EIS is required, it must "take a 'hard look' at the environmental consequences of its actions, including alternatives to its proposed course." *Sierra Club*, 867 F.3d at 1367 (citing 42 U.S.C. § 4332(2)(C)(iii)). "The environmental effects that must be assessed include 'aesthetic, historic, cultural, economic, social, or health' effects." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 530 (D.C. Cir. 2018) (quoting 40 C.F.R. § 1508.8(b)) ("*Oglala Sioux Tribe I*"). "The overarching question" for the court reviewing the EIS is whether its "deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club*, 867 F.3d at 1368 (citation omitted).

"To satisfy the APA's 'arbitrary and capricious' standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). That means that the agency must "explain the assumptions and methodology used in preparing" any model used, *id.* at 204 (citation omitted), and "provide a full analytical defense" of any challenged

aspects, *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (citation omitted). In doing so, the court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 206 (citation omitted).

Applying this framework, in *Eagle County, Colorado v. Surface Transportation Board*, 82 F.4th 1152, 1182 (D.C. Cir. 2023), the D.C. Circuit held that an EIS violated the APA because, in analyzing the effects of a new railway on downline rail traffic and accidents, the agency "relied on national freight train accident rates without explanation and assumed that loaded freight trains were as likely to derail as unloaded trains." By contrast, in *Appalachian Power Co. v. Environmental Protection Agency*, 249 F.3d 1032, 1052–53 (D.C. Cir. 2001), the Court held that the EIS did not violate the APA by relying on a computer model that may have underestimated growth rates for electric power generation because the EPA responded to the objections, explaining that the IPM "provides a reasonable forecast" of growth rates.

**B.     Specific Storage Value**

BLM used a "Groundwater Model Report" to assess the Project's effect on groundwater supplies. Plaintiffs claim this report "was rife with errors," causing a "serious underestimation of drawdowns." Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 116-1 at 15 ("Pls.' Mot.").

Plaintiffs first claim that the model erroneously used a specific storage value of 0.001, rather than 0.00001, which minimized the risk of groundwater drawdown. The EPA's comment in response to the draft EIS noted that BLM used "what appears to be an unrepresentatively high specific storage value (by at least an order of magnitude)," which "may result in a substantial underestimation of both the magnitude and extent of drawdown caused by pumping." AR4651. BLM in turn explained that the "specific storage value was derived from previous Powder River

Basin groundwater modeling for the Powder River Basin Coal Review," and cited the 2014 report. AR12179. The Final EIS again cited the 2014 report as the source for the 0.001 specific storage value. AR12023. But the 2014 model lists specific storage values ranging from 0.78 E-08 to 1.20 E-07, Pls.' Reply at 11, which Defendants concede are off from 0.001 by a factor of 10,000. Consequently, BLM failed to articulate a "rational connection between the facts found and the choice made," *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 203 (citation omitted), or "provide a full analytical defense" of its chosen specific storage value, *Columbia Falls Aluminum Co.*, 139 F.3d at 923 (citation omitted).

Defendants argue that BLM exercised its discretion to estimate the specific storage value of 0.001 based on a 2006 Powder River Basin report, the 2014 Powder River Basin report, and "available scientific literature." Defs.' Cross Mot. for Summ. J. & Resp. Br. in Opp'n, ECF No. 118 at 14 ("Defs.' Cross Mot."). This argument, however, is relevant to whether BLM will be able to substantiate this value on remand—*see infra* Section V—not whether it violated NEPA. Under the Supreme Court's decision in *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943), "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." Put another way, the court must measure the EIS "by what [BLM] did, not by what it might have done." *Id.* at 93–94; *accord Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 206 (citation omitted). Here, BLM explained several times that its specific storage value of 0.001 was supported by the 2014 report, which it plainly was not.

