### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**POWDER RIVER BASIN RESOURCE COUNCIL and WESTERN WATERSHEDS PROJECT**,

     Plaintiffs,

v.

**U.S. DEPARTMENT OF THE INTERIOR and U.S. BUREAU OF LAND MANAGEMENT**,

     Defendants,

and

**STATE OF WYOMING, et al.**,

     Defendant-Intervenors.

Case No. 1:22-cv-2696-TSC

---

### PRIVATE DEFENDANT-INTERVENORS' REMEDY BRIEF

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

ARGUMENT .......................................................................................................3

    I.    The Court Should Remand the Converse County EIS to BLM Without
        Vacatur. ....................................................................................................3

        A.    Vacatur Is Not the Default Remedy for APA Violations; the
               Court Must Apply the *Allied-Signal* Test. ........................................3

        B.    The Single Identified NEPA Violation Does Not Warrant
               Vacatur Because There Is at Least a Serious Possibility That
               BLM Will Affirm the Project on Remand. ........................................5

        C.    The Disruptive Consequences of Vacatur Would Be Severe. .......10

        D.    Plaintiffs' Additional Arguments in Favor of Vacatur Also
               Fail. ...............................................................................................21

    II.    Alternatively, If the Court Grants Vacatur, It Should Clarify That
        BLM Can Issue New Permits and Other Authorizations Pending
        Remand. .................................................................................................22

    III.    The Court Should Not Grant Any Injunctive Relief Against Private-
        Intervenors or Other Operators or Any Relief Related to the RMPA........24

    IV.    The Court Should Lift the Temporary Injunction as Soon as Possible......25

    V.    Private-Intervenors Support Plaintiffs' Request for the Court to Rule
        on Plaintiffs' Remaining Claims Before Remanding to BLM. .................27

    VI.    The Court Should Require BLM to File Status Updates on Its Remand
        Analysis..................................................................................................27

CONCLUSION .................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Air Transp. Ass'n v. U. S. Dep't of Agric.*,
  317 F. Supp. 3d 385 (D.D.C. 2018) ...................................................................5

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................. passim

*Am. Great Lakes Ports Ass'n v. Schultz*,
  962 F.3d 510 (D.C. Cir. 2020) ...............................................................18

*Am. Petrol. Inst. v. Sec. Exch. Comm'n*,
  953 F. Supp. 2d 5 (D.D.C. 2013) ...........................................................22

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  22 F.4th 1018 (D.C. Cir. 2022) ..............................................................4

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023) .............................................................22

*American Hosp. Ass'n v. Becerra*,
  No. 18-2084 (RC), 2023 U.S. Dist. LEXIS 3843 (D.D.C. Jan. 10, 2023)..............................10

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) .............................................................4

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ..............................................................4

*Cement Kiln Recycling Coal. v. EPA*,
  255 F.3d 855 (D.C. Cir. 2001) .............................................................22

*Cent. & S. W. Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) ..............................................................4

*Cent. Me. Power Co. v. Fed. Energy Regul. Comm'n*,
  252 F.3d 34 (1st Cir. 2001)................................................................4

*Coal. for Common Sense in Gov't Procurement v. United States*,
  671 F. Supp. 2d 48 (D.D.C. 2009) .........................................................22

*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
  No. 21-1506 (ABJ), 2023 U.S. Dist. LEXIS 205142 (D.D.C. Nov. 16, 2023) .....................10

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
    144 S. Ct. 2440 (2024) ................................................................................................4

*Diné CARE v. Haaland*,
    59 F.4th 1016 (10th Cir. 2023) ................................................................................4

*Food & Water Watch v. Fed. Energy Regul. Comm'n*,
    28 F.4th 277 (D.C. Cir. 2022) ..................................................................................6

*Fund for Animals v. Norton*,
    390 F. Supp. 2d 12 (D.D.C. 2005) .........................................................................12

*Genus Lifesciences, Inc. v. Azar*,
    No. 1:20-cv-00211 (TNM), 2021 U.S. Dist. LEXIS 15276 (D.D.C. Jan. 27, 2021) ...............18

*Gulf Restoration Network v. Haaland*,
    47 F.4th 795 (D.C. Cir. 2022) ..................................................................................9

*Healthy Gulf v. Fed. Energy Regul. Comm'n*,
    107 F.4th 1033 (D.C. Cir. 2024) .........................................................................6, 10

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ...............................................................................10

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................................................24

*Nat. Res. Def. Council, Inc. v. U. S. Nuclear Regul. Comm'n*,
    606 F.2d 1261 (D.C. Cir. 1979) .............................................................................10

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) .............................................................................22

*Nat. Res. Def. Council v. EPA*,
    808 F.3d 556 (2d Cir. 2015) .....................................................................................4

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
    260 F.3d 1365 (Fed. Cir. 2001) ................................................................................4

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019) ......................................................................5, 11

*Oglala Sioux Tribe v. U. S. Nuclear Regul. Comm'n*,
    896 F.3d 520 (D.C. Cir. 2018) ...............................................................................10

*Prometheus Radio Project v. FCC*,
    824 F.3d 33 (3d Cir. 2016) .......................................................................................4

*Pub. Emps. for Env't Resp. v. Hopper*,
  827 F.3d 1077 (D.C. Cir. 2016) ................................................................5

*Sierra Club v. EPA*,
  60 F.4th 1008 (6th Cir. 2023) ..................................................................4

*Sierra Club v. Fed. Energy Regul. Comm'n*,
  68 F.4th 630 (D.C. Cir. 2023) ..................................................................6

*Sloan v. Soul Circus, Inc.*,
  No. 15-01389 (RC), 2015 U.S. Dist. LEXIS 169565 (D.D.C. Dec. 18, 2015).......................24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ....................................................5, 6, 10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ..........................................................4, 24

*U.S. Steel Corp. v. EPA*,
  649 F.2d 572 (8th Cir. 1981) ..................................................................4

*United States v. Texas*,
  599 U.S. 670 (2023) ..................................................................1, 3, 4, 12

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................4, 13

*Wilderness Soc'y v. U.S. Dep't of the Interior*,
  No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 124730 (D.D.C. July 16, 2024)..............7, 10

*Wilderness Soc'y v. U.S. Dep't of the Interior*,
  No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 51011 (D.D.C. Mar. 22, 2024).....................7

*XO Energy Ma v. Fed. Energy Regul. Comm'n*,
  77 F.4th 710 (D.C. Cir. 2013) ..................................................................6

## REGULATIONS

40 C.F.R. § 1500.1(b) ................................................................................7

40 C.F.R. § 1501.11(b) ..............................................................................12

40 C.F.R. § 1508.1(oo) ..............................................................................12

## OTHER AUTHORITIES

89 Fed. Reg. 77,170 (Sept. 20, 2024) ..........................................................26

BLM Instruction Memorandum, IM 2023-011, *Approved Application for Permit to Drill Extensions* (Nov. 18, 2022), available at https://www.blm.gov/policy/im-2023-011 .............24

BLM Instruction Memorandum, IM 2024-051, *Valid Period of Approved Applications for Permit to Drill* (Aug. 26, 2024), available at https://www.blm.gov/policy/im2024-051 ....................................................................................................................................24

## INTRODUCTION

Private Defendant-Intervenors Continental Resources, Inc.; Devon Energy Production Company LP; Anschutz Exploration Corporation; and the Petroleum Association of Wyoming (collectively, "Private-Intervenors") respectfully request that the Court make four separate remedy rulings:

First, the Court should remand to the Bureau of Land Management ("BLM") without vacating the Converse County Oil and Gas Project ("Project") Environmental Impact Statement ("EIS") and Record of Decision ("ROD"). Vacatur is not warranted in this case because the two-factor test in *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), is not satisfied. On remand, the Court should instruct BLM to either justify or amend the specific storage value used in its groundwater-drawdown analysis. Contrary to Plaintiffs' assertions, vacatur is not a default remedy to be applied by rote for violations under the Administrative Procedure Act ("APA"). *See* Pls.' Remedies Br. at 2, ECF No. 135. Instead, before granting "an extraordinary remedy like vacatur," *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring), the Court must apply *Allied-Signal*'s two-factor test, which weighs (1) the "seriousness" of the agency's error against (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51 (citation omitted). Application of the test in this case strongly weighs against vacatur.

As to the seriousness factor, the Court identified a single National Environmental Policy Act ("NEPA") deficiency in the EIS. *See* Mem. Op. at 13–16, ECF No. 130. That lone error is not sufficiently serious to warrant vacatur. It affects one aspect of BLM's groundwater analysis in an otherwise detailed and comprehensive NEPA document in which the Court has not identified any other mistakes. There is thus at least a serious possibility that BLM will substantiate its decision

to approve the Project and adopt the same ROD on remand. *See generally* Gov't Remedy Br. Plaintiffs fail to create any serious doubt that this could happen. *See* Pls.' Remedies Br. at 3–10.

On the other side of the ledger, the disruptive consequences of vacatur would be severe and far reaching, particularly if the Court were to adopt Plaintiffs' apparent non-sequitur that vacatur would necessarily bar BLM from approving any new applications for permits to drill ("APDs") or other authorizations in the Converse County Project Area until the agency issues a new EIS and ROD. *See id.* at 1, 3, 11. As detailed below and in the attached declarations, such a prohibition would quickly halt oil-and-gas development in a community that depends on the industry for its livelihood, and would substantially harm Private-Intervenors, countless other oil-and-gas operators in Converse County, the State of Wyoming, private mineral and landowners, local business owners, and Converse County citizens. Already, the temporary injunction in the Court's September 13, 2024 order prohibiting new APD approvals has harmed and continues to harm Private-Intervenors.

Alternatively, *if* the Court were to grant Plaintiffs' request to vacate the EIS and ROD (and it should not), the Court must recognize that vacatur does not preclude BLM from approving new APDs in the Converse County Project Area, as long as BLM does not rely on groundwater analysis in the EIS that the Court found unlawful. In other words, as contemplated in the EIS's "No Action" alternative, BLM may continue to approve APDs by (a) relying on other existing NEPA documents, (b) using other aspects of the Converse County EIS that remain valid, *see* Pls.' Remedies Br. at 11 n.3, for support, or (c) performing independent NEPA analyses. *See infra*, Argument § I.C.1. In addition, although Plaintiffs say that they are amenable to development of the approximately 500 already existing APDs pending remand, Pls.' Remedies Br. at 11, Converse

County Project Area operators must be able to obtain "other authorizations" from BLM for those APDs. BLM must be authorized to approve modifications and extensions of existing APDs.

Second, and separately, the Court should refrain from entering any injunctive relief as to Private-Intervenors or other operators, or any other separate relief related to the Resource Management Plan Amendment ("RMPA"), because Plaintiffs requested none.

Third, the Court should lift the temporary injunction, as soon as possible, that prevents BLM from issuing any "APD approvals based on the deficient EIS" while the Court decides the appropriate final remedy. Mem. Op. at 17. The Court issued that order based on the misapprehension that Private-Intervenors *did not* oppose Plaintiffs' request for that temporary relief. *See id*. In their merits reply brief, however, Private-Intervenors *vigorously opposed* any temporary injunction pending remedy briefing for several reasons. *See infra*, Argument § IV. Private-Intervenors are currently suffering harms from the temporary injunction and will continue to suffer harms while it remains in place.

Fourth, and finally, if the Court vacates the EIS and ROD, or grants any form of injunctive relief against BLM or Private-Intervenors, the Court should require BLM to provide status reports to the Court every 90 days as to the progress of its remand analysis.

## ARGUMENT

I. **The Court Should Remand the Converse County EIS to BLM Without Vacatur.**

A. **Vacatur Is Not the Default Remedy for APA Violations; the Court Must Apply the *Allied-Signal* Test.**

Contrary to Plaintiffs' assertion, vacatur is not "the default remedy under the APA." Pls.' Remedies Br. at 1. Indeed, Supreme Court Justices Gorsuch, Thomas, and Barrett recently questioned whether the APA authorizes vacatur at all. *Texas*, 599 U.S. at 695–704 (Gorsuch, J., concurring) (Section 706(2) of the APA "does not say anything about 'vacating' agency action

('wholesale' or otherwise)."); *see also Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
144 S. Ct. 2440, 2450 n.2 (2024) ("Whether the APA authorizes vacatur has been subject to
thoughtful debate by Members of this Court." (citing *Texas*, 599 U.S. at 693–702)). Nonetheless,
in the D.C. Circuit, while vacatur is an available remedy, courts retain discretion "to leave agency
action in place while the decision is remanded for further explanation." *Standing Rock Sioux
Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). "[Courts] have long
recognized that remand without vacatur is a useful arrow in a court's remedial quiver." *Am. Pub.
Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1030 (D.C. Cir. 2022).[1] "The decision whether
to vacate depends on the seriousness of the [action's] deficiencies (and thus the extent of doubt
whether the agency chose correctly) and the disruptive consequences of an interim change that
may itself be changed." *Allied-Signal, Inc.*, 988 F.2d at 150–51 (internal quotation marks and
citation omitted). In other words, the Court must determine whether there is "'at least a serious
possibility that the [agency] will be able to substantiate its decision on remand,' and whether
vacatur will lead to impermissibly disruptive consequences in the interim." *WildEarth
Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (internal quotation marks and citation
omitted). If the Court finds that "the first prong of the *Allied-Signal* analysis supports remand

---

[1] Every circuit to consider the question has held that courts have discretion to remand without
vacatur. *See Cent. Me. Power Co. v. Fed. Energy Regul. Comm'n*, 252 F.3d 34, 48 (1st Cir. 2001);
*Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Prometheus Radio Project v.
FCC*, 824 F.3d 33, 52 (3d Cir. 2016); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th
Cir. 2000); *Sierra Club v. EPA*, 60 F.4th 1008, 1022–23 (6th Cir. 2023); *U.S. Steel Corp. v. EPA*,
649 F.2d 572, 577 (8th Cir. 1981); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir.
2012); *Diné CARE v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023); *Black Warrior Riverkeeper,
Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015); *Allied-Signal*, 988 F.2d
at 150–51; *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380
(Fed. Cir. 2001).

without vacatur, the second prong is 'only barely relevant.'" *Air Transp. Ass'n v. U. S. Dep't of Agric.*, 317 F. Supp. 3d 385, 390 (D.D.C. 2018) (citation omitted).

As to NEPA violations, the D.C. Circuit will perform a "particularized analysis of the violations that have occurred" and weigh "the possibilities for relief" and "any countervailing considerations of public interest." *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (citation omitted); *see also Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 103 (D.D.C. 2019) (weighing negative impacts of leaving project in place against harms from vacatur).

Here, neither *Allied-Signal* factor favors vacatur and the public interest supports continued development, including under new APDs and authorizations, where harms to groundwater are unlikely to occur pending remand.

### B.    The Single Identified NEPA Violation Does Not Warrant Vacatur Because There Is at Least a Serious Possibility That BLM Will Affirm the Project on Remand.

Under *Allied-Signal*'s first factor, what matters is that, after BLM exercises its technical expertise on remand and supplements its drawdown analysis as it deems fit, there is "at least a serious possibility" that it will reaffirm the ROD. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017). Here, there is more than "a serious possibility" that BLM will reaffirm the ROD given the limited scope and nature of the NEPA deficiency to be addressed on remand.

The Court identified only one NEPA deficiency in the EIS—an erroneous specific storage value that BLM used in its Groundwater Model Report to assess the Project's potential effect on groundwater, including groundwater drawdown. *See* Mem. Op. at 13–17. Even then, the Court found that BLM's NEPA error arose not from wholly ignoring an environmental impact, but because BLM did not "articulate a 'rational connection between the facts found and the choice

made.'" *Id.* at 14 (citation omitted). The Court determined that the agency did not "'provide a full analytical defense' of its chosen specific storage value." *Id.* (citation omitted). In such cases, where courts remand NEPA analyses to the agencies for further explanation, vacatur is not warranted because it is likely that the agencies can justify their decisions on remand. *See, e.g.*, *Healthy Gulf v. Fed. Energy Regul. Comm'n*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) (remanding without vacatur where the Federal Energy Regulatory Commission ("Commission") failed to adequately explain greenhouse-gas emissions analysis but court determined it was "'reasonably likely' that, on remand, the Commission can redress the defects and … still authorize the project."); *Sierra Club v. Fed. Energy Regul. Comm'n*, 68 F.4th 630, 652 (D.C. Cir. 2023) (despite the Commission's failure to prepare a supplemental EIS, vacatur was not warranted because it could likely justify that failure with further explanation); *XO Energy Ma v. Fed. Energy Regul. Comm'n*, 77 F.4th 710, 719 (D.C. Cir. 2013) (despite the Commission's failure to explain the basis for its decision, vacatur was unwarranted because there was a significant possibility that it could adequately address those failures on remand).

Here, on remand, the only issue BLM must address is the specific storage value and, if changed, how a new value might impact the estimated groundwater drawdown and the agency's decision to reissue the ROD. *See* Mem. Op. at 15–16. The narrow scope of the remand creates a likelihood that BLM will affirm its decision. *See Food & Water Watch v. Fed. Energy Regul. Comm'n*, 28 F.4th 277, 285, 292 (D.C. Cir. 2022) (finding first *Allied-Signal* factor weighed against vacatur where court found only one NEPA deficiency and agency "could arrive at the same" conclusion on remand); *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 103 (same—where

"[i]n light of the agency's substantial compliance with NEPA," "[t]here is no reason to think that it will be any less thorough in analyzing the three deficiencies on remand").

Contrary to Plaintiffs' assertion, there is no requirement—under the Court's Memorandum Opinion, the *Allied-Signal* test, NEPA, or elsewhere—that BLM must "retain its specific storage value of .001 on remand" to demonstrate that the agency could substantiate or adopt the same groundwater decision in the ROD on remand. *See* Pls.' Remedies Br. at 4–6. The Court itself recognized that BLM's specific storage value may or may not change on remand: "BLM may decide to keep its 0.001 specific storage value on remand" or "upon reconsideration, BLM also might choose to use a specific storage value that is closer to the values in recent data." Mem. Op. at 16. What matters is that BLM "identify [and] consider … high quality" information and conduct an "[a]ccurate scientific analysis." 40 C.F.R. § 1500.1(b). Even if BLM adopts a *new* specific storage value for its supplemental groundwater analysis, there is at least a serious possibility that it will reapprove the Project after doing so, making remand without vacatur appropriate. *See Wilderness Soc'y v. U.S. Dep't of the Interior*, No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 51011, at *68 (D.D.C. Mar. 22, 2024) (in merits decision, holding BLM violated NEPA by relying on earlier, outdated studies and "assumptions that may no longer ring true"); *Wilderness Soc'y v. U.S. Dep't of the Interior*, No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 124730, at *14 (D.D.C. July 16, 2024) (in related remedy order, holding BLM "must bring … new data into full view" and, once completed, "there is a decent likelihood that it could justify its [decision] on remand").

Plaintiffs rely on nothing more than conjecture to argue that BLM may reach a different conclusion on remand. They speculate that the use of a new "specific storage value in [BLM's] groundwater model will show far more significant drawdowns than previously disclosed." Pls.' Remedies Br. at 6. Likewise, they speculate that a supplemental drawdown analysis (based solely

on a changed storage value) will lead BLM to alter, rather than reaffirm, the ROD. *Id.* For instance, Plaintiffs cite a scientific study that is unrelated to the Converse County Project and one comment letter to argue broadly that using a "high" specific storage value results in underestimating drawdown and, conversely, that using an "accurate" specific storage value leads to "reliable modeling results." *Id.* Plaintiffs reach too far with too little evidence. BLM on remand will apply its technical expertise to determine what drawdowns might or might not occur—based on an updated Groundwater Model Report specific to the Converse County Project.

Indeed, Plaintiffs' speculation is contradicted by a technical report prepared by hydrologists at WWC Engineering, who examined drawdown by using varying specific storage values and the same modeling system that BLM used in the EIS. *See* Ex. 1, WWC Engineering Memorandum (Nov. 7, 2024). They explain how the MODFLOW model incorporates several factors, including the specific storage, into its analysis. *Id.* at 2. They also explain the role of the specific storage factor in groundwater analysis, then assesses how sensitive the model's results would be to a change in specific storage, in this case from 0.001 per foot used by BLM to 0.00001, *id.* at 1–2, one of the figures advocated by Plaintiffs, *see* Pls.' Remedies Br. at 5–6. The engineers performed this sensitivity analysis in the same three aquifers studied in Appendix E of the EIS. Ex. 1 at 2.

WWC Engineering concludes that in the aquifer nearest the surface (the Wasatch/Tongue River, which is "Layer 1" in the model), the change in the specific storage value has a "minor effect" on the model results:

> The Wasatch/Tongue River aquifer is the shallowest aquifer and thus most accessible for other uses such as stock water. As such, where potential impacts are the greatest to [persons other than] oil and gas operators, changing the specific storage value would have a very minimal effect on modeled results.

*See id.* at 4. As to the two lower aquifers, WWC Engineering also concluded that "changing the specific storage to 0.00001 ft$^{-1}$ is not expected to significantly change the results of the earlier analysis prepared for the EIS[.]" *Id.* at 4.

Finally, Plaintiffs point to other aspects of BLM's groundwater analysis that they claim are flawed, should be updated on remand, and could result in a changed ROD. *Id.* at 8. Not only are these arguments also hypothetical, but the Court did not address these assertions when Plaintiffs raised them at the summary-judgment stage. *See* Pls.' Mem. Supp. Summ. J. at 17–24, ECF No. 116-1; Minute Order, Oct. 7, 2024 (denying all remaining claims). Nor did the Court direct BLM to address these suppositions on remand. *See* Mem. Op. at 13–17. Thus, again, there is no basis for Plaintiffs' arguments that BLM must address these alleged flaws on remand or adopt a different ROD. This is particularly true since BLM vigorously opposed Plaintiffs' allegations at the summary-judgment stage. Gov't Br. at 18–27, ECF No. 118; Gov't Reply at 2–11, ECF No. 125. Accordingly, Plaintiffs' unsupported assertions and conclusory statements are not enough to show that there is no serious possibility that BLM would be able to adopt the same ROD on remand. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 805 (D.C. Cir. 2022) (denying vacatur where "the environmental groups have given us no reason to doubt that [agency] itself can make the same case on remand").

Perhaps recognizing this shortcoming, Plaintiffs assert that "*even if* there is a chance BLM will reaffirm the same ROD without changes," the Court should nonetheless vacate the EIS and ROD simply because the Court found a NEPA violation. Pls.' Remedies Br. at 7 (emphasis added). Granting Plaintiffs' request is untenable under the law, and the Court should decline Plaintiffs'

invitation to commit reversible error. *Allied-Signal* is binding precedent[2] and, of course, the D.C. Circuit has repeatedly and recently remanded NEPA documents without vacatur after finding the agency made the requisite showing under *Allied-Signal*'s first factor. *See, e.g.*, *Healthy Gulf*, 107 F.4th at 1047; *Oglala Sioux Tribe v. U. S. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018).[3] For all these reasons, the first prong of the *Allied-Signal* test supports remand without vacatur.

### C.    The Disruptive Consequences of Vacatur Would Be Severe.

"[I]n circumstances in which the first prong of *Allied-Signal* supports remand without vacatur, the second prong 'is only barely relevant.'" *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 108 (citation omitted). And here, that barely relevant *Allied-Signal* factor—vacatur's disruptive consequences—also weighs against vacatur. This is true even though, despite Plaintiffs' assertions, vacatur will *not* prevent BLM from approving new APDs or other "authorizations" in the Converse County Project Area.

### 1.    Vacatur of the ROD Does Not Prevent BLM From Approving New APDs or "Other Authorizations."

To appropriately apply the second *Allied-Signal* factor, the Court needs to understand the "real-world consequences following vacatur" of the Converse County EIS and ROD." *See*

---

[2] *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (recognizing that the *Allied-Signal* two-factor test has been "the law of this circuit … since 1993").

[3] It is entirely irrelevant that Plaintiffs can provide a string cite of cases in which courts have granted vacatur in past, unrelated NEPA cases. *See* Pls.' Remedies Br. at 9–10. Private-Intervenors could similarly provide the Court with a string cite of recent NEPA cases in which vacatur was denied. *See, e.g.*, *Wilderness Soc'y v. U.S. Dep't of the Interior*, No. 22-cv-1871 (CRC), 2024 U.S. Dist. LEXIS 124730, at *20 (D.D.C. July 16, 2024); *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 21-1506 (ABJ), 2023 U.S. Dist. LEXIS 205142, at *25 (D.D.C. Nov. 16, 2023); *American Hosp. Ass'n v. Becerra*, No. 18-2084 (RC), 2023 U.S. Dist. LEXIS 3843, at *16 (D.D.C. Jan. 10, 2023). But the appropriate remedy here, like in other NEPA cases, depends wholly on the facts of this case. *See Nat. Res. Def. Council, Inc. v. U. S. Nuclear Regul. Comm'n*, 606 F.2d 1261, 1272 (D.C. Cir. 1979) ("What is called for, in each case, is a 'particularized analysis.'" (citation omitted)).

*Semonite*, 422 F. Supp. 3d at 100–01. Plaintiffs incorrectly suggest that vacatur would prohibit BLM from issuing new APDs. *See* Pls.' Remedies Br. at 11 (stating that vacatur will "prohibit BLM from issuing *new* drilling permits or other authorizations in reliance on the unlawful EIS and ROD"); *see also id.* at 3 ("Vacatur would simply delay issuance of *new* drilling permits until BLM issues a new EIS and ROD."). They are also wrong in suggesting that vacatur means operators should be limited to developing (i.e., drilling new wells on) the approximately 500 existing and approved APDs that they have already "amassed." *Id.* at 11; *id.* at 3 ("activity … may continue on the hundreds of existing permits in the Project area that remain undrilled"). Plaintiffs misunderstand the effect of vacatur.

Vacatur of the EIS and ROD would prevent BLM from approving APDs as authorized in the Converse County ROD—i.e., APDs that "allow year-round oil and natural gas drilling on leased federal lands ... as described in the Converse County Oil and Gas Project Final EIS Preferred Alternative (Alternative B and Option 6) and subject to Conditions of Approval (COA) applied to subsequently approved [APDs]." WY_016736. But vacatur would not prevent BLM from approving *any* APDs or other authorizations within the Converse County Project Area. This is because oil-and-gas development within the Project Area does not depend on the EIS and ROD. *See* WY_012459–60. "[O]ther planned federal oil and gas development" can occur under "previously approved" NEPA documents. *Id.* That is why BLM recognized in the EIS's "No Action" alternative that operators could still develop 1,663 new wells, of which 1,064 wells "could be drilled on federal mineral estate," at an approximate rate of 110 wells per year based on these

previously approved NEPA documents—i.e., *in the absence of the challenged Converse County EIS and ROD*. WY_012371, WY_012459–60.[4]

Additionally, BLM may approve APDs and make "other authorizations" that require NEPA compliance, such as APD modifications and extensions, despite vacatur of the EIS and ROD, so long as BLM independently complies with NEPA through adequate and independent NEPA analysis.[5] BLM is not obligated to rely on a programmatic EIS such as the Converse County EIS. When a programmatic EIS exists, an agency "*may* employ tiering"[6] to the programmatic EIS when evaluating a later proposed action that requires NEPA analysis, but tiering is not required. 40 C.F.R. § 1501.11(b) (emphasis added).

> **2.    Any Form of Vacatur, Especially an Order Adopting Plaintiffs' View of Vacatur, Will Have Severe Disruptive Consequences.**

Granting "an extraordinary remedy like vacatur," *Texas*, 599 U.S. at 702, will have severe disruptive consequences for Private-Intervenors, all other operators in Converse County, mineral owners, members of the local community, the State of Wyoming, and may more. No matter the form of vacatur—whether appropriately understood to allow BLM to continue to approve new APDs or as skewed by Plaintiffs to impose overly broad and unlawful limits—"vacatur will lead

---

[4] An order adopting Plaintiffs' flawed understanding of vacatur would exceed the scope of this case and grant relief on agency actions—i.e., the "previously approved" NEPA documents, WY_012459–60—that Plaintiffs did not challenge. *See Fund for Animals v. Norton*, 390 F. Supp. 2d 12, 15–16 (D.D.C. 2005) (denying the "relief requested" by plaintiffs because it covered a separate agency action "not before the Court in this case").

[5] Private-Intervenors agree with Plaintiffs that such supplemental or additional analysis could include relying on any text or analysis of the EIS that BLM determines remains valid. Pls.' Remedies Br. at 11 n.3. Private-Intervenors would not oppose an order prohibiting BLM from incorporating the specific storage value and groundwater analysis that the Court found invalid.

[6] "Tiering" simply "refers to the process … by which an environmental document may rely on an existing and broader or more general environmental document," 40 C.F.R. § 1508.1(oo), to support the NEPA requirements of a later proposed federal action, *id.* § 1501.11(b).

to impermissibly disruptive consequences." *See WildEarth Guardians*, 368 F. Supp. 3d at 84. Thus, the second *Allied-Signal* factor weighs against vacatur.

Even though vacatur of the EIS and ROD will not prevent BLM from approving new APDs or other authorizations, vacatur nonetheless will lead to delays and regulatory uncertainty that harm operators and the public. As discussed above, BLM can approve APDs under "previously approved" NEPA documents, WY_012371, WY_012459–60, but that authority is not unlimited. Those older NEPA documents authorized 1,064 new federal wells across the Project Area at an approximate rate of 110 wells per year. *Id.* If the EIS and ROD were vacated, BLM would, presumably, need to develop some plan to use that authority equitably among the many operators that, together, have over a hundred APDs currently pending but unapproved, or not submitted, because of the Court's temporary injunction. *See* Ex. 2, Decl. of Jesse Martin ¶¶ 3, 4 ("Martin Decl.") (10 APDs unapproved); Ex. 3, Decl. of Mark Brown ¶¶ 3, 4 ("Brown Decl.") (three APDs unapproved); Ex. 4, Decl. of Glen E. Christiansen ¶ 5 ("Christiansen Decl.") (three unapproved APDs and three APDs not submitted); Ex. 5, Decl. of Joseph DeDominic ¶ 18 (61 APDs unapproved) ("DeDominic Decl."); Ex. 6, Decl. of Timothy Susler ¶ 3(a) ("Susler Decl.") (eight APDs not submitted).

To begin, even using a conservative estimate of a one-year delay, operators would lose tens of millions of dollars in revenue and suffer irreparable harm from the delay's impact on the time-value of their investments. For example, Private Intervenor Continental Resources, Inc. ("Continental") is projected to lose $743,000,000 over a ten-year model from a one-year delay after discounting future revenue to a present value at a 10% discount rate ("PV10"). Ex. 7, Decl. of Ryan Baker ¶ 13 ("Baker Decl."). Private Intervenor Devon Energy Production Company, L.P. ("Devon") would lose $20,897,000 (PV10) over the life of the wells from the same one-year delay.

Ex. 8, Decl. of Rebecca A. Byram & Brian E. Carlson ¶ 18 ("Byram & Carlson Decl."). And Private-Intervenors are not alone—all operators in Converse County will lose significant revenue. *See* Christiansen Decl. ¶ 8 (anticipating $77.4 million in lost revenue and $51 million in forgone expenditures during 2025); Sulser Decl. ¶ 4(a) (six-month delay may result in $2.2 billion in lost revenue from 64-well drilling program); Ex. 9, Decl. of Hunt Walker ¶ 6(f) ("Walker Decl."); Brown Decl. ¶ 3(b). These losses would cause irreparable harm because operators cannot recoup or be compensated by the Plaintiffs or the Government for the impact to the affected wells' value. *See* Byram & Carlson Decl. ¶ 18; Baker Decl. ¶ 13.

Worse, if the Court grants Plaintiffs' requested remedy and precludes BLM from issuing new APDs or other authorizations pending remand, limiting operators to already approved APDs (it should not), then some operators will not have any APDs to drill and others will run out of APDs in early- to mid-2025.[7] Martin Decl. ¶ 7 (no APDs); Walker Decl. ¶ 12 (will shut down drilling operations in mid-2025); DeDominic Decl. ¶ 31 (will run out of APDs in April 2025). The inability to obtain APDs will strand operators' investments in leases and infrastructure, which operators cannot develop—so they cannot recover their capital expenditures. Martin Decl. ¶¶ 5(c) ($4 million pipeline not economic without production from new wells), 6(a)–(b) (incurring costs more than $1.2 million on leases and permitting work); Christiansen Decl. ¶ 5 (incurring costs of

---

[7] The fact that some operators lack, or will lack, APDs to drill in the Converse County Project Area contradicts Plaintiffs' assertion that they should drill the approved APDs they have "amassed." *See* Pls.' Remedies Br. at 11. Moreover, some of the approved APDs authorize wells that are no longer worthwhile to drill—meaning that drilling will lead to unnecessary surface impacts. Walker Decl. ¶ 7.

more than $123,000 to prepare APDs); Brown Decl. ¶¶ 6 (incurring expenses to obtain mineral rights), 7 (incurring costs to prepare APDs and surface-access rights).

But operators will not only lose revenues and value on their investments. They will also incur fees for lack of activity, lose money associated with preparation for production, and suffer losses from long-term impacts to leases and other contracts. For example, if vacatur causes a one-year delay in permitting, Devon would incur $1,914,600 in contractually required fees for not drilling and could stand to lose the ability to recoup $35,905,000 of costs for well, production-facility, and midstream infrastructure build-out and fees due under surface-use agreements. Byram & Carlson Decl. ¶ 13.a–d. If Intervenor-Defendant Anschutz Exploration Corporation ("AEC") runs out of APDs and its contracted drilling rigs sit idle, it must pay around $50,000 per day that each rig and drilling crew is idle. DeDominic Decl. ¶ 33. But if the delays are prolonged and AEC is forced to release its crews, then idling the rigs costs around $20,000 per day each. *Id.* If AEC releases a rig altogether, it must pay $20,000 per day remaining on the contract term. *Id.* Thus, if a rig sits idle for 91 days, that costs AEC $1,820,000. *Id.* ¶ 34. Where AEC's Converse County operations rely on multiple contracted rigs, this number grows significantly the longer BLM delays in approving APDs. *See id.* Delays may also cause operators to miss contractual deadlines to drill wells. Martin Decl. ¶ 6(d).

Operators are also at risk for losing acreage under leases or unit agreements for lack of continuous drilling, costing them additional tens of millions of dollars. For example, both federal and state leases require the presence of a well capable of producing oil or gas in paying quantities at the end of the lease's primary term or else the lease automatically terminates. *See* DeDominic Decl. ¶ 40. If operators cannot obtain an APD to drill the necessary well because of BLM's delay, there is a risk of losing the leases or related units. *See id.* Devon is at risk of losing leaseholds

valued at $78,782,590, and Continental is at risk of losing $4,306,500. Byram & Carlson Decl. ¶ 26; Baker Decl. ¶ 21. AEC may lose about 3,200 acres of leased land (1,700 federal acres and 1,500 state acres). DeDominic Decl. ¶ 40; *see also* Brown Decl. ¶ 8.

These short-term impacts on operators' development plans will have lasting effects on the development of the oil-and-gas reservoirs in Converse County. The inability to obtain APDs will cause existing projects to be permanently under-developed. Martin Decl. ¶ 6(e). It may ultimately cause some operators' investors to lose confidence to execute planned development. *Id*. ¶ 6(g); Walker Decl. ¶ 14. To efficiently develop a mineral reservoir, multiple wells must produce at once; otherwise, existing wells will partially deplete the mineral reservoir so that additional wells cannot be economically drilled and produced later. *See id*.

A delay in production would also cause millions of dollars in losses to the surrounding community. Of course, if operators cannot execute drilling plans, they will be forced to lay-off employees or release contracted drilling crews, impacting hundreds of employees and contractors. Martin Decl. ¶ 6(f); Walker Decl. ¶ 13; DeDominic Decl. ¶¶ 33–36, 44–48. Because a recent study indicates that for every oil-and-gas industry job, an additional 3.8 jobs are created, even more people in the local economy could be impacted. DeDominic Decl. ¶ 36.

Many small businesses depend on the oil-and-gas industry either directly or indirectly. Jerry's Welding is a small business that has operated in Douglas, Wyoming for 50 years. Ex. 10, Decl. of Wendy Meyer ¶ 1. Their employees build tank batteries and other oilfield equipment. *Id.* ¶ 3. Because 95% of their business comes from the oil-and-gas industry, any order halting development in the Converse County Project Area—even for a short time—would slow the demand for their business and products, causing their business to suffer. *Id.* ¶¶ 8–9. Jerry's Welding might have to close for certain days of the week and the owner might be forced to lay-off

employees from high-paying jobs, imposing significant economic strain on local families. *Id.* ¶¶ 9–10. Other small businesses also depend on the industry, albeit less directly. The Depot, a favorite local restaurant and bar in Douglas open for lunch and dinner, relies on the oil-and-gas industry for customers. Ex. 11, Decl. of Rodney York ¶ 8 ("York Decl."). Over half of its customers are oil-and-gas workers, and "the rest [of its customers] benefit from the cascading positive economic effect of the industry in our town." *Id.* The "positive economic effects" are, indeed, substantial. For example, if APDs are delayed by vacatur, Continental would expect to decrease capital expenditures by $212,000,000 during 2025 and 2026 and lease operating expenses by $26,000,000 long term. Baker Decl. ¶ 12.a. This is money that would be directly paid to vendors and third parties, many of whom base their offices in Wyoming and have employees who live and work there, spending money in the community.

Vacatur also will cause the State of Wyoming severe economic damages by depriving it of tens of millions of taxes and royalties. For example, Devon projects that Wyoming will lose $35,355,000, and Continental projects Wyoming will be delayed in receiving $11,000,000 in ad valorem taxes and severance taxes. Byram & Carlson Decl. ¶ 13.f.; Baker Decl. ¶ 12.b. In a worst-case scenario, if AEC is limited to developing 50 APDs in the Project Area, it anticipates paying $312 million less to the State of Wyoming in severance and *ad valorem* taxes long term. *See* DeDominic Decl. ¶ 51. These tax contributions are significant to Wyoming and local communities. They support K-12 education, the University of Wyoming, and community colleges. *Id.* ¶ 54.

Wyoming fee and state mineral owners and the federal government will lose hundreds of millions of dollars in royalties from even a short delay in permitting. Private and state mineral owners will be impacted if such minerals are located adjacent to federal minerals and BLM is prevented from or delayed in approving a permit to drill through the adjacent federal minerals,

such as in the "Fee/Fee/Fed" scenarios at issue in this case. *See* Ex. 12, Decl. of Gregory J. Graham ¶¶ 5, 8–9. For example, if AEC is prevented from obtaining certain APDs, then a retiree may be prevented from receiving the royalties on which he depends for income. *Id.* ¶¶ 2, 4, 9. Devon projects that royalty owners on Devon's wells would lose $96,079,000, and Continental projects royalty owners would lose $17,000,000 in royalties on the oil and gas that would have been sold absent the permitting delay. Byram & Carlson Decl. ¶ 13.f.; Baker Decl. ¶ 12.c. AEC projects that it would pay approximately $377 million less in federal, state, and private royalties over the long term if it can develop only 50 APDs in the Project Area. DeDominic Decl. ¶ 51.

The Court should consider (among other things) whether vacatur "would disrupt settled transactions." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). Here, as discussed above, vacatur disrupts vested oil-and-gas lease rights, drilling contracts, other contract for goods and services related to oilfield services, and more. In addition, the Court should consider the economic harms to the many third parties and community members who depend on the oil-and-gas development in the Project Area. *See Genus Lifesciences, Inc. v. Azar*, No. 1:20-cv-00211 (TNM), 2021 U.S. Dist. LEXIS 15276, at *11–12 (D.D.C. Jan. 27, 2021) (remanding and deferring vacatur after considering, among other things, the "economic harm" to the regulated party and the resulting harm to third parties "who rely on" the regulated party's product). Innumerable businesses and individuals depend on the jobs and economic benefits that the operators bring to the Converse County area. *See* York Decl. ¶ 8; DeDominic Decl. ¶¶ 52–57 (in 2022, oil-and-gas production in Converse County was estimated to be valued at $3,411,627,430, and it contributes significantly to the local economy).

Furthermore, all these harms will be magnified if the Court adopts Plaintiffs' version of vacatur and, in the future, the Court undertakes piecemeal review in this case. On summary

judgment, Plaintiffs challenged the EIS, the ROD, and the RMPA by asserting claims under NEPA, the APA, the Mineral Leasing Act, and the Federal Land Policy and Management Act. *See* Mem. Op. at 1, 11 n.2. Yet the Court in its September 13 Memorandum Opinion determined that BLM's EIS violated NEPA under only one of Plaintiffs' NEPA claims attacking the specific storage value BLM used in its groundwater analysis. Mem. Op. at 13–14; *see also id.* at 11 n.2 ("the [C]ourt … considers only the NEPA claim on the merits"). The Court in its October 7, 2024 Minute Order clarified that Plaintiffs' other claims "remain before the court for potential consideration following remand." Plaintiffs concede that their remaining claims can be dismissed, albeit without prejudice, if the Court grants vacatur. Pls.' Remedies Br. at 17. But that does not alleviate the harms to Private-Intervenors, which would result from the vacatur, not from the existence of the looming claims. If the Court intends to be the umpire throughout the entire NEPA process, calling balls and strikes every time BLM takes a swing at a new NEPA analysis on remand, then a prolonged vacatur is unduly burdensome and harmful.

### 3.    Generalized Alleged Risks of Environmental Impacts Pending Remand Are Insufficient Bases on Which to Grant Vacatur.

Plaintiffs argue that the "risk of environmental harm" pending remand favors vacatur. Pls.' Remedies Br. at 13–14; *see also id.* at 15 ("If the [C]ourt declines to vacate the EIS and ROD, these environmental impacts will be allowed to occur."). Not so.

Initially, Plaintiffs ignore that development in the Converse County Project Area is occurring at a lower rate than authorized in the EIS. BLM anticipated in the EIS that operators would develop 500 wells per year, WY_12374, WY_12376, or approximately 2,000 wells between December 2020 and December 2024. Plaintiffs, however, allege that since the Project was approved in December 2020, BLM has approved only 856 APDs. *See* Decl. of Hannah Goldblatt ¶ 4, ECF No. 135-1. Of those, 535 APDs remain approved, unexpired, and not yet drilled. *Id.* ¶ 5.

That means that *at most*, about 321 wells have been drilled since December 2020. Stated another way, Plaintiffs maintain that only about 16% of the anticipated development has occurred. Thus, the "environmental risks" Plaintiffs are concerned about, even if they occur to some extent pending BLM's action on remand, are far less severe and far less intense than predicted in the EIS. Indeed, one operator has a groundwater well in the Converse County Project Area. Martin Decl. ¶ 8. It has not observed any issues with drawdown and is not aware of any impacts of this well on other freshwater wells. *Id*. And despite Plaintiffs' claims BLM's "recycled water assumptions have since been proven false," *see* Pls.' Remedies Br. at 8, indeed, operators do recycle water in the Project Area to mitigate the water use during oil-and-gas development. *See* DeDominic Decl. ¶¶ 10–14 (AEC invested about $67 million in a water-recycling infrastructure project in the Project Area and now uses 50% recycled water in one area of the Converse County Project Area and 100% in another area).

Further, as detailed in the State of Wyoming's remedy brief, the State of Wyoming State Engineer's Office ("WSEO") independently protects groundwater, including by limiting groundwater withdrawals, through a separate permitting process, for *all* wells drilled in Converse County. *See generally* Wyo.'s Remedy Br. "[T]he WSEO retains statutory authority to declare a groundwater control area and place a cap on water permitting and production, or exercise other means of regulation for both surface water and ground water uses[.]" WY_13154. The WSEO can refuse to issue permits or allow changes to water rights if such an issuance proves detrimental to the public interest or adversely affects water users. Any observed impact to an existing water right, including drawdown or reduced flow, may be subject to priority regulation or other investigations. *See* WY_007491; *see also* Wyo.'s Remedy Br. Simply put, Plaintiffs fail to recognize that the

WSEO's jurisdiction and permitting process exist to guard against the very water-related harms Plaintiffs seek to avoid.

Finally, Plaintiffs make only generalized allegations of harms arising from groundwater use within the Project Area, along with alleged air emissions and wildlife impacts. But Plaintiffs fail to explain how vacating the EIS and ROD will prevent these alleged impacts from occurring. *See id.* at 13–15. On the contrary, where Plaintiffs are amenable to continued "development of existing drilling permits," continued operation of "completed wells [and] infrastructure," and "new drilling of [approximately 500] existing federal permits" despite vacatur and pending remand, *id.* at 11, the environmental impacts Plaintiffs have identified will, to a certain extent, occur regardless of the remedy they seek. Similarly, Plaintiffs' argument that NEPA requires agencies to "look *before* they leap" and, therefore, vacatur is warranted here, *id.* at 16, carries little water given the long history of development in the Project Area, the level of development authorized under the "No Action" alternative, the amount of development that Plaintiffs agree can proceed even if vacatur is imposed, and the robust and years-long NEPA analysis that BLM completed for the Converse County Project.

### D.    Plaintiffs' Additional Arguments in Favor of Vacatur Also Fail.

Finally, Plaintiffs contend that vacatur is warranted because the Court did not reach "the bulk" of their other "potentially meritorious challenges." Pls.' Remedies Br. at 10. This argument should be rejected too. First, Plaintiffs' remaining challenges are not "potentially meritorious," nor do they "cast further doubt on BLM's decision[-]making" or somehow "suggest that BLM will alter" its decision on remand. *See id.* The Court already found at the preliminary-injunction stage that "Plaintiffs have not demonstrated a likelihood of success on the merits *on any of their claims*." Order at 28, ECF No. 105 (emphasis added). Second, Plaintiffs' cited cases, *see* Pls.' Remedies

Br. at 10,[8] and every other D.C. Circuit case discussing this principle that Private-Intervenors reviewed,[9] involved an agency rulemaking or regulatory standard, not NEPA analyses or project approvals. Third, in each of Plaintiffs' cited cases, the courts found the agency actions would change significantly on remand, thus *Allied-Signal* did not support remand without vacatur regardless.[10] By contrast, here, because there is a serious possibility that BLM will adopt the same ROD on remand, the first *Allied-Signal* factor supports remand without vacatur. Plaintiffs' attempt to use the limited scope of the Court's summary-judgment decision to support vacatur—where *Allied-Signal* does not—should be rejected.

## II.    Alternatively, If the Court Grants Vacatur, It Should Clarify That BLM Can Issue New Permits and Other Authorizations Pending Remand.

*If* the Court grants Plaintiffs' request to vacate the EIS and ROD (and it should not), Private-Intervenors request that the Court ensure that the scope of the remedy aligns with the facts of this case, as clarified above, as well as the scope of the single identified NEPA violation, by making two points clear.

First, vacatur does not preclude BLM from approving new APDs as long as BLM does not rely on the EIS groundwater analysis that the Court ruled unlawful. In other words, BLM may

---

[8] *See Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1329 (D.C. Cir. 2023) (Department of Energy efficiency standards); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1253 (D.C. Cir. 2007) (EPA regulation); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 858 (D.C. Cir. 2001) (same).

[9] *See, e.g.*, *Am. Petrol. Inst. v. Sec. Exch. Comm'n*, 953 F. Supp. 2d 5, 8 (D.D.C. 2013) (Securities and Exchange Commission regulation); *Coal. for Common Sense in Gov't Procurement v. United States*, 671 F. Supp. 2d 48, 50 (D.D.C. 2009) (Department of Defense regulation).

[10] *See Nat. Res. Def. Council*, 489 F.3d at 1261–62 ("As a result of our decision today, neither of the two Rules survives remand in anything approaching recognizable form."); *Am. Pub. Gas Ass'n*, 72 F.4th at 1343 ("We see no reason to break from our established practice [of vacatur] when … we are not persuaded it was reasonable for the Secretary to conclude the Final Rule was supported by clear and convincing evidence.'" (citation omitted)); *see also Cement Kiln Recycling Coal.*, 255 F.3d 872 (although not citing *Allied-Signal*, concluding that "[b]ecause EPA will have to set new floors, we need not address the Sierra Club's additional arguments"); *see also id.* at 872 (also declining to reach industry's "potentially remaining claims").

approve APDs by (a) relying on other existing NEPA documents as contemplated in the EIS's "No Action" alternative, WY_012371, WY_012460, (b) using other aspects of the Converse County EIS that remain valid, *see* Pls.' Remedies Br. at 11 n.3, for support, or (c) performing independent NEPA analyses. *See supra*, Argument § I.C.1.

Second, although Plaintiffs purport to be amenable to development of the approximately 500 existing APDs pending remand, Pls.' Remedies Br. at 11, operators in the Converse County Project Area must be able to obtain "other authorizations" from BLM for those APDs. BLM must be authorized to approve modifications to, and extension of, existing APDs.

Many existing APDs require modification through BLM's approval of Sundry Notices[11] before operators can move forward with development. These modifications are necessary to amend underground ("downhole" and "bottomhole") well locations and other site-specific facility locations and other details that evolve as drilling plans are developed and the commencement of operations approaches. Walker Decl. ¶ 6(a)–(d); Brown Decl. ¶ 5(a); Susler Decl. ¶ 3(b); DeDominic Decl. ¶ 19. Because the initial APD-approval process can take months or longer, technical modifications to approved APDs become necessary with time. *Id.* BLM must be authorized to approve Sundry Notices related to the existing 500 APDs pending remand, or else a large percentage of the existing APDs likely will go unused and could expire. DeDominic Decl. ¶¶ 19–20.

Similarly, some of the 500 APDs may expire in 2024 or 2025, which means that operators will not be able to drill a well or wells on the APDs before expiration. *See id.*; Brown Decl. ¶ 5(a).

---

[11] BLM Form 3160-5, available at
https://www.ntc.blm.gov/krc/system/files/legacy/uploads/9637/3160-5%20Sundry%20Notice%20Form.pdf.

Although BLM may extend these APDs, it must do so after complying with NEPA.[12] BLM must be allowed to approve APD extensions pending remand as permitted by their terms.[13] Brown Decl. ¶ 5(b).

### III. The Court Should Not Grant Any Injunctive Relief Against Private-Intervenors or Other Operators or Any Relief Related to the RMPA.

Private-Intervenors request that the Court refrain from entering any injunctive relief separate from vacatur or any other relief related to the RMPA. Critically, Plaintiffs requested neither in their remedy brief.

Plaintiffs are clear: they "only ask this Court to vacate the EIS and ROD—not existing permitting decisions made in reliance on them." Pls.' Remedies Br. at 11 (admitting there is no need to "unwind completed wells or infrastructure"). They make no arguments in favor of an injunction, as required by *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–58 (2010). *See Standing Rock Sioux Tribe*, 985 F.3d at 1054 (holding district court erred in ordering pipeline to shut down where court failed to make required findings under *Monsanto* before ordering injunctive relief). Plaintiffs have, therefore, waived any arguments for injunctive relief. *See Sloan v. Soul Circus, Inc.*, No. 15-01389 (RC), 2015 U.S. Dist. LEXIS 169565, at *45–46 (D.D.C. Dec. 18, 2015) (where a party "has not presented arguments or evidence about … injunctive relief," a court appropriately "deems these arguments waived").

Similarly, Plaintiffs have not requested any relief related to the RMPA. *See generally* Pls.' Remedies Br. (no mention of the RMPA). The Court's Memorandum Opinion also does not

---

[12] BLM Instruction Memorandum, IM 2023-011, *Approved Application for Permit to Drill Extensions* (Nov. 18, 2022), available at https://www.blm.gov/policy/im-2023-011.

[13] *See generally* BLM Instruction Memorandum, IM 2024-051, *Valid Period of Approved Applications for Permit to Drill* (Aug. 26, 2024), available at https://www.blm.gov/policy/im2024-051 (allowing extension of APDs issued on or before June 22, 2024).

discuss the RMPA or Plaintiffs' claims related to the RMPA. *See generally* Mem. Op., ECF No. 130. Thus, no relief related to the RMPA is necessary or appropriate.

Note that Private-Intervenors do not oppose an order that would enjoin BLM from relying on the specific storage value or groundwater analysis in the EIS or ROD that the Court found violated NEPA, but such relief should be narrowly tailored to the NEPA violation.

## IV.    The Court Should Lift the Temporary Injunction as Soon as Possible.

Private-Intervenors request that the Court lift the temporary injunction that prevents BLM from issuing any "APD approvals based on the deficient EIS" while the Court considers the final remedy. Mem. Op. at 17. The Court granted this relief, stating that "[n]either Defendants nor Intervenors oppose this request." *Id.* at 17–18. That statement was inaccurate. Private-Intervenors adamantly opposed Plaintiffs' requested relief. Intvs.' Reply at 25, ECF No. 127 ("Defendant-Intervenors oppose the interim injunction."). Private-Intervenors articulated four reasons why the Court should deny Plaintiffs' request: (1) Plaintiffs lack standing with respect to the APDs; (2) Plaintiffs fail to show harms arising from the APDs; (3) there has been no hearing and Plaintiffs offered no more than speculation to support the requested temporary relief; and (4) Plaintiffs made no showing under *Allied-Signal* that they would likely succeed in showing that vacatur is required. *Id.* at 24–25.

Private-Intervenors are currently suffering harm from the temporary injunction and will continue to suffer harm while it remains in place. For example, as a direct result of the Court's order, BLM is not approving submitted, pending APDs for wells proposed to be drilled within the Converse County Project Area—wells that operators planned to drill between October 2024 and early 2025. Martin Decl. ¶¶ 3, 4 (10 APDs unapproved); Brown Decl. ¶¶ 3, 4 (three APDs unapproved); Christiansen Decl. ¶ 5 (three unapproved APDs); DeDominic Decl. ¶¶ 18, 24–26. Because of the injunction and knowing BLM would not approve the APDs, some operators chose

not to submit APDs. Susler Decl. ¶ 3(a) (eight APDs not submitted); Christiansen Decl. ¶ 5 (three APDs not submitted). That is because these APDs are costly to prepare and, when BLM cannot approve them, the investment in the APDs is stranded. Martin Decl. ¶¶ 6(a)–(b) (incurring costs more than $1.2 million on leases and permitting work); Christiansen Decl. ¶ 5 (incurring costs of more than $123,000 to prepare APDs); *see generally* 89 Fed. Reg. 77,170 (Sept. 20, 2024) ($12,515 APD fee). Operators are experiencing delays in revenue as a result of the remand. *See, e.g.*, Susler Dec. ¶ 3(a) (loss of $329 million in revenue due to delays in APD approvals).

Moreover, because BLM did not approve anticipated APDs, some operators incurred costs to move drilling equipment out of the field, and increasing future costs of having to re-mobilize the equipment and personnel once APDs can be obtained. Martin Decl. ¶ 5(a) (incurring cost of $150,000 to demobilize drilling rig). For AEC, BLM's inability to approve APDs for certain wells that were a high priority on AEC's development plan, impacted the timeline and planned development of 26 other wells through the end of 2024 at a cost of several million dollars. DeDominic Decl. ¶¶ 27, 29.

In addition, operators have invested significant sums—in the multi-millions of dollars—to construct gas pipelines to connect future wells, and the economic justification for these pipelines is dependent on obtaining, drilling, and producing a certain number of the APDs BLM has already refused to grant. Martin Decl. ¶¶ 5(c) ($4 million pipeline not economic without production from new wells). As a result, the pipeline project is now an uneconomic venture. *Id.*

For the reasons discussed above, neither vacatur nor an injunction is warranted. Operators are suffering significant harms from the temporary injunction. The Court should lift the injunction as soon as possible to allow development to continue pending remand, as authorized by the "previously approved" NEPA documents. WY_012371, WY_012460.

**V.    Private-Intervenors Support Plaintiffs' Request for the Court to Rule on Plaintiffs' Remaining Claims Before Remanding to BLM.**

As discussed above, Private-Intervenors could be harmed by piecemeal NEPA remands and repetitive litigation if development of their valid existing lease rights is impaired in the meantime. To avoid those potential harms, and to bring greater finality and clarity to this litigation, Private-Intervenors support the Court ruling now on Plaintiffs' remaining claims, which are already fully briefed, before sending this matter back to BLM for further analysis—so long as the Court lifts the injunction and allows BLM to continue to issue permits under the EIS and ROD until the Court rules on the remaining claims.

**VI.    The Court Should Require BLM to File Status Updates on Its Remand Analysis.**

If the Court vacates the EIS and ROD without also providing the clarifications that Private-Intervenors request above, or if it enters any order that precludes BLM from approving new APDs or other authorizations, the Court should require BLM to file status updates with the Court every 90 days so that the Court and Intervenor-Defendants are apprised of the progress of BLM's analysis.

**CONCLUSION**

The Court should remand the EIS and ROD to BLM without vacatur and impose no restrictions on BLM's authority to approve new development in the Converse County Project Area while it fixes the storage-value issue on remand. If the Court grants vacatur, Private-Intervenors respectfully request that the Court enter the additional, clarifying orders as described herein, and direct that BLM file status reports every 90 days.

Respectfully submitted this 8th day of November 2024.

/s/ Kristina (Tina) R. Van Bockern
Andrew C. Lillie
Mark D. Gibson
Kristina (Tina) R. Van Bockern
Holland & Hart LLP
1800 Broadway, Suite 300
Boulder, Colorado 80302
Telephone: 303.447.7100
Facsimile: 303.295.5111
aclillie@hollandhart.com
mdgibson@hollandhart.com
trvanbockern@hollandhart.com

Attorneys for Intervenor-Defendant
Anschutz Exploration Corporation

/s/ L. Poe Leggette
L. Poe Leggette (D.C. Bar No. 430136)
Bailey A. Bridges
Baker & Hostetler LLP
811 Main St., Suite 1100
Houston, Texas 77002
Telephone: 303.861.0600
Facsimile: 303.861.7805
pleggette@bakerlaw.com
bbridges@bakerlaw.com

Alexander K. Obrecht (CO. Bar No. 46937)
Baker & Hostetler LLP
1801 California Street, Suite 4400
Denver, Colorado 80202-2662
Telephone: 303.861.0600
Facsimile: 303.861.7805
aobrecht@bakerlaw.com

*Attorneys for Defendant-Intervenors*
*Continental Resources, Inc. and Devon*
*Energy Production Company, L.P.*

/s/ *Kathleen C. Schroder*
Mark Champoux, Bar No. CO00114
Kathleen C. Schoder (admitted *pro hac vice*)
Davis Graham & Stubbs LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Telephone: 303.892.9400
mark.champoux@dgslaw.com
katie.schroder@dgslaw.com

*Attorneys for Defendant-Intervenor*
*Petroleum Association of Wyoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of November 2024, I served a true and correct copy of

the foregoing **PRIVATE DEFENDANT-INTERVENORS' REMEDY BRIEF** via the Court's

electronic case filing system, which will cause the foregoing to be served upon all counsel of

record.


*/s/ Kristina (Tina) R. Van Bockern*
Kristina (Tina) R. Van Bockern