UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| POWDER RIVER BASIN RESOURCE COUNCIL et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR et al., <br><br> Defendants. | No. 1:22-cv-02696-TSC |

**DECLARATION OF JOSEPH DeDOMINIC**

I, Joseph DeDominic, under 28 U.S.C. § 1746, declare as follows:

1. I am the President and CEO of Anschutz Exploration Corporation ("AEC"), a position I have held since January 1, 2014. I make the following statements from personal knowledge.

2. I previously submitted declarations dated December 22, 2022, and April 24, 2023, in this matter (ECF Nos. 41-1 and 80-11). This declaration is intended to supplement my prior declarations.

**AEC's Operations and Environmental Standards**

3. AEC is an independent oil-and-gas exploration and development company with operations in Wyoming, Colorado, and Utah.

4. Since its founding, AEC has focused on responsible development of oil-and-gas resources across the Western United States, and it is actively involved in a drilling and development program, including federal leases in Converse County, Wyoming, located in the southern

DECLARATION OF JOSEPH DEDOMINIC - 1

portion of the Powder River Basin. AEC has operated in the Powder River Basin for over 40 years.

5.  Although AEC's oil-and-gas development program in Converse County depends on federal leases and the development of federal minerals, a large portion of AEC's leased acreage is non-federal but requires federal approvals to develop. Approximately 45% of AEC's leased acreage in the County is either privately owned ("fee") or state owned. In fact, none of AEC's well pads in Converse County are located on federal lands; they are sited on either fee or state surface lands. Nonetheless, AEC must obtain federal permits known as Applications for Permits to Drill or "APDs" from the Bureau of Land Management ("BLM") to develop not only its leased federal minerals below the surface but also fee or state minerals. Equally, these fee and state minerals owners do not receive their revenue from royalties and taxes unless federal APDs and "other authorizations" are granted to AEC by the BLM.

6.  AEC operates pursuant to the highest ethical and environmental standards and contributes to the communities in which it operates by providing well-paying jobs and by investing in the social and economic wellbeing of its employees and contractors, and their families.

7.  AEC invests in voluntary harm-mitigation efforts whenever it operates. For AEC's APDs at issue in this lawsuit for example, AEC engaged with consultants to conduct voluntary studies to ensure the viability of AEC's projects consistent with environmental protection and the stewardship of both private and public lands. These voluntary studies focused on, among other things, wildlife and wildlife-habitat surveys, cultural surveys, soil sampling, reclamation studies, and water-impacts analyses.

8.  AEC agrees to, and has agreed to, numerous harm-mitigation measures when it enters into surface-use agreements with private landowners to use their lands for its drilling operations.

DECLARATION OF JOSEPH DEDOMINIC - 2

These measures often go above and beyond federal requirements. Landowners negotiate the placement and character of roads, powerlines, produced-water pipelines, and other infrastructure. Most surface-use agreements also mandate a return of the lands after drilling and completing the wells to the property's original state—as grassland, timberland, or cropland. In addition to landowner-negotiated environmental protections, AEC is subject to local and state law, as well as the terms of the relevant BLM drilling permits, which protect wildlife, land, air, and water. AEC consistently meets or exceeds these legal and contractual standards.

9. AEC also has voluntarily implemented several mitigation measures as appropriate across most, if not all, of its drilling operations. These measures focus on minimizing impacts to the natural environment and local communities, mitigating impacts to wildlife by avoiding placing development near known wildlife habitats, avoiding development in known culturally sensitive areas wherever possible, designing drill-site locations that best fit the natural landscape to reduce the overall disturbance footprint, and shrinking the disturbance footprint of development during all times, but especially during the time from when the access roads and well pads are built to final abandonment of the well after it has run its operational course.

10. For example, AEC's largest infrastructure project in Converse County is a water facility that supports its planned oil-and-gas development. In 2017, AEC purchased 640 surface acres (about one square mile) from a private owner for the purpose of developing water-management infrastructure. This includes containment structures, pipelines, several water wells, and a water-disposal well. Over a 20-year period of oil-and-gas operations in the Project Area, AEC would need to dispose of approximately 35 million barrels of produced water; instead, this water facility allows AEC to recycle that water.

DECLARATION OF JOSEPH DEDOMINIC - 3

11. Water is essential to oil-and-gas development during the drilling and hydraulic-fracturing processes, which require injecting water into the well and downhole to free the oil and gas minerals underground. Drilling and completing a typical deep well requires between 2.1 and 3.5 million gallons of water per well.[1] Water also is a byproduct of oil and gas extraction. In other words, when water is mixed with or otherwise encountered along with the petroleum underground, it is extracted ("produced") along with the oil and gas.

12. The water supply wells for oil-and-gas related activities are drilled much deeper than other wells that supply drinking water. In addition, the water used is of much lower quality than drinking water and often includes significant sediment.

13. Through AEC's water facility in Converse County, AEC can collect and reuse a large percentage of the water used in its oil-and-gas development activities. AEC's operational goal is to use 65% recycled water across its operations. It currently uses 50% recycled water within one development area in Converse County (known as the "SEC" area) and 100% recycled water in another area (known as the "Roper" area).

14. The total estimated cost of implementing this water infrastructure project in Converse County is approximately $67MM.

15. AEC takes its reputation very seriously. Ensuring that its operations are environmentally sound is critical to its business and allows AEC to maintain its stellar reputation and to operate oil-and-gas wells within what it considers its corporate social contract to work with the communities in the Powder River Basin and to uphold the values that Wyoming embraces—

---

[1] *See* Converse County Land Use Plan (April 7, 2015), available at https://www.conversecountywy.gov/DocumentCenter/View/466/Converse-County-Land-Use-Plan-PDF#:~:text=The%20Converse%20County%20Land%20Use,legally%2C%20restrict%20private%20property%20use.

DECLARATION OF JOSEPH DEDOMINIC - 4

clean air and water, bountiful wildlife, good jobs, close-knit communities, and investment in American ingenuity and business. It's good business for AEC to take care of the lands on and in which it operates. AEC wants to operate as cleanly as possible. If it did not go above and beyond laws and regulations, AEC would not be able to continue developing its assets.

**This Lawsuit, AEC's Permits, and Plaintiffs' Requested Relief**

16. In this action, I understand that Plaintiffs seek vacatur of BLM's Converse County Environmental Impact Statement ("EIS") and Record of Decision ("ROD") approving the Converse County Oil and Gas Project (the "Project"). I understand that Plaintiffs also seek to enjoin BLM from approving and issuing any new APDs and "other authorizations" that rely on the EIS and ROD until BLM issues a new EIS and ROD on remand. I also understand that Plaintiffs wish to limit drilling operations pending BLM's remand analysis to existing APDs—meaning APDs that BLM has already approved as of October 18, 2024.

17. BLM has already approved numerous AEC drilling permits, which AEC has been submitting in connection with the ROD since December 2020. Before the Court dismissed Plaintiffs' claims challenging BLM's APD approvals, Plaintiffs sought to cancel 80 of AEC's APDs in this lawsuit. *See* ECF No. 47-2 (Exhibit A to my Dec. 28, 2022 declaration, which lists the 80 challenged APDs).

18. While this lawsuit has been pending, AEC has continued to submit new APDs to the BLM Casper Field Office. For 61 of those permits, BLM's decision is pending, and BLM has indicated that it cannot take any action on these permit applications while the court's September 13, 2024 injunction against new APDs remains in place.

19. As of today, AEC has 70 approved APDs in the Converse County Project area. But because the applications for these permits were submitted months or even years ago, the details

DECLARATION OF JOSEPH DEDOMINIC - 5

of our development plans have evolved. As a result, AEC needs BLM's approval to amend various aspects of the previously approved APDs, including, for example, the approved downhole locations, the siting of surface facilities, or the locations of surface flowlines or pipelines. To obtain BLM's approval of amendments to APDs, AEC needs to submit for BLM's review a Sundry Notice Form 3160-5[2], which triggers BLM's obligation to comply with the National Environmental Policy Act ("NEPA"). Of AEC's 70 previously approved permits, 47 require additional Sundry Notice approvals—and associated NEPA review—from BLM. Without the Sundry Notice approvals, AEC cannot develop its permitted well sites under the APDs, meaning they will go unused unless or until BLM can approve the necessary amendments. As a result, AEC currently has only 23 existing APDs that can be developed as-is.

20. In addition, because many of AEC's drilling permits were submitted and approved years ago, their two-year terms are nearing expiration. BLM "may extend the APD's validity for up to 2 additional years" if the APD was approved before June 22, 2024 and AEC requests an extension "before the expiration of the original approval." *See* 43 C.F.R. § 3171.14 (2023) (BLM can extend two-year APD term).[3] But such renewals also require NEPA compliance. If BLM cannot renew several of AEC's APDs in the next few months, they will expire, causing AEC to lose the significant money it invested in developing each APD package, including the costs incurred to comply with NEPA.

21. AEC intends to continue submitting new APDs for development in the Converse County Project area to BLM's Casper Field Office on a regular basis.

---

[2] Available at https://www.blm.gov/sites/blm.gov/files/uploads/Services_National-Operations-Center_Eforms_Fluid-and-Solid-Minerals_3160-005.pdf.
[3] BLM recently amended the regulations governing APD's terms, changing APD terms from two- to three-year terms and eliminating BLM's authority to extend the terms of APDs approved after June 22, 2024. *See* 43 C.F.R. § 3171.14 (2024); 89 Fed. Reg. 30,916 (Apr. 23, 2024).

DECLARATION OF JOSEPH DEDOMINIC - 6

22. AEC's oil-and-gas production under the approved and pending drilling permits is, like many other producers' efforts, key to a larger effort to increase domestic energy production and curb reliance on foreign oil and gas in a manner that promotes economic security; national security; and adherence to the world's highest environmental, labor, and sustainability standards.

23. This endeavor is also consistent with years of bipartisan efforts and a decades-long Congressional directive "to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production" in the National Materials and Minerals Policy, Research and Development Act of 1980.

**Harm to AEC from the Court's Interim Injunction Against New APDs**

24. As mentioned above, BLM's Casper Field Office has refused to approve APDs that were otherwise administratively complete and ripe for decision because the agency understands that the court's September 13, 2024 order, which enjoins APD approvals "based on the Project EIS" while the court determines the remedy in this case, bars the agency from taking action on *any* APDs even if the agency had already conducted independent NEPA for the APDs.

25. In total, AEC has 61 APDs currently pending BLM review.

26. When the court entered the September 13 order, AEC had 31 APDs and 3 Sundry Notices pending BLM approval that were a high priority for AEC's development plan. These approval requests were submitted to BLM between August 2023 and August 2024 with anticipated BLM approvals between October 2024 and November 2024. AEC intended to develop the wells covered by those high-priority APDs and Sundry Notices between October 2024 and December 2024.

27. Without these high-priority BLM approvals, AEC has suffered disruptions to its current drilling schedule in Converse County and is likely to continue suffering further disruptions.

DECLARATION OF JOSEPH DEDOMINIC - 7

AEC's development program requires mobilizing multiple drilling rigs, for which AEC has already entered into third-party contracts. Delays due to BLM's refusal to approve pending high-priority APDs and Sundry Notices has had a cascading impact on the development of 26 other wells through the end of 2024.

28. Continued refusal from BLM to approve pending APDs and Sundry Notices would force AEC to incur costly logistical shifts in order to continue developing in Converse County. Specifically, it costs about $50,000 per day to keep drilling rigs idle. And when AEC's contactors need to demobilize (take down and apart) and mobilize (transport to a new location and reassemble and prepare) the drilling rigs to different locations and fields in order to accommodate changed drilling plans, AEC will incur additional costs that it would not have otherwise incurred. Demobilization and mobilization each cost about $500,000 on average.

29. The delay and inability to employ its development program has already cost AEC in excess of several million dollars. The longer term impacts of extended delays, however will likely be in the tens of millions because of the time value of investment.

**Harm to AEC if the Court Grants Plaintiffs' Requested Relief**

30. AEC would suffer irreparable harm if the Court were to enjoin BLM from approving *new* APDs or "other authorizations" such as Sundry Notices or renewals, and limit AEC to development on already approved APDs until BLM issues a new EIS and ROD (as Plaintiffs request).

31. As mentioned above, AEC has only 23 existing, approved APDs that it can drill without any further BLM amendment or authorization. With these 23 permits, AEC can continue to drill and develop wells in the Converse County Project area only until April 2025.

32. Once AEC runs out of existing permits and can no longer drill wells in the Project area, AEC will incur substantial damages, arising from the costs of idled drilling rigs, the

DECLARATION OF JOSEPH DEDOMINIC - 8

potential requirement that AEC would need to release one or more of the rigs under contract, lost profits and investment backed expectations, and lost opportunity costs.

33. Every day that a drilling rig sits idle, assuming AEC did not release the full crew, the cost is around $50,000 per day. If AEC cannot obtain new APDs for an extended period, then it may be forced to release its crews, in which case, the daily idle rate would decrease to about $20,000 per day. And if AEC must release the rig contract altogether, then AEC must pay $20,000 per day remaining on the contract term. AEC contracts for the rigs, each with varying terms remaining on the contracts.

34. Thus, for example, if the court grants Plaintiffs relief and AEC runs out of wells to drill on April 1, 2025 but BLM does not complete its remand analysis until July 1, 2025, then AEC's rigs will sit idle for 91 days. One idle rig would cost $1,820,000 in 90 days. (Likely more because AEC would not be able to release its full crews immediately.) Where AEC's operations rely on multiple rigs, this number grows exponentially very quickly.

35. If or when AEC must release its drilling crews, there will be substantial impacts to AEC's employees and contractors. Each drilling rig directly employs about 60 people, and indirectly over 150 to 210 people.

36. This would have a significant impact on the local economy and workforce. A recent study indicates that for every oil-and-gas industry job, an additional 3.8 jobs are created.[4] Thus, at least several hundred people in the local economy could be impacted.

37. In total, AEC has invested substantial resources—at least $500 million in direct and indirect costs. These include investments in: nearly 10 years of technical and engineering studies

---

[4] *See* Impacts of the Oil and Gas Industry on the US Economy in 2021, Prepared for American Petroleum Institute, at ES-1 (April 2023), available at https://www.api.org/-/media/files/policy/american-energy/pwc/2023/api-pwc-economic-impact-report-2023.

DECLARATION OF JOSEPH DEDOMINIC - 9

to identify the areas where oil and gas is present in commercial quantities; securing leases and surface access, both federal and fee; obtaining approval of its APDs; and preparing for and conducting drilling and production under those APDs. This amount also includes investment in ensuring adherence with local natural-resources plans, state laws, and surface-use agreements, including mitigation measures subject to agreements with individual landowners, and all other applicable legal requirements. It also includes AEC's Converse County water facility, discussed above, which allows AEC to utilize substantial amounts of recycled water in its operations.

38. AEC also has constructed numerous roads and powerlines at a cost of millions of dollars. For example, in 2021, AEC obtained an approach permit from Campbell County, Wyoming, to build a road to Midge Fed Well Pad (4171-36). The total cost of constructing this single access road alone was about $400,000.

39. The above-described water-infrastructure and road construction are just a few of the investment projects that AEC has implemented in the Powder River Basin.

40. If AEC is precluded from drilling wells on certain federal and state leases, because BLM cannot timely approve APDs or Sundry Notices pending remand, AEC may lose about 3,200 acres of leased lands (1,700 federal and 1,500 state) due to leases expiring. Both federal and state leases require the presence of a well capable of producing oil or gas in paying quantities at the end of the lease's primary term or else the lease automatically terminates. AEC has not yet been able to permit and drill a well on this acreage, in part, because of BLM's permit approval and NEPA delays. If the leases expire, AEC would lose the substantial investment incurred to obtain the leases.

41. In addition to the financial harms mentioned above, AEC also will suffer reputational harms. AEC is known around the Powder River Basin as a very well-respected, effective, and

efficient operator. AEC has developed this reputation because it is a private company able to adapt quickly to ever-evolving market concerns. Where public companies require months or even years to make decisions and gather stakeholder input, AEC can move quickly and decisively. AEC capitalizes on this reputation when seeking and employing contractors and vendors. If AEC is unable to fulfill contracts with current vendors, AEC's reputation will be diminished.

**Harm to AEC's Vendors, Contractors, and Subcontractors**

42. AEC's drilling program under the pending and forthcoming APDs described here entails a many-years-long process that requires overlapping resources devoted to numerous wells together at the same time, as opposed to discretely drilling one well after another.

43. As such, coordination of work among the various wells is dynamic and includes ensuring that equipment is on-site, crews are mobilized, oil-and-gas resources are properly located, and countless other considerations are accounted for, all of which must adapt and change to accommodate the interconnected nature of the drilling program. To illustrate, drilling and operating one well affects how and when and under what conditions AEC approaches the next well pad, and so on.

44. This type of interconnected drilling program requires AEC to mobilize large and diverse teams in a choreographed manner that includes drill-rig operators, engineers, seismologists, scientists, construction companies, trucking companies, water, and other service providers, etc.

45. Specifically, and with the caveat that there are limitations to providing operation estimates to a single well, AEC estimates that it employs about 369 individuals from its vendors, contractors, and sub-contractors to drill a single well, complete that well, and produce oil and gas from that well.

46. During the preconstruction phase, AEC uses over 30 different vendors to handle the permitting and land-related work: wildlife surveying; federal and state permitting; archeological and cultural site evaluation; water testing; water-rights permitting; and land surveying. Additionally, AEC hires brokers, title agents, geologists, engineers, local attorneys, and abstractors to handle all land-related concerns.

47. When AEC reaches the operational phase, it hires more than 274 people to conduct operations. For a single well to operate, it may cost as much as $2,468,521. This is because AEC hires construction, completion, production, and midstream labor vendors. These vendors may be present on a drilling site anywhere between two days and an entire year while they complete projects.

48. For example, a six-person local oil-pipeline construction crew may be present on AEC sites for seven days. A four-person team of pumpers working for AEC will be present on the project site for an entire year.

49. Not only would granting Plaintiffs' requested vacatur leave a large and interconnected drilling operation only partially completed, it will also leave these vendors, contractors, and subcontractors without meaningful jobs.

**Local and National Harms**

50. The impact of enjoining approvals of drilling permits would undoubtedly be felt beyond individual landowners' fence lines. Converse County, the State of Wyoming, and the nation would suffer as well.

51. In a worst-case scenario, if AEC cannot obtain BLM approval of any new APDs in the Project area and AEC could develop only approximately 50 permits in the Converse County Project area going forward (a number far lower than AEC had forecasted for the Project), then

DECLARATION OF JOSEPH DEDOMINIC - 12

AEC would pay approximately $312 million *less* to the State of Wyoming in severance and ad valorem taxes long term and, AEC would pay approximately $377 million *less* in federal, state, and private royalties long term. In other words, the lost royalties to fee, state, and federal mineral owners plus lost taxes to state and local governments from undrilled AEC wells would be approximately $689 million long term.

52. In calendar year 2021, oil-and-gas production in Converse County was valued at $2,067,781,519. In 2022, through the month of November, oil-and-gas production in the county was estimated to be valued at $3,411,627,430, an increase of 64%.[5]

53. In 2023, oil-and-gas production contributed $2.72 billion dollars to local and state governments in Wyoming. This equates to a direct payment of nearly $4,143 for every person living in Wyoming.[6]

54. The oil-and-gas industry contributes substantially to public education in Wyoming. The oil-and-gas industry contributed over $1.16 billon to K-12 education, the University of Wyoming, and community colleges in 2023.[7]

55. The oil-and-gas industry, by itself, contributed to over 40% of the property taxes assessed in Wyoming in 2022.[8]

56. Wyoming receives about fifty percent of the federal mineral royalties collected by the U.S. Office of Natural Resources Revenue for the mineral production from federal lands. *See* 30 U.S.C. § 191(c). Most of this royalty money goes to "those subdivisions of the State socially or

---

[5] *See* Cynthia Stimson, Douglas Budget, Converse County reaping benefits of the oil, gas boom (March 1, 2023) https://www.gillettenewsrecord.com/news/wyoming/article_13d0dae9-fadd-5fe2-9cdf-e4f5354f3650.html#:~:text=%E2%80%9CIn%20calendar%20year%202021%2C%20oil,Converse%20County%20Treasurer%20Joel%20Shell.
[6] *See* https://pawyo.org/facts-figures/.
[7] *See* https://pawyo.org/facts-figures/.
[8] *See* https://pawyo.org/facts-figures/.

DECLARATION OF JOSEPH DEDOMINIC - 13

economically impacted by development of minerals" for "(i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service." *Id.* § 191(a). As Plaintiffs have pointed out in their briefing, the Converse County Project is "[o]ne of the largest fossil fuel developments in state history." (ECF No. 64-1 at 15.) In Fiscal Year 2023 alone, the U.S. Office of Natural Resources Revenue disbursed $832.86 million to Wyoming.[9] Thus, the state of Wyoming will lose significant tax and royalty revenue if Plaintiffs' requested vacatur is granted.

57. If future drilling approvals are halted, Converse County and Wyoming will suffer the downstream effects. Energy companies drive the economy in Converse County. AEC and other energy companies substantially contribute to the county coffer. AEC and other oil-and-gas companies also invest in a diverse array of people who contribute to the local economy in Douglas, Gillette, and Casper, Wyoming. Local businesses thrive because of the business generated by oil-and-gas development.

58. Granting the vacatur that Plaintiffs seek also would undermine longstanding bipartisan goals to facilitate domestic energy production. In fact, the current administration has specifically encouraged domestic oil companies to "produc[e] more oil"—especially on sites already leased—and implemented a policy to discourage the oil-and-gas industry from "sitting on … unused but approved" APDs like those that Plaintiffs seek to prevent from being utilized.[10]

59. It is my belief that the public and the nation will be substantially harmed if the Plaintiffs' requested relief is granted.

---

[9] *See* https://revenuedata.doi.gov/explore/?dataType=Disbursements&location=NF%2CNA%2C56009%2CWY&mapLevel=State&offshoreRegions=false&period=Fiscal%20Year&year=2023.

[10] *See* Remarks by President Biden on Actions to Lower Gas Prices at the Pump for American Families (Mar. 31, 2022), available at https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/03/31/remarks-by-president-biden-on-actions-to-lower-gas-prices-at-the-pump-for-american-families/.

DECLARATION OF JOSEPH DEDOMINIC - 14

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 8, 2024, in Denver, Colorado.

_____
Joseph DeDominic

DECLARATION OF JOSEPH DEDOMINIC - 15