IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **POWDER RIVER BASIN RESOURCE COUNCIL and WESTERN WATERSHEDS PROJECT**,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF THE INTERIOR and U.S. BUREAU OF LAND MANAGEMENT**,<br><br>Defendants,<br><br>and<br><br>**STATE OF WYOMING,** *et al.*,<br><br>Intervenors-Defendants | Case No. 1:22-cv-2696 |

### DECLARATION OF REBECCA A. BYRAM AND BRIAN E. CARLSON IN SUPPORT OF PRIVATE INTERVENOR-DEFENDANTS' REMEDY BRIEFING

We, Rebecca A. Byram and Brian E. Carlson, declare as follows:

1. We are over eighteen years old, have personal knowledge of the matters set forth in this Declaration, and are competent to testify as to the matters set forth herein.

2. I, Rebecca A. Byram, live in Wyoming and am currently employed as an Environmental Health and Safety ("EHS") Professional with Devon Energy Production Company, L.P. ("Devon"). I have worked for Devon as a Regulatory Advisor and EHS Professional since 2007. Prior to Devon I worked as a Project Manager for Western Range & Water, Inc. (2006-2007) providing consulting and technical support pertaining to regulations administered by the Bureau of Land Management ("BLM") and Wyoming agencies including the Wyoming Department of

Environmental Quality, Wyoming Oil and Gas Conservation Commission, and Wyoming State Engineer's Office. I have 18 years of experience in the environmental and oil and gas industry. I graduated from the University of Wyoming with a Bachelor of Science in Microbiology (with honors) in 2000, and with a PhD in Molecular Biology in 2004. I worked as Pre-Doctoral Fellow at the National Institute of Health (2001-2005) and as a Post-Doctoral Fellow at the Centers for Disease Control and Prevention (2005-2006).

3. I, Brian Carlson, am currently employed as Advising Landman with Devon. I have worked for Devon in various roles since 2007, and I have 20 years of experience in the oil and gas industry. I graduated from the University of Montana with a Bachelor of Science in Business Administration in 2005.

4. Devon is a leading independent oil and natural gas exploration and production company focused on onshore development in the United States. Devon is a results-oriented oil and gas company that builds value for shareholders through our employees by creating a culture of health, safety, and environmental stewardship in an atmosphere of optimism, teamwork, creativity, and resourcefulness and by dealing with everyone in an open and ethical manner.

5. Relevant to this lawsuit, Devon owns and operates federal, state, and private/fee oil and gas leases, surface use agreements, permits, wells, and related infrastructure in the Powder River Basin of Wyoming, including in Converse County.

6. We are familiar with the systems and processes of Devon and the applicable agencies in Wyoming for planning, applying for Applications for Permit to Drill ("APDs"), the environmental work attendant to APDs, and the tracking and approval of the APDs. We communicate regularly with governmental agencies in Wyoming, including the BLM. We have been involved, and

currently are involved in, managing Devon's interests related to the Converse County Oil and Gas Project ("Project").

7. We understand that this lawsuit involves the Plaintiffs' challenge to the Project and APDs issued related to the Project. We have been advised and it is therefore our understanding that on September 13, 2024, the Court found the Project's Environmental Impact Statement ("EIS") deficient on one ground and ordered all parties to submit a supplemental brief on remedy (Document No. 131). Plaintiffs in the above-captioned case—Powder River Basin Resource Council and Western Watersheds Project—filed Plaintiffs' Remedy Brief (Document No. 135). Plaintiffs request vacatur of both the Project's Record of Decision ("ROD") and EIS while on remand.

8. Plaintiffs' requested vacatur would harm Devon's property, economic, and regulatory interests in the Project and related permits. We will explain the specific harm in the following paragraphs.

9. For purposes of these calculations, we have projected that it will take at least a year on remand until BLM can issue permits again. We will refer to the one-year time frame (October 2024 to October 2025) as the "Timeframe." We then applied the Timeframe to Devon's currently planned drilling schedule in the Project area and projected the economic assumptions using Devon's typical price deck. These numbers are based on the planned drilling schedule as it existed for Devon at the time. Drilling schedules are subject to and do change for numerous reasons.

10. The economic projections in the following paragraphs reflect only Devon's planned operations in the Project area that may be impacted by Plaintiffs' requested vacatur. They do not cover or include all of Devon's operations in the greater Powder River Basin or in the rest of the State of Wyoming.

11.     Devon intends to drill up to 36 wells in the Project area during the Timeframe. The filing fees and costs to analyze and prepare for these approved and submitted APDs alone totals $1,080,000, which will be stranded if Plaintiffs' requested vacatur is granted.

12.     To facilitate the development of its leases and related APDs within the Project area, Devon has executed contracts with third-party service companies, suppliers, and midstream companies. Some of these contracts require an upfront and non-refundable payment by Devon and many cannot readily be cancelled without financial payment by Devon. If the ROD and EIS were vacated on remand, Devon would lose its investment in these third-party contracts, be subject to additional financial payments, and potentially be subjected to the risk of breaches of these contracts. Many of these costs are captured in Devon's specific examples discussed below.

13.     For the Timeframe:

  a. Devon will incur $1,914,600 in contractually required fees if its rigs are not drilling during the Timeframe.

  b. As referenced in Paragraph 14, Devon also has a commitment to reimburse its midstream gathering company for building infrastructure within one of the Devon-operated units. Devon could strand up to $25,000,000 in costs for the buildout of midstream infrastructure to facilitate expected drilling and production during the Timeframe.

  c. Devon also has already pre-purchased $5,880,000 in casing for the planned wellbores and paid $5,025,000 for production facilities.

  d. Devon's surface owners will lose $360,000 in surface use agreements for the pads for the planned wells.

  e. Devon's surface owners will also lose $10,800,000 in water payments for completions of the anticipated wells during the Timeframe.

  f. The State of Wyoming would lose $35,355,000 in ad valorem taxes and severance taxes.

  g. Royalty owners in Devon's wells would lose $96,079,000 in royalties on the oil and gas that would have been produced and sold.

14. Additionally, Devon's third-party midstream partner has begun the extensive and costly efforts, to permit and construct a natural gas compressor station in Converse County. This station is necessary to convey gas production to market from future proposed Devon drilled and operated conventional oil wells based upon Devon's 2025 and 2026 development plans in the area. The total cost of the compressor station and ancillary facilities is expected to be more than $25,000,000. Permits have been submitted, costs have already been incurred, and equipment has been ordered as projects of this scale take a minimum of a year to plan and construct.

15. The sole purpose of constructing this compressor station is to capture and beneficially use the natural gas projected to be produced by Devon. If Devon is not able to deliver on development plans communicated to midstream partners, irreparable harm will be done to those relationships, resulting in a hesitancy by those partners to spend capital funds in the future to accommodate gas produced and future development.

16. Similarly, relationships with crude oil midstream partners will be damaged. Similar to the commitments put forth by the gas midstream partners, crude partners have also committed capital to expand pipeline systems and purchase metering equipment.

17. Devon is also continually investing in water infrastructure, which includes a commitment to recycle over 75% of the water produced in our Converse County asset. Devon has also spent

$12,000,000 in water recycling efforts and equipment in the last one-and-a-half years. Devon has a published and solemn goal to reduce flaring intensity to 0.5% or lower, and to eliminate routine flaring by 2030, both of which are highly beneficial to the environment. Devon is committed to eliminating as many haul trucks as possible by pipelining all crude and water production. These efforts are an investment in the future of the Powder River Basin that the regulatory uncertainty of obtaining BLM APD approvals in Converse County jeopardizes.

18.     The one-year permitting delay does not only amount to lost revenue and harm to Devon, Devon's vendors, the State of Wyoming, surface owners, and royalty owners. The delay will also cause Devon irreparable harm by impacting the time-value of money on its investments. That is, after discounting Devon's future revenue streams to their present value at a 10-percent (PV10) discount rate, Devon will lose $20,897,000 (PV10) over the life of the wells just from the one-year delay during the Timeframe. Devon cannot recoup or be compensated by the Plaintiffs or the Government for the vacatur's impact to the affected wells' value.

19.     While the above numbers in Paragraphs 11-18 capture specific instances of harm if Plaintiffs' requested vacatur were to be granted, it does not capture the total harm to Devon's stakeholders—including vendors, surface owners, and other counterparties. The money Devon would have spent to develop the planned wells during the Timeframe and continuing through the life of the wells would have been paid directly to stakeholders who are based in or have offices in Wyoming and employees who live and work there. This is money that would largely be taken from the local and State economies.

20.     Devon is the lessee under oil and gas leases of approximately 161,000 net acres of combined private, State of Wyoming, and federal minerals within the Project's geographic scope.

21. Devon conducts its operations according to a carefully planned schedule that is designed to efficiently develop its assets within the Project's boundaries. In developing a drilling schedule, Devon must meticulously coordinate exploratory work, drilling, completions, and the building of infrastructure to facilitate the development. The timing and success of the drilling schedule heavily depend on the permitting process, including BLM's issuance of APDs.

22. Even temporary interruptions to the permitting process would disrupt Devon's carefully planned drilling schedule and could cause Devon to incur additional operational and third-party expenses. Delays could also impair Devon's broader lease and property rights. Devon's leases often have a limited period in which the lessee must initiate drilling. Without timely drilling, leases can be subject to termination or automatically terminate. Devon's inability to execute its drilling schedule because of Plaintiffs' requested vacatur could subject Devon to termination of its property rights secured by the leases within the Project's boundaries.

23. Many of these acres are committed to federal units, formally called "Federal Exploratory Units." A Federal Exploratory Unit refers to a large geographic area that may consist of federal, State of Wyoming, and fee minerals and associated leaseholds that are combined—i.e., "unitized"—for the purposes of more efficiently developing and producing an oil and gas pool, field, or like area. Each Federal Exploratory Unit is governed by a unit agreement.

24. Unit agreements contain provisions for automatic contraction of the geographic reach of the unit without continuous drilling operations on leaseholds not already within a participating area in the unit. In other words, without the ability to continuously conduct drilling operations the unit will contract, subjecting the contracted leasehold to termination for the expiration of its primary term or due to lack of production.

25. As relevant to potential unit contraction, Devon is the lessee under oil and gas leases of approximately 32,366 net acres of private, State of Wyoming, and federal minerals committed to Federal Exploratory Units at risk of contraction during the Timeframe. Each of these units is governed by a unit agreement with an active continuous drilling operations provision. If Devon is unable to continuously drill within these units during the Timeframe and the units contract, Devon's approximately 32,366 net acres are at risk of expiring or terminating. Furthermore, if the units contract, Devon has approximately 7,932 net acres of additional leasehold that are at risk of being stranded by unleased federal minerals created by potential contraction.

26. The Wyoming Office of State Lands and Investments recently held a lease sale on March 8, 2023, which included numerous parcels located within the Project area. The winning bids on parcels in the Project area near Devon's operations ranged from $411 per acre to $3,503 per acre—with an average of $1,955 per acre. This publicly available information is the best, most recent representation for the current market rate for new leases in the Project area. When we apply an average per-mineral-acre price of $1,955 per acre to Devon's at-risk leasehold and potentially stranded acreage, Plaintiffs' requested vacatur places $78,782,590 of leasehold at risk of expiring, terminating, or being stranded due to unit contraction. There is no guarantee Devon would be able to again lease these minerals, and, even if Devon could, leasing the minerals again would require additional expenditures. Furthermore, there is no guarantee Devon could obtain a suspension of the continuous drilling operations provisions or otherwise save the leasehold from contraction and expiration or termination.

27. Devon also owns non-operated working interests within the Project's boundaries. This means Devon is not the operator or applicant for the applicable APD, but the proposed well will produce from a spacing unit that contains minerals leased by Devon. In this scenario, Devon is

responsible for paying its proportionate share of the costs to drill and produce such a well. If Plaintiffs were to successfully vacate the ROD and EIS during remand, Devon's non-operated working interests and related investments and expected revenue would also be subjected to the same types of harm discussed in Paragraphs 11-18.

28. We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge.

/s/ *Rebecca A. Byram*
Rebecca A. Byram

/s/ *Brian E. Carlson*
Brian E. Carlson