**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| POWDER RIVER BASIN RESOURCE COUNCIL, 934 N. Main St. Sheridan, WY 82801, | Case No. 1:22-cv-2696 **[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT** |
| WESTERN WATERSHEDS PROJECT, 126 S Main Street, Suite B P.O. Box 1770 Hailey, ID 83333, | |
|     Plaintiffs, | |
|     v. | |
| U.S. DEPARTMENT OF THE INTERIOR, 1849 C Street N.W. Washington, DC 20240, | |
| U.S. BUREAU OF LAND MANAGEMENT, 1849 C Street N.W. Washington, DC 20240, | |
|     Defendants. | |

## INTRODUCTION

1. This Second Amended and Supplemental Complaint challenges the Converse County Oil and Gas Project, a major oil and gas development that was personally approved by then-Secretary of Interior David Bernhardt in the waning days of the first Trump administration, as well as Applications for Permit to Drill (APDs) recently approved by the U.S. Bureau of Land Management (BLM) in the Converse County Project area, along with other associated decisions identified herein.

2. The Converse County Project is a capstone of the first Trump administration's

push for "energy dominance" in public lands management, and its efforts to relieve the fossil fuel industry from federal environmental safeguards, including under the Clean Air Act, Migratory Bird Treaty Act, and 2015 Greater Sage-Grouse Plan Amendments. The Project also embodies several questions of nationwide importance to BLM's oil and gas program, including the scope of BLM authority to regulate "Fee/Fee/Fed" wells and mandate air emissions controls.

3.     Although wrongly minimized or ignored by Federal Defendants, the adverse impacts of the Converse County Project are far-reaching and nationally-significant. The Project will lock in staggering amounts of new greenhouse gas emissions from 5,000 new oil and gas wells and supporting infrastructure—at the same time climate scientists are urging an immediate end to new fossil fuel investments. By year ten, the Project will result in 69.5 million metric tons of carbon dioxide equivalent ($CO_2e$) annually, equivalent to 1.2% of total annual U.S. greenhouse gas emissions.

4.     In addition to worsening the global climate crisis, BLM's own analysis projected that the Converse County Project will drive regional air quality to unhealthy levels and impair visibility in units of the National Park System in surrounding states, such as Badlands and Wind Cave National Parks in South Dakota. Nonetheless, Defendants rejected calls from the U.S. Environmental Protection Agency (EPA) and National Park Service (NPS) to impose routine pollution controls, taking the novel and legally erroneous position that BLM "does not have authority to require application of [air quality] mitigation measures."

5.     The Delaware-sized Project will also dramatically change the landscape by introducing 1,500 well pads; 2,900 miles of pipeline; 1,970 miles of access roads; and 1,500 miles of electrical lines—with devastating consequences for wildlife species inhabiting and surrounding the Project area. At the request of the Project developers, Secretary Bernhardt also

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 2

approved a controversial land use plan amendment to exempt the Converse County Project from seasonal timing restrictions designed to protect nesting raptors, a move the U.S. Fish and Wildlife Service warned could lead to Migratory Bird Treaty Act violations. BLM also disregarded land use plan protections required for the imperiled greater sage-grouse, despite acknowledging that all 54 sage-grouse mating grounds in the Project area could be abandoned.

6.      Furthermore, the Converse County Project will consist predominantly of "Fee/Fee/Fed" wells, which extract federal minerals from well pads on adjacent non-federal lands. Pursuant to an unlawful national policy, BLM claims to lack jurisdiction to regulate the surface operations associated with Fee/Fee/Fed wells, meaning much of the Converse County Project is being improperly exempted from critical environmental protections.

7.      In approving the Converse County Project and associated actions, Defendants violated their obligations under the National Environmental Policy Act (NEPA) to take a "hard look" at the Project's environmental impacts, resting on a final Environmental Impact Statement (FEIS) that overlooked and understated key harms. Defendants also violated their obligations under the Federal Land Policy and Management Act (FLPMA) to ensure compliance with federal air quality standards; to comply with the applicable federal land use plan, the Casper Resource Management Plan (RMP); and to prevent unnecessary or undue degradation of public lands. In resting on legally erroneous claims regarding the scope of BLM authority over Fee/Fee/Fed wells and air emissions, Defendants were also arbitrary and capricious in violation of the APA.

8.      In this Second Amended and Supplemental Complaint, Plaintiffs have removed facts and claims from their prior First Amended Complaint, ECF No. 44, challenging APDs that BLM approved in the Converse County Project area in 2020 through 2022, in light of the Court's

November 6, 2023, decision dismissing those claims on Article III standing grounds. *See* ECF

Nos. 105 to 108. Most of those permits have since been drilled or expired.

9.      This Second Amended and Supplemental Complaint does not alter the substance

of the claims from the First Amended Complaint challenging the Converse County Project Final

Environmental Impact Statement (FEIS), Record of Decision (ROD), and Casper Resource

Management Plan (RMP) Amendment, since the Court has not yet ruled upon Plaintiffs' pending

summary judgment motion challenging them on various grounds, other than the groundwater

depletion issue on which the Court held the FEIS and ROD unlawful in its September 13, 2024,

partial summary judgment decision and order. *See* ECF Nos. 130 & 131.

10.     As detailed further below, BLM issued a Supplemental Groundwater

Environmental Assessment ("Groundwater EA") and Finding of No New Significant Effect

("Groundwater FONNSI") in June 2025 purporting to correct the groundwater depletion analysis

deficiency identified by the Court, along with a new Decision Record ("Groundwater DR")

reaffirming the EIS and ROD in all respects. Accordingly, this Second Amended and

Supplemental Complaint adds facts and claims challenging the June 2025 Groundwater EA,

FONNSI, and DR.

11.     As detailed further below, and identified in detail in Appendix A hereto, between

August 7, 2025 and October 22, 2025, BLM also issued some 22 APD Decisions approving 255

new APDs for oil and gas well development in the Converse County Project area, using two new

EAs—called the Off-Lease and On-Lease EAs—and NEPA Categorical Exclusions (CXs). This

Second Amended and Supplemental Complaint adds facts and claims to challenge those new

APD Decisions.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 4

12.     In light of the Court's November 2023 ruling regarding Plaintiffs' standing to challenge APD Decisions and other recent case law from the D.C. Circuit, this Second Amended and Supplemental Complaint also provides detailed factual allegations demonstrating that Plaintiffs have Article III standing to challenge the recent APD Decisions herein.

13.     Together, the FEIS; ROD; Casper RMP Amendment; Groundwater EA, FONNSI, and DR; and the APD Decisions and their supporting NEPA documents are the Final Actions challenged in this Second Amended and Supplemental Complaint.

14.     Because the Final Actions are arbitrary, capricious, and unlawful on multiple grounds as alleged herein, Plaintiffs request that the Court hold each and all of the Final Actions to be unlawful and set them aside in accordance with the APA.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 553, 702, and 706.

16.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

17.     Plaintiffs have exhausted all required administrative remedies prior to filing this lawsuit.

18.     Venue in the District of Columbia is appropriate under 28 U.S.C. § 1391(e) because defendants U.S. Department of Interior and U.S. Bureau of Land Management are based in Washington, D.C., and because the key decisions giving rise to the claims were made in Washington, D.C. by the Secretary of the Interior.

## PARTIES

19.    Plaintiff POWDER RIVER BASIN RESOURCE COUNCIL is a member-based conservation group located in the Powder River Basin region of Wyoming. Formed in 1973 by ranchers and other concerned Wyoming citizens, the Powder River Basin Resource Council has approximately 1,000 members, the majority of whom reside locally within the Powder River Basin. The group has long been involved in working for responsible oil and gas development, addressing the impacts of fossil fuel development on rural people and communities, and working for the preservation and enrichment of Wyoming's agricultural heritage and the responsible use of land, mineral, water, and air resources. The Powder River Basin Resource Council has a strong interest in ensuring the protection of the land, air, water, and mineral resources in the region. The Converse County Project will directly affect many of the Council's members who depend on this region for its recreational opportunities, and, for some, their livelihoods.

20.    Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit membership organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, public policy initiatives, and litigation. Headquartered in Hailey, Idaho, Western Watersheds Project has over 14,000 members and supporters, including those who live, work, and recreate in Wyoming lands that will be impacted by the Converse County Project. Western Watersheds Project, as an organization and on behalf of its members, is concerned with and active in seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West.

21.    Oil and gas development is of great concern to Plaintiffs and their members, staff, and supporters, who have spent decades working to protect wildlife, ecosystems, and other

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 6

natural resources from the harmful effects of fossil fuel development. Plaintiffs participated extensively in the NEPA process for this project, submitting detailed comments to the BLM. Plaintiffs have thus exhausted all administrative remedies before bringing this action.

22.    Plaintiffs also have members, staff, and supporters who regularly visit and recreate on the public lands that will be harmed by the Converse County Project, including in National Parks System units and other protected lands that may face visibility impacts and nitrogen deposition.

23.    Plaintiffs' members, supporters, and staff derive recreational, aesthetic, scientific, inspirational, educational, and other benefits from their use of these public lands and adjacent areas and plan to continue these activities in the future. Development of the Converse County Project will impair their use and enjoyment of these lands by contributing to air pollution, noise pollution, water pollution, visual disruptions, and general disturbance. Plaintiffs' members, supporters, and staff, will also likely avoid traveling to and spending time in areas impacted by oil and gas development—including because of the health risks posed by air pollution, and the disturbance caused by the noise and visual intrusion of such development.

24.    Plaintiffs' members, supporters, and staff also derive recreational, aesthetic, scientific, inspirational, educational, and other benefits from observing species that will be negatively impacted by the Converse County Project, including the greater sage-grouse and various raptor species. The decline of these species means that there are fewer and fewer chances for Plaintiffs' members, supporters, and staff to observe them in the wild. Further development of oil and gas in the Converse County Project area will contribute to their decline, further decreasing opportunities to observe species of interest.

25.    Apart from this action, Plaintiffs and their staff, members, and supporters have no

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 7

adequate remedy at law to address the foregoing injuries to their interests.

26.    Defendant U.S. DEPARTMENT OF THE INTERIOR (DOI) is the federal agency responsible for protecting and managing much of this country's wildlife, natural resources, public lands, and cultural heritage. DOI has nine bureaus, including the BLM, and is responsible for ensuring that BLM's management of the nation's public lands is in accordance with all applicable laws, including the MLA, FLPMA, and NEPA. The Secretary of the U.S. Department of the Interior signed the ROD and RMP Amendment challenged in this case.

27.    Defendant BUREAU OF LAND MANAGEMENT (BLM) is an agency or instrumentality of the United States within DOI, and has been delegated responsibility for managing the public lands and resources at issue in this case, in accordance and compliance with federal laws and regulations. BLM prepared the NEPA documents challenged herein, and approved the Supplemental Groundwater DR and 22 APD Decisions also challenged in this case.

## STANDING TO CHALLENGE APD DECISIONS

28.    As identified in Appendix A below and described more fully herein, Plaintiffs challenge BLM's approval of 255 APDs ("subject APDs") through 22 discrete decisions and their supporting NEPA documents ("APD Decisions"), as follows:

- BLM's August 27, 2025, decision approving 134 of the APDs listed in Appendix A pursuant to the "Casper Field Office Oil and Gas Multi-operator [Off-Lease] Environmental Assessment 2025," DOI-BLM-WY-P060-2025-0108-EA;

- BLM's September 26, 2025, decision approving 58 of the APDs listed in Appendix A pursuant to the "Casper Field Office Oil and Gas Multi-Operator On-Lease Environmental Assessment 2025," DOI-BLM-WY-P060-2025-0120-EA; and

- Twenty (20) BLM decisions issued from August 7 to October 23, 2025, each of which approved between one to eleven APDs pursuant to a NEPA "Categorical Exclusion," also listed in Appendix A.

29. The paragraphs below explain in detail how Plaintiffs' members will be harmed by each of those APD Decisions by specifying: (A) the location of all 255 APDs approved in those APD Decisions; (B) the area affected by the activities encompassed in each of those 255 APDs approved in the APD Decisions; (C) members' use of the areas affected by the 255 APDs approved in the APD Decisions.

30. This section uses the term "APD" as a shorthand for the activity proposed in the APD and ultimately approved by BLM in the later APD Decision, including but not limited to: initial well drilling and fracking; ground clearing and leveling for well pad construction; construction of roads, pipelines, storage tanks, and other supporting infrastructure; flaring and venting; truck traffic to haul material, equipment, water, and workers to and from the well pad; and well maintenance and production operations.

31. Although Plaintiffs provide standing allegations specific to each individual APD, they need only establish standing for each of the 22 APD Decisions (most of which approve multiple APDs).

**A.    APD Locations**

32. Figure 1 below provides a map of the 255 subject APDs approved in the 22 APD Decisions, each labeled by its unique identifier assigned in Appendix A. The map also depicts the Converse County Project boundary; designated sage-grouse habitat; known sage-grouse leks (breeding grounds) in the project area; and other landmarks mentioned below. The APD dots are color coded based on the APD Decision which approved them.

33.     Figure 1 also depicts the principal roads serving the APDs, which will be heavily used by truck traffic serving the APDs with attendant impacts along these roads. Because there is a limited existing road network in Converse County, there is a high degree of certainty as to which roads will be used to serve each APD.

34.     The Operator Group's Transportation Plan indicates that workers will likely travel into the Project area using Wyoming Highway 59 (WY-59), Wyoming Highway 93 (WY-93), or Wyoming Highway 95 (WY-95), depending on the direction of travel. Once inside the Project boundary, workers are likely to use some combination of WY-59, WY 93, Ross Road (County Road 31), Bill Haul Road (County Road 63), Jenne Trail Road (County Road 34), Highland Loop Road (County Road 32), Walker Creek Road (County Road 43), Dull Center Road (a USFS road), and Steckley Road (a USFS Road) to reach a given APD.

     a.  WY-59 is the primary north/south paved all-weather highway in the project area. It also provides direct access to many of the county roads in the project area.

     b.  Ross Road (County Road 31) is the primary north/south access to the western portion of the project area. It is a partially paved and partially graveled road.

     c.  WY-93 is the primary access point for the central section of project area. It also provides access to Ross Road.

**Figure 1 – Map of Subject APDs**



B.     **Area Affected by Each APD**

*Air Pollution Impacts*

35.     As explained in the paragraphs below, each of the subject APDs approved in the APD Decisions will result in the emission of air pollutants throughout its estimated 30-year lifespan, including particulate matter, nitrogen dioxide, sulfur dioxide, carbon monoxide, and hazardous air pollutants, also resulting in the formulation of ozone. The pollutants will be emitted at each development site and from vehicle exhaust along access roads. These emissions can travel tens and hundreds of miles from their source.

36.     Particulate matter ($PM_{2.5}$ and $PM_{10}$) is one of these pollutants. Particulate matter consists of solid particles and liquid droplets suspended in the air, which can include components such as soil or dust particles, smoke, metals, acids, organic chemicals, and allergens. Coarse particulates, called $PM_{10}$, have diameters of less than 10 micrometers. Fine particulates, called $PM_{2.5}$, have diameters of less than 2.5 micrometers.

37.     Each of the APDs will result in $PM_{2.5}$ and $PM_{10}$ emissions from equipment exhaust; dust from unpaved road traffic; flaring; tailpipe emissions from vehicle traffic; and windblown dust from disturbed surfaces.

38.     Particulate matter can remain airborne for long periods and travel hundreds of miles.

39.     Particulate matter is a leading cause of haze, which reduces the visibility, clarity, and color of landscape features and skies. *See* U.S. EPA, Health and Environmental Effects of Particulate Matter (PM), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm. Under stagnant air conditions, such as winter inversions, particulates can produce a distinct layer of haze.

40.     Exposure to particulate matter has a variety of health effects, such as reduced lung function; alterations in lung tissue and structure; respiratory disease; coughing, wheezing, shortness of breath; asthma attacks; cardiovascular events such as heart attacks and strokes; cancer; and premature death. *See* U.S. EPA, Health and Environmental Effects of Particulate Matter (PM), https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm; 88 Fed. Reg. 5558, 5580–604 (Jan. 27, 2023).

41.     The health effects of $PM_{2.5}$ are most serious, because these particles can get deep into the lungs and bloodstream.

42.     Even a short exposure to particulate matter can affect health.

43.     The health effects of particulate matter exposure increase with strenuous or outdoor activity.

44.     $PM_{2.5}$ is also a "no threshold" pollutant, meaning exposure at any non-zero concentration poses health risks. *See Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68 (4th Cir. 2020) ("[A]ny amount of $PM_{2.5}$ in the system is harmful. . . . Thus, even when NAAQS are not violated as to this particulate matter, the record reflects that exposure to $PM_{2.5}$ will increase the risk of asthma, heart attacks, and death."); *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355 (D.C. Cir. 2002) ("[O]zone is, and PM may be, a non-threshold pollutant-that is, a pollutant that causes adverse health effects at any non-zero atmospheric concentration"); 88 Fed. Reg. 5558, 5582–85 (Jan. 27, 2023); 71 Fed. Reg. 2620, 2627–36 (Jan. 17, 2006) (recognizing that there is no threshold below which health risks associated with fine particulate matter would not occur).

45.     Particulate matter pollution can also settle on ground or water, damaging vegetation and crops and disrupting nutrient balances.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 13

46.     There are currently no $PM_{2.5}$ monitoring stations in the Project area, and apparently just one $PM_{10}$ monitoring station in the central Project area, roughly 30 miles northwest of Douglas. This means that unhealthy spikes in these pollutants are likely to go undetected in most areas.

47.     Monitored $PM_{10}$ concentrations in the Project area already spiked above the 150 ug/m3 standard nine times in 2024.

48.     Each APD will also result in emissions of volatile organic compounds (VOCs) and other hazardous air pollutants known to cause cancer and other serious illness. Even a short exposure to VOCs and other hazardous air pollutants can affect health. VOCs and other hazardous air pollutants are emitted from well drilling, fracking, tanks, compressors, pumps, pipes, and truck traffic. VOCs can travel miles from their source.

49.     Each APD will also result in emissions of nitrogen dioxide ($NO_2$), a highly reactive reddish-brown gas that has a pungent odor. $NO_2$ forms when fossil fuels are burned, such as in equipment engines at the wellsite and vehicle traffic.

50.     $NO_2$ is most concentrated within roughly 1/3 of a mile from the source. Exposure to $NO_2$ is associated with a range of harmful effects, including reduced lung function; coughing and wheezing; inflammation of the airways; asthma attacks; heart conditions; and pregnancy and birth risks. Even a short exposure to $NO_2$ can affect health.

51.     $NO_2$ also interacts with water, oxygen and other chemicals in the atmosphere to form acid rain. Acid rain harms sensitive ecosystems such as lakes and forests.

52.     Emissions of VOCs and $NO_2$ in turn break down when exposed to sunlight to result in the formation of ground-level ozone, itself a harmful air pollutant commonly referred to as "smog."

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 14

53.     Ozone can travel hundreds of miles away from the source of the ozone precursors.

54.     Ozone, like $PM_{2.5}$, is considered to be a "no threshold" pollutant, meaning exposure at any non-zero concentration poses health risks. *See Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) ("[M]ore ozone is more ozone, and there is no threshold concentration below which ground-level ozone is known to be harmless.") (cleaned up); *see also* National Ambient Air Quality Standards for Ozone, 62 Fed. Reg. 38,856, 38,863 (July 18, 1997)); EPA, National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,307-10 (Oct. 26, 2015).

55.     Ozone exposure is associated with adverse health effects such as shortness of breath; lung inflammation; reduction of lung function; coughing, chest pain, and throat and nose irritation; asthma attacks; and increased lung permeability. Both short-term and long-term exposure to ozone is associated with increased hospitalizations and deaths from respiratory causes. *See* EPA, National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,307-08 (Oct. 26, 2015).

56.     Ozone can also damage crops and vegetation, by stunting or slowing growth and increasing sensitivity to disease, insects, weather, and other pollutants. *See* EPA, Ecosystem Effects of Ozone Pollution, https://www.epa.gov/ground-level-ozone-pollution/ecosystem-effects-ozone-pollution.

57.     As the primary component of smog, ozone pollution can also reduce visibility and cause the air to appear hazy.

58.     Certain weather conditions, such as a "thermal inversion," can cause smog to be trapped over a particular area for extended periods.

59.     Monitored ozone concentrations in the Project area are already approaching or

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 15

exceeding the 70 parts-per-billion (ppb) maximum daily average (8-hour) NAAQS. Ozone levels spiked above the 70 ppb 8-hour standard four times in 2020 and three times in 2021. They spiked above the standard another four times in 2024, reaching as high as 78 ppb.

60.     Studies show that in-car occupants are exposed to tailpipe emissions and other outdoor air pollutants even with windows closed, due to the ingress of airborne pollution through car ventilations systems.

### *Noise Impacts*

61.     Each of the subject APDs will also cause noise that will noticeably intrude on the natural and quiet sounds for miles around each well site, and may be heard over 5 miles from the source under certain conditions.

62.     These noise impacts caused by each of the subject APDs will include noise from flaring, pump jacks, compressors, construction, truck traffic, and other activities. Such noise would occur at the well pad and along roads used to haul equipment, materials, water, and workers to these sites.

63.     The Converse County FEIS assumes that ambient noise levels across the Project area average 35 dBA. However, studies show that ambient noise levels in rural rangeland areas of Wyoming are often below 25 dBA, depending on terrain, vegetation, and meteorological conditions.

64.     According to the Converse County FEIS, an increase of 3 dBA above ambient levels is detectable by the human ear, a 5 dBA increase is readily noticeable, and a 10-dBA increase is perceived to be a doubling of noise.

65.     The FEIS states that noise levels for typical construction equipment would be up to 90 dBA at a distance of 50 feet. Such noise will occur during construction, reclamation, and

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 16

decommissioning of each APD. Using the inverse square law of noise (*i.e.*, a decrease of 6 dBA per doubling of distance from a point source), construction noise will register at roughly 50 dBA at a distance of 1 mile, 43 dBA at 2 miles, and 36 dBA at a distance of 5 miles. Construction noise is thus likely to be noticeable up to 2 miles from each APD site, and up to 5 miles away in quieter areas.

66.     Drilling noise—an estimated 83 dBA at 50 feet from the source—will register at roughly 42 dBA at 1 mile from the well pad, 36 dBA at 2 miles, and 29 dBA at 5 miles. Drilling noise is thus likely to be noticeable above ambient levels at least 1 mile from each APD site, and up to 2 miles away in quieter areas.

67.     Pump jack noise—an estimated 83 dBA at 50 feet from the source—will register at roughly 36 dBA at a distance of 2 miles and 29 dBA at 5 miles. In quieter areas, pump jacks are thus likely to be noticeable above ambient levels at least 2 miles from each APD site.

68.     Noise levels from trucks—an estimated 80 dBA at 50 feet—will register at roughly 40 dBA at a distance of 1 mile and 33 dBA at a distance of 2 miles. Truck noise is thus likely to be audible for at least 1 mile from roads and even farther in quiet areas.

69.     Noise levels from flaring—an estimated 110 dBA at 50 feet from the source—will register at roughly 70 dBA at a distance of 1 mile, 63 dBA at 2 miles, 55 dBA at 5 miles, and 43.5 dBA at 10 miles. Flaring is thus likely to be highly audible at least 5 miles from each APD site, and noticeable up to 10 miles away.

### *Aesthetic and Viewshed Impacts*

70.     Each of the subject APDs will result in noticeable surface disturbance, industrial in appearance, that contrasts with the natural landscape, impairing the visual setting and aesthetic values of the surrounding lands.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 17

71.    The Converse County Project area consists of wide-open sagebrush and gently rolling grassland, bordered to the southwest by the Laramie Mountains.

72.    The northeastern corner of the Project falls within the Thunder Basin National Grassland, which contains some of the nation's last intact native prairie.

73.    Although portions have been affected by past oil and gas development, the Project area "offers a natural setting" with "natural panoramic landscapes." FEIS at 3.10-1; 4.11-7. It provides opportunities for solitude and "a variety of outdoor recreational activities," such as wildlife watching, fishing, hunting, and horseback riding. *Id.* at 3.10-1, 3.11-78.

74.    Views in the project area are generally broad and unobstructed.



*Expansive Views in Project Area. Photo: Maria Katherman.*



*Views into Project Area looking Southeast from Thunder Basin National Grassland.*
*Photo: Shannon Anderson*



*Views into Project Area looking Southwest from Thunder Basin National Grassland.*
*Photo: Shannon Anderson*



*Expansive Views from WY-93 at Inez Road, within Project Area. Photo: Maria Katherman*



*Thunder Basin National Grassland. Photo: Lance Cheung, USFS*

75.    Each of the subject APDs will typically entail construction or expansion of a multi-acre well pad; construction of a road stem to access the well pad; construction of industrial facilities on the well pad (typically a pump jack of 30-40 feet tall, wellhead, large storage tanks 20-25 feet tall, pits, heater treaters, separators, flares, combustors, meters); and often pipelines and power lines. Following road and well pad construction, the drilling rig (up to 150 feet tall) is transported to the well site and erected on the well pad.

76.    The productive life of each well would be approximately 30 years.

77.    BLM acknowledges that "drill rigs, increased traffic, and other activities associated with oil and gas development would limit or alter the experience of recreational users by introducing an enhanced industrial presence on the landscape."

78.    Given the open and unobstructed terrain, the visual scars from development under each of the subject APDs are likely to be visible for miles around.

79.    BLM prepared a viewshed analysis for Project, which confirms that every APD will be visible from WY-59 or Ross Road, as shown in the Figure below. The blue shading are areas in which BLM found that oil and gas development would be visible from the key roads marked in black and yellow hatching, including WY-59 and Ross Road:

**FIGURE 2 – Viewshed Analysis**



80.    The photographs below are representative of the visual impacts of oil and gas development approved in the Converse County Project area:



*Two well pads in Converse County. Photo: Erik Molvar/WWP*



*Multiple well-pads in Converse County, Wyoming.*
*Photo: David Korzilius, BLM/Flickr (CC BY 2.0 DEED)*



*Oil and gas well pad in Converse County, Wyoming.*
*Photo: David Korzilius, BLM/Flickr (CC BY 2.0 DEED)*



*Bulldozing oil and gas well pad in Wyoming. Photo: WildEarth Guardians*

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 24



*Oil and gas well pads in Powder River Basin. Photo: WildEarth Guardians*



*Well pad and infrastructure in Project Area. Photo: Maria Katherman*



*Drilling rig and flare in Powder River Basin, with Laramie Mountains in background.*
*Photo: Alan Nash.*



*Producing well pad and flare in Powder River Basin. Photo: WildEarth Guardians*



*Flaring and well pad. Photo: EcoFlight*

***Impacts of Flaring and Artificial Lighting on Nighttime Viewsheds and Dark Skies***

81.    Each APD will also result in flaring and other project lighting that disrupts the night sky.

82.    Flaring results in a bright flame that casts a pool of orange light, unnaturally illuminating the surrounding terrain and any low-hanging clouds.

83.    BLM has acknowledged that oil and gas flares are visible approximately 15 miles away at night.

84.    Flares and project lighting will make development sites highly visible at night from surrounding roads, hilltops, and recreation sites. The skyglow resulting from these light sources can be noticeable even if there is no direct line of sight from the well pad.

85.    Both flaring and project lighting will also deteriorate dark night skies and stargazing opportunities in surrounding areas.

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 27

86.    Researchers have found that a single unshielded street lamp can affect the view of the night sky for an observer up to 125 miles away.

87.    BLM acknowledges that lights at night can be visible at distances exceeding 36 miles. *See* BLM, Night Sky and Dark Environments: Best Management Practices for Artificial Light at Night on BLM-Managed Lands, Technical Note 457 (April 2023), https://www.blm.gov/sites/default/files/docs/2023-04/Library_BLMTechnicalNote457_final.pdf.

88.    Due to skyglow, the effects of oil and gas project lighting and flaring will can be noticeable even when there is no direct line-of-sight from the offending light sources.

89.    The photographs below are representative of how flaring and project lighting associated with APD will transform the natural dark nightscape:



*Drilling rig and well pad lit at night, with a second pad visible in the distance.*
*Photo: iStockPhoto.com/grandriver*



*Well pad, workover rig, and flare at night. Photo: SkyTruth*



*Well pads at night visible at great distances. Photo: EcoFlight*

*Wildlife Impacts*

90.     Each APD will result in the displacement or reduction in wildlife populations, such as greater sage-grouse, raptors, eagles, elk, mule deer, and pronghorn.

91.     Among the most severely impacted species will be the greater sage-grouse, an imperiled bird that narrowly avoided Endangered Species Act (ESA) listing in 2010, when the U.S. Fish and Wildlife Service found that ESA listing was "warranted" by population and habitat losses and numerous threats, including oil and gas development; but a listing rule was "precluded" at that time due to resource constraints. *See* 75 Fed. Reg. 13910 (March 23, 2010).

92.     Oil and gas development has well-documented adverse effects on sage-grouse survival, breeding, and behavior and is considered the greatest threat to the species in Wyoming. Roads, pipelines, wells, and other infrastructure cause direct habitat loss and fragmentation. Surface development can disrupt breeding and cause birds to abandon suitable habitat, resulting in population declines. Noise associated with energy development is also known to disrupt the sage-grouse life cycle. Restoration of degraded sagebrush habitats is incredibly slow and difficult, even where required, and disturbed sites may never return to suitability for sage-grouse.

93.     Sage-grouse require large swaths of undeveloped sagebrush, with many birds moving tens of miles between their seasonal use areas.

94.     Sage-grouse breeding sites (leks) and nesting and brood-rearing habitats, as well as winter concentration areas, are especially important to the species' life cycle. The grouse have high fidelity to leks, and most hens will nest within 5.3 miles of the lek where they mated.

95.     Research shows that any drilling within 4 miles of a sage-grouse lek leads to sage-grouse declines, and that the zone of effects may extend much further from development sites.

96.     The FEIS thus acknowledges that the Converse County Project will lead to a

"substantial increase in risk to sage-grouse," including population declines and "risk of . . . abandonment" of all 54 leks in and near the Project area.

97.     The entire project area, and every subject APD, is in designated greater sage-grouse habitat. As depicted in Figure 1 above, many APDs are located near designated sage-grouse "priority" habitat or leks, which are particularly sensitive to disturbance. The development of each APD will contribute to the loss, displacement, and possible eradication of sage-grouse in the Project area.

98.     Oil and gas development also harms pronghorn, mule deer, and other big game.

99.     Figure 3 below is a map of pronghorn habitat from the FEIS, which shows that nearly the entire Project Area is yearlong (purple) or winter (green) pronghorn habitat.

100.    Every APD is located in BLM-designated pronghorn habitat.

**FIGURE 3 – Pronghorn Habitat**



101.    Figure 4 below is a map of mule deer habitat from the FEIS showing that nearly the entire Project Area consists of yearlong (purple) and winter (green) mule deer habitat.

102.    Every subject APD is located in designated mule deer habitat.

**FIGURE 4 – Mule Deer Habitat**



103.    Like sage-grouse, pronghorn and mule deer are mobile species with large home ranges. Both mule deer and pronghorn commonly move tens of miles between seasonal habitats.

104.    Big game avoid areas of human disturbance, and roads, wells, pipelines and other infrastructure can also block their migration to intact habitat. Pronghorn avoidance responses have been reported to distances in excess of 0.6 miles from oil and gas development sites, and mule deer avoidance responses have been reported to distances in excess of 4 miles from oil and gas development sites. Oil and gas traffic may also increase mule deer and pronghorn avoidance

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 32

of habitat around new and existing roads. Big game have been observed avoiding active roads at distances of up to 1,000 meters (0.6 mile).

105.    Displacement in turn can reduce animal fitness and survival by increasing energy expenditures; preventing access to high-quality forage; forcing animals onto lower-quality habitat; and increasing population density and competition in unaffected habitats.

106.    Animals that remain within affected areas are also subjected to increased physiological stress, which can reduce survival and reproduction.

107.    The introduction of new roads, traffic, and fences also presents a risk of direct mortality through fence entanglements or vehicle collisions.

108.    Research shows that big game populations decline after oil and gas development.

**FIGURE 5 – Raptor Nests**



109.    The Project Area is also located in one of only four administratively-recognized bird migration routes in North America, and supports an abundance of migratory birds, including raptor species like the bald eagle, golden eagle, ferruginous hawk, red-tailed hawk, and great horned owl. Figure 5 above shows the over 1,000 raptor nests spread across the Project area.

110.    Every subject APD is within several miles of a raptor nest.

111.    Oil and gas development contributes to displacement and declines of migratory bird populations, including through habitat loss and degradation; equipment and vehicle collisions; increased predator populations; and behavioral disruptions due to noise, lights, traffic, and increased human presence.

112.    Although some reclamation is ostensibly required on the 10% of the Project area on BLM surface, successful habitat restoration in this type of arid landscape is challenging and could take "up to 50 years." FEIS at 4.18-46; *see also id.* at 4.14-8. Riparian and wetland habitat "may never return" to prior conditions. *Id.* at 4.17-6.

113.    Oil and gas development also harms wildlife by facilitating the spread of invasive plant species, through vegetation removal and vehicle, equipment, and machinery use. Non-native invasive plants reduce habitat function and increase the frequency and extent of wildfires, which further destroys native habitat. The threat of accidental wildfire ignition from vehicles, machinery, or human presence also increases while development is occurring.

***Traffic Impacts***

114.    Each APD will cause or contribute to substantial truck traffic to haul material, equipment, water, and workers to and from the well pad. *See* FEIS at 4.13.3.

115.    Significant numbers of gravel trucks are also necessary to construct an oil and gas well pad and access road.

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 34

116.    As BLM acknowledges, these volumes of heavy truck traffic "would cause safety concerns for county residents and visitors" that travel these same roads. FEIS at 5.11-50.

117.    Trucks stir up substantial dust on unpaved county roads. Road dust contains particulate matter that is harmful to breathe; impairs visibility and scenic viewing opportunities from and near roads; and creates hazardous whiteout conditions for drivers.

118.    Trucks also emit diesel exhaust, which contains particulate matter and other toxic components like VOCs.

119.    Larger particulate matter ($PM_{10}$) can travel from a few hundred yards to 30 miles from roadways. Fine particulate matter ($PM_{2.5}$) can remain suspended in the air for long periods, and can also travel hundreds of miles from roadways.

120.    These tailpipe emissions contribute to regional air pollution, including ozone. Breathing diesel exhaust also poses significant health risks. Short term exposure can also cause immediate irritation of the eyes, nose, throat, and lungs; headaches; nausea; and lightheadedness. Long-term exposure is linked to heart and lung conditions and cancer.

121.    On a recent trip on Ross Road in the Project area, PRBRC member Maria Katherman counted 42 semi trucks in just a 5-mile stretch, all hauling gravel or fracking sand.



*Left: Oil and gas traffic on Ross Road. Right: Road dust from passing oil and gas truck.*
*Photos: Maria Katherman, PRBRC member.*



*Whiteout conditions created by passing oil truck.*
*Photo: Shannon Anderson, PRBRC member.*



*Lingering dust trail from single truck on dirt road in Thunder Basin National Grassland.
Photo: Lance Cheung, USDA*

### C.     Member Use of Affected Areas

122.     As described in detail below, Plaintiffs' members live, work, visit, and recreate in the areas affected by each APD. Development of each APD will cause or contribute to a variety of injuries to Plaintiffs' members, including exposure to air pollution, industrial noise, noxious odors, and traffic hazards; reduced wildlife viewing opportunities; deteriorated viewsheds and scenic enjoyment, including stargazing; and other harms.

***Ross Road APDs: APDs 4, 9–12, 24, 31–37, 40, 41, 55, 84, 90–93, 126, 144–48, 183–87, 192, 193, 241–51***

123.     Forty-five (45) of the APDs are located along Ross Road (County Road 31), a quiet two-lane road that runs generally North/South through the length of the project area. Plaintiffs herein refer to this grouping, consisting of APDs 4, 9–12, 24, 31–37, 40, 41, 55, 84,

90–93, 126, 144-48, 183–87, 192, 193, 241–51, as the "Ross Road APDs."

124.    Ross Road will be used to access these Ross Road APDs.

125.    PRBRC member Maria Katherman is an avid birder and outdoor enthusiast who lives in the Project area, along Inez Road. She regularly drives up the length of Ross Road to go birdwatching and enjoy the scenery, often with other friends. On these trips, Katherman particularly enjoys stopping along small ephemeral stream bottoms with old, enduring cottonwoods. She intends to continue making these trips in the future.

126.    In addition to these birding trips, Katherman frequently uses Ross Road to visit the Pumpkin Buttes, which lie north of the Project area as shown in Figure 1. She intends to continue making these trips regularly in the future.

127.    Katherman enjoys observing raptors, sharp-tailed grouse, red-headed woodpeckers, greater sage-grouse (particularly at their mating leks), other birds, pronghorn, and mule deer, among other species.



*Pronghorn on Ross Road. Photo: Maria Katherman*

128.    The primary access route for each of the Ross Road APDs is Ross Road.

129.    APDs 183–85, 192, and 193 are less than 3/4 mile from Ross Road.

130.    APDs 248 and 249 are between 1 and 2 miles from Ross Road.

131.    APDs 31–34, 55, 245, 246, 250, and 251 are between 2 and 3 miles from Ross Road.

132.    APDs 10–12, 24, 35–37, 145, 148, and 243 are between 3 and 4 miles from Ross Road.

133.    APDs 9, 90–93, 126, 144, 146, and 147 are between 4 and 5 miles from Ross Road.

134.    APDs 186, 187, and 247 are between 5 and 6 miles from Ross Road.

135.    APDs 4, 84, 241, and 244 are between 6 and 7 miles from Ross Road.

136.    APDs 40 and 41 are between 7 and 8 miles from Ross Road.

137.    As Katherman drives along Ross Road and stops to recreate, she will be exposed to the truck traffic from the Ross Road APDs, and associated safety, health, noise, and aesthetic impacts.

138.    As Katherman drives along Ross Road and makes stops there to recreate, she is likely to be exposed to air pollution emanating from the well pad for each of the Ross Road APDs.

139.    As Katherman drives along Ross Road and makes stops there to recreate, she is also likely to be exposed to diesel exhaust from trucks serving these APDs, which must use Ross Road.

140.    The pollutants to which she will be exposed include ozone and $PM_{2.5}$, which are considered "non-threshold" pollutants.

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 39

141.    These pollutants can linger in the air for days and travel many miles.

142.    Exposure to ozone and $PM_{2.5}$ at any concentration poses health risks.

143.    Each Ross Road APD will also contribute to particulate matter and ozone concentrations in the area, which in turn will increase the smog and haze that reduce visibility and dull skies, harming Katherman's aesthetic and recreational enjoyment of return trips.

144.    The views along Ross Road are expansive, as depicted in the photo below.



*View East from Ross Road. Photo: Shannon Anderson.*

145.    Given their proximity to the road, each Ross Road APD is likely to be within the viewshed of Ross Road. The project lighting and flaring will make each Ross Road APD even more visible at dawn, dusk, and night. Viewing the new roads, pipelines, powerlines, well pads, tanks, drill rigs, flares, equipment, truck traffic, and other impacts of any Ross Road APD will deteriorate Katherman's aesthetic and recreational enjoyment of future drives and stops along Ross Road.

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 40



*Drill rig contrasting with natural landscape along Ross Road. Photo: Shannon Anderson.*

146.    The industrial and traffic noise from each Ross Road APD is likely to reach Ross Road and other areas in which Katherman recreates. Hearing such noise will detract from her recreational enjoyment of future birding and other visits to areas along Ross Road. It may also prevent her from hearing bird calls along Ross Road.

147.    Every Ross Road APD is in designated greater sage-grouse habitat and within 6.3 miles of a sage-grouse lek.

148.    APDs 4, 90–93, 186, 187, 244, 247, 250, and 251 are all within 2 miles of a sage-grouse lek.

149.    APDs 24, 31–37, 84, 145–48, 153, 183–85, 241–43, 245, 246, 248, and 249 are all within 4 miles of a sage-grouse lek.

150.    APDs 9–12, 40, 41, 55, 126, 144, 192, 193

151.    Every Ross Road APD is in pronghorn, mule deer, and raptor habitat.

152.    The habitat loss, noise, infrastructure, traffic, and increased human presence from

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 41

development and operation of each of the Ross Road APD is likely to cause or contribute to declines in wildlife populations Katherman and other members enjoy viewing. Each of the Ross Road APDs is also likely to deter wildlife from using habitat around Ross Road and the surrounding areas where Katherman enjoys making stops. For both reasons, each of the Ross Road APDs is likely to lessen the ability of Katherman and other members to view birds and other wildlife.

153.    These impacts of each of the APDs will deter Katherman from making future trips along Ross Road.

154.    Each Ross Road APD will also contribute to heavy truck traffic on WY-93 near Katherman's home on Inez Road. Katherman drives on WY-93 frequently to run errands, visit friends, recreate, and get to the nearest town of Douglas. The increased traffic will make such drives, and the turn from Inez Road onto WY-93, more hazardous and stressful. It will also deter her from bicycling into Douglas, which she used to frequently enjoy.

155.    Each Ross Road APD will also contribute to the WY-93 traffic noise that reaches Katherman's home. Since the current wave of oil and gas development in the Powder River Basin began, Katherman can hear the truck traffic on WY-93 start up and hour before dawn. This deteriorates her quality of life at her scenic property on the Platte river, which she and her husband chose for its natural quiet and sense of rural solitude.

156.    The tailpipe emissions from this same traffic will impair the air quality at Maria's home, which is again just 2 miles from WY-93, and in her vehicle cabin as she drives from her home and along WY-93. Breathing such pollutants poses health risks to Katherman.

157.    Katherman also enjoys stargazing and sleeps outside many nights for the purpose of viewing stars. This is a highly valued experience for her. Following the influx of oil and gas

development into Converse County, she can now see a skyglow to the north of her home from all

of the oil and gas project lighting and flares. This light pollution can make it difficult to see

fainter stars and the Milky Way, and it generally diminishes the enjoyment she derives from

viewing the night sky. Simply seeing the lights from an oil and gas project in the horizon also

disturbs the natural setting and feeling of her property and diminishes her aesthetic enjoyment of

being outside around her home.

158.    Maria Katherman's home is within 36 miles of every Ross Road APD, and much

closer to many of these APDs. BLM has acknowledged that lights at night can be visible at

distances exceeding 36 miles. Accordingly, each of the Ross Road APDs is likely to contribute

light pollution that diminish her aesthetic enjoyment and stargazing experience.

***Highway 59 APDs: APDs 14–17, 25–28, 66–69, 72–83, 88, 94, 95, 100–13, 123–25,
135, 149–52, 154–59, 161–74, 176–80, 199–220***

159.    Ninety-seven (97) of the APDs are located along a stretch of Wyoming 59 just

north of Douglas. Plaintiffs herein refer to this grouping, consisting of APDs 14–17, 25–28, 66–

69, 72–83, 88, 94, 95, 100–13, 123–25, 135, 149–52, 154–59, 161–74, 176–180, 199–220, as the

"Highway 59 APDs."

160.    WY-59 is a relatively quiet two-lane road that cuts across the heart of the Project

area before heading into Thunder Basin National Grassland.

161.    PRBRC member Maria Katherman frequently drives along WY-59 to recreate and

to get to horse shows in Gillette, among other purposes, and she intends to continue doing so in

the future. On these drives, she enjoys seeing the natural scenery and wildlife.

162.    WWP member Donal O'Toole, a wildlife enthusiast and retired professor, has

driven along WY-59 from his home in Laramie on many occasions. He describes WY-59 as "one

of his favorite areas" and that "[t]ravelling through this wide-open expanse is a privilege." On

these drives, he takes great pleasure in seeing the natural scenery and native wildlife, including

raptors, pronghorn, and deer. He also enjoys recreating in the Thunder Basin National Grassland,

which he accesses by driving through the Project Area along WY-59. O'Toole intends to

continue making these trips for as long as he is able.

163.    WWP's executive director Erik Molvar, a wildlife biologist and member of

WWP, also regularly drives along WY-59, as well as Steinle Road and Dull Center Road,

particularly to visit the Thunder Basin National Grassland for the purpose of camping, hiking,

wildlife photography, and appreciation of the grassland region. On these drives, he enjoys

viewing the natural scenery and wildlife.

164.    Other WWP and PRBRC members frequently drive and recreate along WY-59.

165.    The Highway 59 APDs are all less than 10 miles from WY-59.

166.    APDs 66–69, 72–83, 167–74, 199–203, are roughly 1.5 mile from WY-59.

167.    APDs 94, 95, 100–12, 161–66, 178, and 213–20 are between 3 and 4 miles from

WY-59.

168.    APDs 123–25 and 204–12 are between 4 and 5 miles from WY-59.

169.    APDs 113, 135, 149–52, and 179, 180 are between 5 and 6 miles from WY-59.

170.    APDs 14–17 are roughly 7.2 miles from WY-59.

171.    APDs 25–28, 154–59 are roughly 8.5 miles from WY-59

172.    APDs 88, 176, and 177 are roughly 9.5 miles from WY-59.

173.    Katherman, O'Toole, Molvar, and other members will pass directly by each of

these APDs as they drive along WY-59. According to BLM's own viewshed analysis, each

Highway 59 APD will be visible from the road. Viewing the new roads, pipelines, powerlines,

well pads, tanks, drill rigs, flares, artificial lighting, equipment, truck traffic, and other impacts of

every Highway 59 APD will deteriorate their scenic and aesthetic enjoyment of these drives.

174.    Each Highway 59 APD is in designated greater sage-grouse habitat and within 11 miles of a greater sage-grouse lek. APDs 124–25 are within 4.7 miles of a lek.

175.    Each Highway 59 APD is also in designated pronghorn, mule deer, and raptor habitat. The habitat loss, noise, infrastructure, traffic, and increased human presence from each of the Highway 59 APDs is likely to cause or contribute to declines in the area's wildlife populations; to deter wildlife from using habitat near WY-59; and to increase wildlife-vehicle collisions on WY-59. These impacts from each Highway 59 APD will lessen members' ability to view birds and other wildlife along WY-59, diminishing their enjoyment of these drives.

176.    Each Highway 59 APD will also contribute to truck traffic on WY-59, exposing members to traffic hazards and stress. The increased traffic will deter Katherman from driving on WY-59 with her horse trailer, requiring a much longer drive to Gillette through Casper for her horse shows.

177.    Each of the Highway 59 APDs is likely to cause or contribute to higher concentrations of ozone, particulate matter, and other pollutants—emanating both from their well pads and truck traffic along WY-59. This will expose members to ozone and $PM_{2.5}$, both non-threshold pollutants, as they drive or recreate along WY-59. Particulate matter and ozone also cause smog and haze that reduce visibility and dull skies, harming members' aesthetic enjoyment of the area's blue skies and natural viewsheds.

***Highway 93 APDs: APDs 1–3, 18, 19, 45–47, 50–54, 56–58, 98, 99, 228–40, 255***

178.    Thirty-six (36) of the APDs are located along Highway 93 (WY-93), a quiet, two-lane road that runs northwest out of Douglas until intersecting with Ross Road, where it jogs north. Plaintiffs herein refer to this grouping, consisting of APDs 1–3, 18, 19, 45–47, 50–54, 56–

58, 98, 99, 228–40, 255, as the "Highway 93 APDs."

179.    Every Highway 93 APD is in designated greater sage-grouse and within 8.1 miles of a sage-grouse lek. APDs 235–40 are all within 3 miles of a sage-grouse lek. APDs 1–3 and 45–47 are within 4 miles of a lek. APD 255 is within 5.1 miles of a lek. APDs 18, 19, 52–54, 56–58, 98, 99, and 228–34 are all between 5.8 and 8.1 miles of a lek.

180.    Every Highway 93 APD is also in pronghorn, mule deer, and raptor habitat. The habitat loss, noise, infrastructure, traffic, and increased human presence from each of the Highway 93 APDs is likely to cause or contribute to declines in the area's wildlife populations; to deter wildlife from using habitat around WY-93 and Ross Road; and to increase wildlife-vehicle collisions. These impacts from each Highway 93 APD will lessen the ability of Katherman and other members to view birds and other wildlife along WY-93 and Ross Road. Seeing dead wildlife on the road will cause them anguish.

181.    Given their proximity to WY-93 or Ross Road, APDs 45–47, 50–54, 56–58, 98, and 99, 231–34, and 255 are likely to be visible as Katherman drives to Ross Road from her home.

182.    APDs 231–34 are 1,000 feet from WY-93.

183.    APD 255 is less than 2 miles from WY-93.

184.    APDs 45–47 are roughly 3.8 miles from WY-93.

185.    APDs 50–54, 56–58, 98, and 99 are all roughly 5 miles from Ross Road.

186.    Viewing the roads, pipelines, powerlines, well pads, tanks, drill rigs, flares, artificial lighting, equipment, truck traffic, and other impacts of these Highway 93 APDs will deteriorate Katherman's aesthetic and recreational enjoyment of future drives to Ross Road.

187.    Katherman's home is also close enough to APDs 45–47, 50–54, 56–58, 98, and

99, 231–34, and 255 that their drilling and operations are likely to cause or contribute to higher concentrations of ozone, particulate matter, and other pollutants at Katherman's home, including no-thresholds pollutants such as ozone and $PM_{2.5}$.

188.     APDs 231–34 are roughly 5 miles from Katherman's home.

189.     APDs 45–47 are roughly 6 miles from Katherman's home

190.     APD 255 is roughly 8 miles from Katherman's home.

191.     APDs 50–54, 56–58, 98, and 99 are roughly 10 miles from Katherman's home.

192.     Ozone and $PM_{2.5}$ can travel well over 10 miles and linger in the air for days.

193.     Exposure to ozone and $PM_{2.5}$ at any concentration poses health risks. Particulate matter and ozone also cause smog and haze that reduces visibility and dull skies, which harm Katherman's aesthetic enjoyment of her property.

194.     Any flaring at APDs 45–47, 231–34, and 255 are likely to be visible and/or audible from Katherman's home, which is just 5–8 miles away, or the immediate surrounds. Noise levels from a typical flare would register at an estimated 55 dBA at a distance of 5 miles and 51.5 dBA at a distance of 8 miles, which would be audible above ambient levels.

195.     Katherman's home is only 17 miles from the farthest WY-93 APD. Given how far light pollution affects viewers, the project lighting and flares from each Highway 93 APD will contribute to the unnatural skyglow visible on the horizon from Katherman's home, diminishing her aesthetic enjoyment of the natural darkness. Each Highway 93 APD will also contribute light pollution that diminishes her stargazing experience.

196.     The trucks bringing materials, equipment, water, and workers to these Highway 93 APDs will likely use WY-93, as this is the fastest route from Douglas. This increase in traffic on WY-93 from each of the WY-93 APDs will harm Katherman in several ways.

197.    First, Katherman drives on WY-93 frequently to get to the nearest town of Douglas, to run errands or visit friends. She also uses WY-93 to recreate along Ross Road. The increased traffic will make such drives, and her turn from Inez Road onto WY-93, more hazardous and stressful. It will also deter her from bicycling into Douglas, which she used to frequently enjoy.

198.    Second, this truck traffic will contribute to traffic noise at Katherman's home, which is only roughly 2 miles from WY-93. Since the current wave of oil and gas development in the Powder River Basin began, Katherman can hear the truck traffic on WY-93 start up and hour before dawn. This deteriorates her quality of life at home, which she and her husband chose for its natural solitude and quiet.

199.    Third, the tailpipe emissions from this traffic will impair the air quality at Maria's home, which is again just 2 miles from WY-93, and in her vehicle cabin as she drives from her home and along WY-93. Breathing such pollutants poses health risks to Katherman.

### Northern Boundary APDs: APDs 175, 223–27

200.    There is a cluster of 6 APDs near the Northern project boundary. Plaintiffs herein refer to this grouping, consisting of APDs 175 and 223–27, as the "Northern Boundary APDs."

201.    All Northern Boundary APDs are in designated greater sage-grouse habitat and within 10 miles of a greater sage-grouse lek.

202.    Each of the Northern Boundary APDs is in mule deer, pronghorn, and raptor habitat.

203.    The habitat loss, noise, infrastructure, traffic, and increased human presence from each of the Northern Boundary APDs is likely to cause or contribute to declines in the area's wildlife populations; to deter wildlife from using habitat near Ross Road and WY-59; and to

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 48

increase wildlife-vehicle collisions on Ross Road and WY-59. These impacts from each Northern Boundary APD will lessen members' ability to view birds and other wildlife along Ross Road and WY-59, diminishing their enjoyment of these drives.

204. Each Northern Boundary APD will also contribute to truck traffic on either WY-93 or along WY-59, causing the same traffic-related impacts as noted for the Highway 93 and Highway 59 APDs above.

205. Each Northern Boundary APD will also be visible from the Pumpkin Buttes, where Maria Katherman goes frequently. She enjoys the solitary feeling and views from atop the buttes. Seeing the well pad, infrastructure, traffic, and vehicle or equipment dust from each of the Northern Boundary APDs will diminish her recreational and scenic enjoyment on future trips.

206. Each Northern Boundary APD is also roughly 10 miles away from the home of PRBRC member LJ Turner. Given their proximity, every Northern Boundary APD is likely to expose him to higher concentrations of ozone and $PM_{2.5}$, which pose health risks

### Thunder Basin Boundary APDs: APDs 13, 89, 132–34

207. A small cluster of five APDs sits right along the Thunder Basin National Grassland Boundary in the central Project area. Plaintiffs herein refer to this grouping, consisting of APDs 13, 89, 132–34, as the "Thunder Basin Boundary APDs."

208. All Thunder Basin Boundary APDs are in designated greater sage-grouse habitat. APDs 132–34 are just 1.5 mile from a greater sage-grouse lek, APD 89 and 13 are less than 6.5 miles from a lek.

209. Each of the Thunder Basin Boundary APDs is in mule deer, pronghorn, and raptor habitat.

210. The habitat loss, noise, infrastructure, traffic, and increased human presence from

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 49

development and operation of each of the Thunder Basin Boundary APDs is likely to cause or contribute to declines in wildlife populations in areas Plaintiffs' members enjoy viewing wildlife, such as along WY-59 and Ross Road. For this reason, each of the Thunder Basin Boundary APDs is likely to lessen members' ability to view birds and other wildlife.

211.    APD 13 is roughly 6 miles from Ross Road and 13 miles from WY-59.

212.    APD 89 is roughly 10 miles from both Ross Road and WY-59.

213.    APDs 132–34 are roughly 10 miles from WY-59 and 12 miles from Ross Road.

214.    Each Thunder Basin Boundary APD will also contribute to truck traffic on either WY-93 or along WY-59, causing the same traffic-related impacts (pollution, noise, safety, visual) to Plaintiffs' members as noted for the Highway 93 and Highway 59 APDs above.

### *Southern Sage-Grouse APDs: APDs 5-8, 70, 71, 85-87, 96, 97, 114-22, 127, 194-95*

215.    Between WY-93 and WY-59, in the southern Project area, lies a cluster of 23 APDs near several greater sage-grouse breeding grounds ("leks"). Plaintiffs herein refer to this grouping, consisting of APDs 5–8, 70, 71, 85–87, 96, 97, 114–22, 127, 194, 195, as the "Southern Sage-Grouse APDs."

216.    All Southern Sage-Grouse APDs are in designated greater sage-grouse habitat and less than 5.8 miles from at least one sage-grouse lek. APD 6 is under 3 miles from the closest lek. APDs 5, 7, 8, 85–87, 96, 97, and 114–22 are all under 5 miles from the closest lek.

217.    Each of the Southern Sage-Grouse APDs is in mule deer, pronghorn, and raptor habitat.

218.    The habitat loss, noise, infrastructure, traffic, and increased human presence from each of the Southern Sage-Grouse APDs is likely to cause or contribute to declines in the area's wildlife populations, especially greater sage-grouse. Each of the Southern Sage-Grouse APDs is

also likely to deter wildlife from using habitat near WY-93 and WY-59 and to increase wildlife-vehicle collisions on these roads. These impacts from each Southern Sage-Grouse APD will lessen the ability of Katherman, Molvar, O'Toole, and other WWP and PRBRC members to view birds and other wildlife along WY-93 and WY-59, which they frequent. Seeing dead wildlife on the road will cause members anguish.

219.    The Southern Sage-Grouse APDs are all less than 6 miles from WY-59 and within the viewshed of that road. Katherman, Molvar, O'Toole, and other WWP and PRBRC members frequently drive on the impacted stretch of WY-59. Viewing the new roads, pipelines, powerlines, well pads, tanks, drill rigs, flares, artificial lighting, equipment, truck traffic, and other impacts of each Southern Sage-Grouse APD will deteriorate these members' aesthetic and recreational enjoyment of these drives.

220.    Each Southern Sage-Grouse APD will also contribute to truck traffic on WY-59, exposing, causing the same traffic-related impacts (pollution, noise, safety, visual) to Plaintiffs' members as noted for the Highway 59 APDs above.

221.    Maria Katherman's home is within 15 miles of every Southern Sage-Grouse APD, and much closer to many of these APDs. BLM has acknowledged that lights at night can be visible at distances exceeding 36 miles. Accordingly, each of the Ross Road APDs is likely to contribute light pollution that her aesthetic enjoyment of her property and stargazing experience.

222.    Given their proximity, every Southern Sage-Grouse APD is likely to dispense pollutants over her home, such as ozone precursors and $PM_{2.5}$. Breathing such pollutants poses health risks to Katherman.

***Walker Creek Road APDs: APDs 29, 30, 38, 39, 42–44, 48, 49, 59–65, 128–31, 136–43, 160, 181, 182, 188–91, 221, 222, 252–54***

223.    Forty (40) of the APDs are located near the Cow Creek and Downs Roadless Areas in Thunder Bain National Grassland, as well as an unpaved backcountry road—Walker Creek Road (County Road 43)—used to reach them from WY-59. Plaintiffs herein refer to this grouping, consisting of APDs 29, 30, 38, 39, 42–44, 48, 49, 59–65, 128–31, 136–43, 160, 181, 182, 188–91, 221, 222, 252–54, as the "Walker Creek Road APDs."

224.    Roadless Areas are unique portions of National Forests that are free from man-made development, including roads, and are preserved in their wild, unspoiled state. Roadless Areas are known for their natural beauty, wildlife, healthy ecosystems, and recreation opportunities.

225.    The Cow Creek and Downs Roadless Areas are prized for their primitive character, remoteness, and unique Northern Great Plains ecological and geographical character.

226.    Members including Maria Katherman and Erik Molvar enjoy recreating in the Cow Creek and Downs Roadless Areas, to camp, hike, birdwatch, take photos, and ride horses. They hope to continue doing so in the future.

227.    Katherman uses Walker Creek Road to reach these Roadless Areas.

228.    APDs 59–65 are located less than 500 feet from Walker Creek Road (County Road 43) and roughly 3 miles from the Downs Roadless Area.

229.    APDs 142 and 143 are roughly 500 feet from Walker Creek Road.

230.    APD 160 is roughly 1,000 feet from Walker Creek Road.

231.    APDs 29 and 30 are roughly 0.5 mile from Walker Creek Road.

232.    APDs 221 and 222 are roughly 1.2 miles from Walker Creek Road.

233.    APDs 38, 39, 128–31, and 252–54 are less than 2 miles from Walker Creek Road.

234.    APDs 42–44 are roughly 3.5 miles from Walker Creek Road.

235.    APDs 48, 49, and 188–91 are less than 5 miles from Walker Creek Road.

236.    APDs 136–41 are roughly 6.5 miles from Walker Creek Road.

237.    APDs 181 and 182 are less than 10 miles from Walker Creek Road.

238.    Viewing the new roads, pipelines, powerlines, well pads, tanks, drill rigs, flares, artificial lighting, equipment, truck traffic, and other impacts of every Walker Creek Road APD will deteriorate members' scenic, aesthetic, and recreational enjoyment of future drives and visits to the Downs and Cow Creek Roadless areas.

239.    Each of the Walker Creek Road APDs is likely to cause or contribute to higher concentrations of ozone, particulate matter, and other pollutants in the Roadless Areas where Molvar and Katherman recreate. Both $PM_{2.5}$ and ozone are considered "no threshold" pollutants, meaning exposure at any non-zero concentration poses health risks. Even a short exposure to $PM_{2.5}$ and ozone can affect health, particularly when engaged in strenuous or outdoor activity.

240.    Particulate matter and ozone also cause smog and haze that reduces visibility and dull skies, harming members' aesthetic enjoyment of the area's blue skies and natural viewsheds.

241.    Each of the Walker Creek Road APDs is all located in designated sage-grouse habitat and within 8.4 miles of a sage-grouse lek.

242.    APDs 181, 182, 136–40 are under 1.7 mile from the closest lek. APDs 48, 49, and 188–91 are all between 2.8 and 3.4 miles from the closest lek. APDs 38, 39, 42–44, and 252–54 are all roughly 5.4 miles from the closest lek.

243.    Each of the Walker Creek Road APDs is also in designated pronghorn, and mule deer habitat. The habitat loss, noise, infrastructure, traffic, and increased human presence from each of the Walker Creek Road APDs is likely to cause or contribute to declines in the area's

wildlife populations and to deter wildlife from using habitat in and around the Roadless Areas. These impacts from each Walker Creek Road APD will lessen members' ability to view birds and other wildlife on future visits to the Downs and Cow Creeks Roadless areas, diminishing their enjoyment.

244.    Each Walker Creek Road APD will also contribute to truck traffic on WY-59, causing the same traffic-related impacts (pollution, noise, safety, visual) to Plaintiffs' members as noted for the Highway 59 APDs above.

245.    Each Walker Creek Road APD will also contribute to traffic on the unpaved access roads used to reach the Roadless Areas, subjecting Molvar and Katherman to traffic hazards and dust plumes that obscure visibility of the road and surrounding views.

246.    These impacts may deter Molvar and Katherman from returning to the Roadless Areas.

### Dull Center Road APDs: APDs 20–23, 196–98

247.    Seven (7) of the APDs are located near Dull Center Road, a backcountry road which Plaintiffs' members, such as Erik Molvar, use for scenic drives and to access the Thunder Basin National Grassland, Cow Creek Roadless Area, and Downs Roadless Area from WY-59. Plaintiffs herein refer to this grouping, consisting of APDs 20–23 and 196–98, as the "Dull Center Road APDs."

248.    APDs 196–98 are located roughly 1.5 mile from Dull Center Road and less than 1 mile from WY-59.

249.    APDs 20–23 are located roughly 2.2 miles from Dull Center Road and roughly 4.5 miles from WY-59.

250.    Each Dull Center Road APD is likely to be visible to Molvar and other members

from Dull Center Road, given the proximity of these APDs to this road. Viewing the new roads, pipelines, powerlines, well pads, tanks, drill rigs, flares, artificial lighting, equipment, truck traffic, and/or other impacts of every Dull Center Road APD will deteriorate their scenic, aesthetic, and recreational enjoyment of future drives along Dull Center Road and of visits to the Downs and Cow Creek Roadless area.

251.    Each Dull Center Road APD is also likely to be visible to Katherman, O-Toole, Molvar, and other members as they drive along WY-59. Viewing the new roads, pipelines, powerlines, well pads, tanks, drill rigs, flares, artificial lighting, equipment, truck traffic, and/or other impacts of each Dull Center Road APD will deteriorate their scenic and aesthetic enjoyment of these drives.

252.    Each of the Dull Center Road APDs is in designated greater sage-grouse, pronghorn, mule deer, and raptor habitat. Each Dull Center Road APD is within 3 miles of designated "priority" habitat for greater sage-grouse and less than 6.8 miles from a greater sage-grouse lek.

253.    The habitat loss, noise, infrastructure, traffic, and increased human presence from each of the Dull Center Road APDs is likely to cause or contribute to declines in the area's wildlife populations; to deter wildlife from using habitat near WY-59, Dull Center Road, and the Southern arm of the Thunder Basin National Grassland; and to increase wildlife-vehicle collisions on WY-59 and Dull Center Road. These impacts from each Dull Center Road APD will lessen members' ability to view birds and other wildlife along WY-59 and Dull Center Road and on their visits to the Thunder Basin National Grassland and Cow Creek and Downs Roadless Areas, diminishing their enjoyment on future visits.

254.    Each Dull Center Road APD will also contribute to truck traffic on WY-59 and

Dull Center Road, causing the same traffic-related impacts (pollution, noise, safety, visual, dust) to Plaintiffs' members as noted for the Highway 59 APDs above.

255.    These impacts may deter members such as Molvar from returning to the Roadless Areas.

## LEGAL FRAMEWORK

### A.    National Environmental Policy Act (NEPA)

256.    NEPA is our basic national charter for protection of the environment. The law is intended to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. *See* 42 U.S.C. § 4331; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

257.    To accomplish these objectives, NEPA requires federal agencies to evaluate the reasonably foreseeable environmental effects of their actions. 42 U.S.C. §§ 4332(C)(i)–(ii), 4336. If the action will have "reasonably foreseeable significant effect on the quality of the human environment," the agency must prepare an "environmental impact statement" (EIS). *Id.* § 4336(b)(1). If the reasonably foreseeable effects are not "significant," or if the significance of such effects is unknown, the agency must prepare an "environmental assessment" (EA). *Id.* 4336(b)(2). The EA process must conclude with a Finding of No Significant Impact or "FONSI" or a determination that an EIS must be prepared. *Id*. Otherwise, actions may be categorically excluded from NEPA only for "category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of [NEPA]." *Id.* § 4336e; *see also id.* §§ 4336(b)(2), 4336c.

258.    NEPA also requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources." *Id.* § 4332(H).

259.    NEPA also limits the circumstances in which an agency may rely on a

programmatic environmental document when approving later decisions. An agency may rely on

the analysis included in a programmatic environmental document in a subsequent environmental

document for related actions as follows: "(1) Within 5 years and without additional review of the

analysis in the programmatic environmental document, unless there are substantial new

circumstances or information about the significance of adverse effects that bear on the analysis;

(2) After 5 years, so long as the agency reevaluates the analysis in the programmatic

environmental document and any underlying assumption to ensure reliance on the analysis

remains valid." *Id.* § 4336b.

### B.    Federal Land Policy and Management Act (FLPMA)

260.    FLPMA directs BLM to manage the public lands "in a manner that will protect

the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water

resource, and archeological values; that, where appropriate, will preserve and protect certain

public lands in their natural condition; that will provide food and habitat for fish and wildlife and

domestic animals; and that will provide for outdoor recreation and human occupancy and use."

43 U.S.C. § 1701(a)(8).

261.    FLPMA provides that BLM "shall" manage public lands "for multiple use and

sustained yield." *Id.* § 1732(a). FLPMA further mandates that the Secretary of Interior "shall . . .

take any action necessary to prevent unnecessary or undue degradation" of public lands. *Id.* §

1732(b). This duty is "the heart of FLPMA." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30,

33. (D.D.C. 2003).

262.    FLPMA's definition of "multiple use" calls for "harmonious and coordinated

management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c).

263.    The Secretary of Interior "shall issue regulations necessary to implement the provisions of [FLPMA] with respect to the management, use, and protection of the public lands." *Id.* § 1733(a).

264.    FLPMA requires that "[t]he Secretary [of the Interior] shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. § 1712(a).

265.    FLPMA and its implementing regulations prohibit BLM from taking actions that are inconsistent with the provisions of the governing RMP. *See* 43 U.S.C. § 1732(a) (BLM must manage public lands "in accordance with the land use plans"); 43 C.F.R. § 1610.5-3(a) (all BLM resource management authorizations and actions "shall conform to the approved [land use] plan."); *see also* 43 C.F.R. § 1601.0-5(b), (c) (defining "conformity").

**C.    Mineral Leasing Act (MLA)**

266.    The Mineral Leasing Act (MLA), 30 U.S.C. §§ 181–287, authorizes the Secretary of Interior to offer certain federal minerals for lease, including oil and gas. The Secretary has delegated this authority to BLM for onshore minerals. *See* 43 C.F.R. § 3100.0-3.

267.    Under the MLA, BLM manages oil and gas development on public lands using a three-stage process: (1) land-use planning, (2) leasing, and (3) permitting of lease exploration and drilling.

268.    In the first phase, BLM prepares a Resource Management Plan (RMP) in accordance with FLPMA, 43 U.S.C. § 1712, and FLPMA's planning regulations, 43 C.F.R. Part 1600. RMPs generally define the allowable uses of the public lands in the planning area, including which lands may be leased for oil and gas development and under what conditions.

269.    In the second phase, BLM issues leases in quarterly competitive lease sales, in accordance with 43 C.F.R. Part 3120. Once issued, a lease is valid for 10 years but can be held indefinitely if it is producing oil or gas "in paying quantities." *Id.* §§ 3120.2-1; 3107.2-1.

270.    In the third and final phase, BLM must approve an Application for Permit to Drill (APD) prior to any drilling or surface operations on the lease. *Id*. § 3162.3-1(c). BLM has broad discretion to attach terms and conditions, known as "Conditions of Approval," to an approved APD. In addition to restrictions listed in the lease itself, BLM may subject an APD to any "reasonable measures . . . to minimize adverse impacts to other resource values, land uses or users" as well as "restrictions deriving from specific, nondiscretionary statutes." *Id.* § 3101.1-2.

271.    The MLA provides that the Secretary of Interior "shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter, and shall determine reclamation and other actions as required in the interest of conservation of surface resources." 30 U.S.C. § 226(g).

### D.    DOI and BLM Authority and Duties as to Air Resources

272.    Various federal laws authorize and require DOI and BLM to impose conditions on their land use authorizations to control their harmful air emissions.

273.    FLPMA broadly requires DOI to "regulate . . . [the] development of" public lands and to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b); *see also id.* 1702(e) (defining "public lands" to include mineral estate).

274.    FLPMA further requires that DOI manage the use of federal lands and minerals "in a manner" that protects "air and atmospheric" values. *Id*. § 1701(a)(8).

275.    FLPMA also calls on the Secretary to "provide for compliance with applicable pollution control laws, including State and Federal air . . . pollution standards or implementation plans" in the development and revision of land use plans. *Id*. § 1712(c)(8). In accordance with that section, the Casper RMP requires BLM to ensure its authorized actions "[c]omply with applicable state and federal AAQS [Ambient Air Quality Standards]" and to "[i]mplement management actions within the scope of the BLM's land-management responsibilities to improve air quality as practicable."

276.    FLPMA regulations also provide that every federal "land use authorization shall contain terms and conditions which shall . . . [r]equire compliance with [state and federal] air and water quality standards." 43 C.F.R. § 2920.7(b)(3).

277.    Section 6 of the BLM standard oil and gas lease form provides: "Lessee must conduct operations in a manner that minimizes adverse impacts to the . . . air . . . [and] visual . . . resources."

278.    BLM Manual 7300, "Air Resources Management", at .04C4 provides that BLM is responsible for "[a]ssuring appropriate stipulations and conditions of approval are included in BLM use authorizations to ensure air pollution emission control, protection methods, and ambient air quality levels are addressed."

279.    Finally, the MLA broadly requires BLM to "regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter"  and "shall determine reclamation and other actions as required in the interest of conservation of surface resources." 30 U.S.C. § 226(g). Moreover, Congress broadly instructed BLM to "do any and all things

necessary to carry out and accomplish the purposes" of the MLA. *Id.* § 189.

280.    BLM commonly requires air quality mitigation measures in approving oil and gas development projects.

281.    For example, BLM's Record of Decision approving the Normally Pressured Lance Natural Gas Development in Wyoming includes mandatory restrictions on fugitive dust, venting, and vehicle travel. It also requires waste capture and recovery; use of Tier 3 drill rig engines; and use of solar powered equipment to the extent practicable. *See* https://eplanning.blm.gov/public_projects/nepa/57654/155638/190417/NPL_Record_of_Decisio n_2018_0827.pdf.

282.    BLM's Record of Decision approving the Jonah Infill Drilling Project in Wyoming required use of Tier II diesel engines and other requirements as to project air emissions. *See* https://eplanning.blm.gov/public_projects/nepa/77463/103586/126804/00rod.pdf.

283.    BLM's decision approving of the La Sal 2 well in Utah required use of Tier II drill rig engines, placed $NO_x$ limits on all combustion engines, required dust suppressants, required use of solar power to the extent possible, and required vapor recovery units. *See* https://eplanning.blm.gov/public_projects/nepa/116510/20010455/250013445/2019.12.17_LaSal 2_APD_FONSI_DR_EA.pdf.

284.    BLM's decision approving the Alta Vista Slaughterville 1H APD in Montana required use of Tier 4 engines. *See* https://eplanning.blm.gov/public_projects/nepa/66656/90809/109165/Alta_Vista_Staughterville- 1H.pdf.

285.    On information and belief, BLM has attached air emission control measures to hundreds of other APD approvals.

E.    **Administrative Procedure Act (APA)**

286.    Judicial review of agency actions under NEPA and FLPMA are governed by the APA, which provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Review under the APA is further limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

287.    The APA directs courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)–(F).

## FACTUAL BACKGROUND

A.    **Overview of the Converse County Project**

288.    The Converse County Project will entail the development of 5,000 oil and natural gas wells in Wyoming's Powder River Basin over a period of 10 years, making it one of the largest oil and gas projects ever approved in the state. The productive life of each well is estimated to be approximately 30 years. In addition to the drilling and fracking of wells, the Project will entail the construction of approximately 2,900 miles of new pipelines; 1,970 miles of access roads; 1,500 miles of electrical lines; 455 other pads; and additional supporting structures and infrastructure. The Project area covers 1.5 million acres (2,344 square miles) in Converse County, Wyoming—an area the size of Delaware and 34 times the size of Washington, DC.

289.    The Project was submitted as a consolidated proposal by an "Operator Group" consisting of Chesapeake Energy Corporation; Devon Energy; EOG Resources, Inc.; Northwoods Energy; and Occidental Petroleum Corporation.

290.    Although only 10% of the land surface in the Project area is managed by federal agencies (6% by BLM and 4% by the Forest Service), 64% of the underlying minerals are federally owned. Accordingly, the Converse County Project will consist predominantly of Fee/Fee/Fed wells—wells that are drilled on non-federal surface overlying non-federal mineral estate that drill horizontally into leased federal minerals.

291.    The Converse County Project area supports abundant birds and wildlife— including the imperiled greater sage-grouse and sensitive raptor species, such as hawks and falcons. There are over 1,000 documented raptor nests within the Project area. Nearly the entire Project area provides habitat for greater sage-grouse, including 199,281 acres of priority habitat (PHMA) and 1,287,429 acres of general habitat (GHMA), and there are 54 sage-grouse breeding sites ("leks") within or immediately adjacent to the Project area. The Project area is also located within the Central Flyway, which is one of only four administratively-recognized bird migration routes in North America.

292.    These lands are the traditional, ancestral, and unceded territory of Indigenous peoples and tribes, including Standing Rock Sioux, Rosebud Sioux, Oglala Sioux, Flandreau Santee Sioux, Arapaho, Cheyenne, Crow, and Shoshone Tribes. The area, which harbors important cultural and sacred sites, remains a place of great significance to Tribal members. It is still used for hunting and fishing, gathering of traditional foods and medicinal plants, and ceremonies and gatherings related to historic events and military victories. Tribes and tribal organizations submitted comments opposing the Converse County Project.

**B.    Converse County ROD and FEIS**

293.    BLM issued a Draft Environmental Impact Statement (DEIS) evaluating the proposed Converse County Project on January 26, 2018. Plaintiffs submitted comments on that

DEIS.

294.    On April 26, 2019, BLM released a Supplemental Draft EIS (SDEIS) to address a newly-proposed amendment to the Casper RMP to exempt the Project from "Timing Limitation Stipulations" that prohibit disturbance in raptor habitat during certain spring and summer months when the birds are nesting. Plaintiffs submitted comments on the SDEIS.

295.    BLM issued the Final EIS (FEIS) on August 10, 2020, describing it as "a programmatic analysis of proposed oil and gas development in the [Converse County Project Area] from which subsequent site-specific NEPA documents for specific permitting actions can be tiered."

296.    The FEIS examined only three alternatives: Alternative A, a no action alternative, in which no new drilling would be authorized; Alternative B, the preferred alternative and the Operator Group's proposed alternative, which would authorize 5,000 new wells on 1,500 new well pads over ten years; and Alternative C, a modified alternative, which would authorize the same number of wells, but would also require some additional mitigation measures such as water recycling and clustering of wells to reduce surface disturbance.

297.    On December 23, 2020, then-Secretary of Interior David Bernhardt personally signed a Record of Decision (ROD) for the Project selecting the preferred alternative, Alternative B. The ROD also approved an amendment to the Casper RMP to allow exemptions to the non-eagle seasonal timing stipulations to allow year-round development, discussed below.

298.    Government records show that senior officials at Department of Interior headquarters were personally involved in moving the Project forward. The Department of Interior flagged Converse County as among the high-profile fossil fuel projects it intended to fast track through the coronavirus pandemic in 2020, according to a July 15, 2020 letter sent by

Katharine MacGregor, then Deputy Secretary of the Department of Interior, to White House

economic advisor Larry Kudlow. Records also show that MacGregor and Joe Balash, Assistant

Interior Secretary for Lands and Minerals Management, personally met with the Converse

County Operator Group in Washington, D.C. to discuss the Project.

### C.      The Raptor Timing Stipulation Exemption and Casper RMP Amendment

299.    The Converse County Project is subject to the Casper RMP, which includes a

Timing Limitation Stipulation prohibiting surface disturbance or occupancy within a certain

distance of non-eagle raptor nests from February 1 to July 31, or until young birds have fledged.

Exemptions may be granted by the authorized officer on a case-by-case basis.

300.    At some point after the DEIS was circulated, BLM decided to evaluate a possible

amendment to the Casper RMP to provide the Converse County Project a special exemption

from the non-eagle raptor Timing Limitation Stipulation. In April 2019, BLM issued the SDEIS

analyzing five "Options" for this RMP amendment.

301.     The FEIS and ROD ultimately analyzed and adopted a new Option 6, which

allows operators in the Converse County Project Area alone to obtain an automatic exemption

from the Timing Limitation Stipulation by merely following certain procedural steps and

adopting a list of modest mitigation measures, as outlined in Appendix G4 of the FEIS. To take

advantage of the exemption, the operator does not have to obtain prior BLM approval.

302.    BLM did not allow the U.S. Fish and Wildlife Service to comment on Option 6

and its impacts on migratory birds.  Earlier, commenting on the similar Option 3, the Service

noted that this option would have "moderate to major" impacts on raptor populations and may

affect BLM's ability to comply with Executive Order 13,186 concerning the protection of

migratory birds. The Wyoming Fish and Game Department likewise expressed concerns with the

proposal, calling automatic exceptions from the non-eagle raptor Timing Limitation Stipulation "unprecedented in Wyoming" and "a significant policy shift."

### D. Fee/Fee/Fed Wells

303.    As noted above, the majority of wells in Converse County Project will be developed in a "Fee/Fee/Fed" scenario, in which the leased federal minerals are extracted from a well drilled on adjacent non-federal lands.

304.    BLM Permanent Instruction Memorandum 2018-014 ("PIM 2018-014") entitled "Directional Drilling into Federal Mineral Estate from Well Pads on Non-Federal Locations," erroneously claims that BLM lacks jurisdiction to impose any surface resource protections on Fee/Fee/Fed wells even though they are used to access federal minerals.

305.    Citing PIM 2018-014, the Converse County FEIS claimed that "BLM has no authority to manage development activities on" Fee/Fee/Fed wells. BLM has already approved hundreds of Fee/Fee/Fed wells in the Converse County Project area with no restrictions on the surface use operations to prevent unnecessary environmental harm.

306.    In reality, the MLA, FLPMA, and their implementing regulations not only authorize but *require* BLM to regulate Fee/Fee/Fed wells. In particular, the MLA requires BLM to "regulate all surface-disturbing activities conducted pursuant to any" federal mineral lease. 30 U.S.C. § 226(g). FLPMA further requires BLM to "regulate . . . [the] development of" federal minerals, 43 U.S.C. §§ 1702(e), 1732(b) (defining "public lands" to include mineral estate), and to "take any action necessary to prevent unnecessary or undue degradation of the lands," *id.* § 1732(b). None of these authorities exempt federal mineral development where surface facilities are located on nonfederal lands.

307.    Nor is BLM otherwise prohibited from regulating federal minerals in ways that implicate nonfederal lands. To the contrary, BLM has authority flowing from the Property Clause to "prohibit absolutely or fix the terms on which [federal] property may be used." *Light v. United State*s, 220 U.S. 523, 536 (1911). Thus, like any other mineral estate owner, BLM has authority to condition the extraction of federal minerals on the developer's agreement to engage in, or refrain from, certain conduct on private lands.

308.    Thus, in failing to regulate surface operations on Fee/Fee/Fed wells in the Converse County Project, BLM has both arbitrarily rested on an incorrect interpretation of its jurisdiction and unlawfully disregarded its MLA and FLPMA mandates to mitigate their adverse environmental effects.

### E.    BLM's Consideration of Air Quality Concerns and Mitigation

309.    The FEIS projected that the Converse County Project will cause exceedances of several human health-based National Ambient Air Quality Standards (NAAQS), including for 24-hour $PM_{10}$, 1-hour $NO_2$, and 24-hour $PM_{2.5}$, resulting in nonattainment status for those pollutants. The EPA submitted several comment letters to BLM, expressing concern that the Project would expose the public to "unhealthy levels of air pollution" and suggesting that BLM's models likely underestimated the Project's true air quality impacts.

310.    The FEIS also projected impacts to visibility and nitrogen deposition at downwind Class I and Sensitive Class II areas, including at Badlands and Wind Cave National Parks in South Dakota, Devil's Tower National Monument in Wyoming, and Agate Fossil Beds National Monument in Nebraska. The National Park Service wrote to express concerns that emissions from the Converse County Project "could impact park air resources and related values, individual and collectively, in these areas."

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 67

311.    Both the EPA and NPS, along with other public commenters, urged BLM to incorporate additional emission mitigation measures to reduce the Project's severe air quality impacts. These proposed measures included electrification of equipment engines, use of Tier 4 diesel engines, a lower $NO_x$ limit on equipment engines, limits on flaring, centralized production and operation facilities to reduce truck traffic, and dust abatement.

312.    BLM refused to incorporate any of these measures, instead taking the novel, erroneous, and entirely unexplained position that it "does not have authority to require application of [air quality] mitigation measures."

### F.    Sage-Grouse Conservation Measures from the Casper RMP

313.    The Converse County Project is subject to numerous restrictions under the Casper RMP, as amended by the 2015 Greater Sage-Grouse Plan Amendments, for the protection of the greater sage-grouse. These measures were adopted through a nationwide planning effort, known as the Greater Sage-Grouse National Planning Strategy, which amended the Casper RMP along with dozens of other BLM and Forest Service plans across the country.

314.    Among these measures are mandatory density and disturbance caps in priority habitat areas, which place a 5% cap on surface disturbance and a limit of one energy facility per 640 acres. Casper RMP at MD SSS 2. Projects that would result in cumulative disturbance above these thresholds cannot be approved. *Id.*

315.    The Casper RMP also requires third parties causing habitat loss and degradation in PHMA to provide compensatory mitigation "that provides a net conservation gain to the species." Casper RMP at MD SSS 4.

316.    The Casper RMP at Appendix C also includes a list of "Required Design Features" for projects in PHMA and GHMA, including measures such as phased development

and clustering of surface disturbances to minimize habitat disturbance and fragmentation.
Required Design Features "are required" and must be applied unless the Required Design
Feature is "documented to be not applicable to the site-specific conditions" or an alternative
measure was applied to provide "equal or better protection." *Id.*

317.    Although BLM acknowledged these requirements in the Converse County ROD
and FEIS, it has failed to comply with them—often without explanation. BLM has approved
APDs in violation of the density and disturbance caps; required no compensatory mitigation for
projects in PHMA; and disregarded important Required Design Features such as "phased
development" and "facilities clustering" without demonstrating that one of the specified
exemption criteria applies.

## G.    Deficiencies in FEIS's Compliance with NEPA

318.    The Converse County FEIS also failed to adequately address the direct, indirect,
and cumulative environmental impacts of the Project and reasonable alternatives to avoid them,
including as follows:

*Failure to Account for Fee/Fee/Fed Wells*

319.    BLM failed to meaningfully account for Fee/Fee/Fed wells in conducting its
NEPA analysis or discuss how the prevalence of Fee/Fee/Fed wells will affect the overall
efficacy of the Project's mitigation measures or environmental impacts of this development.

320.    Although BLM disclosed in its FEIS that it would not regulate the surface
operations associated with Fee/Fee/Fed wells, the body of the FEIS nonetheless repeatedly
assumed that BLM-imposed protections would mitigate adverse effects for the entire Project.

321.    For example, in discussing impacts to greater sage-grouse, BLM claimed there
would be 0 acres of surface disturbance within 0.6 miles of leks in priority sage-grouse habitat,

entirely ignoring the fact that it would not prohibit Fee/Fee/Fed wells from being developed within that 0.6-mile lek buffer.

*Faulty Analysis of Air Quality Impacts*

322.    Although BLM's own modeling predicted significant air quality impacts, numerous errors and omissions in that modeling suggest that BLM overlooked the full extent of the problem. These concerns are heightened by BLM's own acknowledgment that model biases may also have led to under-prediction of certain air quality impacts.

323.    First, as for particulate matter, BLM relied on outdated data on ambient particulate matter concentrations, ignoring more recent EPA monitoring data showing concentrations have roughly doubled in recent years, indicating the potential for more severe NAAQS exceedances.

324.    Second, as for ozone, BLM again relied on outdated background concentrations that ignored the most recent 2017 data showing that ozone concentrations are already approaching the 70 parts-per-billion (ppb) standard and this Project will almost certainly lead to ozone concentrations exceeding the standard.

325.    Third, although BLM projected that the Project would cause exceedances of national emissions standards for "near field" concentrations of Hazardous Air Pollutants (HAPs), BLM made no effort to monitor or model baseline HAPs concentrations, as EPA had recommended. BLM assumed, without evidence, that background concentrations of HAPs would be "very small" and thus improperly ignored the possibility of cumulative effects.

326.    Fourth, BLM failed to meaningfully address impacts to fish and wildlife Air-Quality Related Values (AQRVs) in various downwind Class I and sensitive Class II areas that will suffer elevated ozone levels, nitrogen deposition, visibility impairment, and acid deposition.

The National Park Service identified numerous areas that contain ozone-sensitive plant species, are sensitive to nitrogen enrichment, or are otherwise sensitive to air pollution, yet the FEIS failed to analyze the Project's impacts to these important ecological values.

327.    These and other critiques were raised in lengthy comments from air quality expert Megan Williams, submitted as an attachment to comments by the National Parks Conservation Association. BLM failed to acknowledge or respond to Williams' comments.

*Faulty Analysis of Groundwater Drawdowns*

328.    The Converse County Project will require roughly 108 million barrels of water per year for hydraulic fracturing—nearly equivalent to the existing consumption from all other sources in Converse County. To analyze the Project's likely impacts to groundwater, the FEIS relied on a 2014 Groundwater Model Report, prepared by a BLM contractor for the Project.

329.    The Groundwater Model analyzed two pumping scenarios: "dispersed pumping" and "concentrated pumping." But the FEIS only reported the results of the less impactful, "dispersed pumping" scenario, which assumed that wells would be evenly distributed across the Project area. By reporting only these dispersed pumping results, BLM underestimated the Project's likely drawdowns because groundwater wells are unlikely to be evenly spaced.

330.    BLM also used four incorrect inputs for the Groundwater Model Report, again resulting in a substantial underestimation of the Project's likely drawdowns.

331.    First, BLM failed to update the model after the Operator Group confirmed they would use *double* the projected water consumption: 13,100 acre-feet per year rather than 6,550 acre-feet per year as the Groundwater Model had assumed. When public comments raised this issue, BLM's explanation for the discrepancy was irrational and contradictory.

332.    Second, the model used an outdated and overly conservative well pumping rate,

disregarding more accurate rates offered in comments from the Wyoming State Engineer's office and other sources. The model assumed wells would pump groundwater at a rate between 81 and 100 gallons per minute (gpm), which the contractor claimed was "conservative." However, the Wyoming State Engineer's office noted that the average appropriation for new water supply wells in the Project area since 2014 was 150 gpm, and the FEIS indicates that groundwater well permits issued since 2018 average 180 gpm. BLM neither updated its model to reflect these increased pumping rates nor acknowledged that the out-of-date figure might result in an underestimation of drawdowns.

333.    Third, the model used an incorrect "specific storage" value, further underestimating the Project's likely drawdowns as a result. Specific storage is, essentially, the capacity of an aquifer to release groundwater. The Groundwater Model Report used a specific storage value of 0.001. In response to the EPA's comment that this value appeared to be wrong "by at least an order of magnitude," resulting in a "substantial underestimation of both the magnitude and extent of drawdown caused by pumping," BLM responded that it was derived from previous groundwater modeling for the Powder River Basin Coal Review. However, that Review reports specific storage values orders of magnitude below 0.001.

334.    Finally, the model improperly assumed that the impacted aquifers were "unconfined" as opposed to "confined," again leading to an underestimation of the likely drawdowns. A confined aquifer is one that is bounded above by a less permeable material and responds differently to pumping. Water drawdowns are more severe in confined aquifers. BLM classified the Wasatch/Tongue River Aquifer formations as "unconfined." However, review of relevant U.S. Geological Survey studies suggests that this aquifer is at least partially confined.

335.    For all of the above reasons, BLM substantially underestimated the Converse

County Project's likely impacts to groundwater, thereby failing to take the "hard look" at this issue NEPA requires.

*Insufficient Cumulative Impacts Analysis*

336.     The FEIS also did not adequately analyze the cumulative impacts of the Converse County Project with other non-project oil and gas development or greenhouse gas emissions of other reasonably foreseeable future projects.

337.     BLM used unreasonably low estimates of non-project oil and gas activity for purposes of the cumulative effects analysis. Specifically, the FEIS assumed that there are just 1,520 existing wells in the Converse County Project area, and that an additional 1,663 non-project oil and gas wells will be developed in the future (over some undefined time period). It further assumed that just 110 new wells will be drilled each year. The existing well figure reflects Wyoming Oil and Gas Conservation Commission (WOGCC) data on existing wells as of January 9, 2015. The 1,663-well figure appears to be derived from the NEPA analysis of other pending oil and gas projects, but considered only projects that had been approved as of December 31, 2015—a date two years before the DEIS issued and nearly five years before the ROD/FEIS issued.

338.     As multiple commenters noted, these arbitrary cut-off dates skewed the cumulative effects analysis because fossil fuel development increased markedly in Converse County after 2015. From 2016 to 2019 alone, 3,865 new wells started producing in the County, far exceeding BLM's estimates for the entire cumulative effects period. Oil and gas development is the predominant activity in the Project area, so these inaccurate figures seriously compromised BLM's cumulative effects analysis for various resources, including air quality and sensitive wildlife such as the greater sage-grouse.

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 73

339.    The FEIS also failed to analyze the cumulative greenhouse gas emissions from the Converse County Project in conjunction with other reasonably foreseeable future actions, including other oil and gas developments. Although BLM listed other "reasonably foreseeable actions," it failed to quantify their projected greenhouse gas emissions or otherwise meaningfully assess their cumulative contribution to climate change. BLM's analysis simply compared the Converse County Project emissions to historic emissions.

*Failure to Consider Reasonable Alternatives*

340.    BLM considered only the "No Action" alternative and two action alternatives in the FEIS that were identical in most respects, failing to consider any alternatives to lessen key environmental impacts such as greenhouse gas and other air pollutant emissions.

341.    BLM also unreasonably eliminated many commenter-proposed alternatives from detailed analysis. First, BLM unreasonably rejected alternatives that would reduce the Project's air emissions. Other federal agencies, including the EPA and NPS, proposed concrete air quality mitigation measures for BLM's consideration. These included electrification of equipment engines, use of Tier 4 diesel engines, lower $NO_x$ limit on equipment engines, limits on flaring, centralized production and operation facilities to reduce truck traffic, and dust abatement. BLM did not incorporate these, or any other measures to reduce air emissions and NAAQS exceedances, in any alternative in a meaningful way. Instead, BLM took the erroneous position that it "does not have authority to require application of [air quality] mitigation measures."

342.    Similarly, BLM rejected a greenhouse gas reduction alternative on the grounds that it is technically infeasible to conduct a fully carbon neutral oil and gas drilling process. However, BLM did not consider an alternative that would simply *reduce* greenhouse gas emissions, as commenters proposed.

343.    Finally, although the Converse County Project will have substantial impacts on the greater sage-grouse due to the large expanse of habitat and number of active leks within the Project area, the FEIS failed to consider an alternative that is more protective for sage-grouse and other wildlife. Specifically, BLM did not consider imposing more protective measures such as reductions on Project-related vehicle traffic in important habitat areas; concentration of wells and other surface infrastructure to reduce surface disturbance; noise limitations and mitigation measures; siting of new surface disturbance outside priority habitats; breeding and nesting season restrictions on noise and other disturbances; or compensatory mitigation.

### H.    Partial Summary Judgment Decision and Injunction

344.    On September 13, 2024, the Court issued a memorandum opinion and order in this case partially granting Plaintiffs' motion for summary judgment and denying Defendants' and Intervenors' cross motions for summary judgment. Specifically, the Court found that the Converse County FEIS violated NEPA due to a faulty specific storage value that compromised BLM's analysis of groundwater impacts. ECF 130. The Court did not address Plaintiffs' remaining summary judgment arguments, including other problems with BLM's groundwater analysis, which remain pending and ripe for a decision.

345.    After finding the FEIS and ROD unlawful on this ground, the Court then enjoined "further APD approvals based on the Project EIS until the court rules on remedy." *Id.* at 17; *see also* ECF 131.  It then ordered additional briefing to address whether it "should vacate the Project approval pending remand." ECF 130 at 17; *see also* ECF 131.

346.    To comply with this Court's injunction, BLM did not issue any APDs in the Converse County Project Area for nearly a year, until August 6, 2025.

I.    **Supplemental Groundwater EA, FONNSI, and DR**

347.    On April 29, 2025, BLM unilaterally proceeded with trying to correct the specific storage value error identified by the Court by issuing a technical groundwater drawdown model white paper ("Groundwater White Paper"). The Groundwater White Paper purported to correct the error found by the Court by re-running BLM's groundwater model using three different specific storage values the authors said were supported by the scientific literature.

348.    Plaintiffs submitted comments on the Groundwater White Paper to express concerns that BLM's groundwater drawdown analysis continued to rely on other flawed assumptions previously identified by Plaintiffs. Given their continued concerns about the validity of BLM's groundwater analysis, Plaintiffs urged BLM to evaluate and adopt reasonable mitigation measures to protect groundwater. Additionally, they "request[ed] an opportunity to review and comment on" any subsequent NEPA document, "as the White Paper itself provides only a cursory description of the model results without an analysis or description of the resulting environmental impacts."

349.    On June 6, 2025, BLM issued a Final Supplemental Environmental Assessment ("Groundwater EA"), Finding of No New Significant Impact ("Groundwater FONNSI"), and Decision Record ("Groundwater DR"), asserting that the Groundwater White Paper found no significant impacts from Project groundwater drawdowns analyzed and approved in the FEIS and ROD.

350.    The Groundwater EA was never subject to public comment.

351.    The Groundwater EA only updated BLM's prior groundwater analysis to account for the single NEPA violation—faulty specific storage value—identified by the Court's partial summary judgment ruling.

352.    The Groundwater DR states that it "affirm[s] the previous decision in the Record of Decision for the Converse County Oil and Gas Project" and "incorporates by reference the Final [EIS] for the Converse County Oil and Gas Project and the supplemental EA."

**J.    August–October 2025 APD Approvals**

353.    On August 7, 2025, BLM again began approving APDs in the Converse County Project area. It approved a total of 283 APDs in the Project area from that date through October 22, 2025.

354.    Of these, Plaintiffs herein challenge 22 unique decisions ("APD Decisions") approving 255 of these APDs, as identified in Appendix A below.

355.    Instead of relying on the 2020 FEIS and ROD to satisfy its NEPA obligations for these APDs, BLM approved them using piecemeal NEPA documents including two new multi-operator EAs and roughly 20 Categorical Exclusions (CXs).

356.    The first EA, DOI-BLM-WY-P060-2025-0108-EA, is entitled "Casper Field Office Oil and Gas Multi-operator [Off-Lease] Environmental Assessment 2025." This "Off-Lease EA" states that it analyzes the effects of approving 212 APDs involving Fee/Fee/Fed wells (wells on non-federal lands over non-federal minerals that drill horizontally for federal minerals) on 44 multi-well pads. This EA tiers to and incorporates by reference the 2007 FEIS for the Casper Field Office Resource Management Plan ("Casper RMP FEIS").

357.    The Off-Lease EA cites to and relies on the analysis and conclusions of the 2025 Groundwater White Paper.

358.    On August 27, 2025, BLM issued a FONSI and Decision Record (DR) concluding that the APDs evaluated in the Off-Lease EA would not significantly affect the quality of the human environment. The DR states that it "approves multiple operators' applications for permit

to drill (APD) up to 212 horizontal oil and gas wells from 44 proposed and existing multi-well pads, utilizing access roads and associated infrastructure, on fee surface over off-lease Federal minerals."

359.    On information and belief, that Off-Lease EA, FONSI, and DR were used to approve 134 of the APDs listed in Appendix A below.

360.    The second EA, DOI-BLM-WY-P060-2025-0120-EA, is entitled "Casper Field Office Oil and Gas Multi-Operator On-Lease Environmental Assessment 2025." This "On-Lease EA" states that it analyzes the effects of approving 58 APDs on 26 unique well pads (14 new and 12 existing), along with their associated infrastructure. All of those APDs are "on-lease," meaning they do not involve a Fee/Fee/Fed scenario. This On-Lease EA tiers to and incorporates by reference the 2007 Casper RMP FEIS.

361.    The On-Lease EA cites to and relies on the analysis and conclusions of the 2025 Groundwater White Paper.

362.    On September 26, 2025, BLM issued a FONSI and Decision Record for the On-Lease EA concluding that the approved APDs would not significantly affect the quality of the human environment and the environmental effects would not exceed those described in the 2007 Casper RMP FEIS. The DR states that it "approves multiple operator's applications for permit to drill (APD) 58 horizontal oil and gas wells from both 26 proposed and existing multi-well pads, utilizing access roads and associated infrastructure, on Federal and fee surface over on-lease Federal minerals."

363.    On information and belief, BLM used this On-Lease EA, FONSI, and DR to approve 61 of the APDs listed in Appendix A.

364.    Both these muti-operator Off-Lease and On-Lease EAs contain only a generic and

cursory analysis of possible impacts without the hard look NEPA demands, including at impacts to groundwater, wildlife, air quality, scenic values, traffic, noise, dark night skies, and recreation.

365.    BLM also omitted any analysis of the cumulative impacts of these APDs when combined with other oil and gas development in the Project Area.

366.    Neither EA considered any alternatives to the proposed actions to mitigate their environmental impacts.

367.    In each EA and FONSI, BLM also arbitrary and capriciously determined that the effects did not rise to the level of significance, so as to trigger an EIS.

368.    BLM also issued another 20 final decisions approving 60 additional APDs with NEPA "categorical exclusions." Specifically, BLM relied on two of the categorical exclusions specific to oil and gas development activities that were adopted under Section 390 of the Energy Policy Act of 2005. *See* 42 U.S.C. § 15942.

369.    BLM issued 4 APD Decisions approving a total of roughly 21 APDs in reliance on Categorical Exclusion 2, which applies to "[d]rilling an oil or gas well at a location or well pad site at which drilling has occurred previously within 5 years prior to the date of spudding the well." *Id.* § 15942(b)(3).

370.    BLM also issued 16 decisions encompassing a total of 39 APDs in reliance on Categorical Exclusion 3, which applies to "[d]rilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity, so long as such plan or document was approved within 5 years prior to the date of spudding the well." *Id.* § 15942(b)(3). These decisions pointed to the multi-operator EAs noted above as the relevant prior "document prepared pursuant to NEPA" that analyzed such drilling.

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 79

371.    BLM issued an additional decision encompassing two APDs in reliance on an unknown Categorical Exclusion.

372.    None of the aforementioned NEPA documents analyzes the cumulative effects of these 283 recently-approved wells, much less other past, present, and reasonably foreseeable oil and gas development in the same region.

373.    These piecemeal NEPA documents also improperly segment BLM's NEPA analysis of oil and gas development in the Converse County Project area. An agency cannot engage in piecemeal NEPA reviews "of projects that are 'connected, contemporaneous, closely related, and interdependent,' when the entire project at issue is subject to federal review." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 50, (D.C. Cir. 2015); *see also Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ("when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together.").

374.    The APD Decisions will also result in foreseeable significant impacts, particularly when added to other past, present, and reasonably foreseeable oil and gas development in the Converse County Project area, yet BLM failed to prepare an EIS to evaluate their significance.

375.    For most of the APD Decisions approved with a NEPA Categorical Exclusion, BLM's invocation of Categorical Exclusions 2 or 3 was improper. For example, BLM improperly relied on Categorical Exclusion 2 on the basis that a workover rig, not "drilling," occurred at that location within the prior five years. BLM improperly relied on Categorical Exclusion 3 using prior NEPA documents that did not cover the same activity being proposed in the APD (i.e., "such drilling"). Finally, BLM improperly relied on Categorical Exclusions 2 and 3 to approve the drilling of multiple wells or projects involving more than mere "drilling," such

as construction of well pads, roads, or pipelines. As a result, BLM's failure to prepare an EA or EIS for these wells violated NEPA.

376.    Over 70 percent of the APDs approved in the APD Decisions involve Fee/Fee/Fed wells. For these, BLM excluded any mandatory surface use mitigation measures based on the erroneous legal position staked out in PIM 2018-014 that it lacks authority over surface operations for Fee/Fee/Fed wells.

377.    The APD Decisions also violate various sage-grouse protections in the Casper RMP. For example, BLM approved the APDs without attaching requisite Required Design Features (such as clustering of surface disturbances) or demonstrating that one of the exemption criteria was satisfied.

378.    BLM did not offer a public comment period on any of these APD Decisions.

379.    At least three wells approved in the APD Decisions are already being drilled.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of NEPA—Failure to Take a Hard Look at Project Impacts and Alternatives
### (FEIS, ROD, RMP Amendment)

380.    Plaintiffs incorporate by reference all preceding paragraphs.

381.    This first claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, in authorizing and issuing Converse County FEIS and ROD and Casper RMP Amendment. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

382.    Pursuant to NEPA, BLM must take a hard look at the reasonably foreseeable environmental consequences of a proposed action. 42 U.S.C. §§ 4332(C)(i)-(v). In doing so, it must "make use of reliable data" and "ensure the professional integrity, including scientific

integrity, of the discussion and analysis in an environmental document." *Id.* § 4332(D)–(E).

383.    Agencies must also evaluate "a reasonable range of alternatives" to their proposed action. 42 U.S.C. § 4332(C)(iii); *see also id.* § 4332(F)–(H).

384.    BLM violated these NEPA requirements when evaluating and approving the Final Actions, including but not limited to the following violations:

a.  failing to undertake site-specific environmental analysis;

b.  failing to study or disclose how the prevalence of Fee/Fee/Fed wells impacts the efficacy of the proffered mitigation in reducing the environmental effects of the Project, given that the Project will consist predominantly of "Fee/Fee/Fed" wells for which BLM states it will not impose any surface mitigation measures;

c.  relying on demonstrably inaccurate inputs in its groundwater modelling as to the Project's water consumption and aquifer characteristics to substantially underestimate the Project's impacts on groundwater drawdowns, as the U.S. EPA and Wyoming State Engineer's Office noted in comments;

d.  presenting a misleading and incomplete air quality analysis, including by relying on outdated background concentrations for PM10 and PM2.5; disregarding the extent of non-project PSD increment consumption in analyzing PSD exceedances; and by failing to account for ambient concentrations of hazardous air pollutants;

e.  underestimating the Project's cumulative impacts on a variety of resources by relying on demonstrably low and outdated projections of non-project oil and gas activity in this region when more recent data was readily available;

f.  failing to quantify the cumulative greenhouse gas emissions and climate change impacts of this Project when combined with other future actions; and

g.  eliminating from consideration reasonable alternatives proposed by commenting parties, such as an alternative to reduce the Project's air emissions; an alternative that would consolidate wells onto 16-well pads; an alternative that would be more protective for sensitive wildlife, such as sage-grouse and migratory birds;

h.  failing to supplement its environmental impact statement after obtaining significant new information bearing on the environmental impacts of the Converse County Project, including as to the quantity of water consumption and scale of non-project oil and gas development.

385.  For the foregoing reasons, the Converse County FEIS and ROD and Casper RMP Amendment are arbitrary, capricious, and not in accordance with NEPA and implementing regulations, and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
### Violations of FLPMA—Failure to Prevent Unnecessary or Undue Degradation to Raptors and their Habitat (ROD and RMP Amendment)

386.  Plaintiffs incorporate by reference all preceding paragraphs.

387.  This second claim for relief challenges Defendants' violations of their FLPMA duty to "take any action necessary to prevent unnecessary or undue degradation of the lands," 43 U.S.C. § 1732(b) in approving the Converse County ROD and RMP Amendment.

388.  BLM has adopted regulations interpreting the term "unnecessary or undue degradation" in the context of other programs. Those regulations generally define "unnecessary or undue degradation" to include: (1) impacts greater than those that would result from customary practice or (2) activities that exceed standards of other federal or state law. *See* 43 C.F.R. §§ 2800.0-5(x), 3715-5, 3802.0-5(l), 3809.5.

389.  Courts and the Interior Board of Land Appeals have applied these definitions to

the oil and gas context. *See, e.g.*, *Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66, 76-78 (D.C. Cir. 2011) (unnecessary or undue degradation means "something more than the usual effects anticipated from appropriately mitigated development."); *Colorado Env't Coalition*, 165 IBLA 221, 229 (2005) (unnecessary or undue degradation requires a showing "that a lessee's operations are or were conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology").

390.    In approving the Casper RMP Amendment and Converse County ROD, and BLM allowed unnecessary and undue degradation to public lands by granting this Project alone special relief from the raptor Timing Limitation Stipulation and refusing to adopt the Migratory Bird Conservation Strategy developed by USFWS, thereby allowing impacts greater than would customarily result from prudent oil and gas operations and risking incidental take of migratory birds in violation of the Migratory Bird Treaty Act (MBTA).

391.    BLM's failure to take action necessary to prevent unnecessary or undue degradation from the Converse County Project, in these and other ways, was arbitrary and capricious agency action, an abuse of discretion, and contrary to law, and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
### Violations of the MLA, FLPMA, APA, and Implementing Regulations—
### Failure to Mitigate Project Air Emissions
### (ROD and APD Decisions)

392.    Plaintiffs incorporate by reference all preceding paragraphs.

393.    This third claim for relief is brought pursuant to the APA and other applicable laws, including FLPMA and the MLA, for Defendants' failure to mitigate greenhouse gas and other air pollutant emissions when approving the Converse County ROD and APD Decisions.

394.    As noted above, the Converse County Project is expected to result in exceedances of several NAAQS, prompting the EPA, NPS and others to request that BLM adopt various air quality mitigation measures, including engine standards, reduced flaring, dust abatement, truck traffic restrictions, specially-surfaced roads, and centralized production facilities.

395.    Defendants refused to adopt these measures based on the erroneous claim that BLM "does not have authority to require application of [air quality] mitigation measures."

396.    However, as explained in greater detail above, various federal laws authorize and require BLM to impose air emissions controls, as confirmed by a long history of BLM decisions subjecting oil and gas projects to these same or similar air quality mitigation measures.

397.    BLM's decision not to require air quality mitigation measures for the Converse County Project ROD and the APD Decisions was thus based on a legal error and reflected an unexplained departure from longstanding agency practice, rendering the ROD and APD Decisions arbitrary and capricious.

398.    BLM's failure to require air emissions controls sufficient to avoid NAAQs exceedances in the ROD and the APD Decisions also violated its substantive mandates under the MLA, FLPMA, their implementing regulations, and the Casper RMP to ensure that its land-use authorizations do not result in violations of air quality standards or "unnecessary or undue degradation." *See* 43 U.S.C. §§ 1732(b), 1701(a)(8), 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).

399.    Accordingly, pursuant to the APA, Plaintiffs request that the Court hold unlawful and set aside the ROD and APD Decisions as arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A). Plaintiffs also request that the Court declare, pursuant to the APA and Declaratory Judgement Act, 28 U.S.C. § 2201 *et seq*, that BLM has authority under the MLA and FLPMA to condition its approval of oil and gas development activities on the developer's

agreement to air quality mitigation measures.

## FOURTH CLAIM FOR RELIEF
### Violations of FLPMA—Noncompliance with RMP Requirements
### for the Protection of Greater Sage-Grouse
### (APD Decisions)

400.    Plaintiff incorporates by reference all preceding paragraphs.

401.    This fourth claim for relief challenges Defendants' violations of their FLPMA

duty to ensure the APD Decisions are consistent with the governing RMP. *See* 43 U.S.C. §

1732(a); 43 C.F.R. § 1610.5-3(a).

402.    The APD Decisions are subject to BLM's Casper RMP, as amended by the 2015

Wyoming Greater-Sage-Grouse RMP Amendments.

403.    The APD Decisions do not comply with the requirements of the Casper RMP for

protection of greater sage-grouse, including but not limited to Required Design Features.

404.    The APD Decisions were thus arbitrary, capricious, an abuse of discretion, and

not in accordance with FLPMA and its regulations, and must be held unlawful and set aside

pursuant to the APA, 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF
### Violations of the MLA, FLPMA, APA, and Implementing Regulations—
### Failure to Regulate Surface Operations on Fee/Fee/Fed Wells
### (APD Decisions approving Fee/Fee/Fed wells)

405.    Plaintiffs incorporate by reference all preceding paragraphs.

406.    This fifth claim for relief is brought pursuant to the MLA, FLPMA, and APA

against the APD Decisions approving Fee/Fee/Fed APDs listed in Appendix A.

407.    The APA requires courts to "hold unlawful and set aside" final agency action that

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A).

408.    The APD Decisions constitute final agency actions subject to judicial review under the APA.

409.    The APD Decisions approving Fee/Fee/Fed wells rested on a legal error: the erroneous view that BLM lacks authority to regulate the surface operations associated with Fee/Fee/Fed wells. Accordingly, these APD Decisions are arbitrary, capricious, and otherwise not in accordance with the MLA, MLAAL, FLPMA, their implementing regulations, and other laws governing public lands and minerals.

410.    BLM's approval of these Fee/Fee/Fed APDs without any surface use restrictions or mitigation also violated BLM's responsibilities under the MLA and FLPMA to oversee the extraction of federal minerals and to avoid "unnecessary or undue" degradation. *See* 30 U.S.C. § 226(g); 43 U.S.C. §§ 1702(e), 1732(b), 1732(b).

411.    Accordingly, Plaintiffs request that the Court hold unlawful and set aside the APD Decisions approving Fee/Fee/Fed APDs as arbitrary, capricious, and not in accordance with law, 5 U.S.C. § 706(2)(A), and declare that DOI and BLM have legal authority under the MLA, FLPMA, and other general statutory delegations to regulate the surface operations associated with Fee/Fee/Fed wells, pursuant to the APA and Declaratory Judgement Act, 28 U.S.C. § 2201 *et seq*.

### SIXTH CLAIM FOR RELIEF
### Violations of NEPA and APA—Improper Segmentation
### (APD Decisions)

412.    Plaintiffs incorporate by reference all preceding paragraphs.

413.    This sixth claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the APA, 5 U.S.C. § 706, in issuing the APD Decisions. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

414.    The APD Decisions constitute final agency actions subject to judicial review under the APA.

415.    When determining the scope of an environmental review under NEPA, an agency must consider connected, cumulative, and similar actions together. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("When several proposals for . . . actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together."). Agencies cannot segment the scope of their actions into smaller component parts in order to avoid a finding of significance and evade the full environmental impact study NEPA demands.

416.    The APD Decisions themselves—and other past, present, and foreseeable future APD approvals in Converse County, including but not limited to the Converse County Project— constitute connected, cumulative, and/or similar actions. BLM's environmental reviews of the APD Decisions were improperly segmented from one another, and from other past, present, and foreseeable future APD approvals in Converse County.

417.    BLM's decision to evaluate the APD Decisions through piecemeal NEPA documents rather than a comprehensive EIS was arbitrary and capricious, particularly given that BLM determined in 2020 that the Converse County Project and other ongoing Converse County oil and gas development should be studied in a comprehensive EIS. In approving the APD Decisions without any comprehensive analysis in an EIS, BLM arbitrarily and capriciously changed course without any reasoned explanation.

418.    For the foregoing reasons, the APD Decisions are arbitrary, capricious, and not in accordance with NEPA, the APA, or their implementing regulations, and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

## SEVENTH CLAIM FOR RELIEF
### Violations of NEPA and APA—Inadequate EAs
### (APD Decisions)

419.     Plaintiffs incorporate by reference all preceding paragraphs.

420.     This seventh claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the APA, 5 U.S.C. § 706, in its APD Decisions approving APDs 1 to 134 and their supporting Off-Lease and On-Lease EAs, DOI-BLM-WY-P060-2025-0108-EA and DOI-BLM-WY-P060-2025-0120-EA. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

421.     The APD Decisions constitute final agency actions subject to judicial review under the APA.

422.     The Off-Lease and On-Lease EAs used to approve these APD Decisions fail to satisfy NEPA because each provided only a cursory analysis, failing to take a hard look at the direct, indirect and cumulative impacts to key resources, such as greater sage-grouse, migratory birds, other wildlife species, groundwater, air quality, noise, recreation, transportation, and visual resources.

423.     The Off-Lease and On-Lease EAs also failed to evaluate any alternatives to their proposed actions that would avoid or mitigate their environmental impacts, violating BLM's NEPA duty to "study, develop, and describe technically and economically feasible alternatives" to their proposed actions. 42 U.S.C. § 4332(F); *see also id.* § 4332(H) (agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.").

424.     The Off-Lease and On-Lease EAs also improperly relied on the programmatic

EIS prepared for the 2007 Casper RMP, without "reevaluat[ing]" that analysis "and any underlying assumption to ensure reliance on the analysis remains valid," as required by NEPA. 42 U.S.C. § 4336b(2).

425.    For the foregoing reasons, the APD Decisions approving APDs 1 to 134 and their supporting Off-Lease and On-Lease EAs were each arbitrary, capricious, and not in accordance with NEPA, the APA, or their implementing regulations, and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

**EIGHTH CLAIM FOR RELIEF**
**Violations of NEPA and APA – Failure to Prepare an EIS**
**(APD Decisions)**

426.    Plaintiffs incorporate by reference all preceding paragraphs.

427.    This eight claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the APA, 5 U.S.C. § 706, in approving the APD Decisions. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

428.    The APD Decisions constitute final agency actions subject to judicial review under the APA.

429.    NEPA requires federal agencies to prepare an EIS on any proposal for any major federal action "that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. §§ 4336(b)(1); 4332(C).

430.    Cumulative effects must be considered when determining significance under NEPA.

431.    The APD Decisions will result in foreseeable significant environmental impacts, particularly when added to other past, present, and reasonably foreseeable development in the Converse County Project area.

432.    BLM did not prepare an EIS to evaluate any of the APD Decisions.

433.    This is an unexplained departure from BLM's own prior decision to prepare an EIS to evaluate the impacts of the Converse County Project, in light of the significant impacts to the environment.

434.    BLM's failure to prepare an EIS to evaluate the environmental impacts of each of the APD Decisions violated NEPA. *Id.* U.S.C. §§ 4332(C), 4336(b)(1). BLM's APD decisions were therefore arbitrary, capricious, not in accordance with law, and not in accordance with the procedures required by law, and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A), (D).

**NINTH CLAIM FOR RELIEF**
**Violations of NEPA—Improper Use of Categorical Exclusions**
**(APD Decisions)**

435.    Plaintiffs incorporate by reference all preceding paragraphs.

436.    This ninth claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the Energy Policy Act of 2005, 42 U.S.C. § 15492, in the APD Decisions approving APDs 196 to 255 with Categorical Exclusions, as listed in Appendix A. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

437.    The APD Decisions constitute final agency actions subject to judicial review under the APA.

438.    In approving APDs 196 to 255, BLM failed to prepare an EA or EIS as required by NEPA. Instead, BLM incorrectly claimed that these projects were categorically excluded from NEPA analysis.

439.    Specifically, BLM unlawfully relied on Energy Policy Act Categorical Exclusions 2 and 3 to approve the drilling of multiple wells, even though these Categorical Exclusions are

limited to drilling a single "well."

440.    BLM also unlawfully used Categorical Exclusions 2 and 3 to approve activity

other than drilling, including construction of well pads, roads, and pipelines.

441.    BLM also unlawfully applied Categorical Exclusion 3 using prior NEPA

documents that did not cover the same activity being proposed in the APD (i.e., "such drilling").

442.    BLM also unlawfully relied on Categorical Exclusion 2 on the basis that a

workover rig, as opposed to actual "drilling," occurred at that location within the prior five years.

443.    For the foregoing reasons, BLM's application of a categorical exclusion to the

APD Decisions approving APDs 196 to 255 was arbitrary, capricious, and not in accordance

with NEPA, the Energy Policy Act of 2005, or the APA. Consequently, the decisions approving

these APDs must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

**TENTH CLAIM FOR RELIEF**
**Violations of NEPA and FLPMA Public Participation Requirements**
**(APD Decisions)**

444.    Plaintiffs incorporate by reference all preceding paragraphs.

445.    This tenth claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§

4321 *et seq.*, FLPMA, 43 U.S.C. § 1739(e), and the APA, 5 U.S.C. § 706, in approving the APD

Decisions. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C.

§ 706.

446.    The APD Decisions constitute final agency actions subject to judicial review

under the APA.

447.    FLPMA Section 309(e) requires BLM to provide for public participation in public

lands management decisions. 43 U.S.C. § 1739(e). It requires that: "In exercising his authorities

under this Act, the Secretary [of Interior] shall establish procedures, including public hearings

where appropriate, to give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands." *Id.* (emphasis added).

448.    FLPMA defines "public involvement" as "the opportunity for participation by affected citizens in rule making, decision making, and planning with respect to the public lands, including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures as may be necessary to provide public comment in a particular instance." 43 U.S.C. § 1702(d).

449.    Public notice and comment is separately required under NEPA.

450.    BLM did not offer a public comment period on any of the APD Decisions.

451.    The only information made publicly available online about such APDs before they were approved was the well name and number, operator name, location, surface owner, target lease, and date the APD was received/posted or reposted, if applicable.

452.    None of the APDs listed in Appendix A, including their surface use plans of operation and drilling plans, were posted online for public review.

453.    BLM did not circulate its proposed or final NEPA analysis or proposed APD decisions to the public or Plaintiffs before approving the APDs.

454.    BLM's ePlanning page has never contained a copy of the actual APDs for public review.

455.    As of October 1, 2025, or for some portion of time since October 1, 2025, the APDs were not available for public inspection at the Casper Field Office.

456.    BLM did not notify Plaintiffs of its proposed or final decisions approving the

APDs.

457.    BLMs failure to offer any pre-decisional opportunity for public participation for the APD Decisions was arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA, NEPA and the APA. Consequently, the APD Decisions must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

## ELEVENTH CLAIM FOR RELIEF
### Violation of NEPA and Implementing Regulations
### (Groundwater EA, FONNSI, and DR)

458.    Plaintiffs incorporate by reference all preceding paragraphs.

459.    This eleventh claim for relief challenges BLM's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, in issuing the Groundwater EA, FONNSI, and DR. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

460.    The Groundwater EA, FONNSI, and DR constitute final agency actions subject to judicial review under the APA.

461.    The Groundwater EA and FONNSI contain a fundamentally flawed analysis of the project's impacts on groundwater resources, including by improperly labeling the relevant aquifers as "unconfined" in the groundwater model; assuming unrealistically low pumping rates for new and existing wells based on outdated data; failing to account for half of Project water consumption; making improper assumptions about use of recycled and surface water; and using outdated data on existing groundwater wells. As a result, the Groundwater EA and FONNSI improperly downplay the significance of possible groundwater impacts, including to existing water wells and groundwater-dependent ecosystems.

462.    The Groundwater DR was issued in reliance on the Groundwater EA and FONNSI.

463.    The Groundwater DR also "incorporates by reference" the Converse County Project FEIS, which did not comply with NEPA for the reasons stated in the First Claim for Relief Above.

464.    The Groundwater DR's reliance on that flawed FEIS and Groundwater EA and FONNSI was arbitrary, capricious, and abuse of discretion, and not in accordance with NEPA, the APA, or their implementing regulations, and the Groundwater EA, FONNSI, and DR must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

## TWELFTH CLAIM FOR RELIEF
### Violations of FLPMA, MLA, APA, and Implementing Regulations
### (Groundwater DR)

465.    Plaintiffs incorporate by reference all preceding paragraphs.

466.    This twelfth claim for relief challenges BLM's violations of FLPMA, the MLA, and the APA in issuing the Groundwater DR. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

467.    The Groundwater DR constitutes a final agency action subject to judicial review under the APA.

468.    As alleged in the Second Claim for Relief above, the Converse County ROD and Casper RMP Amendment failed to consider or adhere to BLM's FLPMA duty to "take any action necessary to prevent unnecessary or undue degradation of the lands," 43 U.S.C. § 1732(b), in granting the Converse County Project special relief from the raptor Timing Limitation Stipulation.

469.    As alleged in the Third Claim for Relief above, the Converse County ROD is arbitrary, capricious, and contrary to the MLA, FLPMA and their implementing regulation by resting on the erroneous claim that BLM "does not have authority to require application of [air

quality] mitigation measures."

470.    In purporting to affirm the ROD, the Groundwater DR was also arbitrary, capricious, an abuse of discretion, and contrary to the APA, FLPMA, MLA, and their implementing regulations for these same reasons, and must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A).

**THIRTEENTH CLAIM FOR RELIEF**
**Violation of FLPMA and Implementing Regulations**
**(Groundwater DR)**

471.    Plaintiffs incorporate by reference all preceding paragraphs.

472.    This thirteenth claim for relief challenges BLM's violations of FLPMA, 43 U.S.C. §§ 1701 et seq., and implementing regulations, 43 C.F.R. Part 1600, in issuing the Groundwater DR. This claim is brought pursuant to the judicial review provisions of the APA. 5 U.S.C. § 706.

473.    The Groundwater DR constitutes a final agency action subject to judicial review under the APA.

474.    BLM's Todd Yeager signed the Groundwater DR while exercising "the Delegated Authority of [BLM's] High Plains District Manager."

475.    The Groundwater DR purported to "affirm the previous decision in the Record of Decision for the Converse County Oil and Gas Project."

476.    The Converse County Oil and Gas Project ROD approved an amendment to the Casper RMP.

477.    A decision to approve an RMP amendment and its associated environmental impact statement may not be made by a BLM district manager.

478.    FLPMA implementing regulations specify that an RMP amendment and

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 96

associated environmental impact statement must be approved by the BLM State Director. *See* 43 C.F.R. § 1601.0-4 (providing that the State Director "must approve" any RMP amendment and related EISs); § 1610.5-1 ("the State Director shall approve the plan [or amendment]"); § 1610.5-5 (requiring state director "approval" of RMP amendment); § 1610.5-2(b).

479.    FLPMA itself also provides that "*The Secretary* [of Interior] shall . . . develop, maintain, and, when appropriate, revise land use plans[.]" 43 U.S.C. § 1712(a) (emphasis added).

480.    Todd Yeager, exercising the authority of the BLM District Manager, therefore lacked authority to issue the Groundwater DR as it purported to approve an RMP amendment.

481.    Accordingly, the Groundwater DR must be held unlawful and set aside pursuant to the APA as arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA and FLPMA implementing regulations. 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

(1)    Declare that Defendants violated the NEPA, FLPMA, MLA, and the APA, and/or their implementing regulations in approving the Converse County Project FEIS and ROD; 2020 Casper RMP Amendment; Groundwater EA, FONNSI, and DR; and/or the APD Decisions listed in Appendix A and their supporting NEPA documents;

(2)    Reverse and set aside the Converse County Project FEIS and ROD; 2020 Casper RMP Amendment; Groundwater EA, FONNSI, and DR; and/or the APD Decisions listed in Appendix A and their supporting NEPA documents;

(3)    Declare that DOI and BLM have legal authority under the MLA, FLPMA, and other statutes to regulate the surface operations associated with Fee/Fee/Fed wells;

(4)    Declare that DOI and BLM have legal authority under the MLA and FLPMA to

impose air quality controls on projects extracting federal oil and gas;

(5)     Enjoin DOI and BLM from authorizing any further oil and gas well development or drilling in the Converse County Project Area until BLM complies with the relevant statutes;

(6)     Enter such other injunctive relief as Plaintiffs may pray for hereafter;

(7)     Award Plaintiffs' costs incurred in pursuing this action, including reasonable attorney's fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and

(8)     Grant such other and further relief as the Court deems just and proper.


Dated: November 5, 2025                   Respectfully submitted.

                                          /s/ Sarah K. Stellberg
                                          Sarah Stellberg (ID Bar # 10538)*
                                          Hannah A. Goldblatt (OR Bar # 205324)*
                                          Todd C. Tucci (D.C. Bar # ID0001)
                                          *admitted pro hac vice
                                          ADVOCATES FOR THE WEST
                                          P.O. Box 1612
                                          Boise, ID 83702
                                          (208) 342-7024
                                          sstellberg@advocateswest.org
                                          hgoldblatt@advocateswest.org
                                          ttucci@advocateswest.org

                                          *Attorneys for Plaintiffs*

## APPENDIX A

| Unique APD ID | Well Name | Well Number | Operator |
|---|---|---|---|
| — APD Decision DOI-BLM-WY-P060-2025-0108-EA (August 27, 2025) ||||
| 1 | ACE FED | 3673-3625 2NH | Continental Resources Inc. |
| 2 | ACE FED | 3673-3625 3NH | Continental Resources Inc. |
| 3 | GORLOCK FED | 3573-0113 3H | Continental Resources Inc. |
| 4 | ATLAS | 444 3-34H | Impact Exploration and Prod. LLC |
| 5 | BOOMER FED | 3571-28-16-2 MH | Anschutz Exploration Corp. |
| 6 | BOOMER FED | 3571-28-33-15 MH | Anschutz Exploration Corp. |
| 7 | BOOMER FED | 3571-28-16-3 MH | Anschutz Exploration Corp. |
| 8 | BOOMER FED | 3571-28-16-4 MH | Anschutz Exploration Corp. |
| 9 | BRUCE MOUNTAIN | 3874-7-6-1NH | WRC Energy LLC |
| 10 | BRUCE MOUNTAIN | 3874-7-6-1FH | WRC Energy LLC |
| 11 | BRUCE MOUNTAIN | 3874-7-6-2NH | WRC Energy LLC |
| 12 | BRUCE MOUNTAIN | 3874-7-6-3NH | WRC Energy LLC |
| 13 | BRUSHY CREEK FED | 3773-0113 1SXH | Continental Resources Inc. |
| 14 | CAPTAIN FED | 3671-20-32-14 MH | Anschutz Exploration Corp. |
| 15 | CAPTAIN FED | 3671-20-32-16 MH | Anschutz Exploration Corp. |
| 16 | CAPTAIN FED | 3671-20-32-15 MH | Anschutz Exploration Corp. |
| 17 | CAPTAIN FED | 3671-20-32-13 MH | Anschutz Exploration Corp. |
| 18 | CARAMEL FED | 3672-2133 1NH | Continental Resources Inc. |
| 19 | CARAMEL FED | 3672-2133 2NH | Continental Resources Inc. |
| 20 | CDU ASHBY FED | 01-133870-1XNH | Devon Energy Production Co. |
| 21 | CDU ASHBY FED | 01-133870-2XNH | Devon Energy Production Co. |
| 22 | CDU ASHBY FED | 02-143870-3XNH | Devon Energy Production Co. |
| 23 | CDU ASHBY FED | 02-143870-4XNH | Devon Energy Production Co. |
| 24 | CENTAUR | 334 7-6H | Impact Exploration and Prod. LLC |
| 25 | CLEO FED | 3672-24-1-15 MH | Anschutz Exploration Corp. |
| 26 | CLEO FED | 3672-24-1-16 MH | Anschutz Exploration Corp. |

| 27 | CLEO FED | 3672-24-31-13 MH | Anschutz Exploration Corp. |
|----|----------|-------------------|----------------------------|
| 28 | CLEO FED | 3672-24-1-14 MH | Anschutz Exploration Corp. |
| 29 | CLEVELAND | 3668-3403-1TH | Rockies Resources Holdings LLC |
| 30 | MERRITT | 3668-3403-1TH | Rockies Resources Holdings LLC |
| 31 | CORVUS | 306 9-4H | Impact Exploration and Prod. LLC |
| 32 | CORVUS | 409 9-4H | Impact Exploration and Prod. LLC |
| 33 | CORVUS | 506 9-4H | Impact Exploration and Prod. LLC |
| 34 | KRATOS | 547 8-5H | Impact Exploration and Prod. LLC |
| 35 | KRATOS | 430 8-5H | Impact Exploration and Prod. LLC |
| 36 | KRATOS | 519 8-5H | Impact Exploration and Prod. LLC |
| 37 | KRATOS | 534 8-5H | Impact Exploration and Prod. LLC |
| 38 | PLUME | 3568-0409-1TH | Rockies Resources Holdings LLC |
| 39 | SILVER | 3568-0409-1TH | Rockies Resources Holdings LLC |
| 40 | CRAZY WOMEN CANYON | 3875-17-8-1NH | WRC Energy LLC |
| 41 | DULLKNIFE RESERVOIR | 3875-5-8-1NH | WRC Energy LLC |
| 42 | DICKAU FED | 3468-5-T3H | Anadarko E&P Onshore LLC |
| 43 | DICKAU FED | 3468-6-T1H | Anadarko E&P Onshore LLC |
| 44 | DICKAU FED | 3468-19-T2H | Anadarko E&P Onshore LLC |
| 45 | DUGONG FED | 3472-0214 3NH | Continental Resources Inc. |
| 46 | DUGONG FED | 3472-0214 1NH | Continental Resources Inc. |
| 47 | DUGONG FED | 3472-0214 2NH | Continental Resources Inc. |
| 48 | FAY EDISON FED | 3468-22-T4H | Anadarko E&P Onshore LLC |
| 49 | FAY EDISON FED | 3468-3-T3H | Anadarko E&P Onshore LLC |
| 50 | GELATO FED | 3572-1931 1H | Continental Resources Inc. |
| 51 | GELATO FED | 3572-1931 1NH | Continental Resources Inc. |
| 52 | GELATO FED | 3572-1931 3H | Continental Resources Inc. |
| 53 | GELATO FED | 3572-1931 3NH | Continental Resources Inc. |
| 54 | GELATO FED | 3572-1931 2NH | Continental Resources Inc. |
| 55 | HAZELTON PEAK | 3874-29-32-2NH | WRC Energy LLC |
| 56 | HOOSIER FED | 3572-1708 2NH | Continental Resources Inc. |

| 57 | HOOSIER FED | 3572-1708 3NH | Continental Resources Inc. |
| 58 | ROCKY ROAD FED | 3572-2032 3NH | Continental Resources Inc. |
| 59 | IBERLIN FED | 02-113668-1XNH | Devon Energy Production Co. |
| 60 | IBERLIN FED | 02-113668-2XNH | Devon Energy Production Co. |
| 61 | IBERLIN FED | 02-113668-3XNH | Devon Energy Production Co. |
| 62 | IBERLIN FED | 02-113668-4XNH | Devon Energy Production Co. |
| 63 | SHU IBERLIN FED | 35-233768-1XNH | Devon Energy Production Co. |
| 64 | SHU IBERLIN FED | 35-233768-3XNH | Devon Energy Production Co. |
| 65 | SHU IBERLIN FED | 35-233768-5XNH | Devon Energy Production Co. |
| 66 | LESLIE FED | 3670-2-T3H | Anadarko E&P Onshore LLC |
| 67 | LESLIE FED | 3670-26-T4H | Anadarko E&P Onshore LLC |
| 68 | LESLIE FED | 3670-3-T1H | Anadarko E&P Onshore LLC |
| 69 | LESLIE FED | 3670-27-T2H | Anadarko E&P Onshore LLC |
| 70 | LOKI FED | 3571-23-35-15 MH | Anschutz Exploration Corp. |
| 71 | LOKI FED | 3571-23-35-16 MH | Anschutz Exploration Corp. |
| 72 | MARY IVA FED | 3670-17-T3H | Anadarko E&P Onshore LLC |
| 73 | MARY IVA FED | 3670-17-TP5H | Anadarko E&P Onshore LLC |
| 74 | MARY IVA FED | 3670-17-TP7H | Anadarko E&P Onshore LLC |
| 75 | MARY IVA FED | 3670-18-T1H | Anadarko E&P Onshore LLC |
| 76 | MARY IVA FED | 3670-18-TP1H | Anadarko E&P Onshore LLC |
| 77 | MARY IVA FED | 3670-31-T2H | Anadarko E&P Onshore LLC |
| 78 | MARY IVA FED | 3670-31-TP2H | Anadarko E&P Onshore LLC |
| 79 | MARY IVA FED | 3670-32-T4H | Anadarko E&P Onshore LLC |
| 80 | MARY IVA FED | 3670-32-TP6H | Anadarko E&P Onshore LLC |
| 81 | MARY IVA FED | 3670-32-TP8H | Anadarko E&P Onshore LLC |
| 82 | MARY IVA FED | 3670-18-TP3H | Anadarko E&P Onshore LLC |
| 83 | MARY IVA FED | 3670-31-TP4H | Anadarko E&P Onshore LLC |
| 84 | POWDER RIVER PASS | 3875-26-35-1NH | WRC Energy LLC |
| 85 | MEATLOAF FED | 3571-27-34-14 MH | Anschutz Exploration Corp. |
| 86 | MEATLOAF FED | 3571-27-34-15 MH | Anschutz Exploration Corp. |
| 87 | MEATLOAF FED | 3571-27-34-16 MH | Anschutz Exploration Corp. |

[PROPOSED] SECOND AMENDED AND SUPPLEMENTAL COMPLAINT - 101

| 88 | MOKI FED | 3672-24-1-15 MH | Anschutz Exploration Corp. |
| 89 | PDU TILLARD FED | 04-093772-1XMH | Devon Energy Production Co. |
| 90 | PHOENIX | 334 36-25H | Impact Exploration and Prod. LLC |
| 91 | PHOENIX | 347 36-25H | Impact Exploration and Prod. LLC |
| 92 | PHOENIX | 547 36-25H | Impact Exploration and Prod. LLC |
| 93 | PHOENIX | 534 36-25H | Impact Exploration and Prod. LLC |
| 94 | RAGS FED | 3671-12-24-14 MH | Anschutz Exploration Corp. |
| 95 | RAGS FED | 3671-12-24-14E NH | Anschutz Exploration Corp. |
| 96 | REX FED | 3571-21-33-15 MH | Anschutz Exploration Corp. |
| 97 | REX FED | 3571-21-33-16 MH | Anschutz Exploration Corp. |
| 98 | ROCKY ROAD FED | 3572-2032 1NH | Continental Resources Inc. |
| 99 | ROCKY ROAD FED | 3572-2032 2NH | Continental Resources Inc. |
| 100 | ROON FED | 3671-12-24-15 MH | Anschutz Exploration Corp. |
| 101 | ROON FED | 3671-12-24-15E NH | Anschutz Exploration Corp. |
| 102 | ROON FED | 3671-12-1-1 MH | Anschutz Exploration Corp. |
| 103 | ROON FED | 3671-12-1-1 PH | Anschutz Exploration Corp. |
| 104 | ROON FED | 3671-12-1-1 SXH | Anschutz Exploration Corp. |
| 105 | ROON FED | 3671-12-1-2 MH | Anschutz Exploration Corp. |
| 106 | ROON FED | 3671-12-1-4 MH | Anschutz Exploration Corp. |
| 107 | ROON FED | 3671-12-24-13 MH | Anschutz Exploration Corp. |
| 108 | ROON FED | 3671-12-24-16 MH | Anschutz Exploration Corp. |
| 109 | ROON FED | 3671-12-24-16 PH | Anschutz Exploration Corp. |
| 110 | ROON FED | 3671-12-24-16 SXH | Anschutz Exploration Corp. |
| 111 | ROON FED | 3671-12-24-16E NH | Anschutz Exploration Corp. |
| 112 | ROON FED | 3671-12-24-13W NH | Anschutz Exploration Corp. |
| 113 | ROPER FED | 3671-15-3-1 SXH | Anschutz Exploration Corp. |
| 114 | SANTANA FED | 3571-27-34-13E NBH | Anschutz Exploration Corp. |
| 115 | SANTANA FED | 3571-27-34-14 MH | Anschutz Exploration Corp. |
| 116 | SANTANA FED | 3571-27-34-14E NBH | Anschutz Exploration Corp. |
| 117 | SANTANA FED | 3571-27-34-15 PH | Anschutz Exploration Corp. |

| 118 | SANTANA FED | 3571-27-15-3 MH | Anschutz Exploration Corp. |
| 119 | SANTANA FED | 3571-27-15-3 PH | Anschutz Exploration Corp. |
| 120 | SANTANA FED | 3571-27-33-16W NBH | Anschutz Exploration Corp. |
| 121 | SANTANA FED | 3571-27-34-13 MH | Anschutz Exploration Corp. |
| 122 | SANTANA FED | 3571-27-34-15 MH | Anschutz Exploration Corp. |
| 123 | SDU TILLARD FED | 23-143771-1XNH | Devon Energy Production Co. |
| 124 | SDU TILLARD FED | 23-143771-3XNH | Devon Energy Production Co. |
| 125 | SDU TILLARD FED | 26-353771-1XNH | Devon Energy Production Co. |
| 126 | SOLDIER PARK | 3875 3-10-1NH | WRC Energy LLC |
| 127 | VIKING FED | 3571-26-35-16 MH | Anschutz Exploration Corp. |
| 128 | WILLOW CREEK FED | 3569-23-T4H | Anadarko E&P Onshore LLC |
| 129 | WILLOW CREEK FED | 3569-2-T3H | Anadarko E&P Onshore LLC |
| 130 | WILLOW CREEK FED | 3569-3-T1H | Anadarko E&P Onshore LLC |
| 131 | WILLOW CREEK FED | 3569-22-T2H | Anadarko E&P Onshore LLC |
| 132 | PDU WJ RANCH FED | 14-233772-5XNH | Devon Energy Production Co. |
| 133 | PDU WJ RANCH FED | 14-233772-1XNH | Devon Energy Production Co. |
| 134 | PDU WJ RANCH FED | 14-233772-3XNH | Devon Energy Production Co. |
| **APD Decision DOI-BLM-WY-P060-2025-0120-EA (September 26, 2025)** | | | |
| 135 | ABBEY FED | 3671-33-28-1 MH | Anschutz Exploration Corp. |
| 136 | BILLINGS | 23NXH | 1876 Resources LLC |
| 137 | BILLINGS | 21NXH | 1876 Resources LLC |
| 138 | BILLINGS | 22NXH | 1876 Resources LLC |
| 139 | BILLINGS | 24NXH | 1876 Resources LLC |
| 140 | DILLON | 23NXH | 1876 Resources LLC |
| 141 | DILLON | 24NXH | 1876 Resources LLC |
| 142 | BROAD ARROW FED | 3569-27-T1H | Anadarko E&P Onshore LLC |
| 143 | BROAD ARROW FED | 3569-26-T3H | Anadarko E&P Onshore LLC |
| 144 | BATTLE PARK | 3875-13-24-2NH | WRC Energy LLC |
| 145 | LEO | 534 18-19H | Impact Exploration and Prod. LLC |
| 146 | CENTAUR | 506 7-6H | Impact Exploration and Prod. LLC |

| 147 | CENTAUR | 519 7-6H | Impact Exploration and Prod. LLC |
|-----|---------|----------|----------------------------------|
| 148 | CENTAUR | 547 7-6H | Impact Exploration and Prod. LLC |
| 149 | CHARLES G FED | 3669-21-T4H | Anadarko E&P Onshore LLC |
| 150 | CHARLES G FED | 3669-4-T3H | Anadarko E&P Onshore LLC |
| 151 | CHARLES G FED | 3669-29-T2H | Anadarko E&P Onshore LLC |
| 152 | CHARLES G FED | 3669-5-T1H | Anadarko E&P Onshore LLC |
| 153 | CORVUS | 213 9-4H | Impact Exploration and Prod. LLC |
| 154 | DENVER FED | 3671-18-6-3 MH | Anschutz Exploration Corp. |
| 155 | DENVER FED | 3671-18-6-3 SXH | Anschutz Exploration Corp. |
| 156 | DENVER FED | 3671-18-6-4 MH | Anschutz Exploration Corp. |
| 157 | DENVER FED | 3671-18-6-4E NH | Anschutz Exploration Corp. |
| 158 | DENVER FED | 3671-7-6-3W NH | Anschutz Exploration Corp. |
| 159 | DENVER FED | 3671-7-6-4W NH | Anschutz Exploration Corp. |
| 160 | EH FED UNIVERSE E | 3569-1-T1H | Anadarko E&P Onshore LLC |
| 161 | INOT | 1-22-15PH | Peak Powder River Res. LLC |
| 162 | INOT | 2-22-15PH | Peak Powder River Res. LLC |
| 163 | INOT | 3-22-15PH | Peak Powder River Res. LLC |
| 164 | INOT | 3-21-28PH | Peak Powder River Res. LLC |
| 165 | INOT | 1-21-28PH | Peak Powder River Res. LLC |
| 166 | INOT | 2-21-28PH | Peak Powder River Res. LLC |
| 167 | JAKE JOHNSON FED | 3670-5-P5H | Anadarko E&P Onshore LLC |
| 168 | JAKE JOHNSON FED | 3670-5-TP5H | Anadarko E&P Onshore LLC |
| 169 | JAKE JOHNSON FED | 3670-5-TP7H | Anadarko E&P Onshore LLC |
| 170 | JAKE JOHNSON FED | 3670-6-P1H | Anadarko E&P Onshore LLC |
| 171 | JAKE JOHNSON FED | 3670-6-TP1H | Anadarko E&P Onshore LLC |
| 172 | JAKE JOHNSON FED | 3670-6-TP3H | Anadarko E&P Onshore LLC |
| 173 | JAKE JOHNSON FED | 3670-5-P7H | Anadarko E&P Onshore LLC |
| 174 | JAKE JOHNSON FED | 3670-6-P3H | Anadarko E&P Onshore LLC |
| 175 | LIBRA | 06-101P | EOG Resources Inc. |
| 176 | MOKI FED | 3672-24-1-13 MH | Anschutz Exploration Corp. |
| 177 | MOKI FED | 3672-24-1-14 MH | Anschutz Exploration Corp. |

| 178 | RAGS FED | 3671-12-1-3 MH | Anschutz Exploration Corp. |
|---|---|---|---|
| 179 | ROPER FED | 3671-15-22-15E NH | Anschutz Exploration Corp. |
| 180 | ROPER FED | 3671-15-22-16E NH | Anschutz Exploration Corp. |
| 181 | RUBY FED | 3467-1705 1NH | Continental Resources Inc. |
| 182 | RUBY FED | 3467-1705 2NH | Continental Resources Inc. |
| 183 | SPURS FED | 3574-0113 1NH | Continental Resources Inc. |
| 184 | SPURS FED | 3574-0113 2NH | Continental Resources Inc. |
| 185 | SPURS FED | 3574-0113 3NH | Continental Resources Inc. |
| 186 | TITAN | 347 26-35H | Impact Exploration and Prod, LLC |
| 187 | TITAN | 547 26-35H | Impact Exploration and Prod. LLC |
| 188 | TODFISH FED | 3469-3502 1NH | Continental Resources Inc. |
| 189 | TODFISH FED | 3469-3502 2NH | Continental Resources Inc. |
| 190 | TODFISH FED | 3469-3502 3MH | Continental Resources Inc. |
| 191 | TODFISH FED | 3469-3502 3NH | Continental Resources Inc. |
| 192 | TUESDAY DRAW | 3874-26-35-1FH | WRC Energy LLC |
| 193 | TUESDAY DRAW | 3874-14-23-1SH | WRC Energy LLC |
| 194 | VIKING FED | 3571-26-35-13 MH | Anschutz Exploration Corp. |
| 195 | VIKING FED | 3571-26-35-14 MH | Anschutz Exploration Corp. |
| **APD Decision DOI-BLM-WY-P060-2025-0041-CX (August 7, 2025)** | | | |
| 196 | CDU SEEBAUM FED | 22-273870-3XNH | Devon Energy Production Co. |
| 197 | CDU SEEBAUM FED | 22-343870-1XNH | Devon Energy Production Co. |
| 198 | CDU SEEBAUM FED | 22-343870-2XNH | Devon Energy Production Co. |
| **APD Decision DOI-BLM-WY-P060-2025-0051-CX (August 7, 2025)** | | | |
| 199 | CWDU STODDARD FED | 11-023871-1XNH | Devon Energy Production Co. |
| 200 | CWDU STODDARD FED | 11-023871-2XTH | Devon Energy Production Co. |
| 201 | CWDU STODDARD FED | 11-023871-3XNH | Devon Energy Production Co. |
| 202 | CWDU STODDARD FED | 11-023871-4XTH | Devon Energy Production Co. |
| 203 | CWDU STODDARD FED | 11-023871-5XNH | Devon Energy Production Co. |

| APD Decision DOI-BLM-WY-P060-2025-0069-CX (August 7, 2025) | | | |
|---|---|---|---|
| 204 | BOB FED | 3671-11-2-3 MH | Anschutz Exploration Corp. |
| 205 | BOB FED | 3671-11-2-3 PH | Anschutz Exploration Corp. |
| 206 | BOB FED | 3671-11-23-13 PH | Anschutz Exploration Corp. |
| 207 | BOB FED | 3671-11-23-13 SXH | Anschutz Exploration Corp. |
| 208 | BOB FED | 3671-11-23-13W NH | Anschutz Exploration Corp. |
| 209 | BOB FED | 3671-11-2-3 SXH | Anschutz Exploration Corp. |
| 210 | BOB FED | 3671-11-2-4 MH | Anschutz Exploration Corp. |
| 211 | BOB FED | 3671-11-23-14W NH | Anschutz Exploration Corp. |
| 212 | BOB FED | 3671-11-23-13 MH | Anschutz Exploration Corp. |
| APD Decision DOI-BLM-WY-P060-2025-0070-CX (August 7, 2025) | | | |
| 213 | BUCKY FED | 3671-11-23-13E NH | Anschutz Exploration Corp. |
| 214 | BUCKY FED | 3671-11-23-14E NH | Anschutz Exploration Corp. |
| 215 | BUCKY FED | 3671-11-23-16E NH | Anschutz Exploration Corp. |
| 216 | BUCKY FED | 3671-11-23-15 PH | Anschutz Exploration Corp. |
| APD Decision DOI-BLM-WY-P060-2025-0115-CX (September 12, 2025) | | | |
| 217 | DENNIS L FED | 3670-1-T1H | Anadarko E&P Onshore LLC |
| 218 | DENNIS L FED | 3669-30-T4H | Anadarko E&P Onshore LLC |
| 219 | DENNIS L FED | 3669-6-T3H | Anadarko E&P Onshore LLC |
| 220 | DENNIS L FED | 3670-25-T2H | Anadarko E&P Onshore LLC |
| APD Decision DOI-BLM-WY-P060-2025-0116-CX (September 12, 2025) | | | |
| 221 | SOUTHERN CROSS FED | 3569-29-T1H | Anadarko E&P Onshore LLC |
| 222 | SOUTHERN CROSS FED | 3569-28-T3H | Anadarko E&P Onshore LLC |

| APD Decision DOI-BLM-WY-P060-2025-0117-CX (September 12, 2025) | | | |
|---|---|---|---|
| 223 | GLACIER | 3510-01H | EOG Resources Inc. |
| 224 | GLACIER | 3511-02H | EOG Resources Inc. |
| 225 | GLACIER | 3511-03H | EOG Resources Inc. |
| 226 | GLACIER | 3511-04H | EOG Resources Inc. |
| 227 | GLACIER | 3511-05H | EOG Resources Inc. |
| APD Decision DOI-BLM-WY-P060-2025-0118-CX (September 19, 2025) | | | |
| 228 | CARAMEL FED | 3672-2133 3NH | Continental Resources Inc. |
| 229 | ROYAL FED | 3672-1604 2NH | Continental Resources Inc. |
| 230 | ROYAL FED | 3672-1604 3NH | Continental Resources Inc. |
| APD Decision DOI-BLM-WY-P060-2025-0122-CX (October 2, 2025) | | | |
| 231 | JOHN PEANUT | 1213 34-73 N-CH | Bright Rock Energy LLC |
| 232 | JOHN PEANUT | 1213 34-73 N-DH | Bright Rock Energy LLC |
| 233 | NOTCH | 2425 34-73 N-CH | Bright Rock Energy LLC |
| 234 | NOTCH | 2425 34-73 N-DH | Bright Rock Energy LLC |
| APD Decision DOI-BLM-WY-P060-2026-0004-CX (October 2, 2025) | | | |
| 235 | GOLDEN GOPHER FED | 3573-0214 1NH | Continental Resources Inc. |
| 236 | GOLDEN GOPHER FED | 3573-0214 2NH | Continental Resources Inc. |
| 237 | SHOCKER FED | 3673-3526 1MH | Continental Resources Inc. |
| 238 | SHOCKER FED | 3673-3526 2MH | Continental Resources Inc. |
| APD Decision DOI-BLM-WY-P060-2026-0006-CX (October 2, 2025) | | | |
| 239 | GOLDEN GOPHER FED | 3573-0214 3NH | Continental Resources Inc. |
| 240 | SHOCKER FED | 3673-3526 3MH | Continental Resources Inc. |
| APD Decision DOI-BLM-WY-P060-2026-0008-CX (October 3, 2025) | | | |
| 241 | MEADOWLARK LAKE | 3875-23-14-1NH | WRC Energy LLC |
| APD Decision DOI-BLM-WY-P060-2026-0009-CX (October 3, 2025) | | | |
| 242 | KRATOS | 213 8-5H | Impact Exploration and Prod. LLC |
| 243 | KRATOS | 506 8-5H | Impact Exploration and Prod. LLC |

| | | | |
|---|---|---|---|
| **APD Decision DOI-BLM-WY-P060-2026-0012-CX (October 15, 2025)** | | | |
| 244 | JUNO | 444 15-22H | Impact Exploration and Prod. LLC |
| **APD Decision DOI-BLM-WY-P060-2026-0013-CX (October 15, 2025)** | | | |
| 245 | CORVUS | 519 9-4H | Impact Exploration and Prod. LLC |
| 246 | CORVUS | 534 9-4H | Impact Exploration and Prod. LLC |
| **APD Decision DOI-BLM-WY-P060-2026-0014-CX (October 17, 2025)** | | | |
| 247 | TITAN | 326 26-2H | Impact Exploration and Prod. LLC |
| **APD Decision DOI-BLM-WY-P060-2026-0015-CX (October 17, 2025)** | | | |
| 248 | CORVUS | 444 9-4H | Impact Exploration and Prod. LLC |
| 249 | CORVUS | 547 9-4H | Impact Exploration and Prod. LLC |
| **APD Decision DOI-BLM-WY-P060-2026-0016-CX (October 17, 2025)** | | | |
| 250 | TAURUS | 326 32-29H | Impact Exploration and Prod. LLC |
| 251 | TAURUS | 519 32-29H | Impact Exploration and Prod. LLC |
| **APD Decision DOI-BLM-WY-P060-2026-0017-CX (October 22, 2025)** | | | |
| 252 | CRAZY | 3568-0508-1TH | Rockies Resources Holdings LLC |
| 253 | GOULD | 3568-0508-1TH | Rockies Resources Holdings LLC |
| 254 | LONESOME | 3568-0508-1TH | Rockies Resources Holdings LLC |
| **APD Decision DOI-BLM-WY-P060-2026-0018-CX (October 22, 2025)** | | | |
| 255 | TRIXIE FEDERAL | 3205 34-73 N-DH | Bright Rock Energy LLC |