### C.  Prejudicial Error

The APA also instructs courts to take "due account" "of the rule of prejudicial error." 5 U.S.C. § 706. "The harmless error standard of the APA" does not impose a "particularly

onerous requirement." *Oglala Sioux Tribe I*, 896 F.3d at 535 (citation omitted). Rather, this rule reflects the principle that, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *PDK Lab'ys Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). Plaintiffs need only make "a colorable claim" that prejudice may have resulted from the agency's error. *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003); *accord Shineski v. Sanders*, 556 U.S. 396, 410 (2009). "Whether an error is prejudicial 'depends on a number of factors, including the closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error.'" *RadNet Mgmt., Inc. v. NLRB*, 992 F.3d 1114, 1124 (D.C. Cir. 2021) (citation omitted).

The D.C. Circuit has previously "applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply *precisely* with NEPA procedures." *Oglala Sioux Tribe I*, 896 F.3d at 534 (citation omitted; emphasis in original). For example, in *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) ("*Oglala Sioux Tribe II*"), the Circuit held that an agency's failure to engage in NEPA's formal process for identifying the necessary scope of environmental review was harmless because it engaged in informal processes that "accomplished the same objectives," and plaintiff made "no argument that the failure impacted the project's actual scope."

Defendants claim BLM's reliance on the 2014 report in the Draft EIS, the Final EIS, and in response to the EPA was a harmless "errant parenthetical citation." Defs.' Reply in Supp. of Cross Mot. for Summ. J., ECF No. 125 at 4 (citing AR12023). The court disagrees. As both the EPA and Plaintiffs explain, the drastically higher specific storage value used by BLM may have

resulted "in a substantial underestimation" of groundwater drawdown.  AR4651.  To be sure, BLM may decide to keep its 0.001 specific storage value on remand and justify it by reference to the 2006 report or other evidence in the administrative record.  But, upon reconsideration, BLM also might choose to use a specific storage value that is closer to the values in recent data.

## V.     REMEDY

Under the APA, a "reviewing court *shall . . .* hold unlawful and *set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2) (emphases added).  Thus, "ordinary practice" "is to vacate unlawful agency action." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citation omitted); *accord Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (citation omitted) (vacatur is the "normal remedy").  Courts are "not without discretion," however, "to leave agency action in place while the decision is remanded for further explanation." *Standing Rock Sioux Tribe*, 985 F.3d at 1050 (citation omitted). *But see Comcast Corp. v. FCC*, 579 F.3d 1, 10–11 (D.C. Cir. 2009) (Randolph, S.J., concurring) (arguing that, under the plain text of the APA, courts must vacate any unlawful administrative action).

Defendants request that, should the court grant Plaintiffs' motion, it order additional briefing on remedy.  Defs.' Cross Mot. at 53–54.  Wyoming concurs.  Wyoming's Cross Mot. at 39.  Although Energy Intervenors and Plaintiffs have briefed remedy to some extent, the court would benefit from all parties briefing on the issue of whether vacatur is warranted in this case, bearing in mind the nature of BLM's NEPA violation.  Consequently, the court will order the parties to submit supplemental briefs addressing whether the court should vacate the Project approval pending remand.

Plaintiffs have also requested that the court enjoin BLM from approving any APDs based on the deficient EIS "to preserve the status quo until it determines the appropriate final remedy." Pls.' Reply at 69. The Tenth Circuit took this approach in a similar case, reasoning that "any new APDs based on [deficient] documents" would be legally "invalid." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1050 (10th Cir. 2023). Neither Defendants nor Intervenors oppose this request. The court will therefore enjoin further APD approvals based on the Project EIS while it decides whether to vacate the Project approval pending remand.

## VI.   CONCLUSION

For the foregoing reasons, the court will GRANT in part Plaintiffs' Motion for Summary Judgment, ECF No. 116, DENY Defendants' Cross Motion for Summary Judgment, ECF No. 118, DENY Energy Intervenors' Cross Motion for Summary Judgment, ECF No. 121, and DENY Wyoming's Cross Motion for Summary Judgment, ECF No. 123. The court will also order additional briefing on remedy and enjoin further APD approvals based on the deficient EIS until the court rules on remedy. An Order will accompany this Memorandum Opinion.

Date: September 13, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge